# Libraries: A Misunderstood American Value

*By June Pinnell-Stephens*

## PUBLIC—AND PROFESSIONAL—MISCONCEPTIONS PROMPT A CLARIFICATION OF LIBRARIES' ROLE IN PROTECTING INTELLECTUAL FREEDOM

Every challenge to a book, video, or magazine in a library inevitably raises the question, "Why? What is there about this item that causes someone to request formally that it be denied to everyone in the community?" On its surface, the complaint frequently cites profane language, religious beliefs, or sex and is motivated by a desire to protect minors from objectionable content. The underlying reason, however, often rests on misconceptions about the role of a library in a democracy.



### Faulty Perceptions:

- Librarians endorse the content of their collections.

- "Everyone" agrees on controversial material.

- Representation of all viewpoints means equal numbers.

- Denial of reconsideration requests shows that librarians don't take challenges seriously.

### The perception

Those of us who have dealt with challenges will recognize these or similar comments:

➤ "Libraries should have only good books on their shelves."

➤ "Everyone agrees this video is trash."

➤ "The library only has one book expressing my viewpoint and four that oppose it; therefore, the library is biased."

➤ "The library won't listen to my complaint."

➤ "Why can my children check out an R-rated video from the library when they can't see the same film in a theater?"

All these comments represent faulty assumptions that reflect a combination of human nature and basic misunderstandings about libraries. For example, people believe that we endorse the content of the material in our collections because we only buy "good books." If we're fulfilling our obligation to our communities, however, we're buying titles that present differing viewpoints on as many issues as possible, so we can't logically endorse all of them. The definition of "good" depends, of course, on the reader's beliefs, and users who find something offensive may feel betrayed by a librarian they assumed to hold those same beliefs.

People feel most comfortable associating with others who share their beliefs and values. When users claim that "everyone agrees," they're talking about only those people in the community they know. However, it doesn't take long behind a reference desk to understand just how diverse our communities really are. We have an obligation to represent all members of the community, not just those whose views represent a large group, or even a majority.

While librarians strive to provide collections that represent diverse viewpoints, people may misunderstand the definition of "represent," particularly if they assume it means an equal number of items for different sides of an issue. Often an equal number of titles simply hasn't been published, or perhaps the opposing viewpoint was distributed only as a flyer at the county fair. In some extreme cases, the publisher or producer may refuse to sell to any agency of government, including libraries. Access to the Internet has greatly increased our ability to provide material not available through more traditional means; but even with this access, representation may not necessarily mean equal numbers of items espousing opposing views.

The reconsideration procedure is another area that can cause confusion. If users re-

**JUNE PINNELL-STEPHENS**, *collection services manager at the Fairbanks (Alaska) North Star Borough Public Library, chaired the ALA committee that developed the Libraries: An American Value statement.*

274

Copyright © 1999. All rights reserved.

Dockets.Justia.com

peatedly see their requests to remove material denied, they think we're not taking those requests seriously and discount the entire process. People assume that if we don't agree with them, we're acting on our personal beliefs rather than objectively considering the needs of the entire community, and applying a procedure adopted by the library board.

Judging by the number of complaints dealing with material available to children, the biggest problems occur when parents don't understand our role in serving children. First, they assume that our collections won't include books they find offensive; or, if they do, that we will make the same decisions about what their children are allowed to check out that they would. They also don't understand that the library, as an agency of government, has to follow different rules about restricting access to information than a private business.

> *Our best ally is an educated public lobbying on our behalf.*

### The law

These situations raise the complex legal issues that underlie library policies and procedures, and it's not only our users who don't understand them. Reactions from colleagues to draft versions of *Libraries: An American Value*, a statement developed by an ALA committee to reaffirm our commitment to intellectual freedom (see insert, following p. 80), included several suggestions to remove the phrase "We defend the constitutional rights of all individuals" because the Constitution doesn't mention libraries. However, the Constitution, both as written and as interpreted in court decisions, is where we must begin when we explain our policies to users, because the First Amendment is the legal basis of intellectual freedom in libraries.

The First Amendment states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." That statement appears to be absolute: "Congress shall make no law...." However, there are certain types of speech, determined through Supreme Court decisions, that are not protected by the First Amendment. Those categories are speech that: presents a clear and present danger, such as yelling "Fire" in a crowded theater, where the government does not have an opportunity to intervene and prevent harm; endangers national security, such as revealing troop movements in time of war; defames another person; or is obscene.

Of these categories, obscenity is the least understood. Many people confuse obscenity, which is not protected by the First Amendment, and pornography, which is; and although pornography is "in the eye of the beholder," only a court of law can determine if something is obscene. It wasn't until *Miller v. California* in 1973, involving a California mail-order business dealing in sexual materials, that the courts developed the test they would apply when making that determination. In view of the perception that our policies promote access to obscenity on the Internet, we all need to understand how the courts define it.

The test consists of three parts:

1. The average person (not the most prudish, extreme, or devout, or the youngest), applying contemporary community standards (not some mid-50's sitcom version of a Chamber of Commerce ideal), must find that the work, taken as a whole (not just an offensive bit), appeals to prurient interests (denoting an unhealthy interest in sex, a distinction that implies there is also a healthy interest in sex);

2. It depicts or describes, in a patently offensive way, sexual conduct as defined by state law (the government needs to provide, in advance, notice of content that will not be allowed); and

3. The work, taken as a whole (again, not just an offensive bit), lacks serious literary, artistic, political, or scientific value.

Perhaps the most important word in this test is *and;* all three parts must apply. "Community standards," often cited by people who want to prevent access to sexually explicit material, appears only in the first part of the test; determination of redeeming value is made using a national standard. While it's important to understand the test, it's also critical to understand that librarians do not have the authority to make the determination of obscenity or to enforce the law prohibiting it.

Corollary rights that have developed through court decisions also affect how the First Amendment applies to libraries. The first is the right to receive speech, because, as the court reasoned, the right to speak is meaningless without the right to be heard. This corollary right was extended in the *Kreimer v. Morristown* case (*AL*, May 1992, p. 351–52), in which a homeless man sued the public library for ejecting him, to include some level of use of a public library, the place established by government as the "quintessential locus for the receipt of information."

Another part of the First Amendment, the right "to petition the Government for a redress of grievances," directly affects libraries. This clause is the basis for our reconsideration procedures, and it should guide both the process itself and the attitude we bring to this process.

In addition to the First Amendment rights, the Fifth Amendment guarantees that "No person shall...be deprived of life, liberty, or property, without due process of law," and the 14th Amendment guarantees that "No State shall... 275

Copyright © 1999. All rights reserved.

deny to any person within its jurisdiction the equal protection of the laws." Both clauses directly affect our policies and procedures. Every rule we make governing use of the library and its resources must be applied equally to all users, and there must be a fair and adequate means of notice and appeal. While both private enterprises and public institutions must protect a user's rights to due process and equal protection, the private sector does not have our mandate to protect the right to free expression, since the First Amendment deals only with what the government can or cannot do.

