Bradburn et al v. North Central Regional Library District　　　Doc. 30 Att. 2

# Exhibit B

Decl of Adams
Page 15

Dockets.Justia.com

```
 1
 2                    UNITED STATES DISTRICT COURT
 3                    EASTERN DISTRICT OF WASHINGTON
 4                              AT SPOKANE
 5   _____
 6   SARAH BRADBURN, PEARL CHERRINGTON, )
     CHARLES HEINLEN, and THE SECOND    )
 7   AMENDMENT FOUNDATION,              )
                                        )
 8                  Plaintiffs,         ) NO.
                                        ) CV-06-327-EFS
 9        vs.                           )
                                        )
10   NORTH CENTRAL REGIONAL LIBRARY     )
     DISTRICT,                          )
11                                      )
                    Defendant.          )
12
13   _____
                DEPOSITION UPON ORAL EXAMINATION OF
14                      SARAH MARIA BRADBURN
15   _____
16   TAKEN ON:    Monday, August 13th, 2007
17   TAKEN AT:    Omak Library
                  30 South Ash
18                Omak, Washington
19   START TIME:  1:42 P.M.
20   END TIME:    2:55 P.M.
21
22
23
24
     REPORTED BY: BARBARA J. SCOVILLE, CCR, RPR
25                CCR NO. 2124
```

                                                                    1

```
 1   APPEARANCES:
 2   FOR THE PLAINTIFFS:
 3        MR. DUNCAN MANVILLE, ESQ.
          RAFEL MANVILLE, PLLC
 4        Attorneys at Law
          999 3rd Avenue
 5        Suite 1600
          Seattle, Washington 98104
 6        (206) 838-2660
 7
 8   FOR THE DEFENDANT:
 9        MR. THOMAS D. ADAMS, ESQ.
          KARR TUTTLE CAMPBELL
10        Attorneys at Law
          1201 Third Avenue
11        Suite 2900
          Seattle, Washington 98101
12        (206) 223-1313
13
14
15
16   ALSO PRESENT:  MR. DEAN MARNEY
                    MR. DAN HOWARD
17
```
                                                                    2

```
                              I N D E X
     In re: SARAH BRADBURN vs. NORTH CENTRAL REGIONAL LIBRARY
     Case No.: CV-06-327-EFS
     Date:  August 13th, 2007


                           T E S T I M O N Y
     EXAMINATION                                    PAGE NUMBER
     By Mr. Adams                                        4




                            E X H I B I T S
     14   Notice of Deposition of Mrs. Sarah            38
          Bradburn
     15   Sarah Bradburn's Objections, Answers          38
          and Responses to Defendant's First
          Interrogatories and Requests for
          Production
```
                                                                    3

 1         BE IT REMEMBERED that on Monday,
 2   August 13th, 2007, at 1:42 p.m., at Omak Library,
 3   30 South Ash, Omak, Washington, the testimony of
 4   **MRS. SARAH MARIA BRADBURN** was taken before Barbara
 5   J. Scoville, Certified Court Reporter and Notary
 6   Public. The following proceedings took place:

 8   **SARAH M. BRADBURN**, being first duly sworn to
 9                          tell the truth, the whole
10                          truth and nothing but the
11                          truth, testified as
12                          follows:

14                       EXAMINATION
15   BY MR. ADAMS:
16   Q.  Would you state your full name, please.
17   A.  **Sarah Maria Bradburn.**
18   Q.  Okay. Mrs. Bradburn or Ms. Bradburn?
19   A.  **Mrs.**
20   Q.  Mrs. Bradburn, my name is Tom Adams, and we had a
21       chance to meet just a moment ago. And I'm the
22       lawyer that's representing North Central Regional
23       Library District in this lawsuit that has been
24       brought by you and others here in Federal Court for
25       the State of Washington. And we're here today to

