# Exhibit C

Dockets.Justia.com

```
 1
 2              UNITED STATES DISTRICT COURT
 3              EASTERN DISTRICT OF WASHINGTON
 4                       AT SPOKANE
 5    _____

                                          )
 6    SARAH BRADBURN, PEARL CHERRINGTON,  )
      CHARLES HEINLEN, and THE SECOND     )
 7    AMENDMENT FOUNDATION,                )
                                          )
 8              Plaintiffs,               ) NO.
                                          ) CV-06-327-EFS
 9         vs.                            )
                                          )
10    NORTH CENTRAL REGIONAL LIBRARY      )
      DISTRICT,                           )
11                                        )
                Defendant.                )
12
     _____
13
              DEPOSITION UPON ORAL EXAMINATION OF
14                    PEARL ANNE CHERRINGTON
     _____
15
16   TAKEN ON:    Monday, August 13th, 2007
17   TAKEN AT:    Omak Library
                  30 South Ash
18                Omak, Washington
19   START TIME:  10:42 A.M.
20   END TIME:    11:58 A.M.
21
22
23
24
     REPORTED BY:  BARBARA J. SCOVILLE, CCR, RPR
25                 CCR NO. 2124
```

**Page 17**

1     the Twisp library branch consists of? I'm sure
2     you've never paced it off.
3 A. **Perhaps twice the size of this room.**
4 Q. Okay. Maybe a thousand square feet? Does that
5     sound about right?
6 A. **Yeah, yes.**
7 Q. Does that branch have computer terminals?
8 A. **Yes.**
9 Q. Okay. How many?
10 A. **As of Saturday when I went in, three.**
11 Q. Okay.
12 A. **It only had one up until that time.**
13 Q. Oh, and as of Saturday, they've tripled their --
14 A. **Yes, they have.**
15 Q. Excellent. Are they all situated in the same area?
16 A. **No. There's two in a section and then there is one**
17     **in another section.**
18 Q. Do you have any idea why they're separated?
19 A. **I think they're separated because we have a card**
20     **catalog -- We used to have one designated for the**
21     **card catalog only. It was not Internet. And now**
22     **this -- they're all Internet access. Plus our card**
23     **catalog, that's how we have to access our card**
24     **catalog. I think that one's been sort of set aside**
25     **so it's not continually used so that we can get**

**Page 18**

1     **access to look up books.**
2 Q. Okay.
3 A. **That's what I'm thinking.**
4 Q. When you say "we," just patrons in general?
5 A. **Yes, patrons.**
6 Q. Okay. Do you know the library staff at the Twisp
7     branch?
8 A. **Yes, I do.**
9 Q. Who is that?
10 A. **The main librarian is Terry Dixon. Then there's a**
11     **woman that fills in on Saturdays. I only know her**
12     **first name. It's Rosie. And then she's added some**
13     **new staff, and I'm unsure of what their names are.**
14 Q. Okay. Now, when you visit the Twisp branch,
15     Mrs. Cherrington, what resources do you typically
16     use?
17 A. **I look for books mainly.**
18 Q. And, of course, you use the Internet from time to
19     time; is that right?
20 A. **We got our own computer two years ago. So I did**
21     **actually use the Internet Saturday at the library,**
22     **but it is mainly to look up books actually.**
23 Q. The card catalog?
24 A. **Yes, yes.**
25 Q. Okay. So you have your own computer at home?

**Page 19**

1 A. **Not at home. It's in my husband's office in Twisp.**
2 Q. I see. And are you able to use that computer as you
3     need to more or less?
4 A. **Occasionally. We mainly keep it for business. I**
5     **do -- If I need to get on it to look for**
6     **information, I will use that over the library's now.**
7 Q. Okay. And that computer has Internet access, of
8     course.
9 A. **Yes, it does.**
10 Q. And I don't mean to put words in your mouth. Is
11     that your preferred point of access to the Internet
12     now?
13 A. **Yes.**
14 Q. And is that computer completely unfiltered?
15 A. **Yes.**
16 Q. So your access is not impeded in any way?
17 A. **No, it's not.**
18 Q. And when you come to the Twisp branch to use the
19     Internet now, as I understand it, your usage is
20     primarily directed toward looking up books.
21 A. **Right.**
22 Q. Okay. Do you even have to go on the Internet for
23     that purpose or is that internal?
24 A. **Actually, no, I don't have to go on the Internet for**
25     **that; right.**

