# Exhibit E

Decl of Adams
Page 35

Dockets.Justia.com

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF WASHINGTON

3    AT SPOKANE

4

5

6    SARAH BRADBURN, PEARL CHERRINGTON,        )
     CHARLES HEINLEN, and THE SECOND          )
7    AMENDMENT FOUNDATION,                     )

8         Plaintiffs,                          )   NO.
                                               )   CV-06-327-EFS
9         vs.                                  )

10   NORTH CENTRAL REGIONAL LIBRARY            )
     DISTRICT,                                 )
11                                             )
          Defendant.                           )
12

13

14   DEPOSITION UPON ORAL EXAMINATION OF
     CHARLES MERLE HEINLEN

15

16   TAKEN ON:    Monday, August 13th, 2007

17   TAKEN AT:    Omak Library
                  30 South Ash
18                Omak, Washington

19   START TIME:  7:30 A.M.

20   END TIME:    10:35 A.M.

21

22

23

24

25   REPORTED BY:  BARBARA J. SCOVILLE, CCR, RPR
                   CCR NO. 2124

                                              1

---

1                    I N D E X

2    In re:  SARAH BRADBURN vs. NORTH CENTRAL REGIONAL LIBRARY
     Case No.: CV-06-327-EFS
3    Date: August 13th, 2007

4

5              T E S T I M O N Y

6    EXAMINATION                                   PAGE NUMBER

7    By Mr. Adams                                       4

8

9              E X H I B I T S

10   1    Notice of Deposition of Mr. Charles       29
          Heinlen
11
     2    NCRL Material Selection Review Form       30
12
     3    NCRL Internet Public Use Policy           34
13
     4    NCRL's Document Containing Their          42
14        Mission Statement

15   5    Complaint for Declaratory and            51
          Injunctive Relief
16
     6    American Civil Liberties Union of        58
17        Washington

18   7    Plaintiff Mr. Charles Heinlen's          60
          Objections, Answers and Responses to
19        Defendant's First Interrogatories

20   8    Article in Upside Down World by          79
          Mr. Charles Heinlen
21
     9    Blogography Web site pages               85
22
     10   Letter to Director Marney from           93
23        Mr. Charles Heinlen and Letter to
          Mr. Charles Heinlen from Mr. Dean
24        Marney

25   11   Packet of E-mails                        101

                                              3

---

1    APPEARANCES:

2    FOR THE PLAINTIFFS:

3         MR. DUNCAN MANVILLE, ESQ.
          RAFEL MANVILLE, PLLC
4         Attorneys at Law
          999 3rd Avenue
5         Suite 1600
          Seattle, Washington 98104
6         (206) 838-2660

7

8    FOR THE DEFENDANT:

9         MR. THOMAS D. ADAMS, ESQ.
          KARR TUTTLE CAMPBELL
10        Attorneys at Law
          1201 Third Avenue
11        Suite 2900
          Seattle, Washington 98101
12        (206) 223-1313

13

14

15

16   ALSO PRESENT:  MR. DEAN MARNEY
                     MR. DAN HOWARD
17

18

19

20

21

22

23

24

25

                                              2

---

1         BE IT REMEMBERED that on Monday,

2    August 13th, 2007, at 7:30 a.m., at Omak Library,

3    30 South Ash, Omak, Washington, the testimony of

4    **MR. CHARLES MERLE HEINLEN** was taken before Barbara

5    J. Scoville, Certified Court Reporter and Notary

6    Public.  The following proceedings took place:

7

8         **CHARLES M. HEINLEN,** being first duly sworn to

9                          tell the truth, the whole

10                         truth and nothing but the

11                         truth, testified as

12                         follows:

13

14              EXAMINATION

15   BY MR. ADAMS:

16   Q.   State your name, please.

17   A.   **Charles Merle Heinlen, H-e-i-n-l-e-n.**

18   Q.   Thank you.  Mr. Heinlen, my name is Tom Adams, and

19        we've had a chance to meet briefly this morning

20        already.  How are you?

21   A.   **Great.  How are you?**

22   Q.   Great, thank you.  Thanks for showing up so early

23        this morning so we can get a start on our day.  I'm

24        the lawyer representing the Defendant North Central

25        Regional Library District which is the defendant in

                                              4

**Page 33**

1  that it unblocked to my knowledge.
2  Q. Tell me about that. Does a window pop up when you
3     see a site? When you come to a site --
4  A. That was under their older filter that said, "You
5     can submit a site review request by clicking here."
6     And that led to, I believe, a pop-up window that
7     said that, you know, you could write whatever you
8     wanted to write about that site like -- you know, if
9     I didn't think it was fair that I couldn't look up,
10    you know, one particular Web site, I could write a
11    short paragraph as to why and hit "Send." I do not
12    know whether that went to Mr. Marney or Mr. Howard
13    or straight to N2H2 that was running Bess at the
14    time or anything like that. I know that I did that
15    on a couple of occasions, four or five at least.
16 Q. Okay.
17 A. You know, I provided my e-mail address, and not once
18    did I ever get a response from either them or N2H2.
19 Q. Okay. Has the system changed with the change in
20    filtering software here at the library?
21 A. They went from Bess to this new one that they've
22    got, Fortinet.
23 Q. Right. Has the system changed? Do you still get
24    that pop-up window?
25 A. I'm trying to recall. Like I said, it's early and

**Page 34**

1  I'm not a hundred percent on that.
2  Q. Okay.
3  A. I believe you can submit a site review request, but
4     I couldn't swear to that right now.
5  Q. Are you aware whether Fortinet itself provides a
6     mechanism for you to challenge its classification of
7     a particular URL without ever going to the library?
8  A. Like I just explained, I think so but I'm not a
9     hundred percent so I'm not comfortable answering
10    that one.
11 Q. Do you recall ever having used such a mechanism
12    through Fortinet?
13 A. On Fortinet? To the best of my recollection, no.
14 Q. Are you familiar with NCRL's Internet Public Use
15    Policy?
16 A. I've read it a couple of times.
17        MR. ADAMS: Mark that, please.
18
19        (EXHIBIT 3 WAS MARKED.)
20
21 Q. (By Mr. Adams) Mr. Heinlen, I've just handed you a
22    one-page document that we've marked as Deposition
23    Exhibit 3. But go ahead and take a look at that, if
24    you would, please, and let me know when you've had a
25    chance to review it.

**Page 35**

1  A. Okay.
2  Q. Have you read this before?
3  A. It is posted here to the left of or in between their
4     terminals, I believe.
5  Q. Okay.
6  A. And I think this is also the one that comes up on
7     the screen before you log in or something to this
8     effect.
9  Q. Okay.
10 A. But I have seen this page before. It's also on
11    their Web site, I believe.
12 Q. Have you ever spoken to NCRL personnel about this
13    policy?
14 A. Shortly after US v. ALA, I had e-mailed Mr. Howard
15    back and forth on this.
16 Q. On the Internet policy?
17 A. On the Internet policy, you know, pursuant to that
18    ruling.
19 Q. Okay. What, in particular, did you say --
20 A. I took particular offense to the notion that they
21    would not unblock filters.
22        MR. MANVILLE: Let him finish asking the
23    questions.
24        THE WITNESS: Oh, I'm sorry.
25        MR. MANVILLE: It makes for a cleaner

**Page 36**

1  record.
2        THE WITNESS: My apologies.
3  Q. (By Mr. Adams) No apology necessary. So you say
4     you took particular offense to the NCRL's policy
5     pursuant to which it would not completely unblock
6     their filter; is that correct?
7  A. Yes, sir.
8  Q. Okay. Is it not sufficient in your mind that NCRL
9     will undertake a review on a site-by-site basis of a
10    particular blocked URL?
11 A. I feel that that is unnecessarily intrusive on my
12    privacy that I should have to submit sites in
13    advance. It's also disruptive that I could not just
14    surf the Internet at my own pace and have to submit
15    a site review request for everything that was
16    blocked and come back a day or three later after
17    they made their decision to get to a particular
18    site. It's disruptive.
19 Q. What did you say, that it takes a day or three?
20 A. I said that it possibly could. By the time it gets
21    from here to Wenatchee and back when you're only
22    allotted a one half-hour block of time, you know, I
23    do not see where they could feasibly review every
24    site request that you would think would be coming at
25    them and give you a decision before your time runs

**Page 37**

1 out on this terminal here.

2 Q. You've never tried it though; right?

3 A. At this point, no. And I also feel that it's, you

4 know, intrusive on my privacy.

