Bradburn et al v. North Central Regional Library District

Doc. 32 Att. 2

# Exhibit B

Decl of Resnick
Page 29

Dockets.Justia.com

# Does Pornography-Blocking Software Block Access to Health Information on the Internet?

Caroline R. Richardson, MD
Paul J. Resnick, PhD
Derek L. Hansen, BS
Holly A. Derry, MPH
Victoria J. Rideout, MA

**Context** The Internet has become an important tool for finding health information, especially among adolescents. Many computers have software designed to block access to Internet pornography. Because pornography-blocking software cannot perfectly discriminate between pornographic and nonpornographic Web sites, such products may block access to health information sites, particularly those related to sexuality.

**Objective** To quantify the extent to which pornography-blocking software used in schools and libraries limits access to health information Web sites.

**Design and Setting** In a simulation of adolescent Internet searching, we compiled search results from 24 health information searches (n=3206) and 6 pornography searches (n=781). We then classified the content of each site as either health information (n=2467), pornography (n=516), or other (n=1004). We also compiled a list of top teen health information sites (n=586). We then tested 6 blocking products commonly used in schools and libraries and 1 blocking product used on home computers, each at 2 or 3 levels of blocking restrictiveness.

**Main Outcome Measure** Rates of health information and pornography blocking.

**Results** At the least restrictive blocking setting, configured to block only pornography, the products blocked a mean of only 1.4% of health information sites. The differences between blocking products was small (range, 0.6%-2.3%). However, about 10% of health sites found using some search terms related to sexuality (eg, safe sex, condoms) and homosexuality (eg, gay) were blocked. The mean pornography blocking rate was 87% (range, 84%-90%). At moderate settings, the mean blocking rate was 5% for health information and 90% for pornography. At the most restrictive settings, health information blocking increased substantially (24%), but pornography blocking was only slightly higher (91%).

**Conclusions** Blocking settings have a greater impact than choice of blocking product on frequency of health information blocking. At their least restrictive settings, overblocking of general health information poses a relatively minor impediment. However, searches on some terms related to sexuality led to substantially more health information blocking. More restrictive blocking configurations blocked pornography only slightly more, but substantially increased blocking of health information sites.
*JAMA. 2002;288:2887-2894*    www.jama.com

THE INTERNET HAS BECOME AN IMportant tool for many individuals with health concerns,[1] especially adolescents.[2] Teenagers grapple with sensitive health issues, including depression, substance abuse, and birth control. Concerns about confidentiality, accentuated by many teens not yet having their own health provider, make adolescents' access to information via the Internet particularly important. Given rapidly expanding Internet access, it is not surprising that more than 70% of 15- to 17-year-olds say they have used the Internet to look up health information.[3] Almost half have researched traditional health topics such as cancer or diabetes. About 40% of adolescents have searched for information on a sexual health topic such as pregnancy, birth control, human immunodeficiency virus/acquired immunodeficiency syndrome, or other sexually transmitted diseases; 1 in 4 have researched problems with drugs or alcohol; 17% have searched for information on depression or mental illness; and 11% have searched for information on sexual assault.[3]

In 2000, the US Congress passed the Child Internet Protection Act (CIPA) mandating that schools and libraries install pornography-blocking software on computers used by minors in order to be eligible for some forms of federal funding. While the CIPA requirement for libraries was struck down by a circuit court on the grounds that it violates the First Amendment,[4] it is cur-

Author Affiliations: Department of Family Medicine, University of Michigan Medical School, Veterans Affairs Health Services Research and Development Service (Dr Richardson), School of Information (Dr Resnick and Mr Hansen), and Health Media Research Laboratory (Ms Derry), University of Michigan, Ann Arbor; Henry J. Kaiser Family Foundation, Menlo Park, Calif (Ms Rideout).
Corresponding Author and Reprints: Caroline R. Richardson, MD, Department of Family Medicine, University of Michigan Medical School, 1018 Fuller St, Ann Arbor, MI 48109-0708 (e-mail: caroli@umich.edu).
Medicine and Media Section Editor: Annette Flanagin, RN, MA, Managing Senior Editor.

©2002 American Medical Association. All rights reserved.

Decl of Resnick
Page 30

rently being appealed to the US Supreme Court. Meanwhile, 73% of schools[5] and 43% of public libraries[6] already use filters of some kind.

Filtering software intended to limit minors' exposure to pornography and other controversial material may inadvertently reduce the usefulness of the Internet as a health information tool for adolescents. Web sites that address issues of health and sexuality might be particularly susceptible to erroneous blocking. For example, cases of filters blocking access to breast cancer sites were widely publicized beginning in 1995, although this particular error has largely been corrected in recent years.[7] The use of filtering software in public schools and libraries is of special concern, because adolescents' health concerns often focus on issues related to sexuality, and because those who do not have computers at home rely on schools and libraries for Internet access.

Despite the concerns about the potential impact of blocking software on access to health information, and prolonged and impassioned public debate, surprisingly little empirical evidence exists regarding blocking errors. Recent government-commissioned studies in the United States, Europe, and Australia[8-10] used methodologies similar to ours but had smaller samples of health information sites. Furthermore, most filtering software systems allow administrators to specify blocking configurations, providing individual schools or libraries with the ability to tailor the blocking to local community standards. The effect of different configurations on the accuracy of the blocking systems has not been sufficiently tested.

We developed a computer model to simulate information-seeking by adolescents. Using this model, we tested the ability of 6 different blocking software packages commonly used in schools and libraries, as well as 1 product commonly used on home computers, each under a variety of blocking configurations, to discriminate between health information Web sites and pornography Web sites.

## METHODS
### Study Design
We simulated adolescent searching and browsing on the Internet to compile lists of Web sites that adolescents might come across while looking for either health information or pornography. For the search simulation, trained raters then classified each of the sites in these lists as health information, pornography, or other. Finally, we tested each site against 7 blocking products, each configured at 2 or 3 different levels of blocking restriction, to determine blocking rates for health information and pornography.

### Search Simulation
To simulate searches, we submitted search terms to the 6 Internet search engines that are among the most popular with teens according to data from a Kaiser Family Foundation survey[2]: Yahoo, Google, America Online (AOL), Microsoft Network, Ask Jeeves, and Alta Vista. To ensure that we had some variety in our list of sites with respect to likelihood of being blocked, we selected search terms from the following categories: (1) health topics unrelated to sex (eg, diabetes); (2) health topics involving sexual body parts, but not sex related (eg, breast cancer); (3) health topics related to sex (eg, pregnancy prevention); (4) controversial health topics (eg, abortion); and (5) pornography.

