UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| SARAH BRADBURN, PEARL CHERRINGTON, CHARLES HEINLEN, and the SECOND AMENDMENT FOUNDATION,<br><br>                    Plaintiffs,<br><br>          v.<br><br>NORTH CENTRAL REGIONAL LIBRARY DISTRICT,<br><br>                    Defendant. | No. CV-06-327-EFS<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

I.      INTRODUCTION ................................................................................. 1

II.     SUMMARY OF FACTS ...................................................................... 2

        A.      NCRL USES OVERLY RESTRICTIVE FILTERING
                SOFTWARE TO BLOCK ACCESS TO
                CONSTITUTIONALLY PROTECTED EXPRESSION. ................... 2

        B.      NCRL REFUSES TO DISABLE ITS OVERBROAD
                FILTERS FOR ADULT USERS ...................................................... 4

        C.      LESS RESTRICTIVE ALTERNATIVES ARE READILY
                AVAILABLE. ................................................................................. 5

        D.      NCRL'S FILTERING POLICIES HAVE HARMED
                PLAINTIFFS' FREE SPEECH RIGHTS. ....................................... 5

III.    ARGUMENT ...................................................................................... 6

A.    DEFENDANT'S FILTERING POLICY VIOLATES THE
FIRST AMENDMENT OF THE UNITED STATES
CONSTITUTION......................................................................... 8

    1.   Defendant's Filtering Policy Is an Overbroad
       Restriction on Adult Speech. .................................... 9

        a.   NCRL Limits Adults To Reading Only
           What It Considers Fit For Children. ............................ 9

        b.   NCRL's Filtering Methods Block a
           Substantial Amount of Protected Speech. ................................ 11

    2.   NCRL's Filtering Policy Is an Impermissible
       Content-Based Restriction on Speech. .................................... 13

        a.   NCRL's Speech Restrictions Are Content-
           Based. ....................................................................... 13

        b.   No Adequate Government Interest Justifies
           NCRL's Filtering Policy............................................. 14

        c.   NCRL's Overbroad Filtering Policy Is Not
           Sufficiently Well-Tailored To Any Asserted
           Interest. ..................................................................... 15

    3.   The ALA Decision Supports Plaintiffs' Requested
       Remedy..................................................................................... 16

B.    DEFENDANT'S FILTERING POLICY VIOLATES
ARTICLE I, SECTION 5 OF THE WASHINGTON
STATE CONSTITUTION. .......................................................... 19

IV. CONCLUSION ............................................................................................ 20

# I. __INTRODUCTION__

The publicly-funded North Central Regional Library District ("NCRL") bars adult patrons from reading tens of thousands of constitutionally protected Web sites. All computer terminals at NCRL's 28 branch libraries are subject to a filtering system that blocks access to all Web sites deemed unsuitable for children, and NCRL will not disable the filter at the request of adults. Compounding the problem, the filter wrongly identifies a vast range of innocuous Web sites as being somehow harmful to children. As a result, adult residents of a largely rural five-county area who rely on the public library for Internet access are reduced to reading only that subset of online materials that NCRL deems fit for children. This policy prevented the Plaintiff library users from conducting research for class assignments, locating legitimate businesses and organizations, and simply engaging in study or leisure reading on constitutionally protected subjects. It has also prevented the Plaintiff publisher from communicating with its audience in the NCRL's service area.

The relief these Plaintiffs seek is for NCRL to disable the filter upon the request of individual adult library patrons. The library may continue to use filtering software on its machines, to establish filtered access as the default rule, and to limit underage users to filtered access. But when an adult requests unfiltered access to the Internet, such access must be allowed. Although a federal statute requires NCRL to use some sort of filtering process as a condition of federal funding, the statute allows and encourages libraries to disable the filter "for bona fide research or other lawful purposes." 20 U.S.C. § 9134(f)(3); 47 U.S.C. § 254(h)(5)(D). Indeed, it is this ability to disable the filter that makes the statute constitutional. See United States v. American Library Ass'n, 539 U.S. 194 (2003) ("ALA"). No statute or regulation requires NCRL to implement an overbroad content-based filtering system with no disabling feature for adults. To the contrary, such a system violates the free speech clauses of the United States Constitution, see Mainstream Loudoun v. Board of Trustees of the Loudoun County Public Library, 24 F.Supp.2d 552 (E.D. Va. 1998)

("Loudoun II"), and the Washington State Constitution, see Soundgarden v. Eikenberry, 123 Wn.2d 750 (1994).[1]

## II. SUMMARY OF FACTS

### A. NCRL USES OVERLY RESTRICTIVE FILTERING SOFTWARE TO BLOCK ACCESS TO CONSTITUTIONALLY PROTECTED EXPRESSION.

The North Central Regional Library is a municipal corporation operating 28 branch libraries, serving the primarily rural and small town residents of Chelan, Douglas, Ferry, Grant and Okanogan counties. Plaintiffs' Statement of Material Facts ("PSF") 24-27. Because of its low cost and immense volume, Internet access presents the best means for a public library to disseminate information to remote or rural communities. PSF ¶ 36. NCRL recognizes that the World Wide Web contains information that is enriching to users of all ages. PSF ¶ 37. Because Internet access furthers NCRL's mission to promote reading and lifelong learning and to meet the diverse needs of its patrons, Internet-enabled computer terminals are provided in all of the library's branches. PSF ¶ 38.

