UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| SARAH BRADBURN, PEARL CHERRINGTON, CHARLES HEINLEN, and the SECOND AMENDMENT FOUNDATION,<br><br>                Plaintiffs,<br><br>  v.<br><br>NORTH CENTRAL REGIONAL LIBRARY DISTRICT,<br><br>                Defendant. | No. CV-06-327-EFS<br><br>**PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

      Plaintiffs Sarah Bradburn, Pearl Cherrington, Charles Heinlen and the Second Amendment Foundation submit this Statement of Material Facts pursuant to LC 56.1(a). Plaintiffs rely upon the following facts in support of their Motion for Summary Judgment, filed concurrently herewith.

## I.     THE PARTIES.

### A.    The Individual Plaintiffs.

    1.     Plaintiffs Sarah Bradburn, Pearl Cherrington and Charles Heinlen are patrons of Defendant the North Central Regional Library District ("NCRL"). See Deposition Upon Oral Examination of Sarah Maria Bradburn ("Bradburn Dep.") at 12:12-17, 19:14-20:17; Plaintiff Sarah Bradburn's Objections, Answers and Responses to Defendant's First

Interrogatories and Requests for Production to Plaintiff Sarah Bradburn ("Bradburn's Discovery Responses"), answer to Interrogatory No. 3; Deposition Upon Oral Examination of Pearl Anne Cherrington ("Cherrington Dep.") at 15:12-22; Plaintiff Pearl Cherrington's Objections, Answers and Responses to Defendant's First Interrogatories and Requests for Production to Plaintiff Pearl Cherrington ("Cherrington's Discovery Responses"), answer to Interrogatory No. 3; Deposition Upon Oral Examination of Charles Merle Heinlen ("Heinlen Dep.") at 19:13-15; Plaintiff Charles Heinlen's Objections, Answers and Responses to Defendant's First Interrogatories and Requests for Production to Plaintiff Charles Heinlen ("Heinlen's Discovery Responses"), answer to Interrogatory No. 3.

2.     Plaintiffs Bradburn, Cherrington and Heinlen use computers made available by NCRL to access the Internet.  See Bradburn Dep. at 19:14-20:17; Bradburn's Discovery Responses, answers to Interrogatory Nos. 5, 8; Cherrington Dep. at 18:14-22, 20:5-21:4, 23:16-24:8, 33:16-34:8, 34:16-35:11; Cherrington's Discovery Responses, answers to Interrogatory Nos. 5, 8, 9, 11, 12; Heinlen Dep. at 20:8-24, 22:25-24:10, 26:14-28:6; Heinlen's Discovery Responses, answers to Interrogatory Nos. 5, 8.

3.     Ms. Bradburn is a resident of Republic in Ferry County, Washington, and primarily patronizes the Republic branch of NCRL system.  See Bradburn Dep. at 8:6-18, 19:14-20:17; Bradburn's Discovery Responses, answer to Interrogatory No. 4.  She has no Internet access at home.  See Bradburn Dep. at 9:18-22.

4.     In October or November 2003 Ms. Bradburn attempted to conduct Internet research – particularly regarding alcohol and drug-addiction topics – in connection with academic assignments.  See Bradburn Dep. at 19:14-22:14; Bradburn's Discovery Responses, answers to Interrogatory Nos. 5, 8.

5.     When Ms. Bradburn tried to access material and obtain information relating to youth tobacco usage, the Internet filter that NCRL had installed on its publicly-accessible

computer terminals prevented her from doing so; she ultimately drove to Spokane to complete her research. Id.

6.    Ms. Cherrington is a resident of Twisp in Okanogan County, Washington, and primarily patronizes NCRL's Twisp branch. See Cherrington Dep. at 9:15-21, 10:7-8; 15:12-22, 18:14-22, 20:5-21:4; Cherrington's Discovery Responses, answer to Interrogatory No. 4. She has no Internet access at home. See Cherrington Dep. at 18:25-19:1.

7.    In the summer of 2005 Ms. Cherrington, who is a photographer, attempted to use NCRL's computers to conduct Internet research and obtain information regarding art and health topics. See Cherrington Dep. at 10:16-11:18, 20:5-21:4, 23:16-24:8, 34:16-35:11; Cherrington's Discovery Responses, answers to Interrogatory Nos. 5, 8, 9.

8.    After the filing of Plaintiffs' Complaint for Declaratory and Injunctive Relief ("Complaint") in this case, Ms. Cherrington also attempted to access YouTube. See Cherrington Dep. at 33:16-34:8; Cherrington's Discovery Responses, answers to Interrogatory Nos. 5, 8, 9, 11, 12.

9.    NCRL's Internet filter denied Ms. Cherrington access to YouTube, and restricted her ability to conduct her research and obtain other information via the Internet. See Cherrington Dep. at 20:5-21:4, 23:16-24:8, 33:16-34:8, 34:16-35:11; Cherrington's Discovery Responses, answers to Interrogatory Nos. 5, 8, 9, 11, 12.

10.    Mr. Heinlen is a resident of Okanogan County, Washington, and primarily patronizes NCRL's Omak and Okanogan branches. See Heinlen Dep. at 7:4-8:20, 19:20-20:24; Heinlen's Discovery Responses, answer to Interrogatory No. 4. He has only sporadic Internet access outside the library. See Heinlen Dep. at 24:19-25:17.

11.    Mr. Heinlen attempted to use NCRL's computers to conduct Internet research, to communicate with others via email and a blog that he maintains on MySpace, and to obtain information on topics relating to firearms. See Heinlen Dep. at 26:14-28:6; Heinlen's Discovery Responses, answers to Interrogatory Nos. 5, 8, 11, 12.

