# Exhibit J

Dockets.Justia.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

—————————————————————————————————
                                    )
SARAH BRADBURN, PEARL CHERRINGTON,  )
CHARLES HEINLEN, and THE SECOND     )
AMENDMENT FOUNDATION,               )
                                    )
          Plaintiffs,               ) NO.
                                    ) CV-06-327-EFS
          vs.                       )
                                    )
NORTH CENTRAL REGIONAL LIBRARY      )
DISTRICT,                           )
                                    )
          Defendant.                )
—————————————————————————————————

—————————————————————————————————
          DEPOSITION UPON ORAL EXAMINATION OF
                 PEARL ANNE CHERRINGTON
—————————————————————————————————

TAKEN ON:     Monday, August 13th, 2007

TAKEN AT:     Omak Library
              30 South Ash
              Omak, Washington

START TIME:   10:42 A.M.

END TIME:     11:58 A.M.

REPORTED BY:  BARBARA J. SCOVILLE, CCR, RPR
              CCR NO. 2124

accba41b-d087-48a0-b97a-c037d7d02375

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

SARAH BRADBURN, PEARL CHERRINGTON,     )
CHARLES HEINLEN, and THE SECOND        )
AMENDMENT FOUNDATION,                   )
                                        )
            Plaintiffs,                 ) NO.
                                        ) CV-06-327-EFS
    vs.                                 )
                                        )
NORTH CENTRAL REGIONAL LIBRARY          )
DISTRICT,                               )
                                        )
            Defendant.                  )

DEPOSITION UPON ORAL EXAMINATION OF
PEARL ANNE CHERRINGTON

TAKEN ON:   Monday, August 13th, 2007
TAKEN AT:   Omak Library
            30 South Ash
            Omak, Washington
START TIME: 10:42 A.M.
END TIME:   11:58 A.M.

REPORTED BY:  BARBARA J. SCOVILLE, CCR, RPR
              CCR NO. 2124

## Page 2

1  APPEARANCES:
2  FOR THE PLAINTIFFS:
3     MR. DUNCAN MANVILLE, ESQ.
      RAFEL MANVILLE, PLLC
4     Attorneys at Law
      999 3rd Avenue
5     Suite 1600
      Seattle, Washington 98104
6     (206) 838-2660
7
8  FOR THE DEFENDANT:
9     MR. THOMAS D. ADAMS, ESQ.
      KARR TUTTLE CAMPBELL
10    Attorneys at Law
      1201 Third Avenue
11    Suite 2900
      Seattle, Washington 98101
12    (206) 223-1313
13
14
15
16  ALSO PRESENT:  MR. DEAN MARNEY
                   MR. DAN HOWARD
17
18
19
20
21
22
23
24
25

## Page 3

1              I N D E X
2  In re:  SARAH BRADBURN vs. NORTH CENTRAL REGIONAL LIBRARY
      Case No.: CV-06-327-3FS
3  Date:  August 13th, 2007
4
5
6
7         T E S T I M O N Y
8  EXAMINATION              PAGE NUMBER
9  By Mr. Adams                4
10
11
12
13
14         E X H I B I T S
15  12  Notice of Deposition of Mrs. Pearl        8
        Cherrington
16
    13  Plaintiff Pearl Cherrington's            35
17      Objections, Answers and Responses to
        Defendant's First Interrogatories and
18      Requests for Production
19
20
21
22
23
24
25

## Page 4

1           BE IT REMEMBERED that on Monday,
2      August 13th, 2007, at 10:42 a.m., at Omak Library,
3      30 South Ash, Omak, Washington, the testimony of
4      MRS. PEARL ANNE CHERRINGTON was taken before Barbara
5      J. Scoville, Certified Court Reporter and Notary
6      Public.  The following proceedings took place:
7
8      PEARL A. CHERRINGTON,    being first duly sworn to
9                  tell the truth, the whole
10                 truth and nothing but the
11                 truth, testified as
12                 follows:
13
14           EXAMINATION
15  BY MR. ADAMS:
16  Q.  Good morning, Mrs. Cherrington.  My name is Tom
17      Adams, and we've had a chance to meet just briefly.
18      Just so you're clear, I am the lawyer representing
19      the North Central Regional Library District which
20      from time to time I may refer to as "NCRL" if that's
21      all right.
22  A.  Uh-huh.
23  Q.  And I am representing NCRL, of course, in this
24      lawsuit which you and others have brought in Federal
25      District Court here in Washington concerning NCRL's

SCOVILLE COURT REPORTING
(509) 884-1712

177

accba41b-d087-48a0-b97a-c037d7d02375

## Page 9

1  A. No.
2  Q. Okay, good. May I have your full name, please.
3  A. It's Pearl Anne Cherrington. The Anne is A-n-n-e.
4  Q. Right. And your current address?
5  A. It's Post Office Box 681, Twisp, Washington 98856.
6  Q. And are you married?
7  A. Yes.
8  Q. Okay. And your husband's name?
9  A. Howard Cherrington.
10 Q. How long have you and Howard been married?
11 A. Since 1998, so it will be ten years in February of
12    '08.
13 Q. Okay. Were you married prior to that?
14 A. No.
15 Q. Do you and Mr. Cherrington have a physical address
16    in Twisp? You referenced a P.O. Box.
17 A. Yes, we have a physical address.
18 Q. Okay.
19 A. 636 Twisp River Road.
20 Q. And do you live in Twisp year-round?
21 A. Yes.
22 Q. Okay. Do you have homes elsewhere?
23 A. No.
24 Q. Okay. Do you have children?
25 A. No.

## Page 10

1  Q. Have you ever used any other alias or legal name?
2  A. My maiden name --
3  Q. Which was --
4  A. -- which was Pearl Langdon.
5  Q. L-a-n-g-d-o-n?
6  A. Yes.
7  Q. Very good. And how long have you lived in Twisp?
8  A. It's been 17 years. I moved there in 1999.
9  Q. Where did you live before then?
10 A. It would be Seattle.
11 Q. Okay. How long were you a resident of Seattle?
12 A. Twelve years, so I moved there in 1977.
13 Q. Okay.
14 A. And so the gap there from '89 to '90, I traveled
15    around the country a little bit.
16 Q. All right. Tell me a little bit about your
17    educational background if you would, please.
18 A. Let's see, went to the University of Kansas, majored
19    in journalism and fine art photography. I got a
20    general studies degree in 1977 -- I take that back,
21    1976. I graduated in '76.
22 Q. From the U of K?
23 A. Yes.
24 Q. Did you ever put your journalism degree to work?
25 A. Not really, no.

## Page 11

1  Q. How about your fine arts degree?
2  A. I have put that to work exhibiting in galleries,
3    selling at our farmer's market over in Twisp. On
4    Saturdays, we have a farmer's market. I did that up
5    until two years ago. I did that for probably five
6    years.
7  Q. What kind of work?
8  A. It's, well, fine art photography: landscapes,
9    abstracts, also some greeting cards of various
10   scenes of the Methow Valley.
11 Q. Okay. It sounds nice.
12 A. Yes, it is.
13 Q. Are you still engaged in that profession?
14 A. Yes, I am.
15 Q. Okay. Is it a business or is it a hobby?
16 A. I do have a business, but it is more like a hobby.
17   Just the income possibilities in this area are
18   limited.
19 Q. Sure. And your husband, is he employed now?
20 A. Yes, he's self-employed. He's a residential
21   designer.
22 Q. Okay. Is he an architect?
23 A. Yes.
24 Q. Okay. Other than your educational background at the
25   University of Kansas, have you had any kind of

## Page 12

1    training in the arts or in journalism or in any
2    other field of study?
3  A. In Seattle, I worked at photo labs, and I received
4    training on how to print photographs and customer
5    service in that field. So I did receive training in
6    the photography industry.
7  Q. Okay. Are you a member of any civic organizations,
8    or are you affiliated with any sort of nonprofit
9    group?
10 A. Nonprofit, the Confluence Gallery over in Twisp.
11   It's an art gallery, and it's a nonprofit. And
12   would the ACLU be involved -- I mean, that's an
13   organization I belong to.
14 Q. Sure.
15 A. Part of that question --
16 Q. Sure.
17 A. Okay, ACLU.
18 Q. So you're a member of the ACLU?
19 A. Yes.
20 Q. Any other organizations?
21 A. No.
22 Q. Okay. How long have you been a part of the ACLU?
23 A. I would say, let's see, maybe six years. I don't
24   recall the exact date.
25 Q. Sure.

3 (Pages 9 to 12)

accba41b-d087-48a0-b97a-c037d7d02375

## Page 13

1  A. It would be about six years, I would think.
2  Q. Okay. Did your membership in ACLU lead to your
3     becoming a plaintiff in this lawsuit?
4  A. No, it did not.
5  Q. Okay. That's coincidental?
6  A. Right, right, it is.
7  Q. Okay. Do you recall ever receiving any
8     correspondence from the ACLU's Washington chapter or
9     any other chapter of ACLU about NCRL's Internet
10    filtering policies?
11 A. I received a survey, and I honestly can't remember
12    if it was the ACLU that sent it out. But I did
13    receive a survey surveying if I had ever been
14    blocked from Internet sites.
15 Q. Okay. Did you complete that survey?
16 A. Yes, I did.
17 Q. Okay. And you don't recall who you returned it to,
18    if anyone?
19 A. I don't recall. I really don't.
20 Q. When did that occur?
21 A. It would have been before this lawsuit, probably
22    three years ago, about that time.
23 Q. Did you keep a copy of that by any chance?
24 A. I didn't. I didn't think anything would be coming
25    of it.

## Page 14

1  Q. Do you maintain a personal file of documents
2     pertaining to the NCRL's Internet filtering
3     policies?
4  A. No, I don't.
5  Q. Do you have anything online where you keep e-mail
6     pertaining to that same subject?
7  A. No, I don't.
8  Q. Okay. Any documents in your possession pertaining
9     to either this lawsuit or the NCRL's Internet
10    filtering policies and have those been turned over
11    to your counsel if you have any?
12 A. I didn't have any. No, I didn't have any.
13 Q. All right. Are you a member of the Second
14    Amendment Foundation?
15 A. No, I'm not.
16 Q. Are you acquainted with Sarah Bradburn?
17 A. No.
18 Q. Charles Heinlen?
19 A. No.
20 Q. Other than your lawyers, have you spoken to anybody
21    about your participation in this lawsuit and
22    presumably your husband, of course?
23 A. I spoke to my husband and a couple of friends about
24    what was going on.
25 Q. Okay. Which friends?

## Page 15

1  A. Do you want their names?
2  Q. Please.
3  A. One was Laura Fine-Morrison (phonetics). I
4     explained to her what I was doing.
5  Q. Uh-huh.
6  A. Who else would I have talked to? I talked to Max
7     Shelton and his wife about it.
8  Q. Are these just social acquainances?
9  A. Right, yes, they are.
10 Q. And they're sort of interested in following along?
11 A. Right, they are, yeah.
12 Q. Are you a -- Do you have a library card with NCRL?
13 A. Yes, I do.
14 Q. When did you get that?
15 A. When they started issuing library cards. Was that
16    like four or five years ago?
17 Q. Okay. What branches of the library do you frequent?
18 A. Twisp most frequently, yeah, about once a week.
19 Q. Okay. About once a week?
20 A. Yes.
21 Q. That's a "yes"?
22 A. Yes. I'm sorry.
23           MR. MANVILLE: It'll happen again.
24           THE WITNESS: I know.
25 Q. (By Mr. Adams) I haven't been to the Twisp branch.

## Page 16

1     Let me show you two photographs that have been
2     produced in this case. I won't bother making then
3     them an exhibit.
4        But just for the record, I'm referring the
5     witness to the photographs on a document marked
6     "NCRL 01070."
7        Do these photographs look like the exterior of
8     the building that houses the library in Twisp?
9  A. Yes.
10 Q. And is the lower photograph a fair representation of
11    a part of the library's interior premises?
12 A. Yes.
13 Q. Okay. Now, the upper photograph shows a two-story
14    building. The library itself is not a two-story
15    building, is it?
16 A. No, it's not.
17 Q. Okay. Can you point out for me on the photograph
18    where the library is situated in this building?
19 A. It's these windows right here. (Indicating)
20 Q. Okay. You're pointing --
21 A. This area right in here. (Indicating)
22 Q. So the lower floor, perhaps the four windows, five
23    windows on the far left?
24 A. Yes.
25 Q. Okay. Do you have a sense for how many square feet

4 (Pages 13 to 16)

accba41b-d087-48a0-b97a-c037d7d02375

Page 17

1    the Twisp library branch consists of? I'm sure
2    you've never paced it off.
3    A. Perhaps twice the size of this room.
4    Q. Okay. Maybe a thousand square feet? Does that
5    sound about right?
6    A. Yeah, yes.
7    Q. Does that branch have computer terminals?
8    A. Yes.
9    Q. Okay. How many?
10   A. As of Saturday when I went in, three.
11   Q. Okay.
12   A. It only had one up until that time.
13   Q. Oh, and as of Saturday, they've tripled their --
14   A. Yes, they have.
15   Q. Excellent. Are they all situated in the same area?
16   A. No. There's two in a section and then there is one
17      in another section.
18   Q. Do you have any idea why they're separated?
19   A. I think they're separated because we have a card
20      catalog -- We used to have one designated for the
21      card catalog only. It was not Internet. And now
22      this -- they're all Internet access. Plus our card
23      catalog, that's how we have to access our card
24      catalog. I think that one's been sort of set aside
25      so it's not continually used so that we can get

Page 18

1    access to look up books.
2    Q. Okay.
3    A. That's what I'm thinking.
4    Q. When you say "we," just patrons in general?
5    A. Yes, patrons.
6    Q. Okay. Do you know the library staff at the Twisp
7      branch?
8    A. Yes, I do.
9    Q. Who is that?
10   A. The main librarian is Terry Dixon. Then there's a
11      woman that fills in on Saturdays. I only know her
12      first name. It's Rosie. And then she's added some
13      new staff, and I'm unsure of what their names are.
14   Q. Okay. Now, when you visit the Twisp branch,
15      Mrs. Cherrington, what resources do you typically
16      use?
17   A. I look for books mainly.
18   Q. And, of course, you use the Internet from time to
19      time; is that right?
20   A. We got our own computer two years ago. So I did
21      actually use the Internet Saturday at the library,
22      but it is mainly to look up books actually.
23   Q. The card catalog?
24   A. Yes, yes.
25   Q. Okay. So you have your own computer at home?

Page 19

1    A. Not at home. It's in my husband's office in Twisp.
2    Q. I see. And are you able to use that computer as you
3      need to more or less?
4    A. Occasionally. We mainly keep it for business. I
5      do -- If I need to get on it to look for
6      information, I will use that over the library's now.
7    Q. Okay. And that computer has Internet access, of
8      course.
9    A. Yes, it does.
10   Q. And I don't mean to put words in your mouth. Is
11      that your preferred point of access to the Internet
12      now?
13   A. Yes.
14   Q. And is that computer completely unfiltered?
15   A. Yes.
16   Q. So your access is not impeded in any way?
17   A. No, it's not.
18   Q. And when you come to the Twisp branch to use the
19      Internet now, as I understand it, your usage is
20      primarily directed toward looking up books.
21   A. Right.
22   Q. Okay. Do you even have to go on the Internet for
23      that purpose or is that internal?
24   A. Actually, no, I don't have to go on the Internet for
25      that; right.

Page 20

1    Q. Am I correct then in thinking that you today rarely
2      access the Internet through the Twisp branch
3      computers?
4    A. Yes.
5    Q. Okay. Have you ever tried to access the Internet
6      through a library computer and been blocked from
7      reaching a site you desired to go to?
8    A. Yes.
9    Q. When did that occur?
10   A. About 2005.
11   Q. Okay. Do you have a specific recollection of that
12      incident?
13   A. I have a -- Yes, I do. I went -- plugged in my
14      Web site for an art gallery that I was looking for
15      in Idaho and a "STOP" sign came up and I was
16      surprised to see that.
17   Q. Do you recall the Web site?
18   A. I don't recall the Web site.
19   Q. Okay. What did the pop-up, if you will, inform you
20      of?
21   A. It said, "STOP." And I don't remember exactly what
22      else was said there, what -- why it was stopping.
23      That's when I got up and asked the librarian why
24      that was showing, why I couldn't get into that site.
25   Q. Was that Terry?

5 (Pages 17 to 20)

accba41b-d087-48a0-b97a-c037d7d02375

## Page 21

1  A. Yes, it was.
2  Q. Okay. And what did Terry say?
3  A. And Terry said that she was unable to -- that it was
4    filtered and that she was unable to unlock it.
5  Q. Okay. Did you recall having a discussion with Terry
6    about a mechanism for taking it up a chain, if you
7    will, and seeing about unblocking access to that
8    site?
9  A. I don't recall doing that at the time.
10  Q. You don't recall a discussion about that?
11  A. No, I don't.
12  Q. Okay. Did you attempt to reach that same Web site
13    address through another computer unaffiliated with
14    the library?
15  A. No, I didn't.
16  Q. You didn't have one at your husband's business then?
17  A. Right.
18  Q. Okay. Are you familiar with NCRL's Internet Public
19    Use Policy?
20  A. No, I'm not.
21  Q. Have you ever seen anything in printed form or heard
22    anybody discuss what the parameters of the Internet
23    Public Use Policy might be?
24  A. I just remember seeing a sign posted -- this was on
25    our older computer -- that said something about not

## Page 22

1    to tamper with the system and not to do any hacking.
2    And that's all I recall that it said. It was a
3    little sign.
4  Q. In a previous deposition, we marked this as
5    Deposition Exhibit 3, and I'm going to show this to
6    you now, Mrs. Cherrington. And let me just ask you
7    to take a quick look at that and let me know when
8    you've had a chance to do that.
9  A. Okay. I've read it.
10  Q. Have you had a chance to look at Exhibit 2 (sic)?
11  A. Uh-huh.
12  Q. Have you seen this before?
13  A. Now that I see it, I have seen it on the screen, but
14    I really didn't take the time to read it thoroughly.
15  Q. Okay.
16  A. There are certain words in and there phrases in
17    there that I can recall seeing -- having seen.
18  Q. Were you generally aware that Internet access was
19    filtered?
20  A. At the time I went in there, I wasn't aware of it.
21  Q. When I showed you this document a moment ago,
22    I don't recall if I made reference to "Deposition
23    Exhibit 2" or "Deposition Exhibit 3." I meant to
24    say "3" if I said "2". And I just want to make sure
25    that we're clear that we're referring to Exhibit 3.

## Page 23

1  A. Yes.
2  Q. In the pile of deposition exhibits I've put in front
3    of you now, Deposition -- the document that we have
4    previously marked as Deposition Exhibit 2 is a
5    one-page document. Will you take a look at that for
6    a moment, please.
7  A. Okay.
8  Q. Have you seen this document which is called a
9    "Material Selection Review Form" prior to my just
10    showing it to you just now?
11  A. No.
12  Q. Okay. So you didn't fill out a form like this when
13    you were blocked at getting to the Idaho gallery
14    Web site?
15  A. No, no, I did not.
16  Q. Apart from this Idaho gallery's Web site, have you
17    ever experienced a similar episode where you tried
18    to get to a Web site and have been denied access?
19  A. Yes, I do.
20  Q. Do you recall any specific Web sites?
21  A. I don't recall the specific Web site.
22  Q. In general, can you tell me were they related
23    Web sites to a particular topic?
24  A. No, they weren't. It was -- Well, yeah, I can tell
25    you the topic. I Googled it. It was "anal

## Page 24

1    fissure," and it blocked that -- me from putting
2    that in.
3  Q. Okay. You were just researching a health topic?
4  A. Yes, I was.
5  Q. Okay. Did you bring that to the attention of Terry
6    or anyone else at NCRL?
7  A. I didn't because I knew -- I realized, well, it's
8    one of those that was filtered.
9  Q. Okay. So, again, you would not have filled out a
10    Material Selection Review Form?
11  A. Right.
12  Q. Okay. Have you ever sought out assistance from the
13    Twisp branch staff about how you might formulate an
14    Internet inquiry to get around a blocked-site
15    notice?
16  A. No.
17  Q. Have you ever talked to Terry or anyone else at
18    Twisp about Internet searching generally, about how
19    to be effective in Internet searching?
20  A. No.
21  Q. Is it your position in this lawsuit,
22    Mrs. Cherrington, that adult patrons of NCRL
23    branches should have unfiltered access to the
24    Internet?
25  A. Yes.

6 (Pages 21 to 24)

accba41b-d087-48a0-b97a-c037d7d02375

1    categories presently blocked by NCRL?
2  A. I do not.
3  Q. Okay. So it might be the same, might be broader,
4    might be less broad than what was previously brought
5    to your attention as the blocked categories?
6  A. Okay.
7  Q. Is that true?
8  A. Yes.
9  Q. I gather since you're not overly familiar with the
10   Fortinet namebrand and Fortinet service, which I
11   will represent to you is the current service, you're
12   unaware of Fortinet's own mechanism for any person
13   to challenge Fortinet's classification of a
14   particular Web site.
15  A. Right, I am unaware.
16  Q. Okay. We spoke about your inability to get to the
17   Idaho gallery, and we spoke about your efforts to do
18   research on the health topic.
19  A. Uh-huh.
20  Q. Were there any other Web sites that you were unable
21   to get access to?
22  A. Yes. I went in and tried to get YouTube mainly
23   because there seemed to be a lot of talk about it
24   and I thought, "What is this?" I was curious. And
25   I was blocked from that.

1  Q. Okay. Did you bring that to anyone's attention?
2  A. I did not.
3  Q. You did not.
4  A. No, I didn't.
5  Q. When did you try to get access to YouTube?
6  A. It seems like it was six to ten months ago --
7  Q. Okay.
8  A. -- as I recall.
9  Q. At that time, did you have access to your -- the
10   computer in your husband's office?
11  A. Yes, I did.
12  Q. Were you able to access YouTube there?
13  A. I didn't try.
14  Q. You could; is that true?
15  A. I could have, yes.
16  Q. Do you know whether the blocking of the Idaho
17   gallery could have been the result of a technical
18   issue as opposed to the operation of the software?
19  A. I don't know that.
20  Q. It just said "Blocked"?
21  A. Yes.
22  Q. Okay. The reason I ask is that there's information
23   in this case that if a Web site is hosted on a type
24   of server that it might create an incompatability
25   issue that would prevent access at the terminal

1    level.
2  A. Yes.
3  Q. And you're not aware of that occurring?
4  A. It did not occur. Usually when it -- if you have
5   trouble getting onto somebody's Web site, the page
6   will come up, "This page is unable to be accessed
7   because the Web site is under construction or out of
8   date." But this was a big red "STOP" sign that was
9   definitely filtered.
10  Q. Blocked by the filter.
11  A. Yes.
12  Q. Okay. Do you post online under any kind of a
13   pseudonym?
14  A. No.
15  Q. You e-mail though, of course.
16  A. Yes.
17  Q. Okay. But you don't maintain any kind of a -- you
18   know, a screen name for blogging or anything like
19   that?
20  A. No.
21  Q. You never posted on a blog?
22  A. No.
23       MR. ADAMS: Let's mark this Number 13.
24
25      (EXHIBIT 13 WAS MARKED.)

1  Q. (By Mr. Adams) Mrs. Cherrington, I've handed you a
2   document marked Deposition Exhibit 13. And for the
3   record, I'll state that this document constitutes
4   your "Objections, Answers and Responses to
5   Defendant's First Interrogatories and Requests for
6   Production."
7    I believe you've already reviewed these
8   answers and objections, but go ahead and familiarize
9   yourself with them if you feel you need to. I just
10   have a few questions for you.
11    Is that your signature --
12  A. Okay.
13  Q. I'm sorry, go ahead.
14  A. Okay.
15  Q. Okay. Is that your signature on page 11?
16  A. Yes.
17  Q. In your answer to Interrogatory Number 5 on
18   page 4 --
19  A. Okay.
20  Q. -- in the first sentence, your answer states, "The
21   NCRL's filter denied access to certain Web sites for
22   art galleries in the Pacific Northwest that were
23   included on a list obtained from Artist Trust." Do
24   you see that?
25  A. Right, yes.

accba41b-d087-48a0-b97a-c037d7d02375

Page 41

1    Internet; is that true?
2            MR. MANVILLE: Objection to the form of
3    the question.
4            THE WITNESS: Again, if it's illegal.
5    Q. (By Mr. Adams) Okay. So Internet filtering, in
6    some respects, does not present a problem for you,
7    does it, when it pertains to things that are
8    illegal?
9    A. Yes.
10   Q. True?
11   A. Yes.
12   Q. Is there anything that you can think of that would
13   prevent you this afternoon from driving to the Twisp
14   branch and asking Terry to submit for review the
15   URL, the Web site address, for the Idaho gallery
16   with the request that it be unblocked? Anything
17   preventing you from doing that?
18   A. There isn't except I don't remember the site.
19   Q. All right, fair enough. If you were able to
20   remember the site, nothing would prevent you from
21   asking that it be unblocked.
22   A. Right.
23   Q. Okay.
24   A. I would have to wait a day though for an answer; is
25   that right?

Page 42

1    Q. Or whatever -- The procedure would have to run its
2    course. Who knows how long it would take.
3    A. I see.
4    Q. Now that you know, because you just learned that, a
5    procedure exists for NCRL to review blocked
6    Web sites on a site-by-site basis, is that a
7    mechanism that you would be comfortable invoking?
8    A. Not really.
9    Q. Why not?
10   A. Because I believe as an adult I should be able to
11   have Internet access to sites without having to ask
12   somebody's permission. Or if the librarian herself
13   would be allowed to go in and unblock the site, that
14   would work for me.
15   A. Okay.
16   Q. Given that Internet filtering software is
17   developing, evolving, as you might expect would be
18   the case with any software product -- true? --
19   A. Uh-huh.
20   Q. -- would you agree that it's not unreasonable to
21   help define the software database by pointing out
22   erroneous classifications to those that maintain the
23   software?
24   A. I don't understand the question.
25   Q. Well, for example, Fortinet has its algorithms, its

Page 43

1    method of determining whether a particular site
2    belongs in a particular classification or another
3    classification. And with the many, many, many
4    millions of Web sites out there to classify, I'll
5    ask you to assume that it's not unreasonable for a
6    mistake to be made from time to time. Is that a
7    reasonable assumption?
8    A. Yes, that would be a reasonable assumption.
9    Q. So when those mistaken classifications arise, is it
10   a burden for a patron to call that to the attention
11   of the software provider?
12           MR. MANVILLE: Object to the form.
13           THE WITNESS: It wouldn't be -- Well,
14   can you repeat it again about the burden?
15   Q. (By Mr. Adams) Would it be a burden for the patron
16   to call it to the attention of NCRL? You're sitting
17   right there and you have a blocked Web site. Would
18   it be a burden to tell Terry?
19   A. It wouldn't be a burden, no.
20   Q. Or much a burden even to fill out one of the forms
21   that I showed you earlier to ask for it to be
22   reviewed; true?
23   A. Right. True.
24   Q. It might take longer than you would like, but it's
25   not a burden to invoke the mechanism; is that true?

Page 44

1    A. That's true. Yeah.
2            MR. ADAMS: Give me one moment.
3    Thanks for coming. That's all we have.
4            THE WITNESS: Uh-huh.
5            MR. ADAMS: You'll have an opportunity to
6    review the transcript once our court reporter
7    produces it, and your lawyer will let you know when
8    that's available.
9            THE WITNESS: Okay.
10           MR. ADAMS: And you'll have a right to
11   correct what you believe to be mis-recorded
12   statements or correct a spelling, that sort of
13   thing. If you do exercise that right, your changes
14   will be included in the transcript in the form of an
15   errata sheet at the back. The court reporter
16   won't -- it's not her job to change what's she's
17   recorded --
18           THE WITNESS: Yes.
19           MR. ADAMS: -- but you can say what you
20   think should have been recorded. And your lawyer
21   can explain all that to you. And you'll have a
22   right to sign the transcript. And if you don't sign
23   it within a specified period of time -- I think it's
24   30 days -- then it's deemed signed --
25           THE WITNESS: Okay.

11 (Pages 41 to 44)

### Page 45

1    MR. ADAMS: -- and it becomes a final
2  transcript. I think that's right.
3    MR. MANVILLE: I believe that's correct.
4    MR. ADAMS: We'll all go back and read
5  the rules again on that point. Thanks very much.
6    MR. MANVILLE: Before we wrap this up,
7  off the record let's talk.
8
9    (A BRIEF RECESS WAS TAKEN.)
10
11    (DEPOSITION CONCLUDED AT 11:58 A.M.)
12    (SIGNATURE RESERVED)
13
14
15
16
17
18
19
20
21
22
23
24
25

### Page 46

1  IN RE: SARAH BRADBURN vs. NORTH CENTRAL REGIONAL LIBRARY
   NO. CV-06-327-3FS
2
3    CORRECTION SHEET
4  CHANGES IN FORM AND SUBSTANCE REQUESTED BE MADE IN THE
   FOREGOING ORAL EXAMINATION TRANSCRIPT:
5
   PAGE   LINE        CORRECTION AND REASON
6
7
8
9
10
11
12
13
14
15
16
17  I hereby certify that this is a true and correct copy of my
    testimony, with the exception of the corrections noted above.
18
19    PEARL ANNE CHERRINGTON
      Date
20
21    Notary Public in and for the state
22    of Washington residing at
      Subscribed and sworn to before me on
      this    day of    , 2007.
23    My commission expires on    .
24
    See: Wash. Reports 34A, Rule 30 (e)
25  USCA 28, Rule 30 (e)

### Page 47

1      C E R T I F I C A T E
2  STATE OF WASHINGTON)
          ) ss.
3  COUNTY OF CHELAN  )
4
5    THIS IS TO CERTIFY that I, Barbara J. Scoville,
6  Notary Public in and for the State of Washington, residing
7  at Entiat, reported the within and foregoing testimony; said
8  testimony being taken before me as a Notary Public on the
9  date herein set forth; that the witness was first by me duly
10  sworn; that said examination was taken by me in shorthand
11  and thereafter under my supervision transcribed, and that
12  same is a full, true and correct record of the testimony of
13  said witness, including all questions, answers and
14  objections, if any, of counsel, to the best of my ability.
15    I further certify that I am not a relative, employee,
16  attorney, counsel of any of the parties; nor am I
17  financially interested in the outcome of the cause.
18    Transcribed notes will be destroyed three years from
19  the affixed date unless requested by counsel to retain them.
20    IN WITNESS WHEREOF, I have hereunto set my hand and
21  affixed my official seal this _____ day of
22  _____, 2007.
23
24    Barbara J. Scoville, CCR, RPR
      CCR NO. 2124
25

12 (Pages 45 to 47)

# Exhibit K

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

SARAH BRADBURN, PEARL ) No. CV-06-327-EFS
CHERRINGTON, CHARLES )
HEINLEN, and THE SECOND )
AMENDMENT FOUNDATION, )
)
                Plaintiffs, )
)
        vs. )
)
NORTH CENTRAL REGIONAL )
LIBRARY DISTRICT, )
)
                Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF
ALAN MERRIL GOTTLIEB

September 12, 2007
Seattle, Washington

Taken Before:

Cheryl L Hendricks, CCR #2274
Certified Court Reporter
of
CAPITOL PACIFIC REPORTING, INC.
2401 Bristol Court SW, Olympia, WA 98502
Tel (360) 352-2054  Fax (360) 705-6539

Tacoma          Seattle         Aberdeen
(253) 564-8494    (206) 622-9919    (360) 532-7445
        Chehalis          Bremerton
        (360) 330-0262    (360) 373-9032

www.capitolpacificreporter.com
scheduling@capitolpacificreporting.com

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

SARAH BRADBURN, PEARL            )  No. CV-06-327-EFS
CHERRINGTON, CHARLES             )
HEINLEN, and THE SECOND          )
AMENDMENT FOUNDATION,            )
                                 )
            Plaintiffs,          )
                                 )
      vs.                        )
                                 )
NORTH CENTRAL REGIONAL           )
LIBRARY DISTRICT,                )
                                 )
            Defendant.           )

DEPOSITION UPON ORAL EXAMINATION OF
ALAN MERRIL GOTTLIEB
September 12, 2007
Seattle, Washington

Taken Before:
Cheryl L Hendricks, CCR #2274
Certified Court Reporter
of
CAPITOL PACIFIC REPORTING, INC.
2401 Bristol Court SW, Olympia, WA 98502
Tel (360) 352-2054  Fax (360) 705-6539

Tacoma          Seattle          Aberdeen
(253) 564-8494   (206) 622-9919   (360) 532-7445
Chehalis              Bremerton
(360) 330-0262        (360) 373-9032
www.capitolpacificreporter.com
scheduling@capitolpacificreporting.com

## Page 2

1           APPEARANCES
2
3   FOR THE PLAINTIFF:  AARON H. CAPLAN
          STAFF ATTORNEY
          AMERICAN CIVIL LIBERTIES UNION
4           OF WASHINGTON
          705 2ND AVENUE, #300
5         SEATTLE, WA 98104-1799
          PHONE: (206) 624-2184
6         FAX: (206) 624-2190
          E-MAIL: caplan@aclu-wa.org
7
8   FOR THE DEFENDANT:  THOMAS D. ADAMS
          ATTORNEY AT LAW
9         KARR TUTTLE CAMPBELL
          1201 THIRD AVENUE, #2900
10        SEATTLE, WA 98101
          PHONE: (206) 223-1313
11        FAX: (206) 682-7100
          E-MAIL: tadams@karrtuttle.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1           EXAMINATION INDEX
2
    BY:          EXAMINATION  RE-EXAMINATION
3
4   MR. ADAMS          4
5
6
7
8           EXHIBIT INDEX
9
    NO.  DESCRIPTION          MARKED  IDENTIFIED
10
    16  Notice of CR 30(b)(6)      7      7
11      Deposition of The Second
        Amendment Foundation,
        Complaint for Declaratory
12      And Injunctive Relief,
        Plaintiff Second Amendment
13      Foundation's Objections,
        Answers and Responses to
14      Defendant's First
        Interrogatories and Requests
15      For Production to the Second
        Amendment Foundation
16
17  17  Excerpt from Second Amendment  25    25
        Foundation's Website
18
    18  News Release                 38     38
19
    19  Alan Gottlieb:               59     59
20      The Merchant of Fear
21
22
23
24
25

## Page 4

1           BE IT REMEMBERED that on Wednesday, September
2       12, 2007, at 9:30 a.m., at 1201 Third Avenue, Seattle,
3       Washington, before Cheryl L. Hendricks, Notary Public in
4       and for the State of Washington, appeared Alan Merril
5       Gottlieb, the witness herein.
6           WHEREUPON the following proceedings were had, to
7       wit:
8
9   Alan Merril Gottlieb,   having been first duly sworn by
                the Notary, testified as follows:
10
11
12           EXAMINATION
13
14  BY MR. ADAMS:
15  Q  State your name please, sir.
16  A  Alan Merril Gottlieb.
17  Q  Mr. Gottlieb, we've had a chance to meet briefly this
18      morning.  My name is Tom Adams and I am the lawyer
19      representing Defendant North Central Regional Library
20      District in a lawsuit that has been commenced by four
21      plaintiffS, including the Second Amendment Foundation,
22      in the United States District Court for the Eastern
23      District of Washington pertaining to the library's
24      Internet filtering policy, in general terms.
25           And we're here today to find out what

276b7a5e-fe43-4961-95db-7c36a94e701a

Page 33

1   A  Yes.
2   Q  Okay.  Are you at the maximum?
3   A  No.
4   Q  What is the maximum?
5   A  It depends on market size per market.  There is no
6      direct rule or regulation on how many total stations in
7      radio one can own nationwide.  But with regard to a
8      market there is, depending on the size of the market,
9      and it varies from market to market.
10  Q  Okay.  Are you a member of the. . .  Well, is there a
11     nonprofit entity called The Wise Use Movement?
12  A  No.
13  Q  Is The Wise Use Movement descriptive of anything at this
14     time?
15  A  Yes.
16  Q  Okay.  Tell me what The Wise Use Movement is.
17  A  It's probably lots of organizations and individuals who
18     share a common goal of using resources wisely, basically
19     not locking things up so that nobody -- nobody -- like
20     nobody could use the national parks or nobody could mine
21     or nobody could do this, it's basically using resources
22     in a wise fashion without depleting them.
23  Q  Okay.  Is the movement organized in any way?
24  A  No.  It would be like any movement, so it would be -- no
25     movement's really organized.  Like say -- like civil

Page 34

1      rights movement wasn't really organized as a movement,
2      made up of lots of different people and organizations,
3      so the same kind of thing.
4   Q  So there are no identified officers or even members of
5      The Wise Use Movement; is that right?  Is it more of an
6      idea?
7   A  There are no -- in the answer to the first part of your
8      question, there are no officers or members per se.
9      There's no organization.  As far as an idea goes, it's a
10     little nebulous for me.
11  Q  Is there intellectual property, in your opinion,
12     associated with The Wise Use Movement?
13  A  Not that the movement would own.  Individuals or
14     organizations might own.
15  Q  Okay.  What individuals --
16          (Interruption by the reporter.)
17  A  Not -- not -- the movement itself would obviously own no
18     intellectual property, but various individuals or
19     organizations probably would.
20  Q  (By Mr. Adams)  Would you be one of those individuals?
21          THE WITNESS:  Do you want me to repeat any of
22     that?
23          THE REPORTER:  No.  I've got it.
24  Q  (By Mr. Adams)  Would you be one of them?
25  A  One could make an argument that I would because I've

Page 35

1      written books and articles and I assume that's
2      intellectual property.
3   Q  What about the Council for National Policy, what kind of
4      organization is that?
5   A  It's a national organization made up of individuals to
6      promote a national -- a national policy with a
7      conservative libertarian bent to it.
8   Q  Okay.  Do you have a leadership position in that
9      organization?
10  A  Not at this time, no.  I was on its Executive Committee
11     Board for a number of years.
12  Q  From when to when?
13  A  Oh, boy.  Say, mid '80s through mid '90s probably.
14  Q  Are you still an active member?
15  A  No.
16  Q  But you're a part of that group?
17  A  No.  If you're not a member you're not a part of it.
18  Q  Okay.  So you're not a part of the Council for National
19     Policy at this time?
20  A  At this time, no.
21  Q  Okay.  Did you choose to leave it?
22  A  Yes.
23  Q  Why?
24  A  The dues are rather expensive and I didn't -- and --
25     and -- and you have to go to a number of meetings per

Page 36

1      year and my schedule is really tough to make the
2      meetings and so I wasn't really able to participate.  It
3      wasn't worth paying the dues if I couldn't go.
4   Q  Okay.  You mentioned a number of nonprofit
5      organizations, American Political Action Committee,
6      nointernettax.org, Keep and Bear, the Citizens
7      Committee, and then there's -- I'm probably mixing up my
8      names.  I apologize.
9   A  Don't feel bad.  I do it all the time.
10  Q  My question is this:  Of any of these organizations that
11     we've discussed today, do any of these organizations
12     have a philosophical position about Internet filtering?
13  A  A philosophical position, I can't say that they do.
14  Q  I mean, I suspect that you would -- you might say that
15     Second Amendment Foundation does because they're a party
16     to this lawsuit; is that correct?
17  A  Well, you said philosophical position.  In the case of
18     the Foundation, it's a practical one.  We'd like our
19     materials to be able to be viewed on the Internet.
20  Q  Okay.  Does SAF not have a philosophical position beyond
21     the practical one then?
22  A  Correct.  The Foundation, Second Amendment Foundation,
23     really pretty much only deals with one issue, the right
24     to keep and bear arms.
25  Q  Okay.  Well, if I told you here now that the Second

9  (Pages 33 to 36)

276b7a5e-fe43-4961-95db-7c36a94e701a

Page 77

1  A  Mm-hmm.
2  Q  You did not check?
3  A  Personally I did not check.
4  Q  Nor do you know of anyone within SAF's staff that
5     checked.
6  A  I believe legal counsel checked and that would represent
7     us.
8  Q  When you say legal counsel, are you referring to ACLU
9     counsel?
10 A  I -- I'm not sure if it's ACLU or Manville.
11 Q  Counsel in this case.
12 A  Counsel.
13 Q  Counsel of record representing plaintiffs.
14 A  Counsel of record, correct.
15        MR. ADAMS:  All right, Mr. Gottlieb.  Thank you
16    for your time.  That's all I have.
17        MR. CAPLAN:  I have no questions.
18              (Concluded at 11:53 a.m.)
19              (Signature reserved.)
20
21
22
23
24
25

Page 78

1        C E R T I F I C A T E
2
       I, CHERYL L. HENDRICKS, a duly authorized Court
3  Reporter and Notary Public in and for the State of
   Washington, residing at Olympia, do hereby certify;
4
       That the foregoing deposition of Alan Merril
5  Gottlieb was taken before me on September 12, 2007, and
   thereafter transcribed to the best of my ability by
6  means of computer-aided transcription; that the
   deposition is a full, true, and complete transcript of
7  the testimony of said witness;
8       That the witness, before examination, was by me
   duly sworn to testify the truth, the whole truth, and
9  nothing but the truth, and the witness reserved
   signature;
10
       That I am not a relative, employee, attorney, or
11 counsel of any party to this action, or relative or
   employee of any such attorney or counsel, and I am not
12 financially interested in said action or outcome
   thereof;
13
       That upon completion of signature, if required,
14 I shall herewith securely seal the original transcript
   and serve same upon Thomas D. Adams, counsel for the
15 Defendants.
16      IN WITNESS WHEREOF, I have hereunto set my hand
   and affixed my official seal this 1st day of October,
17 2007.
18
19
20
21      _____
        Cheryl L. Hendricks,
22      CCR NO. 2274
23
24
25

20  (Pages 77 to 78)

# Exhibit L

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

SARAH BRADBURN, PEARL      )  No. CV-06-327-EFS
CHERRINGTON, CHARLES       )
HEINLEN, and THE SECOND    )
AMENDMENT FOUNDATION,      )
                           )
              Plaintiffs,  )
                           )
        vs.                )
                           )
NORTH CENTRAL REGIONAL     )
LIBRARY DISTRICT,          )
                           )
              Defendant.   )

DEPOSITION UPON ORAL EXAMINATION OF
BENNETT HASELTON

September 12, 2007
Seattle, Washington

Taken Before:

Cheryl L Hendricks, CCR #2274
Certified Court Reporter
of
CAPITOL PACIFIC REPORTING, INC.
2401 Bristol Court SW, Olympia, WA 98502
Tel (360) 352-2054  Fax (360) 705-6539

Tacoma              Seattle            Aberdeen
(253) 564-8494    (206) 622-9919    (360) 532-7445
       Chehalis              Bremerton
     (360) 330-0262        (360) 373-9032

www.capitolpacificreporter.com
scheduling@capitolpacificreporting.com

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

SARAH BRADBURN, PEARL ) No. CV-06-327-EFS
CHERRINGTON, CHARLES )
HEINLEN, and THE SECOND )
AMENDMENT FOUNDATION, )
)
Plaintiffs, )
)
vs. )
)
NORTH CENTRAL REGIONAL )
LIBRARY DISTRICT, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF
BENNETT HASELTON
September 12, 2007
Seattle, Washington

Taken Before:
Cheryl L Hendricks, CCR #2274
Certified Court Reporter
of
CAPITOL PACIFIC REPORTING, INC.
2401 Bristol Court SW, Olympia, WA 98502
Tel (360) 352-2054  Fax (360) 705-6539

Tacoma          Seattle          Aberdeen
(253) 564-8494   (206) 622-9919   (360) 532-7445
Chehalis          Bremerton
(360) 330-0262   (360) 373-9032
www.capitolpacificreporter.com
scheduling@capitolpacificreporting.com

## Page 2

1        APPEARANCES
2
3   FOR THE PLAINTIFF:  AARON H. CAPLAN
        STAFF ATTORNEY
        AMERICAN CIVIL LIBERTIES UNION
4         OF WASHINGTON
        705 2ND AVENUE, #300
5       SEATTLE, WA 98104-1799
        PHONE: (206) 624-2184
6       FAX: (206) 624-2190
        E-MAIL: caplan@aclu-wa.org
7
8   FOR THE DEFENDANT:  THOMAS D. ADAMS
        ATTORNEY AT LAW
9       KARR TUTTLE CAMPBELL
        1201 THIRD AVENUE, #2900
10      SEATTLE, WA 98101
        PHONE: (206) 223-1313
11      FAX: (206) 682-7100
        E-MAIL: tadams@karrtuttle.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1              EXAMINATION INDEX
2
    BY:           EXAMINATION  RE-EXAMINATION
3
4   MR. ADAMS          4
5
6
7
8          EXHIBIT INDEX
9
    NO.  DESCRIPTION          MARKED   IDENTIFIED
10
    20  Notice of Deposition of      5      5
11      Bennett Haselton
12  21  Report On Accuracy Rate of   17     17
        FortiGuard Filter
13
    22  Scripts          82     83
14
    23  Copies of E-mails        83     84
15
16  24  Four Drafts of Report    88     88
17
18
19
20
21
22
23
24
25

## Page 4

1          BE IT REMEMBERED that on Wednesday, September
2   12, 2007, at 1:30 p.m., at 1201 Third Avenue, Seattle,
3   Washington, before Cheryl L. Hendricks, Notary Public in
4   and for the State of Washington, appeared Bennett
5   Haselton, the witness herein.
6          WHEREUPON the following proceedings were had, to
7   wit:
8
9   Bennett Haselton,      having been first duly sworn by
                the Notary, testified as follows:
10
11
12          EXAMINATION
13
14  BY MR. ADAMS:
15  Q  State your full name, please.
16  A  Bennett Haselton.
17  Q  Mr. Haselton, we've had a chance to meet briefly just
18     now.  And for the record I'll repeat that my name is Tom
19     Adams and I'm a lawyer representing the Defendant North
20     Central Regional Library District in a lawsuit pending
21     in the United States District Court in the Eastern
22     District of Washington brought by Sarah Bradburn and
23     others pertaining, generally, to the Internet filtering
24     policy that is in place and maintained by NCRL.
25  A  Mm-hmm.

1 (Pages 1 to 4)

Page 17

1    stuck together. And that had happened a number of
2    times. And I wrote about that for slashdot. And I
3    think that was one of the articles somebody asked about
4    about reprinting. I didn't get paid for the reprinting
5    so I didn't remember all the times that it happened.
6  Q  And I take it you have not yet appeared in any of the
7    courts that the judges so found to --
8  A  Well, I haven't been avoiding them. I don't think I
9    actually came back and happened to -- happened to get
10   any of them hearing any of the smalls claims cases since
11   then.
12 Q  I'm just kidding you.
13 A  Oh, well. . . But, I -- well, I almost was. So it was
14   close.
15 Q  Okay. You have told me already that you have been
16   retained as an expert witness on behalf of the
17   Plaintiffs in this case; is that right?
18 A  Yes.
19 Q  And you have completed a report on behalf of the
20   Plaintiffs. Is that also correct?
21 A  Yes.
22          (Exhibit No. 21 marked.)
23 Q  (By Mr. Adams) Mr. Haselton, I've handed you an exhibit,
24   a multipaged exhibit, that we've marked Deposition
25   Exhibit 21. And I'll represent to you that this is a

Page 18

1    copy of the expert report and all of the attachments
2    included with the expert report that you provided to the
3    plaintiffs' attorneys and which the plaintiffs'
4    attorneys have produced as part of this litigation.
5          Do you generally recognize this to be your
6    report?
7  A  Yes.
8  Q  Okay. We'll talk in detail about the contents of your
9    reports here throughout the afternoon. But I want to
10   ask you a couple of preliminary questions first having
11   to do with primarily some of your qualifications.
12         So, if I might, would you turn within Exhibit 21
13   to page 15?
14 A  Okay. I have two sets numbers on each page.
15 Q  Yeah, 15 on the right, --
16 A  Okay.
17 Q  -- lower right, which has the title at the top Bennett
18   Haselton qualifications.
19 A  Okay. Yep. Okay.
20 Q  Is Peacefire, Inc. a for-profit corporation?
21 A  Yes.
22 Q  Are you a part of any nonprofit organizations?
23 A  Like as a volunteer or as a paid member?
24 Q  In any capacity.
25 A  I'm a dues paying member of the ACLU and People for the

Page 19

1    American Way. I'm a volunteer for Life Center Northwest
2    or it's called Living Legacy Foundation now, which does
3    work to promote organ donation.
4          Peacefire, Inc., its main purpose is actually
5    not for profit but it was just easier to set it up as a
6    for-profit corporation because we don't take in -- we
7    don't take in and spend enough money to make -- to make
8    it worthwhile setting it up as nonprofit. And in fact,
9    because of the for-profit, that means I can do the
10   consulting and stuff under that umbrella. So the
11   website exists mainly for a nonprofit purpose, but it's
12   legally a for-profit corporation.
13 Q  Okay. Under the heading Professional Experience, in the
14   year 2000 you make reference to testimony provided to
15   the COPA Commission on the accuracy rates of blocking
16   software. Do you see that reference?
17 A  Yeah.
18 Q  Okay. Tell me, what was the -- what knowledge did you
19   have of blocking software in the year 2000?
20 A  Well, I guess I started the Peacefire website in about
21   1996 and at the time there were not a lot of people
22   publishing critical examinations of blocking software.
23   So I was one of the first people to take some programs
24   and find some of the clearly non-pornographic websites
25   that were being blocked and then publish those as lists

Page 20

1    of examples of sites blocked by the software.
2          And then for the COPA Commission we did
3    something -- I did something a little more formal which
4    is where we were taking random sets of dot com domain
5    names and running them through the software to see what
6    was blocked and then seeing what percentage of those
7    were errors.
8          So there were -- there were very -- there were
9    very few people at the time and still very few people
10   doing anything -- doing any systematic studies like
11   that.
12 Q  Between the year 2000 when you gave this testimony to
13   the COPA Commission and the time that you prepared this
14   report for use by the plaintiffs in this litigation, did
15   you do any kind of systematic study of Internet blocking
16   software?
17 A  We'd done some more reports about some of the programs
18   that I'd tested before, revisited them and run a list of
19   sites through to see what was blocked and see how many
20   were obviously not pornographic.
21 Q  Who is we?
22 A  I guess mostly me.
23 Q  Okay.
24 A  Okay. So yeah, I'd done some updates of the reports on
25   a different program since then.

September 12, 2007
Capitol Pacific Reporting, Inc. (800) 407-0148

193

Page 93

1          C E R T I F I C A T E
2
3          I, CHERYL L. HENDRICKS, a duly authorized Court
   Reporter and Notary Public in and for the State of
   Washington, residing at Olympia, do hereby certify;
4
5          That the foregoing deposition of Bennett
   Haselton was taken before me on September 12, 2007, and
6  thereafter transcribed to the best of my ability by
   means of computer-aided transcription; that the
7  deposition is a full, true, and complete transcript of
   the testimony of said witness;
8          That the witness, before examination, was by me
   duly sworn to testify the truth, the whole truth, and
9  nothing but the truth, and the witness reserved
   signature;
10
11         That I am not a relative, employee, attorney, or
   counsel of any party to this action, or relative or
   employee of any such attorney or counsel, and I am not
12 financially interested in said action or outcome
   thereof;
13
14         That upon completion of signature, if required,
   I shall herewith securely seal the original transcript
15 and serve same upon Thomas D. Adams, counsel for the
   Defendant.
16         IN WITNESS WHEREOF, I have hereunto set my hand
   and affixed my official seal this 2nd day of October,
17 2007.
18
19
20
21         _____
           Cheryl L. Hendricks,
22         CCR NO. 2274
23
24
25

24 (Page 93)

# Exhibit M

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

_____
                                    )
SARAH BRADBURN, PEARL CHERRINGTON,  )
CHARLES HEINLEN, and THE SECOND     )
AMENDMENT FOUNDATION,               )
                                    )
            Plaintiffs,             ) NO.
                                    ) CV-06-327-EFS
        vs.                         )
                                    )
NORTH CENTRAL REGIONAL LIBRARY      )
DISTRICT,                           )
                                    )
            Defendant.              )
_____

_____
      DEPOSITION UPON ORAL EXAMINATION OF
            CHARLES MERLE HEINLEN
_____


TAKEN ON:    Monday, August 13th, 2007

TAKEN AT:    Omak Library
             30 South Ash
             Omak, Washington

START TIME:  7:30 A.M.

END TIME:    10:35 A.M.




REPORTED BY:  BARBARA J. SCOVILLE, CCR, RPR
              CCR NO. 2124

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

SARAH BRADBURN, PEARL CHERRINGTON, )
CHARLES HEINLEN, and THE SECOND )
AMENDMENT FOUNDATION, )
)
               Plaintiffs, ) NO.
) CV-06-327-EFS
     vs. )
)
NORTH CENTRAL REGIONAL LIBRARY )
DISTRICT, )
)
               Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF
CHARLES MERLE HEINLEN

TAKEN ON:   Monday, August 13th, 2007
TAKEN AT:   Omak Library
            30 South Ash
            Omak, Washington
START TIME: 7:30 A.M.
END TIME:   10:35 A.M.

REPORTED BY:  BARBARA J. SCOVILLE, CCR, RPR
              CCR NO. 2124

## Page 2

1  APPEARANCES:
2  FOR THE PLAINTIFFS:
3      MR. DUNCAN MANVILLE, ESQ.
       RAFEL MANVILLE, PLLC
4      Attorneys at Law
       999 3rd Avenue
5      Suite 1600
       Seattle, Washington 98104
6      (206) 838-2660
7
8  FOR THE DEFENDANT:
9      MR. THOMAS D. ADAMS, ESQ.
       KARR TUTTLE CAMPBELL
10     Attorneys at Law
       1201 Third Avenue
11     Suite 2900
       Seattle, Washington 98101
12     (206) 223-1313
13
14
15
16  ALSO PRESENT: MR. DEAN MARNEY
               MR. DAN HOWARD
17
18
19
20
21
22
23
24
25

## Page 3

1            I N D E X
2  In re: SARAH BRADBURN vs. NORTH CENTRAL REGIONAL LIBRARY
   Case No.: CV-06-327-EFS
3  Date: August 13th, 2007
4
5        T E S T I M O N Y
6  EXAMINATION                    PAGE NUMBER
7  By Mr. Adams                        4
8
9        E X H I B I T S
10  1  Notice of Deposition of Mr. Charles      29
       Heinlen
11
12  2  NCRL Material Selection Review Form      30
13  3  NCRL Internet Public Use Policy      34
14  4  NCRL's Document Containing Their      42
       Mission Statement
15  5  Complaint for Declaratory and      51
       Injunctive Relief
16
17  6  American Civil Liberties Union of      58
       Washington
18  7  Plaintiff Mr. Charles Heinlen's      60
       Objections, Answers and Responses to
19     Defendant's First Interrogatories
20  8  Article in Upside Down World by      79
       Mr. Charles Heinlen
21
22  9  Blogography Web site pages      85
23  10  Letter to Director Marney from      93
       Mr. Charles Heinlen and Letter to
       Mr. Charles Heinlen from Mr. Dean
       Marney
25  11  Packet of E-mails      101

## Page 4

1       BE IT REMEMBERED that on Monday,
2  August 13th, 2007, at 7:30 a.m., at Omak Library,
3  30 South Ash, Omak, Washington, the testimony of
4  MR. CHARLES MERLE HEINLEN was taken before Barbara
5  J. Scoville, Certified Court Reporter and Notary
6  Public. The following proceedings took place:
7
8       CHARLES M. HEINLEN,   being first duly sworn to
9                  tell the truth, the whole
10                  truth and nothing but the
11                  truth, testified as
12                  follows:
13
14            EXAMINATION
15  BY MR. ADAMS:
16  Q. State your name, please.
17  A. Charles Merle Heinlen, H-e-i-n-l-e-n.
18  Q. Thank you. Mr. Heinlen, my name is Tom Adams, and
19     we've had a chance to meet briefly this morning
20     already. How are you?
21  A. Great. How are you?
22  Q. Great, thank you. Thanks for showing up so early
23     this morning so we can get a start on our day. I'm
24     the lawyer representing the Defendant North Central
25     Regional Library District which is the defendant in

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

### Page 5

1   a lawsuit pending in federal court commenced by you
2   and others concerning the constitutionality of the
3   library's Internet access policy. And I'm here
4   today to ask you some questions about your claim.
5      Have you had your deposition taken before?
6 A. No.
7 Q. Okay. Let me tell you a little bit about the
8   process then to try to remove some of the mystery,
9   if there is any mystery, for you. We are here to
10   find out what facts and other information you might
11   have that will help us better understand your claim
12   and, if appropriate, test its legal validity in
13   court.
14 A. Uh-huh.
15 Q. And we do that through a question-and-answer
16   dialogue. All right?
17 A. Uh-huh.
18 Q. It's important for you to understand a couple of
19   things to make this procedure work as it is
20   intended, and they're pretty simple rules actually.
21   But one of the most important rules is that when I
22   ask you a question, you have to respond verbally as
23   opposed to an "uh-huh" or "huh-uh" because that is
24   something that the court reporter may or may not be
25   able to interpret. Fair enough?

### Page 6

1 A. Not a problem.
2 Q. Okay. Another rule -- and, again, this is just a
3   matter of common courtesy -- is that I will wait for
4   you to finish an answer before I go on to another
5   question. But by the same token, I would encourage
6   you and hope and ask you to wait for me to ask my
7   question before you try to answer. All right?
8 A. Yes.
9 Q. Okay. If you want to take a break during the
10   proceedings today, that's just fine. You're
11   entitled to speak privately with your lawyer,
12   Mr. Manville, who is here with you today. The only
13   thing I would ask is that you not take a break while
14   a question is pending. Fair enough?
15 A. Understood.
16 Q. Okay. It's also important that you understand that
17   you are under oath here today. Do you understand
18   that?
19 A. I absolutely understand.
20 Q. Okay. And that oath carries the same weight here
21   today in this conference room as it would sitting in
22   court. Okay?
23 A. Of course.
24 Q. Okay, very good. Mr. Heinlen, do you have any other
25   legal names that you've gone by?

### Page 7

1 A. No, sir.
2 Q. Okay. No other aliases of any kind?
3 A. None.
4 Q. Okay. What is your current address?
5 A. Oh, man, I'm in between addresses. Right now, I'm
6   staying at 13 Barnholt Loop Road in Omak.
7 Q. Okay.
8 A. And that will probably change next week.
9 Q. And do you have another address where you will be?
10 A. I'm not a hundred percent sure yet. I'll get ahold
11   of Duncan at that time.
12 Q. Okay. Prior to the address on Barnholt, where did
13   you live?
14 A. In Riverside.
15 Q. Okay. How long have you been at the Barnholt
16   address?
17 A. That's my parents' place. That's where I go when
18   I'm in between place, so I've been there on and off
19   for about 41 years now.
20 Q. Okay. So you've lived on and off with your parents
21   for about 41 years?
22 A. Well, probably more off than on lately but, yes.
23 Q. Okay. And what about the Riverside address?
24 A. What about the Riverside address?
25 Q. Okay. You lived there from when to when?

### Page 8

1 A. That was for a few months probably right around from
2   Halloween until about last week.
3 Q. Okay. So from sometime in late October until
4   sometime in early August?
5 A. That would be fair.
6 Q. Okay. Is that a place you rented or a place --
7 A. That was a place that I was renting. I was rooming
8   with an old college friend.
9 Q. Okay. Are there other addresses in the area that
10   you've lived at from time to time over the years?
11 A. Yeah. There was a place in Okanogan. I forget that
12   address. Then there's 706 Ridge Place in Omak.
13   Prior to that, I was in California. Prior to that,
14   I was in Spokane.
15 Q. Okay. How long did you live in Spokane?
16 A. A couple of years.
17 Q. Okay. From when to when approximately?
18 A. Off the top of my head, sir, I cannot recall
19   exactly. I think I came back around 2002 or so when
20   I was on the road for two years.
21 Q. You went "on the road for two years." What do you
22   mean by that?
23 A. I mean I was working a job where my territory was
24   from Tacoma to San Diego.
25 Q. Okay. What job was that?

2 (Pages 5 to 8)

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

| Page 17 |
|---|

1 those courses of study right after high school?
2 A. I think I took a year off. I started in '85.
3 Q. Okay. Did you go straight through?
4 A. Yes, sir.
5 Q. So you completed your --
6 A. Or actually, no. If you're asking if I took summer
7    courses there, no, I did not.
8 Q. Okay, thank you. So from approximately '85 until
9    '89, you were attending college at Spokane
10   Community?
11 A. '85 to '88.
12 Q. '85 to '88, okay. Have you gone back to school
13    since then?
14 A. The community college here.
15 Q. Here in Omak?
16 A. Uh-huh.
17 Q. That's a "yes"?
18 A. Yes.
19 Q. Did you complete a course of study?
20 A. I was one quarter short of my degree. But it was
21    good enough for me to get into sales, so --
22 Q. Okay. What was that course of study?
23 A. That was marketing and sales.
24 Q. Okay. And that would have been from what period of
25    time?

| Page 18 |
|---|

1 A. That would have been from '98 to 2000.
2 Q. Okay. But you did not receive a degree from that
3    course of study.
4 A. As I said, no.
5 Q. Okay. How about after that, did you go to college
6    again?
7 A. No.
8 Q. Okay. Have you taken any other courses just as a
9    matter of personal interest in any subject on any
10    topic --
11 A. No.
12 Q. -- at the community college or otherwise?
13 A. No. If I want to know something, I just read.
14 Q. Have you studied correspondence courses of any kind?
15 A. No.
16 Q. Okay. Do you hold a Washington driver's license?
17 A. Yes.
18 Q. Are you a registered voter?
19 A. Yes.
20 Q. Do you have any particular hobbies?
21 A. Lots.
22 Q. Do you hunt?
23 A. Yes.
24 Q. Okay. Other outdoor pursuits?
25 A. Hunt, fish, hike, 4-wheel drive, target shooting,

| Page 19 |
|---|

1 drove demolition derbies on and off for 20 years. I
2 mean --
3 Q. Ford or Chevy?
4 A. Actually nothing beats a Chrysler when you're
5    smacking it out. You need to find a track where
6    they're legal. Some drags ban the old Dodges. Last
7    car was a '63 Mercury Marauder with a breezeway rear
8    window in it.
9 Q. I have a family member that drives a Ford Fairlane.
10    That's why I asked.
11 A. GM has a full-spring suspension. They want to fold
12    down into the dirt.
13 Q. Are you a patron of the North Central Regional
14    Library District at this time?
15 A. I have a card, yes.
16 Q. Okay. What branches of NCRL -- If I may, I'm just
17    going to abbreviate to "NCRL" when I refer to the
18    North Central Regional Library District.
19 A. Uh-huh.
20 Q. What branches do you frequent of the NCRL?
21 A. Do you mean which ones do I visit or which ones do I
22    primarily visit when I visit the library?
23 Q. The latter.
24 A. Generally this one; occasionally, Okanogan.
25 Q. So Omak and Okanogan primarily?

| Page 20 |
|---|

1 A. Yes.
2 Q. Okay. How frequently do you come to those branches?
3 A. Not frequently but quarterly at least.
4 Q. Okay. So approximately once every three months?
5 A. Yeah, sometimes sooner.
6 Q. Okay.
7 A. It depends on what my needs are.
8 Q. Okay. When was the last time you came to the Omak
9    branch?
10 A. Last week.
11 Q. And what was your purpose just in general terms?
12 A. Just to use the Internet.
13 Q. Do you come to Omak for purposes other than using
14    the Internet?
15 A. Yeah. It's a good place to do research, find books.
16 Q. Okay. Do you take advantage of library resources
17    other than the Internet?
18 A. Like I said, a good place to find books, magazines.
19 Q. Okay. Do you use the inter-library loan system?
20 A. I think I have in the past, but that has been a long
21    time ago.
22 Q. Okay. Would your responses be the same for your
23    usage at the Okanogan branch?
24 A. Yes, sir.
25 Q. Have you been to any other branch at any time?

5 (Pages 17 to 20)

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

Page 21

1  A. Yes.
2  Q. Okay. Which branch?
3  A. Let's see, I've been to Okanogan, Omak and Oroville,
4     I think, are the only three NCRL branches that I can
5     even recall ever having visited.
6  Q. Is it fair to say that your visits to those branches
7     have been infrequent?
8  A. Very much so.
9  Q. Okay. Are you acquainted with library staff here at
10    Omak?
11 A. You know, it's a small town. I can't say that I
12    know any of them by name, but I think most of them
13    would probably know who I am.
14 Q. Okay. Same in Okanogan?
15 A. That's Lucy. I've probably known her or known of
16    her since birth. Again, small town.
17 Q. Okay. We're here at the Omak branch today, and it
18    sounds like this is the branch that you typically
19    use the most; is that correct?
20 A. Yeah, slightly. Sometimes I run down to Okanogan
21    because it's less busy.
22 Q. Okay. How does Okanogan compare to Omak just in
23    terms of its physical size?
24 A. It's probably about, oh, two-thirds the size, if
25    that, at a glance.

Page 22

1  Q. Okanogan is smaller than Omak?
2  A. Yes.
3  Q. Okay. How many computer terminals are at the Omak
4     branch?
5  A. There's two there.
6  Q. At the Omak branch?
7  A. Oh, the Omak branch, there's four. There's two in
8     Okanogan.
9  Q. Two in Okanogan and four in Omak?
10 A. Uh-huh.
11 Q. That's a "yes"?
12 A. Yes.
13 Q. Okay. And is there a printer in the proximity of
14    the computer terminals here in Omak?
15 A. That, I couldn't say off the top of my head.
16 Q. Okay.
17 A. I would assume so, but ...
18 Q. Okay. Have you ever used a printer in Omak?
19 A. No, sir.
20 Q. Okay. You've never printed anything off the
21    Internet?
22 A. No.
23 Q. Okay. How about in Okanogan?
24 A. No.
25 Q. When was the -- So you used the Omak Internet

Page 23

1     resources on your last visit to the library branch.
2  A. Yes.
3  Q. How long were you on?
4  A. I was only given a half hour block same as everybody
5     else.
6  Q. Okay. Were you able to access the Internet sites
7     that you wanted to access?
8  A. No.
9  Q. Okay. None of them?
10 A. Maybe two.
11 Q. Okay. What sites were you attempting to access?
12 A. Well, let's see, I got on my Yahoo! -- Okay, I
13    can't recall exactly which sites that I was trying
14    specifically to access at the time.
15 Q. When was this?
16 A. This was last week.
17 Q. Okay. Were you coming in for a particular purpose?
18 A. Well, yes.
19 Q. What was that purpose?
20 A. I had a list of sites to check against your --
21 Q. Were you working on an assignment given to
22    you by your counsel or experts --
23 A. Yes.
24 Q. -- obtained by counsel?
25 A. Yes.

Page 24

1  Q. So this was not -- Is it fair to say this is not a
2     personal project you were engaged in, that you were
3     working on assisting in the lawsuit?
4  A. But it was also a personal project --
5  Q. Okay.
6  A. -- in that I disagreed with your filtering policy.
7  Q. I'm sorry?
8  A. I said that it was also a personal project in that,
9     you know, I happen to disagree with your filtering
10    policy. So it's fair to say that I was doing both.
11 Q. Okay. You don't remember any of the sites that you
12    were --
13 A. There was like -- You're asking me to recall. If
14    you could let me access my Yahoo! account, I
15    could -- You know, I mean, I have the sites written
16    down. But off the top of my head at eight o'clock
17    in the morning following Stampede weekend, I cannot
18    recall off the top of my head.
19 Q. Okay. Do you have Internet access from your
20    parents' home?
21 A. Sporadically.
22 Q. Tell me why it's sporadic.
23 A. It's a 56K modem system that goes down quite
24    frequently.
25 Q. So it's not a broadband system?

6 (Pages 21 to 24)

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

Page 25

1   A. No, sir. And like I said, I do not always have
2      access to that system. I've only had access to that
3      system for about the last week.
4   Q. Okay. Do you have your own computer at your
5      parents' home?
6   A. No, sir.
7   Q. But your parents have a computer?
8   A. Yes, sir.
9   Q. Okay. Do you have access to a computer anywhere
10     else?
11  A. No, sir. There's like, what, a pay terminal at
12     PWN Cafe. It costs $5 an hour and they don't open
13     until I have to go to work so, no.
14  Q. When I say "a computer," I mean a computer with
15     Internet access.
16  A. No. I have no appreciable access to another system
17     at this time.
18  Q. Okay. How many hours per week would you estimate
19     that you spend on the Internet?
20  A. If I have access, you mean?
21  Q. Yes.
22  A. About ten.
23  Q. Okay. Has that usage pattern changed over time?
24  A. When I have access, it decreases -- when I don't
25     have access, it decreases dramatically.

Page 26

1   Q. Sure. Let's say access is not an issue. Let's say
2      your 56K modem works at your parents' house and you
3      don't have trouble. Let's assume that's the case.
4      How often do you spend on the Internet?
5   A. Like I said, about ten hours a week.
6   Q. And that usage frequency, that has been relatively
7      constant over time?
8   A. Yes, sir.
9   Q. Will you have Internet access at this next place
10     where you're planning to live if everything works
11     out?
12  A. I do not think so, but I can't say for sure. I
13     don't know.
14  Q. When you're using NCRL Internet resources, tell me
15     what your purposes are.
16  A. What do you mean?
17  Q. What are you trying to do on the Internet?
18  A. Same as everybody else. I'm trying to do research.
19     I'm trying to go where I want to go.
20  Q. Okay.
21  A. I'm trying to lawfully surf the Net on a library
22     terminal.
23  Q. Lawfully surf the Net?
24  A. Yeah. I'm not looking for any X-rated sites or
25     anything.

Page 27

1   Q. Okay. Well, I'm trying to understand if you're --
2      Are you trying to conduct research? Are you trying
3      to look at areas that interest you? Are you trying
4      to communicate with others?
5   A. All of the above.
6   Q. Okay. Anything else?
7   A. Let's see, if I want to check a profile that I've
8      got on a personal site, if I want to check my
9      MySpace, if I want to do research on some of the
10     firearms that I enjoy while I'm out in the woods,
11     you know, pursuing my sporting purposes -- all of
12     the above.
13  Q. Okay. Let's talk about your MySpace account. Tell
14     me what that account encompasses -- or, excuse me,
15     your home page on your MySpace account.
16  A. Same as everybody else. You're just putting a
17     little piece of yourself out there.
18  Q. So you're publishing a little bit about yourself.
19  A. Primarily, yes, just a little, tiny window on my
20     world.
21  Q. So it consists of things that you write and you put
22     onto your home page for others to read and respond
23     to.
24  A. It's not just writing. It's picture. It's music.
25     It's everything.

Page 28

1   Q. Okay. So you're interacting with other people.
2   A. Uh-huh, virtually. It's not interacting like you
3      and are, no.
4   Q. Of course, virtual interacting is what I mean. Is
5      that right?
6   A. Yes, sir.
7   Q. I'm sorry, I forgot to ask you this: have you been
8      involved in civil litigation of any kind previously
9      other than your divorce proceedings?
10  A. Not that I'm aware of, no.
11  Q. Okay.
12  A. I think there was an eviction that Chris had to go
13     to court on that I had to go to court on. But other
14     than that --
15  Q. Who's Chris?
16  A. That was my current wife, the one that we're -- the
17     one that I'm separated from.
18  Q. Okay.
19  A. I don't recall the details. That was some time ago.
20     I'm sure it's all a matter of public record.
21  Q. And any criminal proceedings that you've been
22     involved in?
23  A. None whatsoever.
24  Q. Okay. Do you have any siblings?
25  A. One brother.

7 (Pages 25 to 28)

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

Page 29

1  Q. Who is that?
2  A. His name's Jeffrey Karl.
3  Q. Where does Jeffrey live?
4  A. Tonasket.
5  Q. Older? Younger?
6  A. Two years younger.
7  Q. So you mentioned on your last visit to the Omak
8     branch to use the Internet you were not able to log
9     onto all of the Web sites that you wanted to log
10    onto.
11 A. Virtually none of them. I think only two out of
12    fifty came up.
13 Q. Did you bring that to the attention of staff?
14 A. At that time, no.
15 Q. Later?
16 A. No.
17 Q. Okay. Why not?
18 A. There was no point in it. Every time that I had
19    ever brought it to their attention, they said their
20    hands were tied, there was nothing they could do,
21    the policy all came out of Wenatchee.
22 Q. Have you ever filled out a --
23        MR. ADAMS: Just one second here.
24
25        (EXHIBIT 1 WAS MARKED.)

Page 30

1  Q. (By Mr. Adams) Have you ever filled out a Material
2     Selection Review Form?
3  A. I assume this is a copy of the form.
4        MR. ADAMS: Mark that Number 2x, please.
5
6        (EXHIBIT 2 WAS MARKED.)
7
8  Q. (By Mr. Adams) Mr. Heinlen, I'm showing you a
9     document that's marked as Number 2. Let me know
10    when you've had a chance to review it.
11 A. I've reviewed it.
12 Q. Okay. Have you seen this before?
13 A. I've never been presented with one of these at any
14    NCRL branch that I visited ever.
15 Q. Okay.
16 A. And even if I had -- Well, no, I haven't. I've
17    never seen one. I've never heard of them until
18    today.
19 Q. Okay. Are you aware of NCRL's policy on Internet
20    use and what to do in the event of a blocked site?
21 A. It was mentioned in the Wenatchee World once. It is
22    not posted anywhere on -- that I saw on these
23    terminals.
24 Q. Have you ever had a discussion with a librarian --
25 A. I asked if there was any way the filtering could be

Page 31

1     blocked -- or unblocked repeatedly; and every time,
2     they say, "No."
3  Q. Unblocking a filter is one thing. What about
4     gaining access to a particular site?
5  A. I would also personally take offense to the notion
6     of having to submit a site in advance.
7  Q. That's not my question. My question is, Did you
8     ever ask a librarian to gain access to a particular
9     site?
10 A. To one site, no.
11 Q. You never asked that question.
12 A. To the best of my recollection, I have not asked if
13    you can unblock a certain site. I asked once if
14    they could unblock a personal Web site for me. And
15    that was in 2004, and I got an answer in the
16    negative.
17 Q. Okay. And who gave you that answer?
18 A. I don't remember. It was a staff member here and
19    she was female and that was all I can recall at this
20    time. That was three or four years ago.
21 Q. What was the site?
22 A. I can't remember at this time. It was a personal
23    site that had a profile that -- I specifically
24    recall that much.
25 Q. I'm going to back up and take care of a housekeeping

Page 32

1     item. Let me show you what we've marked as
2     Exhibit 1. Have you seen this before? It's your
3     deposition notice. Have you seen this before?
4  A. I believe I have.
5  Q. Okay. So you're here today pursuant to the
6     deposition notice that was served on your counsel.
7     Is that true to the best of your knowledge?
8  A. Yes, sir.
9  Q. Just so I'm clear, you have never completed and
10    submitted a Material Selection Review Form --
11 A. No, sir.
12 Q. -- similar in form to Deposition Exhibit 2 to your
13    knowledge.
14 A. No, sir. I have submitted site review requests
15    through your filtering when the icon -- when that
16    comes up.
17 Q. Say that again.
18 A. When a site is blocked, it says, "You can submit a
19    site review request by clicking here." Now, I don't
20    know whether that goes to Mr. Marney or whether that
21    goes to their filtering company. I have done that a
22    couple of times and never once in the last four
23    years got a response.
24 Q. Okay.
25 A. Nor have I seen, you know, once I've submitted that

8 (Pages 29 to 32)

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

Page 33

1     that it unblocked to my knowledge.
2 Q.  Tell me about that. Does a window pop up when you
3     see a site? When you come to a site --
4 A.  That was under their older filter that said, "You
5     can submit a site review request by clicking here."
6     And that led to, I believe, a pop-up window that
7     said that, you know, you could write whatever you
8     wanted to write about that site like -- you know, if
9     I didn't think it was fair that I couldn't look up,
10     you know, one particular Web site, I could write a
11     short paragraph as to why and hit "Send." I do not
12     know whether that went to Mr. Marney or Mr. Howard
13     or straight to N2H2 that was running Bess at the
14     time or anything like that. I know that I did that
15     on a couple of occasions, four or five at least.
16 Q.  Okay.
17 A.  You know, I provided my e-mail address, and not once
18     did I ever get a response from either them or N2H2.
19 Q.  Okay. Has the system changed with the change in
20     filtering software here at the library?
21 A.  They went from Bess to this new one that they've
22     got, Fortinet.
23 Q.  Right. Has the system changed? Do you still get
24     that pop-up window?
25 A.  I'm trying to recall. Like I said, it's early and

Page 34

1     I'm not a hundred percent on that.
2 Q.  Okay.
3 A.  I believe you can submit a site review request, but
4     I couldn't swear to that right now.
5 Q.  Are you aware whether Fortinet itself provides a
6     mechanism for you to challenge its classification of
7     a particular URL without ever going to the library?
8 A.  Like I just explained, I think so but I'm not a
9     hundred percent so I'm not comfortable answering
10     that one.
11 Q.  Do you recall ever having used such a mechanism
12     through Fortinet?
13 A.  On Fortinet? To the best of my recollection, no.
14 Q.  Are you familiar with NCRL's Internet Public Use
15     Policy?
16 A.  I've read it a couple of times.
17           MR. ADAMS: Mark that, please.
18
19           (EXHIBIT 3 WAS MARKED.)
20
21 Q.  (By Mr. Adams) Mr. Heinlen, I've just handed you a
22     one-page document that we've marked as Deposition
23     Exhibit 3. But go ahead and take a look at that, if
24     you would, please, and let me know when you've had a
25     chance to review it.

Page 35

1 A.  Okay.
2 Q.  Have you read this before?
3 A.  It is posted here to the left of or in between their
4     terminals, I believe.
5 Q.  Okay.
6 A.  And I think this is also the one that comes up on
7     the screen before you log in or something to this
8     effect.
9 Q.  Okay.
10 A.  But I have seen this page before. It's also on
11     their Web site, I believe.
12 Q.  Have you ever spoken to NCRL personnel about this
13     policy?
14 A.  Shortly after US v. ALA, I had e-mailed Mr. Howard
15     back and forth on this.
16 Q.  On the Internet policy?
17 A.  On the Internet policy, you know, pursuant to that
18     ruling.
19 Q.  Okay. What, in particular, did you say --
20 A.  I took particular offense to the notion that they
21     would not unblock filters.
22           MR. MANVILLE: Let him finish asking the
23     questions.
24           THE WITNESS: Oh, I'm sorry.
25           MR. MANVILLE: It makes for a cleaner

Page 36

1     record.
2           THE WITNESS: My apologies.
3 Q.  (By Mr. Adams) No apology necessary. So you say
4     you took particular offense to the NCRL's policy
5     pursuant to which it would not completely unblock
6     their filter; is that correct?
7 A.  Yes, sir.
8 Q.  Okay. Is it not sufficient in your mind that NCRL
9     will undertake a review on a site-by-site basis of a
10     particular blocked URL?
11 A.  I feel that that is unnecessarily intrusive on my
12     privacy that I should have to submit sites in
13     advance. It's also disruptive that I could not just
14     surf the Internet at my own pace and have to submit
15     a site review request for everything that was
16     blocked and come back a day or three later after
17     they made their decision to get to a particular
18     site. It's disruptive.
19 Q.  What did you say, that it takes a day or three?
20 A.  I said that it possibly could. By the time it gets
21     from here to Wenatchee and back when you're only
22     allotted a one half-hour block of time, you know, I
23     do not see where they could feasibly review every
24     site request that you would think would be coming at
25     them and give you a decision before your time runs

SCOVILLE COURT REPORTING
(509) 884-1712

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

Page 37

1    out on this terminal here.
2    Q. You've never tried it though; right?
3    A. At this point, no. And I also feel that it's, you
4      know, intrusive on my privacy.
5    Q. But, again, you've never tried it.
6    A. No, sir, I have never tried it.
7    Q. Okay. So you don't know how well the procedure
8      works or not, do you?
9    A. As I said, I was uncomfortable submitting in advance
10     the sites that I wanted to see.
11   Q. I understand. But you've never tried it, have you?
12        MR. MANVILLE: Objection, it's been asked
13     and answered.
14        THE WITNESS: No, sir.
15   Q. (By Mr. Adams) So you don't know how long it takes
16     to get an answer back, do you?
17   A. Well, I guess that would be a no.
18   Q. In instances where you've encountered a blocked
19     site, Mr. Heinlen, how do you know that the blockage
20     is not occurring because of some technological
21     issue --
22   A. Because of --
23   Q. -- as opposed to a functioning of the filtering
24     software?
25   A. If it's a filter violation, it comes up "Blocked."

Page 38

1      And under a specific category more often than not,
2    some sites come up and just say "Blocked." Most of
3    them will say "Blocked" and then give a category.
4    Q. Okay. So is it your position that as a patron of
5      the NCRL library that you're entitled to completely
6      unfiltered access to the Internet?
7    A. Yes, sir.
8    Q. Would that include categories of speech that are not
9      entitled to Constitutional protection?
10   A. Such as?
11   Q. Pornography.
12   A. As I said earlier, I was not surfing for porn.
13   Q. Okay. I realize you said that you weren't surfing
14     for it, but do you think that you're entitled to
15     access to it?
16        MR. MANVILLE: Objection to the extent it
17     calls for a legal conclusion.
18        THE WITNESS: Do I think that NCRL
19     patrons should be able to look up materials that
20     some people would consider pornographic?
21   Q. (By Mr. Adams) Sure. Answer that question.
22   A. It's a relative term. I mean, what one man would
23     consider pornographic, another man certainly
24     wouldn't, so ...
25   Q. That isn't the question. The question is access.

Page 39

1    A. I believe that NCRL patrons should have completely
2      unfiltered access. That's my answer.
3    Q. Okay. So do you believe NCRL is entitled to filter
4      Internet access to exclude pornographic content?
5    A. Could you repeat that?
6
7        (THE FOLLOW RECORD WAS READ:
8
9        "Q Okay. So do you believe NCRL is
10         entitled to filter Internet access to
11         exclude pornographic content?")
12
13        MR. MANVILLE: Object to the form of the
14     question.
15   Q. (By Mr. Adams) You can answer.
16   A. I do object to the form of the question. I mean, I
17     said I believe the patrons are -- adult patrons as
18     defined in US v. ALA are entitled to unfiltered
19     access. Okay, that includes all categories.
20   Q. Okay. Is it your position that your rights under
21     the United States Constitution and the Constitution
22     of the State of Washington pertaining to free
23     expression are impaired or breached or somehow
24     compromised by your inability to access pornography?
25        MR. MANVILLE: Object to the form of the

Page 40

1      question.
2        THE WITNESS: I believe that my rights
3      are infringed under the constitutions of the United
4      States and of the State of Washington when I'm
5      denied my ability to seek information on a public
6      library terminal. I believe that that is an
7      infringement of my civil liberties.
8    Q. (By Mr. Adams) Okay. Would you agree that
9      libraries make content-based decisions all the time?
10   A. I would agree that they make content-based decisions
11     based on limited space availability for, like, books
12     and magazines; however, the Internet presents the
13     opposite problem. I mean, it's totally different.
14     There's no shelf space limitation when it comes to
15     Internet access.
16   Q. Let's say the Internet is not installed at this Omak
17     branch and you came in and asked the library to
18     obtain a pornographic book. Would you feel that
19     they have a right to provide that book to you?
20   A. That goes to a shelf space limitation. Their board
21     of directors would make decisions on what they will
22     and will not stock based on the cubic footage
23     available inside their building. I would agree that
24     Okanogan could not, therefore, stock nearly as many
25     books as Omak which can stock less books, I would

10 (Pages 37 to 40)

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

Page 53

1    the request of adults who wish to access
2    Constitutionally-protected speech, disable Internet
3    filters on its publicly-available computer
4    terminals." Do you see where I'm reading?
5    A. Yes, sir.
6    Q. Okay. Does that accurately describe your claim?
7    A. Yes, sir.
8    Q. Does your claim go beyond that?
9    A. How would you define going "beyond that"?
10   Q. I'm focusing on the phrase
11   "Constitutionally-protected speech."
12   A. Which as I've said is a relative term, and since I'm
13   not a member of the legal profession, one that I'm
14   really not qualified to define. But I would say the
15   first sentence is accurate.
16   Q. You would?
17   A. Uh-huh.
18   Q. That's "yes"?
19   A. Yes, to the best of my knowledge.
20   Q. That's fine. Just so I'm clear, Mr. Heinlen -- and
21   I don't mean to belabor the point -- will you agree
22   with me or do you disagree with me that there
23   are -- that there is Constitutionally-protected
24   speech and there is speech that is not
25   Constitutionally protected?

Page 54

1          MR. MANVILLE: Object to the form.
2          THE WITNESS: Let's split a very fine
3    hair. As I said, having -- myself being an
4    equipment operator, I don't feel qualified to
5    interpret the Constitution. I was -- That's where
6    I stand on that.
7    Q. (By Mr. Adams) Well, that's fine. And I wouldn't
8    expect you to interpret the Constitution as we sit
9    here in your deposition today. What I'm getting at,
10   however, is the adjective
11   "Constitutionally-protected" that precedes the word
12   "speech." Does that define speech -- a subset of
13   speech that you're suing about?
14   A. I believe that the courts have typically only
15   restricted speech in the most narrow of instances.
16
17          (A BRIEF RECESS WAS TAKEN.)
18
19   Q. (By Mr. Adams) Mr. Heinlen, based on your previous
20   testimony, I'm fairly clear in your position that
21   you believe NCRL's library branches should provide
22   adult patrons with completely unfiltered access to
23   the Internet. Am I correct in that regard?
24   A. I said that I believe that they should disable the
25   filters for adults upon request, yes.

Page 55

1    Q. Okay. And in your view, a site-by-site review
2    process is inadequate; is that correct?
3    A. Not only is it inadequate, but it's been my
4    contention that it is invasive.
5    Q. Okay. But you've never invoked the procedure here
6    at NCRL to test that; is that correct?
7    A. You know, I've never in all the times I've come here
8    once been presented with the first exhibit -- or
9    Exhibit 2 that you showed me, this sheet.
10   (Indicating)
11   Q. Okay. But have you attempted to gain access to a
12   particular site by any other means?
13   A. No. I mean, I could have cheated and set up a proxy
14   server, I suppose, if I wanted to, but I haven't
15   done that.
16   Q. What's a proxy server?
17   A. Something a kid told me about to get around the
18   filtering.
19   Q. How does it work?
20   A. I'm not sure.
21   Q. A kid told you about it. How old is the kid?
22   A. A teenager.
23   Q. Okay. And what'd the kid tell you?
24   A. I don't recall. It was years ago. He said, "You
25   could set up a proxy server and get around it

Page 56

1    perhaps." That's all I remember from that. I don't
2    remember who. I don't remember when. I don't
3    remember what was said. I just remember that that
4    was passed on to me once by somebody that appeared
5    to be a 17-year-old male.
6    Q. And the sum and substance of that conversation was,
7    This is the way to get around the filter?
8    A. He said, "If you really want to get around it, set
9    up a proxy server." And that was it. I never
10   pursued that.
11   Q. What dangers or risks might be posed by unfiltered
12   access, if any, in your opinion?
13   A. None in my opinion.
14   Q. How about library staff?
15   A. How could that be a risk to them?
16   Q. Well, let's just assume it created a hostile
17   environment. Let's say a patron wanted to view
18   something inappropriate, illegal, offensive,
19   pornographic on the Internet. Would that present a
20   problem for library staff?
21   A. As I said earlier, what's, quote unquote,
22   "offensive" or, quote unquote, "pornographic" is
23   relative. So I suppose it would depend on how
24   sensitive a staff member might be, and that's
25   different for everybody.

14 (Pages 53 to 56)

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

Page 61

1  First Interrogatories and Requests for Production."
2  Take a look at this and generally familiarize
3  yourself with it if you would, please.
4  A. Have I ever seen this?
5      MR. MANVILLE: No.
6  I'll state for the record that any
7  information that was provided here is based on
8  information that was provided to us by Mr. Heinlen
9  but he has not had an opportunity to actually review
10  this document as of yet, and I brought a copy with
11  me today for him to review and sign so when he
12  approves of it.
13      THE WITNESS: Yeah, I have not seen this
14  before. This is like, what, ten pages?
15  Q. (By Mr. Adams) Right.
16  A. So do you want me to sit here and read the whole
17  thing?
18  Q. I guess I do, yes, unless we're going to reconvene
19  your deposition.
20  A. No, I don't want to reconvene it. Can I have a
21  moment with Mr. Manville --
22  Q. Of course.
23  A. -- since there is no question pending?
24  Q. Yes.
25

Page 62

1      (A BRIEF RECESS WAS TAKEN.)
2
3  Q. (By Mr. Adams) Mr. Heinlen, have you had a chance
4  to review your Answers and Objections to
5  Interrogatories and Requests for Production as set
6  forth on Exhibit 7?
7  A. Yes, sir.
8  Q. Okay. Do you have any changes that you wish to
9  make?
10  A. None that I can see, no.
11  Q. Okay. There's a signature page on the last page,
12  page 16 of Exhibit 7. Do you see that?
13  A. Yes, sir.
14  Q. Okay. May I ask you to supply your signature to
15  that if you're prepared to certify under penalty of
16  perjury as the declaration sets forth?
17  A. Okay, here you go. (Witness complying)
18      MR. ADAMS: Is that all right with you,
19  Duncan?
20      MR. MANVILLE: That's fine.
21      THE WITNESS: Where do you want me to put
22  for "executed at"?
23      MR. MANVILLE: "Omak" and the date.
24      THE WITNESS: What is today's date, the
25  13th?

Page 63

1      MR. MANVILLE: The 13th, yes, that's
2  right.
3      THE WITNESS: (Witness complying)
4      Do you need this back?
5  Q. (By Mr. Adams) Now, you can go ahead and keep that
6  in front of you if you would, please. Flip to
7  pages 4 and 5, in particular your response to
8  Interrogatory Number 5, Mr. Heinlen. It begins on
9  page 5.
10      MR. MANVILLE: At the bottom.
11      THE WITNESS: Oh, okay.
12      Yes, sir, page 5.
13  Q. (By Mr. Adams) Okay. Interrogatory Number 5, in
14  essence, asks you to identify the URL addresses for
15  the Web sites for which you claim you were denied
16  access --
17  A. Uh-huh.
18  Q. -- in whole or in part.
19  A. Uh-huh.
20  Q. And you indicate in your answer that you don't have
21  a full list of access -- or, excuse me, a full list
22  of the Web sites to which you've been denied access,
23  but you do provide a number of sites to which you
24  have been denied access.
25  A. Yes, sir.

Page 64

1  Q. And those sites are listed on pages 5, 6, 7 and part
2  of 8; is that correct?
3  A. Well, 5, 6, 7 and part of 8, yeah, that's correct.
4  Q. Okay. Now am I correct in understanding then that
5  all of these are URL addresses to Web sites that you
6  tried to access and could not through the NCRL
7  computers?
8  A. Yes, sir, some of these sites were blocked under
9  Bess, some were blocked under Fortinet, and those
10  were sites that I had tried to access.
11  Q. Okay. Now, sites that were blocked under Bess,
12  which is the prior filtering service --
13  A. Uh-huh.
14  Q. -- the service that preceded Fortinet?
15  A. Uh-huh.
16  Q. Is that "yes"?
17  A. Yes.
18  Q. Okay. Now, do you know whether those sites would
19  still be blocked under Fortinet?
20  A. I believe that some of them are and some of them
21  aren't. I know that I could get into "buckknives"
22  and I think "winchester" and "savage" now. But I
23  know all the personal sites and "moderndrunkard" and
24  "rotten.com" and all that are still blocked. I'm
25  not sure about "trojancondoms" -- I don't think I've

16  (Pages 61 to 64)

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

Page 65

1    subsequently rechecked on Fortinet, but I can't
2    swear to that.
3  Q.  Okay.  Would you do me a favor and go through the
4    list of Web sites that you know you now have access
5    to because of the Fortinet -- the updated Fortinet
6    service.
7  A.  I know that they had subsequently unblocked, I
8    think, most of the sites that were mentioned in the
9    Wenatchee World article.  So "savage" would be
10   allowed.  "Winchester" and "buckknives" would be
11   allowed --
12 Q.  Tell you what, just put an asterisk or check mark
13   next to the sites that are no longer an issue
14   because of the new filtering service.
15 A.  The ones that I can swear to.  I'll put a question
16   mark next to the ones that I think probably could be
17   but can't swear to.  How's that?
18 Q.  If you would, just verbally tell me which sites that
19   you're marking with one mark or another so that I
20   can follow along --
21 A.  Okay, just putting a slash next to the two or three
22   that I know to be unblocked now or, you know, very
23   much believe to be unblocked now.  And that would be
24   "keepandbeararms.com" and "buckknives.com."  I'm
25   putting a question mark next to winchesterguns.com

Page 66

1    and "savagearms.com" since I think they're unblocked
2    but can't swear to it.  I'm putting a question mark
3    next to "trojan" because I think that's unblocked,
4    but I can't quite swear to it.  Couldn't say "yes"
5    in good conscience.
6        That's it that I can say in good conscience
7    are unblocked and the two that I think are probably
8    unblocked and that's it out of this whole list.
9    Everything else I recognize I would honestly believe
10   to be blocked under Fortinet as of now -- or as of
11   the last time I was in here.
12 Q.  Would you characterize any of the Web sites on this
13   list as pornographic in nature?
14 A.  No.  I mean, a lot of them are study sites.  You
15   know, like "paperaircraft.org" was blocked under
16   porn.  That's a study site.  "Texorcist" was
17   religious in nature.  "Moderndrunkardmagazine" is
18   a -- actually has oddly enough some very great
19   remixes and some pretty good literary work on some
20   very famous people.
21 Q.  What about "www.porno.com"?
22 A.  Well, that would be fairly obvious.  I mean, I was
23   just kind of testing the waters with that one.
24 Q.  "That would be fairly obvious" what?
25 A.  I believe that to be, you know, an X-rated site.

Page 67

1  Q.  Are there any other obviously X-rated sites in your
2    estimation?
3  A.  No.  I mean, no.  I think I saw "topashot" once in a
4    great while on "ehowa.com" and "beerandshots.com" --
5    on those two or "woopass" and "beerandshots," but
6    those are just games.
7  Q.  In your estimation, are any of these Web sites
8    inappropriate for viewing by minors?
9  A.  That's parental responsibility not mine.
10 Q.  So is your answer "no" as far as the library is
11   concerned?
12 A.  As far as the library is concerned, my answer is
13   "no."
14 Q.  What is "www.swojo.com," s-w-o-j-o?
15 A.  Let's see, I've only been in that a couple of times.
16   It's really --  I know that that -- I do not believe
17   that one to have any nudity on it at all.
18 Q.  What is that Web site?
19 A.  Like I said, off the top of my head, I cannot quite
20   recall.  There were a lot of sites that I visited,
21   you know, once or twice and that was it.  I visited
22   probably thousands of Web sites in my life.
23 Q.  Okay.  But you recall these because you put them in
24   your interrogatory answer.
25 A.  I put them in my interrogatory answer.  I do

Page 68

1    remember I tried to access "swojo."  It's just that
2    there are a lot of sites in here, and I cannot
3    remember the specific nature of each of them
4    immediately upon mention of it.
5  Q.  Were the Web sites listed in your answer to
6    Interrogatory Number 5 Web sites that you wanted to
7    view as a matter of personal interest or for some
8    other purpose?
9  A.  By and large, most of them were.  I think there were
10   only a couple that were sent to me from other people
11   to check.
12 Q.  As part of this litigation?
13 A.  As part of this litigation and, you know, sometimes
14   I would hear somebody on the street say, "I can't
15   even get to this site.
16       "Oh, what site?"
17       And I just kind of -- if I happened to recall
18   it when I came in on a terminal, I'd checked it.  I
19   mean, there were co-workers and, you know, people
20   that knew I was involved in this that said, "You
21   know, I couldn't even go there."  So ...
22 Q.  Give me an example of that.
23 A.  I can't give you a specific.  It was usually just if
24   I was at an Internet cafe.  You know, "Oh, why are
25   you here paying five bucks an hour?"

17  (Pages 65 to 68)

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

Page 69

1    "Oh, well, you know, this is the only
2 unfiltered access I can get today.
3    "Oh, the library, they wouldn't let me go
4 here."
5    Again, I can't give you any names or anything
6 because I can't recall honestly.  I would if I
7 could.
8 Q.  Have you read the reports furnished by the expert
9    witnesses on behalf of the plaintiffs?
10 A.  As of this time to the best of my recollection, not
11    yet.
12 Q.  Okay.  Do you know who the experts are?
13 A.  Again, if they were ever mentioned any by name, I
14    cannot recall, so I would have to answer no.
15 Q.  Did you perform any work, undertake any activity in
16    support of an opinion expressed by an expert witness
17    designated by the plaintiffs in this case?
18 A.  Ummm, specifically what do you mean by that?
19 Q.  Did you perform any work to assist an expert in
20    reaching an opinion that has been expressed in the
21    expert's report?
22 A.  To reach a conclusion that somebody else has drawn,
23    I would have to say I don't think so.  If you're
24    asking whether or not I checked a Web site at the
25    behest of an expert, then I would have to say yes.

Page 70

1 Q.  Okay.  Which expert?
2 A.  Again, as I stated previously, if I ever knew these
3    people by name, I could not recall.  I do not think
4    that I have.
5 Q.  Okay.  Which Web sites were you asked to check at
6    the behest of an expert?
7 A.  As I stated towards the beginning of these
8    proceedings, there were several.  I have them cashed
9    on my Yahoo! account.  But, you know, you're talking
10    about a couple hundred Web sites potentially.  I
11    couldn't be expected to recall them off the top of
12    my head.
13 Q.  Are any of these Web sites in your -- included in
14    your answer to Number 5?
15 A.  It would be very few.  Like I said, most of these I
16    think were mine.  But "imesh.com," I believe -- the
17    "imesh.com," I believe -- You are asking for
18    specifics; right?  I'm not volunteering this?
19 Q.  Correct.
20 A.  Okay, just so we're clear on that.  I think the
21    "freepapers.net" was one,
22    "americanmortgageandrealty.com, angelcrack.com" the
23    "chavda.com, clinicaldentalmiranda.com,
24    fuckthepolice.com, lonecarrot.com."  The one right
25    below "lonecarrot," I'm not going to even attempt to

Page 71

1 pronounce this early in the morning.  It's spelled
2 m-a-n-g-a-l-a-m-i-n-f-o-t-e-c-h ".com."  And the two
3 below that, "markrudd.com" and "miraclealley.com,
4 paybycell.com, squartier.com, sydneypalmbeach.com,
5 webmaxtemplates.com, 10jigi.org,
6 alfredvogelgrandprix.org, atomichamster.org -- that
7 one looked so interesting that I went to my own
8 computer and looked it up -- "castle-walls.org,
9 columbus-amsterdam-bid.org, cscstl.org,
10 dabarworship.org, eatseafood.org,
11 faithchurchofdavis.org, familiesforfreedom.org,
12 financingbeginnings.org, healthdirectedriding.org,
13 jastar.org" -- oh, no, "iastar.org" -- my mistake --
14 "iconmaker.org, idresearch.org, jeanne-garnier.org,
15 kindnessusa.org, kindstot.org, lamberth.org,
16 lagator.org, lphu.org, menesak.org,
17 milgramreenactment.org, myscienceproject.org,
18 newsongsd.org, offer.org, and ordomag.org."  And if
19 I remember right, every single one of those sites
20 was blocked.
21 Q.  How about on page 8?  The list continues.
22 A.  Oh, my apologies.  "Orctu.org, paperaircraft.org" --
23    Well, actually pretty much everything on page 8.
24    Let's just say that.  That would be easier than
25    trying to pronounce some of this stuff this morning.

Page 72

1 Q.  And, again, each of those sites were sites that you
2    were asked to check?
3 A.  Yes, sir.
4    MR. MANVILLE:  Tom, can I clarify
5 something in regards to the sites that Mr. Heinlen
6 was asked to check?  And if you don't want me to do
7 that, I'm happy to just let him testify based on his
8 recollection.
9    MR. ADAMS:  Go ahead.
10    MR. MANVILLE:  If you go to page 6,
11 everything after "411broadband.com" from there on
12 out, those are sites that he was asked to checked.
13 And I believe those are all sites that are listed in
14 Bennett Haselton's report.
15    MR. ADAMS:  After "411broadband"?
16    MR. MANVILLE:  Yeah, ".com."  And
17 Mr. Heinlen obviously is remembering some of the
18 specific sites that he looked at.  But everything
19 from there on out to page 8 he was asked to check.
20 Some of the sites on page 5 and on to page 6, he was
21 also asked to look at, at various times.  I don't
22 remember exactly which ones they were, but they're
23 more toward the bottom of page 5 and then on to
24 page 6.
25    THE WITNESS:  I do believe that most of

18  (Pages 69 to 72)

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

## Page 73

1  page 5, at least, was almost all mine.
2       MR. MANVILLE: I think a substantial
3  portion of it is yours. That's right.
4       So I don't usually like to jump in, but I
5  thought that might be helpful.
6       MR. ADAMS: It is helpful.
7  Q. (By Mr. Adams) Most of what is on page 5 are your
8  own sites?
9  A. Yes, sir.
10 Q. Does that include "www.porno.com"?
11 A. That one, I'm not sure -- I do not think that
12 "porno.com" was one of my own.
13 Q. How about "whitehouse.com"?
14 A. "Whitehouse.com," I think, actually was --
15 Q. How about "playboy"?
16 A. -- when I was first exploring the filter.
17 "Playboy," I was a subscriber for years. Naturally
18 I would have clicked on that just when I was seeing
19 that everything was blocked.
20 Q. Sure. How about "eharmony.com"?
21 A. That was one of mine.
22 Q. Okay. I think I understood you mention a moment ago
23 when you were responding to a prior question that
24 "atomichamster.org" was interesting enough to you
25 that you went home and --

## Page 74

1  A. I went and looked at it, yeah.
2  Q. On your home computer?
3  A. I don't recall the specifics on it, but I know that
4  it -- I do not believe that would be pornographic in
5  the least. I just thought that the name of it was
6  interesting enough that when I did get to another
7  computer I had to type that one in.
8  Q. Okay. And I think you said that you looked at that
9  at home.
10 A. I did, but that was during a time when I had access
11 outside the library. And as I've stated earlier,
12 that is sporadic.
13 Q. Got it. Any of the other sites included in your
14 answer to Interrogatory Number 5 which you say you
15 were blocked at the library, have you been able to
16 get access to them on your computer?
17 A. Well, since the library is blocked, I would assume
18 that if I'm on my own system or on a private system
19 that I could get access easily enough to any of
20 these sites outside the library.
21 Q. Got it. Flip to page 9 if you would, Mr. Heinlen.
22 I'm looking in particular at your answer to
23 Interrogatory Number 9 where you're describing what
24 efforts you made to bring concerns about blocked
25 sites to the attention of NCRL personnel.

## Page 75

1  A. Uh-huh.
2  Q. And you indicate in your final sentence that you
3  "spoke with and/or corresponded with NCRL
4  administrators Dean Marney and Dan Howard." Do you
5  see that?
6  A. About one or two -- Yes.
7  Q. Okay. Have you provided your counsel to provide to
8  me all correspondence in your possession?
9  A. Everything that I had. As I had stated earlier,
10 however, in several subsequent moves, there is one
11 blue plastic folder that I have that may yet have
12 some things in it that I have not through every
13 honest effort that I have made been able to locate.
14 Q. All right. If you do find it, you'll turn it over
15 to your lawyer?
16 A. The second I do, Duncan will get it.
17 Q. Okay. What is in there that you can recall?
18 A. That I can recall, I think it would have been --
19 there was a copy of the Wenatchee World article when
20 shortly after the US v. ALA ruling came out and
21 their board of directors decided that they weren't
22 going to unblock for adults. There was that. There
23 was one letter from Director Marney, and I believe
24 one or two actual letters from Assistant Director
25 Howard. I think that would be about all that was

## Page 76

1  contained in there. A couple of Freedom of
2  Information Act requests, I recall, minutes from the
3  meeting where they decided against unblocking the
4  filter for adults. I believe that is what is in
5  that file.
6  Q. Have you ever attended a public meeting of the
7  trustees of the NCRL?
8  A. They have them, I think, one Thursday a month at
9  one o'clock in the afternoon in Wenatchee. That is
10 very prohibitive for a working man like myself to
11 get to.
12 Q. So you have not attended a meeting.
13 A. It's not feasible for me to do so, no.
14 Q. Putting aside the correspondence, what can you tell
15 me about your recollection of conversations with
16 either Mr. Marney --
17 A. I've never actually talked to them on the phone. I
18 wanted everything in writing, so it was all e-mail
19 letters --
20 Q. Okay. So when --
21 A. -- to the best of my recollection.
22 Q. I'm sorry, go ahead.
23 A. Oh, no, to the best of my recollection, it was
24 generally via e-mail, and you have the bulk of it
25 right in front of you.

209

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

Page 77

1      MR. MANVILLE: Let him finish his --
2      THE WITNESS: Oh, sorry.
3  Q. (By Mr. Adams) No problem.
4      So in the last sentence of your interrogatory
5  answer -- answer to Interrogatory Number 9 where you
6  said, "Mr. Heinlen also spoke with and/or
7  corresponded with NCRL administrators," in fact, you
8  don't recall any conversations; is that right?
9  A. I think the "or" covers that.
10 Q. I'm just clarifying.
11 A. Yeah. I do not recall actually picking up the
12 phone. I may or may not have at one point, but I do
13 not recall.
14 Q. Okay. Do you recall conversations with anyone else
15 affiliated with NCRL administration on the subject
16 of Internet filtering?
17 A. I asked a couple of librarians, and they just said
18 they couldn't do it, basically that they were just
19 following orders and that the policy came out of
20 Wenatchee.
21 Q. Okay. In your response to Interrogatory Number 10,
22 you make reference to a conversation with a
23 gentleman named "Ray Mendiola" in New Jersey. Do
24 you see that?
25 A. I remember actually speaking with Mr. Mendiola over

Page 78

1  the phone on about two occasions, I think.
2  Q. Okay. What'd you tell Mr. Mendiola and what did he
3  say in response?
4  A. Well, he was the USAC investigator, and he told me
5  that he had sent a questionnaire to Director Marney
6  on everything regarding the filtering policy. I do
7  not remember -- I believe -- yeah, I believe
8  October 2004 sounds correct. He was a very fast
9  talker, a little hard to understand. He seemed
10 slightly incredulous of their policy himself that
11 they were receiving "e-rate" funds and not
12 unblocking the filters. And he had never heard of
13 that from another library in the country.
14 Q. Was anyone else a part of that conversation?
15 A. Not on my end. He could have had me on speaker in
16 New Jersey.
17 Q. Did you exchange correspondence with Mr. Mendiola?
18 A. As far as letters and e-mail, not that I recall.
19 And I cashed every e-mail that I had ever gotten in
20 this matter in a separate folder in my Yahoo!
21 account, and I saw nothing from him there.
22 Q. Any e-mail pertaining to NCRL Internet filtering and
23 your views about it, would that be contained in your
24 Hotmail account?
25 A. I said, "Yahoo!"

Page 79

1  Q. I'm sorry.
2  A. Yeah. I did my best to save everything that I had
3  in a separately labeled folder in my Yahoo! Account.
4  Q. Okay. And you've made all that available to your
5  lawyer for production in this case?
6  A. Yes. And a lot of that was privileged
7  correspondence with Mr. Manville.
8  Q. I understand.
9      MR. ADAMS: Do we have a log of that?
10     MR. MANVILLE: I don't believe you do.
11 We'll get one to you. But I don't think there's
12 going to be anything in it other than just
13 communications with us.
14 Q. (By Mr. Adams) You wrote an article for
15 "upsidedownworld.org"; is that right?
16 A. That was some time ago, yes, sir. Mr. Daniels was
17 gracious enough to publish it.
18
19      (EXHIBIT 8 WAS MARKED.)
20
21 Q. (By Mr. Adams) Mr. Heinlen, I've handed you a
22 four-page document that we've marked as Deposition
23 Exhibit 8 entitled "Censorship at the Local
24 Library." Take a look at that if you would, please.
25 A. Okay -- or, I mean, yes.

Page 80

1  Q. Do you want a little more time?
2  A. Yeah, I'll take a couple of minutes.
3      My writing style has improved quite a bit.
4  Q. (By Mr. Adams) Have you had a chance to review this
5  document?
6  A. Yes, I have. I read the whole thing.
7      MR. ADAMS: Off the record for a second.
8
9      (A DISCUSSION WAS HELD OFF THE RECORD.)
10
11 Q. (By Mr. Adams) Okay. Let's go back on the record.
12 Referring to Exhibit 8, Mr. Heinlen, did you write
13 this article?
14 A. I have to claim I did, yes, sir.
15 Q. Okay. And did you write it in approximately July of
16 2004?
17 A. That sounds about right.
18 Q. Okay. Why did you write this? Was it solicited?
19 Did somebody come to you or did you offer to write
20 it?
21 A. No, I was just -- Like I said, I just wrote it
22 because I felt it needed to be written.
23 Q. Okay. Have you published anything on this
24 particular Web site before or after?
25 A. No, sir. That was the only time I've ever been

20  (Pages 77 to 80)

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

Page 105

1   IN RE: SARAH BRADBURN vs. NORTH CENTRAL REGIONAL LIBRARY
    NO. CV-06-327-EFS

2

3           CORRECTION SHEET

4   CHANGES IN FORM AND SUBSTANCE REQUESTED BE MADE IN THE
    FOREGOING ORAL EXAMINATION TRANSCRIPT:

5

    PAGE   LINE                CORRECTION AND REASON

6

7

8

9

10

11

12

13

14

15

16

17  I hereby certify that this is a true and correct copy of my
    testimony, with the exception of the corrections noted above.

18

19           CHARLES MERLE HEINLEN
             Date

20

21           Notary Public in and for the state
             of Washington residing at

22           Subscribed and sworn to before me on
             this      day of        , 2007.

23           My commission expires on          .

24

    See:  Wash. Reports 34A, Rule 30 (e)

25  USCA 28, Rule 30 (e)

Page 106

1           C E R T I F I C A T E

2   STATE OF WASHINGTON)
             ) ss.

3   COUNTY OF CHELAN   )

4

5           THIS IS TO CERTIFY that I, Barbara J. Scoville,

6   Notary Public in and for the State of Washington, residing

7   at Entiat, reported the within and foregoing testimony; said

8   testimony being taken before me as a Notary Public on the

9   date herein set forth; that the witness was first by me duly

10  sworn; that said examination was taken by me in shorthand

11  and thereafter under my supervision transcribed, and that

12  same is a full, true and correct record of the testimony of

13  said witness, including all questions, answers and

14  objections, if any, of counsel, to the best of my ability.

15      I further certify that I am not a relative, employee,

16  attorney, counsel of any of the parties; nor am I

17  financially interested in the outcome of the cause.

18      Transcribed notes will be destroyed three years from

19  the affixed date unless requested by counsel to retain them.

20      IN WITNESS WHEREOF, I have hereunto set my hand and

21  affixed my official seal this _____ day of

22  _____, 2007.

23

24           Barbara J. Scoville, CCR, RPR
             CCR NO. 2124

25

SCOVILLE COURT REPORTING
(509) 884-1712

211

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

# Exhibit N

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

---------------------------------------------------------

SARAH BRADBURN, PEARL CHERRINGTON,    )
CHARLES HEINLEN, and the SECOND       )
AMENDMENT FOUNDATION,                 )
                                      )
                Plaintiffs,           )
                                      )
        vs.                           ) No. CV-06-327-EFS
                                      )
NORTH CENTRAL REGIONAL LIBRARY        )
DISTRICT,                             )
                                      )
                Defendant.            )
---------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION

OF

DANIEL A. HOWARD

---------------------------------------------------------

Date:            October 17, 2007

Location:        North Central Regional Library
                 16 North Columbia Street
                 Wenatchee, Washington  98801

Start Time:      10:24 a.m.

End Time:        2:11 p.m.

REPORTED BY:     CHARLENE M. BECK, CCR, RPR
                 CCR # 2543

353a7035-c67a-487b-a750-f25928a878a8

## Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

---------------------------------------------------

SARAH BRADBURN, PEARL CHERRINGTON, )
CHARLES HEINLEN, and the SECOND )
AMENDMENT FOUNDATION, )
                          )
        Plaintiffs, )
                          )
    vs.                  ) No. CV-06-327-EFS
                          )
NORTH CENTRAL REGIONAL LIBRARY )
DISTRICT, )
                          )
        Defendant. )
                          )

---------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION
OF
DANIEL A. HOWARD

---------------------------------------------------

Date:        October 17, 2007
Location:    North Central Regional Library
             16 North Columbia Street
             Wenatchee, Washington 98801
Start Time:   10:24 a.m.
End Time:     2:11 p.m.

REPORTED BY:   CHARLENE M. BECK, CCR, RPR
             CCR # 2543

## Page 2

1   APPEARANCES:
2   For the Plaintiffs:     MR. DUNCAN MANVILLE
                    Attorney at Law
3                   C/O ACLU of Washington
                    705 Second Avenue, Ste 300
4                   Seattle, WA 98104-1799
                    (206) 288-9330
5                   duncan.manville@yahoo.com
                    And
6                   MS. CATHERINE CRUMP
                    Attorney at Law
7                   ACLU
                    125 Broad Street, 17th Floor
8                   New York, NY 10004
                    (212) 519-7806
9                   ccrump@aclu.org
10   For the Defendant:    MR. THOMAS D. ADAMS
                    MS. CELESTE MONROE
11                   Karr Tuttle Campbell
                    Attorneys at Law
12                   1201 Third Avenue, Ste 2900
                    Seattle, WA 98101
13                   (206) 223-1313
                    Direct: (206) 224-8026
14                   Fax: (206) 682-7100
                    tadams@karrtuttle.com
15
   Also Present:      MR. DEAN MARNEY
16                   MS. BARBARA G. WALTERS
17
18
19
20
21
22
23
24
25

## Page 3

1            I N D E X
2     EXAMINATION           PAGE
3   MS. CRUMP              4
4      I N D E X O F E X H I B I T S
5            MARKED       IDENTIFIED
6   Number 44         56            56
7   Number 45         58            58
8   Number 46         63          63, 64
9   Number 47         71            71
10   Number 48         78            78
11   Number 49         80            80
12   Number 50         81            82
13                REFERRED TO
14   Number 3    (To a previous deposition)     51
15   Number 41   (To a previous deposition)     88
16
17
18
19
20
21
22
23
24
25

## Page 4

1      DANIEL A. HOWARD,       being first duly sworn,
                         was deposed and
2              testified as follows:
3              (Mr. Manville absent.)
4                  EXAMINATION

10:24:30 5   BY MS. CRUMP:

10:24:30 6   Q   Would you please state your name and spell your last name for

10:24:32 7   the record.

10:24:32 8   A   Yes.  Daniel Alan Howard, H-O-W-A-R-D.

10:24:42 9   Q   As you know by now, I'm Catherine Crump.  I'm a lawyer for

10:24:46 10   the Plaintiffs in this case.

10:24:48 11      You've heard them three times by now, but I'm going to

10:24:52 12   go through the usual deposition preliminaries with you.

10:24:56 13      If you can, please try to answer questions verbally

10:24:58 14   instead of nodding your head or things like that so that we

10:25:00 15   have a notation for the record.  Okay?

10:25:02 16   A   Yes.

10:25:06 17   Q   If you don't understand me, will you please ask me to clarify

10:25:14 18   my questions?

10:25:14 19   A   Yes.

10:25:14 20   Q   If you need a break at any time, you're more than welcome to

10:25:20 21   take one.  I would just appreciate it if you would finish

10:25:22 22   answering the question I have asked before taking a break.

10:25:26 23   Okay?

10:25:26 24   A   Yes.

10:25:26 25   Q   And if at any time you think of additional information that

1 (Pages 1 to 4)

353a7035-c67a-487b-a750-f25928a878a8

## Page 25

10:54:14 1  A  Just to clarify, do you mean any computer or are you
10:54:16 2     specifically interested in Internet computers?
10:54:20 3  Q  Any computer.
10:54:22 4  A  I think two.
10:54:28 5  Q  You think two branches have computers in a children's
10:54:32 6     section?
10:54:32 7  A  Yes.
10:54:34 8  Q  And are those computers separate from the adult computers in
10:54:36 9     those libraries or the general access computers in those
10:54:40 10    libraries?
10:54:40 11 A  I don't understand that question.  What do you mean "sep"--
10:54:42 12    by the computers are separate from?
10:54:44 13 Q  In addition to the computers in the children's room, are
10:54:48 14    there --
10:54:48 15 A  Okay.
10:54:50 16 Q  -- other computers in those libraries?
10:54:52 17 A  Yes.
10:54:52 18 Q  And are they located in a physically different place?
10:54:56 19 A  You mean like not inside the computer (sic)?
10:55:00 20 Q  Not --
       21   A  I mean, all --
10:55:00 22 Q  -- beside or --
10:55:00 23 A  All computers will be located in different...
10:55:02 24 Q  Places, yes.
10:55:04 25 A  Yeah.

## Page 26

10:55:04 1  Q  I just meant:  Are they on different tables?  Are they --
10:55:08 2  A  Yes.  All -- or I don't know.  You mean like sitting on a
10:55:14 3     separate table?  I'm not quite sure.  I -- I don't understand
10:55:16 4     it.
10:55:16 5  Q  Okay.  Two branches have computers in the children's section,
10:55:20 6     right?
10:55:22 7  A  At least.
10:55:22 8  Q  Okay.
10:55:24 9  A  Two I can think of right now.
10:55:26 10 Q  Do those branches also have other computers?
10:55:28 11 A  Yes.
10:55:30 12 Q  Are those computers adjacent to the children's computers?
10:55:34 13 A  No.
10:55:36 14 Q  Where are they for the two examples you can think of?
10:55:40 15 A  They're both -- the libraries I'm thinking of are very large.
10:55:44 16    And most of them have computers throughout the building or
10:55:46 17    the buildings.  One of them, like the Wenatchee Public
10:55:52 18    Library, has computers on three different floors.  The Moses
10:55:58 19    Lake Library is also large and it has computers throughout
10:56:00 20    the building.
10:56:02 21 Q  Okay.  And those are the two examples you're thinking of?
10:56:04 22 A  Yeah.
10:56:06 23 Q  Okay.  Mr. Marney mentioned yesterday that the library used
10:56:38 24    privacy screens at one point.  Were you here during that
10:56:40 25    period?

## Page 27

10:56:40 1  A  No.
10:56:40 2  Q  Have you ever been a part of any discussion about privacy
10:56:44 3     screens?
10:56:44 4  A  Yes.
10:56:44 5  Q  When were those discussions?
10:56:46 6  A  When I was at Sno-Isle Regional Library we had many
10:56:52 7     discussions about privacy screens.  And that was between 1996
10:56:56 8     and 2001 when I worked there.
10:56:58 9  Q  What was the nature of those discussions?
10:57:02 10 A  We talked about their effectiveness.  We -- at Sno-Isle we
10:57:12 11    were required to have them on all of our computers.  And we
10:57:16 12    discussed the -- I had many discussions with them.  It's
10:57:20 13    difficult to characterize them in one way.  I had many
10:57:22 14    discussions with library patrons about them, other discussions
10:57:26 15    with staff.
10:57:28 16 Q  Do you have a view of the effectiveness of privacy screens?
10:57:32 17 A  Yes.
10:57:32 18 Q  What's your view?
10:57:34 19 A  That they're not particularly effective, that folks -- many
10:57:40 20    folks, particularly with visual disabilities, can't
10:57:44 21    effectively see what's going on, that they do not effectively
10:57:50 22    block or protect people from inadvertently viewing what's on
10:57:56 23    the screen, that they're relatively expensive and easily
10:58:00 24    damaged.
10:58:02 25 Q  How much do they cost?

## Page 28

10:58:04 1  A  I -- my memory is they're a couple hundred bucks apiece.
10:58:10 2  Q  And when did you last research their cost?
10:58:12 3  A  I don't believe I ever researched their cost.
10:58:14 4  Q  So how do you know their cost?
10:58:18 5  A  I am -- someone told me what they cost when I worked at
10:58:22 6     Sno-Isle.
10:58:22 7  Q  So that was back sometime between 1996 and 2001?
10:58:28 8  A  Yeah.
10:58:28 9  Q  And did you also say they break relatively easily?
10:58:32 10 A  Yes.
10:58:32 11 Q  How do you know that?
10:58:34 12 A  I had extensive experience using them.  In every branch that
10:58:40 13    I worked in we were required to have those screens on every
10:58:44 14    public access Internet computer.
10:58:48 15 Q  And did you encounter many instances of broken screens?
10:58:52 16 A  Yes.
10:58:52 17 Q  And what does that mean exactly when the screen is broken?
10:58:56 18 A  Let's see.  There were some devices -- let's see.  Are you
10:59:00 19    familiar with the screens?
10:59:00 20 Q  Pretend I'm not.
10:59:02 21 A  Okay.  They're flat and rectangular and they have these
10:59:10 22    little plastic clips that hold them on.  And -- and with
10:59:14 23    people taking them off a lot, the clips break frequently.
10:59:18 24    Also, they're -- to keep people from stealing them and taking
10:59:22 25    them off, they're usually attached to the computer in some

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

353a7035-c67a-487b-a750-f25928a878a8

## Page 29

10:59:24 1    way.  And those chains -- you know, not chains, but the

10:59:26 2    little rubber things that attach them would also break

10:59:30 3    frequently.

10:59:32 4    Q   Is it fair to say that the reason they broke was because

10:59:34 5        people were removing them?

10:59:36 6    A   Yes.

10:59:38 7    Q   And you said you don't think privacy screens block people

10:59:46 8        from inadvertently viewing inappropriate content; is that

10:59:50 9        correct?

10:59:50 10   A   No, that's not correct.

10:59:52 11   Q   What would be a correct statement?

10:59:54 12   A   That I don't think they effectively block people from

10:59:56 13       inadvertently viewing material.

11:00:02 14   Q   I'm sorry.  I forgot to ask you something.

11:00:06 15       Your knowledge of screens breaking, does that also date

11:00:08 16       from your experiences at Sno-Isle between '96 and '01?

11:00:12 17   A   Yeah.  That's my only experience with those screens.

11:00:14 18   Q   Okay.  So let's go back to inadvertent viewing of

11:00:20 19       inappropriate material.

11:00:20 20   A   Sure.

11:00:20 21   Q   Can you explain your opinion.  Why don't you think they're

11:00:26 22       effective?

11:00:26 23   A   Because -- let's see.  The way they're designed is that if

11:00:30 24       you're directly behind someone they block you from -- from

11:00:36 25       viewing what they're -- what someone is looking at.  But

## Page 30

11:00:38 1    people don't just stand in one spot in a library.  They move.

11:00:42 2    And as you move by -- as you pass by you -- you risk -- you

11:00:46 3    get the opportunity to see what people are seeing on the

11:00:50 4    screen.

11:00:50 5    Q   Isn't the screen physically blocked by the person sitting in

11:00:54 6        front of it?

11:00:56 7    A   No.

11:00:56 8    Q   All right.

11:00:58 9    A   I mean, unless they're enormous.

11:01:00 10   Q   So what you're saying is that as people walk by the screen

11:01:04 11       there's some moment when they're able to see what's on it

11:01:08 12       even when a privacy screen is in place?

11:01:10 13   A   Yes.  Yeah.

11:01:10 14   Q   Is that a long period of time?

11:01:12 15   A   I bet -- I think it would vary, wouldn't it?  If a person

11:01:22 16       walked by and continues to move by and is just glancing, I

11:01:26 17       bet it would be a short period of time.  If you walked by and

11:01:30 18       then stopped right at the point that you could see the screen,

11:01:32 19       it could be a long period of time.

11:01:34 20   Q   Okay.  So privacy screens don't protect against one person

11:01:38 21       looking over the shoulder of another person, right?

11:01:40 22   A   Not effectively.  Not completely.

11:01:42 23   Q   But for someone walking by would it be effective?

11:01:46 24   A   No.

11:01:46 25   Q   Why not?

## Page 31

11:01:46 1    A   Because, as I said, you -- you'd reach a moment where the

11:01:50 2        angle would be right so that you could view what's on the

11:01:54 3        screen.

11:01:54 4    Q   And would that be a long moment, a brief moment, a few

11:01:58 5        seconds?

11:01:58 6    A   It would depend.  If you continued to walk, I imagine it

11:02:02 7        would be a short period of time.  If you stopped at that

11:02:04 8        point, at that angle which you could see the screen, it would

11:02:06 9        be as long as you stopped there.

11:02:08 10   Q   What do you mean by "a short period of time"?

11:02:14 11       MR. ADAMS:  I'll object.  No foundation.  It would

11:02:18 12       certainly depend on the pace of the person walking behind the

11:02:22 13       viewer.

11:02:24 14   A   A few seconds.

11:02:28 15   Q   And, again, does your knowledge of this date from your time

11:02:32 16       at Sno-Isle between '96 and '01?

11:02:36 17   A   Yes.

11:02:36 18   Q   All right.  So we talked about the problem of expense, of the

11:02:44 19       privacy screens breaking, of people inadvertently viewing

11:02:50 20       material anyway?

11:02:50 21   A   Sure.

11:02:52 22   Q   Are there any other flaws with privacy screens?

11:02:54 23   A   Yeah.  As I said, people with visib-- visible -- visual

11:03:00 24       disabilities find it difficult to view -- see what's on the

11:03:02 25       screen.  And those folks want to take them off.  Folks with,

## Page 32

11:03:04 1    you know, eye -- eye problems can't see effectively.

11:03:08 2        It also can create -- it also created a contentious

11:03:14 3        atmosphere with patrons because the patrons would want to

11:03:18 4        remove them.  Our policy was that they had to remain on.  So

11:03:24 5        every time it was removed it would be -- lead to a -- you

11:03:24 6        know, a potential conflict with the patron about our policy.

11:03:28 7    Q   All right.

11:03:28 8    A   And so it -- you know, I think it interfered with their

11:03:32 9        access, you know, to what they were trying to see on the

11:03:36 10       screen.

11:03:36 11   Q   Okay.  Have you done any research into privacy screens since

11:03:40 12       2001?

11:03:40 13   A   No.

11:03:42 14   Q   Have there been any discussions since you've been back at

11:03:46 15       NCRL about privacy screens?

11:03:48 16   A   Yes.

11:03:48 17   Q   What was the nature of those discussions?

11:03:50 18   A   I ta-- I talked on -- on some occasions with folks about

11:03:56 19       whether we should consider -- consider using them.  And

11:04:02 20       usually I'd give my opinion about my experience with them.

11:04:06 21   Q   Who did you talk to?

11:04:08 22   A   Dean.

11:04:08 23   Q   And when was this?

11:04:10 24   A   I don't know.

11:04:10 25   Q   Was it in the last year?

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

353a7035-c67a-487b-a750-f25928a878a8

## Page 33

11:04:14 1  A  Yes.
11:04:14 2  Q  Were you considering adopting privacy screens at that point?
11:04:20 3  A  No.
11:04:20 4  Q  So how did it come up?
11:04:24 5  A  When -- when we talk about the Internet and managing it,
11:04:32 6     privacy screens, filters, recessed desks, all the typical
11:04:40 7     materials and methods people use to manage the Internet have
11:04:44 8     usually come up in those discussions.  Or -- or not "usually".
11:04:48 9     They have come up in those discussions.
11:04:50 10 Q  In addition to privacy screens, filters and recessed desks,
11:04:54 11    are there other methods people typically use to manage the
11:04:58 12    Internet?
11:04:58 13 A  My understanding is that there are libraries in Washington --
11:05:02 14    many libraries in Washington State that use a method that's
11:05:06 15    called "Tap & Tell".
11:05:06 16 Q  What is that?
11:05:08 17 A  If -- if an employee or a patron sees somebody viewing
11:05:14 18    something on a screen that they find objectionable, they'll
11:05:18 19    report that to staff, and then staff will approach that
11:05:22 20    person.  I think this is where the "tap" comes in.  Taps them
11:05:26 21    on the shoulder and says "Please stop viewing that", "Get off
11:05:30 22    that site right away", "If you don't stop viewing that, we'll
11:05:32 23    have to ask you to leave."
11:05:36 24 Q  Other than with Dean, have you had any discussions about
11:05:42 25    privacy filters with anyone else?  Not "privacy filters".

## Page 34

11:05:46 1     I'm sorry.  "Privacy screens" with anyone else.
11:05:48 2  A  I can't recall.  You mean here in the -- clarify.
11:05:50 3  Q  Yeah.
11:05:50 4  A  Yeah, I can't recall.
11:05:54 5  Q  Have you had any discussions with the Board?
11:05:54 6  A  I don't -- I can't recall.  I would imagine so.  I would --
11:05:58 7     I'm guessing that they came up.
11:06:00 8  Q  Have you within the last month had any --
11:06:04 9  A  No.
11:06:04 10 Q  -- discussions with the --
11:06:06 11 A  Excuse me.
11:06:08 12 Q  -- Board about privacy screens?
11:06:10 13 A  No.
11:06:10 14 Q  Within the last six months?
11:06:12 15 A  No.
11:06:12 16 Q  Within the last year?
11:06:12 17 A  I don't know.
11:06:14 18 Q  But not in the last six months?
11:06:16 19 A  No.
11:06:18 20 Q  Do you know if the topic of privacy screens has come up with
11:06:24 21    the Board within -- well, after the lawsuit was filed?
11:06:26 22 A  I do not know.
11:06:28 23 Q  Has the Board ever expressed any interest in installing
11:06:36 24    privacy screens?
11:06:36 25 A  No.

## Page 35

11:06:36 1  Q  Have Board Members taken positions on the issue of privacy
11:06:44 2     screens?
11:06:46 3         MR. ADAMS:  If you know.
11:06:48 4  A  Not that I'm aware of.
11:06:50 5  Q  All right.  Let's talk about recessed desks.  Do you have an
11:06:58 6     opinion on the effectiveness of recessed desks?
11:07:00 7  A  Yes.
11:07:02 8  Q  And what is your opinion?
11:07:04 9  A  They're very expensive and not sufficiently effective.
11:07:14 10 Q  How expensive are they?
11:07:16 11 A  One of the major manufacturers that I'm aware of of something
11:07:20 12    called the Nova desk, they start for very small ones at about
11:07:24 13    a thousand dollars apiece.
11:07:26 14 Q  How do you know that?
11:07:28 15 A  I've had experience using them.
11:07:30 16 Q  When was that experience?
11:07:32 17 A  When I worked with Sno-Isle Regional Library.
11:07:36 18 Q  So that was back sometime between '96 and 2001?
11:07:40 19 A  Yes.  And I looked up the price recently.
11:07:44 20 Q  How recently?
11:07:44 21 A  This morning.
11:07:46 22 Q  And the price is still around a thousand dollars?
11:07:48 23 A  Yes.
11:07:48 24 Q  Okay.  And you also said that you didn't think they were
11:07:54 25    effective in preventing the inadvertent viewing by passersby;

## Page 36

11:08:00 1     is that correct?
11:08:00 2  A  That's correct.
11:08:02 3  Q  What is the basis for that opinion?
11:08:04 4  A  I've had extensive experience working with them.  When you --
11:08:10 5     when you pass by them you can see the screen.
11:08:14 6  Q  Do you know if the technology has changed since 2001?
11:08:18 7  A  I do not know.  I can't imagine that it would.  It's
11:08:24 8     essentially a desk where they drop, you know, a monitor in
11:08:26 9     it.  So it isn't sophisticated technology that I'm aware of.
11:08:32 10 Q  Have you had any discussion about recessed desks?
11:08:40 11 A  Yes.
11:08:40 12 Q  Here?
11:08:40 13 A  Yes.
11:08:40 14 Q  When?
11:08:40 15 A  I don't know.
11:08:42 16 Q  With whom?
11:08:42 17 A  With Dean.
11:08:44 18 Q  Within the last year?
11:08:44 19 A  Yes.
11:08:46 20 Q  What was the nature of the discussion?
11:08:48 21 A  We'd talk about -- we have talked -- discussed different
11:08:54 22    methods to manage the Internet including filt-- filters,
11:08:58 23    recessed desks, security guards, Tap & Tell Policies and
11:09:04 24    filters, and we've discussed which we -- that we thought we
11:09:10 25    should use here.

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

217

353a7035-c67a-487b-a750-f25928a878a8

## Page 37

11:09:12 1  Q  And what did you conclude as to recessed desks?

11:09:14 2  A  As I said, I don't -- I think they're not sufficiently

11:09:20 3     effective and that they're very expensive.

11:09:22 4  Q  And so is it fair to say that the library has no intention of

11:09:26 5     purchasing recessed desks in the future?

11:09:32 6  A  I don't.  But I can't speak for Dean and the Board.

11:09:36 7  Q  Have they expressed their views on this topic to you?

11:09:38 8  A  I -- no, not that I'm aware of.

11:09:44 9  Q  So you're not aware of Dean's opinion on recessed desks?

11:09:48 10  A  I'm not, no.

11:09:50 11  Q  Or the Board's?

11:09:50 12  A  No.

11:09:52 13  Q  Let's talk about Tap & Tell.  Have you worked in a library

11:09:56 14     that used a Tap & Tell Policy?

11:09:58 15  A  No, I have not.

11:10:00 16  Q  Do you have an opinion on the effectiveness of Tap & Tell?

11:10:04 17  A  Yes.

11:10:04 18  Q  What is your opinion?

11:10:04 19  A  I think it's unlikely to be consistent and effective,

11:10:14 20     particularly in a library system with many different people.

11:10:20 21     At North Central Regional Library we have over 200 people

11:10:24 22     that work here.  I can't imagine employing a procedure that

11:10:30 23     involves using 200 different opinions on the appropriateness

11:10:34 24     of what people are accessing on the Internet.

11:10:38 25  Q  So in your view a flaw of the Tap & Tell Policy is that too

## Page 38

11:10:46 1     many different people are deciding what content is appropriate

11:10:48 2     to view?

11:10:50 3  A  Not -- not that it's "too many".  That it would be

11:10:52 4     inconsistent and that you wouldn't be able to control it.

11:10:56 5     And it wouldn't be consistent with CIPA.  CIPA tells us that

11:11:02 6     the appropriate method is using a filter.

11:11:06 7  Q  All right.  Well, putting aside what needs to be done to

11:11:12 8     comply with CIPA.

11:11:14 9  A  Well, I wasn't -- oh, excuse me.

11:11:16 10  Q  I'm sorry.  Go ahead.  Please finish --

     11  A  I wasn't saying --

11:11:18 12  Q  -- your thought.

11:11:20 13  A  -- that it was a matter of complying with CIPA.  What I'm

11:11:24 14     saying is that Congress is telling us that the appropriate

11:11:26 15     way to -- to determine, you know, what -- what folks should

11:11:32 16     be able to access in a public library or in a school is a

11:11:36 17     filter, not -- not 200 -- not individual different opinions.

11:11:42 18  Q  Can you imagine a Tap & Tell Policy that didn't involve 200

11:11:46 19     different opinions?

11:11:48 20  A  Yes.

11:11:48 21  Q  Okay.  How would you design that?

11:11:50 22  A  You have a library with one employee.

11:11:54 23  Q  Okay.  But short of that, can you imagine a --

11:11:56 24  A  Sure.  A library with two employees.

11:12:00 25  Q  All right.  Fair enough.

## Page 39

11:12:06 1     Has NCRL considered using a Tap & Tell Policy?

11:12:12 2  A  No.

11:12:12 3  Q  Why not?

11:12:12 4  A  Because we don't think it's effective or appropriate.

11:12:16 5  Q  And are there any other effectiveness problems in addition to

11:12:20 6     the one you've already mentioned of it being essentially

11:12:24 7     standardless?

11:12:24 8  A  Yeah.  I think it would -- it would put our employees in a --

11:12:32 9     in the position of having conflict with our patrons.  It

11:12:36 10     might place them at risk.  It might create a hostile work

11:12:44 11     environment for them if they had to view pornographic

11:12:46 12     materials while they're at work.

11:12:50 13  Q  There have been a few instances in which people have viewed

11:12:52 14     pornographic materials in the libraries, haven't there?

11:12:56 15  A  Yes.

11:12:56 16  Q  And did a librarian ask them to stop any of those instances?

11:13:04 17  A  Yes.

11:13:06 18  Q  And was there a hostile reaction by the patron in any of

11:13:12 19     those instances?

11:13:14 20  A  Yes.

11:13:14 21  Q  Please describe.

11:13:16 22  A  Most recently, within the last month, at our Wenatchee Public

11:13:24 23     Library there was an incident involving an individual viewing

11:13:30 24     some pornographic materials.  My understanding is that the

11:13:32 25     employee asked that person to stop, told the children that

## Page 40

11:13:38 1     were -- and the family that was next -- on the computer next

11:13:40 2     to them to not look.  And there was some conflict with the

11:13:46 3     patron as he picked up his printed materials, which were at

11:13:52 4     the circulation desk.

11:13:52 5  Q  What was the nature of the conflict?

11:13:54 6  A  He -- my understanding was that he was asserting that this

11:14:00 7     was a -- that -- that he had the right to this because it was

11:14:04 8     gay materials.  And I think he -- that he -- I'm -- I'm

11:14:06 9     speculating, but I think that he felt like he was being

11:14:08 10     persecuted because he was gay.  The employees were just

11:14:12 11     telling him:  No.  It was just -- they were inappropriate

11:14:14 12     pornographic images.  That was the problem.  So there was

11:14:18 13     some conflict over that.

11:14:20 14  Q  How long ago was this?

11:14:20 15  A  It was within the last month.

11:14:22 16  Q  And was there any physical altercation or violence?

11:14:24 17  A  No.

11:14:26 18  Q  Were there raised voices?

11:14:26 19  A  I wasn't there.  I don't know.

11:14:28 20  Q  So was there a conflict other than the fact that this person

11:14:38 21     was upset about being asked to stop viewing materials?

11:14:40 22  A  No.

11:14:44 23  Q  And what was the nature of the materials this person was

11:14:54 24     viewing?

11:14:54 25  A  I think that they were images of people having sex with each

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

353a7035-c67a-487b-a750-f25928a878a8

## Page 41

11:14:58 1    other.

11:14:58 2    Q  Can you think of any other time where a patron has been

11:15:04 3       confronted by a librarian after viewing inappropriate content?

11:15:10 4    A  Yes.

11:15:10 5    Q  What are you thinking of?

11:15:12 6    A  At our Omak branch I -- I know that I received like in the

11:15:18 7       mail a printed -- a page of -- of some pornographic materials

11:15:24 8       that then the -- the librarian had sent down for me to see.

11:15:28 9       And my understanding is that she had to ask that person to

11:15:32 10      stop viewing those materials.

11:15:32 11   Q  So there was an individual who viewed inappropriate materials

11:15:36 12      in the Omak branch, yes?

11:15:38 13   A  Yes.

11:15:38 14   Q  And was what you received a screen shot of what that --

     15   A  Yeah.

11:15:42 16   Q  -- person had viewed?

11:15:42 17   A  That's right.

11:15:42 18   Q  And what was the image of?

11:15:44 19   A  It was people having sex with each other.

11:15:48 20   Q  And what did the librarian do when confronted with this

11:15:52 21      person viewing the inappropriate material?

11:15:54 22   A  She told that person to stop.

11:15:56 23   Q  And did he stop?

11:15:58 24   A  Yes.

11:15:58 25   Q  Or she, I suppose.

## Page 42

11:16:00 1    A  Yeah. I...

11:16:02 2    Q  And was there any sort of physical altercation or violence?

11:16:06 3    A  No.

11:16:06 4    Q  Was there any verbal altercation?

11:16:08 5    A  You know, I don't know.

11:16:10 6    Q  Other than those two instances, can you think of any other

11:16:12 7       times when a patron has been asked to stop viewing

11:16:16 8       inappropriate material?

11:16:18 9    A  I -- no, I can't.

11:16:20 10   Q  So that's -- all you can remember today are two instances?

11:16:24 11   A  Yeah. Yes, that's right.

11:16:28 12   Q  Okay.

11:16:30 13   A  Because we have a filter in place.

11:16:36 14   Q  You mentioned you have also discussed the possibility of

11:16:38 15      hiring security guards.

11:16:40 16   A  No, I -- I don't believe I said that.

11:16:42 17   Q  Oh, okay.  Security guards came up somehow.  Can you remind --

     18   A  Sure.

11:16:48 19   Q  -- me how?

11:16:48 20   A  Yeah.  We have heard that there are large library systems

11:16:52 21      that use security guards to enforce the Tap & Tell Policies.

11:16:58 22   Q  And has this library system considered hiring security guards?

11:17:02 23   A  No.

11:17:02 24   Q  Why not?

11:17:02 25   A  The expense.  And it would change our -- the environment

## Page 43

11:17:08 1    here.  At this point we think it would not help us fulfill

11:17:14 2       our Mission, that it would...

11:17:16 3       But, yeah, I think the expense largely too.

11:17:20 4    Q  All right.  We have talked about Tap & Tell, recessed desks

11:17:24 5       and privacy screens.  And other than filters and those three

11:17:28 6       items, can you think of any other ways libraries try to deal

11:17:32 7       with Internet viewing of inappropriate material?

11:17:38 8    A  None occur to me now.

11:17:40 9    Q  Has the Board ever expressed a view on the Tap & Tell Policy?

11:17:50 10   A  I don't remember.  I don't know.

11:17:52 11   Q  Do you know if they've done that within the last six months?

11:17:54 12   A  I don't know.

11:17:56 13   Q  In the last month?

11:17:56 14   A  Beats -- I don't know.

11:17:58 15   Q  Do you generally attend the Board Meetings?

11:18:00 16   A  Yes.

11:18:02 17   Q  And have you attended the Board Meetings for the last year?

11:18:06 18   A  Yes.

11:18:38 19      MR. ADAMS:  Do you want to take a break?  Are you

11:18:40 20   okay?

11:18:40 21      THE WITNESS:  Yeah, let's take a break.

11:18:42 22   A  Is that okay?  May I?  May I?

11:18:44 23   Q  Yeah, that's great.

11:27:20 24      (Recess taken.)

11:27:20 25   Q  I can't remember whether I asked you one question.

## Page 44

11:27:26 1    A  Sure.  Sure.

11:27:28 2    Q  Does the library offer R rated DVDs?

11:27:32 3    A  Yes.

11:27:32 4    Q  Okay.  Is part of your job responsibility deciding or helping

11:27:42 5       to decide what categories should be blocked by the filter?

11:27:46 6    A  It's not really my responsibility, but I have offered some

11:27:50 7       advice to Dean on that, yes.

11:27:52 8    Q  And what about specific sites?  Are you involved in deciding

11:28:00 9       which specific sites should be unblocked?

11:28:02 10   A  Yes.

11:28:04 11   Q  And how does the process work?  You get a Material Selection

11:28:12 12      Request or now an e-mail for a request for a site unblocking.

11:28:16 13      And then what happens?

11:28:16 14   A  Could you restate that for me so I understand exactly what

11:28:20 15      you're asking --

     16   Q  How --

11:28:22 17   A  -- please.

11:28:22 18   Q  How do you and Dean come to a decision as to what categories

11:28:24 19      or sites should be blocked or unblocked?

11:28:26 20      Let's unpack this by starting with the specific sites.

11:28:32 21      When you get a --

     22   A  Oh.

11:28:32 23   Q  -- Material Review Request what happens next?

11:28:34 24   A  Let's see.  I'll start at the very beginning.  When a patron

11:28:40 25      is on one of our Internet stations and they -- they -- they

11 (Pages 41 to 44)

353a7035-c67a-487b-a750-f25928a878a8

| Page 45 | Page 47 |
|---|---|

**Page 45**

11:28:42 1    try to access a site that's blocked, they get this message

11:28:46 2    that tells them if they would like us to review that site

11:28:50 3    that they can click on a link.  And if they click on that

11:28:54 4    link there's a form that they can fill out where we ask them

11:28:58 5    some contact information.  We want to know the site that

11:29:00 6    they -- that's been blocked.  And then there's an area for

11:29:02 7    comments.  When that's submitted -- and it comes into an

11:29:08 8    e-mail account that Barbara monitors -- she forwards that to

11:29:12 9    Dean and I.  Generally Dean designates me to review it

11:29:18 10   initially.

11:29:20 11      The first thing we try to determine is whether or not

11:29:24 12   it's really a filter problem or whether it's another issue.

11:29:28 13   Our experience is that the vast majority, you know, 70 or 80

11:29:34 14   percent of these requests that are submitted to us, are not

11:29:38 15   related to the filter but are related to other technical

11:29:42 16   problems.  So the first thing we do is to try to decide:  Is

11:29:46 17   this a filter issue or not.

11:29:50 18      If it is a nonfilter issue, I generally work with

11:29:52 19   Barbara to resolve the technical problem if we can resolve it.

11:29:58 20      If it is a filter issue, I check to make sure that it's

11:30:04 21   either a category that's been blocked or a site that's on our

11:30:10 22   custom list.  There -- there's a handful of sites there.  We

11:30:20 23   -- we try to -- if it is a -- if it's a category problem, we

11:30:24 24   look at it to make sure that the -- it's been appropriately

11:30:30 25   -- the category has been appropriately assigned to it.

**Page 46**

11:30:40 1      Let's see.  No matter how it's resolved I usually

11:30:42 2   contact the patron, oftentimes by phone.  But if I only have

11:30:50 3   a physical address or an e-mail address, I contact the patron

11:30:54 4   that way to let them know what has been decided and how it's

11:30:58 5   been handled.  Oftentimes I'll write a memo just to document

11:31:02 6   what's happ-- what's happened and what we have decided along

11:31:06 7   with that.

11:31:14 8  Q  You said when you reviewed a -- when the site was blocked

11:31:18 9   under a specific category you looked at it to make sure the

11:31:22 10  category was appropriately assigned --

        11  A  Yes.

11:31:24 12  Q  -- to it.

11:31:24 13  A  Right.

11:31:24 14  Q  How do you make that decision?

11:31:26 15  A  Oh, there are a couple of different ways.  I have a place

11:31:30 16  where I can go at Fortinet where I can type in the site and

11:31:36 17  it will tell me what category it is.  So that's kind of a --

11:31:38 18  that's a way of verifying if it's in a category that's been

11:31:44 19  blocked and what the category is.

11:31:46 20      Let's see.  I use my own judgment.  If, for example,

11:31:50 21  it's been blocked because it's a chat site and the site's

11:31:54 22  called TeenChat and then I look at the site and it seems to

11:31:58 23  be a chat site for teens, then I -- then it gives me enough

11:32:04 24  information to decide it's been appropriately blocked as a

11:32:10 25  chat site.

**Page 47**

11:32:10 1     Does that make sense?

11:32:10 2  Q  That makes sense.

11:32:12 3     Do you always look at the site?

11:32:16 4  A  Yes.

11:32:16 5  Q  How do you decide whether or not something is properly

11:32:26 6  characterized as adult content?

11:32:28 7  A  Huh.  I have never encountered a site that's been blocked for

11:32:36 8  -- that I'm aware of that's with that category that I

11:32:40 9  remember.  So I'm not sure that it come up.

11:32:42 10  Q  What about nudity?

11:32:44 11  A  I don't believe that's come up either.

11:32:46 12  Q  What about pornography?

11:32:50 13  A  I do not believe that that has come up.

11:32:54 14  Q  So you have never had to decide whether or not a particular

11:33:00 15  site was appropriately blocked as nudity, pornography or

11:33:04 16  adult content; is that correct?

11:33:08 17  A  No, that's not correct.

11:33:08 18  Q  What would be a more correct statement?

11:33:10 19  A  I've never had to decide -- I've never had to make -- I've

11:33:18 20  never encountered a request from a patron to review a site

11:33:22 21  that has been blocked under the categories nudity and risque,

11:33:28 22  pornography.  I think the other one is adult content.

11:33:32 23     Is that it?  Well...

11:33:32 24     So I've never encountered a site that's been blocked

11:33:38 25  under that category.

**Page 48**

11:33:38 1     I have had to look at a site and decide whether or not

11:33:42 2  the images that I viewed appeared to be pornography; although,

11:33:50 3  that site was not blocked as a category.

11:33:54 4  Q  Was it blocked as a site?

11:33:56 5  A  It was Craigslist.

11:33:58 6  Q  Okay.

11:33:58 7  A  And that was a custom -- that is blocked in -- with our --

11:34:04 8  with our -- the custom part of our -- the blocking feature.

11:34:08 9  And I had to go by -- I went back to look at the Personals to

11:34:14 10  assure myself that -- yes, that those were pictures of

11:34:18 11  individuals in states of sexual arousal.

11:34:24 12  Q  Did you refer to the Internet Use Policy in the course of

11:34:32 13  making that decision?

11:34:34 14  A  In that decision, no.

11:34:42 15  Q  What about the Library Material Selection Policy?

11:34:46 16  A  Let's see.  I'm not quite sure what you understand by --

11:34:52 17  could you expand on what you mean by "refer to it".

11:34:56 18  Q  Consider.  Did you consider the Library Material Selection

11:35:00 19  Policy?

11:35:00 20  A  No.

11:35:08 21  Q  What question were you trying to ask?  Were you just trying

11:35:16 22  to figure out whether the site was sexually -- the images in

11:35:20 23  Craigslist were sexually explicit?

11:35:22 24  A  I was trying to decide whether allow ing Craigslist -- allowing

11:35:28 25  individuals using our Internet computers access to Craigslist

**Wenatchee Valley Court Reporting**
**(509) 888-DEPO (3376)**

353a7035-c67a-487b-a750-f25928a878a8

| Page 49 | Page 51 |
|---|---|

<div style="page"></div>

**Page 49**

11:35:32 1  was consistent with the philosophy of CIPA, which requires us
11:35:38 2  to block access to depictions of sex or excretion or genitals.
11:35:50 3  So I was thinking more of CIPA. I was thinking about whether
11:35:54 4  it should be blocked as required by CIPA.
11:35:56 5  Q  Is there a difference between the sites that should be blocked
11:36:02 6  according to CIPA and the sites that it would be consistent
11:36:06 7  with the Library's Internet Use Policy to block?
11:36:08 8  A  Okay. I didn't follow that. I didn't understand that.
11:36:12 9  Q  I hardly followed it myself. I can't blame you.
11:36:16 10  All right. CIPA only requires certain categories of
11:36:20 11  content to be blocked, right?
11:36:22 12  A  Yes.
11:36:24 13  Q  Are those categories identical to the categories that the
11:36:30 14  Internet Use Policy requires to be blocked?
11:36:32 15  A  No.
11:36:32 16  Q  What's the difference?
11:36:36 17  A  We block some categories that CIPA doesn't require be blocked
11:36:40 18  Q  What's an example?
11:36:42 19  A  Proxy avoidance. I don't remember that coming up in CIPA.
11:36:48 20  But if we allowed people access to proxy avoidance sites, it
11:36:52 21  would defeat our filter, which is required by CIPA. So it
11:36:58 22  makes sense to us to block proxy avoidance sites.
11:37:02 23  Q  And what about gambling?
11:37:04 24  A  I don't think that that's related to CIPA.
11:37:08 25  Q  Why is gambling blocked?

**Page 50**

11:37:12 1  A  "Why" questions are difficult. And I don't think that I'm
11:37:30 2  the appropriate person to answer that question. If that
11:37:32 3  decision had been my responsibility alone, I think it would
11:37:36 4  be appropriate for me to answer it. So you're asking me kind
11:37:40 5  of to speculate on why that decision has been made. Do -- do
11:37:46 6  I understand that right?
11:37:48 7  Q  Whose decision is it to block gambling?
11:37:52 8  A  It's -- ultimately it's Dean's decision to block gambling.
11:37:58 9  Q  So Dean decides which categories are blocked, yes?
11:38:02 10  A  Ultimately he's responsible for all the -- ultimately our
11:38:04 11  Board is responsible for all of the categories that are
11:38:08 12  blocked. The Board trusts Dean to make decisions like this.
11:38:14 13  The -- the Board has designated Dean to be -- to be
11:38:18 14  responsible for the Internet and to make the decisions
11:38:20 15  regarding the filter. The decision's ultimately Dean's. And
11:38:26 16  Dean consults with other folks here at North Central Regional
11:38:30 17  Library including myself.
11:38:32 18  Q  Is it fair to say that Dean's job is to implement the Board's
11:38:38 19  Policy?
11:38:38 20  A  Yes.
11:38:38 21  Q  All right. Let's talk about the Internet Use Policy. I guess
11:38:46 22  it's already an exhibit.
11:38:48 23  A  Okay.
11:38:50 24  Q  Do you mind looking through that pile to --
11:38:52 25  A  Not a bit.

**Page 51**

11:38:52 1  Q  -- find it?
11:40:40 2  (Discussion had off record.)
11:40:40 3  Q  Please refer to Exhibit 3. Is that the Internet Public Use
11:40:46 4  Policy?
11:40:46 5  A  Yes.
11:40:46 6  Q  Is that the current Internet Public Use Policy?
11:40:56 7  A  It looks like it. You know, I'd have to kind of compare it
11:41:00 8  with something I knew to be the current one. In this setting
11:41:02 9  right here it would be difficult for me to go -- to go
11:41:06 10  through this and notice any typos or any changes in the text
11:41:12 11  without comparing it to something that I knew was the original
11:41:14 12  one. But it appears to be.
11:41:18 13  MR. MANVILLE: I could pull it up on-line if you'd
11:41:20 14  give me Wi-Fi.
11:41:22 15  MR. MARNEY: Where's your library card, sir?
11:41:24 16  A  It looks like it might be.
11:41:26 17  Q  Okay. Please read it and see if you see anything that
11:41:30 18  suggests that it's not the current policy.
11:41:32 19  A  Sure.
11:42:26 20  (Pause in the proceedings.)
11:42:26 21  A  I've finished reading it and it looks like the current policy.
11:42:30 22  Q  Is this a policy of the Board?
11:42:32 23  A  Yes.
11:42:34 24  Q  Did you participate in developing this policy?
11:42:36 25  A  No.

**Page 52**

11:42:42 1  Q  Is this a policy that library staff relies upon to decide
11:42:50 2  what Internet sites are appropriate to access?
11:42:56 3  A  There are some parts of this that speak to that. Let's see.
11:43:02 4  It mentions that all Internet access on North Central Regional
11:43:08 5  Library computers is filtered. It does say that hacking and
11:43:10 6  unlawful on-line activity is prohibited.
11:43:20 7  Q  Are there any other portions that provide guidance as to what
11:43:24 8  sites should or should not be blocked?
11:43:28 9  A  I believe there are. I'm looking for them right now.
11:43:32 10  Ah, it references chat rooms.
11:43:38 11  Q  What does it say about chat rooms?
11:43:40 12  A  It says that the Library District does not host customer
11:43:44 13  e-mail accounts or provide access to chat rooms.
11:43:48 14  Q  Anything else in this policy that provides substantive
11:43:54 15  guidance as to what Internet sites are appropriate for viewing
11:43:56 16  in the libraries?
11:44:02 17  MR. ADAMS: I'll just assert what is obvious, that
11:44:04 18  the document speaks for itself. "Hacking and other on-line"
11:44:08 19  -- "unlawful on-line activities are prohibited" is stated in
11:44:12 20  the policy.
11:44:18 21  A  Yeah. Other than those items we've mentioned, I don't see
11:44:22 22  anything else that speaks to the specifics of what's -- what's
11:44:26 23  filtered and what is acceptable.
11:44:28 24  Q  If you wanted to understand the Board's position on what sites
11:44:34 25  are appropriate, is this the document you would refer to?

353a7035-c67a-487b-a750-f25928a878a8

## Page 57

11:52:58 1    appropriate for folks to access on the Internet at a public
11:53:04 2    library.
11:53:04 3  Q  Can you give any specific examples of when you've considered
11:53:08 4    it?
11:53:08 5  A  Sure. This morning before I came in to this deposition I
11:53:10 6    knew that you'd be asking about our Collection Development
11:53:14 7    Policy. And I know that the general topic is access to folks
11:53:22 8    of the Internet.
11:53:24 9      I use the Collection Development Policy as a general
11:53:28 10   guide on deciding what things we should select for the
11:53:30 11   library. And I use the philos-- same philosophy when I think
11:53:38 12   about what is appropriate for people to access on the
11:53:42 13   Internet.
11:53:42 14 Q  Does it make any difference in the context of the Internet
11:53:46 15   that you're blocking access to content instead of acquiring
11:53:52 16   content?
11:53:52 17 A  Sure. Yes.
11:53:52 18 Q  What difference does it make?
11:53:58 19 A  The process that's involved of developing a collection of
11:54:04 20   library materials is very different than providing access to
11:54:08 21   information over the Internet.
11:54:10 22      (Mr. Marney present.)
11:54:10 23 Q  How so?
11:54:16 24 A  It's not practical to acquire Websites. It's not practical
11:54:22 25   for us to go out and select individual Websites that would be

## Page 58

11:54:26 1    of use for educational or inspirational or recreational
11:54:32 2    purposes for our users.
11:54:36 3      The Collection Development is a deliberative process
11:54:42 4    where we use -- where we have to -- we have to take an action
11:54:50 5    to have anything in our library. We have to make a decision
11:54:54 6    to acquire something. The Internet is very different. We
11:55:00 7    don't have to make any decision in general to acquire items
11:55:04 8    on the Internet.
11:55:06 9      And it also -- like I said, it wouldn't be practical.
11:55:10 10   I don't know how many millions of Websites are out there. We
11:55:12 11   couldn't -- if we were deciding to develop a collection of
11:55:16 12   Websites, we couldn't approach it the same way that we do
11:55:20 13   more traditional library materials like books.
11:55:24 14 Q  All right.
11:55:54 15      MS. CRUMP: Why don't we mark this document as an
11:55:58 16   exhibit.
11:55:58 17      (Exhibit Number 45 marked.)
11:56:00 18 Q  (By Ms. Crump) Do you recognize this document?
11:56:00 19 A  Yes, I do.
11:56:02 20 Q  What is it?
11:56:02 21 A  It's a current Collection Development Policy.
11:56:04 22 Q  And I see on the front cover it says "Adopted 01/04". Does
11:56:12 23   that mean this was adopted in January of 2004?
11:56:16 24 A  Yes.
11:56:16 25 Q  Okay. And you've said that this Collection Development Policy

## Page 59

11:56:34 1    provides guidance as to what Internet sites are appropriate
11:56:38 2    for viewing in the library?
11:56:40 3  A  Yes.
11:56:40 4      I'm sorry. Could you repeat that, please.
11:56:42 5  Q  And did you previously say that this document gives you
11:56:46 6    guidance regarding what Internet sites are appropriate to
11:56:48 7    view in the library?
11:56:50 8  A  Some, yes.
11:56:50 9  Q  Okay. Will you please point out specific portions of the
11:56:54 10   document that provide that guidance?
11:56:56 11 A  Sure. Under Number 1 where it says "The Collection
11:57:00 12   Development Policy is based on and reflects the District's
11:57:04 13   mission, goals, and values as stated in the current Strategic
11:57:08 14   Plan."
11:57:08 15      So when I think about why we provide the Internet,
11:57:12 16   about why it's important for us to provide access to the
11:57:14 17   Internet to the folks that live in our area, which is a very
11:57:18 18   rural area, I want to do that so that we can advance our
11:57:24 19   Mission, which is to promote reading and lifelong learning.
11:57:32 20 Q  All right. And what is the Strategic Plan?
11:57:34 21 A  We're currently using a management system called the Balanced
11:57:42 22   Scorecard, which was developed by two Harvard professors in
11:57:46 23   the early 1990s. The Balanced Scorecard has you look at your
11:57:50 24   organization from four perspectives; the financial
11:57:54 25   perspective, the learning and growth perspective, the

## Page 60

11:58:00 1    customer perspective and the internal processes perspective.
11:58:04 2    Under the Balanced Scorecard you develop mea-- performance
11:58:10 3    measures under each of these perspectives, you set goals and
11:58:14 4    targets, you measure your prog-- progress in achieving those
11:58:20 5    goals.
11:58:22 6  Q  And how does that relate to the Strategic Plan?
11:58:24 7  A  I didn't say it did. You just asked me what our Strategic
11:58:30 8    Plan was.
11:58:30 9  Q  Ah, all right. I'm just trying to understand Number 1 here.
11:58:34 10   It says "The Collection Development Policy is based on and
11:58:34 11   reflects the District's mission, goals, and values as stated
11:58:38 12   in the current Strategic Plan."
11:58:40 13 A  Right.
11:58:40 14 Q  So what is the Strategic Plan? Is that what you were just --
11:58:44 15   is it to implement this Balanced Scorecard?
11:58:46 16 A  I don't quite know how to answer your question. When you say
11:58:50 17   "What is the Strategic Plan" are you asking me like -- I -- I
11:58:54 18   don't know what you're asking me.
11:58:54 19 Q  Do you know what Number 1 refers to when it says "Strategic
       20   Plan"?
11:58:58 21 A  Yes. We're currently using the Balanced Scorecard.
11:59:04 22 Q  As the Strategic Plan?
11:59:04 23 A  It's a -- it's a management system that gives -- it's a
11:59:08 24   system that we're using to create our Strategic Plan.
11:59:12 25 Q  All right. So --

15 (Pages 57 to 60)

353a7035-c67a-487b-a750-f25928a878a8

## Page 61

11:59:14  1    A  So when you say "What is the Strategic Plan", it's a bundle
11:59:18  2       of ideas, it's a group of pieces of paper, it's a collection
11:59:26  3       of performance measures and goals and targets and strategic
11:59:30  4       initiatives.
11:59:32  5    Q  Okay.  And are those contained in this document labeled the
11:59:38  6       "North Central Regional Library and the Balanced Scorecard"?
11:59:40  7    A  Right.  The document that you're holding we use to explain --
11:59:44  8       parts of it we use to explain our system and why -- our
11:59:48  9       library system and why we're using the Balanced Scorecard.
11:59:52 10       The inside portion you're holding right now is called the
11:59:56 11       Strategy Map.  It lists our strategic initiatives, our goals,
12:00:00 12       our targets, our current performance measures and our results.
12:00:08 13    Q  All right.  Why don't we come back to this other document,
12:00:12 14       the Strategic Plan, in a second.
12:00:14 15          Other than Prong 1, is there any other part of the
12:00:16 16       Collection Development Policy which helps you figure out what
12:00:20 17       sites it's appropriate to view in a library?
12:00:22 18    A  I can see some por-- some portions of it that affects my
12:00:30 19       dec-- some discussion on what's appropriate.  And I
12:00:32 20       can see a section here that says that we're not going to
12:00:36 21       exclude materials based on race, nationality, political,
12:00:40 22       religious or social views of the author.  And with that in
12:00:44 23       mind, I wouldn't want to restrict access to any Internet site
12:00:48 24       on the basis of race, nationality, political, religious or
12:00:54 25       social views of an individual or a group.

## Page 62

12:00:58  1    Q  Anything else in this document?
12:01:00  2    A  I would want to collect Internet sites that reflect the
12:01:16  3       interests, demands, the nature of the audi-- the audience,
12:01:24  4       the nature of the people that live in our area.  I would want
12:01:30  5       to make sure that we collect sites that reflect a wide
12:01:36  6       diversity of view points.  I would want to make sure that we
12:01:42  7       allow access to Internet sites that are on significant
12:02:06  8       subjects.
12:02:12  9    Q  What about a Website that consisted of the text "My name is
12:02:18 10       Bob and this is a picture of my dog" and then had the dog on
12:02:22 11       it?  Would the acquisition of that Website be consistent with
12:02:28 12       the Collection Development Policy?
12:02:30 13    A  Could you repeat that again?  I didn't quite understand that.
12:02:32 14    Q  Imagine a Website that has text that says "My name is Bob and
12:02:36 15       this is a picture of my dog".  Would the acquisition of that
12:02:40 16       Website be consistent with the Collection Development Policy?
12:02:46 17    A  I don't know.
12:02:46 18    Q  Why not?
12:02:50 19    A  Why don't I know?
12:02:52 20    Q  Yeah.
12:02:54 21    A  I don't know why I don't know.  I'm not -- I don't understand
12:02:58 22       your question.
12:02:58 23    Q  Does this document provide any guidance on whether or not
12:03:02 24       viewing that Website in the library would be appropriate?
12:03:04 25    A  No.

## Page 63

12:03:06  1    Q  What about the Internet Use Policy?  Does that provide any
12:03:10  2       guidance on whether or not viewing such a Website in the
12:03:12  3       library would be appropriate?
12:03:14  4    A  No.
12:03:16  5    Q  What about the North Central Regional Library and the
12:03:20  6       Balanced Scorecard document, does that provide any information
12:03:24  7       on whether viewing such a Website would be appropriate in a
12:03:28  8       library setting?
12:03:28  9    A  Could you repeat that?
12:03:30 10    Q  Does the Scorecard, the North Central Regional Library
12:03:34 11       Scorecard set of documents, provide any guidance on whether
12:03:38 12       or not it would be appropriate to view such a Website in the
12:03:40 13       library?
12:03:42 14    A  Yes, it does.
12:03:44 15    Q  All right.
12:03:46 16          MS. CRUMP:  Is this already an exhibit, this
12:03:48 17       Balanced Scorecard, from yesterday?
12:03:52 18          MS. MONROE:  I don't think so.
12:03:52 19          MS. CRUMP:  All right.  Why don't we make it an
12:03:54 20       exhibit.  Do you have a second copy of this?
12:03:58 21          MR. ADAMS:  You can go ahead and do that.  We can
12:04:00 22    get copies later.
           23          MS. CRUMP:  Okay.
12:04:40 24          (Discussion had off record.)
12:04:40 25          (Exhibit Number 46 marked.)

## Page 64

12:04:40  1    Q  (By Ms. Crump)  All right.  Will you please take a look at
12:04:48  2       Exhibit 46.
12:04:48  3    A  Sure.
12:04:48  4    Q  And do you recognize this document?
12:04:50  5    A  Yes.
12:04:50  6    Q  And what is it?
12:04:52  7    A  This is a -- a document we -- the -- this is actually two
12:04:56  8       documents that we use to either explain -- excuse me -- what
12:05:04  9       the Balanced Scorecard is, information about -- detailed
12:05:08 10       information about North Central Regional Library, its
12:05:14 11       important reading programs and other details about -- that
12:05:18 12       describe our system.
12:05:20 13          Inside there's a document that lists different
12:05:24 14       perspectives and strategic objectives and measures and
12:05:28 15       targets as well that moni-- that shows our progress on the
12:05:32 16       Balanced Scorecard.
12:05:32 17    Q  Who generated this document?
12:05:34 18    A  Dean and I worked on this.  The individual that actually
12:05:38 19       printed it out is JoAnne Pearsall.
12:05:42 20    Q  When did you create it?
12:05:44 21    A  Over the course of several years.
12:05:48 22    Q  When was it published?
12:05:52 23    A  It's been published in different versions over about two
12:05:56 24       years.
12:05:58 25    Q  What about the most recent version?

16  (Pages 61 to 64)

353a7035-c67a-487b-a750-f25928a878a8

## Page 65

12:06:00  1    A   It's two documents.  I believe that the outside cover was
12:06:18  2        changed a couple of months ago.  The inside piece that I have
12:06:24  3        referred to as the Strategy Map was updated sometime this
12:06:28  4        past summer.
12:06:28  5    Q   Which one is the Strategy Map?
12:06:30  6    A   (Indicating.)
12:06:32  7    Q   The one --
12:06:34  8    A   It -- it's the single sheet.  The ledger -- the folded ledger
12:06:38  9        side sheet is the document that explains our strategic
12:06:42 10        reading programs, talks -- or lists our Mission and Vision,
12:06:48 11        has some information about how the Balanced Scorecard works.
12:06:52 12        That's the folded ledger -- ledger side sheet.  The letter
12:06:58 13        size sheet is the Strategy Map.
12:07:00 14    Q   All right.  So let's go back to my hypothetical about the man
12:07:04 15        and his dog.  What part of this provides guidance on whether
12:07:10 16        or not it's appropriate to view in the library?
12:07:12 17    A   I think a number of parts do, but for me the Mission.  For us
12:07:18 18        we always look back to our Mission to guide us in our work.
12:07:22 19        Our Mission tells us what we're trying to be at our best, why
12:07:26 20        we exist.  And we exist for reading and lifelong learning.
12:07:30 21        And so when we look at each individual site we can think
12:07:34 22        back:  Does this promote reading and lifelong learning?
12:07:38 23    Q   And just for the clarity of the record, the Mission Statement
12:07:42 24        is on the blue box on this page?
12:07:44 25    A   Yes, that's correct.

## Page 66

12:07:46  1    Q   And it is "The mission of the North Central Regional Library
12:07:50  2        is to promote reading and lifelong learning"?
12:07:52  3    A   Sure.  Right.
12:07:54  4    Q   All right.  Is there any other part of this document or these
12:07:58  5        two documents, this exhibit in any event, that provides
12:08:02  6        guidance on what is appropriate to view in a library?
12:08:06  7    A   No.
12:08:14  8    Q   All right.  Given the Mission Statement, does that tell you
12:08:24  9        whether viewing the Website -- the man and his dog Website
12:08:26 10        we've been talking about is appropriate?
12:08:28 11        MR. ADAMS:  Before you answer, I'm going to make
12:08:30 12        an objection based on what I perceive to be an incomplete
12:08:34 13        hypothetical.  Lack of foundation.
12:08:36 14    A   Could you repeat that, please.
12:08:38 15    Q   All right.  Imagine a Website that says "My name is Bob and
12:08:42 16        this is a picture of my dog" and has a picture of his dog on
12:08:46 17        there.  Is it appropriate to view that in the library here?
12:08:54 18        MR. ADAMS:  Same objection.
12:08:54 19    A   If I understand you right, you're asking me to imagine this
12:08:58 20        site and you've just asked me whether it's appropriate to
12:09:00 21        view.  And I have no idea.
12:09:02 22    Q   Is it consistent with the Board's Policy, viewing that site?
12:09:06 23    A   I don't know.
12:09:08 24    Q   All right.  Other than the Exhibit 41 that we've been talking
12:09:16 25        about, the North Central Regional Library Collection

## Page 67

12:09:20  1        Development Policy and the Internet Public Use Policy, is
12:09:22  2        there any other document which would help us understand the
12:09:28  3        Board's perspective on this question?
12:09:30  4    A   I don't know what Exhibit 41 is.
12:09:32  5    Q   I'm sorry.  Well, what is the current exhibit in front of you
12:09:38  6        right now?
12:09:38  7    A   It's Exhibit 46.
12:09:38  8    Q   All right.  Sorry.
12:09:40  9        Other than Exhibit 46, the Collection Development
12:09:42 10        Policy and the Internet Public Use Policy, are there any
12:09:44 11        other written Board guidelines that would help decide whether
12:09:48 12        or not viewing a particular Website was appropriate?
12:09:52 13    A   Not that I'm aware of.
12:09:52 14    Q   All right.
12:10:00 15    A   However, CIPA certainly gives us some guidance about what
12:10:02 16        would be appropriate to view in the library.
12:10:06 17    Q   The libraries -- the Board's Internet Policy, as you
12:10:16 18        understand it, involves blocking all materials that are
12:10:16 19        impermissible under CIPA, correct?
12:10:22 20    A   I don't believe -- no, that's not correct.
12:10:24 21    Q   What would be a more correct statement?
12:10:26 22    A   I can't imagine it for you.
12:10:30 23    Q   Okay.  What is the relationship between CIPA and the Board's
12:10:34 24        Policy on what is appropriate to view in a library?
12:10:38 25    A   I don't know that the Board's Policy on Internet filtering --

## Page 68

12:10:52  1        the relationship between the Board's Policy and CIPA is
12:10:56  2        expressed in the Policy.
12:10:58  3    Q   Is the Board's Policy consistent with CIPA?
12:11:00  4    A   Absolutely.
12:11:02  5    Q   Does it go beyond what CIPA requires?
12:11:04  6    A   What do you mean -- I'm uncertain what you mean by "beyond".
12:11:14  7    Q   Does the Board's Policy sanction blocking material in addition
12:11:18  8        to what CIPA requires to be blocked?
12:11:20  9    A   Yes.
12:11:22 10    Q   What kinds of material?
12:11:24 11    A   Specifically chat.
12:11:24 12    Q   What about gambling?
12:11:30 13    A   I don't understand your question.  What about gambling?
12:11:40 14    Q   Does the Board's Policy sanction blocking gambling?
12:11:44 15    A   No.
12:11:44 16    Q   So the Board has no policy on whether or not gambling should
12:11:48 17        be blocked?
12:11:50 18        MR. ADAMS:  Objection to form.  I don't think
12:11:50 19        that's what he said.
12:11:52 20    Q   Is there any Board Policy on whether or not gambling should
12:11:56 21        be blocked?
12:11:56 22    A   None that I'm aware of.
12:11:58 23        MR. ADAMS:  Object to the form.  The Policy speaks
12:12:00 24        for itself.
12:12:02 25    Q   So how do you decide whether or not gambling should be

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

224

353a7035-c67a-487b-a750-f25928a878a8

| | |
|---|---|
| **Page 69** | **Page 71** |

### Page 69

12:12:06 1 blocked?

12:12:06 2 A I don't decide whether or not the gambling should be blocked.

12:12:12 3 Q Well, how do you advise Dean on whether or not gambling

12:12:16 4 should be blocked?

12:12:16 5 A The way I approach it is I think long and hard about CIPA, I

12:12:24 6 think long and hard about what's -- how we collect more

12:12:28 7 traditional materials as is expressed in the Collection

12:12:34 8 Development Policy, and I use that information to make a

12:12:36 9 recommendation.

12:12:40 10 Q And did you make a recommendation that gambling be blocked?

12:12:44 11 A I don't recall making a recommendation either way.

12:12:46 12 Q Have you ever made a recommendation regarding whether a

12:12:48 13 specific category should be blocked?

12:12:52 14 A Yes, I have.

12:12:52 15 Q And what categories have you recommended be blocked?

12:12:54 16 A Oh. Then I -- I misunderstood you. I -- I have made

12:12:58 17 recommendations on whether -- whether or not we should block

12:13:02 18 categories. I have never made any recommendation that any

12:13:04 19 category be blocked.

12:13:06 20 Q All right. What recommendations have you made regarding

12:13:12 21 whether or not a category should be blocked?

12:13:14 22 A I believe I recommended that we should unblock personal

12:13:22 23 relationships.

12:13:22 24 Q And how did you reach that recommendation?

12:13:28 25 A We did an awful lot of research on some of the personal

### Page 70

12:13:32 1 relationships sites, specifically MySpace. With MySpace we

12:13:38 2 had blocked that in the past. But MySpace and the Internet

12:13:46 3 and our response to the Internet have all evolved. And

12:13:48 4 MySpace came into existence only in 2003. And in 2005 it was

12:13:56 5 purchased by News Corp by -- owned by Rupert Murdoch. I'm

12:14:02 6 speculating that the -- that his company wanted to make it

12:14:04 7 more profitable, and so they began to enforce their Terms of

12:14:10 8 Use, which already forbidded things -- forbid things like

12:14:14 9 pornography.

12:14:18 10 In the spring of 2007 they had a three-prong approach

12:14:24 11 to making MySpace more safe. They hired a Federal prosecutor

12:14:32 12 to ensure Internet safety. They developed some software that

12:14:40 13 made sure that young people -- age, I think, 16 and 15 --

12:14:44 14 could restrict access to their site. They also ensure that

12:14:50 15 now an individual examines every photograph that's uploaded

12:15:00 16 into MySpace.

12:15:00 17 So after we had learned that MySpace had said they had

12:15:04 18 changed and was no longer a -- or was a less dangerous place

12:15:08 19 for children and was less likely to include pornography we --

12:15:14 20 I recommended that we unblock personal relationships as a

12:15:18 21 category.

12:15:22 22 Q Okay. Let's talk about how personal relationships got

12:15:24 23 blocked in the first place.

12:15:26 24 MS. CRUMP: Why don't we mark this as an exhibit

12:15:28 25 also.

### Page 71

12:15:44 1 (Exhibit Number 47 marked.)

12:15:42 2 (Sotto voce comments between Mr. Adams and the Witness.)

12:15:44 3 Q (By Ms. Crump) Is there something you'd like to add?

12:15:50 4 A Yes. Just in an earlier question you ask-- I think you asked

12:15:52 5 about how our Internet Public Use Policy -- like how we formed

12:15:56 6 our decisions on categories. There is a sentence that says

12:16:00 7 "Hacking and unlawful on-line activities are prohibited."

12:16:04 8 And as gambling is an unlawful activity, it makes sense that

12:16:10 9 it be blocked as a category.

12:16:12 10 Q All right. Why don't we take a look at the document I just

12:16:16 11 handed you, which has been marked Exhibit 47. Do you want to

12:16:24 12 take a moment to read that?

12:16:26 13 A Yes.

12:16:46 14 (Pause in the proceedings.)

12:16:48 15 Q Do you recognize that document?

12:16:48 16 A Yes.

12:16:48 17 Q What is it?

12:16:50 18 A It's an e-mail.

12:16:52 19 Q What does the e-mail pertain to?

12:16:56 20 A It pertains to MySpace.

12:16:58 21 Q All right. Does that e-mail help explain why the personal

12:17:02 22 relationships category was blocked?

12:17:02 23 A Yes. It -- it looks like that -- well, let me read it for

12:17:06 24 the record here. I'm writing Dean a message and it's saying

12:17:08 25 "Dean" -- and this is dated May 16th, 2007. (As read):

### Page 72

12:17:14 1 "Dean, We have heard that some patrons are using proxy

12:17:18 2 avoidance sites to defeat our filter and some are using proxy

12:17:22 3 avoidance to access MySpace. While MySpace is currently

12:17:26 4 blocked, we may want to consider a different approach. Chad

12:17:30 5 spoke to a person from Fortinet today and he suggested that

12:17:34 6 we may want to block the category 'Personal Relationships'

12:17:38 7 which would block social networking sites such as MySpace,

12:17:38 8 Facebook, and Friendster. 'Personal Relationships' is not a

12:17:42 9 currently blocked Category. Thank you, Dan Howard".

12:17:48 10 Q So is it fair to say you've blocked access to all personal

12:17:52 11 relationships sites in order to block access to MySpace?

12:17:54 12 A No.

12:17:54 13 Q What happened then?

12:17:56 14 A I don't really recall. But if you -- if you listen carefully

12:18:00 15 to the wording, it says "we may want to consider a different

12:18:04 16 approach", "we may want to block the category 'Personal

12:18:08 17 Relationships'". It doesn't say: "I recommend that we do

12:18:16 18 so."

12:18:16 19 Q And why --

12:18:16 20 A It doesn't say -- it's saying that this is an option

12:18:20 21 available to us that we "may" want to consider.

12:18:22 22 Q And why did you think you may want to consider it?

12:18:24 23 A Because Chad had spoken to a person from Fortinet who

12:18:28 24 suggested that we may want to block the category personal

12:18:34 25 relationships.

353a7035-c67a-487b-a750-f25928a878a8

## Page 73

12:18:34 1   Q  After this e-mail did you have any other conversations with
12:18:38 2        Mr. Marney about personal relationships sites and blocking
12:18:42 3        them?
12:18:42 4   A  Yes.
12:18:42 5   Q  And what --
12:18:44 6   A  Not -- on blocking them?
12:18:46 7   Q  Yeah.
12:18:46 8   A  Not that I recall about blocking or unblocking.  I know that
12:18:49 9        we had conversations about unblocking the category, which we
12:18:52 10      did.
12:18:52 11  Q  So you sent this e-mail, and then based on this e-mail
12:18:56 12      Mr. Marney decided to block the personal relationships site?
12:19:02 13      "Category" rather.
12:19:04 14  A  I have no idea that that happened at all, no.
12:19:06 15  Q  All right.  I thought in the top half of that document --
           16  A  Uh-huh.
12:19:10 17  Q  -- that Mr. Marney issued an instruction that personal
12:19:14 18      relationship sites be blocked.
12:19:16 19  A  Sure.
12:19:16 20  Q  Is that correct?
12:19:16 21  A  Yeah.  It says here "Dan:  Thanks Dan.  Let's go ahead and
12:19:20 22      block 'Personal Relationships' and see if that will solve the
12:19:24 23      problem."
12:19:24 24  Q  And do you know if that was done?
12:19:24 25  A  I don't know.

## Page 74

12:19:26 1   Q  You don't know if personal relationships sites were ever
12:19:28 2        blocked?
12:19:28 3   A  I do not recall if they were or not.
12:19:34 4   Q  So you don't know whether access to personal relationships
12:19:38 5        sites was ever blocked in the --
12:19:42 6   A  As a category?
12:19:42 7   Q  As a category.
12:19:44 8   A  I do know that MySpace was blocked individually.  I do not
12:19:48 9        recall whether personal relationships was blocked as a
12:19:50 10      category.
12:19:52 11  Q  Okay.
12:19:54 12            MS. CRUMP:  You know, I think this is going to
12:19:54 13      take a while longer, so maybe we should go ahead and take a
12:19:58 14      lunch break.
           15             (Discussion had off record.)
           16             (Recess taken.)
13:18:50 17             (Ms. Walters absent.)
13:18:54 18  Q  (By Ms. Crump)  Welcome back from lunch.
13:18:58 19      Do you have anything you want to add or change about
13:19:00 20      you've thought of about your prior testimony?
13:19:02 21  A  No.
13:19:02 22  Q  All right.  Let's go back to the Collection Development
13:19:14 23      Policy.  Now, I want to direct your attention to the last
13:19:22 24      page of this and specifically Point 3.
13:19:38 25             (Ms. Walters present.)

## Page 75

13:19:38 1   Q  This section provides that while individuals are free to
13:19:42 2        select or reject materials for themselves, cannot
13:19:46 3        restrict the freedom of others to read, view or inquire.  Did
13:19:50 4        I read that correctly, that --
13:19:52 5   A  Yes.
13:19:52 6   Q  -- fragment?
13:19:54 7        Okay.  How does that apply to Internet usage?
13:20:00 8   A  My understanding is this Policy was written with traditional
13:20:22 9        library materials in mind, particularly books, but audio
13:20:26 10      books and DVDs.  And I think what that sentence is trying to
13:20:30 11      get at is that it isn't okay for a -- one individual to
13:20:36 12      impose their taste on others.  You know, for example, if they
13:20:40 13      encounter a book that they find objectionable, then it's not
13:20:44 14      okay for them to say that:  "Nobody in the community can read
13:20:48 15      that book because I find it objectionable."
13:20:52 16      I'm not sure if the Board of Trustees had in mind that
13:20:58 17      -- that this Policy was going to be applied to individual
13:21:02 18      Websites.  On the other hand, I could see that the same
13:21:06 19      philosophy would apply if there was an individual who
13:21:10 20      encountered a Website that they thought was objectionable; it
13:21:12 21      wouldn't be okay for that single person to impose their
13:21:16 22      opinion and that restriction on that site on the entire
13:21:22 23      community.
13:21:22 24  Q  As you read this policy, is Point 3 applicable to the
13:21:28 25      Internet?

## Page 76

13:21:30 1   A  Part of it, but not all of it.
13:21:32 2   Q  Which part's applicable?
13:21:34 3   A  The first sentence.  The first two sentences seem applicable.
13:21:42 4        The second sentence seems less applicable to the Internet.
13:21:48 5        Parents still have the priority responsibility to guide their
13:21:52 6        children and direct their reading and viewing.  However,
13:22:00 7        Internet filters also have a role in that now, and that's not
13:22:00 8        mediated necessarily by parents.
13:22:08 9   Q  Do you think it's -- the use of Internet filters is
13:22:14 10      inconsistent with this part of the policy?
13:22:16 11  A  I don't understand that question.  Could you repeat it?
13:22:20 12  Q  It seems to me that by using an Internet filter the library
13:22:24 13      is participating in telling patrons what they can and cannot
13:22:28 14      read and it seems to me that that's inconsistent with Point
13:22:32 15      3.  What do you think about that?
13:22:34 16  A  I don't think that they're inconsistent.
13:22:38 17  Q  Why not?
13:22:38 18  A  Because parents still -- well, in guid-- parents still have
13:22:54 19      the primary responsibility in determining what's appropriate
13:22:56 20      for their child.  So that sentence seems to be the same
13:23:00 21      whether it's the Internet or books.
13:23:04 22      Libraries should still resist having individual
13:23:10 23      viewpoints decide what's available to the entire community.
13:23:18 24      So -- so this -- this policy, this part here, seems consistent
13:23:20 25      with our approach to the Internet.

19  (Pages 73 to 76)

353a7035-c67a-487b-a750-f25928a878a8

## Page 77

13:23:22 1    Q   In its print collection does the library carry Playboy?
13:23:26 2    A   No, we don't.
13:23:28 3    Q   Do you carry Hustler?
13:23:28 4    A   No, we do not.
13:23:30 5    Q   Okay.  If a parent decided it was appropriate for his or her
13:23:36 6        child to view Playboy on the Internet, would that be possible
13:23:40 7        in this library system?
13:23:40 8    A   I don't know.  I'd have to find -- see the -- let's see.  I
13:23:46 9        don't know if Playboy magazine is available in an on-line
13:23:52 10       form.  If it is available, I don't know how it would be
13:23:54 11       classified and whether or not it would be restricted by our
13:23:56 12       filter.
13:23:58 13   Q   Assuming for a minute that Playboy is blocked by the Adult
13:24:02 14       Content Category of Fortiguard -- I don't know whether it is
13:24:04 15       or not, but just assuming that.
13:24:06 16   A   Sure.
13:24:06 17   Q   Would a parent be able to permit his or her child to view
13:24:12 18       Playboy in an NCRL library?
13:24:16 19   A   My understanding is that that would be illegal under CIPA.
13:24:18 20   Q   But would it be consistent with the Board's Policy?
13:24:22 21       MR. ADAMS:  I'll object as no foundation.
13:24:26 22   A   I'm afraid I'm lost again.  I don't quite understand your
13:24:30 23       question.
13:24:30 24   Q   Can parents request that their children be permitted to view
13:24:36 25       material that's blocked by the filter?

## Page 78

13:24:38 1    A   They can certainly make that request.
13:24:40 2    Q   On a site-by-site basis, yes?
13:24:44 3    A   I don't know that we limit what requests parents make to us.
13:24:48 4    Q   All right.
13:24:48 5    A   And I don't think we -- we do not limit what requests parents
13:24:52 6        would make of us.
13:24:54 7    Q   If a parent requested that the filter be disabled for his or
13:25:00 8        her child, would the library honor that request?
13:25:02 9    A   For what site was that again?
13:25:04 10   Q   If a parent requested that the filter be completely disabled
13:25:08 11       so that her children could access the Internet unfiltered,
13:25:12 12       would the library honor that request?
13:25:12 13   A   We -- by definition we provide only filtered access and we
13:25:16 14       never remove the filter entirely ever, so we would not honor
13:25:20 15       that request.
13:25:22 16   Q   All right.  Let's switch topics.
17       (Discussion had off record.)
13:28:00 18       (Exhibit Number 48 marked.)
13:28:00 19   Q   Do you recognize that document?
13:28:02 20   A   Yes.
13:28:02 21   Q   What is it?
13:28:02 22   A   It's a letter that was sent to a library patron.
13:28:10 23   Q   Was it sent by you on March 21st?
13:28:14 24   A   Yes.
13:28:14 25   Q   All right.  I realize that the Library's Policy with respect

## Page 79

13:28:18 1        to Craigslist has changed.  But I want to talk about this
13:28:22 2        particular letter --
13:28:22 3    A   Uh-huh.
13:28:22 4    Q   -- first.
13:28:24 5    A   Oh, yes.
13:28:24 6    Q   This letter provides the reason that the library blocked
13:28:32 7        Craigslist.org on March 21st; does it not?
13:28:36 8    A   It does.
13:28:38 9    Q   And what's that reason?
13:28:40 10   A   There's a sentence that says -- and I'm quoting -- "It
13:28:46 11       contains many images we believe may be harmful to minors."
13:28:52 12       And by that I was saying that it -- it -- that I found images
13:29:02 13       that depicted sexual activity, genitalia and genitalia in a
13:29:12 14       manner that did not seem to have scientific, artistic,
13:29:18 15       literary merit.
13:29:24 16   Q   Does the library work to block access to all material that's
13:29:30 17       harmful to minors?
13:29:32 18   A   Yes, as required by CIPA.
13:29:38 19   Q   And when you use the term "harmful to minors", can material
13:29:42 20       be harmful to minors for reasons other than sexual content?
13:29:46 21   A   Yes.
13:29:48 22   Q   Can you give an example of how?
13:29:50 23   A   For example, if it depicted excretory functions in a manner
13:29:58 24       that wasn't inform-- you know, did not have literary, artistic
13:30:02 25       or scientific merit.

## Page 80

13:30:04 1    Q   And what about violence?  Could a site be so violent that it
13:30:08 2        was harmful to minors?
13:30:10 3    A   I don't remember violence -- definitions of violence being
13:30:14 4        part of the Federal Harmful To Minors Law.
13:30:20 5    Q   When you decide what is harmful to minors are you trying to
13:30:24 6        apply the Federal definition of "harmful to minors"?
13:30:26 7    A   In this case I was.
13:30:28 8    Q   What about in other cases?
13:30:30 9    A   I've never done -- I've never had to do it in any other case
13:30:34 10       with the exception of Craigslist.
13:30:36 11   Q   Okay.  I think I have seen that language used elsewhere.
13:30:40 12   A   Okay.
13:30:40 13   Q   So why don't we talk about the other examples also.
13:31:42 14       MS. CRUMP:  Why don't we mark this as an exhibit
13:31:44 15       also.
13:31:44 16       (Exhibit Number 49 marked.)
13:31:46 17   Q   (By Ms. Crump) Do you recognize that document?  Sorry.  Take
13:31:50 18       a second to read it, if you'd like.
13:32:08 19       (Brief pause in the proceedings.)
13:32:22 20   A   Yes, I recognize that document.
13:32:24 21   Q   What is it?
13:32:24 22   A   It's a letter I sent to a patron.
13:32:28 23   Q   What was the date and who was the patron?
13:32:30 24   A   There is no date.  And the patrons is -- there are two
13:32:34 25       patrons, Amy and B.J. Moore.

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

227

353a7035-c67a-487b-a750-f25928a878a8

## Page 81

13:32:38 1   Q   And does the document pertain to a particular Website?
13:32:40 2   A   Yes.  It -- it looks like it's referencing MySpace.
13:32:44 3   Q   And does it describe a reason why MySpace is blocked?
13:32:50 4   A   Yes, it does.
13:32:50 5   Q   And what was the reason given?
13:32:52 6   A   The presence of chat rooms and material that's potentially
13:32:58 7       harmful to minors.
13:32:58 8   Q   And do you remember what contents lead you to the conclusion
13:33:06 9       that MySpace was harmful to minors?
13:33:08 10  A   I don't have any specific memory of that content, no.
13:33:12 11  Q   Do you remember reviewing MySpace?
13:33:14 12  A   Yes, I do.
13:33:16 13  Q   All right.
13:33:20 14  A   And I remember seeing images that were potentially harmful to
13:33:26 15      minors.
13:33:26 16  Q   Do you remember what those images were?
13:33:30 17  A   I think that -- yes.  They involved nudity and people in
13:33:36 18      states of arousal.
13:33:38 19  Q   All right.
13:33:42 20  A   I -- I see that it's an undated letter, and I'm surprised at
13:33:46 21      that.  But -- so I don't know exactly when this happened.
13:33:52 22  Q   All right.  And let's do one more.  This is a two-page
13:33:56 23      document about Google images and Yahoo images.
13:34:24 24          (Exhibit Number 50 marked.)
13:34:42 25  A   Yes, I do recognize that.

## Page 82

13:34:42 1   Q   What is it?
13:34:44 2   A   It's an e-mail message I sent to an employee.
13:34:48 3   Q   And what did it pertain to?
13:34:50 4   A   It referenced Google and Yahoo images.
13:34:54 5   Q   And did it provide a reason for blocking access to those
13:34:58 6       sites?
13:34:58 7   A   Yes.  Because there were im-- when these sites were not
13:35:02 8       blocked it allowed access to images that were potentially
13:35:04 9       harmful to minors.
13:35:06 10  Q   And in all of those cases what was the meaning of "harmful to
13:35:22 11      minors" you were thinking of?
13:35:22 12  A   It contained images of sexual activity, genitalia or
13:35:30 13      excretory functions in a way that was not -- that did not
13:35:36 14      have literary, artistic or scientific merit.
13:35:40 15  Q   And when you use the phrase "harmful to minors" are you
13:35:44 16      thinking of a minor of a particular age?
13:35:46 17  A   No.  Our understanding is that you have to apply this to as
13:35:50 18      old a minor as possible.  So I guess that -- under CIPA that
13:35:58 19      is 16.
13:36:04 20  Q   Does the library block access to harmful to minors material
13:36:10 21      even when adults are trying to a access that content?
13:36:14 22  A   Yes.
13:36:32 23  Q   I'd like to talk a little bit about how you decide whether a
13:36:36 24      Website contains harmful to minors material.
13:36:44 25      Is it sufficient for a Website to have one harmful to

## Page 83

13:36:46 1       minors image for it to be considered harmful to minors?
13:36:50 2   A   I don't think I've ever -- when I've reviewed anything that I
13:37:00 3       thought had images that were potentially harmful to minors I
13:37:02 4       don't remember encountering -- ever encountering a site that
13:37:06 5       just had one image.
13:37:08 6   Q   If a site only had one image that was harmful to minors,
13:37:14 7       would you recommend blocking access to the whole site?
13:37:18 8   A   If like, for example, it had one image that had child
13:37:22 9       pornography, yes, that would be sufficient to block that site.
13:37:26 10  Q   What if it wasn't child pornography?
13:37:28 11  A   Sure.  If it was obscene and it had been declared illegal by
13:37:34 12      a court of law, then that would be sufficient as well.
13:37:36 13  Q   What if the content wasn't illegal?  It was pornographic but
13:37:42 14      not illegal.  A picture of a naked woman, for instance.
13:37:46 15  A   If it was pornographic, then one image would likely be
13:37:52 16      sufficient to block that site.
13:37:54 17  Q   Would it matter how big the Website was?  Whether it had ten
13:37:58 18      pages or a thousand pages, for instance?
13:38:00 19  A   I think our approach to blocking it or allowing access would
13:38:10 20      be affected by how large the site was.  I think that
13:38:12 21      Craigslist is a really good example of that.  It's a large
13:38:14 22      site with many different functions.  And in that particular
13:38:22 23      case we have tried to allow access to as much as possible as
13:38:26 24      we can that would fit with our approach to the Internet.
13:38:28 25          So, yes, I think that if you're asking if size -- the

## Page 84

13:38:32 1       size of the site and the amount of content that would -- is
13:38:34 2       within it is part of our decision, then, yeah, I think it
13:38:38 3       might affect that decision on how we would approach blocking
13:38:42 4       it.
13:38:42 5   Q   So you would be more likely, for instance, to block a site
13:38:46 6       that had one pornographic image and ten other pages than if a
13:38:52 7       site had one pornographic image in a hundred pages?
13:38:56 8   A   No.
13:38:56 9   Q   All right.  Then maybe I don't understand what you mean.
13:38:58 10      Would you mind trying one more time to explain it to me.
13:39:02 11  A   Certainly.  Well, I think that the -- if you're asking me the
13:39:04 12      size of the -- the size and the amount of information, if
13:39:06 13      that affects our approach to filtering, then the answer is
13:39:10 14      yes.  And the example I gave you was Craigslist, which has a
13:39:16 15      lot of different information, some of which is not -- some of
13:39:22 16      which is -- we think is appropriate.  And so the size of that
13:39:26 17      site has affected the way that we have approached filtering.
13:39:52 18  Q   Have you ever received a complaint from someone who accessed
13:39:56 19      sexually explicit images through a library terminal and was
13:40:00 20      unhappy about it?
13:40:02 21  A   I can't remember.  I don't know.
13:40:14 22  Q   Do you know if you received such a complaint in the last
13:40:18 23      month?
13:40:18 24  A   I don't know.
13:40:18 25  Q   The last week?

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

228

353a7035-c67a-487b-a750-f25928a878a8

## Page 85

13:40:20  1   A  I don't know.
13:40:22  2   Q  The last day?
13:40:24  3   A  Certainly not today.
13:40:26  4   Q  What about yesterday?
13:40:26  5   A  I do not believe I received a complaint like that yesterday.
13:40:34  6   Q  What about on Monday?
13:40:36  7   A  Nope.
13:40:36  8   Q  Friday?
13:40:42  9   A  I can't remember.
13:40:46 10   Q  Okay.  Has anyone ever complained to you about filtering?
13:40:50 11   A  Yes.
13:40:52 12   Q  Who?
13:40:54 13   A  Charles Heinlen is one.
13:41:00 14   Q  Anyone other than Mr. Heinlen?
13:41:02 15   A  Well, it's awfully broad.  Do you mean like com-- just made
13:41:06 16      any complaint in any way related to filtering?
13:41:10 17   Q  Anyone who complained -- who wanted the filter disabled.
13:41:14 18   A  The only person that's ever requested that we have the filter
13:41:20 19      disabled was Charles Heinlen.
13:41:22 20   Q  And was that true for the entire time that the Internet has
13:41:24 21      been filtered at this library?
13:41:26 22   A  To the best of my recollection, yes.
13:41:30 23   Q  So the way the current system works is that no adult no
13:41:48 24      matter how mature or responsible can get information -- can
13:41:54 25      get the filter disabled; is that right?

## Page 86

13:41:56  1   A  We never remove the filter.
13:42:02  2   Q  Why is that?
13:42:04  3   A  You're asking me to speak -- that -- that's a very broad
13:42:10  4      question.  Why is that?  We -- it's been a Board decision
13:42:14  5      that we do not remove the filter.  Our Board affirmed the
13:42:20  6      Filtering Policy in 2007.  And that Policy states that we
13:42:22  7      provide only filtered access.
13:42:26  8   Q  Were you involved in the decision to select Fortiguard as the
13:42:28  9      filtering product?
13:42:30 10   A  No, I was not.
13:42:32 11   Q  That was a decision Ms. Walters recommended and Mr. Marney
13:42:38 12      accepted?  Is that your understanding of --
13:42:38 13   A  Yes.
13:42:38 14   Q  -- what happened?
13:42:40 15   A  Yes.
13:42:40 16   Q  Does Fortiguard ever miscategorize Websites?
13:42:46 17           MR. ADAMS:  Object to the form.
13:42:48 18   Q  Do you know if Fortiguard has ever miscategorized a Website?
13:42:54 19   A  Yes.
13:42:54 20   Q  And has Fortiguard ever miscategorized a Website?
13:43:02 21   A  I thought I -- I thought that's what you just asked.  And --
13:43:06 22      but I understood that's what you had asked and that's what I
13:43:08 23      answered "yes" to.  But if it was a different question and
13:43:12 24      this is a new one, the answer is "yes".
13:43:14 25   Q  Can you give an example?

## Page 87

13:43:16  1   A  No, I can't think of one.  I do remember that at the last
13:43:22  2      deposition that I saw a list of Websites that Charles Heinlen
13:43:28  3      had that he felt were miscategorized.
13:43:38  4   Q  Are adult content Websites -- do you know if adult content
13:43:40  5      Websites are currently accessible in NCRL Libraries?
13:43:46  6   A  Let's see.  My understanding is that as a category that we
13:43:48  7      block adult content.  So if that -- if you're using that kind
13:43:52  8      of specific term, adult content, then those are blocked.  If
13:43:56  9      you're using it as kind of a more general term to reference,
13:44:00 10      you know, Internet sites that might be appropriate for adults,
13:44:04 11      then I'm not aware that all of those are blocked.
13:44:06 12   Q  What I was trying to get at is:  Do you know if even though
13:44:10 13      the adult content category is activated whether adult content
13:44:14 14      is still visible in the NCRL Libraries?
13:44:22 15   A  I'm not aware of any site that has been categoriz--
13:44:28 16      categorized as adult content by Fortiguard but was still
13:44:34 17      accessib-- accessible on one of the North Central Regional
13:44:38 18      Library computers, if that's what you asked.
13:44:48 19           MR. ADAMS:  We'll stipulate that no filter is
13:44:50 20      perfect and that every filter has a degree of underblocking
13:44:54 21      and overblocking associated with it.
13:45:06 22           MS. CRUMP:  Okay.
13:45:06 23   Q  (By Ms. Crump)  I actually think there's -- what I'm looking
13:45:06 24      for is the list of definitions Fortiguard provides.  And I
13:45:12 25      think it's in --

## Page 88

13:45:12  1   A  Oh, sure.
13:45:16  2           MS. MONROE:  It was marked yesterday.  It should
13:45:18  3      be in that pile, I think.
13:45:22  4           MR. MANVILLE:  I think it's toward the end.
13:45:24  5           MR. ADAMS:  Here you go.  Exhibit 41.  Is that
13:45:34  6      what you're looking for?
13:45:42  7           MS. CRUMP:  Yes.
13:45:44  8           MR. ADAMS:  Okay.
13:45:48  9   Q  (By Ms. Crump)  Do you recognize that document?
13:45:52 10   A  No.  It looks like the list of categories that Fortinet has
13:46:02 11      used.  I don't think I recall seeing this specific document
13:46:06 12      myself.
13:46:06 13   Q  All right.  Would you mind taking a look at the definitions?
13:46:10 14   A  No, I wouldn't mind a bit.
13:46:12 15   Q  All right.  Just seeing if you recognize them.
13:46:14 16   A  Yes, I do.
13:46:16 17   Q  And are these the definitions you rely upon to understand
13:46:24 18      what Fortiguard's various categories block?
13:46:26 19   A  I don't recall that I've seen this document before.  But I
13:46:30 20      can take a look at one of the categories that I would
13:46:32 21      recognize and see if it's the same as the documents I have
13:46:36 22      seen before.
13:46:36 23   Q  All right.  Why don't you look at the gambling category, if
13:46:42 24      you don't mind.
13:46:42 25   A  What page is that on?

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

353a7035-c67a-487b-a750-f25928a878a8

Page 101

```
 1              REPORTER'S CERTIFICATE
 2         I, CHARLENE M. BECK, Certified Shorthand
 3    Reporter, do hereby certify:
 4         That the foregoing proceedings were taken
 5    before me at the times and place therein set forth, at which
 6    time any witnesses were placed under oath;
 7         That the testimony and all objections made
 8    were recorded stenographically by me and were thereafter
 9    transcribed by me or under my direction;
10         That the foregoing is a true and correct
11    record of all testimony given, to the best of my ability;
12         That I am not a relative or employee of any
13    attorney or of any of the parties, nor am I financially
14    interested in the action;
15         IN WITNESS WHEREOF, I have hereunto set my
16    hand and affixed my official seal this 5th day of November,
17    2007.
18
19
20
21         _____
           CHARLENE M. BECK, CCR, RPR
22         CCR # 2543
           Notary Public in and for the
23         State of Washington, residing
           at Wenatchee.
24
25    My commission expires on June 19, 2011.
```

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

353a7035-c67a-487b-a750-f25928a878a8

# Exhibit O

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

SARAH BRADBURN, PEARL            )
CHERRINGTON, CHARLES HEINLEN,    )
and the SECOND AMENDMENT         )
FOUNDATION,                      )
                                 )
                Plaintiffs,      )
                                 )
                vs.              )  NO. CV-06-327-EFS
                                 )
NORTH CENTRAL REGIONAL LIBRARY   )
DISTRICT,                        )
                                 )
                Defendants.      )
-----------------------------------------------
DEPOSITION UPON ORAL EXAMINATION

OF

DEAN MARNEY

-----------------------------------------------

Date:        October 16, 2007

Location:    North Central Library Administration Office
             15 North Columbia
             Wenatchee, WA

Start Time: 12:30 p.m.

End Time:    5:15 p.m.

Reported By:  Alison J. Howze, CCR
              CCR # 2575

65fdb704-fa3f-4ced-944b-bc4e673c3b71

## Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

SARAH BRADBURN, PEARL          )
CHERRINGTON, CHARLES HEINLEN,  )
and the SECOND AMENDMENT       )
FOUNDATION,                    )
                               )
            Plaintiffs,        )
                               )
    vs.                        )  NO. CV-06-327-EFS
                               )
NORTH CENTRAL REGIONAL LIBRARY )
DISTRICT,                      )
                               )
            Defendants.        )
-------------------------------------------
        DEPOSITION UPON ORAL EXAMINATION
                     OF
                 DEAN MARNEY
-------------------------------------------

Date:       October 16, 2007
Location:   North Central Library Administration Office
            15 North Columbia
            Wenatchee, WA

Start Time: 12:30 p.m.

End Time:    5:15 p.m.

Reported By: Alison J. Howze, CCR
             CCR # 2575

## Page 2

```
 1   APPEARANCES:
 2   For the Plaintiffs:    MR. DUNCAN MANVILLE
                            Attorney at Law
 3                          C/O ACLU of Washington
                            705 2nd Avenue, Suite 300
 4                          Seattle, WA 98104-1799
                            (206) 288-9330
 5                          dmanville@yahoo.com
 6                          MS. CATHERINE CRUMP
                            ACLU
 7                          125 Broad Street, 17th Floor
                            New York, NY 10004
 8                          (212) 519-7806
                            ccrump@aclu.org
 9
10   For the Defendants:    MR. THOMAS ADAMS
                            MS. CELESTE MONROE
11                          Karr Tuttle Campbell
                            Attorneys at Law
12                          1201 Third Avenue, Suite 2900
                            Seattle, WA 98101
13                          (206) 223-1313
                            (206)682-7100
14                          tadams@karrtuttle.com
15
16   Also Present:          MS. BARBARA WALTERS
                            MR. DAN HOWARD
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              I N D E X
 2     EXAMINATION            PAGE
 3   Mr. Manville              4
 4        I N D E X  O F  E X H I B I T S
 5                  MARKED      IDENTIFIED
 6   Number 27        30          30
 7   Number 28        30          31
 8   Number 29        65          65
 9   Number 30        67          67
10   Number 31        69          69
11   Number 32        77          77
12   Number 33       110         110
13   Number 34       114         115
14   Number 35       114         115
15   Number 36       114         116
16   Number 37       117         117
17   Number 38       121         121
18   Number 39       122         122
19   Number 40       123         124
20   Number 41       127         127
21
22
23
24
25
```

## Page 4

```
 1   DEAN MARNEY,         being first duly sworn
                          was deposed and
 2                        testified as follows:
 3              EXAMINATION
 4   BY MR. MANVILLE:
 5   Q  Mr. Marney, good afternoon.  My name is Duncan Manville.  We
 6      met a couple of months ago, I guess.
 7   A  Correct.
 8   Q  Good to see you again.
 9   A  Right.  Good to see you.
10   Q  And since you sat in on the last round of depositions, I
11      think you probably know the drill, but I'll run through it
12      anyway.
13   A  Okay.
14   Q  First, let me ask you to state and spell your -- state your
15      name and spell your last name for the record, please.
16   A  Dean Marney, M-A-R-N-E-Y.
17   Q  Okay.  And have you ever been deposed before?
18   A  No.
19   Q  All right.  I think Tom did a great job last time around
20      running through the ground rules, but basically they are as
21      follows:  You understand that you're under oath, correct?
22   A  Uh-huh.
23   Q  And that your testimony today is expected to be truthful, and
24      being under oath in this setting has the same significance as
25      being under oath in a trial setting in court.  Is that right?
```

1 (Pages 1 to 4)

Page 17

1  A  I usually have a phone call before the Board meeting, but it
2     just depends on what's going on.
3  Q  In a typical average month?
4  A  Well, let's say in this month I've heard from two of them --
5  Q  Okay.
6  A  -- calling me.
7  Q  And is that -- is that typical?
8  A  I would say so.
9  Q  How long is the Board meeting usually?
10 A  It depends.  We start at 1:00 and usually end by 3:30.  So
11    it's two-and-a-half hours usually.
12 Q  What agenda items do you cover in a typical Board meeting?
13 A  Financial reports, and then we do a Director's report.  Dan
14    will do a Services report.  We may have a Technical report.
15    And then we usually have some -- we may have something that
16    we're bringing to the Board to discuss or show, and then we
17    have Board discussion.  And lately we've been having a lot of
18    executive sessions.
19 Q  What's the NCRL's annual budget?
20 A  Interesting question.  Do you want total budget or working
21    budget?
22 Q  Let's start with total budget.
23 A  Total budget is about 13.5 million.
24 Q  And working budget?
25 A  About 7 million.

Page 18

1  Q  And what accounts for the difference?
2  A  The 13.5 includes endowments, designated funds, and cash
3     carryover.
4  Q  Has the budget been increasing in recent years?
5  A  We're under the limitation, the 1 percent limitation.  So
6     very slowly.  Very slowly.
7  Q  Is that by design?
8  A  That's Tim Iman's thing so we're -- yeah, legislatively we're
9     under -- we can only have 1 percent increase in our revenue.
10 Q  Okay.
11 A  New construction is excluded from that.
12 Q  Do you have any new construction projects planned or under
13    way?
14 A  We don't, but there's lots of new construction in the County
15    so -- but that's slow to get on the books -- the tax books
16    for us.
17 Q  Okay.  All right.  And what are the library's major funding
18    sources?  Most of it is tax revenue, I assume.
19 A  Most of North Central Regional library is funded by property
20    tax.
21 Q  Okay.
22 A  There is some miscellaneous funding, but it is primarily
23    property tax.
24 Q  Have you gotten any grants from the Gates Foundation?
25 A  Yes.

Page 19

1  Q  How much total?  Can you give me a ballpark number?
2  A  I cannot.
3  Q  And when did you get your first Gates Foundation grant?
4  A  Would have been -- I -- I'm going to guess, Duncan.  It was
5     in the '90s.  It was in there when they gave everybody
6     computers.
7  Q  All right.  And is that what the grant was for, to buy
8     computers for the library?
9  A  Yes.  Yes.
10 Q  Did the grant money go for anything else?
11 A  No, I don't believe so.  I mean, it included software.
12 Q  Right.  Okay.  Have you received any other grants or -- or
13    any other miscellaneous funding that's gone toward the
14    purchase of computers or software products or anything like
15    that?
16 A  I don't think so.
17 Q  What monies were used to pay for the Fortinet product?
18 A  I'd have to look specifically at the budget, but I think that
19    came out the automation designated fund.
20        MR. ADAMS:  Duncan, may I have a brief word?
21        MR. MANVILLE:  Yeah, that's fine.  Go ahead.
22        (Discussion had off record.)
23 A  Duncan, we also received CIPA funding, obviously -- E-rate
24    funding.
25        MR. ADAMS:  That's CIPA, C-I-P-A, all caps.

Page 20

1        MR. MANVILLE:  And it's E-rate funding, E, dash,
2     R-A-T-E.
3  Q  (By Mr. Manville)  And do you also -- does the library also
4     receive LSTA grants?
5  A  What kind of grants?
6  Q  LSTA grants.  LSTA grants.
7  A  Oh, yeah.
8  Q  All right.  Do you know, Dean, how the Board -- how the Board
9     members are selected?
10 A  Yes.  They are appointed by the County Commissioners in five
11    counties.  So let's give an example.  We have a Douglas
12    County appointee.  They're appointed by the Douglas County
13    Commissioners, and then they have to be -- there's
14    concurrence in all five counties with the Commissioners
15    before that person can be on the Board.
16 Q  How long do the Board members serve?
17 A  Initial terms -- well, it depends.  If they're filling
18    somebody else's term, it's that.  But a term is seven years.
19 Q  It's a major commitment?
20 A  It's a major commitment.  These are wonderful people.
21 Q  How long has your current Board president been a Board
22    member?
23 A  At least one term.
24 Q  Okay.  Are there Board members who have served for more than
25    one term?

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

234

65fdb704-fa3f-4ced-944b-bc4e673c3b71

Page 21

1  A  Yes.
2  Q  Current Board members?
3  A  Yes.
4  Q  All right.  Can you give me an idea of what Dan Howard's role
5     and responsibilities are?
6  A  He's head of Public -- he's the Director of Public Services.
7     We're divided up in four -- is it four areas?  We're
8     Administrative.  We're Public Services, Organization and
9     Materials, and Facilities.  Dan runs Public Services.
10 Q  Okay.  And was that Organization Materials or --
11 A  Correct.
12 Q  -- Organization -- okay.  So Organization Materials.  And
13    what was the last division?
14 A  Facilities.
15 Q  Facilities.  All right.
16       Who -- is there somebody who reports to you who heads
17    each of those divisions?
18 A  Yes.
19 Q  So who -- who heads up the Administrative --
20 A  I do.
21 Q  -- Division.  Okay.  Is there anyone who reports to you
22    who -- whom everyone else in the division reports to?
23 A  No.
24 Q  Okay.
25 A  Well, yeah.  Sue.  I mean, the Finance Manager.  Is that what

Page 22

1     you were asking?  I kind of spaced out there for a second.
2  Q  I think that's right.  Did --
3  A  In Administration?  Is that what we're talking about?
4  Q  Yeah.
5  A  Yeah.
6  Q  So Sue reports to you --
7  A  She signs the time sheets for all the staff underneath her.
8  Q  And everyone else in Administration reports to her?
9  A  Yes.
10 Q  She reports to you?
11 A  Yes.
12 Q  Okay.  And then Organization and Materials, who heads up that
13    Division?
14 A  Marilyn Neumiller.
15 Q  Could you spell both names for me?
16 A  Okay.  M-A-R-I-L-Y-N, N-E-U-M-I-L-L-E-R.
17 Q  I'm sorry.  You weren't expecting a pop quiz.
18 A  I know.  A spelling test.
19 Q  Facilities, who heads up that division?
20 A  It's pretty loose.  But Renee Whitfield is the -- is doing --
21    is our Facilities manager right now.
22 Q  Is that R-E-N-E-E?
23 A  We really don't have a full manager in Facilities.  We kind
24    of share it.  She's doing this building and the Wenatchee
25    building.

Page 23

1  Q  Okay.
2  A  But Dan handles the facilities as it relates to the branches.
3  Q  And that's Renee, R-E-N-E-E?
4  A  Yes.  Whitfield, W-H-I-T-F-I-E-L-D.
5  Q  Okay.  And I've been referring to these as divisions, but is
6     that right?  Is that what you refer to them as?
7  A  Well, they're budgetary areas.
8  Q  Okay.
9  A  It's the state BAR system.  And I've forgotten what the
10    BAR stands for.  But it's how we budget and classify people.
11 Q  All right.  And as head of -- or somebody who is in part
12    responsible for Facilities, what does -- what does Mr. Howard
13    do?  What are his responsibilities in that regard?
14 A  Well, it's a complicated arrangement we have.  And you want
15    me to go further into it?  We don't own the buildings at our
16    branches.  The Cities own the buildings.  And this is
17    historically since the Region was started.
18       So Cities own the buildings.  We provide services and
19    the insides.  So there's a lot of -- as you can imagine,
20    we're talking to mayors and city clerks quite frequently.
21 Q  Okay.
22 A  And Dan handles a lot of that.
23 Q  Okay.  And as head of the Public Services Division, what does
24    he do?
25 A  He oversees the branches and our mail order operation.

Page 24

1  Q  Okay.
2  A  It's a big job.
3  Q  Sounds like it.
4        And in terms of overseeing the branches, what do you
5     mean by that?  Is that -- obviously the facility itself.  In
6     what --
7  A  The people.
8  Q  The people.  Okay.
9  A  And managing the services that are going on there.
10 Q  Okay.  What's your mail order program?
11 A  We started it.  We're pre Amazon.  It is -- we are.  We were
12    the first library to do it and we're probably going to be the
13    last to ever do it.  But we mail -- we do direct mail to
14    anybody in our region.  They can access us on our web page.
15    We send out a teaser catalogue.  It's a paper catalogue.  We
16    do three a year.  800 number they can call and we'll mail it
17    to you free of charge.  And the return mail is free also.
18    Wonderful service.
19 Q  You're talking about books?
20 A  Books, DVD's, and audiotapes.  I mean now it's CD's.  Sorry.
21 Q  Okay.  Do people return them?
22 A  We get an incredible return rate through mail order.  It's 98
23    percent.  It's amazing.  It really is an amazing program and
24    people love it.
25 Q  I imagine.  Okay.  A little more background on the -- sort of

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

65fdb704-fa3f-4ced-944b-bc4e673c3b71

Page 25

1    general background on the library.  What geographic region
2    does the library cover?
3  A  Five counties.
4  Q  And those are?
5  A  It's Chelan, Douglas, Ferry, Grant, and Okanogan.
6  Q  Okay.  And how many branches does the NCRL --
7  A  28.
8  Q  Okay.  What -- what sort of materials does the NCRL stock?
9    Primarily books, I assume?
10 A  We're heavy into books.  We're heavy into books.
11 Q  But also you mentioned DVD's?
12 A  And we do have DVD's.  Some -- and we have spoken word CD's
13   in the branches also.  And we have some music CD's.  Not a
14   lot.
15 Q  Anything else that people can take out?
16 A  No.  I think you're referring to like some libraries do
17   paintings and games and that kind of stuff.  No, we don't.
18   We don't have those.
19 Q  Do you know how many patrons the library has?  How many card
20   holders?
21 A  Potential -- I couldn't tell you right now.
22 Q  All right.  And I saw somewhere in the materials that I
23   reviewed some time ago the NCRL was operating without library
24   cards, right?
25 A  Up to -- I think, it was two years, ago.

Page 26

1  Q  Is that right?
2  A  -- if I'm correct.  No, we never had library cards.
3  Q  How did that work?
4  A  Great.  It was laborious.  It was a paper system.  And you
5    just gave your name and address and -- and you got your
6    materials.
7  Q  Okay.  And so somebody could be out in Wenatchee from Seattle
8    and take out a book and --
9  A  Yes.  We have a reciprocal borrowing arrangement with Seattle
10   so --
11 Q  So you can return it at a Seattle library?
12 A  I suppose you could.
13 Q  And why did you institute library cards procedures?
14 A  Because we finally could.  We didn't have -- as you can
15   imagine in five counties, we didn't have the infrastructure.
16      I think Seattleites take it as a given that it's
17   there.  We did not have the infrastructure to run our
18   computer system.  So we just recently went to an automated
19   search system that linked everybody together.  And so, you
20   know, it's been a miracle.  I didn't think I would live long
21   enough to see it happen, if you want to know the truth.
22      Okanogan County up to -- it was two years ago they
23   still had places that didn't have telephones.  So it's --
24   I'll tell you it's been one of the biggest challenges of
25   North Central has been infrastructure.

Page 27

1  Q  And getting back to my earlier question, off the top of your
2    head, you're not sure how many library card holders there are
3    at the moment?
4  A  Duncan, I'm horrible remembering numbers.  I can't tell you.
5    I'd have to look it up.  It's right on the --
6  Q  Sure.
7  A  -- balance score card and it's on other things.  I could pull
8    it up for you anytime.
9  Q  All right.
10 A  It's a lot, Duncan.
11 Q  How would you describe the NCRL's mission?
12 A  Our mission is to promote reading and life-long learning.
13 Q  And that is a Mission Statement that I think is on the NCRL's
14   website currently?
15 A  It is.  It is.  And we take it so seriously.
16 Q  Let me just show you a couple of documents here.  This one is
17   Bates label NCRL 01119 and then NCRL 01114.  And I'll
18   represent to you that, obviously, these documents were
19   produced to us by the library.  These are part of your
20   initial disclosures.  And I've -- as you'll see, with a lot
21   of these documents, I've kind of mixed them up.  So they're
22   not in the order that was produced but they're in an order
23   that makes sense to me.
24 A  Okay.
25 Q  So let me just hand you this.  And take a look at that and

Page 28

1    tell me if that first page there to the best of your
2    knowledge accurately reflects the size of the various NCRL
3    branches --
4  A  Yes.
5  Q  -- the square footage.
6  A  Yes.
7  Q  Okay.  And then can you flip to the second page?
8  A  Can I add to this?
9  Q  Please do.
10 A  Some of the square footage does include -- we reimburse --
11   it's not a reimbursement.  It is not a gift.  It is money
12   that we exchange with the Cities by contract to give them
13   money back to make repairs on the buildings.  And we base
14   that on their square footage.  So if you look at Moses Lake,
15   it's 11,518.  That's going to include some of the area
16   outside because that was negotiated.  So some of the numbers
17   will be slightly inflated because they may include a restroom
18   that's not directly attached to the building.  But, yes, it's
19   a general --
20 Q  Okay.  And that's fine.  I appreciate the clarification.  The
21   second document there --
22 A  Oh, okay.
23 Q  -- what is -- what is this NCRL overview?  What was that used
24   for?
25 A  That's part of our balance score card.  And this has recently

7 (Pages 25 to 28)

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

65fdb704-fa3f-4ced-944b-bc4e673c3b71

Page 37

1    interlibrary loan program, correct?
2  A  To the best of my knowledge, no.
3  Q  Well, what's your understanding of -- do you have an
4     understanding of whether there is material that -- that is
5     available on the Internet that is not protected by the First
6     Amendment?
7  A  Well, Duncan, I know that your stance is probably that all
8     speech is protected under the First Amendment.  And I don't
9     have that kind of knowledge or I don't have -- I don't know
10    if my beliefs contain that all -- everything on the Internet
11    is protected by the First Amendment.
12  Q  But do you have an understanding of -- of what material is
13    not protected?
14         MR. ADAMS:  I'll object that -- to the extent
15    that calls for a legal conclusion.
16  A  I only have CIPA that I -- that would probably be the most
17    direct answer.
18  Q  And what's your understanding of what CIPA provides?
19  A  It -- CIPA says that we need to filter for pornography -- I
20    mean for obscenity, child pornography, and harmful to minors.
21  Q  Does CIPA say anything else?  Is it limited to visual
22    depictions?
23  A  I'd have to look at it, Duncan.  I would be afraid to quote
24    from the law.
25         MR. ADAMS:  The statute speaks for itself, of

Page 38

1     course.
2  Q  You played a role in developing the NCRL's Internet Use
3     Policy, correct?
4  A  Yes.
5  Q  Did you review CIPA when you developed that policy?
6  A  That policy was in place before CIPA.
7  Q  Has the policy remained unchanged since CIPA was enacted?
8  A  It was reaffirmed and the wording was changed to reflect
9     recommendations that ALA said to include in it.
10  Q  Okay.  Why did the NCRL obtain public computer terminals for
11    its libraries?
12  A  Public access computers?  Public Internet access computers?
13  Q  Well, I assume that the computers came first and then the
14    Internet followed afterwards; is that right?
15  A  Yes.  I believe we had some computers that had some software
16    on them, word processing software.  Now we're going way back.
17  Q  Sure.  Do you know if they were in all branches?
18  A  No.
19  Q  What was the -- what was the purpose of obtaining Internet
20    access for the NCRL's public terminals?
21  A  Our goal ultimately was to have Internet at all the branches
22    so we could have an integrated catalogue and circulation
23    system all along.  And so the Internet access by the public
24    was almost an add-on.  I mean, Duncan, realize we had dial-up
25    in some of these places.  It wasn't exactly a good service.

Page 39

1  Q  Uh-huh.  Are all the public terminals now at the NCRL's
2     branches, are they high-speed Internet?
3  A  I believe we're there now.  But we've still got, I think, a
4     couple of places that are iffy, but I'd have to check.
5  Q  Iffy in the sense that they might still be a dial-up
6     connection?
7  A  No.  That they may be a cable connection or a satellite
8     connection.  But --
9  Q  Okay.
10  A  -- we're trying to be fiber everywhere, obviously.
11  Q  Do you recall when the NCRL first made the Internet available
12    to its patrons?
13  A  Oh, boy.  I think I'm -- I'd have to guess.
14  Q  Do you know if it -- was it in the late '90s?
15  A  Yeah, I'd say it was close to 2 -- yeah.
16  Q  What was the first NCRL branch that had Internet access?
17  A  The Wenatchee branch.
18  Q  Do you know how much the NCRL pays for Internet access every
19    year?
20  A  I thought you would ask me that question and I was going to
21    look it up for you.  It would be basically impossible.  It
22    would take a lot of time to do it out because we would have
23    to look at -- because our budgeting is in four categories.
24    And then under that it's different categories.  So it's going
25    to come out of Supplies.  It's going to come out of

Page 40

1     Telecommunications.  It would be rough to get just a figure
2     of what it costs.
3  Q  Can you give me a ballpark?
4  A  I can't.
5  Q  I mean, are we talking less than 10,000?  More at that
6     50,000?
7  A  I couldn't even guess.  I don't know.
8  Q  Have you ever done that analysis to determine how much the
9     Internet costs NCRL every year?
10  A  No, because it's so -- it's our infrastructure for our
11    catalogue and our circulation system.  So it's the cost of
12    doing business at this point.
13  Q  Sure.
14  A  I mean, so just to separate out public access to it, I don't
15    even know how to do that.
16  Q  Now, I know that the NCRL has a number of different branches,
17    but is there any way you can give me a general idea of where
18    the public access computer materials are typically located,
19    or does it really vary from branch to branch?
20  A  It varies from branch to branch.  And it's where we could get
21    the wiring in.  We don't own the buildings, as I said, so
22    it's a negotiation with the Cities on what we do.  And it's
23    where we can get the connection in.  And a lot of these
24    places are very old, so you can imagine that the wiring is a
25    problem.

10 (Pages 37 to 40)

65fdb704-fa3f-4ced-944b-bc4e673c3b71

Page 41

1  Q  Uh-huh.  Where are the public access terminals located in the
2     Wenatchee branch?
3  A  They're on the lower mezzanine.  And they're there because we
4     did a remodel down there.  We had planned ahead that we would
5     someday have computers down there.  So they have -- that's
6     probably the only branch that had a planned area for Internet
7     computers or computers of any kind.
8  Q  What's the next largest branch?
9  A  Moses Lake.
10 Q  Moses Lake?
11 A  Yes.
12 Q  Where are the computers located in the Moses Lake branch,
13    public access terminals?
14 A  Well, I don't know how to answer that.
15 Q  Why don't you know how to answer that?  Are they on the main
16    floor or --
17 A  Yes.  There is only one floor in Moses Lake and, yes, they're
18    just in an area.
19 Q  So can you sort of describe it for me?
20 A  Well, if you walk in the door, you're going to see a main
21    desk in the middle.  And if you go to the left, there's some
22    restrooms.  And then there's -- around the restrooms there's
23    public access computers.
24 Q  And --
25 A  And I believe, yes, that's it.

Page 42

1  Q  Is that where they're all located?
2  A  Yes.  I think they're at the central desk.  It's a big
3     central area, desk area, because there's some huge columns in
4     the middle of that building.  And I think there are some
5     public access there, but they're -- I think they're limited
6     to databases that are licensed databases.  I'm stumbling on
7     that.
8  Q  And the -- the Internet access terminals in the Moses Lake
9     branch --
10 A  Uh-huh.
11 Q  -- which way do they face?
12 A  There's -- it's a -- it's a space.  It's a space.  They
13    have -- there's two on each side, I believe.  No, there's
14    probably -- I don't know how many.  There's either three or
15    two on each side and your back faces -- I mean, you're back
16    to back.  And you're next to two other people.  I think there
17    are three there.  I'd have to look at the number of them
18    there.
19 Q  Three on each row?
20 A  Yes.
21 Q  So six total?
22 A  Correct.
23 Q  Okay.  And why were the -- why were the terminals in the
24    Moses Lake branch set up that way?
25 A  That was the only place we could get the wires in.

Page 43

1  Q  All right.
2  A  It's a huge, concrete, very interesting building but not
3     designed to wire.  It's concrete.  You're drilling holes --
4     expensive holes wherever you go.
5  Q  So you have to drill through the outside walls?
6  A  We did.
7  Q  Okay.
8  A  It was -- and where do you put the router?  It's an extremely
9     problematic thing.
10 Q  Where did the router go there?
11 A  I think it's on one of the poles now.
12 Q  Okay.
13 A  But it was a big negotiation where it would go.
14 Q  I bet.  What's the NCRL's smallest branch?
15 A  Oh, the teeniest branch?  I'd have to look at -- we've got a
16    few.  I think the East Wenatchee branch is under 1,000.  It's
17    right about 1,000 square feet.  But we probably have a couple
18    that are as small.
19 Q  Uh-huh.
20 A  Different configurations.  I can look at that.  Thank you.
21    Well, Entiat is awfully small and Twisp is -- looks like is
22    the smallest.
23 Q  Let's talk about Twisp.  How many public access terminals are
24    there in Twisp?
25 A  I think there's two there now.  There was one for a long

Page 44

1     time.
2  Q  And where is it located?
3  A  Just right off the desk.  I mean, you can't turn around in
4     the Twisp branch and not find it.
5  Q  Okay.
6  A  If you can imagine, that's about the size of some people's
7     bedrooms.
8  Q  Okay.  Sure.  Did the monitors face out into the rest of the
9     library?
10 A  Yes.
11 Q  So --
12 A  Because the wiring is right on the other side of it.  So the
13    wall --
14 Q  If you're using the computer, your back is to the rest of
15    the --
16 A  Yes.
17 Q  -- of the room?
18 A  Yes.
19 Q  Okay.  Does the NCRL use any privacy screens on any of its
20    public access terminals?
21 A  Not currently.
22 Q  Why not?
23 A  When we first started in Wenatchee, we did use them.  And
24    people found them a hindrance.  They didn't like them.  And
25    no one has asked for them since.  They were vandalized

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

238

Page 45

1  repeatedly. People complained they couldn't see. Two people
2  couldn't work at them at once.
3  Q  Do you have any written incident reports or anything like
4    that --
5  A  No.
6  Q  -- reflecting the vandalism?
7  A  No.
8  Q  Why not?
9  A  It didn't seem that important.
10 Q  When you say they were vandalized, what do you mean? What
11    happened to them?
12 A  Oh, kids would take them off and they'd get beat up. And,
13    you know, the more that they pulled them off, then they
14    wouldn't go back on. And we were repairing them.
15 Q  So they would take them off the screen and just set them on
16    the floor?
17 A  Sure. Run their chair over them, yeah.
18 Q  Okay.
19 A  Maybe vandalism was too strong a term but --
20 Q  So it isn't -- you don't recall an incident where somebody
21    took the screen off and --
22 A  Hit somebody with it?
23 Q  -- threw it against the wall or --
24 A  No.
25 Q  -- or wrote on it or anything like that?

Page 46

1  A  No.
2  Q  They just removed them and -- and --
3  A  Got rid of them, yes.
4  Q  Yeah. Okay.
5  A  Taking them off wasn't easy. So they would pull off the
6    parts where it would attach and --
7  Q  Do you have any -- were there any written complaints that
8    people submitted about being unable to -- see properly or
9    being unable to work two at a computer or anything like that?
10 A  No.
11 Q  Do you recall any -- the names of anybody who complained
12    about that?
13 A  No.
14 Q  What would they do? Come up to the front desk and complain
15    about it?
16 A  Yes. They would say "Take it off."
17 Q  Do you recall how many complaints you received?
18 A  No.
19 Q  Do you remember when those privacy screens were installed?
20 A  It would have been right when we started doing Internet at
21    Wenatchee, so it would be whenever we started.
22 Q  So when you introduced Internet service at the Wenatchee
23    branch --
24 A  Uh-huh.
25 Q  -- you put privacy screens on all the public terminals?

Page 47

1  A  I think it was on all of them, but I'm not sure.
2  Q  Do you remember how long they were up for?
3  A  I couldn't recall that.
4  Q  Was it a period of weeks or months or years?
5  A  I don't know.
6  Q  How many terminals are we talking about initially?
7      MR. ADAMS: In Wenatchee?
8      MR. MANVILLE: Yes.
9  A  I don't know, Duncan. I'd have to look. It was -- it was --
10    I think it was under five.
11 Q  (By Mr. Manville) Did you ever install privacy screens on any
12    of the NCRL's other public access terminals?
13 A  No.
14 Q  Is there a library employee or staff person who would -- who
15    was working at the Wenatchee branch at the time who might
16    remember some of these incidents that you discussed?
17 A  No, I don't think so. And the IT person has passed away, and
18    the privacy screens were really his thing. At the beginning
19    of the Internet, he wanted people -- he was worried about
20    people buying things on the Internet. And the way things --
21    our computer system was running, it was difficult to get
22    things erased off. He was worried about people having access
23    to credit cards and that kind of stuff.
24      So we tried that. And it -- people didn't seem to
25    like it. There were no requests for it when it was gone. I

Page 48

1  never have seen a request for a privacy screen or heard of
2  one.
3  Q  Have you ever considered the option of recessing the computer
4    monitors into the desk that they're sitting on?
5  A  No. They're -- they're really expensive, I've heard.
6  Q  The recessed desk, you mean?
7  A  I didn't ever see any need for it.
8  Q  Do you know how expensive those desks are?
9  A  I don't know.
10 Q  Have you ever looked to find out?
11 A  No. Duncan, you have to understand that Internet access has
12    not been the number one -- public Internet access has not
13    been our number-one priority. And to just have the things
14    running has been an amazing feat. So to go to that next
15    level would be very odd.
16 Q  Now, I understand that -- and I -- I'm on the board of an
17    arts organization myself and everything runs on a shoestring.
18    And that isn't necessarily the way things work here, but I --
19    I understand.
20 A  Okay.
21 Q  Even so --
22 A  Even so.
23 Q  So you have not considered buying desks that you could recess
24    a monitor in?
25 A  No.

12 (Pages 45 to 48)

65fdb704-fa3f-4ced-944b-bc4e673c3b71

Page 49

1  Q  You said you heard that they were expensive. Where did you
2     hear that?
3  A  I probably read an article. I shouldn't speculate but -- I'm
4     just guessing.
5  Q  Have you ever -- have you ever considered other options for
6     ensuring that library patrons who don't want to see it aren't
7     exposed to, for example, pornography?
8  A  No.
9  Q  Why is that?
10 A  Our mission is to promote reading and life-long learning.
11    And if we have somebody doing that, it changes the
12    environment in our branches. The State Librarian referred to
13    us repeatedly in newspapers as the most family-friendly
14    library in the state. And we are very proud of that. And
15    it's -- we promote kids coming to the library without their
16    parents. We want them there. And the parents' expectation
17    is that it's a safe place. And allowing that kind of
18    activity in the library is not safe for kids.
19 Q  How would it be unsafe for kids to allow that kind of
20    activity if nobody knew it was going on?
21 A  It changes the environment.
22 Q  How so?
23 A  Give me an example of -- what do you mean? A person comes in
24    or what?
25 Q  Well, let's say, you know, there are four people sitting

Page 50

1     at -- what are we talking about -- the Moses Lake branch?
2  A  Uh-huh.
3  Q  So six people sitting at the public terminals. And let's
4     assume that all the screens are recessed in the desks. So no
5     one else other than the person looking at the screen can see
6     what he or she is looking at.
7  A  Uh-huh.
8  Q  And let's assume that one of those people is looking at
9     pornography. How does it change the environment in the rest
10    of the library for this one person to be looking at
11    pornography when no one else in the library knows that he or
12    she is doing it?
13 A  Okay. I get back to -- my response is always that, you know,
14    there's -- there's private behavior, which I don't judge and
15    I don't care about. But there's public behavior. And
16    looking at images that would be explicit adult images are
17    improper in a public setting where kids are around or women
18    are around.
19 Q  But if the kids or women don't know it's going on and aren't
20    impacted by it in any direct way, how does it affect them?
21 A  You would have to assure me that they wouldn't be impacted.
22 Q  And that is my hypothetical. They're not. They don't know
23    it's happening.
24 A  But they could also. If it's a hypothetical, they could.
25 Q  How could they?

Page 51

1  A  What if this person prints it out. What if they invite
2     somebody next to them to look at it. What if they do it in a
3     way where they're touching themselves inappropriately.
4  Q  Are you -- have you ever explored the possibility of
5     implementing controls on printing such that somebody couldn't
6     just print out an image from an explicit website and just
7     leave it lying on the printer across the library?
8  A  Yes. We put the printers in where the -- a librar -- most
9     places. But, again, it's a -- it's a wiring problem and how
10    close it has to be to the computer and stuff.
11 Q  Have you looked at any system --
12 A  But we filter, Duncan, so that's a limited problem for us.
13 Q  You have had problems with people looking at pornography even
14    though you filter, right?
15 A  Oh, of course.
16 Q  All right. And those people with the system that you have
17    right now could print those images on an NCRL printer and
18    leave them sitting there?
19 A  Sure.
20 Q  Do you have any idea whether the prevalence of people looking
21    at pornography on an NCRL terminal would go up or down if the
22    filters were removed?
23        MR. ADAMS: Object to the form of the question.
24    No foundation.
25 A  I would assume it would go up.

Page 52

1  Q  Why would you assume that?
2  A  The times when the filter has gone off, there's been an
3     influx of that activity.
4  Q  How many times has the filter gone off?
5  A  I -- I couldn't tell you.
6  Q  When was the last time it happened?
7  A  I couldn't tell you.
8  Q  Do you know how frequently it happens?
9  A  Infrequently.
10 Q  When the filters go off, how long does it go off for?
11 A  We immediately get told "Is the filter off?" We get a call
12    and then we put it back on.
13 Q  How do you know that there is an influx of activity when --
14 A  We get an immediate call. I'm sorry for interrupting.
15 Q  No, that's fine. How do you know there's an influx of
16    activity? You -- let me rephrase that.
17        When you get an immediate call, who do you get a call
18    from?
19 A  The branch librarian.
20 Q  At the branch where the filter isn't working?
21 A  Yeah.
22 Q  What does he or she tell you, that the filter is not working?
23 A  They usually call and say "Is the filter off? Because we're
24    getting some really weird stuff here."
25 Q  Meaning what?

13  (Pages 49 to 52)

65fdb704-fa3f-4ced-944b-bc4e673c3b71

Page 53

1  A  We -- meaning that usually it's adult explicit material.
2  Q  People coming in to look at it or it's just coming up when it
3     shouldn't be coming up?
4  A  No.  Probably people looking at it.
5  Q  When the filter goes off, you don't know how long it's kind
6     of typically off for?
7  A  No.
8  Q  Do you think it's hours, days, weeks?
9  A  I don't know.  More like an hour.
10  Q  Do you think word gets around the community that the filters
11     are off?
12  A  I don't know.  That's an interesting question.
13         MR. ADAMS:  It also calls for speculation.
14     Objection.
15  Q  But you don't remember the last time it happened?
16  A  No.
17  Q  Have you yourself gotten a call from a branch librarian
18     saying "Hey, I think the filters aren't working"?
19  A  No.
20  Q  What's the basis for your statement that sometimes those
21     calls come in?  Who do the calls come to?
22  A  They'll come to either Barbara or Dan.
23  Q  You don't remember the last time either one them reported to
24     you that there was a problem?
25  A  No.  Barbara doesn't report every technical problem to me.

Page 54

1  Q  Are there written memos or reports generated when the filter
2     goes down in a branch?
3  A  No.
4  Q  Is that ever reflected in any kind of e-mail or anything like
5     that?
6  A  No.  It would be seen like a technical problem.  They would
7     call and say "Is the computer broken?  Fix it."
8  Q  Other than what we've just discussed, is there any other
9     reason why you think more people would come in to NCRL
10     branches and look at pornography if the filters were removed?
11  A  Could you rephrase that?
12  Q  Sure.  We just -- I asked you earlier whether you thought
13     that if the filters were removed there would be more
14     instances where people were looking at porn --
15  A  Uh-huh.
16  Q  -- at NCRL branches.  And when I asked you why you thought
17     that, you said because when the filters go down, there are
18     reports of people looking at -- more reports of people
19     looking at pornography, right?
20  A  Uh-huh.
21  Q  Is there any other reason why you think more people would be
22     looking at porn or obscenity or child pornography at NCRL
23     computers if the filters were removed?
24         MR. ADAMS:  Objection.  I think that
25     mischaracterizes his earlier testimony.  He reported his

Page 55

1     anecdotal experience.  He didn't testify as to a cause and an
2     effect.
3  A  Libraries have a peculiar problem that we attract a certain
4     element in our communities that isn't always family friendly.
5     Recently there was the gentleman that self-described himself
6     as a pedophile.  And in reading the newspaper, he was
7     saying -- telling people to go to the library because it was
8     a good place where children hung out.  We have had incidents
9     with sex offenders, and my assumption is that that would
10     continue to be a problem and might increase.
11  Q  What incident have you had with sex offenders?
12  A  I think you've been given those incident reports.
13  Q  Is this in the stack that was just handed to me?
14         THE WITNESS:  Have we provided those?
15         MR. ADAMS:  Is that in the stack?
16         MS. MONROE:  Yeah.  He has the stack that was
17     provided yesterday.
18  Q  What incidents are you talking about?
19  A  I'd have to look at them, Duncan, to answer clearly.
20         MR. MANVILLE:  Can you dig them out?
21         MR. ADAMS:  Can I make a suggestion?  Can we take
22     a short break and then you can look through there and then
23     ask him questions about it?
24         MR. MANVILLE:  That's fine.
25         (Recess.)

Page 56

1  Q  (By Mr. Manville) I've just been going through some of these
2     documents that were recently produced.  And at the top of
3     this stack is some incident reports relating to some sex
4     offenders that came into various NCRL branches; is that
5     right?
6  A  Uh-huh.  Uh-huh.
7  Q  Is there a -- okay.  This document Bates label NCRL 01595 is
8     a North Central Regional Library Incident Report; is that
9     right?
10  A  Uh-huh.
11  Q  Are there policies in place governing when NCRL staff are
12     required to complete an incident report like that?
13  A  We ask them to complete an incident report on everything.
14     It's mostly used, Duncan, for insurance purposes, if somebody
15     trips or a book falls on their head.  But it's also used for
16     any time we do this.  And if the police are called in, the
17     police report is added to this.
18  Q  All right.  And I think you said that library staff are asked
19     to complete an incident report for everything.  What do you
20     mean by "everything"?
21  A  Anything that happens where they have to call the police or
22     somebody gets hurt.
23  Q  Okay.  Those are the criteria?
24  A  Basically, yes.  It's not a written-down policy.
25  Q  Is there -- is there an expectation that the library staff

14  (Pages 53 to 56)

65fdb704-fa3f-4ced-944b-bc4e673c3b71

Page 57

1    are going to complete an incident report if a library patron
2      violates library procedures or --
3    A  If they have to throw somebody out or ask them leave, I would
4      think that they would do an incident report.
5    Q  Are they supposed to in that circumstance?
6    A  Yes.
7    Q  And by "throw someone out," you mean asking people to leave?
8    A  Yes.  I'm sorry.  I was crude there.
9    Q  So if, for example, somebody were on an Internet terminal and
10     had somehow managed to get around the filter and was looking
11     at material that was obscene --
12   A  Uh-huh.
13   Q  -- that would be a violation of the NCRL policy?
14   A  Uh-huh.  Yeah.  And it probably wouldn't have gotten an on an
15     incident report.  They would just ask them to get off the
16     terminal.
17   Q  And why wouldn't that sort of thing get on an incident
18     report?
19   A  It -- it kind of depends on the gravity.  Duncan, we're not
20     really good at -- the case has made us better on documenting
21     things.  We just really haven't operated that way.  We have
22     tons of volunteers.  We have part-time people.  We have
23     substitutes.  It's really difficult to keep everybody trained
24     and -- and aware of these things.  But we're really drumming
25     on them to do an incident report on all things.

Page 58

1    Q  And this is particularly since the case was filed?
2    A  Yes.  We want to have a good paper trail for you.
3    Q  And the lawsuit was filed, boy, about a year ago?
4    A  Yes.
5    Q  Do you know if there have been any incident reports placed in
6      the file relating to requests that people leave the library
7      because they were looking at materials --
8    A  Yeah.
9    Q  -- that were inappropriate?
10   A  No.  No.  You would have received them if we did.
11   Q  Are you aware of any incidents in the last year where that's
12     happened, where people were looking at materials that are not
13     allowed by the NCRL's policy?
14   A  Yes.
15   Q  And is that -- are those incidents reflected in
16     documentation?
17   A  No.  It would have been a technical report.  It would have
18     been somebody calling in and saying "Is the filter off," or
19     "We're having a problem here."
20   Q  So by technical report you mean somebody calling in and
21     saying there's a technical problem?
22   A  Yeah.
23   Q  So when somebody comes in and gets around the filter
24     somehow --
25   A  Uh-huh.

Page 59

1    Q  -- or the filter isn't working and that person is looking at
2      obscene materials, that's viewed as a technical problem more
3      than a violation of library policies by a library patron?
4    A  I don't understand that question.
5    Q  Well, the main -- is your main concern if somebody is looking
6      at inappropriate material that the filter has broken down or
7      been bypassed, or is your main concern that somebody is
8      looking at inappropriate material?
9    A  Well, the first would be the inappropriate material.  And
10     then we would ask why, and we would assume it's a technical
11     problem.
12   Q  So if the primary issue is somebody is looking at
13     inappropriate material, how come that doesn't get written
14     down in an incident report?
15   A  Well, we'll work on that.
16   Q  Are you aware of any incident where a patron has been looking
17     at obscene material, for example, and been asked to stop or
18     leave and has continued to look at the obscene material?
19   A  No.
20          MR. ADAMS:  You mean refused an instruction to
21     leave?  Is that what you're saying?
22          MR. MANVILLE:  No.  I'll let the question stand.
23     But I can clarify a little bit.
24   Q  (By Mr. Manville) Are you aware of any incident where
25     somebody has refused an instruction to stop looking at

Page 60

1      obscene material or other material that's not allowed by the
2      NCRL's policies?
3    A  No.
4    Q  And that's during your entire tenure with the NCRL, correct?
5    A  Yes.
6    Q  Are you aware of any incident where a library patron was
7      asked to stop looking at inappropriate material and indicated
8      that he or she would stop, but continued to look at the
9      inappropriate material?
10   A  I don't understand that.
11   Q  Are you aware of any incident where somebody is sitting at a
12     terminal --
13   A  Right.
14   Q  -- and they're looking at inappropriate material and the
15     librarian says "Stop doing that," and they say "Sure.  No
16     problem," but they keep looking at it?
17   A  I don't know.  Duncan, we don't -- we don't push our
18     librarians to confront people at the terminals.  That's why
19     we use, you know, a technological solution for a
20     technological problem.
21          Our staff is all women.  We only have one male branch
22     librarian and it's -- it creates an extreme kind of hostile
23     situation for them if they have to go confront somebody who
24     is looking at inappropriate material.  So they mostly assume
25     it can be solved on a technological level, which it does,

15  (Pages 57 to 60)

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

Page 61

1   obviously.
2 Q So does the NCRL have any policy, either formal or informal,
3   written or otherwise, for dealing with somebody who is
4   sitting at an NCRL terminal looking at obscene material, for
5   example?
6 A Yes.
7 Q What is the policy?
8 A Well, the policy would be to either ask them to stop or call
9   and say the -- you know, "Is the filter off," you know, "I'm
10   having a problem here." And if they are afraid, we ask them
11   to call the police.
12 Q All right. Is that policy written down anywhere?
13 A I don't believe so.
14 Q Do you know whether all of the NCRL staff know that that's
15   the policy?
16 A I couldn't guarantee it.
17 Q Has that policy been communicated to the staff in any
18   fashion?
19 A Probably several times.
20 Q Verbally?
21 A Yes.
22 Q All right.
23 A Duncan, the filter works so the problem really doesn't come
24   up that often.
25 Q When's the last time the problem came up?

Page 62

1 A Oh, boy. I'd say -- when somebody got around the filter and
2   was looking at inappropriate -- I'd say two months ago.
3 Q What happened?
4 A The one that I'm aware of.
5 Q What happened?
6 A A guy was looking at some inappropriate stuff. And the
7   person next to them came up to the desk and said that they
8   did. And that person went down and said, "You know, you
9   can't look at that here." And the guy stopped and got up and
10   left.
11 Q Do you know what he was looking at?
12 A No.
13 Q Which branch was this in?
14 A The Wenatchee branch.
15 Q And so the person --
16 A I do know what he was looking at, yes.
17 Q What was he looking at?
18 A It was -- it was two men in a sexual act.
19 Q Do you know how he got around the filter?
20 A I do not know.
21 Q Do you know whether that site was a site that should have
22   been blocked by the filter given the way the filter is
23   configured?
24 A Well, obviously, yes.
25 Q Do you know if the library patron got around the filter or if

Page 63

1   that site was simply a site that wasn't blocked by the filter
2   even though it should have been?
3 A I do not know.
4 Q Did you investigate to determine what the problem was?
5 A I didn't personally.
6 Q Did someone else?
7 A I don't remember. I think we -- I think so.
8 Q Who do you think investigated?
9 A I think we probably told Barbara that there was a problem in
10   Wenatchee, and she checked the filter. I mean, unless we
11   have the website, we can't really -- we can't tell.
12 Q How do you know what this gentleman was looking at?
13 A I believe the employee told me, or told Dan and Dan told me.
14 Q Who was the employee?
15 A It was Linda -- I think it was Linda Crosby, but I'm not
16   sure.
17 Q Do you know if this person became threatening or belligerent
18   when he was asked to stop looking at this material?
19 A No, I don't know that. I doubt it. We're a very public
20   place so it would be odd for somebody to be belligerent.
21 Q Is that just in the Wenatchee branch, or is that in any
22   branch?
23 A In any branch.
24 Q Would it be odd for someone to get threatening or violent?
25 A No.

Page 64

1 Q Why?
2 A It's -- we have had problems in places where -- and it's
3   usually younger people. There have been fights at the
4   computers.
5 Q And have those fights related to websites or Internet
6   filtering?
7 A I don't know. It's usually there and we end up having to
8   call the police.
9 Q But this is -- what are you talking about? Two kids getting
10   into a fight by the computers?
11 A Yes. Yes.
12 Q Do you have any reason to believe that -- that library
13   patrons, if they were asked to stop looking at inappropriate
14   material, would get violent or belligerent or threatening?
15   MR. ADAMS: Object to the form of the question.
16 A Yeah, I would have to guess. It would depend on the person,
17   I guess.
18   MR. ADAMS: Also assumes two kids are not library
19   patrons.
20 Q Are you aware of any instance in which a library patron was
21   asked to stop looking at inappropriate material on an NCRL
22   terminal and didn't stop looking at the material?
23 A No.
24 Q Do you know how many times NCRL patrons have looked at
25   material that's prohibited by the NCRL's policies online over

16 (Pages 61 to 64)

| Page 65 | Page 67 |
|---|---|

**Page 65**

1  the last six or seven years?
2      MR. ADAMS: Object to the form of the question.
3  A No.
4  Q If a library patron did continue to look at inappropriate
5    materials or did -- or refused to stop looking at
6    inappropriate material when asked by a librarian, would you
7    expect the librarian to complete an incident report in that
8    instance?
9  A I would expect them to call us and then call the police.
10 Q Can you remember ever receiving a call like that?
11 A No.
12     MR. ADAMS: Did you want to mark that?
13     MR. MANVILLE: No. It's okay. I want to make
14   this one an exhibit.
15         (Exhibit No. 29 marked.)
16 Q (By Mr. Manville) Mr. Marney, I'm handing you what's been
17   marked Exhibit 29. Can you tell me what that is?
18 A That is an incident report.
19 Q Okay. And what is the incident that was being reported in
20   that incident report?
21 A Do you want me to read the description of the incident?
22 Q Do you have any personal knowledge of the incident?
23 A I would have to -- you know, I -- I don't have any personal
24   knowledge of this. I have seen it and signed my name to it.
25 Q Yeah, I was going to ask you. Are those your initials up in

**Page 66**

1  the upper right?
2  A Yes.
3  Q DM?
4  A Uh-huh.
5  Q Do you know what Kamron Wolf was -- do you know whether
6    Kamron Wolf was looking at material online at the time of
7    this incident?
8  A I don't.
9  Q I see under Description of the Incident it says "She pointed
10   out Kamron who was on Computer No. 4."
11       You don't know if he was looking at anything or if he
12   was just sitting there, do you?
13 A I don't.
14 Q Do you know if Mr. Wolf left the library when he was asked to
15   do so?
16 A Yes, he did leave.
17 Q Did he get belligerent or violent or threatening?
18 A I don't know. It doesn't say that.
19 Q Would you expect to see that sort of notation if there had
20   been --
21 A Yes.
22 Q -- some threatening behavior?
23 A (Nods.)
24 Q Yes?
25 A Yes. Sorry.

**Page 67**

1  Q Do you know of any library staff member who has personal
2    knowledge of this incident other than Brian Bourgeois and
3    Katy Sessions?
4  A No.
5         (Exhibit No. 30 marked.)
6  Q Handing you Exhibit 30, can you tell me what that is?
7  A It is an incident report. It's a copy of an e-mail report
8    from the Moses Lake branch.
9  Q Is this a document you've seen before.
10 A Yes.
11 Q Who was that e-mail sent to?
12 A It would have been sent to Dan.
13 Q Did Dan forward it to you?
14 A Yes. I believe Dan printed it out and gave it to me.
15 Q And it appears that this involves somebody named King; is
16   that right?
17 A Where are you seeing that?
18 Q Second paragraph on the second page.
19 A Second page. Yes, she thought his name was King.
20 Q And you don't know this person, this Mr. King?
21 A I do not -- I do not know this person.
22 Q Do you know whether he had actually ever got on an NCRL
23   computer?
24 A I do not know. Well, it says that she -- that he wanted the
25   Internet computer and she handed him a pass and he sat down.

**Page 68**

1  So I don't know if he got on the station or not.
2  Q Where are you reading that?
3  A On the top of page 2.
4  Q Do you know if this gentleman looked at any inappropriate
5    material on the NCRL computer?
6  A No.
7  Q Why was this document provided to us in discovery? What do
8    you think this document has to do with the lawsuit; do you
9    know?
10 A I don't know. I don't know exactly what you're asking.
11 Q Do you think that there is any connection between this
12   document that's been marked Exhibit 30 and the lawsuit?
13 A I think it shows that we do deal with an element of society
14   that is attracted to a public space that we're trying to
15   protect kids from.
16 Q Do you know -- and the element of society you're talking
17   about here is sex offenders, registered sex offenders?
18 A Correct.
19 Q Do you know if those registered sex offenders have a tendency
20   to come into public libraries and look at pornography on
21   Internet terminals?
22 A I have no idea. I have no idea that they don't.
23 Q Do incidents like this -- well, how many incidents like this
24   are you aware of at NCRL branches?
25 A I think we provided you with three or four.

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

244

65fdb704-fa3f-4ced-944b-bc4e673c3b71

Page 69

1  Q There is this one involving Mr. King. There's --
2  A I don't know, Duncan. I don't know what Celeste gave you.
3  Q Well, how many are you aware of off the top of your head?
4  A Of what? Incidents?
5  Q Incidents involving sex offenders at libraries, public NCRL
6    library branches.
7  A I think we have at least one a year.
8  Q What do those incidents typically consist of?
9  A I don't think there's a typical one.
10            (Exhibit No. 31 marked.)
11  Q Handing you Exhibit 31, this is three documents that I put
12    together. These are documents relating to an incident
13    involving a Robert -- I suppose it's pronounced Gouin,
14    G-O-U-I-N; is that right?
15  A I wouldn't know how to pronounce it.
16  Q Are those your initials up at the top of the incident report?
17  A Yes.
18  Q So you've seen this incident report before --
19  A Yes.
20  Q -- I take it?
21  A Yes.
22  Q When was it provided to you?
23  A It would have been provided to me right after this happened.
24  Q Are you typically provided --
25  A Well, obviously, I saw it on 6-1-05. That's when I dated it.

Page 70

1  Q Are you typically provided with copies of written incident
2    reports?
3  A It doesn't go into the file unless my initials are on it.
4  Q So every -- any incident report that would be generated at
5    any NCRL branch is at some point going to come across your
6    desk?
7  A Hopefully, yes.
8  Q Off the top of your head are you aware of any other written
9    incident reports involving sex offenders in NCRL branches
10    other than Exhibit 30 and Exhibit 31?
11  A No.
12  Q And if I understand correctly, the incident summarized in
13    Exhibit 31 essentially consisted of Mr. Gouin coming into a
14    library branch, correct? He came into a library branch and
15    he was at a computer next to boys?
16  A Yes.
17  Q Did he do anything else to your knowledge?
18  A No.
19  Q Do you know if he was looking at inappropriate material?
20  A I don't know that.
21  Q Did he make inappropriate advances on anybody?
22  A No.
23  Q So this is a guy who just came into the library and was
24    sitting down at a computer?
25  A I don't know that. I don't know if he was sitting or

Page 71

1    standing.
2  Q He came into the library and he was at a computer next to
3    boys, and that's the extent of his infraction in this
4    instance?
5  A Uh-huh.
6  Q And that warranted a written incident report, correct?
7  A Duncan, we ask them to do a report any time that they call
8    the police, and she called the police.
9  Q Do you know why she called the police?
10  A I think she was afraid for the boys.
11  Q Do you know whether Mr. Gouin did anything to frighten her
12    other than being present at the library?
13  A No.
14  Q And I guess the same -- I have the same question for
15    Mr. King. Other than talking to a young woman in the
16    library, are you aware that Mr. King did anything wrong?
17            MR. ADAMS: Object to the form of the question.
18    Duncan, you're asking questions that don't have any
19    foundation. You're not providing, for example, information
20    about circumstances surrounding his release, what might bear
21    upon his freedoms, what he was told in the library. No
22    foundation.
23  Q Can you answer that?
24  A I've forgotten the question at this point. Sorry.
25  Q Other than coming into the library and talking to a young

Page 72

1    woman for a few minutes, are you aware that -- of what
2    Mr. King did wrong?
3  A No.
4  Q Does the library have a policy of tracking activities of
5    registered sex offenders who come into library branches?
6  A We have asked them to be aware. They're aware of the website
7    that provides that information, and we've asked them to be
8    aware of it.
9  Q So are the NCRL's librarians expected to be familiar with who
10    the registered sex offenders are in the neighborhood?
11  A They're not expected, but we ask them to and some of them
12    are.
13  Q When registered sex offenders come into the library, are
14    librarians expected to take any particular action?
15  A Our expectation?
16  Q Yes.
17  A Our expectation is that if there's a problem, that they'd be
18    aware of it and would ask for help.
19  Q What do you define as a problem?
20  A If somebody inappropriately tried to get a child to go to the
21    restroom with them or have them sit on their lap, we would
22    probably question that.
23  Q Are you aware of any instances in which that's happened in
24    NCRL branches?
25  A Yes, but I can't give you dates or times. It's been in the

18 (Pages 69 to 72)

Page 73

1    past. It's been before we even did incident reports.
2  Q When did you start doing incident reports?
3  A I couldn't give you that date.
4  Q Do you remember the incident?
5  A I can remember two incidents. There was a gentleman that
6    tried to talk a young woman into sitting on his lap while he
7    was at a computer. And there was another incident at Moses
8    Lake where a gentleman talked a young, developmentally
9    delayed man into going into the restroom with him, and the
10   police were called.
11 Q Were these incidents, did they occur after 2000 or back in
12   the '90s?
13 A I would think it would be back before this.
14 Q Before this meaning what?
15 A I don't know, Duncan. Duncan, I don't sort the past very
16   well. I'm kind of a future-looking person so it's really
17   hard for me to chunk time that way. I would have guessed
18   it's before this.
19 Q Do you know if any of these incidents involved a sex offender
20   looking at inappropriate material on an NCRL computer
21   terminal?
22 A I have no way of knowing, no. Duncan, I should mention --
23   and it's available in the newspapers -- that there was early
24   on -- I think it was in 2000 -- that we had a young woman who
25   was using the chat feature on our computers at the Wenatchee

Page 74

1    library. She was 12. And she was chatting with a gentleman
2    that ended up being 40. And she left here, went to Spokane,
3    and ended up in Montana and was raped.
4  Q Do you remember the name of that woman?
5  A I don't. Well, she was 12 so that information wasn't
6    released.
7  Q Okay. And when did this happen?
8  A I think it was 2000.
9  Q Which branch was she at?
10 A She was at the Wenatchee branch because we had just started.
11 Q Dean, do you think it is important to protect the privacy of
12   library patrons?
13        MR. ADAMS: Objection. Vague.
14 A Yeah, that's too broad.
15 Q Do you think --
16 A Can you define that?
17 Q Do you think it's important to --
18        (Interruption in proceedings.)
19        THE WITNESS: It's not me.
20 Q Do you think it's important that NCRL patrons are allowed to
21   view websites that they might want to view without somebody
22   looking over their shoulder?
23        MR. ADAMS: Object to the form of the question.
24 A No, it would be impossible.
25 Q What would be impossible?

Page 75

1  A To provide that kind of access. We'd have to put sheets over
2    them or something. I mean, if someone is sitting there
3    reading a book, people are going to see what they're reading
4    so I wouldn't view it in a different way.
5  Q So you don't think that it would be possible to configure the
6    computer monitors such that persons other than the person
7    using the computer would be unable to view what that person
8    was viewing?
9  A It would be very, very difficult and costly. And we're a
10   public library. We're not a private viewing place.
11 Q Why would it be difficult?
12 A We -- because of the wiring and just rearranging furniture.
13 Q I believe you testified earlier that you don't know how much
14   it would cost, for example, to install desks with recessed
15   monitors.
16 A I don't.
17 Q What's the basis for your statement that it would be costly
18   to --
19 A I was thinking of rearranging furniture to -- to use what
20   we're using. Duncan, I'm unaware of any requests from a
21   patron for a private viewing station, ever.
22 Q Are you aware of requests by patrons to disable the filters
23   at the library?
24 A To my knowledge Charles Heinlen has been the only person that
25   has asked for the filter to be disabled.

Page 76

1        MR. ADAMS: H-E-I-N-L-E-N.
2  Q Do you recall receiving a letter from Ann McConnell in
3    November of 2000 complaining about the NCRL's filter policy?
4  A Is she from Stehekin? Is that --
5  Q Yes.
6  A Yes.
7  Q Was she another person who complained about the filter?
8  A Well, she was concerned about the filter. She had received a
9    letter from the ACLU. And I corresponded with her, and she
10   was satisfied with that, is my understanding.
11 Q What's the basis for that understanding?
12 A Well, she was worried that people couldn't access breast
13   cancer on a filtered computer. And I went to the computer
14   and accessed, and it was -- at that time -- I mean the
15   Internet has changed a lot -- it was like a million hits
16   that -- and they were mostly not filtered. I mean, I
17   didn't -- I didn't come to a filtered one. But as I recall,
18   her letter was very flattering about the library.
19 Q After you responded to the letter, did you have any
20   additional correspondence with her?
21 A No. But understand that Stehekin has no phones.
22 Q So why do you think that she was satisfied?
23 A I did not hear from her again.
24 Q So you assumed that she was satisfied?
25 A I assumed that she was happy with that, yes.

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

246

Page 77

1  Q  You exchanged some e-mails with Ken Smith in May of 2006. Do
2     you remember that?
3  A  No.  You'd have to refresh --
4  Q  Was that Dan Howard?
5  A  What?
6  Q  Was that Dan Howard?
7  A  I have no idea.  Oh, Ken Smith, was it?  Was he from Twisp?
8  Q  I don't recall.
9  A  Okay.
10 Q  Do all the NCRL branches currently have wireless Internet
11    access?
12 A  I think we're all wireless now.
13 Q  Is all wireless Internet access filtered?
14 A  It is.
15 Q  The same way that access is filtered at the regular
16    terminals, right?
17 A  Yes.
18        (Exhibit No. 32 marked.)
19 Q  Dean, have you ever seen this e-mail before?  Take a minute
20    to take a look at it.
21 A  All right.  Yes, I am aware of it.
22 Q  Tell me who Gailene is, if you can.
23 A  She's one of the Republic branch librarians.
24 Q  And Lucy?
25 A  Is her area supervisor.

Page 78

1  Q  What's Lucy's last name?
2  A  Lucy Ford.
3  Q  And Gailene's last name?
4  A  I don't know.
5  Q  Was this -- was this e-mail forwarded to you, Exhibit 32?
6  A  I don't remember that it was, but I remember hearing about
7     the incident.
8  Q  Who told you about the incident?
9  A  Dan.
10 Q  What did he tell you about it?
11 A  He just -- he just basically told me this and -- and we kind
12    of had a -- we just talked about it.
13 Q  Do you know what the gentleman referenced in that e-mail was
14    looking at?
15 A  No.  And we didn't -- we didn't -- we didn't follow up on
16    this in any way.  We just told them that, you know, it
17    wasn't -- unless it was inappropriate, we wouldn't do
18    anything.  Bathing suits are hardly inappropriate.
19 Q  Do you --
20 A  But they had a patron complain that they saw it and they
21    hadn't seen it directly.  So I don't think there was any
22    followup whatsoever, except to the staff.
23 Q  So for all you know this guy was looking at bathing suits and
24    beds?
25 A  I have no idea.  Yeah.  Who knows.

Page 79

1  Q  If you were a library patron, would you appreciate the
2     opportunity to go into a library and look at bathing suits
3     and beds for your wife without having someone --
4  A  I wouldn't do it.
5  Q  Why not?
6  A  I don't know.  I mean, to go -- I wouldn't go buy a bathing
7     suit at the public library.
8  Q  Do you have Internet access at home?
9  A  Yes.
10 Q  Do you know if this gentleman had Internet access at --
11 A  I have no idea.
12 Q  You need to wait until I finish my --
13 A  I'm sorry.
14 Q  -- question before you answer it.
15        Okay.  Do you know if he had Internet access at home?
16 A  I don't.
17 Q  Do you know if he had any other reasonable alternative than
18    to go to the library and do his shopping online --
19 A  No.
20 Q  -- here?
21        Do you think that if folks come into the library to
22    shop for bathing suits, let's say, and get reported to the
23    librarian for looking at inappropriate material, they're
24    likely to feel like they're in a safe environment in which to
25    access information?

Page 80

1         MR. ADAMS:  Object to the form of the question.
2     It calls for speculation about what library patrons might
3     feel.
4  Q  What's your view on that?
5  A  Republic is a small town.  And we heard later that he did buy
6     the bathing suit and she enjoyed it immensely.  It was a
7     lovely present.  It's a very small town.
8  Q  So he was shopping for bathing suits?
9  A  Yes.
10 Q  And somebody reported him to the librarian?
11 A  Yes.
12 Q  Do you think he might have appreciated the opportunity to
13    come in and do that shopping without somebody reporting him?
14        MR. ADAMS:  Objection.  Calls for speculation.
15 A  I don't know.  I invite you to visit Republic.
16 Q  Do you know if there have been any other incidents like that
17    where somebody has been reported to the librarian for looking
18    at inappropriate materials when they were, for example,
19    shopping for a bathing suit?
20 A  I don't know.
21 Q  What role, Dean, did you play in developing the NCRL's
22    Internet Public Use Policy?
23 A  Haven't we already covered that or am I having dTja vu?
24 Q  I think we skirted it.
25 A  My role was --

20  (Pages 77 to 80)

65fdb704-fa3f-4ced-944b-bc4e673c3b71

1  Q  Yes.
2  A  I was liaison to the Board.  I was advisory to the Board on
3     that policy.
4  Q  Do you know who drafted that policy?
5  A  I probably did the ultimate draft to present to the Board.
6  Q  So when you say that you were the liaison to the Board with
7     regard to the policy, you meant that you wrote it?
8  A  Yes.
9  Q  Okay.
10        MR. MANVILLE:  Need all the help I can get.
11     Happy I can get it.  I see you have copies too.  Off the
12     record for a second.
13        (Discussion had off record.)
14  Q  (By Mr. Manville) Handing you what was previously marked as
15     Exhibit 3, Dean, is that the current NCRL Internet Public Use
16     Policy?
17  A  I hope so.  Yes, it is.
18  Q  Okay.  And when was this policy first developed?
19  A  This current policy?
20  Q  Yes, sir.
21  A  I would -- man, I'm going to guess.  But it's going to be, I
22     would guess, 2006.
23  Q  Okay.
24  A  Wasn't that when the CIPA ruling came about we reaffirmed our
25     policy?

1  Q  What changed from the prior iteration of the policy?
2  A  I think the -- there was some wording that -- and I can't
3     tell you exactly what it was.  But we changed some wording
4     from -- based on the recommendations of ALA.
5  Q  Do you recall which paragraph of the policy --
6  A  I don't.
7  Q  -- the wording was in?
8  A  I really don't, Duncan.  I'd have to compare it to what --
9     but there were some criteria that I believe the FCC was
10     looking for.  We had to have a policy in place that had to
11     cover certain things.
12  Q  Do you have a copy of the old policy somewhere?
13  A  I don't -- I don't think so.  It's very close to this.  I
14     doubt it.  We try to get rid of those old things so we don't
15     have the confusion.
16  Q  Sure.
17  A  And we don't do an excellent job of it but --
18  Q  I don't think we've seen the prior policy; is that right?
19        MR. ADAMS:  I don't know.  It might not exist
20     anymore.
21        THE WITNESS:  It might not exist.
22        MR. MANVILLE:  Okay.
23  Q  (By Mr. Manville) Do you recall whether the changes to the
24     policy had to do with filtering of Internet access?
25  A  No.  That's always been there.

1  Q  All right.  Did it have to do with hosting customer e-mail
2     accounts or providing access to chat rooms?
3  A  No.  That has always been there.
4  Q  Did the prior Internet Public Use Policy include the old
5     version of the NCRL's Mission Statement?
6  A  Yes.
7  Q  Do you know if the second paragraph of the Internet Public
8     Use Policy changed?
9  A  No, I don't think so.
10  Q  How about the third paragraph?
11  A  I believe that's where the changes were made.
12  Q  All right.  And other than bringing the policy in line with
13     the ALA decision, do you recall -- do you have any
14     recollection of substantively what the change was to the
15     third paragraph of the Internet Public Use Policy?
16  A  I believe it was the wording of the enables access to some
17     materials that may be offensive, disturbing, or illegal.
18  Q  What was the prior wording; do you recall?
19  A  I couldn't tell you.  I don't recall.  Or it may not have
20     even been there.
21  Q  Do you recall if there was any other language of this policy
22     that was changed when the policy was revised a year or so
23     ago?
24  A  No.
25  Q  Meaning that there weren't any other changes, or you don't

1     recall?
2  A  I don't recall.
3  Q  Who drafted the first Internet Use Policy for the NCRL?
4  A  I probably did.
5  Q  And when was that?  Was that around the same time of that
6     Internet access?
7  A  Yes.
8  Q  Does the -- does the Internet Public Use Policy prohibit
9     library patrons from viewing certain types of material
10     online?
11        MR. ADAMS:  I'll object to the form of the
12     question.  The policy speaks for itself.
13  A  Yes.
14  Q  What materials?
15  A  It states that all Internet access on NCRL library computers
16     is filtered.
17  Q  Okay.  But that doesn't tell patrons what they can or can't
18     as a matter of policy look at, correct?
19  A  Correct.
20  Q  If I'm a library patron and I read that and I read that
21     Internet access is filtered, I don't know whether I'm allowed
22     to look at a gambling website for example, correct?
23  A  Correct.
24  Q  So what in the policy would tell me as a patron of the
25     library what websites I was not permitted to look at on a

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

65fdb704-fa3f-4ced-944b-bc4e673c3b71

Page 85

1  library terminal?
2  A It wouldn't say what you're not permitted to look at, but it
3    would be websites that promote our mission.
4  Q Those would be the websites that I would be allowed to look
5    at?
6  A Correct.
7  Q What websites would those be? Would I have any way of
8    knowing as a library patron what websites would promote the
9    NCRL's mission?
10  A No.
11  Q Are there any standards contained in the Internet Use Policy
12    that would allow you to make a determination of whether a
13    particular website furthers the NCRL's mission or not?
14  A I'm confused. How the policy relates to that?
15  Q Yeah. So, for example -- well, the NCRL will entertain
16    requests to unblock a particular site, correct?
17  A Correct.
18  Q If I submit a request to you to unblock a particular site,
19    what standards do you apply in determining whether to unblock
20    it or not?
21  A You know, it -- we thought it -- we have the thought that
22    that's going to be difficult. It's not difficult. I mean,
23    we look at something and we go "Is this -- is this an
24    appropriate site for a public place where there's going to be
25    children and families and does it promote reading and

Page 86

1  life-long learning?"
2  Q I notice there are some sites that have been blocked and
3    unblocked, blocked and unblocked.
4  A Correct. Well, I don't think there's sites that have been
5    blocked and unblocked and blocked and unblocked.
6  Q Well, but there are sites that have been blocked and then
7    unblocked, correct?
8  A Correct. Correct.
9  Q And I understand from some of the documents I was flipping
10    through that Craigslist was recently unblocked.
11  A Yes.
12  Q All right. So did you consider that to be a difficult
13    decision to block Craigslist originally?
14  A Yes. But -- yes.
15  Q Did you consider it to be a difficult decision to unblock
16    Craigslist?
17  A Yes.
18  Q So I take it that there are a lot of websites that are
19    clearly going to be blocked in error where you can take a
20    look at it and instantly say "Well, this should be
21    unblocked"?
22          MR. ADAMS: Objection.
23  A Sure.
24  Q There are going to be websites that are clearly in your view
25    obscenity or something like that?

Page 87

1          MR. ADAMS: I'll object to the form of the
2    question. You can answer.
3  Q Correct?
4  A Correct.
5  Q Do you think there are sites that are going to be in that
6    gray area in between the two?
7  A I think it's less gray than one would think it is.
8  Q And for those sites that fall into the less gray area, what
9    standards do you apply in determining whether a site should
10    be blocked or not?
11  A The same standard.
12  Q You just look at it and make a gut decision basically?
13  A Well, I wouldn't say we make a gut decision, but it's a
14    thoughtful decision.
15  Q But it's a personal subjective decision? There are no
16    objective standards that I as a library patron could look at?
17  A Oh, yes, there are.
18  Q Okay. What standards are those?
19  A Would you like me to give you an example?
20  Q Please.
21  A Okay. We unblocked MySpace. It took us a long time to do
22    it, but we were reviewing it. And MySpace was bought out by
23    Robert Murdoch. And we were hearing he was going to clean it
24    up, and it looked like he did. And I've read several reviews
25    that said that MySpace had been cleaned up and they weren't

Page 88

1  allowing adult explicit photographs. And that they were
2    watching very much the -- the function where people were
3    acting like they weren't the age they were. So we felt like
4    it was -- it was a safe unblocking there.
5  Q Are there still adult images on MySpace?
6  A I haven't checked every page on MySpace, but those that have
7    reviewed it say those have been removed.
8  Q There are no adult images on MySpace?
9  A I cannot attest to that.
10          MR. ADAMS: That's not what he testified to.
11    Objection.
12  Q Who -- is there anyone at the NCRL who actually reviewed
13    MySpace to determine whether you can access adult images on
14    MySpace?
15  A Well, we tried different things. We did search MySpace.
16    And -- and we also -- Barbara was our guinea pig and she
17    opened a MySpace account. In fact, she opened two. And the
18    first time she did it, she got asked to join a lot of porn
19    groups. And then it was much later -- and I can't give you
20    dates. I don't know. But it was this year she was on and it
21    had changed. That did not happen to her.
22  Q What was the process that you went through initially in
23    making the determination to block MySpace?
24  A We blocked personal relationship sites.
25  Q Was MySpace blocked before you blocked the personal

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

249

65fdb704-fa3f-4ced-944b-bc4e673c3b71

Page 89

1   relationships category?
2   A It's part of that category, and that was a category that we
3     blocked.
4   Q But didn't you block MySpace before you blocked the category?
5   A I don't understand that question, Duncan.
6   Q I understand that you blocked the personal relationships
7     category.
8   A Uh-huh.
9   Q At that time when you blocked that category, was MySpace
10    already blocked?
11  A Probably.
12  Q And why did you make the decision to block MySpace initially?
13  A Because of reports of children being preyed upon.
14  Q Reports by whom?
15  A By the media.
16  Q What media?
17  A Newspapers, radio, TV.
18  Q How many newspaper articles did you look at?
19  A I -- I didn't. I mean, I did. I'm not --
20  Q Did you make the decision to block MySpace? Was that your
21    call?
22  A Ultimately all the calls are mine.
23  Q All right. So that one -- that was a decision --
24  A We were under particular pressure. We were hearing from
25    school districts that they would like us to block MySpace

Page 90

1     also because they did it and it was consistent with their
2     program too.
3   Q What school districts did you hear from?
4   A Wenatchee School District and East Wenatchee.
5   Q Others?
6   A I can't remember now.
7   Q When was the -- when did the request come from the Wenatchee
8     School District to block MySpace?
9   A These were -- these were casual conversations and I can't
10    give you times and dates.
11  Q A casual conversation that you had?
12  A Yes.
13  Q With whom?
14  A I was at a meeting and talking and we were talking about
15    MySpace. And I think there was a group there. And they
16    had said, "Boy, I hope you block that."
17  Q So somebody from --
18  A We got a lot of reinforcement for blocking it. I have not
19    heard from anybody since we unblocked it so --
20  Q So this meeting was attended from somebody from the Wenatchee
21    School District and somebody from the East Wenatchee School
22    District?
23  A Well, I -- yeah. I think it was a general meeting at the ESD
24    or something like that.
25  Q And they said "We'd really like you to block MySpace"?

Page 91

1   A It's wasn't direct like that. It was a casual conversation
2     as I said -- general conversation.
3   Q What did you do with that request?
4   A We had already blocked it. So it was just an affirmation of
5     what we were doing.
6   Q So why did you make the decision initially to block it?
7   A Because of the predatory aspects of MySpace?
8   Q But there wasn't at that point -- when you originally decided
9     to block MySpace, there wasn't a request that had been made
10    by a school district that you block it, correct?
11  A No. I probably shouldn't have talked -- sorry.
12  Q All right.
13  A I led you down a different direction.
14  Q All right. So you were relying on media reports?
15  A Correct.
16  Q And, again, what --
17  A And unblocking it I relied on media reports.
18  Q All right. But, you know, what was the process that you went
19    through? How many newspapers did you look at? How many
20    articles did you look at in making that decision to block
21    MySpace?
22  A I don't recall.
23  Q Did you do any investigation on your own to determine whether
24    MySpace should be blocked?
25  A I believe I did.

Page 92

1   Q What investigation did that consist of?
2   A I think I went on MySpace and looked at it.
3   Q For how long?
4   A I don't recall.
5   Q What -- did you just visit a bunch of MySpace pages?
6   A I think so. As I recall, I -- it was pretty easy. I think
7     you could search MySpace by group, and I put in porn star and
8     got quite a few pages.
9   Q Do you know how many pages there are on MySpace?
10  A I have no idea.
11  Q Do you know what percentage of the total number of MySpace
12    pages contain adult images or pornography?
13  A I do not.
14  Q Do you know whether it's a large or small percentage?
15  A I do not. I'm assuming it's small now.
16  Q Do you know whether it's still possible to access adult
17    materials or pornography or obscenity on MySpace?
18  A I do not know that.
19  Q At what point did MySpace cross over from being unacceptable
20    to acceptable?
21  A One of the interesting things about our new filter is the
22    learning curve on it. And we've found that it allows greater
23    specificity in filtering. And we had reports that we could
24    see what was blocked. And MySpace was one of the things that
25    people were trying to get to. So we wanted to be responsive

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

250

Page 93

1  to our clientele. So we looked at it again. And at that
2  point we were looking at reviews and -- which were easy to
3  find -- and -- and re-examined it.
4  Q Could you point me to a particular review that you looked at
5  in determining --
6  A I read a Wall Street Journal article saying that Robert
7  Murdoch is cleaning up MySpace.
8  Q Do you remember when that article came out?
9  A I don't. Because I probably looked at it on our ProQuest or
10  EBSCO database, and I was just pulling up reviews of MySpace.
11  Q Would this have been within the last few months, The Wall
12  Street Journal?
13  A I don't know.
14  Q All right. Can you point me to a -- a newspaper article that
15  you particularly relied on in deciding to block MySpace
16  initially?
17  A No.
18  Q Do you know whether it would be possible to configure the
19  Fortiguard filter to block particular web pages on MySpace as
20  opposed to blocking the entire site?
21  A I don't believe so.
22  Q You don't think it's possible to do that?
23  A I don't think it's possible.
24  Q Do you know if there are any filtering products out there
25  that would allow you to do that?

Page 94

1  A Not that I know of.
2  Q Have you looked into that?
3  A No.
4  Q Why not?
5  A Because we've unblocked MySpace.
6  Q But you didn't look into that prior to unblocking MySpace?
7  A We've only had this up for, you know, two years. So -- or a
8  year and a half, so it's been a learning curve.
9  Q Is the personal relationships category currently unblocked?
10  A It's currently unblocked.
11  Q And why did you decide to unblock personal relationships?
12  A Because of its popularity and we felt it was a safe thing to
13  unblock.
14  Q What process did you go through in making that determination?
15  A We looked at them and we talked about it and --
16  Q Why --
17  A -- made the decision.
18  Q Why did you block the personal relationships category?
19  A Again, it was because of the predatory activities.
20  Q Are you aware of any instances of predator activity involving
21  NCRL patrons, other than I think you mentioned back in May
22  2000 there was an incident involving this 12-year-old girl in
23  a chatroom? Other than that incident are you aware of any
24  other predatory incidents online involving the NCRL patrons?
25  A I don't recall that now.

Page 95

1  Q Do you recall any such incident ever having been brought to
2  your attention?
3  A I don't recall.
4      Duncan, we do review the -- the terms that are on.
5  And MySpace terms of use were -- were changed, I believe.
6  And so we were looking at them and we looked at like
7  Facebook, what their terms of use are. And there's an
8  element of trust there that they're enforcing those terms of
9  use.
10  Q How did the MySpace terms of use change?
11  A That they were going to enforce no adult explicit images.
12  And that they were going after people who were lying about
13  their age.
14  Q I had a question. I lost it.
15  A Okay.
16  Q That's why I'm sitting here.
17      Is it possible that the NCRL will block MySpace again
18  in the future?
19  A I don't know.
20  Q What would -- what could cause the NCRL to block MySpace
21  again?
22      MR. ADAMS: Object to the form of the question.
23  Calls for speculation.
24  A We would review it again if somebody made a complaint.
25  Q So if you -- let's say you got a complaint from a patron that

Page 96

1  their kid had accessed a page on MySpace that had adult
2  materials on it, what would you do with that?
3  A We would talk to the people and find out -- investigate it
4  and then discuss it.
5  Q And is it possible that at that point you would decide to
6  block MySpace again?
7  A I don't know.
8  Q Let me show you a document that's Bates Number NCRL 00362
9  That little red flag on it there --
10  A Does Alison need to see this?
11  Q No, I'm not going to mark it.
12  A Okay.
13  Q I'm just wondering if you -- do you see the reference to the
14  wording having been added to the Internet Use Policy --
15  A Yeah.
16  Q -- apply for E-rate reimbursement? What wording was that; do
17  you recall?
18  A We're back to that -- I think it was that third paragraph.
19  Q I see. And do you -- is -- is this, then, early 2002 when
20  the current Internet Public Use Policy was developed, or has
21  the policy been revised again since then?
22  A I -- you know, I am guessing here. But I'm guessing that
23  that's when this was adopted.
24  Q Okay. It's not a trick question. I'm just curious.
25

24 (Pages 93 to 96)

Page 97

1    Do you support the Internet Public Use Policy?
2  A  Absolutely. It works.
3  Q  In what way does it work?
4  A  It accomplishes what we do. We have very few problems, as
5    you found out, and we're viewed as a family-friendly place.
6    We promote reading like crazy. Kids feel comfortable there,
7    and in most part parents feel comfortable sending their kids
8    to the library alone.
9  Q  What is it about the Internet Public Use Policy that you
10    believe contributes to that environment?
11  A  I think that we have -- that everything is filtered, that
12    we're doing everything possible -- doing the most possible to
13    avoid situations where kids will see inappropriate images --
14  Q  Do you know whether --
15  A  -- where people who don't want to see those images are
16    exposed to them.
17  Q  Do you know whether other library systems in the state of
18    Washington have a policy of disabling their filters at the
19    request of adults?
20  A  Most libraries do.
21  Q  Do you know if those libraries are more or less family
22    friendly than the NCRL?
23  A  I just know that the State Librarian called us the most
24    family-friendly library in the state --
25  Q  Okay. And --

Page 98

1  A  -- so I'm assuming that we are.
2  Q  When did she make that statement?
3  A  Boy, that was a while ago.
4  Q  This is Jan Walsh, right?
5  A  Sure.
6  Q  So a while ago being months, years?
7  A  You're asking me to -- yeah, I would say years.
8  Q  Years. Okay.
9    Do you know -- do you have any idea what she based
10    that statement on?
11  A  Jan has visited us several times and she's seen our operation
12    in action.
13  Q  Do you -- do you know whether she -- whether Jan Walsh
14    equates the family friendliness of the NCRL with the use of
15    filtering software and the refusal to disable the filter for
16    adults?
17  A  I don't know for sure.
18  Q  Do you think it's possible that Jan Walsh thinks that you --
19    that the NCRL is a family-friendly library because you and
20    Dan and the other folks here have done a great job of
21    building this place up independent of the Internet Public Use
22    Policy?
23    MR. ADAMS: Calls for speculation. He doesn't
24    know what Jan Walsh thinks.
25  A  I don't know what Jan thinks.

Page 99

1  Q  Other than Jan Walsh's statement, do you have any basis for
2    believing that the NCRL is more family friendly than other
3    library systems in the state that disable their filters?
4  A  No. Yes. Can I change that answer?
5  Q  Absolutely.
6  A  Yes, I do.
7  Q  Why do you think the NCRL is more family friendly than other
8    libraries in the state that disable their filters at the
9    request of adults?
10  A  I'm -- I'm not answering that question directly with what I'm
11    thinking. Can I go ahead and give answer?
12    MR. ADAMS: Why don't you ask a question and
13    he'll answer the question.
14  A  Yeah. Again? I'm sorry.
15  Q  Maybe I -- did you not understand the question?
16  A  I guess not.
17  Q  Okay.
18    MR. ADAMS: Which -- which question? Ask the
19    question.
20    MR. MANVILLE: The last one I asked him.
21  Q  (By Mr. Manville) I got it. Let's take -- we'll just take a
22    step back here.
23  A  Okay.
24  Q  Do you think the NCRL is more family friendly than other
25    library systems in the state that --

Page 100

1  A  Yes.
2  Q  Hold on a second. Let me --
3  A  Oh, I'm sorry.
4  Q  Let me finish the question.
5  A  I am sorry.
6  Q  Do you think the NCRL is more family friendly than other
7    library systems in the state that disable their systems at
8    the request of adults?
9  A  Yes. Larger libraries use security guards within their
10    library, and that's -- I would say that that is less family
11    friendly.
12  Q  Any other reasons?
13  A  I would base it on the experience of other libraries,
14    particularly Fort Vancouver Regional Library who recently
15    went to full filtering all the time. And they have much more
16    support in their communities for the libraries after they
17    have done that.
18  Q  But do you know if the libraries -- if the Fort Vancouver
19    libraries themselves are more family friendly than they were
20    before they implemented that?
21  A  That would be just anecdotal. I have heard that they are.
22  Q  What anecdotes have you heard in that regard?
23  A  I've heard that the staff is happier and they feel safer and
24    that people are really happy with it.
25  Q  And I take it that you believe the NCRL's staff is happy with

25 (Pages 97 to 100)

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

65fdb704-fa3f-4ced-944b-bc4e673c3b71

| Page 101 | Page 103 |
|---|---|

**Page 101**

1  the NCRL's Internet Public Use Policy?
2  A My understanding is that they are.
3  Q Is that all staff members? Most staff members?
4  A I do not know of a staff member that's unhappy with it.
5  Q So do you think that the causal link between refusing to
6   disable the filters for adults and a family-friendly
7   environment is related to the satisfaction that the community
8   and the library staff has with the policy, or is it related
9   to something else?
10 A That was a really complicated question. Could you rephrase
11  that or --
12 Q Why do you think -- well, let me ask it in a much more simple
13  way.
14 A Yes. Okay.
15 Q Why do you think there's a causal connection between
16  filtering all computers all the time and creating a
17  family-friendly environment?
18 A Because to the best of my knowledge we have had one complaint
19  on -- that we are filtered that came to staff or even to my
20  level.
21 Q Do you know whether a majority of the residents here support
22  the current filtering policy?
23 A I would venture that the majority of people support the
24  policy.
25 Q And why do you think that?

**Page 102**

1  A I've lived here for 30 years and know the communities pretty
2   well. And we base our services on knowing the community.
3   And their expectation would be that we would do this.
4  Q What is it about this community that would make it likely to
5   support a policy of filtering all computers all the time?
6  A An example would be within five counties, to my knowledge
7   there's only one adult book store. There are no stripper
8   bars in five counties. There's an expectation that we're --
9   that we go for the best.
10 Q The best being --
11 A There is -- there is an expectation that we have that we
12  support cultural things that are traditional.
13 Q Can you give me some examples?
14 A There's an expectation that we have Jane Austen on the
15  shelves whether people read it or not.
16 Q Okay.
17 A An example -- I can add an example. We're doing a big read
18  up in Bridgeport, and they picked -- the Superintendent of
19  Schools picked The Call Of The Wild. We talked like crazy
20  trying to get him to pick something more relevant and up to
21  date and more culturally relevant to the Bridgeport area.
22  And they wanted The Call Of The Wild so --
23 Q Are you continuing to block access to Craigslist --
24  Craigslist.org personals?
25 A Yes.

**Page 103**

1  Q Why is that?
2  A Because if you go to those and you click on anything with a
3   picture, you're going to see something very explicit.
4  Q So how do you go about -- maybe this isn't a question for
5   you. But I take it that the Fortinet/Fortiguard filter is
6   capable of filtering out segments of the Craigslist website.
7  A It was very exciting to find that out. Again, we're learning
8   about the software and I don't -- I can't give you the in's
9   and out's of it, but it's pretty -- it's pretty nice to be
10  able to refine the filter down to that level so --
11 Q Do you know if you could do the same thing on MySpace or --
12 A I don't know.
13 Q Have you tried?
14 A I don't know.
15      MR. ADAMS: Objection also. MySpace is unblocked
16  totally.
17      MR. MANVILLE: I understand.
18      MR. ADAMS: Okay.
19 Q (By Mr. Manville) Can you describe for me the steps that a
20  person has to take if he or she walks into an NCRL branch and
21  wants to use the Internet?
22 A They sit down at the terminal. They have to enter in their
23  library card number and their pin number, which is their last
24  four digits of their telephone number. And then they have to
25  agree to the filtering policy and then they're on.

**Page 104**

1  Q The filtering policy being what; the Internet Public Use
2   Policy?
3  A Yes.
4  Q Does that come up on the screen?
5  A Yes. It's right there next to it, yeah.
6  Q Do you have to click through it? Like click on a button
7   saying something like "I accept this policy" or something?
8  A "I agree," yes. Yes.
9  Q I agree. Is there any alternative? If you don't click the
10  button, you don't get online, correct?
11 A You don't get online, correct.
12 Q Are Material Selection Review Forms prominently displayed
13  near the computer terminals?
14 A No, but it suddenly -- we have learned some things. We're
15  getting good at the program, and now you're able to click
16  right at the -- when the site is blocked, you can click a
17  thing to have it reviewed.
18 Q And how does -- tell me how that works.
19 A It comes up and it says "This site has been blocked. Would
20  you like it reviewed? Click on here." They fill out an
21  e-mail message and it's got the forms -- I mean, it's got a
22  place for your name, e-mail, telephone number, address, and
23  then why, and -- and then it comes in.
24 Q Do you have to provide all of that information?
25 A No.

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

253

65fdb704-fa3f-4ced-944b-bc4e673c3b71

## Page 105

1  Q  What information do you need to provide to get a site
2     reviewed?
3  A  I believe you have to have some way for us to contact you.
4  Q  Name and either a --
5  A  E-mail or phone --
6  Q  -- phone or address?
7  A  -- or address, correct.
8  Q  And when was that system implemented?
9  A  Oh, boy, I think we finally got it running two weeks ago.
10 Q  What happens to that request when it gets completed and sent
11    off?  Who does it go to?
12 A  It comes in to Barbara, Dan.  I think it comes in to Barbara,
13    Dan, or myself.  Barbara triages it because I would say at
14    least 75 percent of them are more are technical problems
15    rather than actually been blocked.
16 Q  All right.  Have you gotten any requests to review sites
17    using this new system?
18 A  Yes.
19 Q  How many?
20 A  Boy, I couldn't tell you.  It's more than what we got before
21    but I don't know.
22 Q  Can you give me --
23 A  In two weeks probably --
24 Q  -- ballpark?
25 A  -- about ten.

## Page 106

1  Q  How many over a typical two-week period would you have gotten
2     previously with the written form?
3  A  Oh, probably one or less.
4  Q  And so does the request come to you and Barbara and Dan in
5     the form of an e-mail?
6  A  Yes.
7  Q  Have those e-mails been produced?  Are they in this new stack
8     here?
9        MR. ADAMS:  I'm not sure.
10       MS. MONROE:  I don't think we have.
11 A  I think we just sent them to Celeste.  I mean, it's only been
12    two weeks.
13       MR. ADAMS:  We can probably get you an example if
14 you'd like.
15       MR. MANVILLE:  Yeah, that's fine.  It would be
16 nice but --
17       MR. ADAMS:  Sure.
18       MS. MONROE:  Yeah.
19 Q  (By Mr. Manville)  How quickly have you responded to those
20    requests?
21 A  Really fast.  I mean some in, you know, like an hour.  But
22    because some of them are technical problems, they're faster.
23    Dan usually does the follow up and contacting them.  And he
24    tries to talk to them personally on the phone.  It's just our
25    style.  Otherwise he e-mails them.

## Page 107

1  Q  What's been the range of response times for those ten or so
2     requests?
3  A  Really fast.  I would say within a couple of hours.  It
4     depends on what time of day they come in.
5  Q  Has anything taken longer than that?
6  A  Not so far.  I mean, we haven't gotten any on a Friday night
7     that would take the weekend but --
8  Q  What are your -- when are you typically in the office?
9  A  I'm in -- you're going to get me in trouble here.  I have
10    bankers hours.  No, I'm in sometime in the morning between
11    9:00 and 10:00.  Then I'm here late.  Usually until about
12    7:00 --
13 Q  And do you know --
14 A  -- on most nights.
15 Q  Okay.  And then Barbara and Dan, do you know roughly what
16    their hours are?
17 A  Yes.
18 Q  What are they?
19 A  Barbara is here fairly early in the morning and she's here
20    until -- she's probably here late right now.  So, yeah.  And
21    then she leaves in the afternoon.  But her -- the person
22    working with her, Chad, stays until 8:00 o'clock at night.
23    Dan is here usually between like 7:30, and he leaves between
24    5:00 and 5:30.
25 Q  All right.  How late are the NCRL's branches open?

## Page 108

1  A  7:00 we close.
2  Q  Are the various NCRL branches open on weekends?
3  A  Yes.
4  Q  Does -- do you or Barbara or Dan work weekends typically?
5  A  I know that Barbara checks her e-mail all weekend long and I
6     usually do at least once or twice.
7  Q  Every weekend?
8  A  Yeah.
9  Q  Every Saturday and Sunday?
10 A  Oh, I don't know.
11 Q  And I take it that nonpatrons -- nonNCRL patrons can use the
12    computer terminals as well, correct?
13 A  Yes.  They can receive a guest pass.
14 Q  That's sort of a temporary password for them to enter?
15 A  Yes.
16 Q  What's the NCRL's filtering policy with regard to staff
17    terminals?
18 A  They're all filtered.  CIPA requires that.  Obviously, we
19    have computers here that the filter gets turned off so we can
20    view those sites that are blocked.
21 Q  Are the filters on the staff terminals ever turned off at any
22    other time?
23 A  I don't know.
24 Q  What would be the procedure for disabling a filter on a staff
25    terminal?

27 (Pages 105 to 108)

## Wenatchee Valley Court Reporting
### (509) 888-DEPO (3376)

254

Page 121

1    that it had a filter with it and that it would work on our
2    wireless. So we went with the whole package there.
3  Q  Do you know if the NCRL's Internet usage policy has changed
4    since this lawsuit was filed?
5  A  No.
6  Q  It hasn't changed?
7  A  It has not changed.
8  Q  Have you thought about revising it in any way since the
9    lawsuit was filed?
10  A  No.
11  Q  Have you discussed revising it with anyone other than your
12    counsel?
13  A  With counsel.
14  Q  That's it?
15  A  Yes.
16  Q  Kind of a general question: I'm kind of assuming that on
17    technical issues relating to the Fortinet product and the
18    Fortiguard filter, we'd be better off addressing those
19    questions to Barbara. Is that right?
20  A  Yes.
21            (Exhibit No. 38 marked.)
22  Q  Dean, does Exhibit 38 show the categories that are currently
23    blocked using the Fortiguard filter?
24  A  Yes.
25  Q  All right. And when -- and this is -- this is the current

Page 122

1    configuration of the filter, correct?
2  A  Correct.
3  Q  What's the date on that?
4  A  This is 10-15-07.
5  Q  And when was the last change made to the configuration of the
6    filter in terms of what's blocked?
7  A  Somewhere around that date.
8  Q  Okay. What was changed?
9  A  Duncan, I'm going to have to -- I don't -- I don't have my
10    glasses. And in order to read this, I'm going to have to go
11    get them. Oh, Dan, is going to take care of me.
12            (Mr. Howard absent.)
13            (Exhibit No. 39 marked.)
14        THE WITNESS: They're on my desk.
15        MR. MANVILLE: Why don't we mark this as 39.
16            (Mr. Howard present.)
17        MR. HOWARD: These the right ones?
18            (Discussion had off record.)
19  A  I believe the last change was -- I believe the last change
20    was for Craigslist.
21  Q  (By Mr. Manville) Okay. And that change was made within the
22    past few days?
23  A  The past two weeks.
24  Q  Okay. Exhibit 39, which I think you should have in front of
25    you --

Page 123

1  A  The larger one is.
2  Q  -- is that the -- the prior list of the blocked categories?
3  A  5-17-07. I believe so, but it doesn't include the individual
4    sites --
5  Q  I see.
6  A  -- at the end.
7  Q  Do you mind if I come around?
8  A  No, not at all.
9  Q  I hate to hover but --
10  A  No, that's fine.
11  Q  So to the best of your recollection as you're sitting here
12    today, the difference between these two are going to be with
13    regard to Craigslist and then with regard to the fact that
14    Exhibit 39 lists the individual sites that the NCRL has
15    chosen to block in addition to the categories:
16  A  Correct. Correct.
17  Q  Has the NCRL always allowed access to the drug abuse
18    category?
19  A  On Fortinet?
20  Q  Yes.
21  A  Fortiguard?
22  Q  Yes.
23  A  Yes, I believe so.
24            (Exhibit No. 40 marked.)
25

Page 124

1  Q  Handing you Exhibit 40, what is that? Is that a document
2    that shows the actual configuration of the filter, or is that
3    something that was completed before the filter went into
4    effect, or is it a draft of something? What is that?
5  A  Duncan, I'm not familiar with this. I don't know.
6  Q  If you look on, I think, the top of the second page of that
7    document --
8  A  Second page?
9  Q  Yeah, if I gave you the right one.
10  A  Yes.
11  Q  Is drug abuse blocked in that document?
12  A  I'm -- I'm looking down at the bottom and it says
13    "mkey=test." So I'm assuming this was a test document --
14  Q  That's what I'm wondering.
15  A  -- for filtering. I really don't know what this is to tell
16    the truth.
17  Q  Is that a question that would be appropriate to ask Barbara?
18  A  Barbara may know.
19  Q  All right. To the best of your recollection, the category of
20    drug abuse has never been blocked using the Fortiguard
21    filter, correct?
22  A  Or if it was in an original configuration, we unblocked it as
23    soon as we could.
24  Q  All right. Would that have been just basically an error if
25    it was blocked at some point?

31 (Pages 121 to 124)

| Page 125 | Page 127 |
|---|---|
| 1  A  My recollection was that we were given kind of a standard<br>2    profile and edit -- we edited from there.  And so it was<br>3    finding out what these categories were.  As I said,<br>4    Fortiguard is a wonderful product, but it takes some time to<br>5    learn.<br>6  Q  Okay.  Just handing you a copy of a November 20, 2006, e-mail<br>7    from David Simmer to Barbara Walters, I'm just wondering who<br>8    David Simmer is.<br>9  A  He is a gentleman that has done some work on our web page.<br>10    And he was a personal friend of Howard Purcell.  And he did<br>11    help us out in our transition after Howard's very untimely<br>12    death.  So he is aware of our -- of our computer system.<br>13  Q  Was Mr. Simmer involved in any way in setting policy with<br>14    regard to filtering or picking categories to block or<br>15    anything like that?<br>16  A  No.<br>17  Q  Grab that back from you before I lose it.<br>18        Handing you some documents Bates labeled NCRL 01288<br>19    through 93, I'm just wondering if you can tell me, if you<br>20    know, who filled that profile out.  See that it's been filled<br>21    in by hand?<br>22  A  It wasn't filled in by hand.  I believe I marked this to --<br>23    so we could make copies.  And it was already checked off<br>24    mechanically, and then I marked those because the copies<br>25    weren't coming out. | 1  Q  What's that understanding based on?<br>2  A  The definitions of the Fortinet categories -- Fortiguard<br>3    categories.  Sorry.<br>4  Q  Let me show this to you.  Is this the list of definitions<br>5    that you're referring to?<br>6  A  Yes.<br>7        MR. MANVILLE:  Okay.  Why don't we make that an<br>8    Exhibit too because there's no Bates number on it.<br>9        (Exhibit No. 41 marked.)<br>10  Q  (By Mr. Manville) So Exhibit 41, just to be clear, as far as<br>11    you know is the list of the definitions of these various<br>12    Fortinet categories, correct?<br>13  A  Correct.  It doesn't include their exemptions of what -- what<br>14    they don't include in their filtering.<br>15  Q  Is there a separate document?<br>16  A  I -- I -- I think I have seen it.<br>17  Q  Okay.  Is it -- do you know if it's --<br>18  A  It's on their website.  Is just says, you know, "We don't<br>19    block certain, you know, educational sites about these<br>20    topics," and that kind of thing.<br>21  Q  Is that to the best of your recollection just kind of a<br>22    general statement with regard to all these categories, or is<br>23    there a particular document that provides the definition for<br>24    a category and then a discussion of what's exempted?<br>25  A  I don't recall. |
| Page 126 | Page 128 |
| 1  Q  I see.<br>2  A  So we were still just looking at categories, I believe.  Yes,<br>3    this is still in November of last year.<br>4  Q  Yeah.  So trying to get clear on which categories you were<br>5    going to block?<br>6  A  Right.  Right.<br>7  Q  Why don't you work off that one?<br>8  A  Know that we were instituting an entire computer system at<br>9    this time.<br>10  Q  Sure.  Do you have an understanding of what content is<br>11    included in the hacking category?<br>12  A  I can't quote it, but it's illegal activity -- instructions<br>13    on how to do illegal things on the Internet.<br>14  Q  All right.  And why is that category blocked?<br>15  A  Potentially illegal and it puts us at risk.  We don't want<br>16    people hacking on our computers, getting into our computer<br>17    system.  So it's more about our safety.<br>18  Q  Do you know whether that category would include information<br>19    about hacking that wouldn't facilitate unlawful conduct?<br>20  A  I do not know that.<br>21  Q  For example, an online encyclopedia entry about hacking, a<br>22    Wikipedia entry, that sort of thing?<br>23  A  My understanding is that they don't block those --<br>24  Q  What's your understanding --<br>25  A  -- informational sites. | 1  Q  Okay.  Do you believe that information is --<br>2  A  I do believe that information --<br>3  Q  -- on the website?<br>4  A  Sorry.  I do believe that information is there.<br>5  Q  If we can, let's not talk over each other.<br>6  A  I know.  Sorry.<br>7  Q  We're going to drive her nuts.<br>8        Have you talked to anyone at Fortinet about what's in<br>9    these various categories and what's excluded from them?<br>10  A  No.<br>11  Q  Do you have any information about what's in the categories or<br>12    what's excluded from the categories other than what's in this<br>13    list that's Exhibit 41 and the other information you may have<br>14    seen on Fortinet's website?<br>15  A  No.<br>16  Q  What's the -- what's your understanding -- before I even do<br>17    that -- because we could spend a lot of time on this --<br>18  A  Sure.<br>19  Q  If I ask you what your understanding is of what's in the<br>20    category of proxy avoidance or phishing, any of these other<br>21    things, are you essentially going to read back to me the<br>22    definition that you see there?<br>23  A  Absolutely.<br>24  Q  All right.  Do you have an understanding of why the category<br>25    of proxy avoidance is blocked? |

32 (Pages 125 to 128)

65fdb704-fa3f-4ced-944b-bc4e673c3b71

1  A  Yes.
2  Q  What's your understanding of why that's blocked?
3  A  Because it gives people the way to get around our filter.
4  Q  Do you have an understanding as a technical matter of how
5     that would work, getting around the filter?
6  A  My understanding is that you can go to websites and what
7     they -- and they take you around the filter.
8  Q  Okay.  Can you -- because I don't have that in front of me,
9     can you just sort of look up for me the adult materials
10    category?
11 A  For the controversial?  Oh, adult materials.  I'm sorry.
12 Q  What -- what does that say?
13 A  That says "Mature content website (18+ years and over) that
14    feature or promote sexuality, strip clubs, sex shops, etc.,
15    excluding sex education, without the intent to sexually
16    arouse."
17 Q  And why is that category blocked?
18 A  Because it's a mature-content website, 18-plus years and
19    over.  It promotes sexuality.
20 Q  Do you have an understanding of whether material blocked by
21    that category would be protected by the First Amendment?
22 A  I'm not an expert on the First Amendment.  And I believe that
23    your stance is that everything is protected under the First
24    Amendment.
25 Q  Well, but that wasn't my question.  I wasn't asking you what

1     you thought I thought.  I was asking you what you think.
2  A  I don't know how to answer that.
3  Q  You don't have an understanding one way or the other of
4     whether the material covered by that adult materials category
5     would be protected by the First Amendment?
6  A  No.  But if somebody wanted to access something there, we
7     would look at and try to provide it to them.
8  Q  What if somebody wanted to access a website that sells sex
9     toys?  Would you allow access to that website?
10 A  Probably not.
11 Q  Why not?
12 A  Because it would be inappropriate for our -- the branch
13    environment, in a place where kids congregate.
14 Q  What if the website contained no explicit images?
15 A  I would have to see it, Duncan.
16 Q  Do you know whether there are websites blocked as adult
17    materials that are commercial websites selling sex toys and
18    similar items that don't have sexually explicit images on
19    them?
20 A  I don't know of any requests for those sites.
21 Q  That wasn't -- that wasn't what I was asking you.  Do you
22    know if there are -- if any sites like that exist that are
23    blocked by that category?
24 A  I have no way of knowing.
25 Q  You haven't looked yourself?

1  A  No.
2  Q  Do you know if -- do you know if a website maintained by a
3     photographer who takes pictures of artistic nudes would be
4     blocked as adult materials?
5  A  I don't know.
6  Q  If somebody requested access to such a site, would you allow
7     access to the site?
8  A  Probably.
9  Q  Why?
10 A  Because it's art.
11 Q  How do you draw a distinction between art and -- and a
12    website that's not artistic that's --
13 A  It would depend on the depiction.
14 Q  Do you have any criteria -- any objective criteria that you
15    would use to decide whether one site is art and another site
16    isn't?
17 A  I think it would be the intent of the photographer.
18 Q  How would you determine the photographer's intent?
19 A  I think it's pretty easy to tell if their point is to be
20    sexually arousing or to depict the human form in its natural
21    state.
22 Q  By definition this category consists of materials that are
23    not intended to be sexually arousing; is that right?
24 A  That's not -- are we talking about adult materials?
25 Q  Yes.

1  A  It says that these are (as read):  "...websites...  ...that
2     feature or promote sexuality..."
3  Q  Keep reading.
4  A  "...strip clubs, sex shops, etc. excluding sex education,
5     without the intent to sexually arouse."
6  Q  So by definition this is a category of materials that is not
7     intended to be sexually arousing, correct?
8  A  That's what it says.
9  Q  So why are you blocking access to those materials that are --
10    the purpose of which is not to sexually arouse?
11        MR. ADAMS:  I object, I guess, to the form.  I'm
12    reading that definition a little bit differently.  It speaks
13    for itself, I suppose is all I can say, with respect to my
14    objection.
15 A  Am I supposed to answer the question?
16 Q  Yes.
17 A  Because the definition is that it's mature content for
18    18-plus years and over.
19 Q  So is it your view that any mature content should be blocked
20    by the libraries' filters?
21 A  Your definition of mature is?
22 Q  I'm wondering what your definition is.
23 A  I'm just looking at this definition of this site.
24 Q  You just said that this site is blocked because it contains
25    mature content.  What's your definition of mature content?

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

65fdb704-fa3f-4ced-944b-bc4e673c3b71

## Page 133

1  A  Their definition is stuff appropriate for people 18-plus
2     years and over.
3  Q  So is it your view that the library can lawfully block
4     anything that is intended to be viewed by persons 18 years of
5     age or older?
6         MR. ADAMS: That's -- objection. That misstates
7     his prior testimony.
8  A  Can you repeat the question?
9  Q  Is it your view that if a website contains material that is
10    intended to be viewed only by persons 18 years of age or
11    older, that site can be lawfully blocked by the NCRL?
12 A  I don't know. Duncan, we're refining this. We're in the
13    process of learning it. We've had -- I'm not aware of any
14    requests in this category to have it be removed.
15 Q  Is there a possibility that the NCRL will allow access to
16    adult materials in the future as a category?
17 A  We may.
18 Q  Why does the NCRL block access to the gambling category?
19 A  Gambling is illegal.
20 Q  What's the -- and I -- again, I don't have that in front of
21    me --
22 A  Uh-huh.
23 Q  -- so can you find the definition of gambling for me?
24 A  It's "Sites that cater to gambling activities such as
25    betting, lotteries, casinos, including gaming information,

## Page 134

1     instruction, and statistics."
2  Q  Is it your view that a website that provides instruction
3     regarding how to play Texas Hold-Em is illegal or somehow
4     catering to or encouraging unlawful activity?
5  A  No. But I'm not sure that that's in that site.
6  Q  Do you know whether or not it's in the site?
7  A  No.
8  Q  Have you ever undertaken to find out whether that site -- a
9     site like that would be blocked as a gambling site?
10 A  No.
11 Q  Why not?
12 A  I don't have time, Duncan, to search the Internet on every --
13    every website on the Internet.
14 Q  I don't want to go through this change by change, but I know
15    that the NCRL has over the years revised its -- revised the
16    categories that it has blocked.
17 A  Oh, absolutely.
18 Q  Refined them. Reduced the number of categories that it has
19    blocked; is that correct?
20 A  Correct.
21 Q  And what is the process that the NCRL has gone through to --
22    to refine that blocked list?
23       Let me ask a different way. Has the NCRL made
24    decisions to, for example, unblock a category in response to
25    particular requests typically, or is this just part of an

## Page 135

1     ongoing process of trying to figure out how this filter is
2     going to be configured going forward.
3  A  Both.
4  Q  All right. And why has the NCRL over the years reduced the
5     number of categories of content that it's blocking using the
6     filter?
7  A  A lot of that is just the evolving nature of the Internet and
8     the capabilities that we have now with the new filtering
9     software, and the capabilities we have with our computers.
10 Q  And how have the capabilities changed in a way that has
11    prompted the NCRL to reduce the number of categories that
12    were blocked?
13 A  Duncan, we have two people working in our IT Department. We
14    have 28 places. We used to be -- we used to call it -- we
15    were like a quilt that we were loosely connected everywhere.
16    And when we finally got our new system and now we're all
17    joined up, it's opened up a whole new world of being able to
18    control the -- before we would have had to go out to each
19    individual branch to make a change. Now we can do it with a
20    touch of a button here.
21 Q  I see.
22 A  So it's much more refined. And learning about -- I mean,
23    Fortinet is a very complicated thing. So it's evolving --
24 Q  Sure.
25 A  -- was the simple answer.

## Page 136

1  Q  Does the NCRL currently block web-based e-mail?
2  A  We block -- we don't host e-mail accounts. But, no, we don't
3     block it to my knowledge, e-mail.
4  Q  Like G-mail, for example?
5  A  No. No.
6  Q  Does the NCRL continue to block Google and Yahoo images?
7  A  We do, and it's unfortunate.
8  Q  Why are you -- why is the NCRL blocking Google and Yahoo
9     images?
10 A  Google and Yahoo images have their own filter, and so you can
11    bypass -- you can basically get unfiltered access to images.
12    And then you can go to those sites and the Google images
13    access proxy avoidance. Because you can go right to any site
14    there. And there's some pretty graphic things on there. But
15    we're working toward -- it would be nice to --
16 Q  Have you brought that issue to the attention of folks at
17    Fortinet?
18 A  I believe we have. And looked for a solution there but --
19 Q  I believe you testified earlier that NCRL it not currently
20    blocking the personal relationships category; is that right?
21 A  Let's look and see. Do you know what category that's under?
22    Its --
23       MS. MONROE: It's under general interest.
24       THE WITNESS: General interest.
25       MS. MONROE: Second page.

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

258

Page 137

1  A  There it is.  No, it looks like it is allowed.
2  Q  Do you know whether the NCRL is currently blocking dating
3     sites like Match.com?
4  A  No, we're not blocking those.
5  Q  When did you allow access to sites like Match.com?
6  A  Boy, a while back.
7  Q  Do you know when?
8  A  I don't know when.
9  Q  Sometime this year?
10  A  Yes.
11  Q  And why did the NCRL unblock those dating sites?
12  A  The same reasons that we unblocked MySpace.  We looked at
13     their terms of use of several of them, and they looked fine.
14  Q  The terms of use for those dating sites changed?
15  A  I don't know.
16  Q  Why were the dating sites initially blocked?
17  A  I don't recall.  You mean blocked on Fortinet or --
18  Q  Why did the NCRL block access to Match.com or other dating
19     sites?
20  A  I don't know.
21  Q  Do you know who made the decision to block those sites?
22  A  It was probably one of the test defaults and we hadn't --
23     hadn't reviewed all of it yet.
24  Q  Do you have any idea how accurate Fortiguard is, how much it
25     overblocks or underblocks?

Page 138

1  A  I believe that we've got a definitive study from our expert
2     witness.
3  Q  You'd defer to him on those issues?
4  A  I would.  I haven't had a chance to really study the document
5     yet.
6  Q  But you have -- you yourself haven't done any tests or
7     anything like that?
8  A  No.
9  Q  Okay.
10  A  Fortinet is a very reputable product.
11  Q  Do you know how many times NCRL staff have been asked by
12     adults to disable the filtering product?
13  A  I believe that Mr. Heinlen is the only person that's asked
14     for disabling of the filter.  And I'm not sure if he asked it
15     at the branch level.  Or maybe he did and I'm not recalling
16     it correctly.
17        MR. ADAMS:  Hey, Duncan, if we can finish by
18     5:00, I'd say let's power through.  But if you think that you
19     can't finish by 5:00 anyway, I'd say let Dean go and let him
20     have a comfortable commute to his class.
21        MR. MANVILLE:  I really want to see if I can get
22     it done --
23        MR. ADAMS:  Great.
24        THE WITNESS:  Great.
25        MR. MANVILLE:  -- if that's okay.

Page 139

1        MR. ADAMS:  That would be better for us.  Right?
2        THE WITNESS:  Perfect.
3        MR. ADAMS:  Otherwise we'll just bring you back
4     here at 6:00 tomorrow.
5        THE WITNESS:  All right.  I'll just stay the
6     night.
7  Q  (By Mr. Manville) Let me hand you this document that's Bates
8     labeled NCRL 01510 through 01512.  It's an e-mail string.
9  A  Yes.
10  Q  There's a question there from Jan Walsh, it looks like, to
11     you.  Is this the guy?
12  A  Yes.
13  Q  Sounds like the end of a conversation that you might have had
14     with her about Chuck Heinlen?
15  A  I believe so.
16  Q  What was she referring to there?
17  A  In her -- where?  I'm sorry.  Is this the guy?  Is that what
18     you're saying?
19  Q  Yeah.
20  A  She had called me because he was from our area and she wanted
21     to know who he was, and so then she sent me this.
22  Q  Oh, because she'd received some communications from him?
23  A  Yes.
24  Q  I see.
25  A  Well, it says "Dear Ms. Walsh" from Charles Heinlen.

Page 140

1  Q  So you obviously discussed Mr. Heinlen with her at some point
2     previous?
3  A  She called and asked who he was.
4  Q  Have you received any complaints from NCRL patrons who
5     inadvertently accessed material that you considered to be
6     inappropriate?
7  A  Yes, we have.
8  Q  Do you recall when those --
9  A  I don't, Duncan.
10  Q  How many complaints like that have you received; do you know?
11  A  I'd say under five.
12  Q  Were those complaints -- let me put it this way:  If any of
13     those complaints were made in writing, I take it that we
14     would have --
15  A  You would have them if they were made in writing.
16  Q  Okay.  Do you ever get complaints like that that come to you
17     but that are just verbal, like a phone call or something from
18     a librarian?
19  A  Yes.
20  Q  Have you had some complaints like that?
21  A  Yes.
22  Q  And this would -- those complaints, I take it, would be
23     included in the five that you were referring to earlier?
24  A  Yes.
25  Q  Do you know how much the -- was the N2H2 filter the original

35 (Pages 137 to 140)

65fdb704-fa3f-4ced-944b-bc4e673c3b71

| Page 141 | Page 143 |
|---|---|
| 1  filter that the NCRL purchased? | 1  what that reference is to? |
| 2 A I believe that was the original name of it. | 2 A We were having considerable problems because it's an area |
| 3 Q Okay. Do you know how much the NCR -- was that a | 3    that -- of the Wenatchee branch that -- it's hard to |
| 4    software-based filter; do you know? | 4    supervise. We were having kids fighting and -- and some |
| 5 A I don't know what you mean. | 5    older people doing some things. We were -- we were having |
| 6 Q Well, I mean did the NCRL have to buy any hardware -- | 6    problems. |
| 7 A No. | 7 Q Do you know if these problems related to persons viewing |
| 8 Q -- to put that filter on its computers? | 8    websites that you considered inappropriate, or were these |
| 9 A Sorry. No. | 9    just people who were in the room using the Internet and -- |
| 10 Q Okay. Do you know -- so was it just a software product that | 10 A We were filtering at the time, so I'm assuming it was just |
| 11    the NCRL purchased? | 11    people in the room at the time. |
| 12 A Correct. | 12 Q So it's unrelated to whatever they may have been looking at |
| 13 Q And then in addition to that, a subscription that would allow | 13    as far as you know? |
| 14    the computers to communicate with a remote server or | 14 A As far as I know. |
| 15    something like that, correct? | 15 Q Okay. What did you do about those problems? |
| 16 A Correct. | 16 A In Wenatchee we added video cameras and a person was |
| 17 Q Do you know how much the NCRL paid for that service? | 17    prosecuted for assault in that area. |
| 18 A I believe we provided that invoice to you, but I -- I can't | 18 Q Okay. |
| 19    say the amount off the top of my head. | 19         MR. MANVILLE: Can I see that back? Thanks. |
| 20 Q All right. And then the -- the Fortiguard product, how much | 20 Q (By Mr. Manville) What's your view of what constitutes |
| 21    did the NCRL pay for that; do you know? | 21    material that's harmful to minors? |
| 22 A I don't have that figure off the top of my head. | 22         MR. ADAMS: Objection. It calls for a legal |
| 23 Q Is there an ongoing monthly fee that the NCRL pays for | 23    conclusion. |
| 24    Fortiguard? | 24 A So difficult. I mean, Washington is -- my understanding is |
| 25 A I believe it's an annual subscription fee, but I would have | 25    Washington doesn't have a harmful-to-minors law, so we're |

| Page 142 | Page 144 |
|---|---|
| 1    to check that out. | 1    under the Federal statute. And I can't quote it for you, but |
| 2 Q Do you know the amount of the annual subscription fee? | 2    I think it's a reasonable 17-year-old finds objectionable. |
| 3 A I do not at this point. | 3    That's my guess. |
| 4 Q Let me hand you this document. This is NCRL 0179 -- excuse | 4 Q Do you have a personal view of what material harmful to |
| 5    me -- NCRL 01479 to 01480. | 5    minors would be? |
| 6        Can you just take a look at that and tell me if -- if | 6         MR. ADAMS: Same objection. |
| 7    that comports with your recollection of roughly what the | 7 A Duncan, that's so broad I'm having trouble putting -- giving |
| 8    Fortinet product cost the NCRL initially? I think if you | 8    you something specific. |
| 9    look on page 2, the figure is a little over $48,000 or | 9 Q Can -- can -- in your view can material be harmful to minors |
| 10    something. | 10    if it doesn't involve nudity or sex? |
| 11 A I would have to check this against the rest of the invoices | 11 A Probably. |
| 12    to see where it is. | 12 Q So can you give me an example of somebody -- something that |
| 13        MR. ADAMS: Duncan, just for the record, it looks | 13    wouldn't involve nudity or sex that you would consider to be |
| 14    like this may refer to hardware as well as the filtering. | 14    harmful to minors? |
| 15        MR. MANVILLE: I believe it does. | 15 A I can't give you an example right now. |
| 16        THE WITNESS: Yeah. | 16 Q Do you think that there is Internet content that would be, |
| 17 Q (By Mr. Manville) So, I mean, it's my assumption that | 17    for example, violent that you would consider to be harmful to |
| 18    there -- that there would have been a pretty substantial | 18    minors and subject to blocking by the NCRL? |
| 19    initial up-front cost because there was some hardware and | 19 A There might be, but I can't attest to that. |
| 20    software that had to be purchased, and then a much smaller | 20 Q Do you think that there's a difference between material that |
| 21    annual subscription fee. Is that right? | 21    would be harmful to a 6-year-old and material that would be |
| 22 A Yes. | 22    harmful to a 16-year-old? |
| 23 Q Okay. Handing you a document Bates labeled NCRL 00302, if | 23 A Probably. |
| 24    you look down at the services section, there's a reference to | 24 Q What would -- what would you use as the baseline for |
| 25    some problems, I guess, in the Wenatchee branch. Do you know | 25    determining what material is harmful to minors; a 6-year-old |

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

65fdb704-fa3f-4ced-944b-bc4e673c3b71

|  | Page 145 |
|---|---|

1  or a 16-year-old?
2  A I think you would have to consider both.
3  Q How would you do that?
4  A I think that's one of the difficulties of CIPA. How do you
5    determine what is harmful to minors when it's just such a
6    broad category?
7  Q Well, if you consider both, don't you necessarily -- aren't
8    you necessarily going to drive that category by what would be
9    harmful to a 6-year-old?
10  A Duncan, I fall back on that we look at things and look at
11    them in the context of "Would this be appropriate to view in
12    a public place where there are multiple ages and varieties of
13    people?
14  Q But do you ask "Would this be appropriate to view in a public
15    place by a 6-year-old or by a 16-year-old"?
16  A I try to include all people in that.
17  Q So by a 6-year-old essentially?
18  A No.
19  Q So what if --
20  A No more than a 60-year-old.
21  Q So suppose somebody is looking at something online that would
22    be fine to be seen by a 16-year-old, but that you would
23    consider to be harmful to a 6-year-old, do you think that
24    would be appropriate to view in a public library setting?
25  A You lost me on that one. I'm sorry.

|  | Page 146 |
|---|---|

1  Q Suppose somebody is looking at a website that would be
2    suitable for a 16-year-old but that you would consider to be
3    harmful to a 6-year-old. Do you think that would be
4    appropriate to -- that it would be appropriate to view that
5    website in a public library?
6  A Could you give me an example?
7  Q No. I'm just wondering if you can answer the question.
8  A I don't think I can answer that.
9  Q Why not?
10  A Because I don't know. I don't know unless I'm looking at
11    something specific.
12  Q And you can't give me an -- can you give me an example of
13    something that would be suitable to be viewed by a
14    16-year-old, but not by a 6-year-old.
15  A I don't know. I was hoping you could give me an example.
16  Q Well, what about a -- a site dealing with teen pregnancy? I
17    mean, that would be presumably something that would be
18    suitable to be viewed by a 16-year-old, right?
19  A Correct.
20  Q But maybe not by a 6-year-old?
21  A I'm not sure that it -- unless it had images that were
22    inappropriate, it would be fine.
23  Q Suppose it had graphic discussions of sexual conduct and the
24    potential -- the ramifications of engaging in sexual
25    conduct --

|  | Page 147 |
|---|---|

1  A In print?
2  Q -- diseases. Yeah, in print.
3  A I would have to look at the website, but I would assume that
4    that would be okay.
5  Q How about a site that illustrated how to put on a condom?
6  A If it had the illustration, if it was a drawing -- I'd have
7    to look at it, I would assume.
8  Q Do you think that would be suitable to be viewed by a
9    16-year-old?
10  A I think we do unblock those sites that are on sex education,
11    yes.
12  Q Do you think that would be suitable to be viewed by a
13    6-year-old?
14  A I think it would be less harmful if they were walking by and
15    saw that if it was a drawing or an illustration.
16  Q As opposed to standing there, you mean?
17  A I don't know. I think you're asking me to make up a website
18    and a depiction that -- I'm not sure we're viewing the same
19    website.
20    Yes, we allow sex education material.
21  Q I'm handing you a copy of the Defendant's Responses To
22    Plaintiff's First Interrogatories and Requests For
23    Production.
24  A Yes.
25  Q And this is a --

|  | Page 148 |
|---|---|

1    MR. ADAMS: We've got our own copy, if you want
2    yours.
3    MR. MANVILLE: Sure. That's fine. Thanks.
4  Q (By Mr. Manville) If you go to the last page, page 17, this
5    is your signature on the verification page, correct?
6  A Correct.
7    MR. ADAMS: He may not have your copy, actually.
8  Q Let's see that.
9  A Let's assume that it is.
10  Q That is your signature. Okay.
11  A Okay.
12  Q So you reviewed these answers --
13  A I did.
14  Q -- prior to signing this, correct?
15  A Correct.
16  Q If you go to page 7, it says -- this is the library's answers
17    to Interrogatory No. 4. This reads (as read): "Consistent
18    with this policy, NCRL will not completely remove the
19    Internet filter at an adult patron's request," correct?
20  A Correct.
21  Q And it says (as read): "This is because removal would allow
22    an adult patron to view child pornography, obscenity,
23    pornography, and other harmful material, all of which is
24    either unprotected or potentially disruptive in a library
25    setting." Did I read that right?

37 (Pages 145 to 148)

Page 165

1       REPORTER'S CERTIFICATE
2          I, ALISON J. HOWZE, Certified Shorthand
3     Reporter, do hereby certify:
4          That the foregoing proceedings were
5     taken before me at the times and place therein set
6     forth, at which time any witnesses were placed under
7     oath;
8          That the testimony and all objections
9     made were recorded stenographically by me and were
10    thereafter transcribed by me or under my direction;
11         That the foregoing is a true and correct
12    record of all testimony given, to the best of my
13    ability;
14         That I am not a relative or employee of
15    any attorney or of any of the parties, nor am I
16    financially interested in the action;
17         IN WITNESS WHEREOF, I have hereunto set
18    my hand and affixed my official seal this 25th day of
19    October, 2007.
20
21    _____
      ALISON J. HOWZE, CCR
22    CCR # 2575
      Notary Public in and for the
23    State of Washington, residing
      at Wenatchee.
24
25    My commission expires on October 31, 2008.

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

262

# Exhibit P



Transcript of the Testimony of
# Kenton Oliver

**Date:** November 14, 2007

**Caption:** Sarah Bradburn, et al v. North Central Regional Library District

Digital Court Reporting and Video, LLC
866.721.0972 Toll-free
713.683.0401 Local
713.683.8935 Fax
depos@digitalreporting.com
www.digitalreporting.com

**Job Number: 2761**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

CASE NO. CV 06 327 EFS

JUDGE EDWARD SHEA


SARAH BRADBURN, ET AL.,

        Plaintiffs,       DEPOSITION OF

versus                  KENTON OLIVER

NORTH CENTRAL REGIONAL
LIBRARY DISTRICT,

        Defendant.

        - - - - -

        Deposition of KENTON OLIVER, a witness
herein, called by the Defendant as upon
cross-examination pursuant to the Federal Rules of
Civil Procedure, taken before me, the undersigned,
Laurie Maryl Hart, a Registered Merit Reporter and
Notary Public in and for the State of Ohio, at the
Stark County District Library, 715 Market Avenue
North, Canton, Ohio, on Wednesday, November 14, 2007,
at 12:36 p.m.

        - - - - -

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

1    APPEARANCES:

2    On behalf of the Plaintiffs:

3    (Via Telephone)

4

5           Duncan Manville, Attorney at Law
            1629 2nd Avenue West
            Seattle, Washington 98119

6

7    On behalf of the Defendant:

8

9           Celeste Mountain Monroe, Attorney at Law
            Karr, Tuttle, Campbell
            1201 Third Avenue

10          Suite 2900
            Seattle, Washington 98101-3028

11

12

13                  _ _ _ _ _

14

15

16

17

18

19

20

21

22

23

24

25

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

1               I N D E X

2      Cross-Examination by Ms. Monroe: 4

3                  - - - - -

4               E X H I B I T S

5      Defendant's      Description                    Page

6      51    Plaintiffs' First Supplement            7
             to Initial Disclosures

7

8      52    Stark County District Library           26
             Internet and Computer Use Policy

9

10                 - - - - -

11           O B J E C T I O N   L O G

12     Page, Line

13     16:23

14                 - - - - -

15

16

17

18

19

20

21

22

23

24

25

Page 21

1    discriminate in access by their patrons.  That's kind
2    of the broad.
3  Q    Okay.  And what is your role in furthering that
4    mission as the chair?
5  A    Actually I'm more of a facilitator than anything.
6    I'm the person that facilitates our meetings.  I
7    consult with the Office of Intellectual Freedom in
8    setting the agendas and our strategic direction of
9    the committee.
10  Q    When you say consult with the Office of Intellectual
11    Freedom, is this a national office located --
12  A    In Chicago.
13  Q    In Chicago.  Okay.  The Intellectual Freedom
14    Committee, though, is a national committee; correct?
15    It's not an Ohio --
16  A    Correct.
17  Q    -- version.  Okay.  Has the Intellectual Freedom
18    Committee taken an official position on the use of
19    Internet filters in public libraries?
20  A    Yes.
21  Q    Okay.  And what is that position?
22  A    They are opposed to Internet filters in any way that
23    they would impede access for information to any
24    library users.
25  Q    And you said "in any way"?

Page 22

1  A    In any way that they would impede access for
2    libraries' users to information on the Internet.
3  Q    To any type of information or is that limited to
4    constitutional?
5  A    Constitutionally protected information.
6  Q    What is your understanding of what is
7    constitutionally protected speech or information?
8  A    Anything -- my understanding is that the only thing
9    that would be prohibited to access on the Internet
10    would be anything that would be deemed legally
11    obscene.
12  Q    For example, child pornography?
13  A    Yes.
14  Q    Does Ohio have a definition by state law of 'harmful
15    to minors'?
16  A    Yes.
17  Q    Okay.  What is, to your knowledge, what does the law
18    say?  What does that define it as?
19  A    I could not give you the detail of it without having
20    it in front of me.  I have a general concept of it
21    but I'd rather -- I don't feel comfortable quoting it
22    without having it in front of me.
23  Q    Okay.  Do you know what your general concept would
24    be?
25  A    It involves such things as, as child pornography.

Page 23

1    Deviant sexual practices.  Would be the primary
2    areas.
3  Q    Has the Intellectual Freedom Committee taken a
4    position with respect to whether or not pornography
5    should be viewed at a public library?
6  A    Can I take a break?
7  Q    Yes.
8  A    I'd like to consult.
9  Q    You'd have to answer my question.
10  A    I'm sorry.  I'm sorry.  Could you repeat the
11    question?
12        MS. MONROE:  Could you read it back?
13        (Question read by the reporter.)
14  A    The Intellectual Freedom Committee believes that any
15    information that is constitutionally protected should
16    be made available at a public library.  Pornography
17    is not by definition legally obscene.
18  Q    Okay.  Would you like to talk to Duncan?
19  A    Sure.
20        MS. MONROE:  I'll take a step out.
21        (Off the Record.)
22  BY MS. MONROE:
23  Q    Is it fair to say that the Intellectual Freedom
24    Committee believes that patrons should have access to
25    pornography at public libraries because at least some

Page 24

1    pornography is constitutionally protected?
2  A    Yes.
3  Q    In your time as -- let me take a step back.  Get your
4    title right.  As the chair of the Intellectual
5    Freedom Committee, has there been any discussion
6    about the type of environment that is -- the type of
7    environment that is created when pornography is
8    accessible in a public library?
9  A    I cannot recall specifically that there has been.
10    Although we're all aware of it.
11  Q    When you say that we're all aware of it, what do you
12    mean?
13  A    Well, the committee is not made up of people that are
14    insulated from the library work and so we're all
15    aware of what goes on at the front lines of library
16    where people are using computers and the Internet.
17  Q    In this, in your district, have there been any
18    documented incidents of individuals accessing
19    pornography on the public Internet use computers?
20  A    I would have to double-check our incident reports.
21    It isn't something that jumps right out at me.  It's
22    not a regular occurrence by any means or something
23    that I immediately say yes, we're having trouble with
24    that.
25  Q    Okay.  Beyond maybe having trouble with it, do you

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

Page 25

1    recall there being any incidents?
2  A   I don't recall specific incidents.
3  Q   Would those incidents, if they had occurred, be
4    brought to your attention as part of your role as
5    executive director?
6  A   If their severity reached a certain level, they would
7    be.
8  Q   In your mind, what would -- when would a situation be
9    so severe it would warrant your involvement?
10 A   When we had a patron who was viewing what would be
11   considered legally obscene and they would be doing it
12   on a repeated basis to the point that they were
13   ignoring our staff's warnings to cease and they were
14   also violating the rights of other library users to
15   comfortably use our facilities.
16 Q   Okay. So from that can I understand then that the
17   branch librarians are typically the first people who
18   might respond to a situation where someone was
19   viewing, in your example, you know, unlawful speech?
20 A   It could be any -- I would say it could be any number
21   of different positions, front line public service,
22   not just managerial but front line public service
23   people.
24 Q   So is it possible there have been -- let me take a
25   step back. We'll go through the policy in detail,

Page 26

1    but in the event that an individual is viewing
2    material that is not consistent with your policy, is
3    the practice that a librarian walk over, approach
4    that individual and ask them to cease?
5  A   Yes.
6  Q   Any idea, for example, in this branch that we are in
7    today for this deposition, any idea how many times a
8    week it may happen where a librarian has to ask
9    someone to cease?
10 A   No. I have no idea. It's not a common enough
11   occurrence at that level that it's something that I'm
12   aware of.
13 Q   What is the protocol if someone, if a librarian
14   approaches an individual and asks them to cease and
15   they refuse, are they asked to leave?
16 A   Yes.
17 Q   Why don't we just get the policy out now.
18       (Defendant's Exhibit 52, Stark County
19       District Library Internet and Computer Use
20       Policy, was marked for identification.)
21       MS. MONROE: Off the Record.
22       (Discussion off the Record.)
23   BY MS. MONROE:
24 Q   Mr. Oliver, you've been handed what is marked as
25   Exhibit 52. This is -- well, why don't I switch

Page 27

1    that. What is, what is this?
2  A   This is the Stark County District Library Internet
3    and Computer Use Policy.
4  Q   Is this the current policy?
5  A   Yes.
6  Q   Okay. Were there any prior versions of this policy?
7  A   There may have been. We review it annually, as is
8    stated in the policy. And there may have been a few
9    minor adjustments to it.
10 Q   For purpose of the Record, I'll note that this
11   version states that it is effective April 17th, 2007.
12   Let's take a look at the policy itself. In your own
13   words, what, what is your policy with respect to
14   Internet filtering?
15 A   Basically all of our Internet access workstations are
16   filtered. And in order, if a person or a patron is
17   searching the Internet and they try and access a Web
18   site that has been filtered, or is blocked, if they
19   are an adult they can enter their library card number
20   if they wish and bypass the filter and go on with
21   their search. If they were a child under 16 they
22   will be stopped unless -- not able to proceed and
23   access that site unless they have been given
24   permission by their parents. Or adult guardian.
25 Q   What is the difference between -- strike that. What

Page 28

1    content is filtered for the minor setting?
2  A   We have a whole schedule. It is the Bess filtering
3    package, that's the name of the company, B-e-s-s, and
4    it involves everything from 'personal' is one subject
5    heading to, again I'd have to have the schedule in
6    front of me, but it is what I think you would
7    generally conceive would be filtered by most, most
8    places in the public. Sexually graphic material,
9    illegal, there's actually an 'illegal' subject
10   heading that would have to do with such things as
11   making bombs. But it ranges the entire gamut of
12   areas that people would probably consider to be
13   objectionable in some way or the other.
14 Q   And again, this is the minor setting?
15 A   Yes.
16 Q   So either -- so if I'm an adult or my parent has
17   given me permission, then I have unfiltered, I can
18   get unfiltered access?
19 A   You can. But what you -- part of that process is
20   when you go into the site what you -- when you are
21   attempting to access a site you're given a prompt to
22   enter your library card number. And the other thing
23   about it is that you only have access for ten
24   minutes. And at the end of that ten-minute time if
25   you wish to continue unfiltered access you have to

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

1    reenter your library card.
2  Q   Okay.  So it's a site-by-site basis?
3  A   No, it's general access time period.
4  Q   Once?
5  A   Once you bypass the filter you have ten minutes.
6  Q   Okay.
7  A   If you wish to continue beyond ten minutes, you need
8      to reenter your library card number.
9  Q   I want to draw your attention to the third paragraph
10     of the policy.  "The content of some Web sites may
11     not be accessible due to network security."  With
12     respect to that sentence, does that mean that even if
13     a patron has quote, unfiltered access, unquote, that
14     there are still some sites that are prohibited
15     because they -- for purposes of ensuring network
16     security?
17 A   I would assume that is what that means.
18 Q   Do you have any specific knowledge of what types of
19     sites that might -- they might be?
20 A   No.  And I would speculate that that has to do with
21     just what it says.  Network security.  The library's
22     actual computer system.
23 Q   Are you familiar with the term 'spyware' or
24     'malware'?
25 A   I have a general familiarity with it.

1  Q   Do you think those types of sites might be --
2  A   That would be my assumption.
3  Q   Okay.  Okay.  I'm going to draw your attention to the
4      fifth paragraph.  That reads "Patrons are welcome to
5      use the Internet but may not display images that are
6      deliberately offensive or create a hostile or
7      intimidating environment."  Let's start with that
8      sentence.  Can you give me an idea of what types of
9      sites would be considered deliberately offensive?
10 A   I think that would depend upon the time and place
11     that it was going on and the number of people that
12     were around and the situation, behavioral situation
13     that was going on with a patron and the interaction
14     between the patron and the staff member.
15 Q   Are there any types of sites or content that you feel
16     would unquestionably be deliberately offensive?
17 A   Anything that would be legally obscene.
18 Q   What about with respect to images that create a,
19     quote, hostile or intimidating environment, unquote?
20     What types of sites does that sentence contemplate?
21 A   Again, I think it would depend on the actual
22     environment of where the patron was viewing it and
23     the interaction that might or might not be going on
24     between the staff or between patrons.  I think it's
25     hard to -- without actually being in a setting where

1      an image is being viewed, it's really hard to
2      determine what that would be.
3  Q   Okay.  So, for example, if it's a Saturday afternoon,
4      it's very busy at the library and an individual is
5      viewing pornography on a public use computer.  And a
6      staff member comes over to ask them to stop, is that
7      a situation that could potentially create a hostile
8      or intimidating environment?
9  A   I would believe it would.
10 Q   On to that point, the next policy indicates that
11     patrons may not display on screens or printers
12     sexually explicit graphics or other materials which
13     may be obscene, illegal or harmful to minors as
14     defined in local, state and federal or applicable
15     court decisions.  So what is Stark County's policy
16     with respect to viewing pornography?  Is it ever
17     acceptable for an individual to be in the library
18     viewing pornography?
19 A   Well, I think our main issue is that since
20     pornography is not a legal term and it's very
21     subjective based on the individual, again you would
22     determine -- it would be based upon the specific Web
23     site and what was going on.
24 Q   Okay.  So let's use an example then.  For example,
25     Playboy magazine and the visual depictions of female

1      genitalia and breasts.
2  A   Uh-huh.
3  Q   Is that content that is ever acceptable to be viewed
4      at this library in this library district or is that
5      what is contemplated by the sentence that says
6      "screens may not display sexually explicit graphics"?
7  A   I think again it would depend on the manner in which
8      they're being viewed and the reason for which they're
9      being viewed.  And the Playboy thing, it's hard for
10     me to say without seeing a picture specifically.
11     And, you know, an example of that might be somebody
12     could be on a medical site that is exposing breasts,
13     it would have to do with breast cancer.  And a casual
14     passerby would see breasts on that Web site not
15     knowing if it happened to be with Academy of American
16     Medicine or the Playboy Web site, so again I'd say
17     each individual circumstance, you'd have to take each
18     one individually as opposed to making a uniform
19     statement.
20 Q   Okay.  But the policy here generally, at least on
21     paper, appears to me that there is a line?
22 A   Yes, there is.
23 Q   There is a line?
24 A   There absolutely is a line.
25 Q   Okay.  And obscene and illegal and harmful to minors

713-683-0401  Digital Court Reporting and Video  713-683-8935

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

Page 33

1     feature all, for purposes of this policy, as defined
2     by state, federal or local law?
3  A   Exactly.
4  Q   Are you familiar with the phrase "tap and tell" as it
5     applies to Internet content in public libraries,
6     viewing Internet content in public libraries?
7  A   I believe I am.  It's the same thing as tapping on
8     the shoulder and viewing by librarians.
9  Q   And asking people to leave; correct?
10  A   Yes.
11  Q   Is that an accurate way to describe kind of your
12     privacy protection here?
13  A   Our staff are taught to respect the privacy of
14     everybody using materials in our buildings, whether
15     it be books or the Internet.  And it is not a
16     directive from us that we have staff going around
17     looking over the shoulder of what people are viewing
18     on the Internet.
19  Q   Typically if something is brought to staff members'
20     attention then they would respond?
21  A   Absolutely.
22  Q   Okay.  If a staff member happened to pass by and see
23     something, they would also be authorized to ask the
24     person to stop if, for example, it was child
25     pornography?

Page 34

1  A   Correct.
2  Q   When a patron has access, has full access, you know,
3     gave -- they're an adult or a minor with permission,
4     is it possible then that child pornography is
5     accessible?
6  A   Well, I would say yes, on the Internet in general,
7     not just at our library.
8  Q   Oh, yes.  All right.  I note that it says "Internet
9     users are governed by the library's Appropriate
10     Conduct Policy."  That is, I'm reading from the
11     Internet and Computer Use Policy the last sentence of
12     Paragraph 5.  Is the library's Appropriate Conduct
13     Policy online?
14  A   I believe it is.
15  Q   Okay.  Is there anything in the conduct policy that
16     speaks to the Internet use policy?
17  A   Not to my knowledge.
18  Q   What types of behaviors are considered inappropriate
19     by the terms of the conduct policy?
20  A   The conduct policy is what you would consider a
21     general behavioral policy.  So for instance, noise,
22     you know, starting fights.  Its primary focus is on
23     the idea that your conduct should not be such that it
24     would inhibit or prevent another person from using
25     the library in a productive manner.

Page 35

1  Q   With respect to the Internet and Computer Use Policy,
2     did you draft this policy?
3  A   We had a committee that drafted it.
4  Q   Okay.  How many people were on the committee?
5  A   I would have to check.  I cannot remember.
6  Q   Okay.  Are they all from this district?
7  A   They're from our library.
8  Q   Okay.  Did you get any input from the Intellectual
9     Freedom Committee with respect to this policy?
10  A   We benchmarked against many library publications and
11     also existing policies of other libraries.
12  Q   To your knowledge, is the staff happy with this
13     policy?
14  A   To my knowledge.
15  Q   Does it work?  What about the board?  Are they --
16     have they expressed any new concerns since it was
17     adopted in April of 2007?
18  A   No.
19  Q   Any plans to change any part of this Internet and
20     computer use policy as you look ahead?
21  A   No.  We're very happy with the way it's being used.
22  Q   You said that the filter product that you use for
23     minors is Bess?
24  A   Correct.
25  Q   How long have you had that filter product?

Page 36

1  A   I'd have to double-check.  Bess is, if I'm correct,
2     Bess is also been known as N2-H2.  It's actually a
3     company that's in the Pacific Northwest, I believe,
4     and it's gone through several alliterations.
5  Q   Has that filter product changed since you've been
6     here for six years?  Besides upgrades.
7  A   No.
8  Q   Which may happen.  So it's always been Bess?
9  A   To my knowledge.
10  Q   Who was involved in selecting that product?
11  A   Our computer services staff.  And their manager.  And
12     myself.  But what they did, they did a -- they did an
13     analysis of the marketplace, and as I recall, it was
14     based on quality of the product and pricing as well.
15  Q   Are you aware of whether there's been any concerns
16     from patrons who are minors who feel that they're
17     being denied access to appropriate content because of
18     Bess?
19  A   I'm not directly aware of that.
20  Q   When I asked you about your responsibilities as
21     executive director and about the library, you
22     provided some background about the district itself,
23     including the number of branches, the number of
24     people in the staff and the operating budget.  You
25     said there are eleven branches plus a main branch, so

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

Page 65

```
1          C E R T I F I C A T E
2
3          I, KENTON OLIVER, do hereby certify that I
4   have read the foregoing deposition in the case of
5   SARAH BRADBURN, ET AL., Plaintiffs, versus NORTH
6   CENTRLA REGIONAL LIBRARY DISTRICT, Defendant, and
7   said deposition constitutes a true and correct
8   transcript of my testimony given at the specified
9   time.
10
11          _____
            KENTON OLIVER
12
13   Dated this _____ day of _____.
14          - - - - -
15   Subscribed and sworn to before me this _____ day of
16   _____.
17
18          _____
            Notary Public
19          My commission expires _____
20          - - - - -
21
22
23
24
25
```

Page 66

```
1          C E R T I F I C A T E
2
3
     STATE OF OHIO   )
4                    )SS
     STARK COUNTY    )
5
6          I, Laurie Maryl Hart, a Registered Merit
     Reporter and Notary Public in and for the State of
7    Ohio, duly commissioned and qualified, do hereby
     certify that the within named witness, KENTON OLIVER,
8    was by me first duly sworn to tell the truth, the
     whole truth and nothing but the truth in the cause
9    aforesaid; that the testimony given was by me reduced
     to Stenotype and afterwards transcribed by
10   computer-aided transcription, and that the foregoing
     is a true and correct transcription of the testimony
11   so given by him as aforesaid.
12
13          I do further certify that this deposition was
     taken at the time and place in the foregoing caption
14   specified.  I do further certify that I am not a
     relative, counsel or attorney of either party, or
15   otherwise interested in the event of this action, nor
     is the court reporting firm with which I am
16   affiliated under a contract as defined in Civil Rule
     28(D).
17
18          IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Canton, Ohio,
19   on this 19th day of November, 2007.
20
21          _____
            Laurie Maryl Hart, RMR & Notary Public.
22          My commission expires January 6, 2012.
23
24
25
```

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

# Exhibit Q

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

SARAH BRADBURN, PEARL          )   No. CV-06-327-EFS
CHERRINGTON, CHARLES           )
HEINLEN, and THE SECOND        )
AMENDMENT FOUNDATION,          )
                               )
              Plaintiffs,      )
                               )
       vs.                     )
                               )
NORTH CENTRAL REGIONAL         )
LIBRARY DISTRICT,              )
                               )
              Defendant.       )


DEPOSITION UPON ORAL EXAMINATION OF
JUNE PINNELL-STEPHENS

October 3, 2007
Seattle, Washington



Taken Before:

Cheryl L Hendricks, CCR #2274
Certified Court Reporter
of
CAPITOL PACIFIC REPORTING, INC.
2401 Bristol Court SW, Olympia, WA 98502
Tel (360) 352-2054  Fax (360) 705-6539

Tacoma              Seattle          Aberdeen
(253) 564-8494      (206) 622-9919      (360) 532-7445
       Chehalis              Bremerton
       (360) 330-0262        (360) 373-9032

www.capitolpacificreporter.com
scheduling@capitolpacificreporting.com

**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

SARAH BRADBURN, PEARL ) No. CV-06-327-EFS
CHERRINGTON, CHARLES )
HEINLEN, and THE SECOND )
AMENDMENT FOUNDATION, )
)
Plaintiffs, )
)
vs. )
)
NORTH CENTRAL REGIONAL )
LIBRARY DISTRICT, )
)
Defendant. )

DEPOSITION UPON ORAL EXAMINATION OF
JUNE PINNELL-STEPHENS
October 3, 2007
Seattle, Washington

Taken Before:
Cheryl L Hendricks, CCR #2274
Certified Court Reporter
of
CAPITOL PACIFIC REPORTING, INC.
2401 Bristol Court SW, Olympia, WA 98502
Tel (360) 352-2054  Fax (360) 705-6539

Tacoma        Seattle      Aberdeen
(253) 564-8494  (206) 622-9919  (360) 532-7445
Chehalis        Bremerton
(360) 330-0262  (360) 373-9032
www.capitolpacificreporter.com
scheduling@capitolpacificreporting.com

**Page 2**

1          APPEARANCES
2
3  FOR THE PLAINTIFF: DUNCAN MANVILLE
       ATTORNEY AT LAW
       1629 SECOND AVENUE WEST
4      SEATTLE, WA 98119-1799
       PHONE: (206) 390-8164
5      E-MAIL: duncan.manville@gmail.com
6
   FOR THE DEFENDANT: CELESTE MOUNTAIN MONROE
7      ATTORNEY AT LAW
       KARR TUTTLE CAMPBELL
8      1201 THIRD AVENUE, #2900
       SEATTLE, WA 98101
9      PHONE: (206) 223-1313
       FAX: (206) 682-7100
10     E-MAIL: cmonroe@karrtuttle.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1              EXAMINATION INDEX
2
   BY:          EXAMINATION RE-EXAMINATION
3
4  MS. MONROE          4
5  MR. MANVILLE        114
6
7
8
9              EXHIBIT INDEX
10
   NO. DESCRIPTION          MARKED  IDENTIFIED
11
   25  Report with Attached    73      73
12      Articles and Research
       Material
13
   26  Library Bill of Rights  89      89
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1          BE IT REMEMBERED that on Wednesday, October 3,
2  2007, at 9:30 a.m., at 1201 Third Avenue, Seattle,
3  Washington, before Cheryl L. Hendricks, Notary Public in
4  and for the State of Washington, appeared June
5  Pinnell-Stephens, the witness herein.
6          WHEREUPON the following proceedings were had, to
7  wit:
8
9  June Pinnell-Stephens,   having been first duly sworn by
             the Notary, testified as follows:
10
11
12          EXAMINATION
13
14  BY MS. MONROE:
15  Q  Hi, June, --
16  A  Yes.
17  Q  -- do you mind if I call. . ?  Okay.
18          My name is Celeste Monroe and I introduced
19  myself to you briefly as I walked in for the first time.
20  I represent North Central Regional Library in this
21  action.
22          Would you please state your full name for the
23  record.
24  A  June Pinnell-Stephens.
25  Q  And what is your address?

1 (Pages 1 to 4)

Page 21

1  Q  Okay.
2  A  -- which used -- we were primarily tasked with serving
3     the North Star Borough.  And the latest population was
4     about 86,000 and the size of the bureau -- of the
5     borough was about that of New Jersey.
6  Q  In physical size?
7  A  Yes.
8  Q  Specifically then with respect to the North -- with the
9     North Pole branch, what did that look like, much
10    smaller?
11 A  Yes, it was much smaller and more cramped.  They had --
12    oh, and -- well, in the -- let me go back.  The -- the
13    areas I described were public areas.  There were, of
14    course, pretty much a warren of staff areas.
15 Q  In Fairbanks?
16 A  Yeah.
17 Q  Okay.
18 A  In North Pole, the staff area is shrunk to a room
19    smaller than this, I would think.  And they had a
20    children's area and then stacks and reference all sort
21    of mashed together.  They were very crowded.
22 Q  So no walls separating?  It was an open room just
23    separated by aisles of books?
24 A  Well, and then the children room which was also then the
25    story room -- story time area was open but partially cut

Page 22

1     off by a wall.
2  Q  Okay.  We will likely get into this in more detail
3     later.  But from reading your report, it sounds like at
4     one point the Internet terminals at the Fairbanks branch
5     and possibly the North Pole branch were not filtered.
6  A  That's right.
7  Q  Can you tell me from what period of time -- at what
8     point were Internet computers installed?
9  A  Oh, maybe '95.  I can't remember exactly.  Seems to me
10    it was almost eight years, between six and eight years,
11    that we did not have filters on our Internet stations.
12 Q  So assuming approximately 1995, then seven or eight
13    years later --
14 A  Mm-hmm.
15 Q  -- a filter was employed at both branches --
16 A  Mm-hmm.
17 Q  -- on their Internet computers?
18 A  Mm-hmm.
19 Q  What was the reason for the decision to install a
20    filter?
21 A  The Mayor --
22 Q  Of Fairbanks.
23 A  -- of Fairbanks at the North Star Borough decided that
24    it would be good public policy as well as a good
25    campaign issue to install filters and the assembly voted

Page 23

1     to do so.
2        We had decided previously -- the library staff,
3     we had looked at the cost benefit for putting them on.
4     We'd had no complaints from anybody about Internet use
5     at that point.  And we received approximately $2,500 a
6     year from E-Rate money, if that makes sense to you.
7  Q  Mm-hmm.
8  A  Okay.  I thought it might.  And ended up costing --
9     well, we figured it would cost us $26,000 to install an
10    adequate filtering system.
11 Q  What do you mean by adequate?
12 A  Well, one that had among the best ratings of those that
13    were available at the time.  I mean, some we -- that
14    were tested were clearly inappropriate.  And I can't
15    tell you the names of those.  The automated services
16    folks did most of the testing.  But there were reviews
17    written by a number of different organizations about the
18    various systems.
19 Q  And by best ratings, you mean performance ratings?
20 A  Mm-hmm.
21 Q  With respect to error rates?  Is that what you're
22    referring to?
23 A  Yes.
24 Q  Okay.  So before filters were installed what, if
25    anything, were you doing with respect to your Internet

Page 24

1     stations to prevent children or other people from seeing
2     what was on someone's screen?
3  A  Well, as time went by we started putting -- installing
4     privacy. . .
5  Q  Screens?
6  A  Screens and stations.  We went through an expansion of
7     the library not long after the Internets went into
8     place.  And when we reopened after -- when that
9     expansion was done, we planned for stations with
10    recessed screens, so they are down underneath a table
11    and it's a glass tabletop and you look down through it.
12    And for those stations that had to be on the desktop,
13    some people with trifocals or other reading problems
14    needed a screen on the desktop, we provided privacy
15    screens that actually fit over the screen.
16       We directed the locations of these stations so
17    they would not be right in the largest line of traffic
18    and tried our best to minimize incidental viewing of
19    anything.  And one of the reasons we did that is that
20    our nonfiction collection was fully integrated, that is,
21    children's material, adult material, nonprint material
22    were all interfiled on the same shelves and to -- you
23    had to walk past the main groupings of Internet stations
24    to get to the nonfiction collection of the library.
25 Q  Okay.  Was the mayor's decision to ask you to install

6 (Pages 21 to 24)

04035559-7bdc-4960-a4ea-bd542e318ee9

Page 29

1    find a way to start them with viewed -- reviewed by --
2    sites reviewed by the librarians and made the primary
3    port of -- point of entry. And I don't know if they had
4    gotten to that point.
5  Q  Okay. But children could use computers in the main
6    area?
7  A  Yes.
8  Q  And those -- for a time those computers were not filt --
9  A  Right.
10 Q  -- were not filtered?
11 A  Mm-hmm.
12 Q  Did children at that time need permission to view
13   anything on the computers?
14 A  No.
15 Q  No. What about in North Pole, how many -- were any of
16   the Internet capable computers specifically for children
17   or any computers specifically for children?
18 A  I don't think -- well, they may have had one computer
19   with games or something in the children's room but it
20   was not connected.
21 Q  So how did things change after the filters were
22   installed?
23 A  Well, one of the -- one of the things we did was add a
24   PC reservation system which scheduled all of the -- all
25   of the stations. And people had to have a library card

Page 30

1    or a guest card to sign up for a reservation. All of
2    these details are in the library Internet use policy.
3          We had a few people who would ask to have the
4    filters disabled. But I think -- and it was not just my
5    opinion, I believe my colleagues shared my opinion, that
6    people were reluctant to come up to us and ask to have a
7    filter disabled.
8  Q  Is that a feeling that you got or --
9  A  It's a feeling, yeah. There was something of a stigma.
10   Just like before the days Viagra ads became so
11   prevalent, men would be reluctant to come up to a
12   middle-aged woman and ask for books about erectile
13   dysfunction. It just didn't happen. And there was a
14   stigma that if you were asking to have the filter
15   disabled that you were therefore going to be looking at
16   sexually explicit sites.
17 Q  Was the filter specifically installed to limit access to
18   sexually explicit sites?
19 A  I believe so, yeah. There were no -- and even trying to
20   limit the filters to that category, that particular
21   category, we still had some ridiculous blockages.
22 Q  What do you mean by ridiculous?
23 A  Oh, there would be -- there was one car repair site that
24   was blocked. That's the main one I remember because we
25   had a lot of people who wanted to go to car repair

Page 31

1    materials.
2  Q  In that situation, was there an ability for staff or
3    personnel to override --
4  A  Yes.
5  Q  -- an improperly blocked site?
6  A  Well, at that point we just unblocked the station.
7  Q  Okay.
8  A  We couldn't override -- we couldn't un -- unblock a
9    site. We could send it to the producers for them to
10   unblock it. But the only thing we could do was lift the
11   filter completely --
12 Q  Okay. So you --
13 A  -- from that station.
14 Q  -- didn't have access to unblocking a site
15   specifically --
16 A  Not --
17 Q  -- but you could remove the filter completely --
18 A  Mm-hmm.
19 Q  -- on a specific station?
20 A  Yes.
21 Q  Do you recall the name of the filter product that was
22   being used?
23 A  No, I don't. I'm sorry.
24 Q  Do you have any idea whether or not that filter, that
25   same filter that was being used when you were there, is

Page 32

1    still being used?
2  A  No idea.
3  Q  Any recollection of the filter product changing while
4    you were employed by Fairbanks?
5  A  No, I don't believe there was. I believe talking about
6    how expensive it would be to change to another system,
7    having installed this one. . .
8  Q  Was prohibitive?
9  A  Mm-hmm, yes.
10 Q  To your knowledge, is there still a filter in place at
11   the Fairbanks --
12 A  Yes.
13 Q  -- branch and North Pole?
14 A  (Witness nods head.)
15 Q  Okay. You mentioned a minute ago that Alaska has a
16   privacy law.
17 A  Yes.
18 Q  Can you explain to me what it's about from your
19   perspective or your knowledge?
20 A  Well, from -- it's in our constitution, actually. And
21   it's -- for librarians it means that our citizens have a
22   constitutional right to privacy and that extends into
23   what they view in the library. We also have a
24   confidentiality law that covers their records. But
25   actually, being in -- actually being in the library I

04035559-7bdc-4960-a4ea-bd542e318ee9

Page 61

1    know specifically what your opinions are and the basis
2    for those opinions.  Go ahead.
3  A  Oh.  My opinions about what exactly?
4  Q  Well, what are your opinions with respect to -- you've
5    been retained to formulate --
6  A  Mm-hmm.
7  Q  -- you know, opinions about this case and are here as an
8    expert.  And so I want to know -- I want a statement of
9    your opinions in this matter.
10  A  Basically my view of Internet use in libraries is that
11    adults have a right to unfiltered use of any -- to any
12    protected material.  If the library feels for one reason
13    or another that it has to impose filters -- we were not
14    eager to impose filters in our library but were required
15    to by local ordinance -- they must provide a quick and
16    nonjudgmental way of removing the filter.
17        Just as a librarian -- well, a librarian
18    50 years ago may have said, "Oh, I'm not putting that
19    book in my library.  I'm just going to tuck it in the
20    closet and nobody will ever know we didn't put it out,"
21    librarians these days don't ask users why they want
22    print material, whether it's good for them, and good in
23    quotations, as the forebearers may have done.  The
24    Internet is now another item in the library to which
25    people should have unfettered access, and if they can't,

Page 62

1    if they're adult, they need to have the filters
2    disabled.
3  Q  And what is the basis for that opinion?
4  A  Partly because I know from experience that all the
5    filters over block material, just as they under block
6    material, that no filter has reached a point where it
7    can determine whether the speech is constitutionally
8    protected or not.
9        It's just everything I've seen in my library and
10    determined through my work with the association and
11    professional reading, that lets the library come closest
12    It's one of the items that lets the library come closest
13    so far to providing all views on all issues, all sides,
14    all perspectives.  And we've never, of course, had
15    before the space of the unlimited budget.  The Internet
16    provides us with a window that gets us as close to that
17    goal as possible.
18        To block it arbitrarily by a piece of software
19    that can't think, that doesn't recognize, as I said,
20    what's protected or not, is just -- we just have to
21    recognize that it's -- it's not 100 percent perfect and
22    in that case there has to be a way to remove it.
23  Q  In Fairbanks when you were working there and the filter
24    was employed, it was employed to block sexually explicit
25    material, correct?

Page 63

1  A  Mm-hmm.
2  Q  And if someone asked to have that filter removed, it was
3    done -- an adult, it was done without question?
4  A  Mm-hmm.
5  Q  Does that mean --
6  A  Yes.
7  Q  Does that mean that Fairbanks, in your experience,
8    allowed the viewing of pornography?
9  A  I would say the library in Fairbanks allowed people to
10    make their own decisions about what they viewed.
11  Q  Would removing the filter allow child pornography to
12    come through?
13  A  It's possible.
14  Q  Would Fairbanks Public Library allow the viewing of
15    child pornography?
16  A  We have in our policy, a statement in our regulations,
17    "All use of library Internet workstations is limited to
18    lawful purposes.  Users are required to observe all
19    federal, state, and local laws that may govern the use
20    of the Internet.  These laws include but are not limited
21    to those that regulate distribution of obscenity,
22    possession of child pornography, fraud, threat, libel,
23    harassment, invasion of privacy, disclosure of
24    information that identifies a minor, copyright or patent
25    infringement, unauthorized access, and for users younger

Page 64

1    than 17 years of age access to material harmful to
2    minors."
3  Q  So if someone in your library in Fairbanks was viewing
4    illegal speech, would it be the responsibility of the
5    librarian to ask them to leave?
6  A  We did not have a policy that would ask them to leave
7    for viewing sexually explicit material or others.  We
8    had regulations that governed their behavior in the
9    library.  And we did not have the authority to call the
10    police.  The only advice we could give people if they
11    came across a site that they thought was child
12    pornography was to write down the URL and send it to the
13    FBI.
14  Q  So if someone, for example, was viewing child
15    pornography, there was no authority for you to have them
16    removed.  But would you have asked them to cease?
17  A  Well, you have to understand that given the way we had
18    set up the library, the workstations for the Internet,
19    for me to determine whether or not the person was
20    looking at something that was -- that was child
21    pornography, I'd have to peer down over their shoulders
22    or look through the privacy screens.  And unless some
23    other patron pointed out that a person was viewing
24    something, in the first place I wouldn't know.  I mean,
25    they're not going to walk up to me and say, "Oh, would

04035559-7bdc-4960-a4ea-bd542e318ee9

1  you please disable the filter so I can look at child
2  pornography?" They're not going to do that. So to
3  discover what they're viewing would have been very
4  difficult for me to determine because the privacy
5  obliga -- or privacy. . . I'm losing the words here.
6  Q  Screen?
7  A  The privacy screens, the privacy workstations that we
8  had set up, would make that very difficult.
9  Q  So you wouldn't necessarily know --
10  A  No.
11  Q  -- if people were looking at child pornography?
12  A  No.
13  Q  Or obscenity?
14  A  No.
15  Q  Or pornography?
16  A  No.
17  Q  Does the Fairbanks Public Library stock may be the wrong
18     word, I'm not sure what the phrase is, but do you
19     catalogue or maintain a collection of pornography?
20  A  Well, it depends on how you define pornography. I have
21     heard people seriously define Playboy as pornographic
22     and we do have Playboy in the library. It's on black
23     and white microfilm because it's the only way we can
24     keep it from walking out of the library. But we will
25     let anybody who wants to use it have access to it.

1     We have graphic novels, those are the
2  illustrated adult novels in our fiction collection, one
3  of which was the target of a major brouhaha censorship
4  incident. It had some -- some explicit scenes and they
5  wanted it removed. And after the full community
6  hearing, we went through our reconsideration process,
7  the selection committee reviewed it, felt that it met
8  our committee policy, the decision was sent to the
9  person complaining who then appealed that decision to
10  the Library Commission. The Library Commission held a
11  public hearing and decided that the book deserved its
12  place in the library, it met our selection criteria, and
13  was kept.
14     So there are a number of items, particularly
15  with some of the graphic novels we're now seeing
16  becoming very, very popular, many things I'm sure that
17  some people would and have felt was pornographic.
18  Q  Do you recall the name of the book that was the subject
19     of this brouhaha?
20  A  Billy Budd: KGB by Jerome Charyn, C-h-a-r-y-n.
21  Q  So in that example, if a patron came to you while you
22     were collection manager and said, "I want you to shelf,
23     stock, Hustler because in my opinion it's artistic," --
24  A  Mm-hmm.
25  Q  -- is that something that you would consider?

1  A  We considered any request. We didn't particularly for
2  periodicals or serials. There were a number of
3  considerations. And we would have voted whether or not
4  to add it, just as we would have voted whether or not to
5  add any other magazine that was requested.
6  Q  To your knowledge, at least as of the time you left, was
7  Playboy the only periodical that specifically contained
8  nude images?
9  A  I don't know for sure. Some would say the Sports
10  Illustrated Swimsuit Edition met that criteria.
11  Q  But that's probably the most notable?
12  A  I think so, yeah.
13       MS. MONROE: Okay. Would you like to take a
14  break?
15       THE WITNESS: Yeah.
16          (Brief recess.)
17       MS. MONROE: During the break,
18  Ms. Pinnell-Stephens had to take some pain medication
19  for a back. . .
20       THE WITNESS: Problem, injury, disability.
21       MS. MONROE: So at this time we do not believe
22  it's going to interfere with her testimony. It takes
23  about a half hour for it to kick in.
24       At about -- let me put it this way: If at any
25  point you feel that you're not understanding me or you

1  can no longer provide coherent testimony, let me know
2  and we'll stop and we'll do this another time.
3       THE WITNESS: Okay.
4       MS. MONROE: But we are almost, hopefully, done.
5  Q  (By Ms. Monroe) Okay. Before we get into the report
6     which I'd like to do briefly, I just wanted to follow up
7     on some of the things we were talking about right at the
8     break.
9       One of the things that you pointed out was that
10  the definition of pornography is sometimes in the eye of
11  the beholder.
12  A  Mm-hmm.
13  Q  What is your definition of pornography?
14  A  Well, I guess my definition would be sexually explicit
15     activity that -- what, is -- I -- I guess sexual
16     activity that has more of a negative presentation or
17     aspect to it.
18  Q  Would you agree then that the definition of pornography
19     is somewhat elastic?
20  A  Yes.
21  Q  Do you believe that is all driven by the mores of an
22     individual community?
23  A  I would say it's driven more by the individual, not the
24     community.
25  Q  When the request for Billy Budd; KGB, for example, --

04035559-7bdc-4960-a4ea-bd542e318ee9

Page 73

1    unprotected speech and some protected speech is blocked
2    as a result of this filter, in your opinion is something
3    if they're providing the Internet itself better than
4    nothing?
5    A   Would you. . .
6    Q   I mean, is it better to have a filter than no Internet
7    at all?
8    A   I would say for a certain part.  For the direct Internet
9    access, that -- it's better to have something than
10   nothing.  If you have nothing, if you have no Internet
11   for anybody, not for the reference desk, not for the
12   electronic, you can't -- you can't run a library without
13   having Internet access.
14   Q   Okay.  Let's introduce your report.
15              (Exhibit No. 25 marked.)
16   Q   (By Ms. Monroe)  The court reporter's handed you what's
17   been marked as Exhibit 25.  Can you identify this
18   document for the record?
19   A   It's the letter and the written testimony and I believe
20   a number -- it's the material I handed in and appears to
21   include many of the articles or items that I used in my
22   research.
23   Q   Can we take a quick second to walk through some of these
24   articles that you attached because I note in the letter
25   which is on page 1 of Exhibit 25 point 2 says that you

Page 74

1    have included the data and other information that you
2    consulted and any exhibits you might use.
3              Are you saying potentially at trial with respect
4    to exhibits you might use?
5    A   I don't know that that's the case.  I think when I said
6    that I was talking about this, (indicating).  But -- and
7    some of them, I don't think you have all the articles I
8    provided in my bibliography, if that's what you mean.
9    But I -- I don't know that this was any -- any exhibits
10   for court.
11   Q   Okay.  I specifically had a question about a couple.  I
12   know that you referenced many of these in your report.
13   But it looks like starting at page 155 at the bottom, --
14   A   Mm-hmm.
15   Q   -- the handwritten 155, --
16   A   Yeah.
17   Q   -- I just want to go through this quickly.
18              So you have included an article prepared by
19   Jenner & Block, "Highlights of Supreme Court Decision
20   Striking Down the Communications Decency Act."
21   A   Mm-hmm.
22   Q   And I believe that was specifically cited --
23   A   Mm-hmm.
24   Q   -- in your opinion materials.
25   A   Mm-hmm.

Page 75

1    Q   On page 156 you've included a portion of a News -- from
2    the Newsletter on Intellectual Freedom.
3    A   Mm-hmm.
4    Q   Am I correct that this was published in July of 2006?
5    A   Yes.  It's -- if you're referring to the one that starts
6    here on 156 --
7    Q   Mm-hmm.
8    A   -- and ends on 157.
9    Q   Yes.
10   A   Yeah.  Okay.
11   Q   Okay.  So that's July 2006?
12   A   Mm-hmm.
13   Q   Did you author this article?
14   A   No.
15   Q   On 158 is an article entitled "The Librarian as Secular
16   Minister to Democracy:  The Life and Ideas of John
17   Cotton Dana."
18              Was this referred to in your written report?
19   A   Yes.
20   Q   And can I ask how you intend to use this article in
21   support of your report or opinions?
22   A   I pulled this one up on a literature search and found it
23   very helpful in understanding how libraries and the
24   public perception of what should be in them has changed,
25   particularly after the Golden Age and into -- let's see.

Page 76

1    He spanned, a librarian, from 1889 to -- through the
2    '30s, I think.  And there was a big change in what --
3    first of all, that libraries existed and what they were
4    expected to contain and how people viewed them, what the
5    role of the library was.
6    Q   On page 180 there's an article with a title that starts
7    "One Cathedral More" by Alexis McCrossen.
8              Was this referenced specifically in your report?
9    A   I think so.  It -- actually, it's -- it's interesting to
10   realize that when people were building libraries, this
11   is before the previous article, they were talking about
12   whether it would be this just grand cathedral or a
13   lounging place for bums, and we're still debating that
14   in public libraries, do you kick the homeless out or do
15   you want this to be only a place for the -- for the
16   upstanding middle and upper classes.
17   Q   Okay.  And how does this support your opinions?
18   A   Just that it showed -- it's another instance of
19   development of the -- the -- the role and nature of
20   libraries and how the public perceived them.
21   Q   Turn to page 201.  Can you explain to me why this was
22   provided and what information is contained on it looks
23   from page 201 to 218.
24   A   Right.  This was a search I did on the OCLC database.
25   And what I wanted to do is find -- find whether or not

04035559-7bdc-4960-a4ea-bd542e318ee9

Page 117

```
 1          C E R T I F I C A T E
 2
 3          I, CHERYL L. HENDRICKS, a duly authorized Court
         Reporter and Notary Public in and for the State of
         Washington, residing at Olympia, do hereby certify;
 4
 5          That the foregoing deposition of June
         Pinnell-Stephens was taken before me on October 3, 2007,
         and thereafter transcribed to the best of my ability by
 6       means of computer-aided transcription; that the
         deposition is a full, true, and complete transcript of
 7       the testimony of said witness;
 8          That the witness, before examination, was by me
         duly sworn to testify the truth, the whole truth, and
 9       nothing but the truth, and the witness reserved
         signature;
10
11          That I am not a relative, employee, attorney, or
         counsel of any party to this action, or relative or
         employee of any such attorney or counsel, and I am not
12       financially interested in said action or outcome
         thereof;
13
14          That upon completion of signature, if required,
         I shall herewith securely seal the original transcript
15       and serve same upon Tom Adams, counsel for the
         Defendant.
16          IN WITNESS WHEREOF, I have hereunto set my hand
         and affixed my official seal this 15th day of October,
17       2007.
18
19
20
21          _____
            Cheryl L. Hendricks,
22          CCR NO. 2274
23
24
25
```

30 (Page 117)

04035559-7bdc-4960-a4ea-bd542e318ee9

# Exhibit R

Page 1

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF WASHINGTON

                              No. CV-06-327-EFS

SARAH BRADBURN, PEARL CHERRINGTON,
CHARLES HEINLEN, and the SECOND
AMENDMENT FOUNDATION,

              Plaintiffs,

          vs.

NORTH CENTRAL REGIONAL LIBRARY
DISTRICT,

              Defendant.
_____/

        The Deposition of PAUL RESNICK, an Expert
Witness herein, taken pursuant to Notice of Taking
Deposition before Shari Blythe Holtz, CSR-3910,
Registered Professional Reporter and Notary Public within
and for the County of Wayne, State of Michigan, at
8000 Merriman Road, Romulus, Michigan, on Thursday,
November 15, 2007, commencing at about 12:15 p.m.

APPEARANCES:

        DUNCAN MANVILLE, ESQ.
        1629 2nd Avenue West
        Seattle, Washington  98119
        9206)288-9330

        For the Plaintiffs.

        CELESTE M. MONROE, ESQ.
        Karr Tuttle Campbell
        1201 Third Avenue, Suite 2900
        Seattle, Washington  98101
        (206)224-8064

        For the Defendant.

                        -  -  -

Page 29

1    were generated there are the one that you are asking for.
2  Q   Okay, I think it is possible that the appendices do show
3      some of that information.
4          Would you mind just taking a quick look?
5  A   Okay.  I'll look now.
6          (Witness reviewed document.)  Just to clarify,
7      you are looking for a list of the URLs where the two
8      raters disagreed with each other or where one of them
9      flagged the item?
10 Q   Correct.
11 A   So I note that there is a complete list of the ones where
12     our final determination was that the item was not
13     forbidden, but it was actually blocked according to
14     the -- it would have been blocked in the library.
15         That's not quite what you are looking for,
16     though.
17 Q   Right.
18 A   That's a disagreement between our raters and Fortinet.
19     You are looking for a disagreement between our two
20     raters?
21 Q   Yeah.
22 A   And I think I'm not going to find that.  Let me just look
23     a little farther.
24         (Witness reviewed document.)  No, I don't
25     believe it is in the appendices to the report.  And that

Page 30

1      means that it's also -- it just hasn't been generated.
2      We'd have to generate that from the raw data.
3  Q   Okay.  But it would be -- it is in the raw data, which
4      would be in the materials that were provided.  It would
5      just be a matter of processing that data and kind of
6      regenerating numbers that are reflected in your report,
7      correct?
8  A   Yes.  Everything that's in the report can be generated
9      from the -- yeah, can be generated from the raw data that
10     you have been provided and you could also generate a list
11     of all of the items where the two raters did not
12     initially agree with each other, but I have not provided
13     you anything that would actually generate that list.  You
14     would have to go into the raw data to do that.
15         MR. MANVILLE:  Sounds like a fun project.
16         Why don't we go ahead and start talking about
17     your report.  Can we make that Exhibit Number 54.
18         And I think, for purposes of this deposition,
19     we would only need to make an exhibit of the report
20     itself without the appendices.  So my copy is marked, in
21     the lower right-hand corner, with it starts on page 5 and
22     goes to page 25.
23         (Exhibit 54 was marked for identification.)
24         THE WITNESS:  I'd like to take a quick break
25     before we start that questioning.

Page 31

1          MR. MANVILLE:  Yeah, that's fine.
2          (Short recess.)
3                 - - -
4  BY MR. MANVILLE:
5  Q   Mr. Resnick, you are being handed what's been marked
6      Exhibit 54.  Can you tell me what this is?
7  A   This is the report that I prepared for this case minus
8      some of the appendices.
9  Q   Really, what I want to do, for most of the rest of this
10     deposition, is to walk you through your report and talk
11     about your methodology of the tests you ran, some of the
12     conclusions you reached.
13         So starting with the introduction here, it
14     looks like that second paragraph summarizes your
15     assignment, which consisted of explaining how the NCRL
16     filtering software works, assessing the methods used in
17     Mr. Haselton's study of the error rates in the software,
18     and conducting a study of your own if you thought it
19     would yield greater insight into the software's tendency
20     to overblock content, is that correct?
21         MS. MONROE:  Object to the form, but go ahead.
22 A   Yes, the second paragraph of the report summarizes what
23     I, without the last sentence, summarizes what I took to
24     be my assignment from the attorneys.
25

Page 32

1  BY MR. MANVILLE:
2  Q   Now, tell me what your criticisms are of Mr. Haselton's
3      report.
4  A   I had two major criticisms.  There were a number of
5      smaller ones that I didn't raise in this report.
6          The two major ones are, first, that the set of
7      sites that Mr. Haselton selected for his test -- I mean,
8      beforehand I thought they might not be representative of
9      those that the NCRL patrons actually visit.  After
10     conducting my test, I think that they were not
11     representative of the sites that NCRL patrons actually
12     visit.  So that was my first criticism.
13         And the second is that I was concerned with the
14     lack of assessment of reliability of the zone ratings.
15     It's customary, in doing any kind of manual
16     classification, to assess whether the classification
17     scheme and the people doing it are reliable; that is, is
18     the same site rated the same way by different people; is
19     it rated the same way by the same person from one time to
20     a later time when that same person might look at the
21     site.  And it's partly a check on whether the criteria
22     are clear and partly it's a check on how careful the
23     ratings are done.
24         And I didn't see any kind of -- I'll loosely
25     refer to any of those kinds of assessments as an

cac112cc-59c1-479e-8cf4-8275ce711e6e

1    reiterate what I think your question is.
2         You want Mr. Resnick to opine on the margin of
3    error where 64 dot-com and 49 dot-org sites are allegedly
4    blocked in error but four were not blocked at NCRL
5    computers based on this report, what is that margin of
6    error or how does that affect --
7  A   How could it affect the estimate of the overall overblock
8    rate and how could it affect the estimate of the overall
9    number of incorrect blocks in the whole universe of the
10   web, is that right?
11 BY MR. MANVILLE:
12 Q   That's right, assuming that you may be offering an
13   opinion about that at trial.  If you are not, and they
14   are not going to ask you about it, then I don't need you
15   to do the work.  But it sounds like Celeste may reserve
16   the right to ask you about that.
17 A   She'll decide afterwards.
18 Q   That's right.
19        Mr. Resnick, can you tell me, for my own
20   edification, when you use the term "URL" in your report,
21   is that essentially the same as a web site?
22 A   Well, no.
23 Q   Okay.  What's the difference?
24 A   A URL is the name for something that will get retrieved
25   when a browser or when one computer talks to another to a

1    web server and asks for the path, the path part of the
2    URL.  So the URL is a name for something.
3         And as we discovered, many of the URLs that
4    were accessed were actually things like helper images.
5    They weren't real pages.
6         And I think, in common parlance, the notion of
7    a web site really means sort of a collection of pages
8    that has an initial entry point, some kind of home --
9    "web site" is not a technical term -- but every web site
10   has sort of an entry point, the home page of a site has a
11   URL, as do other pages of a web site, as do individual
12   icons and images that appear on particular pages.
13 Q   Do you draw a distinction between a URL and a URL path?
14 A   Yes.
15 Q   And I guess, as a lay person, I tend to equate a URL with
16   maybe not so much a web site, but the splash page or the
17   home page, at least, of a web site like, your example,
18   www.yahoo.com and then a URL path as a particular page on
19   that web site.
20        But it doesn't sound like that's exactly right,
21   is that right?
22 A   No.  I'm using "URL path" here in a technical sense to
23   be, in my example, just "/NFL."  It's just the stuff
24   after you've specified the domain -- or after you've
25   specified the site -- after you've specified the server.

1    So www.yahoo.com says "go to this server" and "/NFL" is
2    the URL path -- or just the path.
3  Q   What's the difference between a web site and a domain?
4    Is it the same thing?  Is it a domain is really a name of
5    something on a web site is --
6  A   The domain is just www.yahoo.com.  And most domains have
7    a splash page, a home page, that if you just go to
8    www.yahoo.com with a URL path of "/," nothing after the
9    slash, you'll get a web site.
10 Q   Right.
11 A   But that's not the only types of things that we would
12   call a web site.  For example, my personal web site is on
13   a umich server and it has, as a path "/ presnick."  So
14   the whole URL with the "/ presnick" identifies my web
15   site or sort of the starting point for my web site.  And
16   there's subpages under that.
17        So, for example, when I did the -- yeah, well,
18   that's it.
19 Q   Can you summarize for me, very briefly, the section of
20   your report that is titled "What Happens When a Patron
21   Fetches a Page," it starts on page 6?
22 A   Sure.  So here, you know, well, let's go through with the
23   example of yahoo.com/NFL.  The browser tries to talk to
24   the Yahoo server.  And if it succeeds in talking to the
25   Yahoo server, it asks for "/NFL" and an html page comes

1    back.  The browser then figures out exactly how to
2    display that on the user's computer.  Some of that html
3    may include references to additional content that needs
4    to be fetched from the original server or possibly from
5    other servers.
6         Those are the things that I'm sort of calling
7    helper elements.  So things like little icons, or
8    sometimes even bigger sections of content.
9         If you've opened a web page and you've noticed
10   some stuff shows up and then a little while later some
11   other images show up, that's because additional URLs were
12   getting fetched.
13        In this section I'm describing what happens
14   when the extra equipment that NCRL has installed for
15   doing filtering is added into that process.  And
16   essentially it's getting in the middle between the end
17   user's browser and the servers that the browser is going
18   to talk to.  So it's intercepting the communication going
19   both ways and it can decide to change what comes back
20   depending on whether the request is allowed and so on.
21        So the FortiGate is this intermediary and it is
22   doing two things.  It's going and actually fetching the
23   content the same as from the Yahoo server or whatever
24   server you are connecting to, but it's also talking to a
25   rating server that Fortinet maintains called the

cac112cc-59c1-479e-8cf4-8275ce711e6e

Page 85

1    Fortiguard rating server and it's asking how is this URL
2    classified. It's not asking should this URL be blocked.
3    It's just asking how is it classified by Fortinet.
4         When it hears back from the ratings server, it
5    compares that classification to the rules that have been
6    set up locally for what's allowed and which categories
7    are allowed and which categories are not. So if Fortinet
8    has classified it as spam URL, then if the local policy
9    that's programmed into the FortiGate says spam URL is not
10   allowed, then it won't send the contents back to the end
11   user. But if that is allowed, it will send it back.
12        And if it's not allowed, then there are
13   slightly different things that happen, depending on what
14   kind of thing it is. If it's a web page that was
15   requested and it's blocked, then it gets a screen like in
16   Figure 3 or in Figure 2. So the difference between
17   Figure 2 and Figure 3 is Figure 3 are things that
18   Fortinet has classified in a certain category and the
19   library has decided to block that category. Figure 2 is
20   for specific URLs that the library has decided to filter,
21   regardless of how Fortinet is classifying it.
22        And then if it happens to be an image, and this
23   is the inference I made for actually trying this with the
24   sample unit, that if it's an image, rather than giving
25   you a block message, it substitutes a little blank image.

Page 86

1    And that allows kind of graceful degradation like you see
2    in Figure 6 where some helper images are missing, but you
3    can still use the page. But it also has the effect that
4    the user may not even realize that some things have been
5    blocked.
6    Q  The embedded images that you reference on page 12 of your
7       report, are those typically images that are associated
8       with links to other web sites or advertisements or that
9       sort of thing?
10   A  They are different things. Sometimes they are used just
11      to kind of -- just for visual effects in web pages, you
12      know, horizontal lines or things that are kind of spacers
13      to make things space out and look better. Sometimes they
14      are things that you can click on to navigate to, you
15      know, sort of acting as an advertisement. And sometimes
16      they are even things that you can click on for navigation
17      within a site, sometimes like little right arrow and left
18      arrows are sometimes put into images rather than text and
19      then the user would click on them to navigate within a
20      site.
21   Q  And when those embedded images are blocked, what happens?
22      Is there any indication, typically, that embedded images
23      have been blocked?
24   A  From what we were able to see, unlike when you go to
25      Playboy and you get a page back that says you can't

Page 87

1    access Playboy, when one of these images is blocked, you
2    just get a substitute small blank image instead. I'm not
3    sure -- we didn't test it too much. I don't know how
4    smart they are about figuring out -- maybe they are
5    actually figuring out to send a blank image of the same
6    size as the other. But as a user, you would not
7    necessarily know that something was missing.
8    Q  But the small blank image that you mentioned, what is it?
9       Is it typically a box thing, you know, "This image can't
10      be displayed"?
11   A  No. It's literally blank. Well, compare Figure 5 and
12      Figure 6. So in Figure 5 you see the "Firefox Start" at
13      the top and you see the little Firefox swirly thing, I
14      think that's two images, but I'm not sure.
15           In Figure 6 it turns out those images are
16      coming from google.com/images. And Fortinet has
17      classified everything -- everything I've found -- they've
18      certainly classified that particular URL as being image
19      search. And so the image of "Firefox Start" with the
20      swirl is blocked or was blocked when we did the test.
21      And the page that you would get would look like Figure 6.
22           So it doesn't -- you don't see it, but there's
23      actually a blank image in there above Google in Figure 6
24      and that's what makes the spacing come out the same
25      between Figure 5 and Figure 6. But it doesn't say "image

Page 88

1    missing."
2    Q  Okay. And that's what typically happens, based on what
3       you observed, for these embedded images when they are
4       blocked by Fortiguard?
5    A  I don't have a large sample of them, but from my
6       understanding of the technology, I would extrapolate from
7       what I saw here to -- it's my opinion that that would
8       also happen with other helper images that are blocked.
9    Q  Do you know how Fortinet goes about reviewing and
10      classifying web sites?
11   A  No. I know only the written descriptions of their
12      categories that I took from their web site.
13   Q  That are available on the web?
14   A  Yes.
15   Q  Do you know what category the NCRL is currently blocking,
16      as we sit here today?
17   A  No.
18   Q  Do you know what local overrides the library is currently
19      using?
20   A  I don't know about any changes that may have happened
21      since the time that I found out what they were blocking
22      in order to do the report. And I've reported what I
23      believe their policy to be as of that time, but I don't
24      know whether or what changes they have made since then.
25           Celeste mentioned something this morning that

Page 141

1    the block-sites overblock rate is that five to
2    ten percent of actual blocks were errors, is that
3    correct?
4  A    Well, that's the approximate thing there, yeah, looking
5    at both the -- yep. Well, and the more accurate thing is
6    the confidence interval is given at the bottom of
7    page 23.
8  Q    Do you have an opinion whether that blocked-site
9    overblock rate is low?
10 A    I'm actually not convinced that the blocked-sites
11   overblock rate is a very important measure.
12 Q    Okay. Why is that?
13 A    Because I think what matters to a library patron is how
14   often something gets in the way of them doing what they
15   want. So comparing the number of times that the filter
16   got in the way inappropriately to the number of times
17   that the filter got in the way appropriately, which is
18   basically what the blocked-sites overblock rate does,
19   it's like who cares? Why is that an appropriate
20   comparison?
21       The number of times that it blocked correctly
22   has nothing to do with how problematic the incorrect
23   blocks are. What matters is how frequent the incorrect
24   blocks are in the browsing experience of the patron.
25 Q    Again, you don't know how many web sites the NCRL patrons

Page 142

1    attempted to access during the week that generated the
2    data that you based your study on, correct?
3  A    How many domains?
4  Q    Right.
5  A    Correct.
6  Q    Do you know, as a practical matter, whether the 20 errors
7    that you identified with regard to web pages during that
8    week were significant to the patrons of the library or
9    not?
10 A    No, because I don't know what the patrons were doing and
11   whether they were able to find something else that gave
12   them the information they were looking for, so I don't
13   know that.
14 Q    Do you know how many patrons used the library during that
15   week? Strike that.
16       Do you know how many patrons used the computers
17   at the library during that week to access the internet?
18 A    No, our logs don't indicate anything about how many. As
19   far as I know, there isn't even a login procedure, so
20   there's no logging of who was doing any of these
21   accesses.
22 Q    Your report, on page 25, states that you have a
23   potentially greater concern regarding the overblocking of
24   embedded images, is that right?
25 A    Yes.

Page 143

1  Q    And why is that a concern for you?
2  A    Well, I don't know, as we've talked about, I don't know
3    to what extent those actually are incorrect blocks,
4    because we didn't have enough information always to be
5    able to tell whether they were incorrect or not, because
6    we didn't know what they were linking to. But at least,
7    one, we were able to tell a whole set of them coming from
8    google.com/images and pretty clearly were mistakes.
9        So, of course, any mistakes are a cause for
10   concern, but there is a special cause for concern here in
11   that the patrons aren't notified that there's an error
12   there. So there's not the natural feedback mechanism
13   that you get when somebody goes to a page and it says
14   that it's blocked and they have a chance to ask: Hey,
15   wait a minute, I think this is an error. In this case
16   they may -- that feedback system may get broken if people
17   don't realize that they are missing one of those helper
18   images.
19       On the other hand, the helper images that are
20   actually important for navigating a site, I think they
21   would notice those. They might not figure out why they
22   are not there, though.
23 Q    You conclude, at the end of the first full paragraph on
24   page 24, that you don't believe the error rate on helper
25   images is sufficient to warrant removal of the filters

Page 144

1    all together or shutting off internet access altogether,
2    if the filters are otherwise accurately reflecting the
3    library's collection policy and if it is legal to attempt
4    to apply that collection of policies to the internet.
5        Do you have an opinion regarding whether the
6    filters are otherwise accurately reflecting the library's
7    collection policy?
8        MS. MONROE: I'm just going to object on the
9    grounds that Mr. Resnick may not have the foundation to
10   answer that question in full, but feel free --
11 A    So I have not had any detailed discussions with the
12   library about their collection policy for magazines or
13   videos or books or audio, so I don't know.
14       They state, in some document that I looked at,
15   that they are applying the same policy towards the
16   internet that they do in deciding their collection policy
17   for other materials.
18 BY MR. MANVILLE:
19 Q    Do you have an opinion regarding whether it is legal to
20   attempt to apply the library's collection policy to the
21   internet?
22       MS. MONROE: Again, I'm going to object to the
23   extent it calls for a legal conclusion.
24 A    Yeah, I don't understand the law well enough to make that
25   assessment.

36 (Pages 141 to 144)

Page 157

1      STATE OF MICHIGAN )
                         ) SS.
2      COUNTY  OF  WAYNE )
3             CERTIFICATE OF NOTARY PUBLIC
4             I, Shari Blythe Holtz, a duly commissioned and
       qualified Notary Public within and for the County of
5      Wayne, State of Michigan, do hereby certify that the
       witness, whose attached testimony was taken by me in the
6      entitled cause on Thursday, November 15, 2007, was by me
       first duly sworn to testify the whole truth in the
7      aforesaid cause; that the testimony contained herein was
       taken down by me in machine shorthand; transcribed upon a
8      computer under my personal supervision, and is a true and
       correct transcript of the whole of the testimony given by
9      said witness.
10            I do further certify that I have delivered the
       original transcript into the possession of DUNCAN
11     MANVILLE, ESQ., for filing at the time of trial.
12            I do further certify that I am not connected by
       blood or marriage with any of the parties; their
13     attorneys; that I am not an employee of any of them; nor
       interested directly or indirectly in the matter in
14     controversy, as counsel, attorney, or otherwise.
15            IN WITNESS WHEREOF, I have hereunto set my hand
16     at Dearborn, County of Wayne, State of Michigan, this
17     11th day of December, 2007.
18
19
20     _____
       Shari Blythe Holtz, CSR-3910
       Certified Shorthand Reporter
21     Registered Professional Reporter
       Notary Public, Wayne County, Michigan
22     My Commission expires:  September 6, 2013
23            - - -
24
25

cac112cc-59c1-479e-8cf4-8275ce711e6e

# Exhibit S

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

---------------------------------------------------------

SARAH BRADBURN, PEARL CHERRINGTON,    )
CHARLES HEINLEN, and the SECOND       )
AMENDMENT FOUNDATION,                 )
                                      )
            Plaintiffs,               )
                                      )
        vs.                           ) No. CV-06-327-EFS
                                      )
NORTH CENTRAL REGIONAL LIBRARY        )
DISTRICT,                             )
                                      )
            Defendant.                )
                                      )
---------------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION

OF

BARBARA G. WALTERS

---------------------------------------------------------

Date:            October 17, 2007

Location:        North Central Regional Library
                 16 North Columbia Street
                 Wenatchee, Washington  98801

Start Time:      8:30 a.m.

End Time:        10:11 a.m.

REPORTED BY:     CHARLENE M. BECK, CCR, RPR
                 CCR # 2543

## Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

-----------------------------------------------------

SARAH BRADBURN, PEARL CHERRINGTON,       )
CHARLES HEINLEN, and the SECOND          )
AMENDMENT FOUNDATION,                    )
                                         )
                  Plaintiffs,            )
                                         )
        vs.                              )  No. CV-06-327-EFS
                                         )
NORTH CENTRAL REGIONAL LIBRARY           )
DISTRICT,                                )
                                         )
                  Defendant.             )

-----------------------------------------------------

DEPOSITION UPON ORAL EXAMINATION
OF
BARBARA G. WALTERS

-----------------------------------------------------

Date:          October 17, 2007
Location:      North Central Regional Library
               16 North Columbia Street
               Wenatchee, Washington  98801

Start Time:    8:30 a.m.
End Time:      10:11 a.m.

REPORTED BY:   CHARLENE M. BECK, CCR, RPR
               CCR # 2543

## Page 2

```
 1  APPEARANCES:
 2  For the Plaintiffs:   MR. DUNCAN MANVILLE
                          Attorney at Law
 3                        C/O ACLU of Washington
                          705 Second Avenue, Ste 300
 4                        Seattle, WA  98104-1799
                          (206) 288-9330
 5                        duncan.manville@yahoo.com
                          And
 6                        MS. CATHERINE CRUMP
                          Attorney at Law
 7                        ACLU
                          125 Broad Street, 17th Floor
 8                        New York, NY  10004
                          (212) 519-7806
 9                        ccrump@aclu.org
10  For the Defendant:    MR. THOMAS D. ADAMS
                          MS. CELESTE MONROE
11                        Karr Tuttle Campbell
                          Attorneys at Law
12                        1201 Third Avenue, Ste 2900
                          Seattle, WA  98101
13                        (206) 223-1313
                          Direct: (206) 224-8026
14                        Fax: (206) 682-7100
                          tadams@karrtuttle.com
15
    Also Present:         MR. DEAN MARNEY
16                        MR. DAN HOWARD
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                    I N D E X
 2       EXAMINATION                    PAGE
 3  MS. CRUMP                    4
 4  MR. ADAMS                   69
 5       FURTHER EXAMINATION
 6  MS. CRUMP                   71
 7            I N D E X   O F   E X H I B I T S
 8                   MARKED        IDENTIFIED
 9  Number 42          13            14
10  Number 43          22          22, 23
11                         REFERRED TO
12  Number 27   (To Dean Marney's deposition)    13
13  Number 40   (To Dean Marney's deposition) 64, 65, 66
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1        BARBARA G. WALTERS,      being first duly sworn,
                                   was deposed and
 2                                 testified as follows:
 3              (Mr. Howard absent.)
 4                  EXAMINATION
08:30:10  5  BY MS. CRUMP:
08:30:10  6  Q  Good morning.
08:30:10  7  A  Good morning.
08:30:10  8  Q  Would you please state your full name and then spell your
08:30:14  9     last name for the record.
08:30:16 10  A  My full name is Barbara Grace Walters.  My last name is
08:30:20 11     W-A-L-T-E-R-S.
08:30:22 12  Q  Have you ever been deposed before?
08:30:26 13  A  No.
08:30:26 14  Q  All right.  Well, I know you were here yesterday, so I'll
08:30:28 15     just go over the ground rules quickly.  I'm sure your attorney
08:30:32 16     has also explained them to you.
08:30:34 17        To the extent you remember, it would be helpful if you
08:30:36 18     give your answers verbally rather than shaking your head
08:30:38 19     because the court reporter can't pick that up.  Okay?
08:30:42 20  A  Yes.
08:30:42 21  Q  All right.  If I ask you a question and it's not clear, you
08:30:46 22     don't understand what I'm getting at, please tell me.  All
08:30:48 23     right?
08:30:48 24  A  Yes.
08:30:50 25  Q  Then I can clarify the question for you.
```

## Page 17

08:46:36 1   Q  Okay.  Is the log-in process identical whether you're an adult
08:46:40 2       or a child?
08:46:40 3   A  Yes.  Except, again, that's on the public access computers.
08:46:46 4       We're not talking about the children's stations.
08:46:48 5   Q  Right.
08:46:50 6   A  Okay.
08:46:50 7   Q  And what about logging in to the children's stations?  How is
08:46:54 8       that different?
08:46:54 9   A  There is no -- there's just a -- you choose what game you
08:46:58 10      want, click on it and you can play.
08:47:00 11  Q  So there's really not a log-in process?
08:47:02 12  A  No.
08:47:02 13  Q  And what about guests?  How do guests access the Internet?
08:47:06 14  A  If there's a guest, they have to speak with the librarian and
08:47:08 15      get a guest pass.  Again, that's just like a barcode.  It's a
08:47:14 16      little card.  And they have to get a barcode and just a
08:47:16 17      generic pin number, and they can log in using that.
08:47:20 18  Q  Does the person have to provide any identification to get a
08:47:22 19      guest pass?
08:47:22 20  A  Yes.
08:47:24 21  Q  What do they have to provide?
08:47:24 22  A  I'm not sure, actually.  I'd have to research that.
08:47:28 23  Q  Would a driver's license do the trick?
08:47:30 24  A  I'm not sure.  I'd have to research that, what the policy is.
08:47:34 25  Q  Do you know who would know that information?

## Page 18

08:47:36 1   A  Perhaps Dan Howard or Dean Marney.
08:47:38 2   Q  Great.
08:47:40 3         So they go and they get a guest pass.  And then is the
08:47:44 4       process the same --
08:47:44 5   A  Yes.
08:47:46 6   Q  -- from there on?
08:47:48 7         Okay.  Is there a time limit for how long a person can
08:47:52 8       sit at a terminal?
08:47:52 9   A  It varies from branch to branch.
08:47:56 10  Q  Do all branches have a time limit?
08:47:58 11  A  Again, it varies.  Some -- most of them, yes, they do.
08:48:04 12  Q  And is there a waiting list established?
08:48:12 13  A  Again, that varies again from branch to branch to branch.  A
08:48:14 14      lot of those they have set up themselves, policies they've
08:48:18 15      set up themselves, perhaps with Dan Howard, their supervisor.
08:48:22 16  Q  But some branches have waiting lists set up?
08:48:26 17  A  Yes.
08:48:26 18  Q  And some don't?
08:48:26 19  A  Uh-huh.
08:48:26 20  Q  Okay.  What, if any, role do you play in deciding what
08:48:42 21      categories should be blocked by the filter?
08:48:44 22  A  I don't.
08:48:44 23  Q  What, if any, role do you play in deciding which specific
08:48:48 24      sites should be blocked by the filter?
08:48:50 25  A  I don't.

## Page 19

08:48:50 1   Q  Yesterday Mr. Marney explained that there's now an automated
08:48:56 2       process when patrons want to request that a site be reviewed
08:49:02 3       for unblocking.  Is that right?
08:49:06 4   A  Yes.
08:49:06 5   Q  And he also explained that what ends up happening is an
08:49:12 6       e-mail is sent to you and Mr. Howard and Mr. Marney.  Is that
08:49:16 7       your understanding also?
08:49:16 8   A  Yes.
08:49:18 9   Q  What happens once that e-mail is received?
08:49:24 10  A  There's a process it goes through.  It -- it actually goes to
08:49:28 11      support@ncrl.org.  That's an e-mail address and that -- it
08:49:34 12      can be monitored by any of the administrators.  Once that
08:49:38 13      e-mail is received, then I just forward it on to Dan Howard.
08:49:42 14  Q  So your role in site unblocking is limited to forwarding
08:49:48 15      Mr. Howard e-mails?
08:49:50 16  A  Yes.  And at his request -- if he wants me to research
08:49:54 17      something further, that would be at his request.
08:49:56 18  Q  Okay.  What kind of research might he ask you to do?
08:50:00 19  A  Well, perhaps if it's like -- like Dean was saying yesterday,
08:50:04 20      perhaps if it's a site that's not -- that's being blocked
08:50:06 21      under the image searching and it's, say, a -- an exhibit
08:50:10 22      site, you know, for -- for artwork.
08:50:16 23  Q  So you would look at the site and try to determine whether or
08:50:20 24      not it was artwork or not?
08:50:20 25  A  Well, not necessarily.  My role mostly is if -- if it's being

## Page 20

08:50:26 1       blocked by the filter or, say, if it's being blocked because
08:50:28 2       of a technical issue because -- well, yes.
08:50:32 3   Q  So you deal primarily with technical issues?
08:50:38 4   A  Yes.  Yes.
08:50:40 5   Q  And not making substantive judgments?
08:50:44 6   A  No.
08:50:44 7   Q  Have you ever participated in a conversation about whether a
08:50:46 8       particular site should be blocked?
08:50:48 9   A  Yes.
08:50:48 10  Q  In what circumstances?
08:50:52 11  A  It -- it varies.
08:50:54 12  Q  Well, let's take an example.  Did you participate in the
08:50:58 13      decision whether or not Craigslist should be blocked?
08:51:02 14  A  Yes.  Very minimal, yes.
08:51:02 15  Q  What was your participation?
08:51:04 16  A  My participation only was technical, meaning that I approached
08:51:10 17      Dean and let him know that we could block just the Personals.
08:51:14 18      And then they made the decision beyond if they were going to
08:51:18 19      block it or not.
08:51:18 20  Q  By the way, when you say blocking just the Personals, which
08:51:24 21      specific parts of Craigslist does that refer to?
08:51:28 22  A  I'd have to review Craigslist.  I'm not quite sure.  Just
08:51:32 23      there's a Personals section.  And that's broken down.  I don't
08:51:36 24      have that memorized.  I'm sorry.
08:51:38 25  Q  What about MySpace?  Were you involved in the discussion of

5 (Pages 17 to 20)

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

6c6d44c2-3190-4eff-a77a-16cedc6f6108

## Page 25

08:57:14 1 Q And did you hear back from them?

08:57:16 2 A I actually don't recall. I'd have to research that.

08:57:20 3 Q And did you consult with Mr. Howard and Mr. Marney before

08:57:26 4    unblocking this site?

08:57:28 5 A I don't recall. I'm -- I don't recall. I'm sorry. I...

08:57:36 6 Q I know it's an e-mail you wrote a long time ago and so it's

08:57:40 7    understandable. All right. I think that's it for this one.

08:58:10 8    Do you attend the Board of Directors meetings?

08:58:12 9 A No.

08:58:14 10 Q To your knowledge, has the Board of Directors ever decided

08:58:18 11    that a particular category should be blocked or unblocked?

08:58:22 12 A No, I -- I have no idea.

08:58:26 13 Q Have you ever heard of them -- but you're not aware of any

08:58:30 14    instances in which they have made a decision to block a

08:58:32 15    particular category, are you?

08:58:34 16 A I wouldn't know. I don't attend the Board meetings.

08:58:37 17 Q And what about as to a particular site? Has the Board ever

08:58:44 18    weighed in on whether a particular site should be blocked or

08:58:48 19    unblocked?

08:58:48 20 A I wouldn't know that information.

08:58:50 21 Q But you've never been told that the Board made such a

08:58:54 22    decision, have you?

08:58:54 23 A Not that I remember.

08:58:54 24 Q And the same for categories?

08:58:56 25 A Honestly, I don't know. The Board gets the -- that's

## Page 26

08:59:00 1    something that's covered by Dean and Dan and not me. I

08:59:02 2    don't...

08:59:04 3 Q All right. Do you and Mr. Marney and Mr. Howard all work in

08:59:20 4    the same building?

08:59:22 5 A Yes.

08:59:22 6 Q And is it this building --

08:59:22 7 A Yes.

08:59:22 8 Q -- that we're sitting in?

08:59:24 9    When you're making decisions to block or unblock a

08:59:28 10    particular category or site do you meet in person to make

08:59:32 11    those decisions?

08:59:32 12 A That depends. There might be occasions where we have or...

08:59:40 13 Q Could you just describe for me a little bit the process. You

08:59:44 14    get an e-mail and you forward it to Mr. Howard, right?

08:59:46 15 A Uh-huh.

08:59:48 16 Q And what happens next?

08:59:48 17 A On many occasions that's the end of my involvement. You

08:59:52 18    know, Dean or -- excuse me -- Dan will make that decision.

08:59:58 19    Or they will contact that patron, and -- and I'll get a copy

09:00:00 20    of that just so that I know it's been resolved and file it.

09:00:04 21 Q And other times they may ask you to do follow-up research,

09:00:10 22    right?

09:00:10 23 A Yeah, occasionally. Technical research.

09:00:12 24 Q Technical research.

09:00:16 25    Do you agree with the Internet Use Policy?

## Page 27

09:00:26 1 A I stand behind Dan, Dean and the Board, yes.

09:00:30 2 Q But do you personally agree with the Internet Use Policy?

09:00:36 3 A Yes.

09:00:36 4 Q The library deploys the Fortiguard filtering product, yes?

09:01:08 5 A Yes.

09:01:10 6 Q Does it deploy any other filtering mechanisms?

09:01:12 7 A No.

09:01:14 8 Q What is Userful?

09:01:16 9 A Userful is the company where we purchased our public use

09:01:18 10    computers.

09:01:24 11 Q Okay.

09:01:30 12 A Or, actually, I should say actually it's the software.

09:01:34 13    Userful is a company and it's a software that we use on our

09:01:38 14    public use computers. Some of the computers came from them.

09:01:40 15    Some of the hardware -- excuse me -- came from Userful.

09:01:44 16 Q And what does this software do? I've just never heard of it.

09:01:46 17 A Userful. It's actually a software you can download. It's

09:01:52 18    actually -- it uses an open software protocol. Do you know

09:01:56 19    what open software is?

09:01:56 20 Q (Nods).

09:01:58 21 A Okay. It uses an open software protocol. And it controls

09:02:02 22    like log-ins, session times and kind of bundles that all up

09:02:10 23    into that software unit.

09:02:12 24 Q I'd like to show you this document, NCRL 1081. It doesn't

09:02:18 25    need to be an exhibit, but I do have a question about it.

## Page 28

09:02:22 1 A Okay.

09:02:22 2 Q This page indicates that worldnetdaily.com has been blocked,

09:02:32 3    yes?

09:02:32 4 A Yes.

09:02:34 5 Q And it indicated it was blocked because ICRA Chat PICS

09:02:38 6    labeling level exceeded on the above site, right?

09:02:40 7 A Yes.

09:02:42 8 Q What does that mean?

09:02:42 9 A Actually, I'm not quite sure. We don't use the Userful

09:02:48 10    filter. And -- but in times during a few upgrades and

09:02:50 11    installations it was automatically checked. So this was

09:02:54 12    actually a technical error where the Userful filter had been

09:02:58 13    checked on. It's just as simple as logging in and unchecking

09:03:02 14    it.

09:03:02 15 Q Okay. I know that PICS is a voluntary rating program. And I

09:03:08 16    saw that word here and so I just wanted to make sure that you

09:03:12 17    don't routinely run another filtering program on top of --

09:03:16 18 A No. That was a technical error.

09:03:18 19 Q Okay. Do you use a particular version of Fortiguard?

09:03:32 20 A Not that I'm aware of. It just comes bundled with the

09:03:36 21    Fortinet unit. I imagine they upgrade. There's upgrades

09:03:42 22    that happen. But that happens behind -- that happens at a

09:03:44 23    software level.

09:03:44 24 Q You get automatic updates, yes?

09:03:48 25 A Yes.

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

293

6c6d44c2-3190-4eff-a77a-16cedc6f6108

## Page 29

09:03:48 1   Q When did you first deploy Fortiguard?

09:03:52 2   A Fortinet?

09:03:52 3   Q Fortinet, yes.

09:03:54 4   A The Fortinet router system. I -- I can't remember the exact

09:03:58 5    date, but it was early -- it's been about a year. Actually,

09:04:06 6    over a year.

09:04:04 7   Q All right. We should probably start at the beginning. What

09:04:06 8    is Fortinet?

09:04:08 9   A Fortinet is -- is a -- well, the Fortinet routers that we

09:04:14 10    use. Fortinet is a company. And they supply these routers.

09:04:18 11    And Fortiguard happens to be a software, a Web content

09:04:20 12    filtering software, that you can subscribe for those

09:04:24 13    routers.

09:04:24 14   Q What is a router?

09:04:26 15   A A router is -- it's like a little appliance. It about yea --

09:04:32 16    it's smaller than a laptop. And it -- it has bundled in it a

09:04:38 17    firewall, intrusion protection, spam filtering, antivirus

09:04:46 18    filtering. We use -- we use a VPN, IPsec, use all that

09:04:54 19    bundled into a little unit.

09:04:54 20   Q And does all of your Internet traffic go through this router?

09:04:58 21   A Yes.

09:04:58 22   Q What's a firewall?

09:05:00 23   A The firewall is what protects. It's like basically -- I

09:05:06 24    don't know how much -- how you want me to explain it. It's

09:05:10 25    -- it basically is what it sounds like, a firewall. So it

## Page 30

09:05:12 1    filters everything that comes in including viruses, somebody

09:05:16 2    trying to do an attack.

09:05:20 3   Q So let me make sure I understand. If I'm a patron sitting at

09:05:24 4    a computer, at a public access computer, in one of the

09:05:26 5    libraries and I request a site, say, you know,

09:05:34 6    www.newyorktimes.com, my request goes first to this Fortinet

09:05:38 7    router, yes?

09:05:40 8   A It goes through. The traffic travels through that router.

09:05:42 9   Q Okay. And why did you purchase these routers?

09:05:48 10   A Because they're the best in their -- they've won over 80

09:05:52 11    awards. They were considered -- I believe last year, 2006,

09:05:56 12    they won the highest security rating for a security appliance.

09:06:04 13   Q Did you recommend the purchase of the Fortinet product?

09:06:08 14   A Yes, that was mine.

09:06:10 15   Q You made the recommendation and that recommendation was

09:06:14 16    accepted? Is that how it works?

09:06:16 17   A Yes.

09:06:16 18   Q And did you select the Fortinet product in part because of

09:06:20 19    its filtering solution?

09:06:22 20   A Yes and no. I mainly selected it because of the ratings for

09:06:28 21    it. We have been hacked. Our system has been hacked into.

09:06:32 22    We've had -- so my biggest concern was building up this

09:06:38 23    infrastructure of all these 28 locations, which is a huge

09:06:40 24    feed. As Dean mentioned yesterday, it's a huge feed. So

09:06:46 25    buying all these has helped secure that and secure the

## Page 31

09:06:50 1    traffic that goes between branches and our location. That

09:06:54 2    was my main concern was getting that traffic and setting up

09:06:58 3    that infrastructure.

09:07:00 4   Q Before using the filter, the Fortiguard product, you used a

09:07:06 5    filtering product called Bess; is that right?

09:07:08 6   A No.

09:07:08 7   Q What did you use?

09:07:10 8   A Well, it was a filter -- the very last filter that we used

09:07:14 9    before Fortiguard was 8e6.

09:07:18 10   Q 8e6?

09:07:18 11   A Yeah. Through a company called Ties.

09:07:22 12   Q Why did you stop using 8e6?

09:07:24 13   A Because -- the origination behind it was in 2005 I purchased

09:07:28 14    five wireless routers through NLE. They're called Blue

09:07:32 15    Socket wireless routers. Because we wanted to offer wireless

09:07:36 16    access at our main branches and at our branches that are

09:07:40 17    heavily used by travelers. And it was almost impossible to

09:07:44 18    set up our filtering proxy server that we were using at the

09:07:50 19    time to use on these routers.

09:07:52 20   Q And so you replaced 8e6 because of that?

09:07:56 21   A That was the start of it. That's the -- that's the -- that's

09:08:00 22    when they recommended, you know, "Hey, you should look at a

09:08:04 23    different" -- "a different product." At that time we didn't

09:08:06 24    even have firewalls at the branches. We had a simple router

09:08:12 25    and that was it.

## Page 32

09:08:12 1   Q So the decision to adopt Fortiguard was part of this general

09:08:20 2    overhaul of --

09:08:20 3   A Our infrastructure, yes.

09:08:22 4   Q -- the infrastructure?

09:08:24 5   A Yes. And implementing a VPN, Virtual Private Network,

09:08:30 6    between the branches and our location here.

09:08:36 7   Q What kind of research did you do into Fortiguard specifically

09:08:40 8    before selecting it?

09:08:40 9   A Fortiguard specifically?

09:08:42 10   Q Yes. The filtering program I mean.

09:08:44 11   A I really didn't do any research. I mean, I did some research

09:08:48 12    with Fortiguard when they said, you know, it has this Web

09:08:52 13    filtering product. When I bought Fortinet I didn't -- I

09:08:54 14    wasn't looking exactly for a Web filtering product, so the

09:09:00 15    research was completely separate.

09:09:02 16   Q Did you test the filter? What made you decide to use this

09:09:08 17    filter? That's just what I'm trying to figure out.

09:09:12 18   A Well, because it came bundled with this product. And I

09:09:16 19    brought it up that, you know, we could use -- we could go to

09:09:18 20    this -- since we're buying these routers, we could use this

09:09:22 21    filtering software that's available to us through these

09:09:24 22    routers. And then I did research on their filtering software

09:09:30 23    compared to other filtering softwares.

09:09:32 24   Q And what kind of research did you do?

09:09:36 25   A Just on-line research. Just -- I just -- just like anybody

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

294

6c6d44c2-3190-4eff-a77a-16cedc6f6108

| Page 33 | Page 35 |

**Page 33**

09:09:40 1    would do on-line when they're researching a product to

09:09:42 2    purchase or buying.

09:09:44 3    Q  Are there any written records of your research?

09:09:46 4    A  Written, no.

09:09:48 5    Q  Are there any e-mails about it?

09:09:50 6    A  No.

09:09:50 7    Q  Okay. Have there been any discussions about switching away

09:10:00 8    from the Fortiguard filtering product?

09:10:04 9    A  No.

09:10:04 10   Q  Have you been satisfied with the product?

09:10:06 11   A  Yes.

09:10:08 12   Q  Why?

09:10:08 13   A  Because it works.

09:10:12 14   Q  What do you mean by "it works"?

09:10:14 15   A  It does what you want it to do. It does what you ask it to

09:10:18 16   do. It's in conjunction with our -- our policies.

09:10:26 17   Q  Mr. Marney mentioned yesterday that there was some instances

09:10:30 18   in which the filter turned off. Has that happened?

09:10:38 19   A  It happened with our old filtering system. And what you mean

09:10:42 20   "turning off" is that, say, Bess or, say, 8e6, that was a

09:10:48 21   proxy server, i.e., Bess, Ties, all that was called a proxy

09:10:52 22   server. So all our traffic was directed -- was redirected to

09:10:56 23   their servers. And, say, when their servers were down we

09:11:00 24   didn't have Internet access. There was a lot of problems

09:11:02 25   with that. But, again, we just didn't have Internet access.

**Page 34**

09:11:06 1    Q  And have there been any similar problems since you began

09:11:08 2    using Fortiguard?

09:11:10 3    A  No.

09:11:10 4    Q  Do you receive technical phone calls from the branches about

09:11:16 5    the filters?

09:11:16 6    A  In some regards. I guess -- I'm sorry. Let me ask that. In

09:11:20 7    what regards?

09:11:22 8    Q  Regarding any technical problems or confusions or issues

09:11:26 9    people are having with the filter.

09:11:28 10   A  Yes, I get calls.

09:11:30 11   Q  Would you be the person who would receive those calls?

09:11:32 12   A  It depends. If it's strictly a site was -- they're worried

09:11:36 13   about a site being unblocked, they may call Dan and they may

09:11:38 14   call me or they may call Chad Roseburg, who also works in my

09:11:42 15   department.

09:11:42 16   Q  Who is Chad Roseburg?

09:11:44 17   A  He's -- he just works with me. He's a coworker of mine that

09:11:48 18   works in this department. In the IT Department. Excuse me.

09:11:52 19   Q  And how do his job responsibilities differ from yours?

09:11:56 20   A  I'm not sure. I'd have to read his job description.

09:11:58 21   Q  But on a typical day what is he doing compared to what you're

09:12:02 22   doing?

09:12:04 23   A  Well, he does a lot of trouble shooting with the branches as

09:12:06 24   well.

09:12:08 25   Q  So if a call comes in, if someone is having a problem, it

**Page 35**

09:12:12 1    could go to you or it could go to him?

09:12:14 2    A  Yes.

09:12:14 3    Q  Do both of you deal with filtering?

09:12:16 4    A  Yes.

09:12:16 5    Q  Okay.

09:12:30 6           MS. CRUMP:  What time is it?

09:12:34 7           MR. MANVILLE:  9:10.

09:12:40 8           MS. MONROE:  9:10.

09:12:40 9    Q  (By Ms. Crump) You were beginning to explain how Fortinet

09:12:44 10   interacts with your computer network. Could you continue

09:12:46 11   your explanation. I think you said that you had a piece of

09:12:50 12   hardware or a router that's connected to your network. Is

09:12:54 13   that right?

09:12:54 14   A  Yes. All the branches have a Fortinet -- it's called

09:12:58 15   Fortigate 60 router at each of their locations.

09:13:00 16   Q  And is this filtering software located on that router?

09:13:04 17   A  The filtering policies are -- yes, they're located onto the

09:13:10 18   routers.

09:13:12 19   Q  Maybe what we should do is I should ask you to explain how

09:13:16 20   the filtering works. If I'm sitting at a computer and I

09:13:18 21   request a Website, what happens next?

09:13:20 22   A  The Website then goes to -- well, it depends. If you request

09:13:26 23   Google.com, that's going to be in the cache. That means it's

09:13:30 24   gonna' be a site that's accessed daily. It's like North

09:13:34 25   Central Regional Library's Website. That means it's already

**Page 36**

09:13:36 1    cached. It doesn't have to go out. It already knows that

09:13:38 2    it's unblocked. So you get that site immediately.

09:13:40 3           If it's a site that's not cached, then it goes to the

09:13:44 4    Fortiguard I'm assuming servers. I'm assuming that. They go

09:13:48 5    to their servers. It's then categorized there. It comes

09:13:52 6    back, is then compared to our policy. And then the person

09:13:58 7    would either get it blocked or unblocked.

09:14:04 8    Q  And what is a cache?

09:14:06 9    A  A cache is like kind of a memory, like it's in your memory.

09:14:10 10   It's -- I don't know if you've ever experienced where your

09:14:14 11   Internet is down yet Google comes up and you're thinking:

09:14:18 12   "Oh, it's not down. I can get Google." It's because it's in

09:14:22 13   your cache. It's just a -- it's what's that in your memory in

09:14:26 14   your computer.

09:14:26 15   Q  And if the site is in the cache, then you don't have to go

09:14:30 16   through this process of sending --

17   A  Yeah.

09:14:30 18   Q  -- someone's request to Fortiguard?

09:14:32 19   A  That's what makes the system actually faster. That's what

09:14:36 20   makes the system process faster.

09:14:40 21   Q  What methods does Fortiguard use to block access to Internet

09:14:52 22   content?

09:14:52 23   A  I'm not sure I understand that question.

09:14:54 24   Q  Does it use a black list?

09:14:56 25   A  I don't -- I don't know. I don't know how -- I'm not an

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

6c6d44c2-3190-4eff-a77a-16cedc6f6108

## Page 41

09:19:16  1   A   I just accessed their -- their -- their router. I can access
09:19:20  2       their router, their -- what do you call it? I'm sorry. I --
09:19:36  3       they -- I can access their routers from my computer. I can
09:19:40  4       log into their routers and change settings from my computer
09:19:48  5       or create settings and such.
09:19:50  6   Q   Does every computer have a unique router?
09:19:52  7   A   Every computer, no. No, no. Every branch has a unique
09:19:56  8       router.
09:19:58  9   Q   So you could log into the Wenatchee router --
09:20:00 10   A   Yes.
09:20:00 11   Q   -- from your computer?
09:20:00 12   A   Yes.
09:20:02 13   Q   And you could change the filter settings for these two staff
09:20:06 14       computers --
09:20:06 15   A   Yes.
09:20:06 16   Q   -- that way?
09:20:06 17   A   Yes.
09:20:06 18   Q   So it's possible to disable the filter for a particular
09:20:28 19       workstation, yes?
09:20:28 20   A   I have never disabled a filter for a particular workstation.
09:20:32 21       But, yes, it would be possible.
09:20:34 22   Q   Yes, I understand that you haven't done it.
09:20:36 23   A   Okay.
09:20:36 24   Q   I was just asking whether it's technically possible.
09:20:40 25   A   Yes.

## Page 42

09:20:40  1   Q   And your answer is "yes"?
09:20:40  2   A   Yes.
09:20:42  3   Q   Okay. Would it be possible to disable the filter for a
09:20:48  4       particular patron?
09:20:48  5   A   Again, I'd have to answer I don't know. I've never tried.
09:20:52  6       I've never created a policy that way. There's a lot
09:20:56  7       involved -- if I may expand on that, there's a lot involved
09:21:00  8       with a patron's log-in, meaning that they have to have a
09:21:04  9       library card, they have to have -- or let's say a guest card.
09:21:08 10       They have to have a library card. And so there's -- and what
09:21:12 11       that's called is called patron authentication. We have
09:21:14 12       actually a server that authenticates those cards.
09:21:18 13   Q   So someone couldn't just enter in 11111?
09:21:22 14   A   Yes. No, they could not. Yes.
09:21:24 15   Q   And that authenticates that they're using a legitimate card?
09:21:30 16   A   Yes. A legitimate North Central Regional Library Card, yes.
09:21:32 17   Q   Okay.
09:21:34 18   A   And so I imagine creating a policy that's unfiltered for
09:21:38 19       those would entail a lot. I'm just, again, guessing because
09:21:40 20       I've never tried to create one. But there would be involved
09:21:44 21       an authentication of that particular card. How that would
09:21:48 22       happen I don't know.
09:21:48 23   Q   Why don't we take a break for a few minutes. Is that okay?
09:22:04 24   A   Okay.
09:22:04 25   Q   Five minutes.

## Page 43

          1       (Recess taken.)
09:31:50  2       (Mr. Howard present.)
09:31:50  3   Q   Do you have anything you want to clarify after the break?
09:31:52  4   A   I don't believe so, no.
09:31:54  5   Q   Okay. I'd like to go back to your experience on MySpace.
09:31:58  6   A   Okay.
09:31:58  7   Q   Okay. So you created a MySpace profile, right?
09:32:02  8   A   On my own, yes.
09:32:02  9   Q   And you mentioned that you received solicitations for porn,
09:32:06 10       sex, right?
09:32:08 11   A   Well, solicitations, yes, to join their groups.
09:32:10 12   Q   What kind of groups are they?
09:32:13 13   A   Porn groups.
09:32:14 14   Q   How did you know they were porn groups?
09:32:16 15   A   "All Women's Groups". Because it said "Rated X X X". I
09:32:22 16       didn't actually click on it to go to these sites, no.
09:32:26 17   Q   Okay.
09:32:26 18   A   They're just solicitations.
09:32:28 19   Q   I'm not as familiar with MySpace as you.
09:32:30 20   A   Well, I'm not very familiar with it.
09:32:32 21   Q   How did you get these solicitations?
09:32:34 22   A   I just got them via e-mail. When you sign up for a MySpace
09:32:40 23       account it automatically sets you up with a MySpace e-mail.
09:32:46 24       They don't come to your e-mail. You have to log into
09:32:50 25       MySpace. They say "You have three messages". You click on

## Page 44

09:32:52  1       them. They're all solicitations for...
09:32:54  2   Q   There's a special MySpace e-mail that you get, right?
09:32:58  3   A   I'm assuming, yes.
09:33:00  4   Q   And so in your e-mail "in box" you got e-mails that were
09:33:04  5       advertising pornographic Websites?
09:33:06  6   A   Yes.
09:33:08  7   Q   And were those pornographic Websites pornographic MySpace
09:33:14  8       pages?
09:33:14  9   A   I don't know. I didn't click on them.
09:33:16 10   Q   Did they give you the URL for those Websites?
09:33:18 11   A   Just "Join Our Group", yes. Again, like I said, I didn't
09:33:22 12       click on them.
09:33:24 13   Q   Was it joining a MySpace group?
09:33:26 14   A   I wouldn't -- I don't recall. I was assuming, yes.
09:33:28 15   Q   Okay. But --
09:33:28 16   A   Because you can't send -- sorry. May I interrupt?
09:33:32 17   Q   Please.
09:33:32 18   A   You have to have a MySpace account to send somebody an
09:33:36 19       e-mail.
09:33:36 20   Q   Someone else in MySpace?
09:33:38 21   A   Yes. Excuse me. Yes. So I can't receive a MySpace e-mail
09:33:42 22       on my account unless that person has an account.
09:33:44 23   Q   Okay. So MySpace e-mail can only --
09:33:48 24   A   That's my understanding.
09:33:50 25   Q   -- can only e-mail from other MySpace e-mails? Is that what

11 (Pages 41 to 44)

6c6d44c2-3190-4eff-a77a-16cedc6f6108

## Page 49

09:38:44 1    Internet?

09:38:44 2    A  I didn't e-mail. I contacted. I was in -- when I was

09:38:48 3        talking to them regarding a different issue it just came up

09:38:50 4        that they use it. I asked them what their Web filtering

09:38:54 5        product that they used was and then they mentioned they use

09:38:58 6        it.

09:38:58 7    Q  And then you talked to them about their satisfaction level

09:39:02 8        with that product?

09:39:04 9    A  They just told me -- it was in casual conversation -- that,

09:39:08 10       yes, they're happy with the product.

09:39:08 11   Q  Did you have conversations with anyone else in addition to

09:39:12 12       the Northwest Internet folks?

09:39:12 13   A  With salesmen, yes.

09:39:16 14   Q  Salesmen from Fortinet?

09:39:16 15   A  Yes. No, no. Excuse me. Not from Fortinet. From NLE.

09:39:22 16       It's the -- they sell their Fortinet product. They don't

09:39:26 17       sell their product directly. They go through resalers.

09:39:30 18   Q  NLE is the resaler you work with?

09:39:32 19   A  Originally, yes.

09:39:34 20   Q  Do they offer Internet filtering products other than the

09:39:40 21       Fortiguard product?

09:39:40 22   A  I don't know that.

09:39:42 23   Q  Did you discuss any product other than Fortiguard?

09:39:44 24   A  I didn't even ask that with them. I mostly discussed the

09:39:48 25       Fortinet product.

## Page 50

09:39:50 1    Q  So you didn't have discussions with them about the

09:39:52 2        effectiveness of Fortiguard?

09:39:54 3    A  No.

09:39:54 4    Q  Okay. You said you printed out articles about Fortiguard.

09:39:56 5    A  Yes.

09:39:58 6    Q  What sorts of articles did you review?

09:40:00 7    A  One of them was specifically a Fortiguard study that they

09:40:04 8        did, (as stated) "Why Their" -- I believe it's titled (as

09:40:08 9        stated) "Why their filters" -- it's available on-line. (As

09:40:10 10       stated) "Why Their Filters Work". Or I can't remember the

09:40:14 11       exact title. That was one of the studies that I researched.

09:40:16 12   Q  Did you research any other studies?

09:40:18 13   A  I'm sure that I pulled off other reviews, but I don't remember

09:40:26 14       -- I don't recall exactly what studies they were or what

09:40:28 15       articles they were.

09:40:30 16   Q  Did you print out any other articles other than the one

09:40:36 17       Fortiguard review done by Fortinet?

09:40:38 18   A  I don't recall. Not that I recall. I'm sorry. Not that I

09:40:40 19       recall.

09:40:44 20       Can I answer that? I also am a part of Horizon user

09:40:50 21       group. That's, again, our ILS System, to go back to that.

09:40:54 22       I've also spoken with a lot of other system administrators at

09:40:58 23       other libraries, not just about the Fortiguard or Fortinet

09:41:02 24       product but other instances too. That's another group I've

09:41:06 25       consulted.

## Page 51

09:41:06 1    Q  That's another group you've consulted for IT questions

09:41:10 2        generally?

09:41:10 3    A  Yes.

09:41:12 4    Q  Did you discuss Fortiguard with them?

09:41:14 5    A  No.

09:41:14 6    Q  Do you recall reading any effectiveness reviews of the

09:41:20 7        Fortiguard product other than reviews conducted by Fortinet

09:41:26 8        itself?

09:41:26 9    A  Yes.

09:41:26 10   Q  Do you remember what they were?

09:41:30 11   A  I -- I don't remember the site. I remember there's one -- I

09:41:34 12       don't know if it was put out by ALA. It was a review of --

09:41:38 13       when CIPA came out they did a report on several products, a

09:41:44 14       census; Smart Filter, which is a Bess product; Fortiguard.

09:41:50 15       And I printed off that review, actually.

09:41:52 16   Q  Did you base your decision to select Fortiguard in part on

09:41:58 17       that review?

09:41:58 18   A  On several -- yeah, that was one of them. I didn't base it

09:42:02 19       on that review, no.

09:42:02 20   Q  But in part on that review?

09:42:04 21   A  Yes, partial.

09:42:06 22   Q  And did that review recommend Fortiguard especially?

09:42:08 23   A  It was impartial. It was an impartial review of all of them.

09:42:12 24       So, no, it did not give any recommendations. It just gave

09:42:16 25       the facts of each product.

## Page 52

09:42:20 1    Q  Were there particular features you were looking for when

09:42:24 2        considering the Fortiguard product?

09:42:26 3    A  I -- no, not the Fortiguard. But the Fortinet product, yes.

09:42:30 4    Q  All right. So really you were focusing on Fortinet --

09:42:34 5    A  Yes.

09:42:34 6    Q  -- as a whole?

09:42:36 7    A  Yes.

09:42:36 8    Q  You were less concerned with the specifics of the Fortiguard

09:42:38 9        product?

09:42:38 10   A  I wouldn't say I was less concerned. But I was concerned

09:42:42 11       with the whole package, how it -- yes, I was concerned about

09:42:46 12       the whole package.

09:42:46 13   Q  All right. So you remember the ALA survey?

09:43:06 14   A  I'm not sure if it was ALA. I am just saying it was --

09:43:10 15   Q  You remember a comparative survey?

09:43:12 16   A  Yes.

09:43:14 17   Q  And you remember a Fortinet survey?

09:43:16 18   A  Yes.

09:43:16 19   Q  Or document?

09:43:16 20   A  Yes, document.

09:43:16 21   Q  And do you remember any other documents?

09:43:20 22   A  No.

09:43:20 23   Q  All right. You mentioned earlier that you do not play a role

09:43:40 24       in deciding which categories are unblocked or blocked. Is

09:43:46 25       that correct?

13 (Pages 49 to 52)

6c6d44c2-3190-4eff-a77a-16cedc6f6108

## Page 53

09:43:46  1    A  I don't play a major role in that, no.

09:43:48  2    Q  You don't play a major role?

09:43:50  3    A  Yes.  That's probably kind of a gray area there.

09:43:52  4    Q  In what way is it a gray area?

09:43:54  5    A  Well, I mean on the technical end of it.  If they say they

09:43:58  6       want something unblocked, then I'm the person that goes in

09:44:02  7       and does the physical change or, you know, physical log-on to

09:44:06  8       these routers and I make that change.

09:44:08  9    Q  But that's your exclusive role?

09:44:10  10   A  Yes.

09:44:10  11   Q  Who makes the policy decision?

09:44:10  12   A  I'm sorry.  You'd have to ask that to Dean or Dan.  I'm not

09:44:16  13      quite sure exactly.

09:44:16  14   Q  But is it one of them?

09:44:18  15   A  Or the Board.  I'm sure the Board is involved in that.

09:44:22  16   Q  So it's Dean, Dan or the Board?

09:44:26  17   A  And the Board.

09:44:28  18   Q  Okay.  Dean, Dan and the Board?

09:44:30  19   A  I guess.  I'm sorry.  I would have to -- you'd have to ask

09:44:36  20      Dean and Dan that.

09:44:36  21   Q  You just get told what the decision is?

09:44:38  22   A  Yes.  I'm basically the support, their support.

09:44:40  23   Q  Your job is to implement the decision?

09:44:42  24   A  Yes.

09:44:44  25   Q  With respect to Craigslist, that site was blocked in its

## Page 54

09:44:52  1       entirety until recently, right?

09:44:54  2    A  Yes.

09:44:56  3    Q  When did you learn that you could block partial sites?

09:45:00  4    A  Just as a test.  We were trying to block just the Personals.

09:45:04  5       And that was just recently, right before we decided to unblock

09:45:08  6       it.

09:45:08  7    Q  So you just experimented and it worked?

09:45:14  8    A  Uh-huh.

09:45:14  9    Q  Is that something you just did within the last few weeks?

09:45:18  10   A  Right.  Before we unblocked it, yes.

09:45:20  11   Q  Have you ever tried to block a page as opposed to a whole

09:45:24  12      domain previously?

09:45:26  13   A  No.  Oh, wait.  Excuse me.  Can I re-take that back?

09:45:28  14      Yes.  There are certain -- there's called -- part of

09:45:32  15      our --there's called a URL Filter.  We do block certain

09:45:38  16      URL's.  That's like Craigslist was.

09:45:40  17   Q  But are those URL's like domain names like www.washingtonpost.

09:45:44  18      com?  Or do they include specific Web pages like --

09:45:48  19   A  They are domain names, yes.

09:45:50  20   Q  So you would block the whole domain?

09:45:52  21   A  Yeah.

09:45:52  22   Q  Craigslist is the first time you've blocked a specific part

09:45:56  23      of the name?

09:45:58  24   A  Yes.  There's several sites you can do that, but like I can't

09:46:02  25      log on into Google images and block just flowers.  You can't

## Page 55

09:46:08  1       do that.  So I was unaware that you could do that with

09:46:10  2       Craigslist.

09:46:12  3    Q  But it would be impossible, for instance, to block one

09:46:14  4       interior page of the library system as a Website?  Is that --

09:46:18  5    A  I'm not sure.  I would have to test that.  Like I said, it

09:46:22  6       changes from how the site is built.  So it changes from site

09:46:24  7       to site.

09:46:26  8    Q  But you could block a specific Web page, right, if you had --

09:46:30  9    A  Yes.  I could block www.ncrl.org, yes.

09:46:34  10   Q  So you don't necessarily have to block the whole domain?

09:46:38  11   A  It depends -- again, it depends on the Website, how the

09:46:42  12      Website is built.

09:46:42  13   Q  Could you maybe describe what the technical difference is

09:46:48  14      between sites where you can and can't do that.

09:46:50  15   A  I can't.  I can't.  I mean, like Craigslist, we were able to

09:46:54  16      do that.  As I said earlier, Google images -- I can't block a

09:46:56  17      certain part of Google images just for certain things.

09:47:00  18      That's my only -- that's about as technical as I can get.

09:47:06  19   Q  You don't know whether you could block one page of the

09:47:06  20      library's home page?

09:47:08  21   A  I don't.  Again, I'd have to test that.

09:47:10  22   Q  What would you do to test that?

09:47:12  23   A  Just that.  I would test -- say could I block ncrl.org/

09:47:22  24      resources to just see if I could block that specific page.

09:47:24  25   Q  You don't know whether that's possible sitting here today?

## Page 56

09:47:28  1    A  I don't.

09:47:28  2    Q  You mentioned earlier that there hasn't been a discussion of

09:47:44  3       replacing Fortiguard; is that correct?

09:47:46  4    A  Not that I recall, yes.

09:47:48  5    Q  And you said -- and correct me if I'm mischaracterizing what

09:47:54  6       you said earlier -- that that's because it works?

09:47:58  7    A  Yes, that's what I said.  I do believe that Fortiguard works.

09:48:02  8    Q  And what does that mean?

09:48:04  9    A  I meant -- like I said before, it works for how our Internet

09:48:08  10      policy is.  It works for our -- our Internet policy.

09:48:10  11   Q  What does that mean?

09:48:12  12   A  Meaning it works for us.  I'm not saying it works for

09:48:16  13      everybody.  I'm not saying it works for somebody else.  It

09:48:18  14      works for how we have our Internet policy set up.  It goes

09:48:22  15      into great details in all the categories.  I can't explain

09:48:26  16      all the categories.  There's over a hundred of them.  But it

09:48:28  17      really gets down to the fine details.

09:48:30  18   Q  So it works for you because it has a broad variety of

09:48:34  19      categories it offers?

09:48:34  20   A  Well, that and probably more, yes.

09:48:38  21   Q  What more?

09:48:38  22   A  Well, I mean, it's very detailed.  It's a -- it's not just

09:48:42  23      one little product it just blocks.  It blocks at page level.

09:48:46  24      So we're -- well, I'm sorry.  Can I -- I'm not sure of that.

09:48:50  25      I can't -- again, I'm not an expert on how Fortiguard works.

14  (Pages 53 to 56)

Wenatchee Valley Court Reporting
(509) 888-DEPO (3376)

6c6d44c2-3190-4eff-a77a-16cedc6f6108

## Page 69

10:07:30 1  Q  What significance does that fact have?

10:07:32 2  A  Say if a computer gets hacked, you know, it gets compromised,

10:07:38 3     then they can change the settings on the computer.  Those

10:07:40 4     settings aren't on a specific computer.

10:07:42 5  Q  Your point is it's harder to circumvent because you can't

10:07:48 6     just hack the computer; you have to effect the firewall?

10:07:52 7  A  Yeah.

10:07:52 8  Q  Is that right?

10:07:52 9  A  Yes.

10:07:52 10 Q  Okay.  Well, I don't know that I have any other questions.

10:08:02 11       MS. CRUMP:  Can you think of anything else?

10:08:06 12       MR. MANVILLE:  (Shakes head.)

10:08:08 13       MR. ADAMS:  I just have a couple follow-up

10:08:10 14    questions, if it's all right, if you're done.

10:08:12 15       MS. CRUMP:  Sure.  Please.

16              EXAMINATION

10:08:14 17    BY MR. ADAMS:

10:08:14 18 Q  Ms. Walters, just a few follow-up questions for you.

10:08:16 19    Am I correct in it's understanding that NCRL implemented the

10:08:22 20    Fortinet routers initially and then Fortiguard's subscription

10:08:26 21    service came later?

10:08:26 22 A  Yes.

10:08:26 23 Q  So Fortinet was up and operational with a different filter

10:08:30 24    for a brief period of time?

10:08:32 25 A  Yes.

## Page 70

10:08:32 1  Q  So approximately how long, if you know?

10:08:34 2  A  I think only a couple months.

10:08:36 3  Q  Okay.  And when NCRL later went to the Fortiguard subscription

10:08:42 4     service, is it true that NCRL initially used the default

10:08:50 5     settings provided by Fortiguard in determining the filter

10:08:54 6     parameters?

10:08:54 7  A  Yes.  And then we changed them as we --

10:08:58 8  Q  Okay.  Is it also true that as NCRL's familiarity with the

10:09:04 9     Fortiguard service grew, changes were made and your use of

10:09:08 10    Fortiguard evolved?

10:09:08 11 A  Yes, I believe so.

10:09:10 12 Q  Okay.  Thank you.

10:09:10 13    And we spoke a little bit about Exhibit 43, and I want

10:09:16 14    to draw your attention to that too.  That is the January

10:09:20 15    31st, 2007 e-mail from you to Mr. Howard --

10:09:24 16 A  Uh-huh.

10:09:24 17 Q  -- about the drugdigest.org Website.

10:09:28 18 A  Yes.

10:09:30 19 Q  Is it true that you have no role -- typically have no role in

10:09:36 20    the decision whether a particular Website should or should

10:09:38 21    not be blocked?

10:09:38 22 A  Yes, that's true.

10:09:40 23 Q  Okay.  And is the circumstances represented by Exhibit 43 an

10:09:46 24    anomaly?

10:09:46 25 A  Yes.

## Page 71

10:09:46 1  Q  Okay.  And typically today decisions to block or unblock a

10:09:54 2     Website at the request of a patron are passed on to Mr. Howard

10:09:58 3     and Mr. Marney?

10:09:58 4  A  And the Board, yes.

10:10:00 5  Q  To the best of your knowledge?

10:10:02 6  A  Right, to the best of my knowledge.

10:10:02 7  Q  But you're not exactly sure if the Board participates in the

10:10:06 8     process at that granular level, are you?

10:10:08 9  A  I don't know.

10:10:08 10 Q  That's all I have.

10:10:10 11       MS. CRUMP:  The problem with follow-up questions

10:10:12 12    is that they lead to more questions.

10:10:14 13       THE WITNESS:  Okay.

14              FURTHER EXAMINATION

10:10:14 15    BY MS. CRUMP:

10:10:14 16 Q  Okay.  So Fortinet was installed first?

10:10:16 17 A  Yes.

10:10:18 18 Q  And then Fortiguard was activated later?

10:10:19 19 A  Yeah.  Within months, yes.

10:10:20 20 Q  Within months?

10:10:22 21 A  Within months.

10:10:24 22 Q  And can you give me an approximate time --

10:10:26 23 A  I can't.

10:10:26 24 Q  -- frame?

10:10:28 25    That document that we're looking at dated 11-21, did

## Page 72

10:10:32 1     that reflect the default settings?

10:10:36 2  A  At that time?  I -- I would have to research that.  I'm sorry.

10:10:40 3     I don't --

10:10:42 4  Q  So you don't know?

10:10:42 5  A  11-21 seems like a later date than, yeah, the default.

10:10:46 6  Q  So you're not certain whether or not those particular

10:10:48 7     settings were selected by the library or whether those were

10:10:52 8     the default settings?

10:10:52 9  A  No.

10:10:54 10       MS. CRUMP:  Got anything?

10:10:56 11       MR. MANVILLE:  (Shakes head.)

10:10:58 12 Q  (By Ms. Crump) All right.  I guess we're done.

10:10:58 13 A  Thank you.

11:00:00 14 Q  I hope that wasn't too painful.

11:11:02 15 A  No, it wasn't.

16              (Proceeding concluded at 10:11 a.m.)

17

18

19

20

21

22

23

24

25

18  (Pages 69 to 72)

## Page 73

1    CORRECTION SHEET
2    CHANGES IN FORM AND SUBSTANCE REQUESTED BE MADE IN THE
     FOREGOING ORAL EXAMINATION TRANSCRIPT:
3
     Page  Line      Correction & Reason
4     |    |
5     |    |
6     |    |
7     |    |
8     |    |
9     |    |
10    |    |
11    |    |
12    |    |
13    |    |
14    |    |
15    |    |
16    |    |
17   I hereby certify that this is a true and correct copy of my
     testimony, with the exception of the corrections noted above.
18
19   _____
     BARBARA G. WALTERS
20
21   _____
     NOTARY PUBLIC in and for the State of
22   Washington, residing at _____.
     Subscribed and sworn to before me on
23   this _____ day of _____, 20____.
24   My commission expires on _____.
      See:  Wash. Reports, CR 30(e), USCA, Rule 30(e)
25

## Page 74

1         REPORTER'S CERTIFICATE
2         I, CHARLENE M. BECK, Certified Shorthand
3    Reporter, do hereby certify:
4         That the foregoing proceedings were taken
5    before me at the times and place therein set forth, at which
6    time any witnesses were placed under oath;
7         That the testimony and all objections made
8    were recorded stenographically by me and were thereafter
9    transcribed by me or under my direction;
10        That the foregoing is a true and correct
11   record of all testimony given, to the best of my ability;
12        That I am not a relative or employee of any
13   attorney or of any of the parties, nor am I financially
14   interested in the action;
15        IN WITNESS WHEREOF, I have hereunto set my
16   hand and affixed my official seal this 5th day of November,
17   2007.
18
19
20
21   _____
         CHARLENE M. BECK, CCR, RPR
22       CCR # 2543
         Notary Public in and for the
23       State of Washington, residing
         at Wenatchee.
24
25   My commission expires on June 19, 2011.

19 (Pages 73 to 74)

6c6d44c2-3190-4eff-a77a-16cedc6f6108

# Exhibit T

# North Central Regional Library

## INTERNET PUBLIC USE POLICY

The mission of the North Central Regional Library is to promote reading and lifelong learning.

Internet access is offered as one of many information resources supporting that mission.

The Internet is currently an unregulated medium. While the Internet offers access to materials that are enriching to users of all ages, the Internet also enables access to some materials that may be offensive, disturbing, or illegal. There is no guarantee that information obtained through the Internet is accurate or that individuals are who they represent themselves to be. The library district recognizes that it cannot fully control the amount of material accessible through the Internet but will take reasonable steps to apply to the Internet the selection criteria stated in the Collection Development Guidelines and Procedures.

All Internet access on NCRL library computers is filtered.

The library district does not host customer e-mail accounts or provide access to chat rooms.

The library district cannot guarantee privacy for individuals using library public access computers to search the Internet and computer screens may be visible to people of all ages, backgrounds, and sensibilities. Customers are requested to exercise appropriate discretion in viewing materials or submitting sensitive personal information. Minors, in particular, are discouraged from sharing personal information online.

Hacking and other unlawful online activities are prohibited.

The District's director is responsible for establishing procedures to carry out this policy.

EXH 3 DATE 8-13-2007
WITNESS C HEINLEN
BARBARA J. SCOVILLE

NCRL 01097