THE HONORABLE EDWARD F. SHEA

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

SARAH BRADBURN, PEARL
CHERRINGTON, CHARLES HEINLEN, and
the SECOND AMENDMENT FOUNDATION,

      Plaintiffs,

            v.

NORTH CENTRAL REGIONAL LIBRARY
DISTRICT,

      Defendant

No. CV-06-327-EFS

**PLAINTIFFS' OPPOSITION TO
DEFENDANT NORTH CENTRAL
REGIONAL LIBRARY DISTRICT'S
MOTION FOR SUMMARY
JUDGMENT**

I. INTRODUCTION ................................................................................. 1

II. PLAINTIFFS HAVE STANDING TO SEEK INJUNCTIVE RELIEF .................. 1

    A. General Principles of Standing ...................................................... 1

    B. Each Plaintiff Faces Actual And Imminent Constitutional Injury ............... 3

PLAINTIFFS' OPPOSITION TO NCRL'S MOTION
FOR SUMMARY JUDGMENT -- i

**AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION**
705 Second Avenue, Suite 300
Seattle, Washington 98104-1799
(206) 624-2184

1.     The Plaintiff Library Patrons Face Unconstitutional Restrictions On Their Freedom To Read ................................................................ 3

2.     The Plaintiff Publisher Faces Unconstitutional Restrictions On Its Freedom To Communicate With Its Willing Audience .................... 5

3.     Plaintiffs Have Overbreadth Standing Where Others Are Harmed In Similar Ways By NCRL's Filtering Policies ............................... 5

III.   NCRL'S FILTERING POLICY IS OVERBROAD ................................................. 7

A.   NCRL's Stated Purpose Is To Prevent All Patrons -- Including Adults -- From Viewing Material It Deems Inappropriate For Children .................... 7

B.   NCRL Filters According to Categories That Encompass Protected Speech . 7

C.   The Technology Used For Filtering Inevitably Results In Overblocking ..... 9

1.     The FortiGuard Filter Overblocks .................................................... 9

2.     Site-By-Site Unblocking Does Not Cure the Constitutional Problem ...................................................................................... 11

IV.   NCRL IMPOSES A CONTENT-BASED SPEECH RESTRICTION THAT FAILS HEIGHTENED SCRUTINY ................................................................. 11

A.   NCRL Filters Based on Content .................................................... 11

B.   NCRL's Proffered Justifications for Continuous Filtering for Adults Are Inadequate .......................................................................... 12

1.     Complying With CIPA ............................................................... 12

2.     Promoting NCRL's Mission and Collection Development Policy .... 12

3.     Ensuring Network Security ........................................................ 13

4.     Working Cooperatively With Schools ......................................... 13

5.     Minimizing Confrontations Between Patrons and Staff .................. 13

6.     Protecting Children From a "Dangerous Environment" .................. 15

PLAINTIFFS' OPPOSITION TO NCRL'S MOTION
FOR SUMMARY JUDGMENT -- ii

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington 98104-1799
(206) 624-2184

7.    Preventing Illegal Conduct ................................................................ 16

8.    Avoiding Liability for Employment Discrimination ......................... 16

C.    NCRL's Filtering Policy Is Not Narrowly Tailored ...................................... 18

1.    An Overbroad Filtering Regime Is By Definition Not Narrowly
Tailored ............................................................................................... 18

2.    Less Restrictive Alternatives Exist .................................................... 18

V.    THE WORDING OF NCRL'S WRITTEN INTERNET USE POLICY IS NOT
AT ISSUE ................................................................................................................ 19

VI.    CONCLUSION ........................................................................................................ 20

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington  98104-1799
(206) 624-2184

# I.   INTRODUCTION

The facts crucial to resolving this case are not in dispute:  the North Central Regional Library ("NCRL") configures its internet filters to prevent <u>all</u> patrons from viewing certain categories of constitutionally protected material that it does not want minors to view; the filter blocks additional protected material that does not actually fit within the categories the library seeks to filter; and the library will not disable the filter upon the request of an adult.  For the reasons explained below and in Plaintiffs' briefs on related motions (which are incorporated here by reference[1]), this Court should enter judgment in favor of Plaintiffs.

This brief addresses only the federal free speech claim under the First Amendment.  All issues relating to the state constitution are discussed in Plaintiffs' summary judgment briefs and Plaintiffs' opposition to NCRL's motion to certify.

# II.   PLAINTIFFS HAVE STANDING TO SEEK INJUNCTIVE RELIEF

Plaintiffs include library users who want to use the facilities of their public library free of censorship and a publisher that wants to communicate with readers in the library free of censorship.  Plaintiffs plainly have standing to seek an injunction to resolve this controversy.

## A.   General Principles of Standing

NCRL would only be entitled to judgment if it could prove that all four Plaintiffs lack standing.  The "presence of one party with standing assures that controversy before [the] Court is justiciable."  <u>Dep't of Commerce v. U.S. House of Representatives</u>, 525 U.S. 316, 330 (1999) (internal citation omitted).  <u>See also</u> <u>Bowsher v. Synar</u>, 478 U.S. 714, 721 (1986).  NCRL raises

---

[1] Plaintiffs will use the following abbreviations to refer to briefs:  PSJ means Plaintiffs' Memorandum in Support of Summary Judgment (Docket #40, filed February 4, 2008).  DSJ means Defendant's Motion for Summary Judgment (Docket #28, filed February 4, 2008).  DOPSJ means Defendant's Opposition to Plaintiffs' Motion for Summary Judgment (Docket #48, filed February 15, 2008).

