UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

SARAH BRADBURN, PEARL
CHERRINGTON, CHARLES HEINLEN,
and the SECOND AMENDMENT
FOUNDATION,

                    Plaintiffs,

        v.

NORTH CENTRAL REGIONAL LIBRARY
DISTRICT,

                    Defendant.

No. CV-06-327-EFS

**PLAINTIFFS' COUNTERSTATEMENT OF FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Sarah Bradburn, Pearl Cherrington, Charles Heinlen and the Second Amendment Foundation submit the following Counterstatement of Facts in Opposition to Defendant's Motion for Summary Judgment.

1.      To clarify Defendant's Fact #7:  NCRL's Board of Directors has delegated certain tasks to Dean Marney, Director of the North Central Regional Library District ("NCRL") – including determining what categories and classifications of Web sites should be blocked by NCRL's FortiGuard filter.  See Howard Dep. at 44:4-7, 50:9-17 (Ct. Rec. 41 at 220, 221); Walters Dep. at 18:20-22, 52:23-53:24 (Ct. Rec. 41 at 292, 297-98).

1     2.     Plaintiffs object to NCRL's assertion in its Fact #15 that it is "responsible" for

2 "working cooperatively with public schools in its territory."  NCRL cites no authority – legal

3 or otherwise – to support the assertion.

4     3.     With regard to Defendant's Fact #21:  Plaintiffs object that the Children's

5 Internet Protection Act ("CIPA") speaks for itself.  Moreover, the definition of "technology

6 protection measure" in CIPA is narrower than NCRL suggests.  CIPA § 1703(b)(1) states in

7 pertinent part: "The term 'technology protection measure' means a specific technology that

8 blocks or filters Internet access to visual depictions that are: (A) obscene, as that term is

9 defined in section 1460 of title 18, United States Code; (B) child pornography, as that term is

10 defined in section 2256 of title 18, United States Code; or (C) harmful to minors."  CIPA §

11 1703(b)(2) in turn defines "harmful to minors" to mean "any picture, image, graphic image

12 file, or other visual depiction that – (A) taken as a whole and with respect to minors, appeals

13 to a prurient interest in nudity, sex, or excretion; (B) depicts, describes, or represents, in a

14 patently offensive way with respect to what is suitable for minors, an actual or simulated

15 sexual act or sexual contact, actual or simulated normal or perverted sexual acts, or a lewd

16 exhibition of the genitals; and (C) taken as a whole, lacks serious literary, artistic, political, or

17 scientific value as to minors."  In sum, CIPA defines "technology protection measure" as a

18 technology that blocks or filters Internet access to "visual depictions" that are obscenity, child

19 pornography or harmful to minors.

20     4.     With regard to Defendant's Fact #22:  Plaintiffs object that CIPA speaks for

21 itself.  Two similar statutory provisions are at issue.  20 U.S.C. § 9134(b)(3) provides: "An

22 administrator, supervisor, or other authority may disable a technology protection measure

23 under paragraph (1) to enable access for bona fide research or other lawful purposes."  47

24 U.S.C. §254(h)(6)(D) reads: "An administrator, supervisor, or other person authorized by the

25 certifying authority under subparagraph (A)(i) may disable the technology protection measure

26 concerned, during use by an adult, to enable access for bona fide research or other lawful

purpose." The circumstances in which CIPA allows for disabling of a library Internet filter are thus quite broad: under CIPA, the filter may be disabled at the request of a library patron who wishes to use the Internet for any lawful purpose. Finally, although CIPA may not, on its face, require that library Internet filters be disabled at the request of adults, the First Amendment of the United States Constitution and Art. I, § 5 of the Washington State Constitution require such disabling.

5. Plaintiffs object to Defendant's Fact #23 – particularly the paragraph's preamble – as argumentative and unsupported by authority. In particular, NCRL cites no authority for its suggestion that it possesses "broad discretion to decide what material to provide to its patrons in fulfillment of its mission." Plaintiffs deny that NCRL possesses such "broad discretion" in the context of Internet filtering – and particularly with regard to whether NCRL's Internet filter must be disabled at the request of adults. Nor does NCRL cite any authority for its suggestion that full-time Internet filtering is necessary to "create a safe environment for its patrons and employees," or for its suggestion that its policy of never disabling its Internet filter at the request of adult patrons is consistent with its obligations under CIPA. Contrary to the implication in Defendant's Fact #23, CIPA does not require or permit NCRL to configure its Internet filter to block an enormous quantity of constitutionally-protected speech, and does not require or permit NCRL to deny requests by adults to have the filter disabled.

6. Contrary to Defendant's Fact #27:

NCRL's Director, Dean Marney, testified at deposition that NCRL first made the Internet available to its patrons in the late 1990s. See Marney Dep. at 39:11-15 (Ct. Rec. 41 at 237). Mr. Marney's deposition testimony was consistent with documents produced by NCRL in discovery showing that NCRL's Omak branch went online in November 1999, see Minutes of November 17, 1999 meeting of NCRL's Board of Directors, at NCRL 00296 (Ex. XX); and that NCRL's largest branch (in Wenatchee) went online in January 2000, see January 13,

2000 Director's Report, at NCRL 00301 (Ex. YY).  Mr. Marney's testimony was also consistent with a series of letters that he sent to Nancy Talner of the American Civil Liberties Union of Washington in 2000.  <u>See</u> Correspondence from Mr. Marney to Ms. Talner (Ex. CCC).

Mr. Marney also testified at deposition that public Internet access on NCRL's computers has been continuously filtered since NCRL first made the Internet available to its patrons in the late 1990s

Q. I see.  Do you recall when the NCRL first put it's Internet filter in place?

A. We've never had unfiltered access so –

Q. From –

A. – from the inception.

Q. Okay.  So the first day you went – went online –

A. Went online.

Q. – it was filtered?

A. That's my recollection.

Marney Dep. at 109:24-110:7 (Ex. RR); <u>see</u> <u>also</u> <u>id.</u> at 81:14-17, 82:23-25, 84:3-16 (Ct. Rec. 41 at 248); Dep. Ex. 3 (Ct. Rec. 41 at 302); Defendant's Discovery Responses, answer to Interrogatory No. 4 (Ct. Rec. 41 at 104-06).  Documents produced by NCRL in discovery corroborate this testimony.  Those documents show that on June 10, 1999 NCRL's Board of Directors approved an Internet Public Use Policy that provided for Internet filtering, and specifically instructed Mr. Marney to install a filtering system on all of NCRL's public access computers.  <u>See</u> Minutes of June 10, 1999 meeting of NCRL's Board of Directors, at NCRL 00277 (Ex. VV).  The documents further show that filtering software had been ordered and received by August 12, 1999.  <u>See</u> Minutes of August 12, 1999 meeting of NCRL's Board of Directors, at NCRL 00281 (Ex. WW).  The letters that Mr. Marney sent to Ms. Talner in 2000

further confirm that Internet access on NCRL's computers was filtered well before December 2000. See Ex. CCC.