Finally, if violation of a constitutional right is at issue, the courts will use the "highest level of scrutiny" when assessing the case. As a result, we must prove a compelling interest in taking any action that may infringe someone's rights, and the action we take must be the least restrictive way possible to address that interest. Clearly, we must keep these legal mandates in mind when developing and explaining our procedures and policies.

### The stakes

Veterans of challenges over the years know that community members tend to fall into one of three groups during censorship incidents: those who will never be our supporters, those who will always be our supporters, and those who are watching the other two camps. It is this last group we need to target and educate, particularly in view of recent sensationalized media coverage of Internet access in the library. Although the credibility of this coverage began to falter when people became more familiar with the Internet and recognized its value as well as its problems, the attacks generated ill-considered legislation such as the Communications Decency Act that we have had to fight in expensive lawsuits. Our best ally in fighting future attempts to block access to all types of library resources is an educated public lobbying on our behalf.

It's easy to see how these misconceptions lead to problems, but correcting them will require an extended dialogue. The issues at stake are complex, and we can't explain them in just a sound bite. However, unless the public clearly understands them, these issues will continue to foster misunderstanding and erode the community's confidence in the library. We hope that *Libraries: An American Value* can help begin this dialogue. ❖

*The issues at stake are complex, and we can't explain them in just a sound bite.*

---

## PUBLISHING GRANT FOR LIBRARIANS

### THE WOMEN'S NATIONAL BOOK ASSOCIATION/ANN HEIDBREDER EASTMAN GRANT

is available for librarians interested in learning about the relationship between the library and publishing professions.

The WNBA offers a grant of up to $750 for a librarian to take a course or participate in an institute devoted to aspects of publishing as a profession or to provide reimbursement for such study completed within the past year.

#### ELIGIBILITY

Librarians holding an MLS or its equivalent and having at least two years of post master's work experience in a library may apply. The primary qualification will be the likelihood of career benefit to the person taking the course.

#### DEADLINE
September 30, 1999

#### FOR MORE INFORMATION
Guidelines are available at
www.ala.org/work/pubs/eastman.html
or
Contact the Grant Administrator
American Library Association
50 East Huron Street
Chicago, IL 60611
Fax: 312/944-8741
ecotton@ala.org

276

Copyright © 1999. All rights reserved.

**From:** June Pinnell-Stephens [jpstlib@451north.net]
**Sent:** Thursday, February 15, 2007 8:09 AM
**To:** 'Waidner, Mary'
**Subject:** RE: A Request from Oklahoma

Hi, Maralee –

I'm so pleased that Alicia enjoyed the program and thought they'd be helpful.

Although I don't have my comments in a file (they were pretty much extemporaneous from a broad outline, my usual speaking method), I'd be delighted to write my thoughts on the subject. I'm afraid it will have to wait until I'm back from a conference next week where I'll be giving a program. After that commitment is completed, I'll devote some time to this response.

Thank you for asking, and I'll get back to you as soon as I can.

June


June Pinnell-Stephens
3140 Roden Lane
Fairbanks, AK 99709
907-479-5826


"It's not true that life is one damn thing after another - it's one damn thing over and over." – Edna St. Vincent Millay

---

> **From:** Waidner, Mary [mailto:mwaidne@tulsalibrary.org]
> **Sent:** Wednesday, February 14, 2007 10:00 AM
> **To:** jpstlib@451north.net
> **Subject:** A Request from Oklahoma
>
> To: June Pinnell-Stephens
>
> Dear June:
> My name is Maralee Waidner and I am a Collection Development Specialist at the Tulsa City-County Library System. Yesterday, at a meeting with the personnel at our African American Resource Center, your name came up in connection to a talk you presented at a conference of librarians of color. One of our librarians, Alicia Lattimer, attended your presentation and noted that you had focused on the subject at hand - the cultural reasons for us to provide some of the "urban" or "street lit" titles that are so often challenged - especially in a state like Oklahoma. Could you possibly send us a copy of your talk (if it is still in your computer)? Please don't go to any trouble but, if possible, we would really appreciate hearing your views on this subject. Alicia said it was a wonderful talk and she thinks it would be very helpful in our discussion.
>
> Thank you in advance for your help in this matter.
>
> Maralee Waidner
>
> *Collection Development Specialist*
> *Tulsa City-County Library*
> *400 Civic Center*
> *Tulsa, OK 74103*
> *(918) 596-1621*
> *mwaidne@tulsalibrary.org*

277

Several years ago, I heard Judith Krug of ALA's Office for Intellectual Freedom describe a presentation by Paula Johnson, a YA author.

Paula had spent her early years in the segregated South, where she was not allowed to enter the "whites only" library and where the "colored" library was anything but "equal."

Then her family moved North. She went to the local library and half expected someone to prevent her from entering. Not only was she allowed to enter, when she did, she saw books that reflected her face and her life. At that point she felt she belonged in this new community and was part of it.

I've never forgotten that incident, and I think it epitomizes our responsibility as collection development librarians to include material that reflects *every* face in the communities we serve. As homogenous as some of our communities may seem, there are always people of different race, ethnic background, religion, or orientation, and they deserve to find material that speaks to their lives, as well. In addition, providing material that reflects these segments of our communities allows those in the majority group to learn about the "other" people in their midst.

Often, however, these items are the focus of challenges, usually by the majority. Rather than trying to avoid confrontation by excluding material we anticipate *might* be controversial, we need to embrace challenges as an opportunity to educate our communities about the role of the library in a democracy.

Our responsibility is to provide material for *all* the people we serve; it is each user's responsibility to determine which of those items he or she finds appropriate. If we allow a vocal group, even a large majority group in our community, to prevent us from including a full spectrum of voices, we deny the constitutional basis of the library, which is derived from the 1st Amendment.

As one judge said, the library is the "quintessential locus for the receipt of information," which makes the use of a public library a corollary 1st Amendment right. That right protects the individual from the "tyranny of the majority," and it should inform our selection policies and practices.

I sympathize with those of you on what sometimes seems to be a battleground, since I've spent some time there myself, and you may not prevail in every instance. It's been my experience in responding to challenges that there are three groups (I think of them as rings) of people:

- In front are the folks who are in your face – they will never be your friends, and you won't convert them
- At the back are staunch library supporters – they will always be your friends, and you don't need to convert them
- In the middle are the majority of folks in your community – they can be educated about the role of the library, and they are your target audience.

In the end, our role is to serve each person in our communities by providing collections that reflect each individual's face and voice, particularly when those faces and voices fall outside the majority's preferred viewpoint. Realizing that goal may take time and may not be easy, but I think it's the most profound obligation of our profession.