                                                                    4

**Page 17**

1 marked previously in another deposition. This is
2 Deposition Exhibit 6. Tell me if that letter looks
3 familiar to you, Mrs. Bradburn.
4 A. I don't remember this letter in particular. I would
5 doubt that I saw this letter.
6 Q. Why is that?
7 A. It's dated October 31st, 2000. I met my husband in
8 November 4th of 2000, and he is actually probably
9 the only one as -- listed as an ACLU member. I
10 don't know that I am. I may be.
11 Q. Okay.
12 A. But that was previous to my husband, and I wasn't
13 getting letters from the ACLU at that time.
14 Q. Okay. But you do remember seeing letters addressed
15 to you from ACLU?
16 A. My husband received a card --
17 Q. Okay.
18 A. -- and I responded to that.
19 Q. Okay. Is your membership in ACLU -- Well, I guess
20 I'm a little confused. Are you a member or is your
21 husband a member or do you know?
22 A. I really don't know.
23 Q. Okay.
24 A. We get mail and some of it is addressed to both of
25 us and some is just addressed to him and some, you

**Page 18**

1 know, obviously just to me.
2 Q. Okay.
3 A. I consider myself part of the ACLU as his wife. I
4 mean, I support the ACLU.
5 Q. Uh-huh.
6 A. Did I sign a card to say I'm an ACLU card-carrying
7 member? I don't know. I probably didn't.
8 Q. I bet you could at any time if you wanted. How did
9 you become involved in this lawsuit?
10 A. My husband received a card in the mail. It was a
11 little postcard. It was not that letter. It was a
12 little postcard that said, "Have you ever had any
13 trouble with the filters on the library?"
14     And he said, "I haven't. Have you?"
15     And I said, "You know, I think I have."
16     And I filled it out and here we are.
17 Q. Okay. When did those postcards come around to the
18 best of your knowledge?
19 A. That's what I was saying. I think it was 2004 or
20 five.
21 Q. Okay. All right.
22 A. It just -- My head for dates, specific dates and
23 times, is a little fuzzy. I'm sorry, but I don't
24 carry one of those little date calculators around in
25 my head, and time flows quickly.

**Page 19**

1 Q. It all blurs together. Do you belong to any other
2 organizations besides ACLU?
3 A. I'm a member of Alcoholics Anonymous.
4 Q. Okay. Anything else?
5 A. I have a membership to the gun club in Republic.
6 Q. Okay. Are you a member of the Second Amendment
7 Foundation?
8 A. No, I'm not.
9 Q. Okay. Are you familiar with Pearl Cherrington?
10 A. No.
11 Q. Charles Heinlen?
12 A. I vaguely recognize the names. But, no, I don't
13 know them.
14 Q. Okay. You mentioned a moment ago your husband
15 showed you the postcard. And you indicated in
16 response or as part of a conversation with him that,
17 yeah, you had had "a problem," quote unquote, with
18 the Internet filtering at the NCRL branch in
19 Republic; is that right?
20 A. Uh-huh.
21 Q. Is that "yes"?
22 A. Yes. Oh, sorry. Yes.
23 Q. Okay. Tell me about that. What specifically did
24 you encounter that you characterize as "a problem"?
25 A. When I was a student for the year that I went to

**Page 20**

1 Eastern, I commuted. I went to Eastern for the week
2 and commuted back to Republic on weekends. So some
3 of the assignments that I had, it was important for
4 me to do as much as I could over the weekend as well
5 as during the week. I went to the library to find
6 the research I needed on a particular paper. It was
7 a prevention class on teenage use of tobacco. And I
8 typed in "tobacco use by teenagers" or "teenage use
9 of" -- you know, "teenage tobacco use" or
10 "adolescent tobacco use," some particular form of
11 those words or maybe many of those and got nothing.
12 And I -- I didn't have enough computer savvy to know
13 why I got nothing. I didn't know that the Internet
14 was the same here as there, so I just concluded that
15 I couldn't do my work in Republic. And when I went
16 back to Spokane during the week, I went to the
17 Spokane library and got oodles of information.
18 Q. Typing in the same search?
19 A. Yes.
20 Q. Exactly the same search?
21 A. Yes.
22 Q. When you say you "got nothing," what do you mean?
23 A. No articles. Nothing came up. I got nothing.
24 Q. What showed on the screen?
25 A. I don't recall.