**Page 20**

1 Q. Am I correct then in thinking that you today rarely
2     access the Internet through the Twisp branch
3     computers?
4 A. **Yes.**
5 Q. Okay. Have you ever tried to access the Internet
6     through a library computer and been blocked from
7     reaching a site you desired to go to?
8 A. **Yes.**
9 Q. When did that occur?
10 A. **About 2005.**
11 Q. Okay. Do you have a specific recollection of that
12     incident?
13 A. **I have a -- Yes, I do. I went -- plugged in my**
14     **Web site for an art gallery that I was looking for**
15     **in Idaho and a "STOP" sign came up and I was**
16     **surprised to see that.**
17 Q. Do you recall the Web site?
18 A. **I don't recall the Web site.**
19 Q. Okay. What did the pop-up, if you will, inform you
20     of?
21 A. **It said, "STOP." And I don't remember exactly what**
22     **else was said there, what -- why it was stopping.**
23     **That's when I got up and asked the librarian why**
24     **that was showing, why I couldn't get into that site.**
25 Q. Was that Terry?

Decl of Adams
Page 27

```
 1  A. Yes, it was.
 2  Q. Okay. And what did Terry say?
 3  A. And Terry said that she was unable to -- that it was
 4     filtered and that she was unable to unlock it.
 5  Q. Okay. Did you recall having a discussion with Terry
 6     about a mechanism for taking it up a chain, if you
 7     will, and seeing about unblocking access to that
 8     site?
 9  A. I don't recall doing that at the time.
10  Q. You don't recall a discussion about that?
11  A. No, I don't.
12  Q. Okay. Did you attempt to reach that same Web site
13     address through another computer unaffiliated with
14     the library?
15  A. No, I didn't.
16  Q. You didn't have one at your husband's business then?
17  A. Right.
18  Q. Okay. Are you familiar with NCRL's Internet Public
19     Use Policy?
20  A. No, I'm not.
21  Q. Have you ever seen anything in printed form or heard
22     anybody discuss what the parameters of the Internet
23     Public Use Policy might be?
24  A. I just remember seeing a sign posted -- this was on
25     our older computer -- that said something about not
                                                      21
```

```
 1     to tamper with the system and not to do any hacking.
 2     And that's all I recall that it said. It was a
 3     little sign.
 4  Q. In a previous deposition, we marked this as
 5     Deposition Exhibit 3, and I'm going to show this to
 6     you now, Mrs. Cherrington. And let me just ask you
 7     to take a quick look at that and let me know when
 8     you've had a chance to do that.
 9  A. Okay. I've read it.
10  Q. Have you had a chance to look at Exhibit 2 (sic)?
11  A. Uh-huh.
12  Q. Have you seen this before?
13  A. Now that I see it, I have seen it on the screen, but
14     I really didn't take the time to read it thoroughly.
15  Q. Okay.
16  A. There are certain words in and there phrases in
17     there that I can recall seeing -- having seen.
18  Q. Were you generally aware that Internet access was
19     filtered?
20  A. At the time I went in there, I wasn't aware of it.
21  Q. Okay. When I showed you this document a moment ago,
22     I don't recall if I made reference to "Deposition
23     Exhibit 2" or "Deposition Exhibit 3." I meant to
24     say "3" if I said "2". And I just want to make sure
25     that we're clear that we're referring to Exhibit 3.
                                                      22
```

```
 1  A. Yes.
 2  Q. In the pile of deposition exhibits I've put in front
 3     of you now, Deposition -- the document that we have
 4     previously marked as Deposition Exhibit 2 is a
 5     one-page document. Will you take a look at that for
 6     a moment, please.
 7  A. Okay.
 8  Q. Have you seen this document which is called a
 9     "Material Selection Review Form" prior to my just
10     showing it to you just now?
11  A. No.
12  Q. Okay. So you didn't fill out a form like this when
13     you were blocked at getting to the Idaho gallery
14     Web site?
15  A. No, no, I did not.
16  Q. Apart from this Idaho gallery's Web site, have you
17     ever experienced a similar episode where you tried
18     to get to a Web site and have been denied access?
19  A. Yes, I do.
20  Q. Do you recall any specific Web sites?
21  A. I don't recall the specific Web site.
22  Q. In general, can you tell me were they related
23     Web sites to a particular topic?
24  A. No, they weren't. It was -- Well, yeah, I can tell
25     you the topic. I Googled it. It was "anal
                                                      23
```

```
 1     fissure," and it blocked that -- me from putting
 2     that in.
 3  Q. Okay. You were just researching a health topic?
 4  A. Yes, I was.
 5  Q. Okay. Did you bring that to the attention of Terry
 6     or anyone else at NCRL?
 7  A. I didn't because I knew -- I realized, well, it's
 8     one of those that was filtered.
 9  Q. Okay. So, again, you would not have filled out a
10     Material Selection Review Form?
11  A. Right.
12  Q. Okay. Have you ever sought out assistance from the
13     Twisp branch staff about how you might formulate an
14     Internet inquiry to get around a blocked-site
15     notice?
16  A. No.
17  Q. Have you ever talked to Terry or anyone else at
18     Twisp about Internet searching generally, about how
19     to be effective in Internet searching?
20  A. No.
21  Q. Is it your position in this lawsuit,
22     Mrs. Cherrington, that adult patrons of NCRL
23     branches should have unfiltered access to the
24     Internet?
25  A. Yes.
                                                      24
```