Q. But, again, you've never tried it.

6 A. No, sir, I have never tried it.

7 Q. Okay. So you don't know how well the procedure

8 works or not, do you?

9 A. As I said, I was uncomfortable submitting in advance

10 the sites that I wanted to see.

11 Q. I understand. But you've never tried it, have you?

12 MR. MANVILLE: Objection, it's been asked

13 and answered.

14 THE WITNESS: No, sir.

15 Q. (By Mr. Adams) So you don't know how long it takes

16 to get an answer back, do you?

17 A. Well, I guess that would be a no.

18 Q. In instances where you've encountered a blocked

19 site, Mr. Heinlen, how do you know that the blockage

20 is not occurring because of some technological

21 issue --

22 A. Because of --

23 Q. -- as opposed to a functioning of the filtering

24 software?

25 A. If it's a filter violation, it comes up "Blocked."

**Page 38**

And under a specific category more often than not,

2 some sites come up and just say "Blocked." Most of

3 them will say "Blocked" and then give a category.

4 Q. Okay. So is it your position that as a patron of

5 the NCRL library that you're entitled to completely

6 unfiltered access to the Internet?

7 A. Yes, sir.

8 Q. Would that include categories of speech that are not

9 entitled to Constitutional protection?

10 A. Such as?

11 Q. Pornography.

12 A. As I said earlier, I was not surfing for porn.

13 Q. Okay. I realize you said that you weren't surfing

14 for it, but do you think that you're entitled to

15 access to it?

16 MR. MANVILLE: Objection to the extent it

17 calls for a legal conclusion.

18 THE WITNESS: Do I think that NCRL

19 patrons should be able to look up materials that

20 some people would consider pornographic?

21 Q. (By Mr. Adams) Sure. Answer that question.

A. It's a relative term. I mean, what one man would

23 consider pornographic, another man certainly

24 wouldn't, so ...

25 Q. That isn't the question. The question is access.

**Page 39**

1 A. I believe that NCRL patrons should have completely

2 unfiltered access. That's my answer.

3 Q. Okay. So do you believe NCRL is entitled to filter

4 Internet access to exclude pornographic content?

5 A. Could you repeat that?

6

7 (THE FOLLOW RECORD WAS READ:

8

9 "Q Okay. So do you believe NCRL is

10 entitled to filter Internet access to

11 exclude pornographic content?")

12

13 MR. MANVILLE: Object to the form of the

14 question.

15 Q. (By Mr. Adams) You can answer.

16 A. I do object to the form of the question. I mean, I

17 said I believe the patrons are -- adult patrons as

18 defined in US v. ALA are entitled to unfiltered

19 access. Okay, that includes all categories.

20 Q. Okay. Is it your position that your rights under

21 the United States Constitution and the Constitution

22 of the State of Washington pertaining to free

23 expression are impaired or breached or somehow

24 compromised by your inability to access pornography?

25 MR. MANVILLE: Object to the form of the

**Page 40**

1 question.

2 THE WITNESS: I believe that my rights

3 are infringed under the constitutions of the United

4 States and of the State of Washington when I'm

5 denied my ability to seek information on a public

6 library terminal. I believe that that is an

7 infringement of my civil liberties.

8 Q. (By Mr. Adams) Okay. Would you agree that

9 libraries make content-based decisions all the time?

10 A. I would agree that they make content-based decisions

11 based on limited space availability for, like, books

12 and magazines; however, the Internet presents the

13 opposite problem. I mean, it's totally different.

14 There's no shelf space limitation when it comes to

15 Internet access.

16 Q. Let's say the Internet is not installed at this Omak

17 branch and you came in and asked the library to

18 obtain a pornographic book. Would you feel that

19 they have a right to provide that book to you?

20 A. That goes to a shelf space limitation. Their board

21 of directors would make decisions on what they will

22 and will not stock based on the cubic footage

23 available inside their building. I would agree that

24 Okanogan could not, therefore, stock nearly as many

25 books as Omak which can stock less books, I would

Decl of Adams
Page 38

**Page 41**

1   assume, than their main branch in Wenatchee. And

2   that's all a space limitation. And they will make

3   their decisions based on that among other

4   considerations. And, again, I would restate that

5   the Internet presents an opposite dilemma.

6 **Q.** What other considerations besides shelf space?

7 **A.** I'm not a librarian nor am I a board member. I'm

8   not qualified to answer that question.

9 **Q.** You're not qualified to answer that question. Okay.

10   Are librarians qualified to answer that question?

11 **A.** I believe that's up to the board and not the

12   individual librarians themselves.

13 **Q.** Okay. Well, who makes the content decisions about

14   what materials are or are not kept at a particular

15   library branch?

16 **A.** Again, not working for a library, I couldn't

17   honestly answer that.

18 **Q.** Presumably the librarians; right?

19 **A.** No.

20      MR. MANVILLE: Object to the form.

21      THE WITNESS: No, presumably the board of

22 directors. I think they would have final say since

23 they're the ones that are signing the librarians'

24 paychecks.

25 **Q.** (By Mr. Adams) What's the role of the public

41

**Page 42**

. library in your opinion?

2 **A.** I believe it is their role to facilitate access of

3   information to any member of the public that seeks

4   it.

5 **Q.** Would you agree that the role of the library is to

6   facilitate learning and cultural enrichment?

7 **A.** I said, "information." I believe that learning and

8   cultural enrichment would fall under that.

9 **Q.** Have you read NCRL's mission statement?

10 **A.** Years ago.

11 **Q.** Do you have any idea what its mission is presently?

12 **A.** I do not know what they presently say their mission

13   is.

14      MR. ADAMS: Let's make this Number 4.

15

16      (EXHIBIT 4 WAS MARKED.)

17

18 **Q.** (By Mr. Adams) Mr. Heinlen, I've handed you a

19 multi-page document that we've marked as Deposition

20 Exhibit 4. Take a look at it and generally

21 familiarize yourself with it if you would, please.

22 You don't have to read it word for word.

23 **A.** You're just wanting me to familiarize myself with

24   the one sentence, section "I. Mission Statement"?

25 **Q.** Sure we'll start with that.

42

**Page 43**

1 **A.** Okay. "To promote reading and lifelong learning."

2 **Q.** Okay. Does that strike you as a mission that is an

3   appropriate mission for the NCRL?

4 **A.** I think it goes to what I said, that a library is

5   there to facilitate information to them that take

6   it.

7 **Q.** Okay. Well, the mission statement of NCRL is "to

8   promote reading and lifelong learning." Is that

9   correct?

10 **A.** Uh-huh.

11 **Q.** Is that a "yes"?

12 **A.** Yes, sir.

13 **Q.** Now, in your view, does that mission require NCRL to

14   provide its patrons with unlimited access to any

15   kind of content of any form of any nature at any

16   time if it can do so?

17      MR. MANVILLE: Object to the form of the

18 question.

19 **Q.** (By Mr. Adams) You can answer.

20      THE WITNESS: Could you feed me back that

21 question again?

22

23      (CONTINUE ON THE FOLLOWING PAGE.)

24

25

43

**Page 44**

1      (THE FOLLOWING RECORD WAS READ:

2

3      "Q Now, in your view, does that mission

4      require NCRL to provide its patrons

5      with unlimited access to any kind of

6      content of any form of any nature at

7      any time if it can do so?")

8

9      THE WITNESS: That would be a yes. What

10 if one of their patrons wants to learning something

11 that the board might object to? That still goes to

12 their mission statement of lifelong learning.

13 **Q.** (By Mr. Adams) What if a patron -- what if you

14 walked into the Omak branch and you said, "I'd like

15 to do some online gambling and I don't care that it

16 may be illegal; I want you to provide me access to

17 Internet sites that allow me to engage in this

18 pursuit of mine which I deem interesting and

19 important to me"?

20 **A.** If I wanted to perform an illegal act on library

21   property, they are well within their rights to get

22   the police right across the street and deal with it

23   accordingly.

24 **Q.** Would they be within their rights to block your

25 access to those sites?

44

1    MR. MANVILLE: Object to the form.

2    THE WITNESS: Yeah, do I have to answer

3    that one?

4    MR. MANVILLE: Yes, subject to your

5    objection.

6    THE WITNESS: Subject to your objection.

7    Subject to his objection, I said that I think

8    the patrons should have unfiltered access, period.

9  Q. (By Mr. Adams) Is that a "yes"?

10 **A. That is a "yes."**

11 Q. And if you came in and said, I have an interest in

12   undertaking learning how to conduct hacking

13   operations so that I can bring down the NCRL

14   computer system," could you have access to such

15   sites that would teach you to do that?