For each of the first 4 categories, we chose 6 frequently used search terms for health topics relevant to adolescents.[2] Frequency data for each search term was obtained from 2 different search engine logs of search term use, one from Overture.com[11] and the other from Excite.[12] For the fifth category, we also used the Overture and Excite data to select 6 frequently used search strings: *blowjob, free sex, teen porn, hardcore porn, porn,* and *XXX.*

On May 9, 2002, we ran a custom JAVA computer program to conduct searches for the 30 search strings on each of the 6 search engines and to store the results in a database. The search procedure programmed into this simulation program was based on data from an observational pilot study during which we observed 12 teens conducting a total of 69 health information searches. Because none of adolescents in the observational study clicked on advertisements or sponsored links, and they looked past the fourth page of results less than 5% of the time, our JAVA program also ignored ads and sponsored links and captured only the first 40 search results from each search. The list of search results was collapsed into a smaller list of unique uniform resource locators (URLs), and sites that were not available for classifying or blocking tests because they were offline or broken, or for other technical reasons, were not included in the analysis. We also screened each Web site for automatic redirect coding, and for most of these sites we were able to follow the redirect link in our blocking tests. If either the original URL or the redirected destination was blocked, we considered the site to be blocked.

### Web Site Classification
Research associates coded the Web sites following a detailed coding scheme according to whether or not they contained health information and then by whether or not they were pornographic. The raters explored each site by reading pages and following links, seeking both health information and pornography. If no health information was found within 2 minutes, the site was classified as nonhealth; the same was done for pornography. Any information about topics that might be discussed in a medical school or school of public health counted as health information, even if the source or quality of the information was questionable. Loosely following the definitions of obscenity in US law,[13] any text or graphics depicting genitals or a sexual act and designed to appeal to a prurient interest, and not of an educational or scientific nature, were considered pornography. Sites that contained both health information and pornography (n=14/3987 rated sites) were classified as pornographic for all analyses.

©2002 American Medical Association. All rights reserved.

Decl of Resnick
Page 31

Two primary raters were each assigned 60% of the sites, and ratings were done independently. Sites were assigned to raters using a systematic sampling from the complete list with a random component to ensure that raters could not know which sites would be rated by the other rater. The 10% overlap for each allowed us to calculate interrater reliabilities for both the health information rating ($\kappa = .84$) and for the pornography rating ($\kappa = .92$). Primary raters also had the option of not assigning a classification to a site for which they were unsure of the proper rating. These sites, and those given 2 different ratings by the 2 primary reviewers, were subsequently discussed with a third rater and a consensus rating of health, pornography, or other was assigned.

### Blocking Products

We tested 7 different blocking products (TABLE 1), 6 of which were products commonly used in schools and libraries. All 6 of these products allow the network administrator to specify a custom blocking configuration by specifying topics or categories. The categories vary from vendor to vendor, though they tend to be roughly comparable. Some vendors provide one or more default configurations, but vendors have a wide range of customers, including corporations as well as schools and libraries, and most vendors were not willing to identify a "typical" school configuration. Calls to 20 school systems and libraries confirmed wide variability in their configurations and that none was using a vendor's default setting. We defined 3 configurations for each product, to reflect extreme choices and a middle position. Our least-restrictive configuration, matching the configuration used in another recent test,[8] was designed to block only pornography. Our moderately restrictive configuration blocked pornography as well as a few other categories such as illicit drugs, nudity, and weapons. It was modeled on the configuration used by one major statewide school network that blocked fewer categories than some school districts but more than others. Our most restrictive

**Table 1.** Blocking Products

| Product | Company | Market Share, %* |
|---|---|---|
| SmartFilter v3.0.1 | Secure Computing | <5 (Education) |
| 8e6 v4.5 | 8e6 Technologies | <5 (Education) |
| Websense v4.3.1 | Websense | 6 (Education) 6 (Library) |
| CyberPatrol (SuperScout v4.1.0.8) | SurfControl | 10 (Education) 45 (Library) |
| Symantec Web Security v2.0 | Symantec | 6 (Education) |
| N2H2 v2.1.4 | N2H2 | 40 (Education) <5 (Library) |
| AOL Parental Controls | America Online | Home |

*Data from Curry and Haycock.[16]

configuration for each product was set up to block all topics or categories that plausibly might be blocked in some school or library. For most products, all categories that the products offered were blocked except news, health, education, finance, search engine, and job search sites. The details of our product configurations are available on the study Web page (http://www.kff.org).

The seventh blocking product we tested was America Online Parental Controls (AOL PC). At the time of our study, this product, designed primarily for home use, allowed only 2 configuration options appropriate for teens. Parents could choose a moderately restrictive setting for mature teens or a very restrictive setting for young teens. We have chosen not to include AOL PC in the between-product comparisons. This is partly because AOL is not commonly used in schools and libraries and partly because the limited configuration options made it impossible to determine if AOL's blocking was truly comparable to the configurations that we set for the other products in the study.

Most of the blocking tests were completed immediately after the searches, on the same day. Due to technical difficulties related to AOL's proprietary browsing software, the AOL PC blocking test took several days to complete. Due to errors in the initial runs, CyberPatrol's configurations and 2 of the configurations each for Symantec (least restrictive and moderately restrictive) and Websense (moderately restrictive and most restrictive) were rerun about 6 weeks later.

### Top Health Sites Recommended for Teens

Our browsing simulation entailed compiling a list of recommended health information Web sites for teens (n=633). Two online directories (Yahoo and Google) were used to determine the most popular and widely recommended health sites for adolescents. Within these directories, there are several health categories (eg, Kids and Teens > Health > Drugs and Alcohol). We selected only those sites for which the category header mentioned teens or youth as well as health issues related to 1 of our 24 health search terms. These sites were assumed to be health information sites and were not independently rated. The sites were compiled from the directories in June 2002.

### Statistical Analysis

As a measure of an individual blocking product's tendency to block health information Web sites, we calculated the percentage of health information sites that were blocked by each of the blocking products at each blocking level. The denominator for all of these percentages was the number of unique health information sites in our list of search simulation results that were reachable at the time of the blocking test for each product and configuration. A similar analysis was done for the pornography sites in our search simulation results and for the recommended health sites list. We also calculated summary percentage results for all of the blocking products at a given configuration.

©2002 American Medical Association. All rights reserved.

Decl of Resnick
Page 32

In order to identify statistically significant differences in product performance, we used a series of 6 multivariable logistic regressions to calculate odds ratios and 95% confidence intervals for tendency to block health information or pornography. Multivariate logistic regression was used because it allowed us to test statistical significance of product differences without having to do post-estimation adjustments for multiple comparisons. The regression model also allowed us to examine the effects of factors such as search term on likelihood of appropriately blocking pornography or inappropriately blocking health information while controlling for blocking product. Models were estimated independently at each blocking level and independently for health blocking and for pornography blocking. The dependent variable in all of these models was a dichotomous variable representing the results of a single blocking test by 1 product at 1 blocking level for 1 site, either blocked or not blocked. The independent variables were dummy dichotomous variables representing the 6 different school and library blocking products.