Since NCRL first began offering Internet access to its patrons in the late 1990s, it has also maintained systems to limit which Web sites patrons may view on library computers. PSF ¶ 39. NCRL currently uses a filtering product called FortiGuard, which categorizes Web

---

[1] NCRL may argue that its actions are compelled by, or at least comply with, the Children's Internet Protection Act ("CIPA"), which requires public libraries receiving federally subsidized Internet access to install a "technology protection measure" that bars online access by all patrons to "visual depictions" constituting "obscenity" or "child pornography," and bars access by minors to "visual depictions" that are "harmful to minors." 20 U.S.C. § 9153(g) (Library Services Technology Act); 47 U.S.C. § 254(h) (E-Rate program). Plaintiffs here raise no objection to the blocking of Web sites that constitute obscenity or child pornography, or to the blocking of minors' access to material defined by statute as harmful to minors. NCRL's policy, however, is neither required by nor consistent with CIPA. First, CIPA requires a method to block "visual depictions," but NCRL's filter blocks entire Web sites and all of their text. Second, NCRL does not limit its filtering to the three categories enumerated in the statute (obscenity, child pornography and material that is "harmful to minors"). Instead, NCRL also filters other material, including image searches, gambling, and additional matter not covered by CIPA. Third, CIPA requires that minors – not adults – be precluded from viewing material deemed "harmful to minors." Yet NCRL does not allow adults to access such material. In ALA (discussed in more detail below), the Supreme Court upheld CIPA against a facial challenge, but explicitly acknowledged that a constitutional objection could be raised should a library refuse to unblock its filter for adults for research or other lawful purposes. This is such a case.

sites based on their content and allows library administrators to identify categories of content that end users will not be allowed to view. PSF ¶ 40, 65-95. NCRL currently blocks the categories titled Adult Materials, Gambling, Nudity and Risque, Pornography, Proxy Avoidance, Web Chat, Instant Messaging, Image Search, Video Search, and Spam URL. PSF ¶ 88-89.[2] At other times since this lawsuit was commenced, NCRL has also blocked the nebulously defined categories of Drug Abuse, Personal Relationships, Illegal or Unethical, Web Translation, and Plagiarism. PSF ¶ 83-89. The FortiGuard filter also allows NCRL to block individual Web sites based on any criteria or no criteria at all, according to the preferences of library administrators. PSF ¶ 90-97. Since this suit was filed, the library has at times blocked access to the popular Web sites MySpace, Craigslist and YouTube, among others. Id.

NCRL's filtering choices have prevented patrons from accessing tens of thousands of Web pages that are constitutionally protected. Vast categories of speech are barred when there is official concern over a small subset of it. To take only one example, the popular web site MySpace has been blocked in the recent past, and NCRL may block it again in the future. PSF ¶ 92, 95. MySpace allows people of all ages to post material of their choice, be it discussions of politics, art, history, or other personal interests. It is a vastly popular site: millions of people have profile pages on MySpace, including all of the major presidential candidates. PSF ¶ 93. The terms of service for MySpace.com do not allow the posting of obscene material. PSF ¶ 94. Because MySpace is a largely open and minimally regulated forum, some small subset of the MySpace postings may contain objectionable content. But

---

[2] NCRL additionally blocks categories that may pose dangers to the integrity of the library's computers: Hacking, Phishing, Malware, and Spyware. PSF ¶ 88-89. Plaintiffs agree that the library may use filtering software to protect its system. However, the "Proxy Avoidance" category includes not only sites that actively allow circumvention of the library's equipment, but any site that provides "information … on how to bypass Internet access controls and browse the Web anonymously." PSF ¶ 88. This category does nothing to protect NCRL's equipment, but instead serves to prevent library users from gathering information about how to use other computers for anonymous browsing. There is, of course, nothing unlawful about anonymous Web browsing.

NCRL has in the past, and may in the future, respond by barring all access to all of the MySpace universe.  PSF ¶ 95.

Similarly, image search web sites (like <u>images.google.com</u>) allow users to find pictures of virtually anything on the Web, be it flowers, horses, or oceans.  Yet NCRL prevents users from employing these services to find any images at all.  PSF ¶ 89-91.

Even with regard to the categories of Pornography and Adult Materials, NCRL's filter is inherently imperfect, blocking a substantial amount of material that is not obscene, not child pornography, and not "harmful to minors" as that term is defined by statute.  PSF ¶ 98-112.  Taking a random sample of Internet addresses, Plaintiffs' expert Bennett Haselton discovered that of the Web sites blocked by FortiGuard as Pornography or Adult Materials, approximately 12% of .com domains and 24% of .org domains were blocked in error.  PSF ¶ 101-09.   This included, for example, <u>www.latinamericavolunteer.com</u>, <u>www.markrudd.com</u>, <u>www.renaissancevoices.com</u>, <u>www.vacuumequipmentsupplies.com</u>, <u>www.tulipflorists.com</u>, <u>www.acceptpregnancy.org</u>, <u>www.faithchurchofdavis.org</u>, <u>www.kindnessusa.org</u>, <u>www.paperaircraft.org</u>, and <u>www.swojo.org</u> (the web site of the Seattle Women's Jazz Orchestra).  PSF ¶ 106, 109.  Extrapolating from these samples, it is likely that at any given time FortiGuard's categories of Pornography and Adult Materials block approximately 77,000 web sites that are constitutionally protected and entirely proper to view in a public library.   PSF ¶ 107, 110.   Defense expert Paul Resnick found that approximately 5-10% of the Web pages blocked by FortiGuard were blocked in error.  PSF ¶ 111.  Under either estimate, tens of thousands of innocuous Web sites are wrongly blocked at any given time.