12. His ability to access information on the World Wide Web ("Web") was restricted by NCRL's Internet filter. See Heinlen Dep. at 22:25-24:10, 29:7-12, 31:7-24, 63:13-73:21; Heinlen's Discovery Responses, answers to Interrogatory Nos. 5, 11, 12.

13. In its more recent configuration NCRL's filter has also denied Mr. Heinlen access to various dating sites, photographs embedded in commercial emails sent to his Hotmail and Yahoo! email accounts, and a large number of other miscellaneous Web sites that he has attempted to visit. See Heinlen Dep. at 22:25-24:10, 29:7-12, 31:7-24, 63:13-73:21; Heinlen's Discovery Responses, answers to Interrogatory Nos. 5, 11, 12.

14. Until quite recently, Mr. Heinlen was also precluded from accessing his MySpace blog. See Heinlen's Discovery Responses, answers to Interrogatory Nos. 5, 12.

**B.    The Second Amendment Foundation.**

15. Plaintiff the Second Amendment Foundation ("SAF") is a Washington non-profit corporation focusing on the constitutional right to own and possess firearms. See Plaintiff Second Amendment Foundation's Objections, Answers and Responses to Defendant's First Interrogatories and Requests for Production to the Second Amendment Foundation ("SAF's Discovery Responses"), answer to Interrogatory No. 2; Deposition Upon Oral Examination of Alan Merril Gottlieb ("Gottlieb Dep."), at 36:20-24.

16. SAF's national office is located in the State of Washington. See SAF's Discovery Responses, answer to Interrogatory No. 4.

17. SAF has approximately 650,000 contributing members and supporters, geographically distributed in all 50 states with numbers proportional to population density. Id.

18. SAF has more than 1,000 contributing members and supporters in Chelan, Douglas, Ferry, Grant and Okanogan Counties. Id.

19. SAF maintains a site on the Web at www.saf.org, and sponsors several publications that are available online. Id., answers to Interrogatory Nos. 5, 8.

20.     One of the publications that SAF sponsors is Women & Guns ("The World's First Firearms Publication for Women"), a magazine with its own Web site, located at www.womenandguns.com. Id.

21.     SAF wishes to communicate the contents of its Web site and sponsored publications to Internet users in North Central Washington who may rely on public library computers for Internet access. See Gottlieb Dep. at 36:14-19.

22.     The Women & Guns Web site has been blocked by NCRL's Internet filter. See SAF's Discovery Responses, answer to Interrogatory No. 8.

23.     Because NCRL's Internet filter blocked access to www.womenandguns.com on NCRL's computers, SAF was prevented from communicating with Internet users in North Central Washington who rely on public library computers for Internet access. Id.

**C.      The North Central Regional Library District.**

24.     Defendant the North Central Regional Library District is a municipal corporation that was established in 1960 by a vote of the rural residents of Chelan, Douglas, Ferry, Grant and Okanogan Counties. See Complaint at ¶ 9; Answer and Affirmative Defenses of Defendant North Central Regional Library District ("Answer") at ¶ 9.

25.     NCRL was formed and is operating under Chapter 27 of the Revised Code of Washington and other statutes applicable to inter-county rural library districts. Id.

26.     NCRL was organized to provide library services for, and to operate branch libraries in all areas outside of incorporated cities and towns within Chelan, Douglas, Ferry, Grant and Okanogan Counties, as well as incorporated cities and towns that are either annexed to the aforementioned counties or have entered into service contracts with NCRL. Id.

27.     NCRL operates 28 community libraries in Chelan, Douglas, Ferry, Grant and Okanogan Counties. Id.; see also Deposition Upon Oral Examination of Dean Marney ("Marney Dep.") at 24:25-25:7.

28.     NCRL receives federal funding through the E-Rate program (which provides for discounts to public libraries to assist them in obtaining telecommunications services and Internet access) and the Library Services and Technology Act (which provides for grants to public libraries).  <u>See</u> Marney Dep. at 19:23-20:7.

## II.     THE ROLE OF PUBLIC LIBRARIES.

29.     As Plaintiffs' expert June Pinnell-Stephens explained in her expert report, the role of public libraries changed dramatically during the 20th Century.  <u>See</u> Deposition Upon Oral Examination of June Pinnell-Stephens ("Pinnell-Stephens Dep.") at 73:16-22; Dep. Ex. 25 at 107-13.

30.     Today it is widely accepted that the primary role of the public library is not to serve as a "temple of culture" focused exclusively on collecting "great literature" with the goal of enlightening and uplifting the public, but to be a "locus for the receipt of information" and to "serve each person in our communities by providing collections that reflect each individual's face and voice, particularly when those faces and voices fall outside the majority's preferred viewpoint."  Dep. Ex. 25 at 112, 115.

31.     In her expert report, Ms. Pinnell Stephens explained the difference between selection of library materials and censorship, quoting from an article by Lester Asheim:

> "Selection, then, begins with a presumption in favor of liberty of thought; censorship, with a presumption in favor of thought control.  Selection's approach to the book is positive, seeking its values in the book as a book, and in the book as a whole.  Censorship's approach is negative, seeking for vulnerable characteristics wherever they can be found – anywhere within the book, or even outside it.  Selection seeks to protect the right of the reader to read; censorship seeks to protect – not the right – but the reader himself from the fancied effects of his reading.  The selector has faith in the intelligence of the reader; the censor has faith only in his own.  In other words, selection is democratic while censorship is authoritarian, and in our democracy we have traditionally tended to put our trust in the selector rather than in the censor."

Dep. Ex. 25 at 113-14 (<u>quoting</u> Lester Asheim, <u>Not Censorship But Selection</u>, Wilson Library Bulletin, Sept. 1953, at 63-67).