PLAINTIFFS' OPPOSITION TO NCRL'S MOTION
FOR SUMMARY JUDGMENT -- 1

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington  98104-1799
(206) 624-2184

no objection to Plaintiff Charles Heinlen's standing. DSJ at 11-14. Thus, even if there were a valid basis to challenge the other Plaintiffs' standing (which there is not for the reasons explained below), the Court would still need to reach the merits.

Standing hinges on the presence of "injury that could be redressed if the requested relief is granted." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). "Injury in fact" exists where there is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Nelson v. National Aeronautics and Space Administration, 512 F.3d 1134, 1142 (9th Cir. 2008) (internal citations and punctuation omitted). Plaintiffs' concerns are unquestionably concrete and particularized, as they have identified precisely which conduct is causing the constitutional injury (NCRL's refusal to disable its Internet filter at the request of adults) and the type of injunction that will remedy that injury (disabling of the filter at the request of adults).

NCRL's standing argument focusses instead on whether past injury has been shown. Plaintiffs have suffered past injury (as explained below), but NCRL's argument ignores that present injury and imminent future injury are grounds for standing even if a past constitutional injury has not been proven. "The requirements for the issuance of a permanent injunction are the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law." Easyriders Freedom F.I.G.H.T. v. Hannigan, 92 F.3d 1486, 1495 (9th Cir. 1996) (citation omitted). Accord Idaho Watersheds Project v. Hahn, 307 F.3d 815, 833 (9th Cir. 2002). The justiciability of imminent future injury is what allows for pre-enforcement facial challenges to new statutes, as occurred in United States v. American Library Ass'n, 539 U.S. 194 (2003) ("ALA") and Ashcroft v. Free Speech Coalition, 535 U.S. 234 (2002). Thus, the key is whether Plaintiffs will likely suffer constitutional injury the next time they visit the library. NCRL's filtering policy guarantees that they will. This form of injury, of course, cannot be remedied by

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington 98104-1799
(206) 624-2184

money damages, because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns 427 U.S. 347, 374 (1976).

**B.      Each Plaintiff Faces Actual And Imminent Constitutional Injury**

**1.      The Plaintiff Library Patrons Face Unconstitutional Restrictions On Their Freedom To Read**

NCRL argues that plaintiffs Cherrington and Bradburn lack standing because they could not recite from memory the URL's of each Web site that NCRL's filter prevented them from viewing.  DSJ at 13.  This level of precision simply is not legally required.  Both plaintiffs described the subject matter of the material that they sought to access, and have provided enough evidence to substantiate the fact that NCRL interfered with their lawful and constitutionally protected efforts to obtain information via the Internet.  Bradburn was blocked from Web sites about teen smoking.  PCSF ¶ 42.[2]  Cherrington was prevented from accessing the Web sites of various art galleries, and described the blocking screen generated by the filter.  PCSF ¶ 45.  The head librarian on duty in the Twisp library told Cherrington that NCRL's Internet filter was the cause.  PCSF ¶¶ 45, 46.  NCRL continues to this day to block Web sites featuring artistic nudity. DSF ¶ 54; PCSF ¶ 11.  In addition, Cherrington identified YouTube by name.  PCSF ¶ 45.

NCRL does not attempt the same argument with regard to Plaintiff Charles Heinlen, since it would be sure to fail.  In interrogatory answers, Heinlen listed 166 specific Web sites that had been blocked by NCRL's filter.  PSF ¶¶ 11-14.  As recently as February 23, 2008 he was prevented from viewing certain Web sites that he attempted to view and would like to view

_____

[2] Plaintiffs will use the following abbreviations to refer to the various statements of fact submitted pursuant to Local Rule 56.1:  PSF means Plaintiffs' Statement of Facts (Docket #41, filed February 4, 2008).  DSF means Defendants' Statement of Facts (Docket #29, filed February 4, 2008).  DCSF means Defendants' Counter-Statement of Facts (Docket #49, filed February 15, 2008).  PCSF means Plaintiffs' Counter-Statement of Facts (filed February 25, 2008).

PLAINTIFFS' OPPOSITION TO NCRL'S MOTION
FOR SUMMARY JUDGMENT -- 3

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington  98104-1799
(206) 624-2184

in the future.  PCSF ¶ 11.  NCRL asserts that "[t]he sites Heinlen claims were blocked are no longer blocked."  DSJ at 14.  With the sole exception of MySpace, see Marney Decl. at ¶ 56, NCRL has adduced no evidence whatsoever to support that assertion, so it cannot be accepted as fact.  Even if NCRL has unblocked some previously-blocked sites, that would not affect standing (is there "injury in fact") but instead deals with mootness (is the injury still redressable).  The argument is unpersuasive as to Bradburn and Cherrington (for whom NCRL describes it as an objection to standing) and as to Heinlen (for whom NCRL describes it as an objection on the merits).  "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982).  Otherwise, "the courts would be compelled to leave the defendant … free to return to his old ways."  United States v. Concentrated Phosphate Export Assoc., 393 U.S. 199, 203 (1968) (internal quotation marks omitted).