7. Contrary to Defendant's Fact #28: Documents produced by NCRL in discovery indicate that the first filtering product that NCRL purchased was SurfWatch, not N2H2's SmartFilter, Bess Edition. See Minutes of May 11, 2000 meeting of NCRL's Board of Directors, at NCRL 00313 (Ex. ZZ). Mr. Marney's letters to Ms. Talner in 2000 confirm that NCRL's first filtering product was SurfWatch. See Ex. CCC. NCRL was using the N2H2 filtering product by January 11, 2001. See January 11, 2001 Director's Report, at NCRL 00334 (Exhibit AAA); Minutes of January 11, 2001 meeting of NCRL's Board of Directors, at NCRL 00332 (Exhibit BBB); Defendant's Discovery Responses, answer to Interrogatory No. 1 (Ct. Rec. 41 at 100-02); February 6, 2001 letter from Mr. Marney to Ms. Talner (Exhibit CCC).

8. Plaintiffs object to Defendant's Fact #29 on grounds of hearsay and lack of personal knowledge.

9. Contrary to Defendant's Fact #30: Although many of the specific incidents giving rise to the current litigation occurred while the Bess filter was in place, NCRL continued to block a substantial number of Web sites after implementing its current FortiGuard filter – including sites that Plaintiffs wished to access. See Cherrington Dep. at 33:16-34:8 (Ct. Rec. 41 at 182); Cherrington's Discovery Responses, answers to Interrogatory Nos. 5, 8, 9, 11, 12 (Ct. Rec. 41 at 60-63) (FortiGuard denied Plaintiff Pearl Cherrington access to YouTube); Heinlen Dep. at 22:25-24:10, 29:7-12, 31:7-14, 63:13-73:21 (Ct. Rec. 41 at 200, 202, 206-09); Heinlen's Discovery Responses, answers to Interrogatory Nos. 5, 11, 12 (Ct. Rec. 41 at 72-76, 79) (FortiGuard denied Plaintiff Charles Heinlen access to MySpace, various dating sites, images embedded in emails, and many other miscellaneous Web sites). NCRL has submitted no evidence showing that the majority of Web sites to which Mr. Heinlen was previously denied access have been unblocked.

10.     Plaintiffs object to Defendant's Fact #39 on the grounds that it constitutes hearsay, is so vague as to be meaningless, and improperly purports to state a legal conclusion. Additionally, no Exhibit F was attached to Dr. Resnick's declaration (nor, for that matter, was any Exhibit E attached to his declaration). And finally, the Fortinet witness whom NCRL's counsel deposed on January 17, 2008 testified that to the best of his knowledge, "there is no certification process for actual products with regards to CIPA." Deposition of Liam Chasteen ("Chasteen Dep.") at 37:3-5 (Ex. NN); see also id. at 35:25-37:16.

11.     To clarify Defendant's Fact #54: On February 23, 2008 Plaintiff Charles Heinlen visited NCRL's Omak branch to determine whether certain Web sites were blocked by NCRL's Internet filter. See Declaration of Charles Heinlen in Opposition to Defendant's Motion for Summary Judgment ("Heinlen Decl. in Opp.") at ¶ 3. He attempted to access the following Web sites, and confirmed that the FortiGuard filter currently blocks all of them under the category Nudity and Risque, except www.courting-disaster.com which is blocked under the category Adult Materials:

www.netnude.com
aanr.com
www.artenuda.com/paintings2.asp
gregfriedler.com
billbrandt.com
www.ryoung-art.com
www.courting-disaster.com
www.mapplethorpe.org/index.html
fineartnude.com/webring

Id. Copies of screen shots of the splash pages of the above-listed Web sites are attached hereto as Exhibit DDD. Mr. Heinlen also attempted to access the personals section of the Craigslist Web site, but NCRL's filter denied him access to that site as well. See Heinlen Decl. in Opp. at ¶ 3. Mr. Heinlen wishes to access that section of the Craigslist site in the future. Id.

12.     With regard to Defendant's Fact #55, the definitions listed in that paragraph contain several non-substantive typographical errors, and do not precisely match the definitions provided by Fortinet on its Web site and listed in the document attached as Exhibit C to Barbara Walters' declaration.

13.     Plaintiffs object to Defendant's Fact #59 because it is based on the declaration of Dean Marney, who has no personal knowledge of when Dan Howard (who responded to all the unblocking requests that NCRL received after October 1, 2007) actually answered the requests.  Moreover, contrary to, and by way of clarification of Defendant's Fact #59:

A review of documents recently produced by NCRL indicates that NCRL received 92 unblocking requests (including 90 automated requests) between October 1, 2007 and February 20, 2008.  (NCRL received 83 automated requests before it filed its Motion for Summary Judgment on February 4, 2008.)  Copies of those documents are attached hereto as Exhibit EEE.  The various requests and NCRL's responses to them are summarized in the spreadsheet that is attached hereto as Exhibit FFF.  Based on the documents in Exhibit EEE (and as summarized in Exhibit F):

- Of the 90 automated unblocking requests that NCRL received between October 1, 2007 and February 20, 2008, NCRL responded to 25 requests more than 24 hours after they were received (in some cases the delay stretched to more than three days).

- Of the remaining 65 requests, NCRL responded to 29 requests the next day.

- Of the remaining 36 requests, NCRL responded to 27 requests on the same day they were received (with two responses going out by mail), but in only eight instances did NCRL respond in less than an hour.

- It cannot be determined whether NCRL responded to the remaining 11 requests.

- NCRL has granted a patron's request to unblock a Web site on only 12 occasions since October 1, 2007.

- Web sites that have been blocked in error and about which NCRL patrons have specifically complained since October 1, 2007 include www.keyartpromotions.com, artbyjohndan.com (described by the requestor as "non-offensive, mostly abstract art"), www.pcthandbook.com (erroneously blocked as "Pornography"), www.firstthings1st.com

(described by the requestor as a nonprofit ministry but erroneously blocked as "Gambling"), and www.ourfamily-web.com (erroneously blocked as Malware).

- NCRL has refused to unblock numerous image search sites despite having received requests by library patrons to be allowed to view images:
    - for scrapbooking,
    - of Disney characters,
    - needed to study for anatomy and physiology,
    - to help in quilting,
    - needed to do homework for college,
    - relating to law enforcement,
    - of the Normandy beaches at the time of D-Day,
    - of singer Gerard Way, and
    - of Michael Jordan.