278

# Collecting Contested Titles: The Experience of Five Small Public Libraries in the Rural Midwest, 1893–1956

*Wayne Wiegand*

This essay is an analysis of the history of how, when, and if five small public libraries in the rural Midwest acquired ten controversial books published between 1885 and 1951. My research is extracted from a database that records all titles obtained by these five libraries over an eighty-year period. It also incorporates analysis of when these titles appeared (or did not appear) in acquisitions guides like *Fiction Catalog* and *Standard Catalog for Public Libraries* and notes which of these guides were purchased by the five libraries. I conclude that the collections of each of these five libraries tended to reflect the cultural values systems of the local elites who ran them.

As of this writing, there are more public libraries in the United States than McDonald's restaurants, and as many children participate in public library–sponsored summer reading programs as in Little League baseball. Of the nine thousand urban and rural public library systems in the United States, over 80 percent reside in towns with populations less than twenty-five thousand.[1] Rare is the town of more than three thousand that does not boast a public library, an institution that is, in many respects, uniquely American and has become the model other capitalist societies with Western style democracies have sought to emulate. In the twentieth century alone thousands of small public libraries in rural America have made available and circulated billions of books to millions of citizens young and old, male and female, black, red, yellow, brown, and white. Yet historians–including library historians–know relatively little about this unique but ubiquitous American institution.

Cheryl Malone's invitation to contribute an essay to this special issue of *Libraries & Culture* came at a time when I was writing a book-length manuscript I've tentatively entitled "Main Street Public Library: A Community Institution in the Rural Heartland, 1865–1956." The study takes a focused analysis of five small public libraries in

*Libraries & Culture*, Vol. 40, No. 3, Summer 2005
©2005 by the University of Texas Press, P.O. Box 7819, Austin, TX 78713-7819

five rural midwestern communities: the Moore Public Library in Lexington, Michigan; the Morris Public Library in Morris, Illinois; the Rhinelander District Library in Rhinelander, Wisconsin; the Sage Public Library in Osage, Iowa; and the Bryant Library in Sauk Centre, Minnesota. Readers familiar with American literature will immediately recognize the last site; Sinclair Lewis was born and raised there, and many have argued that Sauk Centre is really the fictionalized town of Gopher Prairie he described in his best-selling and still frequently read *Main Street*; ergo, my title.[2] Three of my five small public libraries do, in fact, reside on Main Street. Chronologically, my research project covers their histories from the origins of each institution in the late nineteenth century through passage of the 1956 Library Services Act, the first federal legislation to provide grants to local public libraries through state library agencies in order to supplement their collections and services.

I am very pleased to be able to extract some of the data from that research to craft an essay that honors the contributions to library history of Don Davis and allows me to thank him for thirty years of friendship and (sometimes) collaboration in this small corner of the larger scholarly worlds of history and librarianship.[3] The field of library history has significantly improved since the mid-1970s; substantial credit for that improvement goes to Don for his high quality scholarship and bibliographical work and for his editorial accomplishments at *Libraries & Culture*. He's been a marvelous ambassador for our craft; I will sorely miss him. Enjoy retirement, dear friend, and best of luck to you, Avis, and your wonderful family.


Why these five communities? Why these five libraries? All had conventional but important sources of historical information like microfilmed local newspapers, census data, and city council and library board minutes, and all were within easy driving distance of Madison, Wisconsin (at the time I was on the faculty at the University of Wisconsin School of Library and Information Studies). Equally important, however, all had saved their accessions books, a rich and relatively untapped research resource. Some had also saved some circulation records, which identified who read what when.[4]

What's an accession book? In the 1880s a library supplies company called the Library Bureau developed this common form for systematically recording every book acquired by a library. By the 1890s most small American public libraries had begun using Library Bureau accessions books, and as each of my five small public libraries established itself, each began entering acquisition records in

accessions books they purchased from the Library Bureau. Because they did this so systematically, they automatically standardized bibliographic information, including title, author, publisher, place of publication, date acquired (and often when and why withdrawn), source of acquisition (e.g., purchased directly from the publisher or book distribution agency or obtained by donation), and often the broad Dewey Decimal number—those three digits to the left of the decimal that automatically classifies each title into broad groups by subject.

From my perspective the accessions books constituted a goldmine of information about book availability. Beginning in 1993 I had research assistants key this information into a relational database that when finished will allow me to compare and contrast collections over time by means of a variety of fields (including subject) and answer questions like: What information on African Americans was available to patrons of the Morris Public Library in the 1920s? How well were women represented in the fiction collections at the Rhinelander Public Library at the turn of the century? How much of the Moore Public Library came from New York publishers? What books were purchased—or not purchased—during periods of significant change (World War I, the Great Depression), and what does that tell us about the organizational behaviors and biases of this ubiquitous cultural institution?

For this essay honoring Don Davis, however, I selected ten titles, at least one published in every decade between the 1880s and 1950s. Most were controversial when published; some still are. When Mark Twain's *Adventures of Huckleberry Finn* was published in 1885 it was banned by a variety of public libraries, including the Concord, Massachusetts, Public Library, which labeled it as "trash and suitable only for the slums." This attitude had staying power; in 1905 *Huckleberry Finn* was removed from the children's room of the Brooklyn Public Library.[5]

For the 1890s I chose Kate Chopin's *The Awakening* (1899), a novel that dealt with a woman's spiritual, intellectual, and sexual "awakening." Many reviewers found it offensive, and the St. Louis Public Library and its branches immediately banned it from their shelves. To represent a title published in the first decade of the twentieth century I selected Theodore Dreiser's *Sister Carrie*, originally printed by Doubleday in 1900 but, shortly after the publisher's wife read an advance copy and objected to its contents, suppressed by the publisher immediately thereafter. Although a second edition published in 1907 received wider circulation, *Sister Carrie* was still banned in many places through the first half of the twentieth century.

In 1915 birth control advocate Margaret Sanger issued *Family Limitation*, a pamphlet the New York Society for the Suppression of Vice

immediately got a New York court to declare "contrary not only to the law of the state, but to the law of God." Sanger was subsequently jailed for writing it; her husband was jailed for distributing it. With all the attention this merited in the national press, it seems fair to assume selectors for my five small public libraries knew of its existence before 1920. When Sinclair Lewis published *Elmer Gantry* in 1927 the U.S. Post Office Department defended postmasters who banned it from the mails (in 1931, the Post Office Department even banned any catalog that listed the book), and libraries in Boston and Camden, New Jersey, refused to put it on their shelves.

I focus on two novels for the 1930s, one written by an African American woman, the other by a white man. Zora Neale Hurston's *Their Eyes Were Watching God* was not so much controversial in the American public library community as ignored. Published in 1937, it recounts the life of an African American woman who found contentment, triumphed over sexism and poverty, and married three times before finding a man as concerned with her happiness as his own. John Steinbeck's *The Grapes of Wrath*, on the other hand, was wildly popular but met opposition from public libraries across the country immediately after it was published. For example, the East St. Louis (Illinois) Public Library burned its copies because of the vulgar words it contained, and other public libraries in Missouri, Oklahoma, and California banned it from their shelves.