**Page 21**

1  Q. Did anything pop up indicating to you that you were
2     being blocked?
3  A. Not that I recall. I just really had no idea why I
4     got no information. I thought it a little odd, but
5     I just waited until I went to Spokane and did the
6     research there.
7          And it didn't -- it didn't ever -- you know, I
8     didn't dwell on that. I didn't think about that at
9     all until this card came, and I went -- then it kind
10    of connected in my head, "Oh, that's why I got no
11    information."
12 Q. But you don't recall seeing anything indicating that
13    the sites that you were attempting to access were
14    blocked or --
15 A. I don't recall that, no.
16 Q. Okay. You're talking about a search that you may
17    have entered on Google or some other search
18    engine -- is that right? -- or a particular Web site
19    address?
20 A. No particular Web site address. I didn't have one.
21 Q. Okay. You were just doing a search.
22 A. A search.
23 Q. Okay. Did you ask the librarian at the Republic
24    branch about what you were encountering?
25 A. No, I didn't.

**Page 22**

1  Q. Okay. Did you think -- did you think about doing
2     that, or did you just not think about it?
3  A. No, I just didn't do it.
4  Q. Okay.
5  A. I didn't think about doing it, and I -- it never
6     occurred to me.
7  Q. Okay. Are we talking about a single occasion when
8     this occurred?
9  A. Yes.
10 Q. Okay. Apart from that, have you ever had any other
11    instance of not being able to get from the Internet
12    what you thought you should be able to get at the
13    Republic branch?
14 A. No.
15 Q. Okay. Have you been to other branches within the
16    NCRL system?
17 A. Ever?
18 Q. Uh-huh.
19 A. Yes.
20 Q. To use the Internet, I mean.
21 A. Probably not.
22 Q. Okay. So your experience with the Internet, the
23    NCRL's Internet services, have been at the Republic
24    branch.
25 A. Correct.

**Page 23**

1  Q. Are you familiar with the NCRL Internet Use Policy?
2  A. Not specifically.
3  Q. Let me show you a document that we have marked in a
4     previous deposition as Exhibit 3. Take a look at
5     that, Mrs. Bradburn, and let me know when you've had
6     a chance to review it generally.
7  A. Okay.
8  Q. Have you seen this document before?
9  A. I believe it might be posted at our library.
10 Q. Okay. In Republic?
11 A. Uh-huh.
12 Q. And you think you might have seen it near the
13    computer terminal or somewhere in the library?
14 A. Somewhere in the library.
15 Q. Okay. So you've read this before today.
16 A. I think I have.
17 Q. Okay. Is it fair to say that you were aware that
18    the Internet was being filtered when you sat down to
19    use it?
20 A. I think I understood that, but I didn't understand
21    the extent of it.
22 Q. When you sit down at a terminal and you log on, are
23    there screens that you have to go through?
24 A. Yes.
25 Q. What do those screens say? What do they tell you or

**Page 24**

1     ask of you? Do you have to enter information, who
2     you are or your password or anything like that?
3  A. Yes. I think you have to enter the last four digits
4     of your phone number.
5  Q. Okay. Are there any other statements or permissions
6     that you have to accept or agree to, to proceed?
7  A. Gosh, I don't remember.
8  Q. You just kind of click through them and off you go?
9  A. Yes, I guess.
10 Q. Okay. Are you aware of NCRL's procedures,
11    mechanisms, that a patron is free to invoke if the
12    patron runs across a Web site that is blocked
13    because of the Internet policy?
14 A. I've heard that you can fill out a request card now
15    requesting that you be allowed access to a site.
16 Q. Okay. Have you ever taken that step?
17 A. No.
18 Q. Okay. Have you ever seen the form that you're
19    describing?
20 A. No.
21 Q. Let me show you a document that we marked in an
22    earlier deposition that as Exhibit Number 2. Take a
23    look at that if you would, please.
24 A. Okay.
25 Q. So have you seen a document similar to Exhibit 2

**Page 25**

1 before?
2 A. No.
3 Q. And you've never filled one out?
4 A. No.
5 Q. You've spoken to the one experience about trying to
6 gain access to "teenage tobacco use" and such
7 topics, and I appreciate that testimony. If you
8 were to go to the Republic branch this afternoon or
9 tomorrow and search for something and find a Web
10 site that was blocked that you wanted access to,
11 would you find it burdensome to complete a form like
12 Exhibit 2 to try to gain access?
13 A. I think I wouldn't -- I wouldn't know what to put.
14 I wouldn't have a specific site. I would be, you
15 know -- like I was for that paper, I was searching a
16 general topic. I didn't have a specific Web site in
17 mind. I had no clue.
18 Q. Okay.
19 A. So, yes, I would find it pretty burdensome.
20 Q. You couldn't proceed --
21 A. No.
22 Q. -- in that instance, could you?
23 A. No.
24 Q. Okay. What if you did a search and a Web site
25 looked interesting to you but you couldn't access it