Decl of Adams
Page 28

**Page 25**

1  Q. Do you think a filter is appropriate for any topic?
2  A. No.
3  Q. Okay. What about, say, pornography?
4  A. You would have to define what "pornography" is.
5  Q. Okay. Let's use your definition of "pornography,"
6     and you don't even have to tell me what your
7     definition is. We all know it when we see it. I
8     think the Supreme Court has told us.
9  A. Uh-huh.
10 Q. But with your definition in mind, do you agree or
11    disagree that it's proper for NCRL to filter out
12    Web sites that would touch upon that definition of
13    "pornography" that you have in mind?
14          MR. MANVILLE: Object to the form of the
15 question.
16    But you can go ahead and answer.
17          THE WITNESS: Could you repeat the
18 question, please.
19          MR. ADAMS: I'm not sure I can.
20 I'll let you reread it.
21
22    (CONTINUE ON THE FOLLOWING PAGE.)
23
24
25

**Page 26**

1     (THE FOLLOWING RECORD WAS READ:
2
3     "Q But with your definition in mind, do
4        you agree or disagree that it's
5        proper for NCRL to filter out
6        Web sites that would touch upon that
7        definition of 'pornography' that you
8        in mind?")
9
10          THE WITNESS: Okay. Well, my definition
11 of "pornography" is I know there are forms of
12 pornography that are illegal that the Supreme Court
13 has said. Those would be the ones that would be
14 filtered if they are illegal.
15 Q. (By Mr. Adams) Would you agree that filtering for
16    that purpose is proper?
17 A. Yes.
18 Q. And you wouldn't have a problem with the library
19    filtering for those particular Web sites?
20 A. If it's against the law, I wouldn't have a problem.
21 Q. Okay. Does that extend to -- does that reasoning
22    extend to other topics that would be against the
23    law, let's say, online gambling or, let's say,
24    Web sites focused on teaching people how to hack
25    into computers --

**Page 27**

1  A. Uh-huh.
2  Q. -- things that are clearly illegal?
3  A. Okay. If they're clearly illegal, then they could
4     be filtered.
5  Q. Okay. Do I take it from your statements then that
6     you would agree that there are some types of speech
7     which are not constitutionally protected?
8          MR. MANVILLE: I'll object to the form.
9  Q. (By Mr. Adams) You can still answer.
10 A. I'm sorry, the question?
11 Q. Would you agree with me that there are some
12    categories of speech, of expression, which are not
13    constitutionally protected?
14          MR. MANVILLE: Object to the form.
15          THE WITNESS: I don't understand the
16 question. I'm sorry.
17 Q. (By Mr. Adams) Okay. Let me try it a slightly
18    different way. Would you agree with me that there
19    are certain categories of speech, certain topics of
20    content, which if access is blocked raise no
21    Constitutional issue?
22          MR. MANVILLE: Object to the form of the
23 question.
24          THE WITNESS: It's still confusing to me.
25 Q. (By Mr. Adams) I don't mean to belabor this. You