16    MR. MANVILLE: Object to the form.

17    THE WITNESS: Again, I believe all access

18   for adults should be ongoing, so that would be a

19   "yes" as well --

20 Q. (By Mr. Adams) Okay.

21 **A. -- but simply on the premise that I believe adults**

22   **should have unfiltered access.**

23 Q. Okay. If you came into the Omak branch and said, "I

24   want access to a site so I can buy cigars from

25   Cuba," should the Omak library branch provide you

45

with access to such sites?

2    MR. MANVILLE: Object to the form.

3    THE WITNESS: You can get Cubans in

4    Canada. But, yes.

5  Q. (By Mr. Adams) My point, I think you understand, is

6    that your position -- and I'm trying to just

7    understand this as clearly as I can -- that you

8    believe you are entitled to walk into a branch of

9    the NCRL library and ask for access to sites that

10   would permit you to undertake illegal activity; is

11   that correct?

12    MR. MANVILLE: Object to the form.

13    THE WITNESS: Yeah, I object to that

14   question. I said --

15 Q. (By Mr. Adams) You still have to answer.

16 **A. I understand I still have to answer it. I simply**

17   **want unfiltered access to the information that I**

18   **want to seek.**

19 Q. I understand --

20 **A. So that would have to, by association, be a "yes."**

21   **But it is not my position that I want to do anything**

22   **illegal here at all.**

23 Q. I understand. That isn't the point, sir. I'm just

24   trying to get a sense of whether you think it is the

25   obligation of the library to provide access to a

46

1    patron who might.

2    MR. MANVILLE: Object to the form.

3    THE WITNESS: I think it is their

4    obligation to provide unfiltered access to -- you

5    know, unfiltered Internet access for adults -- for

6    adult patrons.

7  Q. (By Mr. Adams) Okay. Are you aware of NCRL's

8    stated interest in making its library branches safe

9    for children?

10 **A. I've always told my daughter it's impolite to look**

11   **over somebody's shoulder to read what they're**

12   **reading, to seek what they're seeking.**

13 Q. Okay. Are you aware of NCRL's stated objective that

14   I just characterized for you?

15 **A. I believe that Mr. Marney stated that in a _Wenatchee_**

16   **_World_ article when this case first went public.**

17 Q. Okay. Is that a compelling objective in your view?

18    MR. MANVILLE: Object to the form.

19 Q. (By Mr. Adams) Is that a proper objective?

20 **A. No. I believe that it is not their role to act as**

21   **parents or baby-sitters in any way whatsoever.**

22   **Okay? My parental responsibilities are my parental**

23   **responsibilities not theirs.**

24 Q. The Omak branch has four computer terminals with

25   Internet access -- is that correct? -- to the best

47

1    of your knowledge?

2  **A. To the best of my knowledge. I've never walked back**

3    **into the children's section or over here. I don't**

4    **know if they have another terminal over there.**

5  Q. But in the area that you use here at the Omak

6    branch, there are four terminals together?

7  **A. Yes, sir.**

8  Q. And they're all in close proximity to one another?

9  **A. Uh-huh.**

10 Q. Is that a "yes"?

11 **A. Yes.**

12 Q. Okay. Side by side at a desk similar to what we're

13   sitting at right now?

14 **A. Desks almost identical to this, two terminals per**

15   **desk, yes.**

16 Q. Okay. Is it possible for the user of one terminal

17   to look over and see what is being previewed on the

18   Internet by another user at a different terminal?

19 **A. If he was curious as to what his neighbor was doing,**

20   **I suppose.**

21 Q. That's a "yes"?

22 **A. That is a "yes."**

23 Q. Okay. Does the posing of -- Excuse me. Does the

24   provision of unfiltered Internet access present any

25   danger of any kind in your mind?

Decl of Adams
Page 40                                    48

**Page 49**

1 A. No.

2 Q. None whatsoever?

3 A. None whatsoever.

4 Q. Okay. Is all form of expression, is all speech, is

5 everything published on the Internet in your opinion

6 Constitutionally protected?

7      MR. MANVILLE: Object to the form.

8      THE WITNESS: I'm not a lawyer. I can't

9 answer that one in good conscience.

10 Q. (By Mr. Adams) Is pornography Constitutionally

11 protected?

12      MR. MANVILLE: Object to the form.

13      THE WITNESS: In what context? I mean --

14 Is pornography protected speech? I don't know the

15 case history on that. I know that Larry Flint beat

16 Jerry Falwell all the way to the Supreme Court but

17 George Carlin didn't, so ...

18 Q. (By Mr. Adams) Well, we don't have to define it as

19 "pornography." We don't have to --

20 A. Well, we kind of do if you keep asking me what I

21 think about it, don't we?

22 Q. Well, let's say this then: let's use "obscenity" and

23 let's say that "obscenity" has the definition that

24 is set forth in federal law. Now, whatever it is --

25 And we don't have to say what it is; but whatever it

**Page 50**

1 is, it is out there.

2 A. Well, you mean printed versions of, you know, the

3 seven words on George Carlin's list?

4 Q. Okay. Let's just --

5 A. I mean, you know, people publish that all the time.

6 Q. We don't have to define it. Let's just say that

7 something out there constitutes "pornography."

8 Would you agree with me on that?

9 A. It depends. Different people are offended by

10 different things. It's all relative.

11 Q. Okay. Let's switch gears. Let's talk about the

12 activities of a terrorist in a foreign country. All

13 right?

14 A. Okay.

15 Q. Let's say that such activities were interesting to

16 somebody here in the United States. And let's --

17 Would you agree that the library has a right to

18 block Internet access to the publications of such a

19 person?

20      MR. MANVILLE: Object to the form of the

21 question.

22      THE WITNESS: Well, let's say

23 hypothetically I wanted a different perspective on

24 what we were doing in Iraq and I wanted to get my

25 news from Al Jazeera just to read what they had to

**Page 51**

1 say and see their side of it for a perspective.

2 What's the difference? It doesn't make me a

3 terrorist by any stretch.

4 Q. (By Mr. Adams) Of course not. No one is suggesting

5 that, sir. I'm just asking about access to things

6 that might promote such activities. Is it

7 appropriate to block or filter that kind of thing?

8      MR. MANVILLE: Object to the form.

9      THE WITNESS: I don't know that anybody

10 ever has tried to access that information from one

11 of these terminals.

12 Q. (By Mr. Adams) That's not the question.

13 A. Unblocked is unblocked.

14      MR. ADAMS: Let's mark this Number 5,

15 please.

16

17      (EXHIBIT 5 WAS MARKED.)

18

19 Q. (By Mr. Adams) Mr. Heinlen, I've just handed you a

20 document that we've marked as Deposition Exhibit 5.

21 And for the record, I'll indicate that this is the

22 Complaint for Declaratory and Injunctive Relief by

23 the plaintiffs in this lawsuit.

24 A. Uh-huh.

25 Q. Take a look at this, if you would, please, and just

**Page 52**

1 generally familiarize yourself with it.

2 A. I've seen this before. Okay.

3 Q. Have you had a chance to look it over?

4 A. I'm skimming through it now. Like I said, I believe

5 this is a document that I have seen before. Yeah,

6 this was filed some time ago.

7 Q. This was filed in late 2006.

8 A. Uh-huh.

9 Q. Is that right to the best of your knowledge?

10 A. I do not see a date on the front of it, so I'll take

11 your word for it.

12 Q. Okay.

13 A. Oh, yeah, okay, "November 2006" right here on the

14 bottom. (Indicating)

15      MR. MANVILLE: Somehow we've got two

16 dates on it.

17      MR. ADAMS: It's not a big deal about the

18 date.

19      THE WITNESS: Okay.

20 Q. (By Mr. Adams) On page 1 in paragraph 1, the first

21 sentence, the statement was made that

22 "Plaintiffs" -- And you are a plaintiff; correct?

23 A. Yes, sir.

24 Q. -- "challenge the Constitutionality of a policy

25 adopted by the NCRL whereby the NCRL will not, at

Decl of Adams
Page 41

**Page 53**

1　　the request of adults who wish to access
2　　Constitutionally-protected speech, disable Internet
3　　filters on its publicly-available computer
4　　terminals." Do you see where I'm reading?
5　A.　Yes, sir.
6　Q.　Okay. Does that accurately describe your claim?
7　A.　Yes, sir.
8　Q.　Does your claim go beyond that?
9　A.　How would you define going "beyond that"?
10　Q.　I'm focusing on the phrase
11　　"Constitutionally-protected speech."
12　A.　Which as I've said is a relative term, and since I'm
13　　not a member of the legal profession, one that I'm
14　　really not qualified to define. But I would say the
15　　first sentence is accurate.
16　Q.　You would?
17　A.　Uh-huh.
18　Q.　That's "yes"?
19　A.　Yes, to the best of my knowledge.
20　Q.　That's fine. Just so I'm clear, Mr. Heinlen -- and
21　　I don't mean to belabor the point -- will you agree
22　　with me or do you disagree with me that there
23　　are -- that there is Constitutionally-protected
24　　speech and there is speech that is not
25　　Constitutionally protected?