For each model, we chose the blocking product that performed best (either least likely to block health information or most likely to block pornography) as the reference group when specifying the independent variables. This allowed us to interpret the regression results such that odds ratios significantly different from 1 indicate that the product performed significantly worse than the best product in the category. We used STATA v7.0 SE[14] for this analysis and used STATA's "svy" commands, allowing adjustment for clustering by site. These models were estimated using a pseudo-log likelihood method. Goodness of fit was tested using the Hosmer-Lemeshow method on all 6 models unadjusted for clustering, and all had excellent fit across the range of probabilities.

We selected 1 of the search terms that resulted in a large number of blocked health information sites (*safe sex*) for more detailed analysis of the content of health information sites (n=45) that were blocked by at least 1 product at either the least restrictive or moderately restrictive settings. A research associate visited each of the sites and summarized the content in 1 or 2 sentences, with specific attention to content that might have triggered the blocking software. We then analyzed the summaries to determine patterns.

## RESULTS
### Search Simulation Results
Our search simulation yielded a total of 6760 Web sites. After eliminating duplicate sites (n=2501) and sites that were unreachable or could not be included for technical reasons (n=272), 3987 unique URLs remained. Of these unique sites, 2467 contained health information and not pornography, 516 contained pornography, and 1004 were rated as neither health information nor pornography.

Results of the blocking tests on the health information sites are shown in the first section of **Table 2**. Large differences are apparent with the 6 comparable products compared as a group across the 3 levels of blocking. At the least restrictive blocking configuration, the mean blocking rate of health sites was 1.4% (range for the 6 products, 0.6%-2.3%). The mean blocking rate of pornography sites was 87.2% (range, 84%-90%). As the level of blocking increased from least to moderate to most restrictive, the frequency of health blocking increased substantially while the improvement in pornography blocking was small. At moderate blocking settings, the mean blocking rate of health information sites was 5.2%; at the most restrictive settings, it was 24%. At the least restrictive configuration, 5% of all health information sites were blocked by at least 1 product. This compares with 16% of sites for moderate blocking settings and 63% of sites for the most restrictive settings.

**Table 2.** Blocking Results for All Products Across 3 Levels of Blocking Restrictiveness*

| Restrictiveness | SmartFilter | 8e6 | Websense | CyberPatrol | Symantec | N2H2 | Mean Blocking Rate, %† | AOL PC |
|---|---|---|---|---|---|---|---|---|
| Health Information URLs Blocked (n = 2467) | | | | | | | | |
| Least | 56 (2.3) | 27 (1.1) | 15 (0.6) | 39 (1.6) | 48 (1.9) | 20 (0.8) | 1.4 | NA |
| Moderate | 143 (5.8) | 112 (4.5) | 94 (3.8) | 68 (2.8) | 188 (7.6) | 160 (6.5) | 5.2 | 79 (3.2) |
| Most | 447 (18.2) | 371 (15.1) | 873 (35.4) | 552 (22.4) | 826 (33.5) | 481 (19.5) | 24.0 | 398 (16.1) |
| Pornography URLs Blocked (n = 516) | | | | | | | | |
| Least | 450 (87.2) | 460 (89.1) | 433 (83.9) | 442 (85.7) | 453 (87.8) | 462 (89.5) | 87.2 | NA |
| Moderate | 457 (88.7) | 469 (90.9) | 471 (91.3) | 442 (85.7) | 461 (89.3) | 479 (92.8) | 89.8 | 475 (92.1) |
| Most | 459 (89.0) | 475 (92.1) | 484 (93.8) | 450 (87.2) | 467 (90.5) | 485 (94.0) | 91.1 | 489 (94.8) |
| Recommended Health Information URLs Blocked (n = 586) | | | | | | | | |
| Least | 0 (0) | 3 (0.5) | 3 (0.5) | 3 (0.5) | 8 (1.4) | 2 (0.3) | 0.5 | NA |
| Moderate | 6 (1.0) | 7 (1.2) | 8 (1.4) | 5 (0.9) | 49 (8.4) | 22 (3.8) | 2.8 | 7 (1.2) |
| Most | 98 (16.8) | 64 (10.9) | 230 (39.4) | 155 (26.5) | 167 (28.5) | 136 (23.2) | 24.2 | 90 (15.0) |

*AOL PC indicates America Online Parental Controls; URL, uniform resource locator; and NA, not applicable.
†For all products except AOL PC.

  ©2002 American Medical Association. All rights reserved.

Decl of Resnick
Page 33

There were some statistically significant differences between products, as summarized in TABLE 3. In the least restrictive blocking configuration, Websense was the least likely to block health information, so Websense became the reference category (odds ratio, 1). SmartFilter, 8e6, CyberPatrol, and Symantec were all more likely to block health information than Websense, but N2H2 was not significantly more likely to block health information than was Websense. Within the margin of error for our study, Websense and N2H2 are both top products at not blocking health information at the least restrictive blocking configuration. Across all 3 blocking levels, N2H2 was the best at blocking pornography.

Overall, for the 24 health search strings only about 1% of search results were pornography, but the software blocked fewer of these pornography sites (62%) than those resulting from pornography searches (89%). Adding a dummy variable for a pornography vs not pornography search in the logistic regression reported in Table 3 confirmed that this difference is statistically significant ($P<.001$).

When comparing health information blocking rates across the 24 different health search terms, there were some notable differences in performance as summarized in TABLE 4. At the least restrictive setting, where products were supposed to block pornography only, about 10% of nonpornographic health information sites returned from searches using the terms *safe sex*, *condom*, and *gay* were blocked, while for most other searches less than 1% of health sites were blocked. At the moderately restrictive setting, these search terms again yielded a larger percentage of health results blocked, as did *ecstasy*, presumably because the moderately restrictive setting was supposed to block access to sites about illegal drugs. At the most restrictive blocking setting, most strings yielded a health information blocking rate of at least 10%, and half of the more controversial topics had rates above 40%.

When we tested the blocking products against a list of 633 top health information sites, we found similar results. After excluding 29 sites that were unreachable and eliminating duplicates, we ran our blocking test on 586 unique recommended health sites. At the least restrictive blocking setting, 0.5% (range, 0%–1.4%) of recommended teen health information sites were blocked. This compares with 2.5% (range, 0.9%-8.4%) at the moderately restrictive blocking settings and 23% (range, 10.9%-39%) at the most restrictive blocking settings.

### What Kinds of Health Sites Were Blocked?

Of the 86 unique health sites resulting from searches using the term *safe sex*, 28 were blocked by some product at the least restrictive configuration and 42 were blocked by some product at the moderately restrictive configuration. Of those blocked at the least restrictive configuration, the vast majority contained at least moderately specific descriptions of condom use and/or alternatives to intercourse. Four of these sites contained pictures and graphic depictions of sexual acts and 2 contained nudity that seemed to be artistic in nature. Three required users to confirm that they were older than 18 years before visiting the site. Four sites sold condoms. The additional health sites blocked at the moderately restrictive configuration did not appear qualitatively different than those blocked at the least restrictive level, ie, they did not contain more offers for condoms or more explicit information on safer sexual practices.