**B.      <u>NCRL REFUSES TO DISABLE ITS OVERBROAD FILTERS FOR ADULT USERS</u>.**

NCRL could easily turn off the filter on a single terminal for use by a single patron.  PSF ¶ 80.  However, NCRL will not disable the filter on any terminal for any user or any reason.  PSF ¶ 41.  If a Web site falls within one of FortiGuard's categories or is separately

blocked by NCRL staff, no one in any of NCRL's branches may view it.  PSF ¶ 41, 44.  At most, NCRL allows users to request that individual Web sites be unblocked.  PSF ¶ 43-44, 46-49.  Upon receiving such a request, NCRL's administrators consider whether the site should be viewed by all of the library's users, including minors, and only then will the site be added to the acceptable list.  Id.  Thus, if an adult user wishes to read material that the library would not be willing to display to a minor, the adult will not be allowed to view it.

## C.  LESS RESTRICTIVE ALTERNATIVES ARE READILY AVAILABLE.

The experience of other public libraries shows that a filtering policy like NCRL's, which combines overly censorious filtering software with a refusal to disable the filter for adult users, is not needed to accomplish a library's legitimate goals.

The library systems in Fairbanks, Alaska; Canton, Ohio; and Madras, Oregon allow adult users to have unfiltered Internet access.  Fairbanks and Canton (which are multi-branch systems analogous to NCRL) allow adults to disable the filter upon request, while Madras does not use filters at all.  PSF ¶ 122, 124, 127.  These libraries have not experienced problems with the viewing of pornography, obscenity, or any other inappropriate material.  On those rare occasions when a patron reports that someone is viewing inappropriate material in Canton or Madras, a librarian simply asks the patron to stop, and the patron always complies.  PSF ¶ 125-26, 131.  Fairbanks has effective methods (including privacy screens and recessed desks) to ensure that that no one other than the user can see what is on a given computer screen.  PSF ¶ 121.  Its librarians have not received a single complaint about inappropriate computer usage.  PSF ¶ 123.

## D.  NCRL'S FILTERING POLICIES HAVE HARMED PLAINTIFFS' FREE SPEECH RIGHTS.

The individual Plaintiffs are library users who rely on NCRL for Internet access because they have no Internet access at home (like Sarah Bradburn of Republic, PSF ¶ 3, and Pearl Cherrington of Twisp, PSF ¶ 6), or have it at home only sporadically (like Charles

Heinlen of Omak, PSF ¶ 10).  Their right to read on the Internet has been frustrated by NCRL's filtering in many ways:

- When Ms. Bradburn was pursuing an advanced degree in substance abuse counseling, and she found that NCRL's filter prevented her from conducting research for a class assignment on teenage alcohol and drug addiction.  She ultimately drove to the Spokane library in order to complete her research.  PSF ¶ 4.

- Ms. Cherrington is a photographer who wanted to locate art galleries in which to display her work, but found that the Web site for one such gallery was blocked by NCRL's filter.  She was also barred from accessing information about health issues.  During the pendency of this lawsuit, she was barred from accessing YouTube, which she wanted to explore after hearing "a lot of talk about it."  PSF ¶ 7.

- Mr. Heinlen is a frequent library user who has been blocked from accessing many Web sites at NCRL.  For example, he was denied access to sites relating to firearms; dating sites; his own MySpace blog; and various sites of interest to him, including www.theonion.com, www.facebook.com, www.guinnesswebstore.com, and www.moderndrunkardmagazine.com. PSF ¶ 11-14.

NCRL's filtering policy harms not only library users, but publishers who cannot communicate with willing readers at NCRL branches.  The Second Amendment Foundation, a Washington non-profit corporation, publishes periodicals and Web sites regarding firearms and the rights of firearms owners.  PSF ¶ 15, 19-20.  It wishes to communicate its political messages via the Web to its many members in north central Washington and to other firearms enthusiasts in the area.  PSF ¶ 18-21.  Its publication www.womenandguns.com is designed for female gun owners and is not salacious in any way, yet it too was blocked by NCRL's filter.  PSF ¶ 20-23.

### III.  ARGUMENT

This case involves two information sources that enjoy special protection in free speech jurisprudence:  public libraries and the Internet.  Both are inhospitable venues for government actions designed to restrict access to expression.