## III.    THE INTERNET.

32.    The Internet is a network of interlinked computers and computer networks. See Reno v. American Civil Liberties Union, 521 U.S. 844, 849-50 (1997).

33.    The Web consists of a vast number of documents stored in computers around the world.  Id. at 852 (1997).

34.    Internet users employ tools such as browsers and search engines to locate Web pages, which are accessible via hyperlinks.  Id.

35.    An enormous amount of information is available on the Web, which the U.S. Supreme Court has characterized as "comparable, from the readers' viewpoint, to both a vast library including millions of readily available and indexed publications and a sprawling mall offering goods and services."  Id. at 853.

36.    The Internet and Web present public libraries' "best opportunity for disseminating information to remote communities.  These electronic sources, in combination with cooperative collection development arrangements, can maximize the total resources any library can make available to its users, whether those users are in a large metropolitan area or in a small farming community."  See Dep. Ex. 25 at 107.

## IV.    NCRL'S INTERNET FILTERING POLICY.

### A.    The Basic Policy.

37.    NCRL recognizes that the Web contains information that is enriching to users of all ages.  See Defendant's Responses to Plaintiffs' First Interrogatories and Requests for Production ("Defendant's Discovery Responses"), answer to Interrogatory No. 4.

38.    In furtherance of its mission to promote reading and lifelong learning, and to meet the diverse educational, vocational and recreational needs of its patrons, NCRL provides public Internet access at all of its library branches.  See Complaint at ¶ 12; Answer at ¶ 12; Defendant's Discovery Responses, answers to Interrogatory Nos. 4, 6, Ex. C.

39.     Public Internet access on all NCRL computers has been filtered continuously since NCRL first made the Internet available to its patrons in the late 1990s.  See Marney Dep. at 39:11-15, 81:14-17, 82:23-25, 84:3-16; Dep. Ex. 3; Defendant's Discovery Responses, answer to Interrogatory No. 4.

40.     Since September 2006 (shortly before this lawsuit was filed), NCRL has filtered Web content at all of its library branches using a product called the FortiGuard Web Filtering Service, provided by California-based Fortinet.  See Defendant's Discovery Responses, answers to Interrogatory Nos. 1, 3.

41.     Public Internet access at all NCRL branches is filtered at all times; NCRL will not, upon request, disable its Internet filter for any reason, including allowing adult patrons of the library to conduct bona fide research via the Internet or to access the Web for other lawful purposes.  Id., answer to Interrogatory No. 4.

42.     NCRL's filtering policy was developed by NCRL's Director, Dean Marney, and approved by NCRL's Board of Directors.  See Marney Dep. at 80:21-81:8.

**B.     NCRL's Policy With Regard to Unblocking of Specific Web Sites.**

43.     Rather than disabling its FortiGuard filter at the request of adults, NCRL has implemented a policy whereby a patron who has been denied access to a particular Web site or page can submit a request to allow access to the site or page.  See Defendant's Discovery Responses, answers to Interrogatory Nos. 3, 4.

44.     NCRL stated in its answer to Plaintiffs' Interrogatory No. 3 that when such a request is submitted, "[i]f the … request is consistent with the libraries [sic] Internet Usage Policy, the site is unblocked on all NCRL branch computers."  Conversely, if the request is deemed to be inconsistent with NCRL's Internet Usage Policy, the request to unblock the site will be denied.

45.     The individual Plaintiffs object on several grounds to the need to submit requests to access specific Web sites on a case-by-case basis.  See Bradburn Dep. at 36:9-

37:11; Cherrington Dep. at 41:12-42:14; Heinlen Dep. at 36:8-37:17, 54:19-55:4. As Mr. Heinlen testified at deposition:

> Q. [I]s it not sufficient in your mind that NCRL will undertake a review on a site-by-site basis of a particular blocked URL?
>
> A. I feel that that is unnecessarily intrusive on my privacy that I should have to submit sites in advance. It's also disruptive that I could not just surf the Internet at my own pace and have to submit a site review request for everything that was blocked and come back a day or three later after they made their decision to get to a particular site. It's disruptive.

Heinlen Dep. at 36:8-18.

46. At the time NCRL answered Plaintiffs' interrogatories, a request to access a particular Web site on an NCRL computer would have had to have been submitted via a "Material Request Form" – a written document which (according to NCRL) Director Dean Marney or Director of Public Services Dan Howard might or might not "review within matter [sic] of hours." Defendant's Discovery Responses, answer to Interrogatory No. 4.

47. In late September or early October 2007 (several weeks before members of its executive staff were scheduled to be deposed) NCRL implemented a system whereby a patron wishing to view a particular blocked Web site could submit a review request by clicking a button on his or her computer screen. See Marney Dep. at 104:12-107:7; Deposition Upon Oral Examination of Daniel A. Howard ("Howard Dep.") at 44:8-46:25; Deposition Upon Oral Examination of Barbara G. Walters ("Walters Dep.") at 18:23-20:6.

48. Messrs. Marney and Howard are the only NCRL personnel authorized to rule on a request to access a blocked Web site – at least where the request involves more than a mere technical issue capable of being resolved by NCRL's information technology staff. See Howard Dep. at 44:8-46:25; Walters Dep. at 18:23-20:6, 26:9-24, 70:19-71:9.

49. Such requests are usually (but not always) responded to "within a couple of hours," Marney Dep. at 107:1-4 – although a request submitted on a Friday evening might languish through the weekend, id. at 107:5-7.