Judge Brinkema considered and rejected the identical argument in Mainstream Loudoun v. Bd. of Trust. of Loudoun County Library, 24 F. Supp. 2d 552, 559 (E.D. Va. 1998) ("Loudoun II"), finding that the plaintiffs in that case had standing and the case was not moot simply because particular blocking decisions had been reversed.  The library "failed to carry its burden of demonstrating that the wrong will not be repeated."  Id. at 559.  Given that NCRL continues to filter Web content and block specific Web sites (like the personals section of Craigslist) and entire categories of sites consisting primarily – if not exclusively – of protected speech, it is not merely likely but inevitable that the harm Plaintiffs have complained of will be repeated.

Finally, Plaintiffs must rebut NCRL's inflammatory suggestion that Plaintiff Heinlen wishes to use library computers to view pornography or obscenity.  DSJ at 14.  To the contrary,

PLAINTIFFS' OPPOSITION TO NCRL'S MOTION
FOR SUMMARY JUDGMENT -- 4

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington  98104-1799
(206) 624-2184

he testified at deposition, "I'm trying to lawfully surf the Net on a library terminal….  I'm not looking for any X-rated sites or anything."  PCSF ¶ 52.  In his view, if any patron were to view obscenity or perform illegal acts using library computers, NCRL would be "well within [its] rights to get the police right across the street and deal with it accordingly."  Id.

### 2. The Plaintiff Publisher Faces Unconstitutional Restrictions On Its Freedom To Communicate With Its Willing Audience

Contrary to NCRL's contention, Plaintiffs can establish that the Web site for the Second Amendment Foundation publication "Women & Guns" was blocked by NCRL's Internet filter, since the filter denied Mr. Heinlen access to the site in November 2006.  PCSF ¶ 39.  Even if the site was unblocked on a later date when NCRL tested it, SAF still has standing because NCRL offers no assurance that the site will not be blocked in the future absent an injunction.  PCSF ¶ 40.  An undisputed declaration that a site was blocked on a given date (which exists here) establishes standing, even if there is evidence that the site was unblocked on a different date. See Loudoun II, 24 F.Supp. at 558.

### 3. Plaintiffs Have Overbreadth Standing Where Others Are Harmed In Similar Ways By NCRL's Filtering Policies

In a First Amendment case alleging overbreadth, the rules of standing are relaxed.  "The 'overbreadth' doctrine, which is a departure from traditional rules of standing, permits a defendant to make a facial challenge to an overly broad statute restricting speech, even if he himself has engaged in speech that could be regulated under a more narrowly drawn statute." Alexander v. United States, 509 U.S. 544, 555 (1993).  See Get Outdoors II, LLC v. City of San Diego, 506 F.3d 886, 890-94 (9th Cir. 2007).  Because Plaintiffs object to the overbreadth of NCRL's filtering, they are allowed to argue both their own injuries and the injures of "others not

PLAINTIFFS' OPPOSITION TO NCRL'S MOTION
FOR SUMMARY JUDGMENT -- 5

**AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON FOUNDATION**
705 Second Avenue, Suite 300
Seattle, Washington  98104-1799
(206) 624-2184

before the court." Id. at 891, quoting Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973). The record shows that plaintiffs' experiences are not unique.

In the fall of 2007, NCRL installed a mechanism for patrons who encounter blocked sites to immediately send a complaint or an unblocking request to library staff. PCSF ¶ 13. This correspondence, summarized at PCSF Ex. FFF, reveals NCRL's filtering policy in action. Between October 1, 2007 and February 20, 2008, library users sent 90 requests for unblocking, of which only 12 were granted. Id. A local artist was blocked from viewing www.artbyjohndan.com, his own site that featured his "completely non-offensive, mostly abstract art." Id. A family was blocked from seeing its own web site hosted by www.ourfamily-web.com. Id. An unemployed patron researching job opportunities at the Northern Quest Casino was blocked from the Kalispel tribe's web site under the "Gambling" category, even though that site did not itself allow any online gambling. Id. A patron who wished to have access to the web site www.animeinsider.com wrote:

> This is not a porn site. It is a website dedicated to Anime Insider Magazine. The focus of this site is expanded coverage of the magazine, so that a cost effective magazine is available to fans of Japanimation. I am 61 years old and not a participant in porn or so-called 'adult' media.

Id. NCRL refused to allow the patron to view the web site because one of the links found there led to a category called "Animexxx," which in turn led to sites the library considered pornographic. Instead of simply blocking access to the allegedly pornographic sites that were the subjects of the links, the library stated: "While this site may offer access to Anime Insider magazine, part of the site appears to include pornography. With that in mind, we plan to continue to block access to this site." Id. NCRL also flatly rejected a request to disable the filter. Id. Overbreadth standing helps ensure that these injuries may be rectified even if there is some technical defect in Plaintiffs' individual standing.

PLAINTIFFS' OPPOSITION TO NCRL'S MOTION
FOR SUMMARY JUDGMENT -- 6

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington 98104-1799
(206) 624-2184

## III.    NCRL'S FILTERING POLICY IS OVERBROAD

"The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process."  <u>Ashcroft v. Free Speech Coalition</u>, 535 U.S. 234, 237 (2002).  Whether a governmental policy restricts a "substantial amount" of constitutionally protected communication is a question of law that may be determined on summary judgment.  <u>Id.</u> at 256 (deciding overbreadth on summary judgment); <u>Board of Airport Commissioners of City of Los Angeles v. Jews for Jesus, Inc.</u>, 482 U.S. 569, 572 (1987) (same).  NCRL does not genuinely dispute the volume of Web sites that it prevents its patrons from viewing.  Instead, it argues that the amount of material it censors is not substantial, and hence constitutionally tolerable.  This Court should find otherwise.