- NCRL has also refused requests by its patrons to unblock:
    - Chat sites (including sites like www.meebo.com that do not require users to download software);
    - www.animeinsider.com, not because the site had pornographic material on it, but merely because it had links to other sites that Dan Howard considered pornographic; and
    - www.happyhacker.org, because it included sections that appeared to give hacking tips. This despite the fact that the site bills itself as "The website computer criminals don't want you to read" and is focused primarily on techniques for defending computers against hackers. See Ex. DDD.

14.     Contrary to Defendant's Fact #60, NCRL's policy of refusing to disable its Internet filter at the request of adults is not consistent with its mission to promote reading and lifelong learning. NCRL's policy is guaranteed to prevent adults from reading and learning about topics that NCRL has placed off limits from all its patrons. Plaintiffs also deny that there is any connection between "NCRL's current filtering profile" and the safety of NCRL's library branches. NCRL has adduced no evidence of any such connection.

15.     Contrary to Defendant's Fact #61, NCRL's policy does not comply with CIPA. As Plaintiffs explained in footnote 1 to their Memorandum of Law in Support of Their Motion for Summary Judgment, NCRL's filtering policy conflicts with CIPA in numerous respects.

16.     Plaintiffs object to Defendant's Fact #62 on the grounds that CIPA speaks for itself, and that in testifying about what CIPA requires Mr. Marney (on whose testimony this paragraph is based) is impermissibly purporting to state a legal conclusion.

17.     Plaintiffs object to Defendant's Fact #63 on the ground that CIPA speaks for itself, and that in testifying about what CIPA requires Mr. Marney (on whose testimony this paragraph is based) is impermissibly purporting to state a legal conclusion.  Plaintiffs further object that this paragraph does not accurately summarize the relevant portions of CIPA.

18.     Plaintiffs object to Defendant's Fact #64 on the ground that CIPA speaks for itself, and that in testifying about what CIPA requires Mr. Marney (on whose testimony this paragraph is based) is impermissibly purporting to state a legal conclusion.  Plaintiffs further object that this paragraph does not accurately summarize the relevant portions of CIPA.

19.     Plaintiffs object to Defendant's Fact #65 on the ground that CIPA speaks for itself.

20.     Plaintiffs object to Defendant's Fact #66 as vague, conclusory and lacking foundation.  The paragraph is predicated solely on the declaration of Dean Marney, who testified at deposition that technical questions relating to NCRL's FortiGuard filter would be better addressed to the library's Information Technology Manager, Barbara Walters, see Marney Dep. at 121:16-20 (Ct. Rec. 41 at 255); and that he did not know what the procedure would be for disabling the filter on one of NCRL's public use computer terminals, id. at 109:406 (Ex. RR).

Moreover, contrary to Defendant's Fact #66, disabling the FortiGuard filter at the request of adults would be consistent with NCRL's mission.  NCRL's assertion that disabling the filter at the request of adults would present "other problems" is so vague and conclusory as to be entirely meaningless.

As for NCRL's contention that disabling the FortiGuard filter would present unspecified "technological challenges," that contention is inconsistent with the facts that have been developed through discovery.  Fortinet representative Liam Chasteen testified as follows at deposition:

> Q. Can a librarian at a particular library branch that is using the FortiGuard filter disable the filter on a particular computer terminal?

1     A. Yes.

2     Q. How would a librarian go about doing that?

3     A. Depending on how the FortiGate was configured, it could be as simple as merely logging in and checking a check box.

4

5     Q. That would allow a library patron to have unfiltered Internet access at that terminal; correct?

6     A. If properly configured; correct.

7    Chasteen Dep. at 57:5-15 (Ex. NN); <u>see</u> <u>id.</u> at 61:8-11.

8         It also bears noting that, as Mr. Marney testified at deposition, although Internet access

9    at all of NCRL's staff computers is filtered, NCRL is able to disable the filter on at least some

10   of its computers to allow staff members to view Web sites to which NCRL's patrons have

11   requested access:

12     Q. What's the NCRL's filtering policy with regard to staff terminals?

13     A. They're all filtered.  CIPA requires that.  Obviously, we have computers here that the filter gets turned off so we can view those sites that are

14        blocked.

15     Q. Are the filters on the staff terminals ever turned off at any other time?

16     A. I don't know.

17     Q. What would be the procedure for disabling a filter on a staff terminal?

18     A. The – I don't know.

19     Q. Is there –

20     A. I'd ask Barbara.

21     Q. Okay.  Do you know what the procedure would be for disabling the filter on a public use terminal?

22

23     A. I do not know.

     <u>See</u> Marney Dep. at 108:16-109:6 (Ex. RR).  If NCRL can disable the FortiGuard filter on a

24   staff terminal, it should certainly be able to disable the filter on a public use terminal –

25   particularly where Fortinet's representative Mr. Chasteen testified that such disabling would

26   be a simple matter.

21.     Plaintiffs object to Defendant's Fact #67 based on lack of foundation (see discussion of Defendant's Fact #66 above) and because the paragraph is impermissibly vague and conclusory.  Moreover, it bears noting that NCRL does not dispute that it could acquire the capacity to disable its FortiGuard filter at the request of adults by purchasing of additional unspecified authentication software or hardware.

22.     Plaintiffs object to NCRL's reference in its Fact #69 to unidentified "technological challenges" and the possibility of NCRL's computer network being "dismantled" for the reasons stated in their discussion of Defendant's Fact #66 above.  Moreover, although, as Plaintiffs noted in their Motion for Summary Judgment at 3 n.2, they do not dispute that NCRL may take appropriate steps to safeguard its computer network, contrary to Defendant's Fact #69 disabling the FortiGuard filter at the request of adult library patrons would not pose any security threat to the network.  See Declaration of Bennett Haselton In Opposition to Defendant's Motion for Summary Judgment.

23.     Contrary to Defendant's Fact #71, allowing unfiltered Internet access at the request of adults would not create any unacceptable risks for NCRL's patrons or staff, or create a hostile atmosphere for families, children or staff.  NCRL has adduced no evidence that allowing unfiltered Internet access at the request of adults would create any such unacceptable risks or hostile atmosphere.

24.     Contrary to Defendant's Fact #74, allowing unfiltered Internet access at the request of adults would put not NCRL staff in the position of "being unwelcomingly exposed to, and put in the position of, having to confront patrons."

25.     To clarify Defendant's Fact #77, Dan Howard's experience with privacy screens is limited to a period when he worked for the Sno-Isle Regional Library between 1996 and 2001.  See Howard Dep. at 27:2-8 (Ct. Rec. 41 at 215).  He was not employed by NCRL when NCRL briefly experimented with privacy screens at its Wenatchee branch in early 2000.  See Marney Dep. at 46:22-47:13 (Ct. Rec. 41 at 239); January 13, 2000 Director's Report, at

NCRL 00301 (Ex. YY); Howard Dep. at 26:23-27:1 (Ct. Rec. 41 at 215). He has had no experience with privacy screens since 2001, see Howard Dep. at 29:15-17 (Ct. Rec. 41 at 216); and has not research privacy screens since then, id. at 32:11-13 (Ct. Rec. 41 at 216).