For the 1940s I focus on two novels, one written by an African American male, the second by a white female willing to tackle taboo subjects. Richard Wright's boyhood experience with public libraries is well documented. While growing up in Memphis he subverted Jim Crow laws by penning a note to the public librarian that read: "Dear Madam: Will you please let this nigger boy have some books by H. L. Mencken?" His novel *Native Son*, which was published in 1940 and addresses the problems of growing up in an urban ghetto, quickly became a Book-of-the-Month Club selection and in the early 1940s outsold even Steinbeck's *The Grapes of Wrath*, which had won the Pulitzer Prize for fiction in 1940. Lillian Smith's novel *Strange Fruit*, published in 1944, addressed interracial marriage, abortion, and lynching. That same year the U.S. Post Office Department seized six copies and refused to pass any more copies through the mails. *Strange Fruit* was also banned in Boston by the Board of Retail Book Merchants and the commissioner of police.

My final selection, representing the 1950s, is J. D. Salinger's *Catcher in the Rye*, a coming-of-age novel about an adolescent boy published in 1951 that has been a target of censors for more than half a century. For all that time public libraries across the country have had to

address questions of whether to acquire copies or whether to replace them when they regularly disappear. Thus, my sample consists of ten books published over a fifty-six-year period: six authored by men, four by women, two by African Americans.

To help determine which of the thousands of books annually made available by the publishing industry that they will put on their shelves and make available to their patrons, for most of the twentieth century librarians have used a series of tools. Many take the form of collection guides, and, in effect, titles cited in these guides to some extent carry the imprimatur of the nation's library leaders who compile them. Because I could search by author and title, my database was quickly able to identify which of my five small public libraries had purchased copies of these guides and when.

The first sizeable library collection guide was *Catalog of "A.L.A." Library*, a volume the U.S. Bureau of Education published for ALA through the Government Printing Office for an exhibit the association put together for the 1893 World's Columbian Exposition in Chicago. The volume listed 5,230 titles recommended for any small to medium-sized public library; that it included in this total only 809 works of fiction gives some indication of the relative value late-nineteenth-century librarians placed on the reading of fiction, which nonetheless constituted 65–75 percent of the circulation in most public libraries. To make its selections a committee of ALA members combed reviews of books to sample expert opinions in periodicals like the *Atlantic* and *Dial* and professional journals like *Political Science Quarterly* and the *American Historical Review*. Titles cited tended to be those works upon which these expert communities had reached consensus. Minutes of the Bryant Library board of trustees indicate Sauk Centre purchased a copy of the ALA catalog in 1893; Rhinelander acquired one shortly thereafter.

*Huckleberry Finn* did not make the 1893 catalog but did make the second edition published in 1904. ALA then published supplements in 1912 (Rhinelander purchased a copy that same year) and 1923, a third edition in 1926 (Morris and Bryant acquired copies at that time), and supplements again in 1933 (Morris purchased one), 1943, and 1952.[6] *Sister Carrie* made the 1926 edition; *The Grapes of Wrath* was cited in the 1943 supplement; *Strange Fruit* made the 1952 supplement.

The H. W. Wilson Company, since 1900 publishers of *Readers Guide to Periodical Literature* and other indexes serving the library profession, issued a number of collection guides during the twentieth century. Over time the Wilson Company evolved a policy that determined the pool of possibilities from which titles would be selected. To merit inclusion in one of its collection guides a book had to be

reviewed at least four times in the periodicals Wilson covered in all of the indexes it published if it was a work of fiction, at least two times if it was a work of nonfiction. Compilers then made their selections based upon review recommendations.

For this essay I looked at *English Prose Fiction*, a list of 800 titles Wilson published in 1908 (Rhinelander purchased a copy in 1909), and *Fiction Catalog*, a list of 350 novels the company issued a year later (none of my libraries purchased this one). In 1913 Wilson began issuing its Standard Catalog Series, a part of which covered fiction; supplements were issued in 1928 and 1931 (Morris bought all three the same years they were published). Then in 1934 the company published *Standard Catalog for Public Libraries* (Bryant purchased two copies, Morris one) and followed it with new editions in 1940, 1949 (Bryant purchased both editions the years they came out), and 1958. None included fiction. Instead, in 1941 Wilson began issuing *Fiction Catalog*, a list of 5,000 titles recommended for any small- to medium-sized public library, and starred 785 titles as recommended for "first purchase" and double starred 350 as especially important. New editions of *Fiction Catalog* followed in 1950 and 1960 (surprisingly, none of my libraries acquired copies of the 1941, 1950, and 1960 editions), by which time Wilson's bibliographic guides had begun issuing annual supplements to its standard collection guides, all of which ultimately served to supplant ALA catalogs, which then ceased publication.[7] Accessions books records indicate the Moore Library of Lexington and the Sage Library of Osage never purchased a copy of any of these guides through 1960.

*Huckleberry Finn* was cited in all of the *Fiction Catalog*s, beginning with 1908, and by the 1941 edition merited two stars, a ranking it held in the 1950 and 1960 editions. *Sister Carrie* made the 1913 and all subsequent editions. The 1941 and 1950 editions gave it a single star, the 1960 edition a double star. *Elmer Gantry* was cited in the 1941 edition, and although it was listed in the 1950 edition under *Main Street* as "other recommended titles" by Lewis, it was dropped altogether for the 1960 edition. The 1941, 1950, and 1960 editions of the *Fiction Catalog* all cited *Their Eyes Were Watching God*. Already in its 1941 edition *The Grapes of Wrath* merited a double star, a ranking it retained in the 1950 and 1960 editions. *Native Son* made the 1941 edition, then moved up to a single star in the 1950 edition, a double star in the 1960 edition. *Strange Fruit* got a single star in 1950, a double star in 1960. *Catcher in the Rye* merited a double star in the 1960 edition, the first time it was cited.

None of the ALA or Wilson guides listed Kate Chopin's *The Awakening*, although early editions of the *Fiction Catalog* did cite her *Bayou Folks*.

Margaret Sanger's *Family Limitation* made no list of recommended titles, although later editions of Wilson catalogs did cite her *Happiness in Marriage, My Fight for Birth Control,* and *What Every Boy and Girl Should Know.* ALA catalogs appear to have been more "careful" than Wilson catalogs. If my list of ten titles here is representative of a universe, it appears that editors of the former waited longer for consensus to emerge from expert communities. It also appears that editors of the latter placed greater trust in reviewers whose evaluations had appeared in periodicals Wilson routinely indexed.