**Page 26**

1 because of the Internet policy? Could you then take
2 that Web address and put it on this form?
3 A. I guess I could.
4 Q. If you had that information.
5 A. I would -- I think I would prefer if the librarian
6 could just release that at the time but not go
7 through this kind of procedure.
8 Q. Okay. Do you know what happens when a form like
9 this is filled out and given to a librarian?
10 A. It goes to the main branch and they research it and
11 send it back and --
12 Q. Do you know how long all that takes?
13 A. It sounds like a while.
14 Q. Do you know that for a fact?
15 A. I don't.
16 Q. Okay.
17 A. But I know it's not going to be right now.
18 Q. Okay. What would be a reasonable time to get a
19 response?
20 A. I suppose it depends on what you're doing. The
21 paper I was doing was due the next week, so no kind
22 of timeline except right then would have been
23 appropriate.
24 Q. Uh-huh. If you were trying to obtain a book that
25 was unavailable at the Republic branch but might be

**Page 27**

1 available at the Twisp branch by inter-library loan,
2 would it be reasonable for you to wait a couple days
3 to get that book? Would you expect a book to be
4 delivered along that kind of timeline?
5 A. Yes.
6 Q. Okay. Not within hours though.
7 A. No.
8 Q. Okay. What other resources do you use at the
9 Republic branch besides the Internet?
10 A. I check out books, I check out the DVDs, videos.
11 Q. Okay. What would you say is your primary use of the
12 library's resources if there is a primary use?
13 A. Probably the books.
14 Q. How often do you check out books?
15 A. Oh, gosh, it goes in spurts, but there are periods
16 where I check out books weekly.
17 Q. Okay. How often do you use the Internet?
18 A. At the library?
19 Q. Yes.
20 A. The Internet at the library, I don't use very often.
21 Q. Okay. Where else do you go to access the Internet?
22 A. I was able to access it at work but no longer, so
23 I'll probably be back to the library. But I would
24 say once a month maybe.
25 Q. Before your job ended at Ferry County?

**Page 28**

1 A. Correct.
2 Q. Okay. Are there any other Internet access points in
3 Republic besides the library?
4 A. There is a computer center.
5 Q. Okay. Is that a fee-based access point?
6 A. Yes, it's a donation.
7 Q. Do you use that from time to time?
8 A. About once a year.
9 Q. Okay. Do you know whether you are accepting the
10 NCRL Internet Usage Policy as a condition of your
11 accessing the computer terminals? That's a poor
12 question. Do you know whether or not by -- you must
13 accept the NCRL Internet Usage Policy in order to
14 proceed further toward using the Internet when you
15 sit down at a terminal? That's not much better, is
16 it.
17 A. I'm sorry.
18 Q. No, no, it's not you. It's probably me. Do you
19 understand what I'm getting at? The Internet Usage
20 Policy that NCRL has, do you know whether or not you
21 have to accept that in order to use the Internet?
22     MR. MANVILLE: Object to the form.
23     You can answer that.
24     THE WITNESS: Pardon me?
25     MR. MANVILLE: I'm just making an

**Page 29**

1  objection for the record.
2  THE WITNESS: And I'm still unclear about
3  the question. I'm sorry.
4  Q. (By Mr. Adams) That's okay. Do you know whether or
5  not the NCRL requires its patrons to agree to and
6  accept the Internet Usage Policy before the patrons
7  are permitted to use the NCRL computers?
8  A. Oh, I would -- I would think so.
9  Q. Okay. So do you believe that you have, in fact,
10  accepted the policy and agreed to the policy before
11  using NCRL's computers?
12  MR. MANVILLE: Object to the form.
13  THE WITNESS: I think -- I'm not exactly
14  sure how to answer that. I don't -- I think I
15  agree with it to some degree but not entirely that
16  it's -- that it's necessarily the way it should be
17  or necessarily the way it needs to be in place at
18  this time.
19  Q. (By Mr. Adams) Okay. What would you change about
20  it?
21  A. Well, I think -- like this form, I think I would
22  want to have some kind of ability to go to the
23  librarian to be able to say, "Look, I'm looking for
24  information on this topic; and can you unlock the
25  filter?" or have access at that time not, you know,