**Page 28**

1     told me that you don't have an issue with the
2     library blocking Web sites devoted to the sorts of
3     pornographic content which have been deemed illegal;
4     correct?
5  A. Yes, uh-huh.
6  Q. Okay. So would you also agree that if the library,
7     the NCRL, blocked access to those sites that it
8     would not be invading the Constitutional rights
9     under the First Amendment or the Constitutional
10    rights under the Washington State Constitution of a
11    user such as yourself?
12          MR. MANVILLE: Object to the form of the
13 question.
14          THE WITNESS: If just -- All I can say
15 is if it's illegal, then they have a right to filter
16 it if it is deemed illegal by the Supreme Court or
17 the State of Washington.
18 Q. (By Mr. Adams) Okay. And the flip side of that is
19    you would not claim, would you, a Constitutional
20    right to access it through NCRL's computers?
21 A. That is right. That is right.
22 Q. Thank you.
23 A. Sorry.
24 Q. So filtering for some purposes can be appropriate in
25    your view; true?

Decl of Adams
Page 29

**Page 29**

1 A. Yes.
2 Q. Okay. I appreciate from your prior testimony that
3 you've never invoked the NCRL's procedure for
4 reviewing blocked sites and possibly unblocking
5 them, but I'll ask you to just take it as a given
6 that such a procedure exists. All right?
7 A. Okay.
8 Q. If you were to invoke such a procedure, what would
9 you believe to be a reasonable time to get a
10 response back from the library?
11 A. Within the hour.
12 Q. Okay. What about within a day?
13 A. I think within a day is too long because those of us
14 that live ten miles out would have to come in the
15 next day to get an answer or we could call. But you
16 have to wait too long. And if you need information
17 quickly, that's too long to wait given that the
18 Internet is so instantaneous. So waiting a day is
19 still not good.
20 Q. Okay. If a branch had no computer terminals but you
21 wanted to get access to a certain book --
22 A. Uh-huh.
23 Q. -- how long would you expect to wait for that book
24 if it came by inter-library loan?
25 A. We wait about a week.

**Page 30**

1 Q. Is that reasonable?
2 A. Yes, I would say it's reasonable.
3 Q. So you would be willing to wait a week for a book
4 and not find that unreasonable, but you wouldn't be
5 willing to wait more than an hour to gain access to
6 a blocked Web site.
7 A. Right.
8 Q. Okay. And help me understand that. Explain that to
9 me.
10 A. Because a blocked Web site -- Getting a book
11 through the mail takes time, but a blocked Web site
12 is interfering with my right to have information
13 accessed at that time.
14 Q. Aren't we still talking about ultimate access to the
15 content? It's just the time it takes to get it.
16 A. No, not necessarily.
17 Q. Okay. Let's -- Work with me a little bit on this
18 hypothetical. Let's say this Idaho gallery whose
19 Web site you couldn't get to from --
20 A. Right.
21 Q. -- the NCRL terminal --
   A. Right.
23 Q. -- let's say they had a book that included
24 everything that you wanted to know about the Idaho
25 gallery --

**Page 31**

1 A. Uh-huh.
2 Q. -- and you could get that book by waiting a week.
3 A. Uh-huh.
4 Q. Would that not be an appropriate solution to your
5 need for information?
6 A. Not necessarily because of the time. If it's dated
7 material -- if it were dated -- So to me, it
8 wouldn't -- Still waiting a day for the Internet is
9 still too long.
10 Q. So if your need is time sensitive, then a quick
11 response is important to you.
12 A. Yes, it is.
13 Q. Okay. If your need is not time sensitive, then
14 what?
15 A. Then it's -- I can wait.
16 Q. Okay. But, again, not having invoked the NCRL's
17 mechanism for reviewing blocked Web sites, you don't
18 know how long it takes.
19 A. Right.
20 Q. It might be an hour; right?
21 A. It could be an hour. That would be great.
22 Q. Yeah, okay. Do you know anything about the type of
23 filtering software now in use at the library?
24 A. A small -- I know a little bit.
25 Q. Tell me what you know.