**Page 54**

1　　MR. MANVILLE: Object to the form.
2　　THE WITNESS: Let's split a very fine
3　　hair. As I said, having -- myself being an
4　　equipment operator, I don't feel qualified to
5　　interpret the Constitution. I was -- That's where
6　　I stand on that.
7　Q.　(By Mr. Adams) Well, that's fine. And I wouldn't
8　　expect you to interpret the Constitution as we sit
9　　here in your deposition today. What I'm getting at,
10　　however, is the adjective
11　　"Constitutionally-protected" that precedes the word
12　　"speech." Does that define speech -- a subset of
13　　speech that you're suing about?
14　A.　I believe that the courts have typically only
15　　restricted speech in the most narrow of instances.
16
17　　　(A BRIEF RECESS WAS TAKEN.)
18
19　Q.　(By Mr. Adams) Mr. Heinlen, based on your previous
20　　testimony, I'm fairly clear in my position that
21　　you believe NCRL's library branches should provide
22　　adult patrons with completely unfiltered access to
23　　the Internet. Am I correct in that regard?
24　A.　I said that I believe that they should disable the
25　　filters for adults upon request, yes.

**Page 55**

1　Q.　Okay. And in your view, a site-by-site review
2　　process is inadequate; is that correct?
3　A.　Not only is it inadequate, but it's been my
4　　contention that it is invasive.
5　Q.　Okay. But you've never invoked the procedure here
6　　at NCRL to test that; is that correct?
7　A.　You know, I've never in all the times I've come here
8　　once been presented with the first exhibit -- or
9　　Exhibit 2 that you showed me, this sheet.
10　　(Indicating)
11　Q.　Okay. But have you attempted to gain access to a
12　　particular site by any other means?
13　A.　No. I mean, I could have cheated and set up a proxy
14　　server, I suppose, if I wanted to, but I haven't
15　　done that.
16　Q.　What's a proxy server?
17　A.　Something a kid told me about to get around the
18　　filtering.
19　Q.　How does it work?
20　A.　I'm not sure.
21　Q.　A kid told you about it. How old is the kid?
22　A.　A teenager.
23　Q.　Okay. And what'd the kid tell you?
24　A.　I don't recall. It was years ago. He said, "You
25　　could set up a proxy server and get around it

**Page 56**

1　　perhaps." That's all I remember from that. I don't
2　　remember who. I don't remember when. I don't
3　　remember what was said. I just remember that that
4　　was passed on to me once by somebody that appeared
5　　to be a 17-year-old male.
6　Q.　And the sum and substance of that conversation was,
7　　This is the way to get around the filter?
8　A.　He said, "If you really want to get around it, set
9　　up a proxy server." And that was it. I never
10　　pursued that.
11　Q.　What dangers or risks might be posed by unfiltered
12　　access, if any, in your opinion?
13　A.　None in my opinion.
14　Q.　How about to library staff?
15　A.　How could that be a risk to them?
16　Q.　Well, let's just assume it created a hostile
17　　environment. Let's say a patron wanted to view
18　　something inappropriate, illegal, offensive,
19　　pornographic on the Internet. Would that present a
20　　problem for library staff?
21　A.　As I said earlier, what's, quote unquote,
22　　"offensive" or, quote unquote, "pornographic" is
23　　relative. So I suppose it would depend on how
24　　sensitive a staff member might be, and that's
25　　different for everybody.

Decl of Adams
Page 42

**1  Q.** What if somebody wanted to use a proxy server to
**2**  conduct illegal activity, would that be a risk to
**3**  guard against?
**4  A.** Having no familiarity with that, I couldn't say. I
**5**  would say that unfiltered access is unfiltered
**6**  access. And, again I said that repeatedly in the
**7**  context of adults, you know, as defined in US v. ALA
**8**  Web site.
**9  Q.** Right. Then an adult could set up a proxy server;
**10**  right?
**11  A.** I don't know how. I'm 41 years old; so if I don't,
**12**  I assume most adults in this town wouldn't either.
**13  Q.** If a patron walks into the Omak branch and asks for
**14**  a book, is it the obligation of the NCRL to get that
**15**  book regardless of its content?
**16**         MR. MANVILLE: Object to the form.
**17**         THE WITNESS: I thought we'd been over
**18**  that. You know, libraries are limited with respect
**19**  to shelf space and that the Internet is a different
**20**  medium. I mean, a library has to pay for books and
**21**  it has to store the books; whereas with the
**22**  Internet, the library has to pay and make an effort
**23**  to keep information out. It's exactly the opposite.
**24  Q.** (By Mr. Adams) Do you think a -- do you think that
**25**  a library also has an obligation to determine if a

                                                        57

**1**  particular resource has some sort of cultural merit,
**2**  if it will contribute in some fashion to the
**3**  learning of the patrons that use that library
**4**  branch?
**5  A.** That is relative to the individual and not a board
**6**  of directors.
**7  Q.** True. But let me ask you this: doesn't a decision
**8**  have to be made whether a particular resource meets
**9**  some standard?
**10  A.** Again, that's up to, say, me to decide what I want
**11**  to fill my head with not them.
**12  Q.** Would you agree with me that not every resource can
**13**  be obtained? And I'm talking about a book.
**14  A.** With respect to printed medium, I would agree with
**15**  you there; but with respect to the Internet, no.
**16**
**17**         (EXHIBIT 6 WAS MARKED.)
**18**
**19  Q.** (By Mr. Adams) Mr. Heinlen, I've handed you a
**20**  two-page document that we have marked as Deposition
**21**  Exhibit 6. Take a look at that, if you would,
**22**  please, and just generally familiarize yourself with
**23**  it.
**24  A.** Okay.
**25  Q.** Exhibit 6 appears to be a correspondence from the

                                                        58

**1**  American Civil Liberties Union of Washington dated
**2**  October 31 of 2000. Have you seen this letter
**3**  before?
**4  A.** To the best of my knowledge, no. In fact, I'm
**5**  reasonably certain I have not.
**6  Q.** Okay. Have you ever received correspondence from
**7**  the ACLU of Washington or other affiliates of the
**8**  ACLU concerning NCRL's Internet filtering practices?
**9  A.** It was not until after I contacted them that I ever
**10**  received anything from them.
**11  Q.** Okay. Do you have a file of that correspondence?
**12  A.** As I said, I've moved probably a half a dozen times
**13**  in the last three years, it seems like, so some of
**14**  my correspondence has been lost.
**15  Q.** Okay. Do you have a file at this time?
**16  A.** Not that I can locate. And God knows I've tried.
**17  Q.** I'm not talking about privileged correspondence
**18**  between you and your lawyers.
**19  A.** I understand that.
**20  Q.** Okay. You have a 10-year-old daughter; right?
**21  A.** Yes, sir.
**22  Q.** What would be your view if your daughter were in the
**23**  Omak branch of the library using the Internet and an
**24**  adult patron were seated next to her viewing things
**25**  that you wished your daughter did not have to see or

                                                        59

**1**  be exposed to in any form? What would be your
**2**  reaction?
**3  A.** Well, I would not know that if she didn't come to me
**4**  with the information first. Then if she did, that
**5**  would give me a chance as her father to give her my
**6**  view of what she saw and my interpretation of it.
**7  Q.** Do you think --
**8  A.** So it'd be good experience to, you know, kind of
**9**  teach her something.
**10  Q.** Would you expect the library to have a policy in
**11**  place to try to limit or minimize any such
**12**  exposures?
**13  A.** I don't think it's their job to minimize what the
**14**  adult next to her could see. I would much prefer
**15**  that she not be looking over his shoulder in the
**16**  first place.
**17**         MR. ADAMS: Let's mark this as Exhibit 7.
**18**
**19**         (EXHIBIT 7 WAS MARKED.)
**20**
**21  Q.** (By Mr. Adams) Mr. Heinlen, I've handed you a
**22**  multi-page document that we've marked Deposition
**23**  Exhibit 7. And for the record, I'll indicate that
**24**  it's my understanding that these constitute your
**25**  "Objections, Answers and Responses to Defendant's