## COMMENT

For all 7 of the filtering products we tested, access was blocked to only a small percentage of health information Web sites when the blocking configurations were set to the least restrictive settings. With only 1.4% of health information sites that we tested blocked, a teenager whose access to a particular health information site is inadvertently blocked will probably be able to easily find an unblocked site with similar information. This suggests that filtering software set to block pornography will not necessarily have a serious impact on access to general health information. Compared with other factors that may limit teenagers' access to health information when searching the

Table 3. Tendency to Block Health Information Sites vs Pornography Sites*

| Restrictiveness | OR (95% CI) | | | | | |
|---|---|---|---|---|---|---|
| | SmartFilter | 8e6 | Websense | CyberPatrol | Symantec | N2H2 |
| | | | Health Information | | | |
| Least | 3.8 (2.3-6.2) | 1.8 (1.1-3.0) | Reference† | 2.6 (1.6-4.3) | 3.2 (1.9-5.4) | 1.3 (0.8-2.4) |
| Moderate | 2.2 (1.7-2.7) | 1.7 (1.3-2.1) | 1.4 (1.1-1.8) | Reference† | 2.9 (2.3-3.8) | 2.4 (2.0-3.1) |
| Most | 1.3 (1.1-1.4) | Reference† | 3.1 (2.7-3.5) | 1.6 (1.4-1.8) | 2.8 (2.5-3.2) | 1.4 (1.2-1.6) |
| | | | Pornography | | | |
| Least | 0.80 (0.58-1.1) | 0.96 (0.70-1.3) | 0.61 (0.45-0.82) | 0.70 (0.51-0.96) | 0.84 (0.61-1.2) | Reference† |
| Moderate | 0.61 (0.42-0.88) | 0.77 (0.51-1.2) | 0.81 (0.54-1.2) | 0.46 (0.32-0.66) | 0.65 (0.44-0.95) | Reference† |
| Most | 0.51 (0.35-0.77) | 0.76 (0.47-1.2) | 0.97 (0.61-1.5) | 0.44 (0.29-0.65) | 0.61 (0.40-0.93) | Reference† |

*OR indicates odds ratio; CI, confidence interval.
†The reference product for each group was chosen to be the best product. For pornography blocking, the best product is the one *most* likely to block pornography; for health information blocking, the best product is the one *least* likely to block health information.

Decl of Resnick
Page 34

Internet, including spelling errors, limited search skills, and uneven quality of search engines, overblocking by filtering software set at the least restrictive blocking settings poses a relatively minor barrier for most of the health topics we studied.

However, the blocking rates were noticeably higher for some topics. For example, with searches on *safe sex*, almost 10% of attempts to access health results were blocked, and 33% of health sites were blocked by at least 1 of the products, even on the least restrictive setting. More than 20% of attempts were blocked at the moderate setting. These blocking rates may be enough to make blocking software a serious impediment to searching for this type of health information. This is particularly concerning given that 80% of teens identify sexual health as very important.[2] The conventional wisdom that the presence of words mentioning sexual body parts fools blocking software appears not to be true (no *breast cancer* search results were blocked at the least restrictive configuration). There do seem to be patterns, however, in the types of blocking errors. To the extent that these blocked health information sites represent errors and not intentional blocking of controversial sites, further research and product development should be devoted to improving the ability of products to discriminate between pornography and health information in sites related to safe sex, condoms, and homosexuality.

We also found that configuration of the products can have a large impact on access to health information. The moderately restrictive configurations that we believe approximate many schools' settings led to more than 3 times as much blocking of health information as the least restrictive, pornography-only blocking settings. Overall, the most re-

**Table 4.** Blocking of Health Information by All Products During Health Searches

| Search String | Sites Returned From Searches, No. (%)* | | | | Health Information Sites Blocked, %† | | |
|---|---|---|---|---|---|---|---|
| | Health | Pornography | Other | All | Least Restrictive | Moderately Restrictive | Most Restrictive |
| Health Topics Unrelated to Sex | | | | | | | |
| Diabetic diet | 202 (88) | 0 (0) | 28 (12) | 230 | 0.1 | 0.2 | 13.9 |
| Diabetes | 196 (85) | 0 (0) | 34 (15) | 230 | 0.1 | 0.4 | 10.0 |
| Ecstasy | 171 (72) | 2 (1) | 64 (27) | 237 | 0.3 | 24.9 | 36.2 |
| Alcohol | 204 (88) | 0 (0) | 27 (12) | 231 | 0 | 7.1 | 12.7 |
| Suicide | 200 (85) | 2 (1) | 32 (14) | 234 | 0.2 | 1.7 | 13.7 |
| Depression | 189 (80) | 0 (0) | 46 (20) | 235 | 0 | 1.0 | 11.2 |
| Health Topics Involving Body Parts, Not Sex-Related | | | | | | | |
| Breast cancer | 224 (97) | 0 (0) | 8 (3) | 232 | 0 | 0.2 | 6.9 |
| Cancer | 221 (95) | 0 (0) | 12 (5) | 233 | 0 | 0.3 | 3.7 |
| Jock itch | 180 (94) | 0 (0) | 11 (6) | 191 | 0.6 | 1.4 | 15.4 |
| Yeast infection | 206 (94) | 1 (0) | 11 (5) | 218 | 0.1 | 1.1 | 18.4 |
| Breast feeding | 217 (92) | 0 (0) | 18 (8) | 235 | 0.2 | 1.2 | 18.6 |
| Breast pump | 163 (70) | 0 (0) | 69 (30) | 232 | 0 | 0.9 | 26.3 |
| Health Topics Related to Sex | | | | | | | |
| Sexually transmitted disease | 112 (49) | 0 (0) | 118 (51) | 230 | 1.4 | 3.4 | 23.4 |
| Herpes | 203 (88) | 0 (0) | 29 (12) | 232 | 1.0 | 1.8 | 23.0 |
| Safe sex | 131 (68) | 11 (6) | 51 (26) | 193 | 9.3 | 20.5 | 50.0 |
| Condom | 152 (65) | 9 (4) | 72 (31) | 233 | 9.1 | 27.7 | 55.4 |
| Pregnancy | 219 (94) | 0 (0) | 15 (6) | 234 | 0.4 | 0.6 | 31.6 |
| Birth control | 210 (89) | 0 (0) | 27 (11) | 237 | 1.8 | 5.0 | 34.7 |
| Controversial Health Topics | | | | | | | |
| RU486 | 177 (76) | 1 (0) | 54 (23) | 232 | 0.3 | 2.1 | 25.8 |
| Abortion | 184 (79) | 0 (0) | 48 (21) | 232 | 0.2 | 3.2 | 44.6 |
| Gay | 74 (38) | 10 (5) | 113 (57) | 197 | 11.1 | 24.6 | 59.9 |
| Lesbian | 79 (34) | 7 (3) | 149 (63) | 235 | 3.8 | 17.1 | 59.0 |
| Rape | 151 (67) | 2 (1) | 74 (33) | 227 | 1.2 | 3.3 | 22.0 |
| Date rape | 152 (83) | 1 (1) | 30 (16) | 183 | 1.7 | 5.2 | 21.1 |
| Total | 4217 (78) | 46 (1) | 1140 (21) | 5403 | 1.3 | 5.1 | 24.1 |

*Totals reflect all search results; if a site is suggested by more than 1 search engine, it may be counted mutliple times. A maximum of 240 results are possible for each search, but some search engines did not return results for some searches, either because of transitory errors or because they refuse to return results for some search strings, and some sites returned by searches were broken or unreachable.
†Blocking percentages reflect the percentage of unique sites returned by all searches for that search term that were blocked. If a site is suggested by more than 1 search engine, it is counted only once. Percentages are averaged across the 6 products for the given setting (least, moderate, most).