Public libraries are vital to a self-governing democracy that relies upon a well-informed citizenry.  To that end, the library is a "mighty resource in the free marketplace of

ideas. It is specially dedicated to broad dissemination of ideas. It is a forum for silent speech." Minarcini v. Strongsville City Sch. Dist., 541 F.2d 577, 582-83 (6th Cir. 1976). "Public libraries are places of freewheeling and independent inquiry." Mainstream Loudoun v. Board of Trustees of the Loudoun County Library, 2 F.Supp.2d 783, 795 (E.D. Va. 1998) ("Loudoun I"). See also Kreimer v. Bureau of Police, 958 F.2d 1242, 1255 (3[d] Cir. 1992) (public library is "the quintessential locus for the receipt of information"); Sund v. City of Wichita Falls, 121 F. Supp.2d 530, 547 (N.D. Tex. 2000) ("The right to receive information is vigorously enforced in the context of a public library."). While public librarians have latitude to exercise their best professional judgment in selecting a library collection, removal of material from a library for censorious purposes is constitutionally suspect. See Loudon I, 2 F.Supp.2d at 793-94; Board of Education v. Pico, 457 U.S. 853, 872, 879 (1982).

On the Internet, a proliferation of speech is expected, encouraged and constitutionally protected. See Reno v. American Civil Liberties Union, 521 U.S. 844 (1997). "The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a)(3). It is the declared policy of the United States "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2). As a result, the government's ability to restrict citizens' expression is at its weakest when it comes to the Internet. Because the Internet is "the most participatory form of mass speech yet developed," Reno, 521 U.S. at 863 (citation omitted), there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium," id. at 870. The Court effectuated this principle in Reno by invalidating an Internet censorship statute because in the name of protecting children, it "effectively suppresse[d] a large amount of speech that adults have a constitutional right to receive and to address to one another." Id. at 874.

Both libraries and the Internet share an important feature: they facilitate expression at relatively low cost, and hence are available on an equal basis to the rich and the poor. The constitution provides especially strong protection to modes of communication that are accessible to all. See, e.g., Martin v. City of Struthers, 319 U.S. 141, 146 (1943) (door-to-door distribution of literature is "essential to the poorly financed causes of little people"); City of Ladue v. Gilleo, 512 U.S. 43, 57 (1994) (residential signs are especially important for "persons of modest means").

By preventing adults from accessing a substantial amount of constitutionally protected Internet speech due to its content, NCRL's filtering policy dramatically limits the opportunity for education and discourse in the precise locations where those values should be most carefully protected. This case is not about NCRL's freedom to allocate its resources and add material to its collection. Instead, it is about the deliberate removal from circulation of ideas that would otherwise be available to library patrons at no cost, solely because of a preference that patrons not be exposed to them. To analogize to the printed page, NCRL is not obliged to purchase the *Encyclopedia Britannica*, but once it has done so it may not tear out selected pages to ensure that patrons do not see them. See Loudoun I, 2 F.Supp.2d at 793-96; PSF ¶ 31 (difference between selection and censorship). NCRL's filtering policies operate in the same way, in violation of the free speech clauses of the United States and Washington State Constitutions.

A.  **DEFENDANT'S FILTERING POLICY VIOLATES THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION.**

NCRL's policy violates two well-established First Amendment doctrines. The policy is overbroad because it reduces adults to reading only what is fit for children, and because it blocks a substantial amount of protected expression that is harmful to no one. The policy is also unconstitutional as a content-based system of censorship that is not justified by any governmental interest and is not well-tailored to the interests asserted.

**1.  Defendant's Filtering Policy Is an Overbroad Restriction on Adult Speech.**

"The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." <u>Ashcroft v. Free Speech Coalition</u>, 535 U.S. 234, 237 (2002).  NCRL's filtering policy may have been intended to restrict access to unprotected speech, but it is overbroad because it blocks a substantial amount of protected speech.  The substantial restriction on speech arises from two main sources.  First, NCRL does not allow adults to view any Internet material that the library does not consider suitable for children.  Second, NCRL's configuration and operation of the FortiGuard filter inevitably results in denial of access to tens of thousands of Web sites that enjoy constitutional protection.  Both sources of overbreadth can be easily corrected by using the remedy envisioned by Congress:  disabling the filter upon the request of an adult.

**a.  NCRL Limits Adults To Reading Only What It Considers Fit For Children.**

It has been clear for over fifty years that government may not "reduce the adult population … to reading only what is fit for children." <u>Butler v. Michigan</u>, 352 U.S. 380, 383 (1957).  In <u>Butler</u>, the Court overturned a Michigan law that criminalized the distribution of literature that could have "a potentially deleterious influence upon youth." <u>Id.</u> at 382-83.  The Court ruled that the government may not "quarantine the general reading public against books not too rugged for grown men and women in order to shield juvenile innocence." <u>Id.</u> at 383.

The Court has never backed down from the principle it established in <u>Butler</u>.  It has consistently struck down laws that reduce adults to viewing only that which is fit for children, even where the government has a legitimate or even compelling interest in protecting children.  <u>See</u>, <u>e.g.</u>, <u>Lorillard Tobacco Co. v. Reilly</u>, 533 U.S. 525, 563 (2001) (government has interest in reducing underage smoking, but may not place excessive restrictions on outdoor tobacco advertising near schools); <u>United States v. Playboy Entm't Group, Inc.</u>, 529 U.S. 803, 814 (2000) (government has interest in shielding children from "unwanted, indecent speech that comes into the home," but may not require scrambled broadcast signals); <u>Reno</u>,

521 U.S. at 874 (government has interest in "protecting children from harmful materials," but may not criminalize placement of "indecent" materials on the Internet); Denver Area Educ. Telecomms. Consortium, Inc. v. FCC, 518 U.S. 727, 743, 759 (1996) (government has "need to protect children from exposure to patently offensive sex-related material," but may not require cable television operators to segregate and block "patently offensive" content); Sable Communications of California v. FCC, 492 U.S. 115, 131 (1989) (government has interest in "protecting the physical and psychological well-being of minors," but may not ban indecent telephone messages); Erznoznik v. City of Jacksonville, 422 U.S. 205, 212 (1975) (government has "undoubted police power to protect children," but may not ban all nudity from drive-in movie theaters).