**C.    NCRL's Objectives in Maintaining Its Filtering Policy.**

50.    NCRL's primary stated purpose in filtering Web content at all times is to promote a family-friendly environment and avoid exposing patrons (particularly children) to inappropriate images.  <u>See</u> Marney Dep. at 97:1-16.

51.    NCRL seeks to shield all library patrons from material that NCRL believes is "harmful to minors."  <u>See</u> Howard Dep. at 79:16-21.  As Mr. Howard testified at deposition:

> Q.    Does the library block access to harmful to minors material even when adults are trying to access that content?
>
> A.    Yes.

<u>Id.</u> at 82:20-22.

52.    At various times, NCRL has blocked access to MySpace and Craigslist on the ground that some Web pages on those sites contained images determined by NCRL to be "harmful to minors."  <u>Id.</u> at 78:18-79:15, 80:16-81:18; <u>see also</u> Dep. Exs. 48, 49.

53.    NCRL currently blocks access to image search sites such as Google Image Search and Yahoo! Image Search because those sites allow access to images that NCRL believes could be "harmful to minors."  <u>See</u> Howard Dep. at 81:22-82:19; Dep. Ex. 50.

54.    NCRL has no meaningful standard in place for determining whether a particular Web site should be blocked given the configuration of the library's Internet filter. As Dean Marney testified at deposition:

> Q.    If I submit a request to you to unblock a particular site, what standards do you apply in determining whether to unblock it or not?
>
> A.    You know, it – we thought it – we have the thought that that's going to be difficult.  It's not difficult.  I mean, we look at something and we go, "Is this – is this an appropriate site for a public place where there's going to be children and families and does it promote reading and life-long learning?"

Marney Dep. at 85:18-86:1.

55.    The deposition testimony of Messrs Marney and Howard demonstrates that NCRL's decision makers are incapable of reaching consistent conclusions regarding whether

particular Web sites or categories or classifications of Web sites should be blocked.  Id. at 85:18-96:7, 129:8-134:13, 143:20-147:20; see also Howard Dep. at 58:17-68:11, 78:18-84:17; Dep. Exs. 45, 46, 48.

56.     Under NCRL's policy, access by adults to a Web site containing hundreds or thousands of pages of content could be denied if only one page on the site contains an image that NCRL deems harmful to minors.  See Howard Dep. at 83:6-84:17.

57.     Mr. Marney testified at deposition that he assumed the prevalence of people looking at pornography would increase if NCRL's FortiGuard filter were to be removed.  See Marney Dep. at 51:20-25.

58.     When asked the basis for that assumption, Mr. Marney responded that "[t]he times the filter has gone off, there's been an influx of that activity," id. at 52:1-3 – meaning people looking at "adult explicit material," id. at 51:20-53:9.

59.     NCRL's Information Technology Manager, Barbara Walters, testified at deposition that the only time NCRL's Web filter had ever "turned off" was before NCRL had put its FortiGuard filter in place, that when the filter had stopped working it was because the servers maintained by the filter provider had gone down, and that "when their servers were down we didn't have Internet access."  See Walters Dep. at 33:17-34:3.

60.     When asked during his deposition if there was any other reason why he thought more people would view pornography, obscenity or child pornography on NCRL computers if NCRL's filter were to be disabled, Mr. Marney testified:

> Libraries have a peculiar problem that we attract a certain element in our communities that isn't always family friendly.  Recently there was the gentleman that self-described himself as a pedophile.  And in reading the newspaper, he was saying – telling people to go to the library because it was a good place where children hung out.  We have had incidents with sex offenders, and my assumption is that that would continue to be a problem and might increase.

Marney Dep. at 55:3-10.

61.     Mr. Marney subsequently testified:

| | | |
|---|---|---|
| Q. | | Handing you Exhibit 30, can you tell me what this is? |
| A. | | It is an incident report. It's a copy of an email report from the Moses Lake Branch. |

* * *

Q.    Do you know if this gentleman looked at any inappropriate material on NCRL computer?

A.    No.

* * *

Q.    Do you think that there is any connection between this document that's been marked Exhibit 30 and the lawsuit?

A.    I think it shows that we do deal with an element of society that is attracted to a public space that we're trying to protect kids from.

Q.    Do you know – and the element of society you're talking about here is sex offenders, registered sex offenders?

A.    Correct.

Q.    Do you know if those registered sex offenders have a tendency to come into public libraries and look at pornography on Internet terminals?

A.    <u>I have no idea</u>. I have no idea that they don't.

Q.    Do incidents like this – well, how many incidents like this are you aware of at NCRL branches?

A.    I think we provided you with three or four.

<u>Id.</u> at 67:6-68:25 (emphasis added); <u>see</u> <u>also</u> Dep. Ex. 30.

62.    Mr. Marney testified at deposition with regard to several other incidents involving sex offenders, stating that he did not know whether any of the individuals in question had viewed inappropriate material online while in the library. <u>See</u> Marney Dep. at 69:11-73:22; Dep. Ex. 31. Mr. Marney provided no further justification for his belief that more people would look at pornography on library computer terminals if NCRL's FortiGuard filter were to be disabled.

63. Since NCRL first began providing Internet access to its patrons in the late 1990s, only one person (Plaintiff Charles Heinlen) has asked that NCRL's filter be disabled. See Marney Dep. at 75:22-25, 138:11-16.

## V.  FUNCTION AND CONFIGURATION OF NCRL'S INTERNET FILTER.

### A.  How the FortiGuard Web Filtering Service Works.

64. Prior to switching to FortiGuard, NCRL had filtered Web content using a server software product called SmartFilter, Bess Edition, manufactured by Secure Computing, Inc. See Defendant's Discovery Responses, answer to Interrogatory No. 1.