**A.    NCRL's Stated Purpose Is To Prevent All Patrons -- Including Adults -- From Viewing Material It Deems Inappropriate For Children**

There is no dispute that NCRL's filtering policy is driven by a conscious governmental policy to ensure that no one – including adults – will have access to certain Web sites because the library believes they are not fit for children.  PSF at ¶¶ 50, 51; DSJ at 1-17.  NCRL will only allow a blocked web site to be accessed if it is willing for minors to view that site.  PSF 43-44.  This approach suffers from the same fatal flaw as the Michigan statute that banned all literature that could have "a potentially deleterious influence upon youth."  <u>Butler v. Michigan</u>, 352 U.S. 380, 383 (1957).  As the Supreme Court remarked about that vastly overinclusive speech restriction, "[s]urely, this is to burn the house to roast the pig."  <u>Id</u>.

**B.    NCRL Filters According to Categories That Encompass Protected Speech**

If the FortiGuard filtering categories are taken at face value, they plainly extend to constitutionally protected material that is not obscene, is not child pornography, and is not "harmful to minors" as defined in CIPA.  Many of these categories were discussed in Plaintiffs'

PLAINTIFFS' OPPOSITION TO NCRL'S MOTION
FOR SUMMARY JUDGMENT -- 7

summary judgment motion. PSJ at 11-13. An equally problematic category is "Nudity and Risque," defined as "Mature content sites (18+ or older) that depict the human body in full or partial nudity <u>without the intent to sexually arouse</u>." DSF ¶ 55 (emphasis added). This definition sweeps in valuable speech ranging from a photograph of the ceiling of the Sistine Chapel to an anatomical chart in a medical textbook. The filter's actual functioning belies any argument that NCRL blocks access only to hard-core pornography. The filter blocks fine art that happens to feature nudity – including, for example, www.artenuda.com/paintings2.asp (part of a site dedicated to "Renaissance, Baroque, Rococo, Neo-Classical masterpieces of fine art"), www.mapplethorpe.org/index.html (the Web site of the Robert Mapplethorpe Foundation), fineartnude.com/webring (a site dedicated to artistic photographs of nudes). PCSF ¶ 11. This culturally valuable expression is constitutionally protected, and there is no justification for prohibiting adult library patrons from viewing it.

Other categories that NCRL seeks to block raise similar problems. For example, NCRL blocks <u>all</u> image search tools because "[i]f such categories were not blocked, a patron could circumvent the filter by simply entering terms associated with obscene content." Even if this were true, NCRL's approach throws out the baby with the bathwater. The record reflects that a large number of NCRL patrons are aggrieved by the decision to bar image search web sites that they sought to use for entirely innocent purposes including scrapbooking, quilting, school reports, college homework, or to search for Disney characters or photos from the D-Day invasion at Normandy. PCSF ¶ 13 & Exs. EEE and FFF. As one library user wrote:

> Not sure I understand why [Google image search] is blocked. People that want to find pictures of 'inappropriate' things can find them without the image search. If they are motivated to do so, they will. Kind of like every other illegal activity. Please don't make life more difficult for the 99.5% of people using the library resources in an acceptable manner (for instance, using the image search to study for anatomy and physiology).

PLAINTIFFS' OPPOSITION TO NCRL'S MOTION
FOR SUMMARY JUDGMENT -- 8

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington 98104-1799
(206) 624-2184

Id.  The library rejected all of these unblocking requests.  In a similar vein, NCRL blocks all sites about gambling, whether or not they facilitate illegal transactions.  PSF ¶ 88.  Given the proliferation of state lotteries and surge in popularity of televised poker, there is likely to be substantial interest in lawful information about gambling.

**C.     The Technology Used For Filtering Inevitably Results In Overblocking**

**1.     The FortiGuard Filter Overblocks**

NCRL acknowledges in its Opening Brief the inevitability of underblocking (failure to block sites matching the category description) and overblocking (blocking sites that do not match the category description).  DSJ at 19.  NCRL contends that overblocking is not a substantial problem, but it is an independent source of overbreadth.

Plaintiffs' expert Bennett Haselton established that at any given time, FortiGuard will block approximately 80,000 entirely innocent web sites as "Pornography" and "Adult Material."  The number of overblocked sites would be even larger if Haselton had tested for other categories blocked by NCRL, including "Nudity and Risque", "Gambling", "Image Search", and so on.  NCRL's expert Paul Resnick reported a similar volume of overblocking.  PSF ¶ 101-11.  NCRL does not genuinely dispute the sheer magnitude of sites wrongly blocked.  Instead, it argues that it is inconsequential collateral damage.  For this argument, it relies chiefly on Dr. Resnick's conclusion that during the week of August 23-29, 2007, NCRL patrons made requests to see only 20 Web sites that were blocked in error.  DSJ at 19.  NCRL's argument is not well-taken.