26. To clarify Defendant's Fact #82, Mr. Howard's experience using recessed desks is limited to the period between 1996 and 2001 when he worked for the Sno-Isle Regional Library. See Howard Dep. at 35:5-19 (Ct. Rec. 41 at 217). He does not know if recessed-desk technology has changed since 2001. Id. at 36:6-9 (Ct. Rec. 41 at 217).

27. Plaintiffs object to Defendant's Fact #84 because it is based on the hearsay testimony of Dan Howard, who "looked up the price" of recessed desks on October 17, 2007 and testified at deposition (and reiterated in paragraph 23 of his declaration submitted in support of NCRL's Motion for Summary Judgment) that with regard to a particular brand of recessed desk called the Nova desk, "they start for very small ones at about a thousand dollars apiece." Howard Dep. at 35:12-13 (Ct. Rec. 41 at 217). Should the Court decide to consider Mr. Howard's hearsay testimony regarding the price of recessed desks, Plaintiffs ask that the Court also consider the documents attached hereto as Exhibit GGG. These documents were printed off the World Wide Web on February 23, 2008. See Declaration of Duncan Manville in Opposition to Defendant's Motion for Summary Judgment ("Manville Decl. in Opp.") at ¶ 23. They show that contrary to Mr. Howard's testimony, Nova recessed desks can be purchased for as little as $645 – not including discounts that might be available for bulk purchases. The documents attached hereto as Exhibit GGG also show that other brands of recessed desks are available for as little as $539.99, and that side-by-side Nova recessed desks (which NCRL could use at library branches with multiple public use terminals) are available for as little as $1,130, or $565 per computer. Finally, another option that NCRL could potentially avail itself of is retrofitting existing computer tables with hardware that would allow NCRL to recess computer monitors in the existing tables. The documents attached hereto as Exhibit GGG show that Nova retrofit kits are available for as little as $392.

28.    Plaintiffs object to Defendant's Fact #89 as vague and conclusory.  NCRL has presented no evidence regarding how much more prevalent the incidents referenced in its Fact #89 allegedly were before NCRL decided to configure its FortiGuard filter to block the Image Search classification.  In fact, contrary to Defendant's Fact #89, during the course of this litigation NCRL has identified by approximate date (that is, by month and year) only three instances in which allegedly pornographic images were accessed online in an NCRL library branch, and all three incidents took place <u>after</u> NCRL began blocking the Image Search classification in January 2007 (<u>see</u> Defendant's Fact #92 and Fact #96, referencing incidents in March and December 2007 in which patrons were allegedly able to access pornography online at NCRL's Okanogan and Bridgeport branches; Howard Dep. at 39:13-41:1 (Ct. Rec. 41 at 218-19), referencing an incident in the Wenatchee branch that allegedly occurred within the month prior to Mr. Howard's October 17, 2007 deposition).

29.    Plaintiffs object to Defendant's Fact #90 through Fact #98 because they are predicated solely on declaration testimony by Mr. Howard that is hearsay and is not based on personal knowledge.  In fact, these paragraphs, and the declaration testimony on which they are predicated, are in many instances double hearsay, since Mr. Howard's testimony appears to be based in part on information that was allegedly communicated by unidentified staff members to Sharron Reddick and several other named individuals who subsequently spoke with Mr. Howard about what they had heard.

30.    Plaintiffs also object to Defendant's Fact #90 through Fact #98 and Mr. Howard's corresponding declaration testimony as vague and conclusory.  For example, with regard to Fact #91, NCRL and Mr. Howard do not say how many alleged "specific incidents" occurred in which allegedly pornographic images were viewed online, or when the alleged incidents occurred.  NCRL and Mr. Howard do not describe the particulars of the alleged incidents, or describe the allegedly "explicit, pornographic images" referenced in this paragraph.  The alleged images could have been anything from obscenity to harmless artistic

nudes.  And finally, NCRL and Mr. Howard do not describe any of the "confrontations" that allegedly took place, or provide any basis for concluding that the alleged "confrontations" were of a nature that would have been stressful or upsetting to a librarian of ordinary and reasonable sensibilities.  For all that can be gleaned from Mr. Howard's declaration, the "confrontations" could very well have consisted of nothing more than polite dialogue.

Similarly, NCRL and Mr. Howard do not describe the particulars of the "inappropriate pornographic materials" that were allegedly seen on the computers and printers at NCRL's Okanogan branch (Defendant's Fact #93), do not describe the circumstances in which the images were found (in fact, paragraph 93 does not even state that the images were downloaded from the Internet, as opposed to having been uploaded from a disk or CD-ROM for the purpose of printing hard copies), and do not state how many times the referenced materials were allegedly found or when they were found.

NCRL and Mr. Howard do not describe the particulars of the alleged pornography that was purportedly accessed by a single patron at NCRL's Republic branch (Defendant's Fact #94), do not describe the circumstances in which the patron allegedly accessed the pornography, do not state when or how many times the patron allegedly accessed the referenced materials, and provide no specifics concerning the reference to unidentified patrons allegedly "manag[ing] to access an inappropriate site."

With regard to Defendant's Fact #95, NCRL and Mr. Howard to not say when the alleged incident referenced in the paragraph occurred (other than that it occurred sometime before fall 2006), and provide no particulars concerning the alleged pornography at issue (in fact, paragraph 95 again does not even state that the images in question were downloaded from a Web site).  Similarly, NCRL and Mr. Howard provide no specifics regarding the allegedly pornographic images referenced in Defendant's Fact #96 and the corresponding paragraph 14 in Mr. Howard's declaration, other than the subjective and conclusory assertion that "the pictures were sexual and extremely graphic."  Defendant's Fact #97 does not say

what Carla Loreto searched for or explain how a presumably innocuous search yielded the result complained of.

Finally, Defendant's Fact #98 and the corresponding paragraph 16 of Mr. Howard's declaration do not say how frequently Katy Sessions saw pornography on the public Internet computers at NCRL's Wenatchee branch, either before or after NCRL implemented its FortiGuard filter. Based on this paragraph there could have been two instances before fall 2006 and one after. Moreover, Fact #98 and Mr. Howard's corresponding declaration testimony are demonstrably inaccurate, since (as explained above in Plaintiffs' discussion of Defendant's Fact #27) NCRL's Wenatchee branch did not go online until January 2000. Ms. Sessions could not possibly have seen Internet pornography on the Wenatchee computers in 1998 or 1999, as Fact #98 suggests, nor could she have been taking unspecified "anti-anxiety medication" to cope with "uncomfortable confrontations with patrons regarding the Internet" during that period. And finally, once again Fact #98 and Mr. Howard's corresponding declaration testimony contain no specifics concerning any of the "uncomfortable confrontations" that allegedly occurred between patrons and Wenatchee staff regarding the Internet. Again, based on NCRL's conclusory Fact #98 these "confrontations" could have amounted to nothing more than polite dialogue.