Space limitations will not permit in-depth histories of all five of my small public libraries and their communities, but brief summaries of two might be helpful. Lexington, Michigan, is located 70 miles north of Detroit on the shores of Lake Erie. Incorporated as a village in 1855, it initially functioned as a port for shipping lumber to Detroit, Cleveland, and Chicago. Settlers of Anglo-Saxon stock came from Canada, New England, and the Middle Atlantic states. Shortly after arrival they established businesses (banks and shops) and professional offices (law, doctor, dentist), set up churches (Methodists in 1850, Roman Catholics in 1863, Congregationalists in 1878), and began establishing educational institutions (in 1892 a new brick elementary school replaced a series of temporary sites that had served the community for half a century), social associations (a Masonic Lodge in 1853, Knights Templar in 1878, and a women's club called the Atheneum in 1878), and cultural agencies, including the Cadillac House, a hotel built in 1860 that functioned as Lexington's cultural center and later opera house. Taken together this thick web of clubs, lodges, churches, and various civic organizations provided the sites in which most of the village's social, cultural, and financial business was conducted and out of which leaders crafted the community occasions and means for modeling the values they hoped all Lexingtonians would emulate.[8]

In 1870 community leaders formed the Lexington Library Association with a subscription of $150; the money was used to purchase books to which all members of the association had access. It lasted only two years. In 1900, however, lumber baron L. L. Wood gave the village 1,300 books, which his nieces—Mary, Ella, and Emma Moore—placed in the Atheneum Society rooms, which at the time were located over the Lexington State Bank. When their father, Charles H. Moore, died two years later, the daughters purchased the Divine Law Office Building and had it remodeled for a public library. The Charles H. Moore Library opened in January 1903, and it has been there ever since.

The first board of trustees consisted of President Watson Beach, a Civil War veteran who came to Lexington from New England in 1859.[9]

He was Republican, Congregationalist, and in 1903 a circuit judge. Vice president was Daniel Clarke, a native of Vermont who arrived in Lexington in 1870 to set up a dry goods store. Like Beach he voted Republican; unlike Beach he was Episcopalian. His wife was a member of the Atheneum. At its first meeting the board voted to give the Atheneum use of the building's second story "as long as they remained in active existence."[10] To this day the club still meets there. First board secretary was John Norman, a Canadian dentist who had come to Lexington in 1867, joined the Episcopal church, but voted Democrat. His wife was also a member of the Atheneum.

To monitor library rules (board members retained the authority to select books) on 3 November 1902 the board appointed Anna Henry librarian. Anna was the daughter of Lexington pioneer George Henry, locally prominent Republican and Episcopalian who was also president of the Lexington school board, president of the Lexington village council, and owner of a local hotel and lumber business. Anna was a member of the Atheneum and the Eastern Star. She remained librarian until she married in 1911, at which time Florence Walther succeeded her. Walther held the position until 1953. She was the daughter of Lexington pioneer Frederick Lucien Walther, an Episcopalian, and she was a member of the Atheneum. Because of her voice she sang at many of Lexington's cultural events held at the Cadillac House (just across the street from the Moore) in the first decades of the twentieth century. It is not hard to see from this brief sketch that the Moore Public Library was a community reading institution established and run by local male elites but managed by women who by their family relationships were directly connected to these elites.

When women were given the right to vote in 1920, however, control of the Moore Library quickly shifted. Because trustees of the Moore were elected, membership on the library board became attractive positions for which women openly campaigned. By 1925, in fact, the five-member board consisted entirely of women. In reality, however, that's the only variable distinguishing it from its predecessors. All were married to prominent men in local business; all were active in the Atheneum, local churches, educational activities, and community affairs. Their names appeared regularly in the newspaper.

In 1925 Lexington boasted a population of 519, and the Charles H. Moore Library had a collection of 4,800 volumes, for a very healthy average of 9.2 volumes per capita. Moore also boasted a circulation of 8,500, for a per capita average of 16.4—again, very high against a national average of 10 volumes per capita.[11] But these figures are deceptive. By 1923 the automobile had begun to impact most of the country, Lexington included, and because of its location on the shores of Lake

286

Erie, summer vacationers from Detroit found Lexington easy to reach. Many rented locally owned cabins; others camped in the village-owned park. All used publicly maintained local beaches. By 1925 summer tourism had become so important to Lexington that it drove the local economy. Vacationers frequented local churches and businesses and used the services of local professionals like doctors, lawyers, and dentists. Little wonder they were also given access to the Moore collections to help supply their vacation reading needs, and by the hundreds every summer they drew books from the Moore, thus inflating its circulation rate. To keep vacationers supplied with fresh reading material, village fathers and mothers were happy to build the Moore's collections much above the average of three per capita, and over the decades the Moore did not change its policy. In 1956 Lexington's population was 596; the Moore collection had grown to 7,600 volumes, thus averaging 13.3 per capita. In 1956 its circulation totaled 8,160, thus averaging 13.7 per capita, a phenomenal figure compared to other small public libraries.[12]

When soldiers returned from the Civil War in 1865 to Sauk Centre, Minnesota, they came back to a Republican town in the middle of a Democratic county. The countryside was being settled by northern European immigrants, but the town was being settled largely by transplanted Yankees who supported temperance societies, involved themselves heavily in town meetings, and set about establishing Sauk Centre's institutions of civic society. In 1866 several women from prominent families established a reading room. Two years later Sauk Centre's leaders organized a social library around a collection of 700 volumes the club had accumulated and named it after William Cullen Bryant. Legend has it the townspeople did so to get part of the poet's personal library or, better yet, a substantial cash gift. Instead they got an autographed copy of a book of poems, which disappeared from circulation several years later.[13]

In 1880 the village council decided to make the library public by levying a small tax to support it. By that time the association's collection had grown to 1,200 volumes, and its circulation to Sauk Centre's 1,200 citizens averaged 5,000 per year. Sauk Centre's residents were given free access to its collections, which were open to the public from 2:00 to 6:00 p.m. every Saturday. Nonresidents were charged two cents a week and allowed to draw one book per exchange for a two-week period, just like residents. The collection itself still had no permanent home. Since 1868 it had moved from a room in the local school to a board member's office, then to a corner in another board member's store, then to a room in city hall. In 1880 the council appointed nine board members who then elected

Alphonse Barto as their president.[14] Barto was born in Vermont and had served as a captain in the Union Army, and after he arrived in Sauk Centre in 1869 to start a law firm, he organized the local Grand Army of the Republic (GAR) chapter. He also helped organize the county's bar association and served as vice president in the local Merchants National Bank and as member (later president) of the local school board. He was Republican, Congregationalist, and a Mason.