**Page 30**

1  however long that procedure takes.
2  Q. Okay. Do you think it's appropriate for NCRL to
3  filter for some subjects?
4  MR. MANVILLE: Object to the form.
5  THE WITNESS: For adults?
6  Q. (By Mr. Adams) Yeah.
7  A. I guess I don't know specifically what you have in
8  mind.
9  Q. Well, let's just choose, say, pornography. Do you
10  think it's appropriate for NCRL to screen out
11  Web sites that deal with pornography?
12  A. I don't have any problem with that.
13  Q. With that kind of screening --
14  A. Correct.
15  Q. -- that type of filtering?
16  A. Correct.
17  Q. Okay. So filtering for that purpose is all right
18  from your standpoint.
19  A. I don't have a problem with that. I don't -- I
20  certainly don't want children to be able to access
21  whatever they want to access in that regards.
22  Q. Okay. So filtering for children in particular
23  doesn't create an issue for you.
24  A. No, it doesn't.
25  Q. Okay. Let's focus on adults for a second. Do you

**Page 31**

1  have any particular objection to NCRL's filtering
2  Web content, Internet-based content, that deals with
3  pornographic topics?
4  A. For an adult, I don't know. But I know the library
5  isn't a place that's private. So in that sense, I
6  don't have a problem with them filtering that even
7  for adults.
8  Q. Okay. What about other illegal activity? Let's say
9  online gambling or let's say Web sites that promote
10  hacking or the proliferation of spyware, things that
11  are against the law, do you think it's appropriate
12  for NCRL to filter Web-based content deriving from
13  sites that promote illegal activity?
14  A. I don't think I have a problem with that either.
15  Q. Okay. So for some subjects such as we're talking
16  about -- illegal activity, pornography -- Internet
17  filtering doesn't trouble you.
18  A. No.
19  Q. As a conceptual matter or in the way that NCRL is
20  doing it; is that correct?
21  A. Correct.
22  MR. MANVILLE: Object to the form.
23  Q. (By Mr. Adams) You can answer.
24  A. Correct.
25  MR. MANVILLE: It's also subject to lack

**Page 32**

1  of foundation.
2  Q. (By Mr. Adams) What do you know about the -- if
3  anything, about the filtering software and filtering
4  service employed today by the NCRL?
5  A. I don't have any idea.
6  Q. Okay. Have you heard the brand name Fortinet,
7  F-o-r-t-i-n-e-t?
8  A. I saw it today.
9  Q. Okay. In what context?
10  A. On the computer.
11  Q. Okay. Tell me what you saw.
12  A. Just saw that name.
13  Q. "Filtering by Fortinet" or something?
14  A. (Witness nodding her head)
15  Q. Is that a "yes"?
16  A. Yes.
17  Q. Okay. Do you know anything about the Fortinet
18  service?
19  A. No idea.
20  Q. Okay. Do you know what categories of information or
21  types of content NCRL does filter for now?
22  A. No.
23  Q. Okay. Same question as to the previous software
24  that NCRL had in place, something called "Bess,"
25  B-e-s-s, do you know anything about that type of

**Page 33**

1   software?
2   A. No.
3   Q. Okay. Or what categories were filtered by NCRL
4      using that software?
    A. No.
    Q. Do you know anything about how Fortinet classifies
7      particular Web sites within certain topical areas or
8      other topical areas?
9   A. No.
10  Q. Okay. Having been a substitute librarian for a time
11     in Republic, do you have a thought about how
12     libraries -- how NCRL goes about making
13     content-based decisions in determining what is in or
14     not in its collections?
15  A. No, I don't.
16  Q. Have you ever -- Were you ever a part of any
17     collection decisions?
18  A. No.
19  Q. Okay. Are you familiar with NCRL's mission
20     statement, Mrs. Bradburn?
21  A. Off the top of my head, no.
22  Q. Let me show you a document that we've marked
23     previously as Exhibit 4. You're free to look at it
24     in its entirety, but I'm really only interested in
25     asking you a question or two about the mission