**Page 32**

1 A. Very little. I just know that there's a certain
2 name for it.
3 Q. "Fortinet"? Does that sound familiar?
4 A. No, it doesn't. I think it started with an S.
5 Q. "Bess"?
6 A. No. And then it listed the names of categories of
7 things that it filters. I can't recall all of them.
8 I know one I thought was "alcohol". I don't know --
9 It might have had "drugs". It had "nudity". There
10 are just certain words. The "gambling" that I
11 picked up because there was a big long list of them.
12 Q. How did you get access to that list?
13 A. I had the list, I believe, in some of the -- Is it
14 the documents from the ACLU? I believe there was a
15 description of what the library uses to filter.
16 Q. Okay. The categories?
17 A. Yes, yes.
18 Q. Okay. Are you aware that since your lawsuit has
19 been filed the library in the normal course has
20 changed its filtering system and gone to a different
21 software program and service provider?
22 A. I had heard about that, not in great detail. I had
23 just heard that they had gone to a different
24 filtering system.
25 Q. Okay. And as you sit here today, do you know the

| | |
|---|---|
| 1    categories presently blocked by NCRL? | 1    level. |
| 2    A. I do not. | 2    A. Yes. |
| 3    Q. Okay. So it might be the same, might be broader, | 3    Q. And you're not aware of that occurring? |
| 4    might be less broad than what was previously brought | 4    A. It did not occur. Usually when it -- if you have |
|       to your attention as the blocked categories? | 5    trouble getting onto somebody's Web site, the page |
| 5    A. Okay. | 6    will come up, "This page is unable to be accessed |
| 7    Q. Is that true? | 7    because the Web site is under construction or out of |
| 8    A. Yes. | 8    date." But this was a big red "STOP" sign that was |
| 9    Q. I gather since you're not overly familiar with the | 9    definitely filtered. |
| 10    Fortinet namebrand and Fortinet service, which I | 10    Q. Blocked by the filter. |
| 11    will represent to you is the current service, you're | 11    A. Yes. |
| 12    unaware of Fortinet's own mechanism for any person | 12    Q. Okay. Do you post online under any kind of a |
| 13    to challenge Fortinet's classification of a | 13    pseudonym? |
| 14    particular Web site. | 14    A. No. |
| 15    A. Right, I am unaware. | 15    Q. You e-mail though, of course. |
| 16    Q. Okay. We spoke about your inability to get to the | 16    A. Yes. |
| 17    Idaho gallery, and we spoke about your efforts to do | 17    Q. Okay. But you don't maintain any kind of a -- you |
| 18    research on the health topic. | 18    know, a screen name for blogging or anything like |
| 19    A. Uh-huh. | 19    that? |
| 20    Q. Were there any other Web sites that you were unable | 20    A. No. |
| 21    to get access to? | 21    Q. You never posted on a blog? |
| 22    A. Yes. I went in and tried to get YouTube mainly | 22    A. No. |
| 23    because there seemed to be a lot of talk about it | 23    MR. ADAMS: Let's mark this Number 13. |
| 24    and I thought, "What is this?" I was curious. And | 24    |
| 25    I was blocked from that. | 25    (EXHIBIT 13 WAS MARKED.) |
| 33 | 35 |
|       Q. Okay. Did you bring that to anyone's attention? | 1    Q. (By Mr. Adams) Mrs. Cherrington, I've handed you a |
| 2    A. I did not. | 2    document marked Deposition Exhibit 13. And for the |
| 3    Q. You did not. | 3    record, I'll state that this document constitutes |
| 4    A. No, I didn't. | 4    your "Objections, Answers and Responses to |
| 5    Q. When did you try to get access to YouTube? | 5    Defendant's First Interrogatories and Requests for |
| 6    A. It seems like it was six to ten months ago -- | 6    Production." |
| 7    Q. Okay. | 7    I believe you've already reviewed these |
| 8    A. -- as I recall. | 8    answers and objections, but go ahead and familiarize |
| 9    Q. At that time, did you have access to your -- the | 9    yourself with them if you feel you need to. I just |
| 10    computer in your husband's office? | 10    have a few questions for you. |
| 11    A. Yes, I did. | 11    Is that your signature -- |
| 12    Q. Were you able to access YouTube there? | 12    A. Okay. |
| 13    A. I didn't try. | 13    Q. I'm sorry, go ahead. |
| 14    Q. You could; is that true? | 14    A. Okay. |
| 15    A. I could have, yes. | 15    Q. Okay. Is that your signature on page 11? |
| 16    Q. Do you know whether the blocking of the Idaho | 16    A. Yes. |
| 17    gallery could have been the result of a technical | 17    Q. In your answer to Interrogatory Number 5 on |
| 18    issue as opposed to the operation of the software? | 18    page 4 -- |
| 19    A. I don't know that. | 19    A. Okay. |
| 20    Q. It just said "Blocked"? | 20    Q. -- in the first sentence, your answer states, "The |
| 21    A. Yes. | 21    NCRL's filter denied access to certain Web sites for |
|       Q. Okay. The reason I ask is that there's information | 22    art galleries in the Pacific Northwest that were |
| 23    in this case that if a Web site is hosted on a type | 23    included on a list obtained from Artist Trust." Do |
| 24    of server that it might create an incompatability | 24    you see that? |
| 25    issue that would prevent access at the terminal | 25    A. Right, yes. |
| 34 | Decl of Adams Page 31    36 |

# Exhibit D

2. The NCRL's filter blocked a search engine query for the term "anal fissure," presenting a "STOP" sign instead of returning results.