                                                        60

Decl of Adams
Page 43

Page 61

1  First Interrogatories and Requests for Production."
2  Take a look at this and generally familiarize
3  yourself with it if you would, please.
4  **A. Have I ever seen this?**
   MR. MANVILLE: No.
6  I'll state for the record that any
7  information that was provided here is based on
8  information that was provided to us by Mr. Heinlen
9  but he has not had an opportunity to actually review
10 this document as of yet, and I brought a copy with
11 me today for him to review and sign so when he
12 approves of it.
13 THE WITNESS: Yeah, I have not seen this
14 before. This is like, what, ten pages?
15 **Q.** (By Mr. Adams) Right.
16 **A. So do you want me to sit here and read the whole**
17 **thing?**
18 **Q.** I guess I do, yes, unless we're going to reconvene
19 your deposition.
20 **A. No, I don't want to reconvene it. Can I have a**
21 **moment with Mr. Manville --**
22 **Q.** Of course.
23 **A. -- since there is no question pending?**
24 **Q.** Yes.
25

Page 62

(A BRIEF RECESS WAS TAKEN.)
2
3  **Q.** (By Mr. Adams) Mr. Heinlen, have you had a chance
4  to review your Answers and Objections to
5  Interrogatories and Requests for Production as set
6  forth on Exhibit 7?
7  **A. Yes, sir.**
8  **Q.** Okay. Do you have any changes that you wish to
9  make?
10 **A. None that I can see, no.**
11 **Q.** Okay. There's a signature page on the last page,
12 page 16 of Exhibit 7. Do you see that?
13 **A. Yes, sir.**
14 **Q.** Okay. May I ask you to supply your signature to
15 that if you're prepared to certify under penalty of
16 perjury as the declaration sets forth?
17 **A. Okay, here you go. (Witness complying)**
18 MR. ADAMS: Is that all right with you,
19 Duncan?
20 MR. MANVILLE: That's fine.
21 THE WITNESS: Where do you want me to put
   for "executed at"?
23 MR. MANVILLE: "Omak" and the date.
24 THE WITNESS: What is today's date, the
25 13th?

Page 63

1  MR. MANVILLE: The 13th, yes, that's
2  right.
3  THE WITNESS: (Witness complying)
4  Do you need this back?
5  **Q.** (By Mr. Adams) Now, you can go ahead and keep that
6  in front of you if you would, please. Flip to
7  pages 4 and 5, in particular your response to
8  Interrogatory Number 5, Mr. Heinlen. It begins on
9  page 5.
10 MR. MANVILLE: At the bottom.
11 THE WITNESS: Oh, okay.
12 Yes, sir, page 5.
13 **Q.** (By Mr. Adams) Okay. Interrogatory Number 5, in
14 essence, asks you to identify the URL addresses for
15 the Web sites for which you claim you were denied
16 access --
17 **A. Uh-huh.**
18 **Q.** -- in whole or in part.
19 **A. Uh-huh.**
20 **Q.** And you indicate in your answer that you don't have
21 a full list of access -- or, excuse me, a full list
22 of the Web sites to which you've been denied access,
23 but you do provide a number of sites to which you
24 have been denied access.
25 **A. Yes, sir.**

Page 64

1  **Q.** And those sites are listed on pages 5, 6, 7 and part
2  of 8; is that correct?
3  **A. Well, 5, 6, 7 and part of 8, yeah, that's correct.**
4  **Q.** Okay. Now am I correct in understanding then that
5  all of these are URL addresses to Web sites that you
6  tried to access and could not through the NCRL
7  computers?
8  **A. Yes, sir, some of these sites were blocked under**
9  **Bess, some were blocked under Fortinet, and those**
10 **were sites that I had tried to access.**
11 **Q.** Okay. Now, sites that were blocked under Bess,
12 which is the prior filtering service --
13 **A. Uh-huh.**
14 **Q.** -- the service that preceded Fortinet?
15 **A. Uh-huh.**
16 **Q.** Is that "yes"?
17 **A. Yes.**
18 **Q.** Okay. Now, do you know whether those sites would
19 still be blocked under Fortinet?
20 **A. I believe that some of them are and some of them**
21 **aren't. I know that I could get into "buckknives"**
22 **and I think "winchester" and "savage" now. But I**
23 **know all the personal sites and "moderndrunkard" and**
24 **"rotten.com" and all that are still blocked. I'm**
25 **not sure about "trojancondoms" -- I don't think I've**

1  subsequently rechecked on Fortinet, but I can't
2  swear to that.
3  Q. Okay. Would you do me a favor and go through the
4  list of Web sites that you know you now have access
5  to because of the Fortinet -- the updated Fortinet
6  service.
7  A. I know that they had subsequently unblocked, I
8  think, most of the sites that were mentioned in the
9  Wenatchee World article. So "savage" would be
10 allowed. "Winchester" and "buckknives" would be
11 allowed --
12 Q. Tell you what, just put an asterisk or check mark
13 next to the sites that are no longer an issue
14 because of the new filtering service.
15 A. The ones that I can swear to. I'll put a question
16 mark next to the ones that I think probably could be
17 but can't swear to. How's that?
18 Q. If you would, just verbally tell me which sites that
19 you're marking with one mark or another so that I
20 can follow along --
21 A. Okay, just putting a slash next to the two or three
22 that I know to be unblocked now or, you know, very
23 much believe to be unblocked now. And that would be
24 "keepandbeararms.com" and "buckknives.com." I'm
25 putting a question mark next to winchesterguns.com

65

and "savagearms.com" since I think they're unblocked
2  but can't swear to it. I'm putting a question mark
3  next to "trojan" because I think that's unblocked,
4  but I can't quite swear to it. Couldn't say "yes"
5  in good conscience.
6         That's it that I can say in good conscience
7  are unblocked and the two that I think are probably
8  unblocked and that's it out of this whole list.
9  Everything else I recognize I would honestly believe
10 to be blocked under Fortinet as of now -- or as of
11 the last time I was in here.
12 Q. Would you characterize any of the Web sites on this
13 list as pornographic in nature?
14 A. No. I mean, a lot of them are study sites. You
15 know, like "paperaircraft.org" was blocked under
16 porn. That's a study site. "Texorcist" was
17 religious in nature. "Moderndrunkardmagazine" is
18 a -- actually has oddly enough some very great
19 remixes and some pretty good literary work on some
20 very famous people.
21 Q. What about "www.porno.com"?
22 A. Well, that would be fairly obvious. I mean, I was
23 just kind of testing the waters with that one.
24 Q. "That would be fairly obvious" what?
25 A. I believe that to be, you know, an X-rated site.

66

1  Q. Are there any other obviously X-rated sites in your
2  estimation?
3  A. No. I mean, no. I think I saw "topashot" once in a
4  great while on "ehowa.com" and "beerandshots.com" --
5  on those two or "woopass" and "beerandshots," but
6  those are just games.
7  Q. In your estimation, are any of these Web sites
8  inappropriate for viewing by minors?
9  A. That's parental responsibility not mine.
10 Q. So is your answer "no" as far as the library is
11 concerned?
12 A. As far as the library is concerned, my answer is
13 "no."
14 Q. What is "www.swojo.com," s-w-o-j-o?
15 A. Let's see, I've only been in that a couple of times.
16 It's really -- I know that that -- I do not believe
17 that one to have any nudity on it at all.
18 Q. What is that Web site?
19 A. Like I said, off the top of my head, I cannot quite
20 recall. There were a lot of sites that I visited,
21 you know, once or twice and that was it. I visited
22 probably thousands of Web sites in my life.
23 Q. Okay. But you recall these because you put them in
24 your interrogatory answer.
25 A. I put them in my interrogatory answer. I do

67

1  remember I tried to access "swojo." It's just that
2  there are a lot of sites in here, and I cannot
3  remember the specific nature of each of them
4  immediately upon mention of it.
5  Q. Were the Web sites listed in your answer to
6  Interrogatory Number 5 Web sites that you wanted to
7  view as a matter of personal interest or for some
8  other purpose?
9  A. By and large, most of them were. I think there were
10 only a couple that were sent to me from other people
11 to check.
12 Q. As part of this litigation?
13 A. As part of this litigation and, you know, sometimes
14 I would hear somebody on the street say, "I can't
15 even get to this site.
16        "Oh, what site?"
17        And I just kind of -- if I happened to recall
18 it when I came in on a terminal, I'd checked it. I
19 mean, there were co-workers and, you know, people
20 that knew I was involved in this that said, "You
21 know, I couldn't even go there." So ...
22 Q. Give me an example of that.
23 A. I can't give you a specific. It was usually just if
24 I was at an Internet cafe. You know, "Oh, why are
25 you here paying five bucks an hour?"