©2002 American Medical Association. All rights reserved.

Decl of Resnick
Page 35

strictive configurations blocked more than 17 times as often as the least restrictive configurations. However, these more restrictive settings led to only slight improvements in blocking of pornography: their main effect was to block other potentially controversial types of information, including some types of health information.

There may be principled reasons why some schools or libraries choose to block more than pornography, including some kinds of health information. These decisions, however, should be viewed as important policy decisions and not mere technical configuration issues to be left to network administrators. The choice of configurations should get at least as much public and managerial scrutiny as the initial decision about whether to install filters at all.

Comparing among the products, the blocking rates for health information varied by a factor of 2 or more. At the least restrictive settings, for most health searches the overall blocking rates were small enough that erroneous blocking was rare for all the products. For more restrictive settings, and for searches on topics such as *safe sex*, differences among products would become more noticeable.

The products each blocked 80% to 90% of the pornography sites at minimal blocking levels. Health searches generated links to pornography sites only about 1% of the time, so that accidentally stumbling across pornography while searching for health information is a rare occurrence, and even rarer with blocking software. However, it is interesting to note that the filters were far more effective at blocking pornography sites resulting from pornography searches than at blocking pornography sites resulting from health searches. One possible explanation is that the same characteristics, such as particular text appearing in the content or links to and from other sites, that caused pornography sites to appear in search engine results also caused the blocking software to classify them incorrectly. We do not know exactly what text content or link patterns might be the source of the errors, or whether the sites were deliberately designed to induce such errors.

Some simple industry-wide actions might reduce error rates even further and aid in product selection and configuration. For example, it would be helpful if creators of health or pornography sites could provide hints to the vendors about how the site should be classified. One solution might be the more widespread use of embedded labels[15] or the creation and use of domain names such as .health and .xxx.[7] Conversely, it would be helpful if vendors informed operators of Web sites about whether their sites were blocked, so that errors could be identified and corrected more quickly. This could be accomplished through an electronic clearinghouse, operated by a nonprofit organization or government agency, where people could submit a URL and find out immediately whether the site was blocked on any of the configurations of the major vendors.

Vendors may have commercial reasons for not fully disclosing their blocking strategies. However, providing the ability to check if a specific URL is blocked would not require vendors to divulge the trade secrets of their classification methods or publish their entire blocking lists. Some vendors voluntarily provide sites allowing users to check for blocking of specific URLs. Legislation or regulation could mandate vendor participation or provide incentives such as certifying vendors for government contracts if they allow these blocking checks. Moreover, if a publisher does find that its site is blocked and feels that it is a mistake, the software vendor may not be responsive to an inquiry asking for a reevaluation. One possible solution would be to establish an appeal process that the vendor would have to respond to within a fixed period of time. Finally, to aid in product and configuration selection, tests of the form reported in this article should be conducted on a regular basis, using a different set of search topics each time.

While the rigorous sampling methods and the large sample size lend weight to the results, there are several limitations to our study. First, while we simulated searches on topics that previous surveys indicate interest teenagers, our simulations were still fairly basic. We did not attempt to model how teenagers react to the short summary text for each site that a search engine returns, and how that influences their choices of which links to follow. Similarly, we did not attempt to model how having some sites blocked would affect the progress of a search. Second, we made no attempt to rate the quality of health information or the relevance of health sites to the search topics. Third, when we counted blocked health information sites, we made no attempt to check whether alternative sources of the same health information were available and not blocked. Thus, this study measures the percentages of health and pornography items that are blocked, but was not designed to give a detailed picture of how the presence of blocking software would affect the quality of health information a teenager would find when searching. Fourth, some of the product configurations were tested at a later date due to technical difficulties. Since the search results from an earlier date were used, it is possible that the product vendors had revised their blocking decisions for those URLs, perhaps reducing the number of blocked health sites or increasing the number of blocked pornography sites. However, results for product configurations tested later were roughly consistent with the overall pattern of results, both for individual products and across products.

Another important limitation of the study is that it focused only on the categories of pornography and health information. Some individuals may think that teenagers should be prevented from accessing information on controversial topics such as condoms, homosexuality, and abortion. Our analysis treated sites discussing these topics as health information sites. Depending on one's opinion about accessibility of information on these controversial topics, the more restrictive blocking rates for health information found in some

Decl of Resnick
Page 36

of the software configurations may or may not be problematic. While it was fairly easy to achieve interrater reliability in classifying pornography and health information, it is less clear what the objective criteria for more controversial topics would be, and we deferred that to future research. For those who are interested in rerating our sample, running their own statistics, or simply examining our ratings, the database is available on the study Web page (http://www.kff.org).

The differences between products were much smaller than the differences between settings within each product. For general health information searches, at their least restrictive settings, overblocking by filtering software poses a relatively minor risk. However, for searches for some sexually related health information and for homosexuality, the blocking of health information sites was around 10% even on the least restrictive setting, suggesting that blocking software is less effective at distinguishing pornography sites from those discussing these health topics. Moreover, more restrictive blocking configurations substantially increased health information blocking with only slight improvement in pornography blocking: the main effect of the more restrictive settings is to block other categories of controversial material besides pornography.

**Author Contributions:** *Study concept and design:* Richardson, Resnick, Rideout.
*Acquisition of data:* Richardson, Hansen, Derry.
*Analysis and interpretation of data:* Richardson, Resnick, Hansen, Rideout.
*Drafting of the manuscript:* Richardson, Resnick, Hansen.
*Critical revision of the manuscript for important intellectual content:* Richardson, Resnick, Hansen, Derry, Rideout.
*Statistical expertise:* Richardson, Resnick.
*Obtained funding:* Richardson, Resnick, Rideout.
*Administrative, technical, or material support:* Hansen, Derry.
*Study supervision:* Richardson, Resnick, Derry, Rideout.
**Funding/Support:** This study was supported by a contract from the Kaiser Family Foundation. Ms Rideout is employed by the Kaiser Family Foundation and had substantial input into the study design, analysis, and presentation of results.
**Acknowledgment:** For project conceptualization and management we thank Victor Strecher, PhD, MPH, and Ed Saunders, MS. For programming and data management we thank Mike Nowak, MS, and Ian Jones, BA. For statistical consultation we thank Rod Little, PhD, MSc, and Ying Yuan, MS. Joel Howell, MD, PhD, Rod Hayward, MD, and Mack Ruffin, MD, MPH, provided helpful comments on manuscript drafts.