The only court to consider the constitutionality of a single library's Internet filtering policy found that it unconstitutionally reduced adults to reading only what was fit for children. See Loudoun I (denying Library's motion for summary judgment); Loudoun II (granting plaintiffs' motion for summary judgment). Citing to much of the above-referenced case law, Judge Brinkema, herself a former reference librarian, held that the library's policy was "overinclusive because, on its face, it limits the access of all patrons, adult and juvenile, to material deemed fit for juveniles." Loudoun II at 567.

This Court should follow suit. Where a willing speaker exists, "the protection afforded [by the free speech clause] is to the communication, to its source and to its recipients both." Virginia Pharmacy Board v. Virginia Consumer Council, 425 U.S. 748, 756 (1976). See also Kreimer, 958 F.2d at 1250-55 ("The right of freedom of speech and press includes … the right to receive, the right to read"). This includes the right to receive information on topics that are ordinarily reserved for adults, including information about sexuality. See Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 74-75 (1983) (right to receive information about condoms via U.S. mail). And of course, it applies to the right to receive information via the Internet. See Reno, 521 U.S. at 874.

**b.** **NCRL's Filtering Methods Block a Substantial Amount of Protected Speech.**

In addition to the central problem discussed above, NCRL's use and configuration of the FortiGuard filter results in the blocking of tens of thousands of constitutionally protected Web sites. This overbreadth problem arises in three major ways.

First, like all software that attempts to assimilate and categorize the immeasurable scope of information available on the Web, FortiGuard makes mistakes. PSF ¶ 98. It is inevitable that FortiGuard will mislabel some Web sites as falling within a target category when in fact they do not. This basic reality is not disputed by the parties' respective technology experts. Although there is some variation in their research methods, both experts concluded that at any given time, tens of thousands of innocuous Web sites are erroneously labeled as Pornography or Adult Materials. PSF ¶ 101-11. Examples of this blocked content are attached to Mr. Haselton's expert report, and the Court may view those examples to confirm that they are constitutionally protected. PSF ¶ 100, 106, 109. Congress recognized that technologically-driven overblocking would be inevitable, which is why it included a provision in CIPA expressly authorizing library filters to be disabled for legitimate purposes. 20 U.S.C. § 9134(f)(3); 47 U.S.C. § 254(h)(5)(D).

It is significant to note that this source of overbreadth causes NCRL to block access to material that no one – not even NCRL's librarians or administrators – believes is improper. The professional judgment that librarians exercise when selecting books to purchase is missing here. NCRL is, by analogy, not simply tearing out pages from the *Encyclopedia Britannica*, but tearing out a great number of them at random. Even assuming this type of overblocking could be viewed as accidental or unintended, such overblocking cannot be said to serve any governmental interest at all.

Second, even if FortiGuard could attain the technologically impossible feat of accurately categorizing every Web site, its categories, taken at face value, reach a substantial amount of material that is constitutionally protected for adult viewing. For example,

FortiGuard's "Gambling" category includes not only sites facilitating illegal wagers, but also any sources of "gaming information, instruction, and statistics." PSF ¶ 88. In the area of sexually-oriented expression, FortiGuard's categories do not match the constitutional definition of obscenity from <u>Miller v. California</u>, 413 U.S. 15, 24 (1973), or of "girlie" magazines that may be made unlawful for minors under <u>Ginsberg v. New York</u>, 390 U.S. 629, 633 (1968). Both constitutional categories require an appeal to prurient interest, but that element is missing from FortiGuard's definitions of "Adult Material" ("Mature content websites (18+ years and over) that feature or promote sexuality … without the intent to sexually arouse") and "Nudity and Risque" ("Mature content websites (18+ years and over) that depict the human body in full or partial nudity without the intent to sexually arouse)." PSF ¶ 88. Even FortiGuard's definition of its "Pornography" category ("Mature content websites (18+ years and over) which present or display sexual acts with the intent to sexually arouse and excite") omits the constitutionally crucial element of lack of serious literary, artistic, political, or scientific value. <u>Id.</u> In short, even where a FortiGuard category may result in the desired effect of blocking some material that falls within a proscribable category under First Amendment law (such as obscenity, child pornography, or true threats), the FortiGuard categories are not constructed to track constitutional requirements.

The same concern applies to the category of Image Search or Video Search currently blocked by NCRL. It is conceivable that these tools could be used to search for obscene images, but that is far from their only or primary use. These services could locate images of Thomas Jefferson's Monticello for a patron with an interest in architecture, or find video of Martin Luther King's "I Have A Dream" speech for a patron with an interest in civil rights. It is the essence of overbreadth for NCRL to prevent the use of these search services merely because some constitutionally-proscribable needles may be lurking within a constitutionally-protected haystack.