65. The FortiGuard Web Filtering Service that NCRL currently uses has two primary components: the FortiGuard Rating Server and the FortiGate firewall/proxy unit. Id., answer to Interrogatory No. 3; see also Deposition of Paul Resnick ("Resnick Dep.") at 83:19-86:5, Ex. 54 (expert report) at 6-13.

66. The server is a database maintained by Fortinet, which sorts Web sites into approximately 75 categories and also classifies Web pages based on media types and sources. Id.; see also Dep. Ex. 38.

67. The FortiGate unit is a small multi-function security appliance that acts as an intermediary between the browser on the end user's computer and the servers with which the browser communicates. See Resnick Dep. at 84:13-85:3; Dep. Ex. 54 at 6-13; Walters Dep. at 29:9-19, 30:18-31:3, 35:9-36:20.

68. Web filtering is one of the tasks that the FortiGate unit can perform. Id.

69. A FortiGate unit has been installed at each of NCRL's 28 branches. See Walters Dep. at 35:9-15, 41:6-8.

70. All Internet traffic to and from the computers at each NCRL branch is routed through the FortiGate unit. Id. at 29:20-21, 30:3-8.

71. The following figure (taken from Fortinet's Web site) summarizes how the FortiGuard Web Filtering Service works.



72.     When a library patron attempts to fetch a particular Web page, a request for the page's uniform resource locator ("URL" – for example, http://www.waed.uscourts.gov) is sent to the FortiGate unit.  <u>See</u> Resnick Dep. at 84:13-85:3; Walters Dep. at 30:3-8, 35:19-36:20; Defendant's Discovery Responses, answer to Interrogatory No. 3.

73.     If the URL had previously been requested at that library branch, Fortinet's categorization and classification of the URL is stored in the FortiGate unit's cache.  <u>See</u> Walters Dep. at 35:19-36:20; Defendant's Discovery Responses, answer to Interrogatory No. 3.

74.     The FortiGate unit compares the URL's categorization and classification to the rules that NCRL has set up locally regarding which Web sites may be accessed by library patrons, and the unit either denies or allows access to the requested Web page.  <u>Id.</u>

75.     If Fortinet's categorization and classification has not been cached in the FortiGate unit, the unit sends a message to the FortiGuard Rating Server requesting the URL's categorization and classification.  <u>See</u> Resnick Dep. at 84:21-85:3; Walters Dep. at 35:19-36:20; Defendant's Discovery Responses, answer to Interrogatory No. 3.

76. When the FortiGate unit receives the requested information from the server, it compares the URL's categorization and classification to NCRL's rules, and either denies or allows access to the Web page. <u>See</u> Resnick Dep. at 85:4-11; Defendant's Discovery Responses, answer to Interrogatory No. 3.

77. If access to a Web site or page is denied, the computer user receives a message to that effect. <u>See</u> Resnick Dep. at 85:12-21; Defendant's Discovery Responses, answer to Interrogatory No. 3.

78. If access to an embedded image is denied, the user receives no message; instead, a blank image is substituted for the blocked image. <u>See</u> Resnick Dep. at 85:22-86:5.

79. As NCRL's expert, Paul Resnick, testified at deposition, a computer user denied access to an embedded image "may not even realize that some things have been blocked." <u>Id.</u> at 86:3-5.

80. There is no technological impediment to disabling the FortiGuard filter at the request of an adult. <u>See</u> Walters Dep. at 41:18-42:2.

**B.      How NCRL Has Configured the FortiGuard Filter.**

81. NCRL has configured its FortiGuard filter to block certain categories and classifications of Web sites. <u>See</u> Marney Dep. at 121:22-24, 127:10-25; Dep. Exs. 38, 41.

82. The decision whether to block a category or classification of sites is entirely within the discretion of NCRL Director Dean Marney. <u>See</u> Howard Dep. at 44:4-7, 50:9-17; Walters Dep. at 18:20-22, 52:23-53:24.

83. As NCRL stated in its answer to Plaintiffs' Interrogatory No. 3, "[t]here have been a few changes to the blocked categories since the Fortinet filter was installed in the first NCRL branch in September 2006."

84. As of November 21, 2006, NCRL was blocking the following categories of Web sites: Drug Abuse, Hacking, Illegal or Unethical, Proxy Avoidance, Web Translation, Phishing, Plagiarism, Adult Materials, Gambling, Nudity and Risque, Pornography, Web

Chat, Instant Messaging, Potential Security Violating, Malware and Spyware; NCRL was also blocking the Video Search and Spam URL classifications.   See Defendant's Discovery Responses, answer to Interrogatory No. 3, Ex. B.

85.    By March 7, 2007 NCRL had stopped blocking the Drug Abuse, Illegal or Unethical, and Web Translation categories, but had started blocking the Image Search classification. Id.

86.    NCRL stopped blocking the Plagiarism category sometime before March 14, 2007. Id.

87.    By May 17, 2007 NCRL had added Personal Relationships to the categories that it was blocking, but NCRL stopped blocking that category sometime before October 15, 2007. Id.; see also Marney Dep. at 121:22-24; Dep. Ex. 38.