When considering overblocking, the salient question is the potential for interference with protected speech.  For example, Schad v. Borough of Mount Ephraim, 452 U.S. 61 (1981), involved a zoning ordinance that barred all "live entertainment" from the city limits.  The Supreme Court found this to be overbroad without requiring the plaintiff to provide evidence that there was any particular level of demand for live entertainment in the town.  The ordinance was

PLAINTIFFS' OPPOSITION TO NCRL'S MOTION
FOR SUMMARY JUDGMENT -- 9

overbroad not because it eliminated a volume of communication for which there was proven past demand, but because it eliminated communication that could be substantial. Here, the question is not how much injury NCRL's filtering policy inflicted on library patrons in the past, but how much it may cause in the future. The fact that no NCRL patron happened to request a particular wrongly blocked site in the past does not reduce other patrons' right to see it today or tomorrow.

Even if overbreadth were to be judged solely on past overblocking experienced by NCRL patrons, Plaintiffs submit that 20 Web sites per week would result in approximately 1,040 instances of overblocking per year, which is by itself a substantial imposition on speech in its own right. But as it happens, NCRL's assertion about 20 overblocked sites in one week understates Dr. Resnick's actual findings. His full report indicates that 20 entire web sites (top-level domain names) were wrongly blocked, but an even larger number of individual web pages had graphics or images wrongly blocked, including 24 large images and 744 smaller "helper" images. PCSF ¶ 35. Thus, in the test week, NCRL patrons requested but were not allowed to view over 788 wholly innocuous URLs. Over the course of a year, this would amount to 40,976 wrongful blockages big and small.

These troubling numbers are an understatement of the full problem for several important additional reasons. First, Dr. Resnick's task was to determine how often FortiGuard wrongly identified sites as falling within NCRL's chosen categories, whether or not the categories are themselves suspect. This means that if the "Nudity and Risque" category blocks 100 attempts by NCRL viewers to access Renaissance paintings by Titian or Michaelangelo, NCRL's method would not count them as errors. Second, Dr. Resnick did not attempt to quantify the number of cites wrongly blocked as Malware, Spyware, Hacking, and Phishing. The record reflects that in the past few months both the Malware and Hacking web sites have generated errors about which NCRL patrons have complained. PCSF ¶ 13 & Exs. EEE & FFF. Third, as Dr. Resnick himself

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington 98104-1799
(206) 624-2184

acknowledged, his sample is likely affected by the fact that NCRL patrons know that the library filters stringently, and hence they may have engaged in self-censorship that reduces the total number of requests for sites that would have been wrongly blocked in the absence of self-censorship. PCSF ¶ 34.

### 2. Site-By-Site Unblocking Does Not Cure the Constitutional Problem

NCRL's unblocking procedures do not save its policy of refusing to disable its Internet filter at the request of adults. First, NCRL does not commit to unblocking individual Web sites at the request of adults – it only unblocks Web sites that it considers fit for viewing by all patrons, including children. FortiGuard allows users to disable the filter at a single terminal for a designated length of time, PCSF ¶ 20, and this is the method envisioned by CIPA, but NCRL will not do it. Second, there is no procedure for the <u>prompt</u> unblocking of erroneously blocked Web sites. Branch librarians are not authorized to unblock Web sites at the request of patrons. Rather, the decision whether to unblock must be made at headquarters, which takes hours or days. PCSF ¶ 13. For a rural library where patrons may have to travel significant distances to reach the library, the absence of a prompt response is significant.

### IV. NCRL IMPOSES A CONTENT-BASED SPEECH RESTRICTION THAT FAILS HEIGHTENED SCRUTINY

#### A. NCRL Filters Based on Content

NCRL acknowledges, as it must, that its filter blocks web sites based on their content. <u>See</u> DSJ at 15 ("Internet filtering is a form of content selection"). A government entity may not interfere with communication because of its content unless it demonstrates that the decision serves compelling interests in a narrowly tailored way. <u>See</u> PSJ at 13-14; <u>Loudoun II</u>, 24 F.Supp.2d at 564-65. NCRL cannot satisfy either part of that test.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington 98104-1799
(206) 624-2184

**B.** **NCRL's Proffered Justifications for Continuous Filtering for Adults Are Inadequate**

NCRL's reasons for its actions are not compelling (or even substantial).

**1.** **Complying With CIPA**

NCRL's filtering system deviates from CIPA in many ways. PSJ at 2 n.1. Moreover, CIPA authorizes libraries to disable the filter, and it is this ability to disable that makes the statute constitutional. <u>United States v. American Library Ass'n</u>, 539 U.S. 194 (2003) ("<u>ALA</u>"). <u>See generally</u>, PSJ at 16-18.

**2.** **Promoting NCRL's Mission and Collection Development Policy**

NCRL assertion that its filtering practices are "consistent" with its mission and Collection Development Policy, DSJ at 7, 11, 14-15, 16, is supported only by a conclusory assertion in a declaration. DSF ¶ 60; Marney Decl. at ¶ 32. "Uncorroborated and self-serving declarations … alone do not create any genuine issues of material fact." <u>DuBois v. Association of Apartment Owners of 2987 Kalakaua</u>, 453 F.3d 1175, 1180 (9th Cir. 2006). <u>See also</u> <u>Lujan v. Nat'l Wildlife Federation</u>, 497 U.S. 871, 888 (1990) (purpose of Rule 56(e) "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit"). In fact, NCRL's stated mission "to promote reading and lifelong learning" is not well served by preventing adults from reading tens of thousands of Web sites. If anything, a filtering policy that sharply reduces the availability of reading matter, while creating frustration and ill will on the part of library patrons, is certain to discourage reading and lifelong learning.