31. Plaintiffs also object to Defendant's Fact #90 through Fact #98 and to the corresponding paragraphs in Mr. Howard's declaration on the grounds that none of the librarians named in those paragraphs (Sharron Reddick, Jennifer Thompson, Lucile Ames, Gailene Hooper, Claire Kirkpatrick, Michelle Orosco, Carla Loreto and Katy Sessions) were disclosed by NCRL pursuant to Rules 26(a)(1)(A) or 26(e) as "individual[s] likely to have discoverable information that the disclosing party may use to support its claims or defenses." See Manville Decl. in Opp. at ¶ 27. Moreover, Mr. Howard was explicitly asked during his October 17, 2007 deposition whether he was aware of any instances in which patrons of NCRL had viewed pornographic images online and been requested to stop by NCRL staff.

See Howard Dep. at 39:13-42:11 (Ct. Rec. 41 at 218-19). Mr. Howard testified that he was only aware of two such specific instances – one at NCRL's Wenatchee branch and one at the Omak branch. Id. He did not identify by name any of the persons allegedly involved. Id. He stated that he was not aware of any instance in which a library patron had refused a request to stop viewing inappropriate materials, and that he had no knowledge of there ever having been any physical altercation or verbal dispute between library staff and a patron regarding the viewing of inappropriate materials online. Id. To the extent Mr. Howard may have gathered additional information (including the names of possible witnesses) since his October 17, 2007 deposition, that information was not disclosed to Plaintiffs until NCRL filed its Motion for Summary Judgment on February 4, 2008. See Manville Decl. in Opp. at ¶ 27.

32.     Finally, to clarify Defendant's Fact #90 through Fact #98, it bears noting that although NCRL first made the Internet available to its patrons at its Omak Branch over eight years ago in December 1999 and at its Wenatchee branch in January 2000 (see above discussion of Defendant's Fact #27) and has had public Internet access in all of its library branches since 2002 (see Defendant's Discovery Responses, answer to Interrogatory No. 1 (Ct. Rec. 41 at 101)), NCRL has identified only two instances – referenced in its Fact #95 and Fact #97 – in which a minor saw allegedly pornographic images on an NCRL public use computer terminal. And in one of these instances the image was purportedly retrieved and inadvertently shown to the minor by an NCRL staff member.

33.     Contrary to Defendant's Fact #99, under applicable law and on the facts presented NCRL could not be held liable for facilitating a hostile work environment.

34.     To clarify Defendant's Fact #105, at deposition Dr. Resnick acknowledged that the results of his study may have been skewed by the fact that the sample of URLs that he used to generate his data was taken while the FortiGuard filter was in place:

> Q. And why did you think it was appropriate to take a sample reflecting patrons' access patterns when the filters were installed?

A. Well, it depends what you are trying to test. So if you are trying to test in a situation how many of the things that people try to access are done in error, then it's good to take a list of what they actually access.

What you miss when you do that, and the reason I was bringing this up, is that there may be things that people would have tried to access that they don't try to access because they've had experience that they are blocked. And if the filters had been around for a while, maybe the patrons have adjusted their behavior. And I wouldn't be able to tell that from my study. So any self-censorship that users are doing, I wouldn't be able to detect with my study.

Deposition of Paul Resnick ("Resnick Dep.") at 92:12-93:2 (Ex. UU); see also id. at 93:3-96:4.

35.     To clarify Defendant's Fact #110:

As NCRL observes in its paragraph 106, in any given week there are approximately 2,180 instances in which an NCRL patron attempts to access a URL – either a complete Web page or part of a Web page – and NCRL's FortiGuard filter denies the patron access to the requested URL. It follows that NCRL patrons are denied access to Web pages and other URLs 311 times every day, and 113,360 times every year.

A primary purpose of Dr. Resnick's study was to determine how many of the 2,180 URLs that the FortiGuard filter blocked during the week of August 23-29, 2007 were blocked in error – that is, how many of those URLs should not have been blocked based on NCRL's configuration of its filter and the categories and classifications that it had selected to block. See Resnick report at 14 (Ct. Rec. 32 at 54).

To assess the FortiGuard filter's overblocking rate, Dr. Resnick and his colleagues first had to classify the 2,180 URLs comprising the test set, and determine whether it would be "possible to evaluate whether the URL should have been blocked." See Resnick report at 17-19 (Ct. Rec. 32 at 57-59). Dr. Resnick and his colleagues ultimately determined that of the original test set of 2,180 URLs, only 2,070 were "ratable" – meaning that he and his colleagues could determine whether they had been correctly blocked. See Resnick report at 19-20 (Ct. Rec. 32 at 59-60); Resnick Dep. at 108:3-110:3 (Ex. UU). They decided that they

would be unable to rate sites falling into Fortinet's Hacking, Phishing, Malware and Spyware categories, and sites falling into the Spam URL classification.  <u>See</u> Resnick report at 19-20 (Ct. Rec. 32 at 59-60).  Thus, Dr. Resnick's report did not assess FortiGuard's overblocking rate for Web sites falling into those categories.  <u>Id.</u>; <u>see also</u> Resnick Dep. at 49:9-20, 56:18-24 (Ex. UU).

Most of the "ratable" URLs were not for full Web pages, but were for so-called "helper images" (1406 URLs) – that is, "little images that are parts of web pages."  <u>See</u> Resnick report at 12-13 (showing examples of embedded images), 20-22 (Ct. Rec. 32 at 52-53, 60-62); Resnick Dep. at 110:4-8 (Ex. UU).  As NCRL notes in its paragraph 106, 289 URLs were for full Web pages.  194 URLs were for images that Dr. Resnick referred to in his report as "other images."  <u>See</u> Resnick report at 12-13, 20-22 (Ct. Rec. 32 at 52-53, 60-62).  Dr. Resnick classified the remaining five URLs as "other."  <u>See</u> Resnick report at 22 (Ct. Rec. 32 at 62).