In 1898 board members negotiated an agreement with the Gradatim, Sauk Centre's most prestigious women's club, whose membership was heavily populated by trustee spouses. The club came to the board arguing that the community needed a place of moral and cultural enrichment to keep Sauk Centre youth out of local billiard halls and away from temptation. If trustees agreed to open the library Thursday, Saturday, and Sunday nights, club members volunteered to staff it. After trustees accepted the offer, the experiment proved immediately successful; in the first 100 nights, 1,300 people frequented the reading room. In 1902 the Gradatim extended its offer to cover the library every evening except Sunday.[15]

By that time Sauk Centre mayor Michael Hogan, also a Bryant trustee, was corresponding with Andrew Carnegie. In 1903 Hogan announced that Carnegie had agreed to give Sauk Centre $10,000 to construct a new building on the condition—typical of all Carnegie grants—that the community tax itself for at least 10 percent of his gift per year to support it. When Sauk Centre agreed, trustees selected a site on the corner of 5th and Main and, with the help of a local architect and local labor, erected a typical classically designed Carnegie library building.[16]

Although James Norris—local agent for the Great Northern Railway, GAR member, Republican, Mason, Congregationalist, and chairman of the local Sunday School Association—was board president in 1909, focusing on Sinclair Lewis's parents is more illuminating. His father, board member Edwin J. Lewis, was a local physician, Mason, and Oddfellow who was born in Connecticut. His stepmother, Grace, had not only been charter member and president of the Gradatim, she had also spearheaded club efforts in 1898 to open the library evenings and then organized the Sauk Centre "Rest Room," a place open every Saturday where German and Scandinavian immigrant farm wives and their children could find respite when they came into town for supplies marketed by local merchants and the services offered by local bankers, lawyers, and physicians.[17] For a fee they could also use the Bryant Library, full of information only in English. In 1909 Sauk Centre's population was 2,463; Bryant's collections totaled 7,326 titles, for a per capita average of 3. That year

the library circulated 21,258 volumes, for a per capita average of 8.8. Both figures compare favorably against a national average.[18] Board members continued to select new titles for the Bryant. To place them on the shelves and monitor their use the board had hired the recently widowed Minnie Mullen, daughter of Sauk Centre pioneer S. M. Bruce. Mullen was also vice president of the Gradatim and charter member of the Sauk Centre chapter of the Eastern Star.

By 1954 Sauk Centre's population had stabilized around 3,000, but the Bryant's collection had grown to 17,776 volumes for an average of 5.7 per capita. Its circulation hit 42,667 that year, for an average of 13.6 per capita. Both were high compared to the national average.[19] Reasons why are not difficult to find. Adults accounted for 37 percent of this total, juveniles 63 percent. The latter reflected an arrangement the Bryant had made with the local school board in 1919 to function as Sauk Centre's school library. In 1954 nine people served on the board; seven were born in Sauk Centre; three were women, all of whom were Protestants and members of the Gradatim and the St. Michael's Hospital Auxiliary, much like the spouses of the male members of the library board. Male trustees were members of the American Legion, Rotary, and Chamber of Commerce, just like the spouses of female members of the library board. Among males on the board, one was Catholic, the rest were Protestant; all but one were Masons or Oddfellows.

Lewis Olds was the Bryant's fifth professional librarian, and, like most of the board members employing him, he was a Protestant and a Mason. His wife was also active in the Gradatim. In the late 1940s Olds had received his training at the University of Minnesota Library School, and after he arrived in Sauk Centre in 1948 he used knowledge he had learned at the library school to carry out his professional responsibilities at the Bryant. Those responsibilities included book selection.[20] By 1954 Olds was authoring a regular "Book Review" column in the weekly *Sauk Centre Herald* and annually celebrating the ALA-inspired national Book Week in November. The reading club he was sponsoring for children every summer paid big dividends in circulation; so did a rental collection of popular fiction considered not good enough for permanent acquisitions but nonetheless necessary to "hook" people on reading so they could graduate to the "better" books the library had in the regular stacks.

The histories of public libraries in Morris, Illinois, Rhinelander, Wisconsin, and Osage, Iowa, show characteristics unique to each population served yet common to the small public libraries of Lexington and Sauk Centre, but because of space limitations I now return to the ten titles identified at the beginning of this essay and follow their

acquisition through the history of the collections of these five libraries. *Huckleberry Finn* did not make the 1893 ALA catalog but was cited in the 1904 edition and every *Fiction Catalog* Wilson published. The Sage and Rhinelander Public Libraries acquired their first copies in 1900, while the Moore received its first copy as a gift in 1903, the Bryant in 1914, and Morris not until 1921, when it purchased two copies. Once that first copy was purchased, however, each of the five libraries regularly replaced it when it was worn out, and some even had multiple copies on their shelves.

Kate Chopin's *The Awakening* fared much worse. It merited no listings in any of the ALA or Wilson Company catalogs. Similarly, before 1960 none of the five small libraries covered in this study had acquired a copy. Theodore Dreiser's *Sister Carrie* did slightly better. ALA catalogs ignored it until the 1926 edition; Wilson catalogs cited it in 1915, single starred it in 1950, double starred it in 1960. But the Bryant did not purchase a copy until 1927, shortly after the 1926 edition of the ALA catalog that the Bryant had purchased cited it. Morris bought a copy in 1943, but the Rhinelander Public Library did not purchase its first copy until 1963. Neither the Sage nor the Moore library had acquired a copy before 1970. And just like Kate Chopin's *The Awakening*, Margaret Sanger's *Family Limitations* was never cited in any ALA or Wilson catalog, and none of the five small public libraries covered here ever acquired a copy.

Sinclair Lewis's *Elmer Gantry* was cited in the 1941 edition of the *Fiction Catalog* but was dropped thereafter. Because Sauk Centre was Lewis's hometown, perhaps it is not surprising that the Bryant acquired three copies in 1927 and regularly replaced them as they wore out. The Sage also acquired a copy in 1927, the same year the Morris Public Library received a copy as a gift. Rhinelander waited until 1934 to acquire its copy; Morris received a second copy as a gift in 1938. Zora Neale Hurston's *Their Eyes Were Watching God* was cited in the 1941, 1950, and 1960 editions of the *Fiction Catalog*, but before 1970, when the database completes coverage, only the Bryant Library had acquired a copy (1938), and that was as a gift.

Of course, John Steinbeck's *The Grapes of Wrath* was much better known. The ALA catalog supplement covering literature issued between 1937 and 1941 cited it, and, beginning with the 1941 edition of the *Fiction Catalog*, it was already double starred, a ranking it retained in the 1950 and 1960 editions. The Sage, Bryant, and Morris public libraries all bought copies shortly after it was published in 1939; the Rhinelander and Moore libraries bought copies a year later. In subsequent decades all regularly replaced copies when old ones wore out or disappeared from shelves.

Richard Wright's *Native Son*, published in 1940, was cited in the 1941 edition of the *Fiction Catalog* and merited a single star in the 1950 and a double star in the 1960 editions. Bryant and Rhinelander purchased copies in 1940; Morris bought a copy two years later, at which time Moore received a copy as a gift. The Sage Public Library still had not acquired a copy by 1970. Lillian Smith's *Strange Fruit* was cited in the 1952 ALA catalog supplement; the *Fiction Catalog* gave it a single star in 1950, a double star in 1960. The Bryant, Rhinelander, and Morris public libraries purchased copies the year it was published in 1944. Rhinelander purchased a second copy three years later. The Moore and Sage public libraries, however, still did not have a copy in their collections in 1970. As for J. D. Salinger's *Catcher in the Rye*, which already merited a double star in the 1960 edition of the *Fiction Catalog*, the Sage Public Library purchased a copy in 1951. Rhinelander received two copies as gifts in 1953, the Moore bought its first copy in 1955, but the Morris Public Library did not purchase a copy until 1963. As of 1970 the Bryant still had not acquired a copy.