**Page 34**

    statement that's articulated in the first paragraph.
2   A. I think it was reiterated also on your second
3      document.
4   Q. Okay. The Internet Usage Policy?
5   A. Yes.
6   Q. Okay. So the mission statement as articulated by
7      NCRL is "to promote reading and lifelong learning."
8      Correct?
9   A. Uh-huh.
10  Q. Okay. Is that "yes"?
11  A. Yes, sorry.
12  Q. Okay. And is that in your view as a former
13     substitute librarian an appropriate encapsulation of
14     NCRL's mission?
15  A. Yes.
16  Q. And is NCRL's further stated goal of "creating a
17     safe place for children to come and learn" an
18     appropriate objective for the library to strive for?
19  A. Yes.
20  Q. Okay. Would you agree that the library exists to
21     serve the needs of all its patrons of any age?
    A. Yes.
    Q. Okay. Young kids and adults alike?
24  A. Yes.
25  Q. Okay. Would you also agree that in serving the

**Page 35**

1      diverse needs of the patrons the library has to
2      balance what is necessary and appropriate for the
3      needs of one group versus the other?
4   A. Yes.
5   Q. It's all about balance, isn't it?
6   A. Yes.
7   Q. Now, in your Complaint, Mrs. Bradburn, the central
8      tenant of the complaint seems to be that you and the
9      other plaintiffs are disputing the NCRL's policy of
10     not disabling the Internet filter upon the request
11     of an adult patron; is that right?
12  A. Yes.
13  Q. Okay. But you do agree, as you just testified, that
14     filtering in some instances is appropriate; is that
15     correct?
16  A. Yes.
17  Q. Okay. So is it reasonable in your view for NCRL to
18     balance those things, those thoughts, by undertaking
19     a site-by-site review of a blocked Web site when
20     that occurs in the course of a patron's use of the
21     Internet?
22         MR. MANVILLE: Object to the form.
23         THE WITNESS: I didn't really follow that
24  completely.
25  Q. (By Mr. Adams) Okay, sure. Well, your Complaint

**Page 36**

1      states NCRL's got a policy of not disabling the
2      Internet filter entirely when an adult requests that
3      occur. Yet you've also testified that you believe
4      it is appropriate to maintain a filter for some
5      topics, some categories of information -- illegal
6      activity, pornography, spyware. We talked about
7      some things; right?
8   A. Yes.
9   Q. Okay. So with those thoughts in mind, do you think
10     that it's an appropriate compromise, in addition to
11     that, the goal of furthering the interests of
12     children and adults alike? So with all of those
13     goals in mind and thoughts in mind, is it
14     appropriate in your view for the NCRL to say, "You
15     know what? We'll leave this Internet filter in
16     place; and if an adult patron runs into a block,
17     we'll undertake a site-by-site review and maybe
18     unblock it"?
19         MR. MANVILLE: Object to the form.
20         THE WITNESS: I can see how that could
21  work in some instances but not in others.
22  Q. (By Mr. Adams) Okay. Give me an example of an
23     instance where it would not work.
24  A. For instance, in writing my paper that was due that
25     week and I was only home for two days Saturday and

**Page 37**

1  Sunday and then returning to Spokane on Monday,
2  there wasn't time to on Saturday fill out a form and
3  have that information back before I had to go, you
4  know, commute.
5  Q. Uh-huh. Would you feel differently if you had
6  undertaken your research for your school paper two
7  weeks ahead of time or three weeks? I mean, it's
8  your need that makes the policy unworkable; is that
9  correct?
10 A. Yes, but I don't know that I always had that
11   information that far in advance.
12 Q. Okay. By analogy if you were working at the library
13   on a term paper and you had no computer access and
14   the book that you needed to complete your term paper
15   was in Twisp, would you blame the library if the
16   library couldn't get it to you before your term
17   paper deadline?
18 A. No.
19 Q. Okay.
20       MR. DEAN MARNEY: Tom, can we take a
21 break so I can ask you a question?
22       MR. ADAMS: Sure, let's take a little
23 break.
24
25       (A BRIEF RECESS WAS TAKEN.)