3. The NCRL's filter blocked access to www.youtube.com. The message displayed indicated that the site was being blocked because it had chat capability.

**INTERROGATORY NO. 6**: Prior to the filing of the Complaint, were you aware of NCRL's Internet Usage Policy?

**ANSWER**: Ms. Cherrington was not familiar with any particular document known as the Internet Usage Policy prior to the filing of the Complaint. She remembers seeing a sign posted near the computer terminal that she was using which stated that users should not tamper with or hack into the library's computer system, but she does not recall this document saying anything about Internet filtering.

**INTERROGATORY NO. 7**: Did you accept NCRL's Internet Usage Policy before accessing the Internet on NCRL computers?

**ANSWER**: Ms. Cherrington objects to the word "accept" as vague and ambiguous. Subject to and without waiver of the foregoing objection, Ms. Cherrington states that she does not recall signing or orally agreeing to any specific terms before accessing the Internet on any of the NCRL's computers.

**INTERROGATORY NO. 8**: With respect to each website identified in Interrogatory No. 5, state the reason(s) that you sought access to the site.

**ANSWER**:

1. Ms. Cherrington was looking for art gallery websites because she is a professional photographer and was hoping to find art galleries at which to sell her work.

2. Ms. Cherrington wished to learn about anal fissures because of health problems she was experiencing.

Decl of Adams
Page 33

PEARL CHERRINGTON'S OBJECTIONS, ANSWERS
AND RESPONSES TO DEFENDANT'S FIRST
INTERROGATORIES AND REQUESTS FOR
PRODUCTION (Cause No. 2:06-cv-327) – Page 5
cg201309

RAFEL MANVILLE PLLC
999 3rd Ave., Ste. 1600, Seattle, WA 98104
main 206.838.2660 fax 206.838.2661

3. Ms. Cherrington wished to explore www.youtube.com because it was a topic of public discussion and debate that she wished to become familiar with.

**INTERROGATORY NO. 9**: Discuss what efforts, if any, you made to bring your concerns about the blocked sites (identified in Interrogatory No. 5) to the attention of NCRL personnel, including the name of any individual that you spoke with, the date of the conversation and the response.

**ANSWER**:

1. The denial of access to the art gallery Web sites occurred in early summer 2005. On the day access was denied, Ms. Cherrington spoke with librarian Terry Dixon. Ms. Dixon said that the denial of access resulted from the library's filtering software and that she was unable to do anything to allow access to the blocked sites.

2. The blockage of the "anal fissure" search occurred shortly after the first incident. Ms. Cherrington did not bother the librarian about it, since she had been told that the filter could not be turned off.

3. The denial of access to www.youtube.com occurred sometime during the winter of 2006-07. Ms. Cherrington did not speak to a librarian about this.

**INTERROGATORY NO. 10**: Discuss what efforts, if any, you made to bring you concerns about the blocked sites (identified in Interrogatory No. 5) to the attention of any other person or entity (other than your attorney), including state or federal officials/employees. For each individual identify their (its) name, the date of the conversation and the response.

**ANSWER**: Ms. Cherrington spoke about the blocked sites to her husband and friends, but not to any state or federal officials.

**INTERROGATORY NO 11**: Have you accessed, or attempted to access, the Internet at an NCRL branch since the Complaint was filed?

**ANSWER**: Yes.

Decl of Adams
Page 34

PEARL CHERRINGTON'S OBJECTIONS, ANSWERS
AND RESPONSES TO DEFENDANT'S FIRST
INTERROGATORIES AND REQUESTS FOR
PRODUCTION (Cause No. 2:06-cv-327) – Page 6
cg201309

RAFEL MANVILLE PLLC
999 3rd Ave., Ste. 1600, Seattle, WA 98104
main 206.838.2660  fax 206.838.2661