68

1        "Oh, well, you know, this is the only
2   unfiltered access I can get today.
3        "Oh, the library, they wouldn't let me go
4   here."
5        Again, I can't give you any names or anything
6   because I can't recall honestly.  I would if I
7   could.
8 Q. Have you read the reports furnished by the expert
9   witnesses on behalf of the plaintiffs?
10 A. As of this time to the best of my recollection, not
11   yet.
12 Q. Okay.  Do you know who the experts are?
13 A. Again, if they were ever mentioned any by name, I
14   cannot recall, so I would have to answer no.
15 Q. Did you perform any work, undertake any activity in
16   support of an opinion expressed by an expert witness
17   designated by the plaintiffs in this case?
18 A. Ummm, specifically what do you mean by that?
19 Q. Did you perform any work to assist an expert in
20   reaching an opinion that has been expressed in the
21   expert's report?
22 A. To reach a conclusion that somebody else has drawn,
23   I would have to say I don't think so.  If you're
24   asking whether or not I checked a Web site at the
25   behest of an expert, then I would have to say yes.

                                 69

1 Q. Okay.  Which expert?
2 A. Again, as I stated previously, if I ever knew these
3   people by name, I could not recall.  I do not think
4   that I have.
5 Q. Okay.  Which Web sites were you asked to check at
6   the behest of an expert?
7 A. As I stated towards the beginning of these
8   proceedings, there were several.  I have them cashed
9   on my Yahoo! account.  But, you know, you're talking
10   about a couple hundred Web sites potentially.  I
11   couldn't be expected to recall them off the top of
12   my head.
13 Q. Are any of these Web sites in your -- included in
14   your answer to Number 5?
15 A. It would be very few.  Like I said, most of these I
16   think were mine.  But "imesh.com," I believe -- the
17   "imesh.com," I believe --  You are asking for
18   specifics; right?  I'm not volunteering this?
19 Q. Correct.
20 A. Okay, just so we're clear on that.  I think the
21   "freepapers.net" was one,
22   "americanmortgageandrealty.com, angelcrack.com" the
23   "chavda.com, clinicaldentalmiranda.com,
24   fuckthepolice.com, lonecarrot.com."  The one right
25   below "lonecarrot," I'm not going to even attempt to

                                 70

1 pronounce this early in the morning.  It's spelled
2 m-a-n-g-a-l-a-m-i-n-f-o-t-e-c-h ".com."  And the two
3 below that, "markrudd.com" and "miraclealley.com,
4 paybycell.com, squartier.com, sydneypalmbeach.com,
5 webmaxtemplates.com, 10jigi.org,
6 alfredvogelgrandprix.org, atomichamster.org -- that
7 one looked so interesting that I went to my own
8 computer and looked it up -- "castle-walls.org,
9 columbus-amsterdam-bid.org, cscstl.org,
10 dabarworship.org, eatseafood.org,
11 faithchurchofdavis.org, familiesforfreedom.org,
12 financingbeginnings.org, healthdirectedriding.org,
13 jastar.org" -- oh, no, "iastar.org" -- my mistake --
14 "iconmaker.org, idresearch.org, jeanne-garnier.org,
15 kindnessusa.org, kindstot.org, lamberth.org,
16 lagator.org, lphu.org, menesak.org,
17 milgramreenactment.org, myscienceproject.org,
18 newsongsd.org, offer.org, and ordomag.org."  And if
19 I remember right, every single one of those sites
20 was blocked.
21 Q. How about on page 8?  The list continues.
22 A. Oh, my apologies.  "Orctu.org, paperaircraft.org" --
23 Well, actually pretty much everything on page 8.
24 Let's just say that.  That would be easier than
25 trying to pronounce some of this stuff this morning.

                                 71

1 Q. And, again, each of those sites were sites that you
2   were asked to check?
3 A. Yes, sir.
4        MR. MANVILLE:  Tom, can I clarify
5 something in regards to the sites that Mr. Heinlen
6 was asked to check?  And if you don't want me to do
7 that, I'm happy to just let him testify based on his
8 recollection.
9        MR. ADAMS:  Go ahead.
10        MR. MANVILLE:  If you go to page 6,
11 everything after "411broadband.com" from there on
12 out, those are sites that he was asked to checked.
13 And I believe those are all sites that are listed in
14 Bennett Haselton's report.
15        MR. ADAMS:  After "411broadband"?
16        MR. MANVILLE:  Yeah, ".com."  And
17 Mr. Heinlen obviously is remembering some of the
18 specific sites that he looked at.  But everything
19 from there on out to page 8 he was asked to check.
20 Some of the sites on page 5 and on page 6, he was
21 also asked to look at, at various times.  I don't
22 remember exactly which ones they were, but they're
23 more toward the bottom of page 5 and then on to
24 page 6.
25        THE WITNESS:  I do believe that most of

1　page 5, at least, was almost all mine.

2　　　　MR. MANVILLE: I think a substantial

3　portion of it is yours. That's right.

4　　　So I don't usually like to jump in, but I

5　thought that might be helpful.

6　　　　MR. ADAMS: It is helpful.

7　Q. (By Mr. Adams) Most of what is on page 5 are your

8　own sites?

9　A. Yes, sir.

10　Q. Does that include "www.porno.com"?

11　A. That one, I'm not sure -- I do not think that

12　"porno.com" was one of my own.

13　Q. How about "whitehouse.com"?

14　A. "Whitehouse.com," I think, actually was --

15　Q. How about "playboy"?

16　A. -- when I was first exploring the filter.

17　"Playboy," I was a subscriber for years. Naturally

18　I would have clicked on that just when I was seeing

19　that everything was blocked.

20　Q. Sure. How about "eharmony.com"?

21　A. That was one of mine.

22　Q. Okay. I think I understood you mention a moment ago

23　when you were responding to a prior question that

24　"atomichamster.org" was interesting enough to you

25　that you went home and --

73

1　A. I went and looked at it, yeah.

2　Q. On your home computer?

3　A. I don't recall the specifics on it, but I know that

4　it -- I do not believe that would be pornographic in

5　the least. I just thought that the name of it was

6　interesting enough that when I did get to another

7　computer I had to type that one in.

8　Q. Okay. And I think you said that you looked at that

9　at home.

10　A. I did, but that was during a time when I had access

11　outside the library. And as I've stated earlier,

12　that is sporadic.

13　Q. Got it. Any of the other sites included in your

14　answer to Interrogatory Number 5 which you say you

15　were blocked at the library, have you been able to

16　get access to them on your computer?

17　A. Well, since the library is blocked, I would assume

18　that if I'm on my own system or on a private system

19　that I could get access easily enough to any of

20　these sites outside the library.

21　Q. Got it. Flip to page 9 if you would, Mr. Heinlen.

22　I'm looking in particular at your answer to

23　Interrogatory Number 9 where you're describing what

24　efforts you made to bring concerns about blocked

25　sites to the attention of NCRL personnel.

74

1　A. Uh-huh.

2　Q. And you indicate in your final sentence that you

3　"spoke with and/or corresponded with NCRL

4　administrators Dean Marney and Dan Howard." Do you

5　see that?

6　A. About one or two -- Yes.

7　Q. Okay. Have you provided your counsel to provide to

8　me all correspondence in your possession?

9　A. Everything that I had. As I had stated earlier,

10　however, in several subsequent moves, there is one

11　blue plastic folder that I have that may yet have

12　some things in it that I have not through every

13　honest effort that I have made been able to locate.

14　Q. All right. If you do find it, you'll turn it over

15　to your lawyer?

16　A. The second I do, Duncan will get it.

17　Q. Okay. What is in there that you can recall?

18　A. That I can recall, I think it would have been --

19　there was a copy of the Wenatchee World article when

20　shortly after the US v. ALA ruling came out and

21　their board of directors decided that they weren't

22　going to unblock for adults. There was that. There

23　was one letter from Director Marney, and I believe

24　one or two actual letters from Assistant Director

25　Howard. I think that would be about all that was

75

1　contained in there. A couple of Freedom of

2　Information Act requests, I recall, minutes from the

3　meeting where they decided against unblocking the

4　filter for adults. I believe that is what is in

5　that file.

6　Q. Have you ever attended a public meeting of the

7　trustees of the NCRL?

8　A. They have them, I think, one Thursday a month at

9　one o'clock in the afternoon in Wenatchee. That is

10　very prohibitive for a working man like myself to

11　get to.