**REFERENCES**

1. Fox S, Rainie L. *The Online Health Care Revolution: How the Web Helps Americans Take Better Care of Themselves*. Washington, DC: Pew Internet and American Life Project; 2000:23.
2. Rideout V. *Generation Rx.com: How Young People Use the Internet for Health Information*. Menlo Park, Calif: Henry J. Kaiser Family Foundation; 2001:37.
3. *Generation Rx.com Survey*. Menlo Park, Calif: Henry J. Kaiser Family Foundation; 2001.
4. *American Library Association Inc v United States*, 9537 US Dist Lexis (2002 ED PA).
5. Cattagni A, Westat EF. *Internet Access in US Public Schools and Classrooms: 1994-2000*. Washington, DC: National Center for Education Statistics; 2001:20.
6. Oder N. The new wariness. *Libr J.* 2002;127:55-57.
7. Thornburgh D, Lin H, eds. *Youth, Pornography, and the Internet*. Washington, DC: National Academy Press; 2002.
8. US Department of Justice. *Web Content Filtering Software Comparison*. Morrisville, NC: eTesting Labs; 2001:18.
9. Greenfield P, Rickwood P, Tran HC. *Effectiveness of Internet Filtering Software Products*. Sydney, Australia: CSIRO Mathematical and Information Sciences; 2001:90.
10. Brunessaux S, Isidoro O, Kahl S, Ferlias G, Soares ALR, for MATRA Systemes & Information, Matra Global Netservices, Sail Labs, Hypertech, Red Educativa. *Report on Currently Available COTS Filtering Tools*. 2001. Available at: http://www.saferinternet.org/downoads/netprotect_review_tools.pdf. Accessibility verified October 30, 2002.
11. Tools page. Overture Web site. *Search Term Selection Tool*. Available at: http://www.overture.com/d/USm/adcenter/tools/index.jhtml;2002. Accessibility verified October 30, 2002.
12. Jansen B, Spink A, Saracevic T. Real life, real users, and real needs: a study and analysis of user queries on the web. *Information Processing Manage*. 2000;36:207-227.
13. *Miller v California*, 413 US 15 (1973).
14. StataCorp. *Stata Statistical Software: Release 7.0 SE*. College Station, Tex: Stata Corp; 2001.
15. Resnick P. Filtering information on the Internet. *Sci Am*. 1997;273:106-108.
16. Curry A, Haycock K. Filtered or unfiltered? *Sch Libr J*. 2001;1:42-47.

Decl of Resnick
Page 37

# Exhibit C

BY PAUL J. RESNICK, DEREK L. HANSEN, AND CAROLINE R. RICHARDSON

# Calculating
# ERROR RATES
## For Filtering Software

Establishing a blueprint for conducting and reporting tests of filter effectiveness.

Surveys in the U.S. have found that 95% of schools [4], 43% of public libraries [5], and 33% of teenagers' parents [8] employ filtering software to block access to pornography and other inappropriate content. Many products are also now available to filter out spam email.

Filtering software, however, cannot perfectly discriminate between allowed and forbidden content, resulting in two types of errors. First, under-blocking occurs when content is not blocked that should be restricted. Second, over-blocking occurs when content is blocked that should not have been restricted. Steps can be taken to reduce the frequency of errors, and to reduce their costs (for example, by providing easy appeals processes, quick overrides, and corrections) but some errors are inevitable.

Decl of Resnick
Page 39

The frequency of errors is an empirical question of great importance. For example, in 2000, the U.S. Congress passed the Child Internet Protection Act (CIPA) mandating that schools and libraries install content-filtering software in order to be eligible for some forms of federal funding. A district court struck down the requirement for libraries on the grounds that it violates the First Amendment. Much of that court's finding of facts was devoted to analyses of error rates [1] and some of the arguments made on appeal to the U.S. Supreme Court also hinged on analyses of error rates.

Most empirical studies of error rates have suffered from methodological flaws in sample selection, classification procedures, or implementation of blocking tests. Results have also been interpreted inappropriately, in part because there are two independent measures of over-blocking that are sometimes confused, and likewise for under-blocking. This article presents a framework to guide the design and interpretation of evaluation studies. While the framework applies with only minor modifications to the evaluation of spam filters, the examples and discussion here focus on pornography filters.

## A Framework for Testing Filtering Software

The process of testing filter effectiveness is graphically outlined in Figure 1. A test set of items is generated. These items are classified to see whether they should be blocked and are tested to see whether they are actually blocked by filters. For each item, then, there are four possible outcomes: it may be correctly blocked, incorrectly blocked (which we refer to as an over-block), correctly not blocked, or incorrectly not blocked (which we refer to as an under-block). Finally, in step 3, the rates of over- and under-blocking are calculated.

**Step 1: Create a Test Set.** The first major step in the process is to create a test set of Web sites or other Internet content on which the performance of the filters will be judged. One approach is to collect a set of accessed items, as a way of evaluating filters' impact on users. For example, for the CIPA case, Finnell selected sites from the proxy server access logs of three public libraries [1]. Simulations can also be conducted, to approximate what users might access. For example, for a study of filtering error rates on health information, we entered search strings on 24 health topics into six search engines and collected the first 40 results from each search [7].

A second approach is to collect a set of accessible items, as a way of evaluating the impact of filters on publishers. There is no good way to sample from all the available Web pages (even search engines index only a fraction of pages they encounter). Instead, some well-defined subset of Internet content must be chosen, such as the health listings from certain portal sites or all the Web pages served by particular Web servers.

Figure 1. Summary of process for testing filter effectiveness.

|  | Blocked | Unblocked |
|---|---|---|
| Bad | Correct Block | Under-Block |
| OK | Over-Block | Correct Non-Block |

Step 1: Create a Test Set of URLs
Step 2a: Blocking Test
Step 2b: Classification
Step 3: Calculate Over- and Under-Blocking

Test sets are only representative of the larger collection from which they were drawn. For different purposes it is appropriate to estimate error rates for different subsets. For example, even within the overall domain of health sites, our study found quite different error rates from searches on the terms "condom" and "gay" than for searches on "depression" and "breast cancer" [7].

The collection process should satisfy three properties. First, it should be objective and repeatable. Many studies have relied on tester judgment to select interesting or relevant items [2, 3, 10], possibly introducing bias. Second, the collection process should be independent of the filters to be tested. The sample used by Finnell reflected patrons' access patterns when filters were installed, not what their access patterns would have been without filters. Third, large test sets should be assembled. Some studies have relied on small test sets. Others with large test sets covered so many categories of content that there was not enough statistical power to evaluate the effectiveness of the filters for particular categories [2, 3, 10].