Third, when relying on FortiGuard's categories or a list of its own creation, NCRL blocks entire Web sites, not the specific pages that contain allegedly inappropriate material. The problem is particularly acute for the so-called "Web 2.0" sites that host user-generated content. For example, NCRL has in the past blocked MySpace, and reserves the right to block it in the future. PSF ¶ 92-95. If a single MySpace entry contains improper material, perhaps that entry could be blocked, but not every single MySpace page – including the campaign pages of Hillary Clinton, Mike Huckabee, John McCain, Barack Obama, Ron Paul, and Mitt Romney. The same principle applies to YouTube, which NCRL has blocked in the past. PSF ¶ 8-9, 96. Even if some of the videos available on this site are problematic, the vast bulk of the site is not. "Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." Turner, 512 U.S. at 683 (citation omitted).

**2.** **NCRL's Filtering Policy Is an Impermissible Content-Based Restriction on Speech.**

**a.** **NCRL's Speech Restrictions Are Content-Based.**

The restrictions NCRL has placed on its Internet terminals are purely content-based, and are likely viewpoint-based as well. Web sites are blocked because NCRL, by way of FortiGuard, has determined that their content is improper. Judge Brinkema agreed that library filters are by definition content-based. See Loudoun I, 2 F.Supp.2d at 796; Loudoun II, 24 F.Supp.2d at 564. The government has very little ability to restrict communication purely on the basis of its content. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter or its content." Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95 (1972). Accord Texas v. Johnson, 491 U.S. 397, 414 (1989).

Content-based restrictions on speech are ordinarily upheld only if they serve a compelling government interest, are necessary, and are narrowly tailored to that interest. This standard was applied in Loudon II, 24 F.Supp.2d at 564-65, and should be applied here. If

this Court instead were to adopt the approach of Justice Breyer's concurrence in <u>ALA</u>, it would require NCRL's policy to withstand "a form of heightened judicial scrutiny" akin to intermediate scrutiny, which asks whether the challenged government action serves an "important or substantial" interest in a manner "narrowly tailored to achieve the desired objective." 539 U.S. at 218 (citation omitted). Under either standard – and they are not significantly different for current purposes – NCRL cannot justify content-based filtering.

> **b.** **No Adequate Government Interest Justifies NCRL's Filtering Policy.**

NCRL has failed to establish a compelling or important reason not to disable its filter at the request of adults. Where heightened scrutiny is involved, "the government must present more than anecdote and supposition" to support its claim that an actual problem exists requiring the suppression of speech. <u>Playboy</u>, 529 U.S. at 822-23. The government cannot "simply posit the existence of the disease sought to be cured." <u>Turner</u>, 512 U.S. at 664 (internal citation and quotation omitted). "It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." <u>Id.</u>

In <u>Loudoun II</u>, the court rejected the library's contention that it had a legitimate interest in filtering. The library in that case offered no evidence that anyone had ever complained about patrons viewing inappropriate content in Loudoun County libraries. <u>Id.</u> Instead of offering evidence based on its own experience, the library relied on "a single complaint arising from Internet use in another Virginia library and reports of isolated incidents in three other libraries across the country." <u>Id.</u> The court held that on such a record no reasonable trier of fact could conclude that the government had met its burden of establishing a need for intervention in the form of content filtering. <u>Id.</u> at 566.

NCRL has no legitimate interest in reducing adults to reading only what is fit for children. For example, NCRL's Director testified that he was worried about sex offenders looking at pornography if NCRL were to provide unfiltered Internet access at the request of

adults, but he admitted that he had no idea whether sex offenders have a tendency to look at online pornography at public libraries. PSF ¶ 60-62. This sort of "anecdote and supposition," Playboy, 529 U.S. at 822, provides an insufficient basis for a speech restriction.

### c. NCRL's Overbroad Filtering Policy Is Not Sufficiently Well-Tailored To Any Asserted Interest.

Even if NCRL had demonstrated an adequate interest in Internet filtering, its policy of refusing to disable its filter at the request of adults is not narrowly tailored for essentially the same reasons that render the policy overbroad, as described above. Moreover, there are readily available, less speech-restrictive alternatives to keep children from viewing material that may be "harmful to minors."

In Loudoun II, the court found that a number of far less restrictive alternatives existed that would serve the library's needs as well as filtering would. Most importantly, Judge Brinkema found that the relief requested by the plaintiffs in that case would be a less restrictive alternative: "the library could install filtering software that could be turned off when an adult is using the terminal." 24 F. Supp. 2d at 567. In addition, if it wished, the library could also implement other measures. To prevent onlookers from seeing adult material while it was being viewed by an adult patron, the library could install privacy screens so that only the intended user could see the material. Id. The Fairbanks library uses privacy screens and recessed desks to protect both reader privacy and the onlooker sensitivities. PSF ¶ 121. A library may also enforce an acceptable use policy, pursuant to which patrons who view truly improper material are told to stop (sometimes referred to as a "tap and tell" policy). PSF ¶ 120. This is the method historically used by libraries when children read adult material. 24 F.Supp.2d at 567 (librarians are accustomed to "'shooing' people away from sites we know are objectionable, just as we always have with prepubescent boys giggling over gynecological pictures in medical books"). These same efficacious alternatives to full-time compulsory filtering are available to NCRL as well.