88.    The categories of Web sites that NCRL's Internet filter is currently configured to block – along with category descriptions provided by Fortinet – are listed below, see Marney Dep. at 121:22-24, 127:10-25; Dep. Exs. 38, 41.

| | |
|---|---|
| Hacking | Websites that depict illicit activities surrounding the unauthorized modification or access to programs, computers, equipment and websites. |
| Proxy Avoidance | Websites that provide information or tools on how to bypass Internet access controls and browse the Web anonymously, includes anonymous proxy servers. |
| Phishing | Counterfeit webpages that duplicate legitimate business webpages for the purpose of eliciting financial, personal or other private information from the users. |
| Adult Materials | Mature content websites (18+ years and over) that feature or promote sexuality, stripclubs, sex shops, etc. excluding sex education, without the intent to sexually arouse. |
| Gambling | Sites that cater to gambling activities such as betting, lotteries, casinos, including gaming information, instruction, and statistics. |
| Nudity and Risque | Mature content websites (18+ years and over) that depict the human body in full or partial nudity without the intent to sexually arouse. |

| | |
|---|---|
| Pornography | Mature content websites (18+ years and over) which present or display sexual acts with the intent to sexually arouse and excite. |
| Web Chat | Websites that promote Web chat services. |
| Instant Messaging | Websites that allow users to communicate in "real-time" over the Internet. |
| Malware | Sites that are infected with destructive or malicious software, specifically designed to damage, disrupt, attack or manipulate computer systems without the user's consent, such as virus or trojan horse. |
| Spyware | Sites that host software that is covertly downloaded to a user's machine, to collect information and monitor user activity, including spyware, adware, etc. |

89.     In addition to the categories listed above, NCRL's filter is currently configured to block the Image Search, Video Search and Spam URL classifications of Web sites.  Id.

90.     Finally, NCRL has set its filter to block access to certain specific Web sites – a list that has also changed over time.  See Marney Dep. at 86:9-11, 87:21-88:4; Walters Dep. at 53:25-54:2; Dep. Ex. 38; Defendant's Discovery Responses, answer to Interrogatory No. 3, Ex. B.

91.     The specific Web sites to which NCRL currently blocks access include runescape.com (an online adventure game); easyriders.com (an online motorcycling magazine); maxgames.com (a site containing a variety of online games); mamma.com/Mamma_pictures (images with the word "mamma" in the label); ask.com/images, ask.com/pictures, netvue.com, pixsy.com, search.live.com/images, images.google.com and images.search.yahoo.com (image search engines); and craigslist.org/cgi-bin/personals.cgi (a personals site).  See Dep. Ex. 38.

92.     At various other times since it implemented the FortiGuard filter, NCRL has blocked and unblocked MySpace and Craigslist.  See Marney Dep. at 86:9-11, 87:21-88:4; Walters Dep. at 53:25-54:2.

93.    Millions of people have profiles on MySpace – including Hillary Clinton, Mike Huckabee, John McCain, Barack Obama, Ron Paul and Mitt Romney.  See screenshot of myspace.com splash page, at 2; printouts of splash pages of MySpace profiles of Barack Obama, Hillary Clinton, John McCain, Mitt Romney, Mike Huckabee and Ron Paul.

94.    The terms of use for MySpace do not allow the posting of obscene material on the site.  See myspace.com Terms & Conditions, at 1, 4.

95.    Although users of NCRL's computers may access both MySpace and Craigslist at the moment, Dean Marney testified at deposition that NCRL could block MySpace again in the future.  See Marney Dep. at 95:17-19.

96.    According to Plaintiff Pearl Cherrington, NCRL's filter denied her access to YouTube in late 2006 or early 2007.  See Cherrington Dep. at 33:16-34:8.

97.    When FortiGuard is configured to block access to a particular Web site, access to the entire Web site may be denied – which is how NCRL has been employing the filter.  See Marney Dep. at 93:18-23; Walters Dep. at 54:11-21.  Thus, when sites like MySpace are blocked, NCRL's patrons are denied access to millions of individual Web pages.  Similarly, when access to a site like Playboy is denied, NCRL's patrons are precluded from accessing not only images of nude women, but also Web pages containing news stories, interviews and other protected speech.

### C.    The FortiGuard Filter's Error Rates.

98.    Like all Internet filters, the FortiGuard filter makes mistakes.  See Howard Dep. at 86:18-24, 87:19-21.

99.    As both Mr. Marney and Mr. Howard testified at deposition, NCRL's FortiGuard filter does not prevent library patrons from viewing pornographic images online.  See Marney Dep. at 51:13-15, 58:11-14, 140:4-11; Howard Dep. at 39:13-15.

100.    The FortiGuard filter also overblocks – meaning that it erroneously blocks Web sites that contain protected speech and should not be blocked.  See Howard Dep. at

86:18-24, 87:19-21; Deposition Upon Oral Examination of Bennett Haselton ("Haselton Dep.") at 17:15-18:7, Dep. Ex. 21 (expert report) at 7-11; Resnick Dep. at 31:5-8; Dep. Ex. 54 at 24.

101.     Plaintiffs' expert Bennett Haselton tested the accuracy of the FortiGuard filter, describing the methodology and results of his study in an expert report. See Dep. Ex. 21.

102.     Mr. Haselton started with 100,000 randomly-selected .com domains and 100,000 randomly-selected .org domains. Id. at 6.

103.     He determined that FortiGuard blocked as "Pornography" or "Adult Materials" 1,366 of the .com domains, of which 536 were "real" Web pages – that is, pages that were not site errors or placeholder or redirect pages. Id. at 7.

104.     He further determined that FortiGuard blocked as "Pornography" or "Adult Materials" 482 of the .org domains, of which 207 were "real" Web pages. Id. at 9.

105.     Of the 536 .com domains blocked by FortiGuard, 64 were not pornographic and were thus blocked in error, for an error rate of 11.9%. Id. at 7.

106.     Examples of non-pornographic .com sites that Mr. Haselton found to have been blocked erroneously by FortiGuard include www.latinamericavolunteer.com, www.markrudd.com, www.patiececlinic.com, www.photocomponents.com, www.renaissancevoices.com, www.sydneypalmbeach.com, www.tulipflorists.com and www.vacuumequipmentsupplies.com. Id. at 8-9.