The Collection Development Policy, Marney Decl. Ex. C, nowhere authorizes librarians to bar adult patrons from seeing wide swaths of lawful material that is already bought and paid for. To the contrary, the Policy emphasizes that "The Board of Trustees believes that reading, listening to, and viewing library materials are individual, private matters. While individuals are

PLAINTIFFS' OPPOSITION TO NCRL'S MOTION
FOR SUMMARY JUDGMENT -- 12

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington 98104-1799
(206) 624-2184

free to select or to reject materials for themselves, they cannot restrict the freedom of others to read, view, or inquire." The Collection Development Policy also recognizes that "Not all materials [in the collection] will be suitable for all members of the library." The Policy states that NCRL "shall be responsive to public suggestion of titles and subjects to be included in the library collection." The past few months of unblocking requests show that NCRL's filtering policy actually impedes the library's ability to respond to public suggestions. PCSF ¶ 13.

### 3. Ensuring Network Security

Plaintiffs agree that NCRL may take appropriate steps to protect the integrity of its network (<u>see</u> PSJ at 3 n.2). However, NCRL has not been demonstrated how the categories chosen will serve that goal. In fact, the best approach to network security is appropriate firewall and malware screening software, and not measures like the "Spam URL" category that bar viewers from accessing any web site that is mentioned in a spam e-mail (most of which would pose no security risk at all. <u>See</u> Declaration of Bennett Haselton.

### 4. Working Cooperatively With Schools

Disabling the filter at the request of adults would not prevent NCRL from working cooperatively with schools. Nothing in Plaintiffs' requested relief would affect NCRL's authority to require filters when its computers are used by minors.

### 5. Minimizing Confrontations Between Patrons and Staff

Where heightened scrutiny is involved, "the government must present more than anecdote and supposition" to support its claim that an actual problem exists requiring the suppression of speech. ); <u>United States v. Playboy Entm't Group, Inc.</u>, 529 U.S. 803, 822-23 (2000). NCRL's arguments about confrontations in the library are quite literally based upon

**AMERICAN CIVIL LIBERTIES UNION**
**OF WASHINGTON FOUNDATION**
705 Second Avenue, Suite 300
Seattle, Washington 98104-1799
(206) 624-2184

anecdote.  Moreover, the anecdotes are inadmissible hearsay.[3]  Even if considered, they are not legally persuasive.

The main thrust of most of these anecdotes is that library staff disliked viewing what some library patrons were viewing.  But "speech does not lose its protected character … simply because it may embarrass others."  <u>NAACP v. Claiborne Hardware Corp.</u>, 458 U.S. 886, 910-911 (1982).  Librarians, as much as – and indeed, more than – other citizens, are expected to know that "the burden normally falls upon the viewer to 'avoid further bombardment of his sensibilities simply by averting his eyes'."  <u>Erznoznik v. City of Jacksonville</u>, 422 U.S. 205, 210-11 (1975), quoting <u>Cohen v. California</u>, 403 U.S. 15, 21 (1971) (internal punctuation omitted).  Thus, even if some employees are willing or eager for NCRL to suppress substantial amounts of protected expression in order to avoid exposure to a tiny amount of unprotected expression, this would not justify the suppression.

In some hearsay anecdotes, library staff supposedly felt uncomfortable asking patrons to stop viewing inappropriate material.  <u>See</u> DSF at ¶ 90-98.  NCRL labels these events as "confrontations," but the actual interactions with the patrons are not described (only the subjective feelings of the library staff).  There is no evidence that these library users refused to conform their behavior to appropriate standards when instructed by a librarian.  In fact, there is no evidence that these alleged "confrontations" consisted of anything more than a polite exchange of words.  Nor is there any evidence that a child under the age of ever viewed

---

[3] The only source of these anecdotes is the hearsay repeated in the Declaration of Dan Howard. DSF at ¶ 90-98.  The Court should disregard paragraphs 8-17 of Mr. Howard's declaration.  Mr. Howard himself has never witnessed patrons viewing pornography in the library.  <u>Compare</u> Howard Decl. at ¶¶ 7-16 <u>with</u> Howard Dep. at 39-41 (PCSF at ¶ 29-32).  NCRL did not disclose as witnesses any of the library staff mentioned in Mr. Howard's declaration, so under Fed.R.Civ.P. 37(c)(1), these witnesses may not be called to testify at trial.  As a result, the declaration is not an affidavit "made on personal knowledge" that sets forth "facts that would be admissible in evidence."  Fed.R.Civ.P. 56(e).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington  98104-1799
(206) 624-2184

pornographic images on a library computer due the actions of an adult library patron. PCSF at ¶ 29-32. Sometimes librarians must perform uncomfortable tasks, including asking boisterous patrons to lower their voices, homeless patrons to shower, or underage patrons to stop giggling over gynecology texts. See Loudoun II, 24 F.Supp.2d at 567. Labeling these events "confrontations" does not justify content-based censorship.

Finally, there is no evidence that the relief requested would lead to significantly more interactions of this sort. If the hearsay reports are believed, NCRL's existing filtering system does not successfully banish all obscene images from NCRL's computers. See Marney Dep. at 51, 61-63, 140; Howard Decl. ¶ 7; Howard Dep. at 39-42. The existing sporadic level of alleged incidents will continue regardless. Not all adult users would ask for unfiltered Internet access if it were available, especially if the NCRL service area is as straight-laced as NCRL claims. PCSF ¶ 57. There is also no reason to believe that all requests for disabling would be made in order to view obscenity. Given the stigma involved, it is unreasonable to presume that many adults will view obscene in small-town public libraries where they might be seen by their neighbors.