According to Dr. Resnick's study, FortiGuard erroneously blocked 53% (744 of 1,406) of the helper images that it blocked during the week of August 23-29, 2007.  <u>See</u> Resnick report at 22-23 (Ct. Rec. 32 at 62-63).  Extrapolating from those numbers, FortiGuard erroneously blocks 106 helper images every day on NCRL's public access computers, and 38,688 helper images every year.  Moreover, as Dr. Resnick explained in his report:

> When a policy says that a URL is to be blocked and the destination host returns an image file, instead of passing a blocked message to the patron's computer, the FortiGate substitutes a small invisible image.  This has the advantage of not interfering with the patron's interaction with other parts of the page from which the embedded image is blocked.  The disadvantage, however, is that … <u>a patron may not realize that anything has been blocked.</u>

Resnick report at 12 (Ct. Rec. 32 at 52) (emphasis added); <u>see also</u> Resnick Dep. at 83:19-88:8 (Ex. UU).  In other words, FortiGuard blocks embedded images, and erroneously blocks twice as many such images as it should, without notifying library patrons that the images are being blocked.  In addition, of the 194 blocked full-size images that Dr. Resnick and his

colleagues had classified as "other images," 24 were blocked in error.  See Resnick report at 23 (Ct. Rec. 32 at 63).

With regard to the 289 full Web pages that FortiGuard blocked during the week of August 23-29, 2007, it bears reiterating that NCRL has deployed its filter to block Web sites and not individual Web pages.  See Marney Dep. at 93:18-23 (Ct. Rec. 41 at 251); Walters Dep. at 54:11-21 (Ct. Rec. 41 at 298).  Thus, with the exception of www.craigslist.org (see Marney Dep. at 102:23-103:14 (Ct. Rec. 41 at 253); Walters Dep. at 53:25-55:18 (Ct. Rec. 41 at 298)), if FortiGuard blocks a Web page, it necessarily blocks the entire site of which that page is a part.  Dr. Resnick's study indicates that 289 times every week, NCRL's FortiGuard filter denies the library's patrons access to complete Web sites.  That means that 41 times every day – 15,028 times every year – an NCRL patron attempts to access a Web site on an NCRL computer and is prevented from doing so by the library's FortiGuard filter.  And this does not include Web sites blocked by FortiGuard under the Hacking, Phishing, Malware and Spyware categories, and under the Spam URL classification.

Dr. Resnick's data also indicate that approximately three times every day, 20 times every week, and 1,040 times every year, an NCRL patron attempts to access a Web site on an NCRL computer and is prevented from doing so because NCRL's FortiGuard filter has blocked the site in error.  And again, these numbers do not include Web sites erroneously blocked under the Spyware, Hacking, Phishing and Malware categories or the Spam URL classification.  Thus, the actual number of Web sites that NCRL's FortiGuard filter erroneously blocks every week is almost certainly larger than 20.

36.    To clarify Defendant's Fact #111, see above discussion of Defendant's Fact #110.

37.    Defendant's Fact #113 is inaccurate in several respects.  First, as discussed in above with regard to Defendant's Fact #30, Contrary to Defendant's Fact #113 FortiGuard was the operative filter at the time several Plaintiffs sought to access a number of Web sites.

Second, as Plaintiff Pearl Cherrington testified at deposition, when NCRL's Internet filter denied her access to an art Web site, she brought the matter to the attention of Terry Dixon, the head librarian at NCRL's Twisp branch, and was told that Internet access was filtered and that Ms. Dixon was "unable to unlock it." See Cherrington Dep. at 18:6-13, 20:5-21:11 (Ct. Rec. 41 at 180-81). And third, as Plaintiff Charles Heinlen testified at deposition, in 2004 he asked NCRL staff to unblock a specific "personal Web site," but his request was denied. See Heinlen Dep. at 31:7-24 (Ct. Rec. 41 at 202). Prior to their respective depositions, neither Ms. Cherrington nor Mr. Heinlen had ever seen a "Material Selection Review Form" – the form that NCRL now claims it made available to patrons so they could request unblocking of specific Web sites. See Cherrington Dep. at 23:2-15 (Ct. Rec. 41 at 181); Heinlen Dep. at 30:8-18, 32:9-14 (Ct. Rec. 41 at 202).

38.     To clarify Defendant's Fact #115, SAF maintains that www.womenandguns.com was at one time blocked by NCRL's Internet filter. SAF does not allege that the site is currently blocked.

39.     To clarify Defendant's Fact #116, Plaintiff Charles Heinlen attempted to access www.womenandguns.com at NCRL's Okanogan branch on November 17, 2006. See Heinlen Decl. in Opp. at ¶ 2. NCRL's filter denied Mr. Heinlen access to that Web site.

40.     To clarify Defendant's Fact #119, although www.womenandguns.com may not currently be blocked by NCRL's FortiGuard filter, Plaintiff The Second Amendment Foundation ("SAF") is concerned that NCRL will block that Web site (or another site sponsored by SAF) in the future. See Deposition Upon Oral Examination of Alan Merril Gottlieb ("Gottlieb Dep.") at 36:25-38:13, 47:12-20 (Ex. PP).

41.     To clarify Defendant's Fact #121, Sarah Bradburn primarily patronizes NCRL's Republic branch. See Bradburn Dep. at 19:14-20:17 (Ct. Rec. 41 at 170); Bradburn's Discovery Responses, answer to Interrogatory No. 4 (Ct. Rec. 41 at 48).

42.     Contrary to Defendant's Fact #123, as Ms. Bradburn testified at deposition, although she cannot now recall certain particulars of the incident at NCRL's Republic branch in which she was unable to access information online relating to youth tobacco usage, she believes that NCRL's Internet filter denied her access to that information.  See Bradburn's Discovery Responses, answers to Interrogatory Nos. 5, 8 (Ct. Rec. 41 at 48-49); Bradburn Dep. at 18:8-15, 19:14-22:14 (Ct. Rec. 41 at 170-71).

43.     To clarify Defendant's Fact #126, regardless of whether Ms. Bradburn can recall the specific Web sites to which she was denied access, and although she believes NCRL may employ Internet filtering as its default rule to block certain categories of content, see Bradburn Dep. at 30:2-31:24 (Ex. MM), she wishes to be able to have, on request, unfiltered Internet access for lawful purposes at her local library – something she cannot now have given NCRL's filtering policy.  See Bradburn Dep. at 27:17-28:1 (Ex. MM), 35:7-37:11 (Ct. Rec. 41 at 172-73).

44.     To clarify Defendant's Fact #128, Ms. Cherrington primarily patronizes NCRL's Twisp branch.  See Cherrington Dep. at 15:12-22, 18:14-22, 20:5-21:4 (Ct. Rec. 41 at 179-81); Cherrington's Discovery Responses, answer to Interrogatory No. 4 (Ct. Rec. 41 at 60).