So what can be learned from all this? First, with few exceptions it does not appear that the library profession's conventional collection guides stimulated these five small public libraries to purchase particular titles. It does appear that the Moore and Sage libraries never acquired these collection guides, and none of the libraries appear to have purchased any editions of the *Fiction Catalog* after 1941. The Sage, Rhinelander, and Moore all purchased copies of *Huckleberry Finn* in the first decade of the twentieth century, but none owned the 1904 edition of the ALA catalog, which was the first collection guide to list it. Although both libraries had purchased copies of the new edition of the catalog, Bryant did acquire a copy of *Sister Carrie* after it was cited in the 1926 edition of the ALA catalog, but Morris did not. For the most part, then, it does not look like the five small public libraries covered here looked to the nation's library community to help them make reading selections for local patrons. One might argue a connection between the absence of Kate Chopin's *The Awakening* and Margaret Sanger's *Family Limitation* in the collections guides and the collections, but decisions about not acquiring were probably not based on lack of recommendation from ALA or Wilson.

Second, discerning clear patterns in the acquisition of the other eight titles is difficult. The Bryant seems most liberal. It bought anything Sinclair Lewis published, most of which was controversial. Perhaps that helps to explain its willingness to acquire so many of the other titles. Still, it waited until 1927 to acquire *Sister Carrie* and never did get a copy of *Catcher in the Rye* during the period the database covers.

At the same time, however, it acquired copies of *The Grapes of Wrath*, *Native Son*, and *Strange Fruit* shortly after they were published. Morris was much like the Bryant. Although it waited until 1943 to acquire a copy of *Sister Carrie* and never bought a copy of *Catcher in the Rye*, it accessioned *Elmer Gantry*, *The Grapes of Wrath*, *Native Son*, and *Strange Fruit* shortly after they were published. With the exception of *Sister Carrie* and *Their Eyes Were Watching God*, Rhinelander's collecting practices mirrored the Bryant and Morris.

Lexington's Moore seemed more circumspect. Although it never acquired copies of *Sister Carrie*, *Their Eyes Were Watching God*, and *Strange Fruit*, it did get a copy of *Elmer Gantry* ten years after it was published and acquired *Catcher in the Rye* in 1955. Sage appears to be the most conservative among these five libraries. Although it acquired *Huckleberry Finn*, *Elmer Gantry*, *The Grapes of Wrath,* and *Catcher in the Rye* as early as any other library in the sample, it never did acquire *Sister Carrie*, *Their Eyes Were Watching God*, *Native Son*, and *Strange Fruit.*

What to make of all this? A reasonable explanation can be found in the concept of cultural hegemony articulated by Antonio Gramsci.[21] Before exploring and applying the concept, however, let me return to Sauk Centre in the 1950s. Except for not enough money to buy good books, the Bryant seemed relatively free of problems. It had been untouched in 1952 when the mayor called for a halt to the sale of indecent literature in Sauk Centre. The mayor had taken his cue from a St. Cloud, Minnesota, socialite who had developed a list of objectionable materials, including comic books and the pocketbook fiction of authors like Mickey Spillane and Erskine Caldwell. While local merchants bowed to pressure from the mayor's office and "voluntarily" pulled such materials from their shelves, it was unnecessary for the Bryant to take any action at all. It had never acquired the materials in the first place. Similarly, when the National Americanism Commission of the American Legion condemned periodicals like *Science and Society* and *Soviet Russia Today* in the early 1950s, the Legion's local chapter—whose membership was heavily populated with library board members or their husbands—did not have to worry about the Bryant; the library subscribed to none of them. After all, they were not indexed in the Wilson Company's *Readers Guide to Periodical Literature.*[22]

What was happening here fits Gramsci's concept of cultural hegemony, which hypothesizes that the culture of dominant groups in capitalist societies is produced and transmitted in and through certain societal mechanisms and that the ways in which this culture is absorbed by and affects the behavior of common people are multiple. Gramsci also notes that functioning within capitalist systems are a series

of institutions not specifically concerned with political or economic issues, in which cross-class negotiations occur that are constantly in progress and never finished. Many of these institutions are part of what he calls "civic society," and it is within these institutions that an "ideational persuasion" takes place that mediates a "consent of the masses." Libraries qualify as one of those institutions in "civic society."

Between the time they opened their doors and 1956, citizens in these five communities were not forced to use their public libraries, all of which had collections that varied in profile from one site to another, if my sample ten titles is indicative of a larger pattern. And in each community it appears that the local public library constituted no apparent threat to the town's socioeconomic elite. None was ever shut down; I found no case in which any citizen publicly demanded the withdrawal of a specific title that any of my five libraries had acquired. For the most part, board members who were responsible for the libraries' collections—which in Gramsci's terms consisted of a set of texts made available by local elites for the "ideational persuasion" of all members of the community—seemed to feel comfortable that library patrons, no matter their age, creed, sex, or ethnicity, would be exposed to no ideas foreign to a carefully structured small town value system they themselves modeled.

That as late as 1960 only two of the libraries owned copies of *Sister Carrie*, only three owned copies of *Strange Fruit* and *Catcher in the Rye* (only one owned both), and not one of the libraries owned all three of these titles suggests that the small public library represents an excellent example of a civic institution controlled by a local dominant group that is constantly negotiating its position between pressures exercised from above (e.g., titles recommended by academy experts and numbers of a distant literary establishment) and below (e.g., the local demand for popular fiction written by people like Mickey Spillane and Phyllis Whitney). And because it is a civic institution people do not have to use that must constantly keep its eye on circulation rates to justify its funding, it functions as one of society's most democratic reading institutions.

## Notes

1. American Library Association, *Quotable Facts About America's Libraries, 2002–2003* (Chicago: American Library Association, 2003).

2. Sinclair Lewis, *Main Street* (New York: Harcourt, Brace, Jovanovich, 1920).

3. For an account of our first meeting nearly thirty years ago see my "American Library History Literature, 1947–1997: Theoretical Perspectives?" in Andrew B. Wertheimer and Donald G. Davis, Jr., eds., *Library History Research in America* (Washington, D.C.: Library of Congress, 2000), 4–34.

4. For solid scholarship capitalizing on this data see Christine Pawley, "Better than Billiards: Reading and the Public Library in Osage, Iowa, 1890–1895," in James P. Danky and Wayne A. Wiegand, eds., *Print Culture in a Diverse America* (Urbana: University of Illinois Press, 1998), 173–99; and her longer award-winning study *Reading on the Middle Border: The Culture of Print in Late-Nineteenth-Century Osage, Iowa* (Amherst: University of Massachusetts Press, 2001).