**Page 38**

1       MR. ADAMS: Why don't we go ahead and
2 mark this.
3
4       (EXHIBIT 14 WAS MARKED AND
5        EXHIBIT 15 WAS MARKED.)
6
7  Q. (By Mr. Adams) Mrs. Bradburn, I've handed you a
8     document that we've marked as Deposition Exhibit 15,
9     and it constitutes -- it's a multi-page document
10    consisting of your "Objections, Answers and
11    Responses to Interrogatories and Requests for
12    Production." I suspect you've had a chance to
13    review this earlier in the afternoon, but feel free
14    to take another look through it if you would like.
15 A. Yes.
16 Q. Is that your signature on page 11?
17 A. Yes.
18 Q. In your answer to Interrogatory Number 5 on page 4
19    and extending on to the top of page 5, I'm a little
20    confused by that. In the third sentence, I believe,
21    you write, "The computer responded that no links
22    were accessible for these queries." Do you see
23    that?
24 A. Yes.
25 Q. Now, I understood from your testimony earlier that

**Page 39**

1     you don't recall getting any response at all. Did I
2     understand that right?
3  A. Yes.
4  Q. So there wasn't an affirmative response, was there,
5     saying, "No links are accessible"?
6  A. I don't -- I don't recall what came up.
7  Q. Was it a blank screen?
8  A. There was no information. The information I was
9     trying to find, you know, I don't remember whether
10    it said it was "Filtered," whether it said, "There
11    is no information, no matches, to your search." I
12    don't remember specifically what happened, but I got
13    no information.
14 Q. Is it possible that the screen went blank because of
15    a technical difficulty?
16 A. I have -- I haven't any idea.
17 Q. Okay. Do you recall whether the screen was blank?
18 A. No.
19 Q. You just don't recall.
20 A. I don't.
21 Q. It sounds like you packed up and went to Spokane at
22    that point --
23 A. Yes.
24 Q. -- not literally but figuratively.
25 A. Yes.

**Page 40**

1  Q. Now, Interrogatory Number 11 on page 6 asks whether
2     you have accessed or attempted to access the
3     Internet since the Complaint was filed at an NCRL
4     branch. And you have amended your answer to say
5     "yes"; is that right?
6  A. Yes.
7  Q. Okay. And then in Number 12, you say you don't
8     remember the specific Web sites for which you claim
9     access was denied; is that correct?
10 A. Yes.
11 Q. Okay. Are you sure that access was denied?
12 A. No.
13 Q. Okay. Tell me about that a little bit. I
14    understand that you don't recall the specific
15    Web sites that you were trying to enter. Or perhaps
16    this was an Internet query. Which was it?
17 A. This was similar to the work that I did when I was
18    in school. I just went back and did the same kind
19    of search, "adolescent tobacco use." And I did
20    receive some information. At that point, I would
21    have been able to do my research.
22 Q. Okay. We're talking now about the occasion after
23    the Complaint was filed.
24 A. Yes.
25 Q. Okay. And on that occasion, you, again, went to a

**Page 41**

1     search engine. Was it Google?
2 A. **I believe it was.**
3 Q. Okay. So you went to Google and you entered some
4     terms --
   A. **Yes.**
6 Q. -- and you clicked "Search."
7 A. **Yes.**
8 Q. And what happened?
9 A. **There were Web sites.**
10 Q. Okay. So you got a positive response to your
11     search.
12 A. **Yes.**
13 Q. Okay. And did you click on the links?
14 A. **Yes.**
15 Q. And what happened?
16 A. **Information.**
17 Q. You got the information.
18 A. **Yes.**
19 Q. So you weren't blocked at all.
20 A. **Not then.**
21 Q. Okay. I guess I was a little confused because the
22     question -- the predicate of this area of inquiry in
23     Interrogatory 12 is, "Identify Web sites for which
24     you claim access was denied." But, in fact, access
25     was not denied.

**Page 42**

   A. **Right. Sorry.**
2 Q. That's okay. No, no, I just wanted to be clear.
3           MR. MANVILLE: Tom, let me jump in. I
4 think that the amended answer there was referring to
5 the denial of access on the prior occasion, and
6 probably this should have just stayed "NA" given
7 that this Interrogatory 12 was referring back to
8 Interrogatory Number 11 if that's helpful --
9           THE WITNESS: Okay.
10          MR. MANVILLE: -- although Interrogatory
11 Number 12 is a bit vague in that it says, "Identify
12 all Web sites for which you claim access was
13 denied." And she doesn't remember the specific
14 Web sites for which access was denied prior to the
15 filing of the lawsuit.
16           MR. ADAMS: Prior to the filing of the
17 Complaint.
18           MR. MANVILLE: Subsequent to the filing
19 of the Complaint, I don't think she has been denied
20 access as far as she knows.
21 Q. (By Mr. Adams) Okay. And prior to the Complaint,
22     you entered some search terms, probably in Google --
23     right? -- and that's all you remember.
24 A. **Yeah. I don't remember that it was Google. I**
25     **really don't.**