12　Q. So you have not attended a meeting.

13　A. It's not feasible for me to do so, no.

14　Q. Putting aside the correspondence, what can you tell

15　me about your recollection of conversations with

16　either Mr. Marney --

17　A. I've never actually talked to them on the phone. I

18　wanted everything in writing, so it was all e-mail

19　letters --

20　Q. Okay. So when --

21　A. -- to the best of my recollection.

22　Q. I'm sorry, go ahead.

23　A. Oh, no, to the best of my recollection, it was

24　generally via e-mail, and you have the bulk of it

25　right in front of you.

76

**Page 77**

1         MR. MANVILLE: Let him finish his --

2         THE WITNESS: Oh, sorry.

3  **Q.** (By Mr. Adams) No problem.

4     So in the last sentence of your interrogatory

   answer -- answer to Interrogatory Number 9 where you

6  said, "Mr. Heinlen also spoke with and/or

7  corresponded with NCRL administrators," in fact, you

8  don't recall any conversations; is that right?

9  **A. I think the "or" covers that.**

10  **Q.** I'm just clarifying.

11  **A. Yeah. I do not recall actually picking up the**

12  **phone. I may or may not have at one point, but I do**

13  **not recall.**

14  **Q.** Okay. Do you recall conversations with anyone else

15  affiliated with NCRL administration on the subject

16  of Internet filtering?

17  **A. I asked a couple of librarians, and they just said**

18  **they couldn't do it, basically that they were just**

19  **following orders and that the policy came out of**

20  **Wenatchee.**

21  **Q.** Okay. In your response to Interrogatory Number 10,

22  you make reference to a conversation with a

23  gentleman named "Ray Mendiola" in New Jersey. Do

24  you see that?

25  **A. I remember actually speaking with Mr. Mendiola over**

                                77

**Page 78**

    **the phone on about two occasions, I think.**

2  **Q.** Okay. What'd you tell Mr. Mendiola and what did he

3  say in response?

4  **A. Well, he was the USAC investigator, and he told me**

5  **that he had sent a questionnaire to Director Marney**

6  **on everything regarding the filtering policy. I do**

7  **not remember -- I believe -- yeah, I believe**

8  **October 2004 sounds correct. He was a very fast**

9  **talker, a little hard to understand. He seemed**

10  **slightly incredulous of their policy himself that**

11  **they were receiving "e-rate" funds and not**

12  **unblocking the filters. And he had never heard of**

13  **that from another library in the country.**

14  **Q.** Was anyone else a part of that conversation?

15  **A. Not on my end. He could have had me on speaker in**

16  **New Jersey.**

17  **Q.** Did you exchange correspondence with Mr. Mendiola?

18  **A. As far as letters and e-mail, not that I recall.**

19  **And I cashed every e-mail that I had ever gotten in**

20  **this matter in a separate folder in my Yahoo!**

21  **account, and I saw nothing from him there.**

22  **Q.** Any e-mail pertaining to NCRL Internet filtering and

23  your views about it, would that be contained in your

24  Hotmail account?

25  **A. I said, "Yahoo!"**

                                78

**Page 79**

1  **Q.** I'm sorry.

2  **A. Yeah. I did my best to save everything that I had**

3  **in a separately labeled folder in my Yahoo! Account.**

4  **Q.** Okay. And you've made all that available to your

5  lawyer for production in this case?

6  **A. Yes. And a lot of that was privileged**

7  **correspondence with Mr. Manville.**

8  **Q.** I understand.

9         MR. ADAMS: Do we have a log of that?

10        MR. MANVILLE: I don't believe you do.

11  We'll get one to you. But I don't think there's

12  going to be anything in it other than just

13  communications with us.

14  **Q.** (By Mr. Adams) You wrote an article for

15  "upsidedownworld.org"; is that right?

16  **A. That was some time ago, yes, sir. Mr. Daniels was**

17  **gracious enough to publish it.**

18

19        (EXHIBIT 8 WAS MARKED.)

20

21  **Q.** (By Mr. Adams) Mr. Heinlen, I've handed you a

22  four-page document that we've marked as Deposition

23  Exhibit 8 entitled "Censorship at the Local

24  Library." Take a look at that if you would, please.

25  **A. Okay -- or, I mean, yes.**

                                79

**Page 80**

1  **Q.** Do you want a little more time?

2  **A. Yeah, I'll take a couple of minutes.**

3        **My writing style has improved quite a bit.**

4  **Q.** (By Mr. Adams) Have you had a chance to review this

5  document?

6  **A. Yes, I have. I read the whole thing.**

7         MR. ADAMS: Off the record for a second.

8

9    (A DISCUSSION WAS HELD OFF THE RECORD.)

10

11  **Q.** (By Mr. Adams) Okay. Let's go back on the record.

12  Referring to Exhibit 8, Mr. Heinlen, did you write

13  this article?

14  **A. I have to claim I did, yes, sir.**

15  **Q.** Okay. And did you write it in approximately July of

16  2004?

17  **A. That sounds about right.**

18  **Q.** Okay. Why did you write this? Was it solicited?

19  Did somebody come to you or did you offer to write

20  it?

21  **A. No, I was just -- Like I said, I just wrote it**

22  **because I felt it needed to be written.**

23  **Q.** Okay. Have you published anything on this

24  particular Web site before or after?

25  **A. No, sir. That was the only time I've ever been**

       Decl of Adams        80

       Page 48

# Exhibit F



# On Dallas library computers, porn is a regular sight

News analysis finds easy access in Dallas; city plans review

12:00 AM CST on Tuesday, January 15, 2008

**By DAVE LEVINTHAL / The Dallas Morning News**
dlevinthal@dallasnews.com

Viewing hard-core pornography is as easy as obtaining a Dallas library card.

And at Dallas' central library, the practice of patrons viewing explicit Internet material is commonplace, according to a *Dallas Morning News* analysis of Web pages accessed on J. Erik Jonsson Central Library public computers and stored on the city's computer server.

During a 45-minute period on Dec. 19, for example, central library computer users accessed more than 5,200 Web pages containing identifiably pornographic material, such as photographs depicting full nudity, intercourse and other sex acts. That figure represents about 7.5 percent of the more than 69,000 Web pages accessed on the central library's public computers during the time period studied.

With 26 public library branches throughout Dallas, the data suggest that tens of thousands of pornographic Web pages each day flash across the screens of public computers in plain view of any passer-by, from unflappable adults to impressionable children – who may freely access pornography themselves.

This easy availability of pornography at Dallas' libraries also pits two strong interests against each other: Those who don't believe a taxpayer-funded facility designed for education and research should facilitate people titillating themselves and those who believe restricting information contains its own nefarious set of pitfalls.

Top city officials, unaware of the prevalence of pornographic material viewing on library computers, said they'll immediately review the matter.



SONYA N. HEBERT/DMN
At the J. Erik Jonsson Central Library downtown, patrons access the Internet to review bus schedules, shop for shoes, read news articles, play online games and study history. But a *Dallas Morning News* analysis shows tens of thousands of pornographic Web pages flash across the screens each day as well.

"It's certainly concerning to me. It's surely not appropriate in a public library, and it's not a signal we want to send," Mayor Tom Leppert said. "We want people to come to our libraries and use them for traditional reasons. Viewing this material – it's clearly not what the computers in the library are there for."

Deputy Mayor Pro Tem Dwaine Caraway said: "We should look at this situation; we will look at it and we will try to do the necessary things we need to do to ban it as best we can. It makes all the sense in the world that we control access to it – and immediately."

Decl of Adams
Page 50

Both Mr. Leppert and Mr. Caraway say they'll discuss the matter with the city manager's office and library officials.

Installing pornography-filtering software on library computers, both officials added, is probably warranted.

Dallas City Manager Mary Suhm, first hired to city service as a librarian, says she's "very concerned" about the number of people viewing pornography on city computers, "and we're conscious we have folks in the library using it who don't want to be looking at that kind of stuff."

As for software-based pornography filters?

"We don't think filtering is the answer because of the reasons the American Library Association has outlined," she said.

'Other effective ways'

The American Library Association is outspoken in its belief that computer pornography filters, which Dallas public libraries don't employ, are easily obtainable but hardly infallible.

The filters have been known to inadvertently block medical and artistic information, such as Web pages about breast cancer and classic paintings depicting nudity. They also raise the specter of a government – or corporation – dictating what residents may view when using a library computer.

"There is no technology that can filter out all objectionable material, and every filter filters out constitutionally protected material. Filtering is of great concern to us, as a result," said Emily Sheketoff, executive director of the American Library Association's Washington, D.C., office.