**Step 2a: Blocking Test.** Each selected URL is tested against the various filters to see whether access to the site is blocked. This is best performed through automated processes that are able to quickly test a large number of URLs against the filters. Automated tests must take into account the possibility that sites may redirect browsers through HTTP headers, HTML, or JavaScript code, to other sites. A Web browser would attempt to access the original URL

Decl of Resnick

Page 40

There have been numerous studies that report the over- and under-blocking rates of filtering software products. **THE METHODOLOGY OF SUCH STUDIES HAS IMPROVED** substantially in recent years, **BUT SIGNIFICANT CONCERNS STILL REMAIN.**

and then the destination URL. Thus, in an automated test, a filter should also be tested against both URLs and the site should be considered blocked if either one is blocked.

Vendors regularly update the contents of their blocking lists and rules. In order to maintain comparability between vendors, therefore, all products being compared should be updated just before the tests are run. In addition, all tests should be run simultaneously or nearly so, to allow for a fair comparison. If the test set reflects the results of simulated searches, the blocking tests should be conducted as soon as possible after the searches are run, so that the results reflect what would have been accessible to a user from the search.

Product configuration choices can have a large impact on rates of over-blocking and under-blocking. For example, nearly all products offer a variety of settings or categories that can be chosen. These categories range from pornography to gambling to hobbies and rarely match up perfectly across products, making comparisons across products difficult. An informal survey of 20 school systems and libraries confirmed wide variability in their configurations and that none were using a vendor's default setting [7]. Thus, tests should be run against a range of configurations.

**Step 2b: Classification of Sites.** Each URL in the test set is classified to determine whether it should have been blocked or not. The definition of what should be blocked will depend on the purpose of the test. For example, in order to test the over- and under-blocking of pornographic material it would be necessary to classify each site as containing or not containing pornographic material. In order to test whether filtering software implements the CIPA standard, or the legal definition of obscenity, sites would have to be classified according to those criteria. And if the goal were simply to test whether filtering software correctly implements the vendor's advertised classification criteria, the sites would be independently classified according to those criteria.

Ideally, the classification process should satisfy three properties [6]. First, it should have face validity, meaning there is an obvious connection to the underlying definition of what should be blocked. Second, the procedure should be reliable, meaning that the process is sufficiently documented to be repeatable and that multiple ratings of items would be in substantial agreement. Third, there should be construct and criterion validity, meaning the classifications should be in substantial agreement with those produced by other processes that have reliability and face validity.

|  | Blocked | Unblocked |
|---|---|---|
| Bad | a | b |
| OK | c | d |

Over-blocking errors
OK-sites over-block rate (1-specificity): $\frac{c}{d+c}$
Blocked-sites over-block rate (1-precision or 1- pos. pred. value): $\frac{c}{a+c}$
Under-blocking errors
Bad-sites under-block rate (1-recall or 1-sensitivity): $\frac{b}{a+b}$
Unblocked-sites under-block rate (1- neg. pred. value): $\frac{b}{d+b}$

Figure 2. Calculating error rates.

Because site content can change over time, sites should ideally be classified according to their state at the time the blocking tests were run. By caching the contents of sites when blocking tests are run, it is acceptable to delay the actual classification. This also allows the cache to be made public, so that others can scrutinize the classification decisions made by the raters in the study or classify the sites independently according to different criteria.

**Step 3: Over- and Under-Blocking Reporting.** For any product configuration and set of URLs tested, there are four results from the testing and classification, as shown in the top part of Figure 2: (a) the number of correct blocks, (b) the number of under-blocks, (c) the number of over-blocks, and (d) the number of correct non-blocks. For brevity, we will refer to sites as "bad" if they should be blocked and as "OK" if they should not be blocked according to the classification that was done: no value judgment is intended.

Decl of Resnick
Page 41

Two-by-two outcome tables arise when evaluating all sorts of binary decisions, from radar operators detecting the presence or absence of enemies to medical diagnostic tests to information-retrieval techniques that select documents from a large corpus. The most useful summaries of filtering test outcomes describe under-blocking and over-blocking error rates (percentages). There are two natural ways to calculate each error rate, each providing different information. Figure 2 summarizes how to calculate the error rates and their relation to measures usually reported in information science and medical research.

Consider, first, the amount of over-blocking. One measure, which we call the OK-sites over-block rate, is the fraction of acceptable sites that are blocked. This measure is related to what medical researchers would call the specificity of a diagnostic test. It is useful in answering the question of how frequently a user who is trying to access OK (non- pornographic) sites will be blocked. This is the number that a school or library or parent should consider when deciding whether a filter is overly broad in restricting access to information that should be available.

This error rate could also be relevant to a U.S. court performing an "intermediate scrutiny" or "reasonableness" analysis. To be reasonable, restrictions must not interfere substantially with the legitimate uses of a forum. One interpretation is that over-blocks must be few in relation to correct non-blocks of OK sites: in other words, the OK-sites over-block rate must be low.

A second measure of over-blocking, which we call the blocked-sites over-block rate, is the fraction of all blocked sites that are OK (not pornographic). This measure is related to what information scientists would call precision and medical researchers would call positive predictive value. It might be useful to a school or library or parent when deciding whether to monitor for blocking as evidence of violation of acceptable use policies. For example, if a high proportion of blocked sites are in fact OK, then the mere fact that a user tries to access a blocked site would not be a reason to suspect that user of trying to access pornography.

This error rate could also be relevant to a U.S. court performing a "strict scrutiny" analysis. To satisfy strict scrutiny, restrictions must be "narrowly tailored" to meeting a compelling government interest. One interpretation is that over-blocks must be few in relation to correct blocks of bad sites: in other words, the blocked-sites over-block rate must be low.

Note that the two measures of over-blocking are independent, as illustrated in Tables 1a and 1b, which give results from hypothetical tests of two filters, on the same set of sites. In both tables, the fictitious filters have a blocked-sites over-block rate of 50%: they are equally imprecise. They differ in the OK-sites over-block rate, however. In Table 1a, 99% of the OK sites are blocked but in Table 1b only 1% are blocked.

Any estimate of the blocked-sites over-block rate is sensitive to the prevalence of OK sites in the test set. Table 1d differs from Table 1c only in having a higher concentration of OK sites. The error rates of the filter on bad and OK sites are both 1% in both tables. The blocked-site over-block rate, however, goes from 1% to 50%.