### 3. The ALA Decision Supports Plaintiffs' Requested Remedy.

American Library Association was a divided decision, with no single opinion commanding a majority of the justices. Six justices held that the CIPA statute did not on its face violate the First Amendment when Congress conditioned the receipt of federal funds on recipient libraries installing filters that could be disabled upon request. 539 U.S. at 214 (four-justice plurality), 215 (Kennedy, J., concurring); 215 (Breyer, J., concurring). The present case is distinguishable, because NCRL's policy is substantially more burdensome than the filtering required by CIPA. See Footnote 1, above. Moreover, the justices expressly invited an as-applied challenge if in the future a library refused to disable filtering for adults.

Chief Justice Rehnquist's plurality opinion framed the facial validity question as whether "libraries would violate the First Amendment by employing the filtering software that CIPA requires." 539 U.S. at 203. A significant characteristic of CIPA-compliant software is "the ease with which patrons may have the filtering software disabled." Id. at 209. The plurality relied on the Solicitor General's representation at oral argument that a "librarian can, in response to a request from a patron, unblock the filtering mechanism altogether," and that a patron would not "have to explain … why he was asking a site to be unblocked or the filtering to be disabled." Id. Because the filters could be disabled, the statute on its face did not impose a significant burden on the rights of adult patrons. Id.

Justices Kennedy and Breyer agreed that easily disabled filters were crucial to the statute's constitutionality. This was the sole subject of Justice Kennedy's brief concurrence, in which he observed that "[i]f, on the request of an adult user, a librarian will unblock filtered material or disable the Internet software filter without significant delay, there is little to this case." Id. at 214. Justice Kennedy noted that "if some libraries do not have the capacity to unblock specific Web sites or to disable the filter or if it is shown that an adult user's election to view constitutionally protected Internet material is burdened in some other substantial way, that would be the subject for an as-applied challenge." Id. at 215.

Justice Breyer agreed that CIPA was constitutional, although he differed from the plurality regarding the applicable standard. Regardless of the applicable level of scrutiny, Justice Breyer considered CIPA's disabling provision to be the key fact in the case.

> [The statute] contains an important exception that limits the speech-related harm that "overblocking" might cause. As the plurality points out, the Act allows libraries to permit any adult patron access to an "overblocked" Web site; the adult patron need only ask a librarian to unblock the specific Web site or, alternatively, ask the librarian, "Please disable the entire filter."

Id. at 219. Like Justice Kennedy, Justice Breyer noted that in an as-applied challenge, a court could be called upon to review "local library rules or practices" that place greater restrictions on patrons' ability to read freely. Id. at 219-20.

Justice Souter (with Justice Ginsburg) dissented, but only because in his view CIPA did not go far enough in requiring libraries to disable the filters. If "an adult library patron could, consistently with the Act, obtain an unblocked terminal simply for the asking … and if that policy were communicated to every affected library as unequivocally as it was stated to us at argument, local librarians might be able to indulge the unblocking requests of adult patrons to the point of taking the curse off the statute for all practical purposes." Id. at 232.

Although no one opinion garnered a majority, ALA provides some guidance here. "When a fragmented Court decides a case and no single rationale enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193 (1977) (citation and quotation marks omitted). Here, two justices (Kennedy and Breyer) concurred in the judgment, and the concurrence of either would have been sufficient to form a majority. In both cases, the "narrowest ground" was the same: Internet filters in public libraries do not violate the First Amendment so long as they are disabled at the request of adults. Both justices upheld CIPA because of its disabling provision, and both stated that a library's refusal to disable a filter would be grounds for an as-applied challenge.

The Institute for Museum and Library Services (IMLS) is the federal agency responsible for administering CIPA funds under the LSTA, 20 U.S.C. § 9134(f). "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." Chevron v. Natural Resources Defense Council, 467 U.S. 837, 844 (1984). In its official guidance, IMLS emphasized that libraries should be prepared to disable filters as part of the statutory package. The agency said:

> On June 23, 2003, the Supreme Court issued its opinion reversing the judgment of the district court and finding that CIPA, on its face, is constitutional. The Supreme Court held that public libraries' use of Internet filtering software does not violate their patrons' First Amendment rights, therefore CIPA does not induce libraries to violate the Constitution and is a valid exercise of Congress's spending power. In upholding CIPA, the Supreme Court emphasized "the ease with which patrons may have the filtering software disabled," and that a patron who "encounters a blocked site … need only ask a librarian to unblock it or … disable the filter." Under the IMLS Grants to States Program, an administrator, supervisor, or other authority may disable a technology protection measure to enable access for bona fide research or other lawful purposes. 20 U.S.C. § 9134(f)(3). The plurality highlighted the government's confirmation at oral argument that a "librarian can, in response to a request from a patron, unblock the filtering mechanism altogether," and further that a patron would not "have to explain … why he was asking a site to be unblocked or the filtering to be disabled."

IMLS Policy Notice, "The Children's Internet Protection Act," available online at www.imls.gov/about/cipa.shtm (citation omitted). Similarly, the FCC's description of its E-Rate program reiterates the rule of 47 U.S.C. § 254(h) that filters may be disabled for adults to pursue research for "other lawful purposes." FCC Consumer Facts, "Children's Internet Protection Act," available online at www.fcc.gov/cgb/consumerfacts/cipa.html.