107.     Assuming a total of 110,819,264 .com sites in the world (representing the original pool of sites from which Mr. Haselton derived his 100,000-site sample), some 71,000 .com sites are erroneously blocked by FortiGuard at any given time. Id. at 10.

108.     Of the 207 .org domains blocked by FortiGuard, 49 were not pornographic and were thus blocked in error, for an error rate of 23.6%. Id. at 9.

109.     Among the errors were www.acceptpregnancy.org, www.alcohol-abuse.org, www.faithchurchofdavis.org, www.healthdirectedriding.org, www.kindnessusa.org,

1   www.paparaircraft.org, www.swojo.org (the Web site of the Seattle Women's Jazz Orchestra)

2   and www.voicecarenetwork.org.  Id. at 9-10.

3        110.    Assuming a total of 11,813,406 .org sites, about 5,800 are blocked in error by

4   FortiGuard at any given time.  Id. at 11.

5        111.    NCRL's expert, Paul Resnick, raises no substantial challenge to the results of

6   Mr. Haselton's test of the FortiGuard filter; rather, after conducting his own study of the

7   filter's overblocking rates, Dr. Resnick reached a conclusion roughly similar to Mr.

8   Haselton's: that is, that approximately 5-10% of Web pages (Mr. Haselton tested Web sites)

9   blocked by the FortiGuard filter are blocked in error.  See Resnick Dep. at 31:5-8; Dep. Ex. 54

10  at 24.

11       112.    Dr. Resnick also raised other concerns about the FortiGuard filter.    For

12  example, he noted in his report that the filter overblocks embedded images without so

13  advising the end user.  See Resnick Dep. at 142:22-143:22; Dep. Ex. 54 at 25.

14  **VI.    ALTERNATIVES TO FILTERING.**

15       **A.    Alternatives Rejected By NCRL.**

16       113.    Even though patrons of NCRL can (and do) access and view Internet

17  pornography with the FortiGuard filter in place, see Marney Dep. at 51:13-15, NCRL has

18  decided not to implement alternative measures to keep library patrons from inadvertently

19  viewing inappropriate materials on library computers.  For example, NCRL installed privacy

20  screens on terminals in its Wenatchee branch when access to the Internet was first provided to

21  patrons in 1999, but removed the screens after (according to Mr. Marney) receiving

22  complaints about them.  See Marney Dep. at 39:11-17, 44:19-48:2.

23       114.    Since then NCRL has not installed privacy screens on any of its computers, or

24  investigated the possibility of doing so.  Id. at 44:19-48:2; see also Howard Dep. at 27:2-33:9,

25  33:24-35:4.

26

115.    NCRL decided not to invest in recessed desks as a cost-saving measure and because the desks were thought to be insufficiently effective.  <u>See</u> Marney Dep. at 48:3-49:4; Howard Dep. at 33:2-9, 35:5-37:12.

116.    NCRL decided not to substitute a "tap-and-tell" policy for its current filtering policy primarily out of concern that abandoning the current policy would lead to confrontation between library staff and patrons.  <u>See</u> Howard Dep. at 33:10-23, 37:16-42:11.

117.    Even though NCRL patrons do view pornography online and are occasionally asked to stop doing so, NCRL is only aware of a single incident in which a patron became upset after having been asked to stop viewing pornographic images, and that incident did not result in any physical altercation or violence.  <u>See</u> Marney Dep. at 58:5-10, 59:24-60:5, 61:2-63:20, 64:20-65:11; Howard Dep. at 39:13-42:11.

118.    NCRL decided not to hire security guards due to the expense and because "it would change … the environment here."  Howard Dep. at 42:14-43:3.

119.    NCRL has not considered any other alternatives to full-time Internet filtering.  <u>See</u> Marney Dep. at 49:5-8.

**B.      Alternatives Adopted By Other Libraries.**

120.    Many libraries have found ways to promote a safe, family-friendly environment without burdening adult speech through continuous filtering.  Alternatives to full-time filtering include privacy screens and monitor hoods, reconfiguration of computer monitors to make the screens less visible to passers-by, recessed desks, central printing stations, and "tap-and-tell" policies.  <u>See</u> Dep. Ex. 25 at 122.

121.    Many libraries have chosen to forego filters entirely, or to institute a disabling policy in conjunction with all, some or none of the foregoing additional measures.  For example, the computer monitors at the Fairbanks North Star Borough Library ("FNSBL") in Fairbanks, Alaska, have been configured to maximize privacy, and recessed desks and privacy

filters have been installed.  See Pinnell-Stephens Dep. at 23:24-24:24, 62:23-65:16; Dep. Ex. 25 at 122.

122.    After an Internet filter was installed on FNSBL's computers, the library implemented a procedure whereby the filter would be disabled at the request of an adult.  See Pinnell-Stephens Dep. at 29:21-31:20, 62:23-65:16.

123.    In part because of the manner in which FNSBL had set up its publicly-accessible computers to maximize privacy, the library has received no complaints relating to the Internet.  See Dep. Ex. 25 at 122.

124.    Although Internet access on all computers at the Stark County District Library ("SCDL") in Stark County, Ohio is filtered by default, adult patrons may elect to bypass the filter upon logging on.  See Deposition of Kenton Oliver ("Oliver Dep.") at 26:24-27:5, 27:10-24; Dep. Ex. 52.

125.    Patrons are precluded from viewing images that are obscene, illegal or harmful to minors, and can be asked to stop if they are viewing inappropriate material online in the library.  See Oliver Dep. at 31:10-33:3, 33:19-34:1, Dep. Ex. 52.