### 6. Protecting Children From a "Dangerous Environment"

NCRL speculates that "unfiltered adult internet use may lead to a dangerous environment for children." DSJ at 18-19. NCRL's only support for this assertion is a newspaper article discussing online pornography in a Dallas, Texas public library. "Newspaper articles have been held inadmissible hearsay as to their content." Larez v. City of Los Angeles, 946 F.2d 630, 642 (9th Cir. 1991). Even if considered, there is no mention anywhere in the newspaper article that Dallas library patrons' viewing of pornographic images online created a "dangerous environment" for anyone – children or adults. Also, according to the article, Internet access is

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington  98104-1799
(206) 624-2184

always unfiltered at the Dallas library, whereas the only relief Plaintiffs are seeking in this case is disabling of NCRL's Internet filter at the request of adults.

### 7. Preventing Illegal Conduct

NCRL seeks to prevent illegal activity (for example, online gambling) on NCRL computers, DSJ at 11, 16, which is a legitimate objective. However, NCRL cannot block vast amounts of protected speech as the means to deter illegality. "The Government may not suppress lawful speech as the means to suppress unlawful speech." Ashcroft v. Free Speech Coalition, 535 U.S. 234, 255 (2002). See also Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973) ("the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted…." ).

### 8. Avoiding Liability for Employment Discrimination

Finally, NCRL implies that the requested relief would subject it to liability for employment discrimination. DSJ at 17, 18. A claim of sex discrimination based upon a hostile work environment requires proof of, among other things, an employer's conduct that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Craig v. M & O Agencies, Inc., 496 F.3d 1047, 1055 (9th Cir. 2007). The conditions of employment at a public library include a willingness to accept that patrons may read things that the staff would not appreciate. If NCRL's reasoning were accepted, Jewish employees could sue a library for allowing patrons to read Hitler's *Mein Kampf*, or African-American employees could sue a library that stocked copies of works alleged to be racist. Such claims would of course fail. See Monteiro v. Tempe Union High School District, 158 F.3d 1022, 1029-30 (9th Cir 1998) (public school did not discriminate by assigning *Huckleberry Finn* as required reading, even though book frequently uses the word "nigger"). Indeed, if NCRL's argument were correct it would probably need to filter for an entire range of

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington 98104-1799
(206) 624-2184

Internet expression that it currently does not, because a claim for hostile environment is not limited to sex discrimination.  See Monteiro, 158 F.3d at 1033 (outlining claim for racially hostile environment).

No court has ever found that a public library could be sued for the absence of filters. Loudoun II, a case indistinguishable from this one, held the opposite.  A major defense of the Loudoun County library was that its overbroad internet filtering policy was necessary to prevent a hostile work environment.  Judge Brinkema rejected that claim because, as here, filtering is not necessary to avoid a hostile work environment.  24 F.Supp.2d at 565-66.  Other types of liability were at issue in Kathleen R. v. City of Livermore, 104 Cal.Rptr.2d 772 (Cal. App. 2001), where the plaintiff wanted her local library to install filters to ensure that her 12-year-old son did not see the adult material viewed by adult patrons.  The California Court of Appeals rejected all of plaintiff's theories, concluding that "a city is not subject to suit for damages or an injunction for offering unrestricted access to the Internet through computers at a public library."  Id. at 775. Much of the immunity results from 47 U.S.C. § 230(c)(1), which prevents any lawsuit against a "provider" of interactive computer services (including a library) for content written by third parties.  Id. at 776-781.

NCRL relies upon inadmissible hearsay from newspaper articles about a hostile work environment lawsuit in Minneapolis.  DSJ at 18 n.11.  The actual facts of that case support Plaintiffs.  In Adamson v. Minneapolis Public Library, No. 03-02521 (D. Minn. March 24, 2003), librarians challenged a policy that expressly allowed patrons to view obscenity on library computers, and instructed library staff not to intervene even if patrons invited minors to view obscenity with them.   PCSF ¶ 56, Ex. HHH.  This alarming situation is distinguishable from the relief requested by Plaintiffs in this case, which would not require NCRL to tolerate obscenity or substantial disruption of library facilities.  Adamson settled out of court and established no

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington  98104-1799
(206) 624-2184

precedent. PCSF ¶ 56, Ex. III. Significantly, the Minneapolis library revised its internet use policy after settling <u>Adamson</u>, and ***the new policy is precisely what Plaintiffs seek here***:

> The Children's Internet Protection Act (CIPA), passed Congress in 2000 and upheld by the Supreme Court in 2003, requires libraries receiving certain types of federal funding to equip Internet-access computers with a technology protection measure that blocks or filters visual depictions that are obscene, contain child pornography or are harmful to minors. In compliance with CIPA, the [Minneapolis Public] Library Board authorized installation of filtering software designed to prevent access to obscenity, child pornography and materials harmful to minors. In accordance with the law, persons aged 17 years or older may request to have the filters disabled for any lawful purpose that meets the Minneapolis Public Library Internet Policy and Guidelines AND THE FILTER WILL BE DISABLED.
>
> … Illegal use of the Internet is prohibited. Library users may not use the Library's Internet access to view, print, distribute, display, send or receive images, text or graphics of obscene material or material that violates laws relating to child pornography. Library users may not disseminate, exhibit or display to minors materials that are harmful to minors.