45.     Defendant's Fact #130 is inaccurate.  Contrary to Fact #130, although Ms. Cherrington cannot recall some of the specific URLs that she was unable to access because of NCRL's Internet filter, her deposition testimony makes it abundantly clear that the filter denied her access to an Idaho art gallery's Web site and a Web site containing health information.  See Cherrington Dep. at 20:5-21:4, 23:16-24:8, 34:16-35:11 (Ct. Rec. 41 at 180-82).  In particular, Ms. Cherrington described the blocking screen that the filter displayed when she was denied access to the forbidden Web content.  See Cherrington Dep. at 20:5-24, 34:16-35:11 (Ct. Rec. 41 at 180, 182).  And finally, the head librarian at NCRL's Twisp branch confirmed that the problem Ms. Cherrington was experiencing accessing the art gallery

site was caused by the filter.  <u>See</u> Cherrington's Discovery Responses, answer to Interrogatory No. 9 (Ct. Rec. 41 at 62); Cherrington Dep. at 21:3-4 (Ct. Rec. 41 at 180).  Ms. Cherrington also stated in her answers to various interrogatories that NCRL propounded, and subsequently testified at deposition, that NCRL's FortiGuard filter denied her access to YouTube (as noted in NCRL's paragraph 131).  <u>See</u> Cherrington's Discovery Responses, answer to Interrogatory Nos. 5, 8, 9, 11, 12 (Ct. Rec. 41 at 60-63); Cherrington Dep. at 33:16-34:8 (Ct. Rec. 41 at 182).

46.	To clarify Defendant's Fact #132,  regardless of whether Ms. Cherrington can recall the specific art gallery and health sites to which she was denied access, regardless of whether YouTube is currently unblocked on NCRL's computer terminals, and although Ms. Cherrington believes NCRL may employ Internet filtering as its default rule to block certain categories of content, <u>see</u> Cherrington Dep. at 25:1-28:21, 40:24-41:11 (Ex. OO), Ms. Cherrington wishes to be able to have, on request, unfiltered Internet access for lawful purposes at her local library – something she cannot now have given NCRL's filtering policy. <u>See</u> Cherrington Dep. at 24:22-25 (Ex. OO).

47.	Defendant's Fact #133 is inaccurate.   Contrary to Fact #133, as Ms. Cherrington stated in her answer to NCRL's Interrogatory No. 9:

> The denial of access to the art gallery Web sites occurred in early summer 2005.  On the day access was denied, Ms. Cherrington spoke with librarian Terry Dixon.  Ms. Dixon said that the denial of access resulted from the library's filtering software and that she was unable to do anything to allow access to the blocked sites.

Cherrington's Discovery Responses, answer to Interrogatory No. 9 (Ct. Rec. 41 at 62).  Ms. Cherrington subsequently testified at deposition that she brought her concerns about her inability to access the Idaho art gallery Web site to the attention of Ms. Dixon, the head librarian at NCRL's Twisp branch.  <u>See</u> Cherrington Dep. at 20:5-21:4 (Ct. Rec. 41 at 180-81).

48.     Defendant's Fact #134 is incorrect.  See discussion of Defendant's Fact #113, Fact #130 and Fact #133 above.

49.     Contrary to Defendant's Fact #135, NCRL was using FortiGuard when the filter prevented Ms. Cherrington from accessing YouTube.  See ¶¶ 113 and 130 above; see also Cherrington's Discovery Responses, answers to Interrogatory Nos. 5, 8, 9, 11, 12 (Ct. Rec. 41 at 60-63).

50.     To clarify Defendant's Fact #137, Mr. Heinlen has also patronized NCRL's Moses Lake, Tonasket and Oroville branches.  See Heinlen's Discovery Responses, answer to Interrogatory No. 4 (Ct. Rec. 41 at 72).

51.     Defendant's Fact #139 is incorrect.  See discussion of Defendant's Fact #113, Fact #130 and Fact #133 above.

52.     To clarify Defendant's Fact #141, although Mr. Heinlen does believe he should have access to the types of online materials referenced in this paragraph (as he testified at deposition, "[u]nblocked is unblocked," Heinlen Dep. at 51:13; see also id. at 38:4-40:7, 44:13-47:6, 54:19-25 (Ex. QQ)), he did not testify that he believes he or any other NCRL patron has a right to actually view materials that are not protected by the United States or Washington State Constitutions.  To the contrary, he testified at deposition that he does not wish to look at pornography or engage in illegal activity on NCRL's computers, id. at 26:14-25 (Ct. Rec. 41 at 201) ("I'm trying to lawfully surf the Net on a library terminal…. I'm not looking for any X-rated sites or anything."), 38:4-12 (Ct. Rec. 41 at 204), 46:20-22 (Ex. QQ); and that if any patron were to perform an illegal act on library property, NCRL would be "well within [its] rights to get the police right across the street and deal with it accordingly," id. at 44:13-23 (Ex. QQ).

Mr. Heinlen does, however, wish to be able to have, on request, unfiltered Internet access for lawful purposes at his local library – something he cannot now have given NCRL's filtering policy.  See Heinlen Dep. at 38:4-7, 46:16-18, 52:20-53:7, 54:19-25 (Ex. QQ).

52.     Contrary to Defendant's Fact #142, Plaintiffs filed their Complaint for Declaratory and Injunctive Relief ("Complaint") in this matter on November 16, 2006.  Ct. Rec. 1.

54.     Contrary to Defendant's Fact #143, NCRL answered Plaintiffs' Complaint on January 2, 2007.  Ct. Rec. 5.

55.     Contrary to Defendant's Fact #146, NCRL's Answer and Affirmative Defenses ("Answer") merely asserted that "Plaintiffs have failed to allege facts constituting a present case or controversy."  Ct. Rec. 5 at 5.  The Answer did not explain the grounds for that assertion.  Id.  In any event, NCRL has not come forward with any evidence to support its suggestion that all the specific Web sites to which Plaintiffs were previously denied access have been unblocked.

56.     Plaintiffs object to Defendant's Fact #149 because it is predicated on declaration testimony by Thomas Adams that is hearsay and is not based on personal knowledge, and on a hearsay exhibit (Ex. G) to Mr. Adams' declaration.  Should the Court decide to consider NCRL's Fact #149 and the declaration testimony and exhibit on which it is based, however, the Court should also consider the following information pertaining to the lawsuit referenced in Fact #149 and in the corresponding exhibit to Mr. Adams' declaration:

Attached hereto as Exhibit HHH is a copy of the complaint that was filed in Adamson v. Minneapolis Public Library, No. 03-02521 (D. Minn. March 24, 2003) ("Adamson Complaint"), the case referenced in NCRL's Fact #149.  In Adamson a group of librarians challenged a library policy that expressly allowed patrons to view obscenity on library computers, and instructed library staff not to intervene if a user viewed obscenity and even if the user invited minors to view obscenity with them.  See Adamson Complaint at ¶¶ 26-29, 38-41, 44-45.  According to the Adamson Complaint,

[Library administrators] made no effort to limit the viewing of legally obscene material on its terminals.  They put no limits on the amount or type of material patrons could print out on MPL printers.  They took no steps to prevent children from viewing obscene and pornographic materials at the library.  They

specifically directed their security staff not to respond to staff requests to cause patrons to stop viewing these materials. They did not remove patrons who behaved inappropriately towards staff or other patrons except in the most extreme circumstances and even then only for short periods of time. At no time did MPL provide any training to its managers or supervisors on how to deal with the hostile and offensive working environment created by library's policy of unfettered Internet access.