5. Anne Lyon Haight, *Banned Books, 387 B.C. to 1978 A.D.* (New York: R. R. Bowker Company, 1978), 49–50.

6. U.S. Bureau of Education, *Catalog of "A.L.A." Library: 5,000 Volumes for a Popular Library Selected by the American Library Association* (Washington, D.C.: Government Printing Office, 1893); Melvil Dewey, ed., *A.L.A. Catalog: 8,000 Volumes for a Popular Library, with Notes* (Washington, D.C.: Government Printing Office, 1904); Elva L. Bascom, ed., *A.L.A. Catalog, 1904–1911. Class List: 3,000 Titles for a Popular Library with Notes and Indexes* (Chicago: American Library Association, 1912); *A.L.A. Catalog, 1912–1921: An Annotated List of 4,000 Books* (Chicago: American Library Association, 1923); Isabella M. Cooper, ed., *A.L.A. Catalog, 1926: An Annotated Basic List of 10,000 Books* (Chicago: American Library Association, 1926); Marion Horton, ed., *A.L.A. Catalog, 1926–1931: An Annotated List of Approximately 3,000 Titles* (Chicago: American Library Association, 1933); Marion Horton, ed., *A.L.A. Catalog, 1937–1941: An Annotated List of Approximately 4,000 Titles* (Chicago: American Library Association, 1943); and Florence Boochever, ed., *A.L.A. Catalog, 1942–1949: An Annotated List of Approximately 4,500 Titles* (Chicago: American Library Association, 1952).

7. *English Prose Fiction: A Selected List of About 800 Titles Cataloged by Author and Title with Annotations* (Minneapolis: H. W. Wilson Company, 1908); *Fiction Catalog: A Selected List of About 350 Novels, Cataloged by Author and Title with Annotations* (Minneapolis: H. W. Wilson Company, 1909); *Standard Catalog Series: Fiction Catalog: A Selected List of About 2,000 Titles Cataloged by Author and Title with Annotations* (Minneapolis: H. W. Wilson Company, 1913); Corinne Bacon, comp., *Standard Catalog for Public Libraries: Fiction Section*, 2nd rev. ed. (New York: H. W. Wilson Company, 1931); Minnie Earl Sears et al., comps., *Standard Catalog for Public Libraries, 1934 Edition: An Annotated List of 11,700 Titles with a Full Analytical Index* (New York: H. W. Wilson Company, 1934); Dorothy E. Cook and Dorothy H. West, comps., *Standard Catalog for Public Libraries, 1949 Edition: An Annotated List of 12,000 Titles with Full Analytical Index* (New York: H. W. Wilson Company, 1949); Dorothy H. West and Estelle A. Fidell, comps., *Standard Catalog for Public Libraries, 4th Edition, 1958: A Classified & Annotated List of 7,610 Non-Fiction Books Recommended for Public & College Libraries, with a Full Analytical Index* (New York: H. W. Wilson Company, 1959); Dorothy E. Cook and Isabel Stevenson Monro, comps., *Fiction Catalog, 1941 Edition: A Subject, Author, and Title List of 5,050 Works of Fiction in the English Language; with Annotations* (New York: H. W. Wilson Company, 1942); Dorothy E. Cook and Estelle A. Fidell, comps., *Fiction Catalog, 1950 Edition: A Subject, Author and Title List of 3,400 Works of Fiction in the English Language with Annotation* (New York: H. W. Wilson Company, 1951); and Estelle A. Fidell and Esther V. Flory, comps., *Fiction Catalog, Seventh Edition, 1960: A List of 4,097 Works of Fiction in the English Language with Annotations* (New York: H. W. Wilson Company, 1961).

8. For more discussion of the roles these organizations played in American middle-class communities see John S. Gilkeson, Jr., *Middle-Class Providence, 1820–1940* (Princeton, N.J.: Princeton University Press, 1986); and Anne Firor Scott, *Natural Allies: Women's Associations in American History* (Urbana: University of Illinois Press, 1992).

294

9. Demographic data on all Moore Library board members and librarians have been gleaned from a systematic reading of all issues of the weekly *Sanilac Jeffersonian* and its predecessors, 1890–1960. For most of the twentieth century the *Jeffersonian* carried a column entitled "Lexington News."

10. Moore Board Minutes, 3 November 1902, Charles H. Moore Library, Lexington, Michigan.

11. See E. W. Browning, "Some Statistics from the Middle West," *Library Journal* 45 (1920): 741–42.

12. *History of Sanilac County, 1834–1984* (Shawnee, Kans.: Inter-Collegiate Press, 1984), 71–79. See also United States Education Office, *Public Library Statistics, 1950* (Washington, D.C.: Government Printing Office, 1954).

13. *Sauk Centre Herald,* 19 November 1868; Helen B. Baker, "Bryant Library Started Friday, Nov. 13, 1869," *Sauk Centre Herald,* 7 June 1928; "Bryant Library Association of Sauk Centre," Minutes, Board of Directors, Bryant Library, Sauk Centre, Minnesota. Hereafter cited as BL Minutes. Standard histories of Sauk Centre and Stearns County, Minnesota, include Ivy Louise Hildenbrand, *Sauk Centre: The Story of a Frontier Town: The First 50 Years, 1855–1905* (Sauk Centre, Minn.: Sauk Centre Area Historical Society, 1993); and W. B. Mitchell, *A History of Stearns County,* 2 vols. (Chicago: H. B. Cooper, Jr., & Company, 1915).

14. See L. T. Storey to S. M. Bruce, 22 April 1880, Manuscript Collection, Sauk Centre Area Historical Society, Sauk Centre, Minnesota.

15. *Sauk Centre Herald,* 6 October 1898, 13 January 1898, and 24 November 1902.

16. J. F. Cooper (Sauk Centre City Clerk) to James Bertram, 17 December 1902; Minnesota Congressman Page Harris to Andrew Carnegie, 17 January 1903; and Michael Hogan to Bertram, 31 January 1903, reel 28, Records of the Carnegie Corporation, Rare Books and Manuscripts Reading Room, Butler Library, Columbia University, New York. See also BL Minutes, 17 February 1903; and *Sauk Centre Herald,* 19 February 1903.

17. For background on Sinclair Lewis's family see Richard Lingeman, *Sinclair Lewis: Rebel from Main Street* (New York: Random House, 2002), chaps. 1 and 2.

18. "Statistics," *Minnesota Public Library Commission Notes* 3 (1910): 2–3.

19. United States Education Office, *Public Library Statistics, 1950.*

20. Some biographical information on Olds can be found in *Sauk Centre Herald,* 22 July 1948 and 2 August 1951.

21. See Antonio Gramsci, *Prison Notebooks,* vol. 1 (New York: Columbia University Press, 1992).

22. See *Sauk Centre Herald,* 5 June 1952 and 19 June 1952.

Copyright of Libraries & Culture is the property of University of Texas Press and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.