**Page 43**

1 Q. Okay.
2 A. **But I entered words and nothing happened, nothing**
3     **came up, no information.**
4 Q. And you don't remember what was on the screen in
5     front of you.
6 A. **I don't.**
7 Q. That's fine. What school district did you work in
8     as a substitute school teacher?
9 A. **Omak, Tonasket, Republic. I don't think I ever made**
10     **it to Oroville.**
11 Q. Okay. What period of time are we talking about?
12 A. **'91 to 2001.**
13 Q. Okay. Toward the end of that period, were you
14     teaching in schools that offered Internet access to
15     students?
16 A. **Yes.**
17 Q. Okay. Do you know whether or not Internet access to
18     students was filtered?
19 A. **I don't really know.**
20 Q. Okay. Did teachers themselves have access to school
21     computers with Internet access during that period of
22     time? As a substitute teacher, could you sit down
23     at a terminal and use it if you wanted to?
24 A. **I don't recall that. I don't.**
25 Q. You never did it, it sounds like.

**Page 44**

1 A. **I don't think so.**
2 Q. You don't recall that.
3 A. **I don't recall it.**
4           MR. ADAMS: Okay. Let's take a quick
5 break.
6
7           (A BRIEF RECESS WAS TAKEN.)
8
9           MR. ADAMS: Thank you very much. We're
10 all done.
11           THE WITNESS: Thanks.
12           MR. ADAMS: You will have an opportunity
13 to review the transcript once it's been completed.
14 And your attorney, Mr. Manville, will make that
15 available to you, or it may come directly from the
16 court reporter come to think of it. And you'll have
17 an opportunity to review the transcript. And if you
18 think errors have been made in the transcription of
19 your testimony, you can indicate that on an errata
20 sheet that is attached to the back. We don't change
21 "yes" to "no" or anything else. Her recording is
22 what becomes the official record, but you can amend
23 that with your own errata sheet if you think that's
24 appropriate.
25           THE WITNESS: Okay. All right.

```
1        MR. ADAMS: Very good.
2        THE WITNESS: Thanks.
3
4     (DEPOSITION CONCLUDED AT 2:55 P.M.)
         (SIGNATURE RESERVED)
```

45

```
IN RE: SARAH BRADBURN vs. NORTH CENTRAL REGIONAL LIBRARY
NO. CV-06-327-EFS

              CORRECTION SHEET

CHANGES IN FORM AND SUBSTANCE REQUESTED BE MADE IN THE
FOREGOING ORAL EXAMINATION TRANSCRIPT:

PAGE   LINE              CORRECTION AND REASON
```

17  I hereby certify that this is a true and correct copy of my testimony, with the exception of the corrections noted above.

19  **SARAH MARIA BRADBURN**
    Date _____

    _____
    Notary Public in and for the state
    of Washington residing at _____
    Subscribed and sworn to before me on
    this ____ day of _____, 2007.
23  My commission expires on _____.

See: Wash. Reports 34A, Rule 30 (e)
USCA 28, Rule 30 (e)

46

```
1                    C E R T I F I C A T E
2    STATE OF WASHINGTON)
                        ) ss.
3    COUNTY OF CHELAN   )
4
5       THIS IS TO CERTIFY that I, Barbara J. Scoville,
6    Notary Public in and for the State of Washington, residing
7    at Entiat, reported the within and foregoing testimony; said
8    testimony being taken before me as a Notary Public on the
9    date herein set forth; that the witness was first by me duly
10   sworn; that said examination was taken by me in shorthand
11   and thereafter under my supervision transcribed, and that
12   same is a full, true and correct record of the testimony of
13   said witness, including all questions, answers and
14   objections, if any, of counsel, to the best of my ability.
15      I further certify that I am not a relative, employee,
16   attorney, counsel of any of the parties; nor am I
17   financially interested in the outcome of the cause.
18      Transcribed notes will be destroyed three years from
19   the affixed date unless requested by counsel to retain them.
20      IN WITNESS WHEREOF, I have hereunto set my hand and
21   affixed my official seal this _____ day of
22   _____, 2007.
23
24                    _____
                      Barbara J. Scoville, CCR, RPR
25                    CCR NO. 2124
```

47