Libraries looking to limit pornography should consider placing their Internet-connected computers in clear view of library staff, or install privacy screens so that the computer user, not bystanders, is the only person capable of viewing what's on the monitor, Ms. Sheketoff said.

"There are other effective ways libraries can go about protecting children from images parents may find objectionable than simply blocking material. Filters – they create a bigger free speech violation issue than is worth it," said Tracey Hayes, director of the American Civil Liberties Union of Texas' Access Project.

Many of the Web pages viewed by Dallas library patrons are popular and pedestrian – Google, Yahoo, YouTube, MySpace, Facebook and dating sites such as Match.com and True.com. Users accessed the Internet to review bus schedules, shop for shoes, read news articles, play online games and study history.

But plenty of pages are potentially offensive, even shocking.

Among the more extreme pornographic Web sites accessed on Dallas library computers is one billing itself as containing "merciless scenes of raw brutal domination" and "unleashed sexual terror." Some of the sites contain scenes of overt sexual violence.

Texas law, library policy

Dallas doesn't have a law specifically prohibiting viewing pornography on public library computers. But it does empower library officials to terminate access to anyone whose Internet usage isn't "compatible with the mission of the library."

Decl of Adams
Page 51

State law also addresses the issue, albeit indirectly.

The Texas Penal Code prohibits a person from intentionally displaying obscene photos or other material and

from being "reckless about whether a person is present who will be offended or alarmed by the display or distribution."

City officials, however, can't recall any recent case in which authorities prosecuted a Dallas library patron under the law.

Ms. Suhm notes that the library has barred 36 people from using the library because they violated library policies.

Additionally, computers are placed in public places so librarians may monitor whether a patron's Internet usage is violating library policies, Ms. Suhm said.

If someone is violating a library policy, libraries are able to send electronic messages directly to that patron's terminal requesting them to cease their behavior, she said, adding that some librarians have reported sending such messages as many as a few dozen times each week.

As far as District 13 council member Mitchell Rasansky is concerned, Dallas has but one route to pursue.

"I'm going to put a stop to this. This is just disgusting. I can't believe this is happening in our libraries," he said, noting that he plans to speak this week with Ms. Suhm and the city attorney's office to review options, including software filters.

Not only in Dallas

Dallas is hardly the only U.S. city to grapple with the issue of pornography accessed on public library computers.

Three years ago in Denton County, officials placed pornography filters on most public computers in part because of complaints that users were downloading explicit images.

Plano's library Internet policy states that all but one computer in each library uses a filtering device but also notes it "cannot guarantee that access to sites containing adult entertainment, pornography or illegal activities will be blocked."

Policies in large U.S. cities vary greatly, with some like Dallas forgoing pornography filtering on library computers, while others, such as Phoenix, use them. San Jose, Calif., is in the midst of a heated debate over whether to implement porn-filtering software.

"I suspect," Mr. Caraway said, "that we'll be having our own discussion."

Decl of Adams
Page 52

# Exhibit G

Decl of Adams
Page 53

Welcome to the Brainerd Lakes Area No. 1 Online Information Source!



Dispatch Home                          Minnesota News





we have what you need....

local/area news
archives | auto | big banana | business | church | classifieds | coolschoolu | education | family |
farm | food | fyi | golf | government | health & wellness | living | news | neighbors | north country |
obits | opinion | people | racing | sports | state news | state sports | tech | tempo | up north |
weather | what's doing?

ap news  top news | us news | world | business | sports | health | technology | entertainment |
politics



Web posted **Saturday, August 16, 2003**

## Librarians settle Internet porn case



MINNEAPOLIS (AP) --
Minneapolis library
officials will consider
restricting patrons' access
to Internet porn and pay
$435,000 to a dozen
librarians to settle a
lawsuit that alleged the
prevalence of the images
constituted a hostile work
environment, the
librarians' lawyer said
Friday.

Library officials confirmed the settlement in a statement. They
didn't confirm the amount, but said it involves a payment from their
liability insurer.

Lawyer Bob Halagan, representing the librarians, said money wasn't
the point of their claim of a hostile work environment. But he said
that they sought a sufficient payment so that library officials
elsewhere would take seriously such staff complaints.

As part of the operating changes, library officials will consider
Internet filters to screen out certain materials, changes in the

**extra!**
UpNorthAutos.com
Find A Car! -          here
**TheMinnesotaStore**
Online Shopping -     here
**LakesArea.net**
Community Info -      here

**our departments**

Decl of Adams
Page 54

**News -**     here
**Advertising -**     here
**Circulation -**     here
**Contact List -**     here
**Talking FAQs -**     here

printing of Internet material to reduce exposure to explicit material, more sanctions for those who violate library Internet policy, and consultation with staff on the placement of terminals in the new downtown library.

The library didn't admit wrongdoing, but Laurie Savran, the trustee representing the Library Board in settlement negotiations, apologized during an all-day settlement conference on Aug. 7.

"I apologized to the 12 plaintiffs that this happened to them and that it was so difficult for them and that we didn't address their concerns more expeditiously," Savran said.

### ✊ E-MAIL THIS STORY TO A FRIEND

E-mail this story to a friend!

**More lakes state news!**

| Voice **your opinion** on this story | Voice **your opinion** of our web site |
|---|---|
| **E-mail** our editors | How to **contact us** |

©Copyright The Brainerd Daily Dispatch
506 James Street, P.O. Box 974, Brainerd, Minnesota, U.S.A. 56401
The Brainerd Daily Dispatch, Central Minnesota's Daily Newspaper. Continuing The Weekly Dispatch founded in 1881. Published daily except six legal holidays in Brainerd, Minnesota by The Brainerd Daily Dispatch, a division of Morris Communications, Corp. The official newspaper of Crow Wing County. Offices located at 506 James Street, Brainerd, MN 56401. MEMBER OF THE ASSOCIATED PRESS.

Decl of Adams
Page 55







Powered by

# Librarians sue over being subjected to Internet porn

Advertisement

MINNEAPOLIS (AP) — A barrage of Internet pornography has turned the downtown library into a hostile work environment for a dozen librarians, according to claims in a new federal lawsuit.

The 12 sued the city library system Monday in U.S. District Court in Minneapolis, alleging they endured an intimidating, hostile and offensive workplace that violated state and federal law. The lawsuit seeks damages of at least $400,000 each, plus workplace changes.

But one of the librarians, Wendy Adamson, said they still are willing to participate in mediation of the dispute.

The women first filed discrimination charges with federal and state agencies in 2000.

"It's been three years. We would have sat down with the library at any time during those three years, and they wouldn't do it," Adamson said.

The case has aroused national attention as it seeks to define how far libraries should go to avoid censorship, at the risk of exposing librarians and patrons to unwanted images.

"We were living in hell, and they were unwilling to acknowledge the problem," said Adamson.

The librarians and their lawyer, Bob Halagan, will be going against a library system that has had considerable turnover since the complaints were made. Library Director Mary Lawson, whom the librarians claimed was unwilling to impose stricter controls on computer use, has been replaced.

Her successor, Kit Hadley, said that she will consult with the library board's attorney on legal options but that her goal was a better working environment for all library users.

The issue arose soon after Internet access was installed in 1997. Almost immediately, the librarians claimed, the screens began displaying "virtually every imaginable kind of human sexual conduct."

One librarian, Nancy Corcoran, told Lawson about the exposure, but the director said she favored a policy of unfettered use of the Internet, the lawsuit alleges. The matter escalated through 2000, prompting debate about the extent to which the library should try to control access, limit use and protect children and others within view of screens.

AT&T offers
**wireless**
coverage in
more countries
**than any**
other U.S. carrier.

Rep
Me
Bah
Can
Sp
South
Italy

Decl of Adams
Page 56

Library officials said they had instituted guidelines aimed at curbing the abuses, but the librarians said the new policies didn't go far enough.

The lawsuit alleges that the 12 librarians became increasingly upset and angry at the library system and patrons.

Finally, in May 2000, they filed discrimination charges with the U.S. Equal Employment Opportunity Commission and the Minnesota Department of Human Rights.

A year later, the EEOC found probable cause that federal law had been violated because of a sexually hostile work environment. The case was referred to the Justice Department, which after a 19-month review decided last month not to file suit.

---

Copyright 2005 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

**Find this article at:**
http://www.usatoday.com/tech/news/techpolicy/2003-03-26-library-porn_x.htm

☐ Check the box to include the list of links referenced in the article.

Copyright 2008 USA TODAY, a division of Gannett Co. Inc.

Decl of Adams
Page 57