Consider, for example, Edelman's selection of 6,777 blocked sites as presented in the CIPA case [1]. Janes' classification process, as also reported in the court's decision, estimated that about two-thirds of those were over-blocks. But since the sampling process drew from a set deliberately designed to have a very high concentration of OK items, it should be expected that a large percentage of the blocked items would also be OK. An even more fundamental problem occurred in studies presented by Hunter [1] and Lemmons [1, 10] that employed separate samples of OK and bad sites. Any estimate of the blocked-site over-block rate from such tests is arbitrary: selecting a larger or smaller sample of OK sites, while holding everything else constant, would yield different esti-



**Table 1a.**

|     | Blocked | Unblocked |
|-----|---------|-----------|
| Bad | 99      | 1         |
| OK  | 99      | 1         |

**Table 1b.**

|     | Blocked | Unblocked |
|-----|---------|-----------|
| Bad | 1       | 99        |
| OK  | 1       | 99        |

**Table 1c.**

|     | Blocked | Unblocked |
|-----|---------|-----------|
| Bad | 99      | 1         |
| OK  | 1       | 99        |

**Table 1d.**

|     | Blocked | Unblocked |
|-----|---------|-----------|
| Bad | 99      | 1         |
| OK  | 99      | 9801      |

Table 1a–d: Measuring blocked-sites rates.

**Test Set Selection**
- ☐ Objective and repeatable process
- ☐ Independent of filters
- ☐ Large enough set to give statistical power

**Blocking Test**
- ☐ Redirects handled properly
- ☐ Updated blocking lists
- ☐ Multiple configurations tested

**Classification**
- ☐ Face validity
- ☐ Reliability
  - ☐ Criteria documented sufficiently to allow repetition
  - ☐ Inter-rater reliability reported
- ☐ Construct and criterion validity
- ☐ Sites cached at time of blocking tests

**Error Rate Reporting**
- ☐ OK-site over-block rate
- ☐ Blocked-site over-block rate
- ☐ Bad-site under-block rate
- ☐ Unblocked-site under-block rate

Table 2. Methodology checklist.

Decl of Resnick
Page 42

mates of the blocked-site over-block rate.

If a study selects only blocked items for a test set, it cannot calculate the OK-sites over-block rate. To do that, one would need additional information about the proportion of blocked to unblocked sites and the proportion of unblocked sites that were OK. For example, Edelman tested more than 500,000 URLs in order to select the 6,777 blocked items. If, as seems likely, the vast majority of the 500,000+ unblocked sites were acceptable, then the OK-sites over-block rate may have been under 1%. However, one cannot be sure since the study was designed only to identify blocking errors, not their frequency among all OK sites.

Now consider the rate of under-blocking. One measure, which we call the bad-sites under-block rate, is the percentage of all unacceptable sites that were not blocked. This measure is related to recall in information science and sensitivity in medical research. It is the number that a school or library or parent or judge should consider when deciding whether blocking software is effective at preventing children from accessing pornography or other undesirable materials.

Another measure, the unblocked sites under-block rate, is the percentage of all unblocked sites that should have been blocked. This measure could be useful in determining whether an honor code is needed in addition to any installation of filters. For example, if this error rate is high, then the fact that a site was not blocked does not necessarily mean that it is non-pornographic, and it might be necessary to inform students that they are still responsible for not visiting pornographic sites even if the filters do not block their access. Again, the two measures of the under-blocking rate are independent: one may be high without the other being high. In Tables 1a and 1b, the unblocked sites under-block rates are both 50%, but the bad-sites under-block rates are 1% and 99% respectively.

## Conclusion

There have been numerous studies that report the over- and under-blocking rates of filtering software products. The methodology of such studies has improved substantially in recent years, but significant concerns still remain. Table 2 summarizes desirable methods.

There is no easy answer to the question of how to best protect children from inappropriate material on the Internet [9], or even whether any protection is needed. Certainly, filtering software is not a silver bullet—there are other approaches available, including student education, privacy screens, honor codes, and adult monitoring. However, the amount of attention and public concern about whether filters are helpful or harmful suggests an ongoing need for careful empirical investigation. Objective and methodologically sound research must inform the debate.

Values, however, will be the ultimate determining factor. How much over-blocking or under-blocking is too much? When we reported our findings of error rates in blocking health information [7], few questioned our methods or findings, but both supporters and opponents of filtering claimed the results supported their positions. People simply differ in their assessments of the benefits of blocking bad sites and the costs of blocking OK sites. Methodologically sound research is needed to redirect attention away from meaningless debates comparing misleading study results toward meaningful debates about values. ▣

REFERENCES
1. *American Library Association, Inc., v. United States.* 2002, E.D. PA.
2. Brunessaux, S., Isidoro, O., Kahl, S., Ferlias, G., and Soares, A.L.R. *Report on Currently Available COTS Filtering Tools.* MATRA Systemes and Information, 2001; www.net-protect.org/en/results3.htm.
3. Greenfield, P., Rickwood, P., and Tran, H.C. *Effectiveness of Internet Filtering Software Products.* CSIRO Mathematical and Information Sciences, 2001; www.aba.gov.au/internet/research/filtering/.
4. Kleiner, A. and Lewis, L. *Internet Access in U.S. Public Schools and Classrooms: 1994–2002.* U.S. Department of Education, National Center for Education Statistics, NCES 2004-011; nces.ed.gov/pubs2004/2004011.pdf.
5. Oder, N. The new wariness. *Library Journal 127*, 1 (2002), 55–57.
6. Pedhazur, E.J. and Schmelkin, L.P. *Measurement, Design, and Analysis: An Integrated Approach.* Lawrence Erlbaum and Associates, Hillsdale, NJ, 1991, 819.
7. Richardson, C., Resnick, P., Hansen, D., and Rideout, V. Does pornography-blocking software block access to health information on the Internet? *Journal of the American Medical Association 288*, 22 (2002).
8. Rideout, V. *Generation Rx.com: How Young People Use the Internet for Health Information.* Henry J. Kaiser Family Foundation: Menlo Park, CA, 2001.
9. Thornburgh, R. and Lin, H., Eds. *Youth, Pornography, and the Internet.* National Academy Press, Washington, DC, 2002.
10. U.S. Department of Justice. *Web Content Filtering Software Comparison.* eTesting Labs, Morrisville, NC, 2001; www.veritest.com/clients/reports/usdoj/usdoj.pdf.

PAUL RESNICK (presnick@umich.edu) is a professor at the University of Michigan School of Information.
DEREK L. HANSEN (shakmatt@umich.edu) is a Ph.D. student at the University of Michigan School of Information.
CAROLINE RICHARDSON (caroli@umich.edu) is an assistant professor in the Department of Family Medicine at the University of Michigan Medical School and a research scientist at the VA Health Services Research and Development Center in Ann Arbor, MI.

Research for material appearing in this article was supported under a contract with the Kaiser Family Foundation.

Permission to make digital or hard copies of all or part of this work for personal or classroom use is granted without fee provided that copies are not made or distributed for profit or commercial advantage and that copies bear this notice and the full citation on the first page. To copy otherwise, to republish, to post on servers or to redistribute to lists, requires prior specific permission and/or a fee.

© 2004 ACM 0001-0782/04/0900 $5.00