Read in its entirety, ALA means that a library with an overbroad Internet filter may be able to avoid a constitutional violation by disabling the filter at the request of adult patrons. Because NCRL will not do this, its policies are subject to the ordinary First Amendment rules. Under those principles, this Court should find that NCRL's filtering policy violates Plaintiffs' free speech rights under the First Amendment.

## B. DEFENDANT'S FILTERING POLICY VIOLATES ARTICLE I, SECTION 5 OF THE WASHINGTON STATE CONSTITUTION.

Article I, § 5 of the Washington State Constitution provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." In cases involving overbreadth or prior restraint, Article I, § 5 provides greater protection than the First Amendment of the U.S. Constitution.

> Washington's free speech guaranty requires us to pay especially close attention to allegations of overbreadth. Article 1, section 5 establishes freedom of speech as a preferred right. Unlike the First Amendment, article 1, section 5 categorically rules out prior restraints on constitutionally protected speech under any circumstances. Regulations that sweep too broadly chill protected speech prior to publication, and thus may rise to the level of a prior restraint. … Because the Washington Constitution is less tolerant than the First Amendment of overly broad restrictions on speech, we must apply the standard of Art. 1, § 5 in considering whether [a challenged practice] is overbroad.

O'Day v. King County, 109 Wn.2d 796, 803-04 (1988) (citations and internal punctuation omitted.) Accord Voters Educ. Comm. v. Washington State Pub. Disclosure Comm'n, 161 Wn.2d 470, 494, 513 (2007); Ino Ino, Inc. v. City of Bellevue, 132 Wn.2d 103, 117 (1997); Soundgarden, 123 Wn.2d at 764. In addition, "Under Const. art. 1, § 5 … prior restraint of constitutionally protected expression is per se unconstitutional." JJR, Inc. v. Seattle, 126 Wn.2d 1, 6 (1995). This proposition has been sufficiently well established by the Washington Supreme Court that no Gunwall analysis is needed to justify an independent interpretation of the Washington Constitution. See Voters Educ. Comm., 161 Wn.2d at 494 n.16.

Washington law, in a manner slightly different than federal law, forbids two types of prior restraints. First is the "classic" prior restraint or speech licensing scheme, understood as "official restrictions imposed upon speech or other forms of expression in advance of actual publication." JJR, 126 Wn.2d at 6 (citation omitted). A system that allows officials to revoke nude dancing licenses without judicial review is forbidden under this theory. Id. at 5-8. Second, government actions containing overbreadth or vagueness sufficient to "chill protected speech prior to publication" will "rise to the level of a prior restraint" by effectively squelching communication before it can occur. O'Day, 109 Wn.2d at 803-04.

For example, the "Erotic Sound Recordings" statute struck down in <u>Soundgarden</u> forbade, on pain of contempt, the sale to minors of recorded music deemed "harmful to minors" under a definition very similar to the one at issue in <u>ALA</u>. 123 Wn.2d at 757. Even when sold to adults, such recordings needed to be marked "adults only." <u>Id.</u> at 766. A severe chilling effect resulted: music store owners cancelled orders from distributors and refrained from selling many recordings to minors even if they had not been deemed "erotic," and musicians feared they would need to curtail their protected speech to ensure that their works would be sold. <u>Id.</u> at 763. The Washington State Supreme Court held that this chilling effect rose to the level of a prior restraint in light of the Washington Constitution's greater abhorrence of overbroad speech restrictions. <u>Id.</u> at 764.

NCRL's filtering policy imposes the same sort of official restrictions on speech that Washington's free speech clause forbids. Like the licensing agency in <u>JJR</u>, NCRL examines the content of speech to decide whether it will be allowed to be communicated to the library audience, and takes affirmative action to prevent the access from taking place. The restriction affects adults, even though the justification is to protect children. Like the labeling law in <u>Soundgarden</u>, NCRL's policy effectively places an electronic label on certain constitutionally protected Internet speech because it is supposedly harmful to minors, and this label prevents the public from accessing the speech. The blocking occurs on the instructions of the government agency in a way that is far more direct than the chilling effect in <u>Soundgarden</u>, which was mediated through decisions of music store owners.

Under the <u>O'Day</u>/<u>JJR</u>/<u>Soundgarden</u> line of cases, NCRL's filtering system violates Art. I, § 5 of the Washington Constitution. It does not allow persons to speak on all subjects, and inhibits free communication even when there has been no abuse of free speech rights.

## IV. CONCLUSION

For the foregoing reasons, summary judgment should be entered in favor of Plaintiffs.

DATED this 4th day of February, 2008.

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION

By:    /s/ Duncan Manville
Duncan Manville, WSBA #30304
1629 2nd Avenue W.
Seattle, WA  98119
Tel. (206) 288-9330
Fax (206) 624-2190
duncan.manville@yahoo.com

Aaron H. Caplan, WSBA #22525
American Civil Liberties Union of Washington
Foundation
705 Second Avenue, Third Floor
Seattle, WA  98103
Tel. (206) 624-2184
Fax (206) 624-2190
caplan@aclu-wa.org

Catherine Crump, pro hac vice
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004
Tel. (212) 519-7806
ccrump@aclu.org

Counsel for Plaintiffs