126.    Kenton Oliver, SCDL's Executive Director, is not aware of any incident involving a library patron who was viewing prohibited material online and who ignored staff requests to cease.  See Oliver Dep. at 24:17-26:12.

127.    At the Jefferson County Library District ("JCLD") in Madras, Oregon, Internet access is always unfiltered.  See Deposition of Sally W. Beesley ("Beesley Dep.") at 21:18-25, 31:15-32:6, 33:14-34:23; Dep. Ex. 62.

128.    JCLD takes no special precautions with respect to the privacy of library patrons.  See Beesley Dep. at 40:22-41:19.

129.    Library patrons who are viewing inappropriate material online can be asked to cease their activities or leave the premises.  Id. at 36:20-40:6; see also Dep. Ex. 63.

1     130.   The library only has "a few" incidents each year where a patron reports that

2     another patron is viewing inappropriate material on a library computer.  See Beesley Dep. at

3     42:14-43:15.

4     131.   In every instance in which a staff member has asked a library patron to stop

5     viewing inappropriate material, the patron has complied with the request.  Id. at 58:4-59:2.

6     DATED this 4th day of February, 2008.

7

8                                             AMERICAN CIVIL LIBERTIES UNION OF
                                              WASHINGTON FOUNDATION
9

10                                            By:    /s/ Duncan Manville
                                              Duncan Manville, WSBA #30304
11                                            1629 2nd Avenue W.
                                              Seattle, WA  98119
12                                            Tel. (206) 288-9330
                                              Fax (206) 624-2190
13                                            duncan.manville@yahoo.com

14                                            Aaron H. Caplan, WSBA #22525
                                              American Civil Liberties Union of Washington
15                                            Foundation
                                              705 Second Avenue, Third Floor
16                                            Seattle, WA  98103
                                              Tel. (206) 624-2184
17                                            Fax (206) 624-2190
                                              caplan@aclu-wa.org
18
                                              Catherine Crump, pro hac vice
19                                            American Civil Liberties Union Foundation
                                              125 Broad Street, 18th Floor
20                                            New York, NY  10004
                                              Tel. (212) 519-7806
21                                            ccrump@aclu.org

22                                            Counsel for Plaintiffs

23

24

25

26

BRADBURN V. NORTH CENTRAL REGIONAL LIBRARY DISTRICT
Case No. CV-06-327-EFS

**INDEX OF EXHIBITS TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Exhibit A:     Plaintiffs' Complaint for Declaratory and Injunctive Relief

Exhibit B:     Answer and Affirmative Defenses of Defendant North Central Regional Library District

Exhibit C:     Plaintiff Sarah Bradburn's Objections, Answers and Responses to Defendant's First Interrogatories and Requests for Production to Plaintiff Sarah Bradburn

Exhibit D:     Plaintiff Pearl Cherrington's Objections, Answers and Responses to Defendant's First Interrogatories and Requests for Production to Plaintiff Pearl Cherrington

Exhibit E:     Plaintiff Charles Heinlen's Objections, Answers and Responses to Defendant's First Interrogatories and Requests for Production to Plaintiff Charles Heinlen

Exhibit F:     Plaintiff Second Amendment Foundation's Objections, Answers and Responses to Defendant's First Interrogatories and Requests for Production to the Second Amendment Foundation

Exhibit G:     Defendant's Responses to Plaintiffs' First Interrogatories and Requests for Production, and Exhibits B and C thereto

Exhibit H:     Excerpts from the Deposition of Sally W. Beesley

Exhibit I:     Excerpts from the Deposition Upon Oral Examination of Sarah Maria Bradburn

Exhibit J:     Excerpts from the Deposition Upon Oral Examination of Pearl Anne Cherrington

Exhibit K:     Excerpts from the Deposition Upon Oral Examination of Alan Merril Gottlieb

Exhibit L:     Excerpts from the Deposition Upon Oral Examination of Bennett Haselton

Exhibit M:     Excerpts from the Deposition Upon Oral Examination of Charles Merle Heinlen

Exhibit N:     Excerpts from the Deposition Upon Oral Examination of Daniel A. Howard

Exhibit O:     Excerpts from the Deposition Upon Oral Examination of Dean Marney

Exhibit P:     Excerpts from the Deposition of Kenton Oliver

Exhibit Q:     Excerpts from the Deposition Upon Oral Examination of June Pinnell-Stephens

Exhibit R:     Excerpts from the Deposition of Paul Resnick

Exhibit S:     Excerpts from the Deposition Upon Oral Examination of Barbara G. Walters

Exhibit T:      Deposition Exhibit 3

Exhibit U:      Deposition Exhibit 21

Exhibit V:      Deposition Exhibit 25 (without appendices)

Exhibit W:      Deposition Exhibit 30

Exhibit X:      Deposition Exhibit 31

Exhibit Y:      Deposition Exhibit 38

Exhibit Z:      Deposition Exhibit 41

Exhibit AA:     Deposition Exhibit 45

Exhibit BB:     Deposition Exhibit 46

Exhibit CC:     Deposition Exhibit 48

Exhibit DD:     Deposition Exhibit 49

Exhibit EE:     Deposition Exhibit 50

Exhibit FF:     Deposition Exhibit 52

Exhibit GG:     Deposition Exhibit 54 (without appendices)

Exhibit HH:     Deposition Exhibit 62

Exhibit II:     Deposition Exhibit 63

Exhibit JJ:     Printout of myspace.com splash page and splash pages of MySpace profiles of Hillary Clinton, Mike Huckabee, John McCain, Barack Obama, Ron Paul and Mitt Romney

Exhibit KK:     Printout of myspace.com Terms & Conditions