PSF ¶ 56, Ex. JJJ. (capital letters in original). The requested injunction would result in the same practices that the Minneapolis library believes are ample protection against liability.

**C.     NCRL's Filtering Policy Is Not Narrowly Tailored**

> **1.     An Overbroad Filtering Regime Is By Definition Not Narrowly Tailored**

A restriction that is overbroad is, by definition, not narrowly tailored. <u>See</u>, <u>e.g.</u>, <u>Bd. of Trust. of the State University of New York v. Fox</u>, 492 U.S. 469, 482 (1989) ("Quite obviously, the rule … that a statute … must be 'narrowly tailored' … prevents a statute from being overbroad"). The overbreadth arguments set forth above are therefore relevant here.

> **2.     Less Restrictive Alternatives Exist**

A government policy that "effectively suppresses a large amount of speech adults have a constitutional right to receive and to address to one another … is unacceptable if less restrictive

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington 98104-1799
(206) 624-2184

alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to achieve." <u>ACLU v. Reno</u>, 521 U.S. 844, 874 (1997). In such a case, "the burden is on the government to prove that the proposed alternatives will not be as effective as the challenged statute." <u>Ashcroft v. ACLU</u>, 542 U.S. 656, 665 (2004). A wide range of less-restrictive library alternatives have been endorsed by the Courts and adopted by comparable small-city and rural libraries. PSJ at 5. NCRL asserts without explanation that none of the methods that work successfully for others will work for it. DOPSJ at 6-7. However, the adequacy of available alternatives is a question of law for the court, and when the government adopts a broad content-based restriction on internet speech, there is "an especially heavy burden on the Government to explain why a less restrictive provision would not be as effective." <u>Reno</u>, 521 U.S. at 879. "A court should not assume a plausible, less restrictive alternative would be ineffective." <u>Playboy</u>, 529 U.S. at 824.

It is also important to compare the proposed alternatives to the existing method. NCRL acknowledges that that even with filters installed, patrons manage to view content that the library deems inappropriate for children. <u>See</u> Marney Dep. at 51, 61-63, 140; Howard Decl. ¶ 7; Howard Dep. at 39-42. If NCRL's goal is to prevent bystanders from seeing unwanted matter, it would be more efficacious for the library to concentrate on privacy screening and line-of-sight techniques than continued attempts to fortify an inherently imperfect electronic Maginot Line.

## V. THE WORDING OF NCRL'S WRITTEN INTERNET USE POLICY IS NOT AT ISSUE

The portions of NCRL's brief defending its written Internet Use Policy, DSJ at 6-9, misapprehend Plaintiffs' challenge. This lawsuit is not about the formal wording of the Internet Use Policy; it is about whether the library can refuse to disable its overbroad Internet filter upon the request of an adult patron. The cause of action created by 42 U.S.C. § 1983 allows plaintiffs

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington 98104-1799
(206) 624-2184

to challenge constitutional violations caused not just by "statute, ordinance, [or] regulation" but also caused by "custom" or "usage." This encompasses unwritten policies as well as those committed to paper. <u>Kirkpatrick v. City of Los Angeles</u>, 803 F.2d 485 (9th Cir. 1986) (adjudicating § 1983 challenge to unwritten policy). It is undisputed here that, in Defendants' words, "NCRL will not disable the filter upon the request of an adult patron." DSF ¶ 23. This is the policy that plaintiffs challenge.

## VI. CONCLUSION

For the foregoing reasons, NCRL's Motion for Summary Judgment should be denied.

DATED this 25th day of February, 2008.

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION

By:    /s/ Aaron H. Caplan
Aaron H. Caplan, WSBA #22525
American Civil Liberties Union of Washington
Foundation
705 Second Avenue, Third Floor
Seattle, WA  98103
Tel. (206) 624-2184
Fax (206) 624-2190
caplan@aclu-wa.org

Duncan Manville, WSBA #30304
1629 2nd Avenue W.
Seattle, WA  98119
Tel. (206) 288-9330
Fax (206) 624-2190
duncan.manville@yahoo.com

PLAINTIFFS' OPPOSITION TO NCRL'S MOTION
FOR SUMMARY JUDGMENT -- 20

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington  98104-1799
(206) 624-2184

Catherine Crump, pro hac vice
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004
Tel. (212) 519-7806
ccrump@aclu.org

Counsel for Plaintiffs

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

PLAINTIFFS' OPPOSITION TO NCRL'S MOTION
FOR SUMMARY JUDGMENT -- 21

1
2

**CERTIFICATE OF SERVICE**

I hereby certify that on February 25, 2008, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the persons listed below:

Thomas D. Adams
Celeste Mountain Monroe
KARR TUTTLE CAMPBELL
1201 Third Avenue, Suite 2900
Seattle, WA 98101

Attorneys for Defendant

DATED this 25th day of February, 2008.

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION

By: /s/ Aaron H. Caplan
Aaron H. Caplan, WSBA #22525
American Civil Liberties Union of Washington
Foundation
705 Second Avenue, Third Floor
Seattle, WA 98103
Tel. (206) 624-2184
Fax (206) 624-2190
caplan@aclu-wa.org

PLAINTIFFS' OPPOSITION TO NCRL's MOTION
FOR SUMMARY JUDGMENT

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
705 Second Avenue, Suite 300
Seattle, Washington 98104-1799
(206) 624-2184