¶ 60.

Attached hereto as Exhibit III is a copy of the U.S. District Court's docket sheet in Adamson. It indicates that the parties to the lawsuit settled their dispute, and that the case was dismissed on August 28, 2003 without any court ruling on the merits.

Attached hereto as Exhibit JJJ is a copy of the Minneapolis Public Library's current Internet use policy, which was downloaded from the Web site http://www.mpls.lib.mn.us/policy.asp on February 14, 2008. The library's policy indicates that it was revised effective August 25, 2004, in the wake of the Adamson settlement. (The Web site has the logo of the Hennepin County Library on it because the Minneapolis Public Library merged with the Hennepin County Library effective January 1, 2008. As indicated in the text of the policy, this exhibit reflects the policy of the Minneapolis Public Library from the time of adoption to the present.) The stated policy of the Minneapolis library currently includes the following language:

> The [Minneapolis Public] Library upholds and affirms the right of every individual to have access to constitutionally protected material on the Internet. The content of the Internet is not managed or governed by any entity, therefore users may encounter materials they consider offensive…. Parents and guardians are responsible for monitoring Internet access by children.

> The Children's Internet Protection Act (CIPA), passed by Congress in 2000 and upheld by the Supreme Court in 2003, requires libraries receiving certain types of federal funding to equip Internet-access computers with a technology protection measure that blocks or filters visual depictions that are obscene, contain child pornography or are harmful to minors. In compliance with CIPA, the Library Board authorized installation of filtering software designed to prevent access to obscenity, child pornography and materials harmful to minors. In accordance with the law, persons aged 17 years or older may request to have the filters disabled for any lawful purpose that meets the Minneapolis Public Library Internet Policy and Guidelines AND THE FILTER WILL BE DISABLED.

… Illegal use of the Internet is prohibited. Library users may not use the Library's Internet access to view, print, distribute, display, send or receive images, text or graphics of obscene material or material that violates laws relating to child pornography. Library users may not disseminate, exhibit or display to minors materials that are harmful to minors.

57.     Plaintiffs object to Defendant's Fact #150 because it is predicated on declaration testimony by Thomas Adams that is hearsay and not based on personal knowledge, and on a hearsay exhibit to Mr. Adams' declaration. Should the Court decide to consider Defendant's Fact #150 and the declaration testimony and exhibit on which it is predicated, however, the Court should also consider that, based on the newspaper article cited by NCRL, all Internet access on the Dallas library system's public computer terminals is unfiltered at all times – both for adults and for children. Ct. Rec. 30 at 50-51. Here, by contrast, Plaintiffs merely seek an order that would require NCRL to disable its FortiGuard filter at the request of adults who wish to use the Internet for bona fide research or other lawful purposes. The Court should also consider the fact that an urban library system like the one in Dallas is likely to have a very different clientele than a rural library district in a five-county region like the one Dean Marney described as follows during his deposition:

Q. What is it about this community that would make it likely to support a policy of filtering all computers all the time?

A. An example would be within five counties, to my knowledge there's only one adult book store. There are no stripper bars in five counties. There's an expectation that we're – that we go for the best.

Q. The best being –

A. There is – there is an expectation that we have that we support cultural things that are traditional.

Q. Can you give me some examples?

A. There's an expectation that we have Jane Austen on the shelves whether people read it or not.

Marney Dep. at 102:4-15 (Ct. Rec. 41 at 253).

Much more similar to NCRL than the Dallas library system are the Stark County District Library ("SCDL"), headquartered in Canton, Ohio; the Fairbanks North Star Borough

Library in Fairbanks, Alaska ("FNSBL"); and the Jefferson County Library District ("JCLD") in Madras, Oregon.  <u>See</u> Deposition of Kenton Oliver ("Oliver Dep.") at 12:24-13:8, 36:20-41:13 (Ex. SS); Deposition Upon Oral Examination of June Pinnell-Stephens ("Pinnell-Stephens Dep.") at 6:25-10:16, 16:20-22:1, 27:23-29:20 (Ex. TT); Deposition of Sally W. Beesley ("Beesley Dep.") at 14:19-21:25 (Ex. LL).  These library systems are more rural in nature, and include very small branch libraries similar to several of NCRL's branches.  <u>Id.</u>  As noted in Plaintiffs' Statement of Facts in Support of Their Motion for Summary Judgment, at ¶¶ 120-31, these libraries either do not filter Web content (JCLD) or disable the filter at the request of adults (SCDL and FNSBL), and they have not experienced problems with excessive viewing of pornography by library patrons.

DATED this 25th day of February, 2008.

AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON FOUNDATION


By:    /s/ Aaron H. Caplan
Aaron H. Caplan, WSBA #22525
American Civil Liberties Union of Washington Foundation
705 Second Avenue, Third Floor
Seattle, WA  98103
Tel. (206) 624-2184
Fax (206) 624-2190
caplan@aclu-wa.org

Duncan Manville, WSBA #30304
1629 2nd Avenue W.
Seattle, WA  98119
Tel. (206) 288-9330
Fax (206) 624-2190
duncan.manville@yahoo.com

Catherine Crump, pro hac vice
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004
Tel. (212) 519-7806
ccrump@aclu.org

Counsel for Plaintiffs

1    **CERTIFICATE OF SERVICE**

2         I hereby certify that on February 25, 2008, I electronically filed the foregoing

3    document with the Clerk of Court using the CM/ECF system, which will send notification of

4    such filing to the persons listed below:

5              Thomas D. Adams
               Celeste Mountain Monroe
6              KARR TUTTLE CAMPBELL
               1201 Third Avenue, Suite 2900
7              Seattle, WA  98101

8              Attorneys for Defendant
9
      DATED this 25th day of February, 2008.
10
                        AMERICAN CIVIL LIBERTIES UNION OF
11                      WASHINGTON FOUNDATION

12
                        By:    /s/ Aaron H. Caplan
13                      Aaron H. Caplan, WSBA #22525
                        American Civil Liberties Union of Washington
14                      Foundation
                        705 Second Avenue, Third Floor
15                      Seattle, WA  98103
                        Tel. (206) 624-2184
16                      Fax (206) 624-2190
                        caplan@aclu-wa.org
17

18

19

20

21

22

23

24

25

26