BRADBURN V. NORTH CENTRAL REGIONAL LIBRARY DISTRICT
Case No. CV-06-327-EFS

**INDEX OF EXHIBITS TO PLAINTIFFS' STATEMENT OF FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Exhibit LL:      Excerpts from the Deposition of Sally W. Beesley

Exhibit MM:      Excerpts from the Deposition Upon Oral Examination of Sarah Maria Bradburn

Exhibit NN:      Excerpts from the Deposition of Liam Chasteen

Exhibit OO:      Excerpts from the Deposition Upon Oral Examination of Pearl Anne Cherrington

Exhibit PP:      Excerpts from the Deposition Upon Oral Examination of Alan Merril Gottlieb

Exhibit QQ:      Excerpts from the Deposition Upon Oral Examination of Charles Merle Heinlen

Exhibit RR:      Excerpts from the Deposition Upon Oral Examination of Dean Marney

Exhibit SS:      Excerpts from the Deposition of Kenton Oliver

Exhibit TT:      Excerpts from the Deposition Upon Oral Examination of June Pinnell-Stephens

Exhibit UU:      Excerpts from the Deposition of Paul Resnick

Exhibit VV:      Minutes of June 10, 1999 meeting of NCRL's Board of Directors (NCRL 00277-78)

Exhibit WW:      Minutes of August 12, 1999 meeting of NCRL's Board of Directors (NCRL 00281-82)

Exhibit XX:      Minutes of November 17, 1999 meeting of NCRL's Board of Directors (NCRL 00296-97)

Exhibit YY:      January 13, 2000 Director's Report (NCRL 00301)

Exhibit ZZ:      Minutes of May 11, 2000 meeting of NCRL's Board of Directors (NCRL 00313-14)

Exhibit AAA:      January 11, 2001 Director's Report (NCRL 00334)

Exhibit BBB:      Minutes of January 11, 2001 meeting of NCRL's Board of Directors (NCRL 00332-33)

Exhibit CCC:      Correspondence between Dean Marney and Nancy Talner

Exhibit DDD:     Copies of screen shots of the splash pages of Web sites that are currently blocked by NCRL's Internet filter

Exhibit EEE:     Documents produced by NCRL in discovery pertaining to requests made by patrons of NCRL between October 1, 2007 and February 20, 2008 to unblock specific Web sites

Exhibit FFF:     Spreadsheet summarizing requests made by patrons of NCRL between October 1, 2008 and the present to unblock specific Web sites

Exhibit GGG:     Documents showing prices for recessed desks and for recessing retrofit kits

Exhibit HHH:     Complaint filed in Adamson v. Minneapolis Public Library, No. 03-02521 (D. Minn. March 24, 2003)

Exhibit III:     Docket sheet of the U.S. District Court for the District of Minnesota in Adamson v. Minneapolis Public Library, No. 03-02521 (D. Minn. March 24, 2003)

Exhibit JJJ:     Minneapolis Public Library's current Internet use policy, downloaded from the Web site http://www.mpls.lib.mn.us/policy.asp on February 14, 2008

# Exhibit LL

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

SARAH BRADBURN, PEARL

CHERRINGTON, CHARLES

HEINLEN and the SECOND

AMENDMENT FOUNDATION,

        Plaintiffs,

      vs.                No. CV-06-327-EFS

NORTH CENTRAL REGIONAL

LIBRARY DISTRICT,

        Defendant.

                 /

DEPOSITION OF SALLY W. BEESLEY

Taken on behalf of Defendant

Taken before LISA I. KROON

CSR No. 95-0311

January 18, 2008

58e03572-1282-4f61-bef6-c8174332bd8b

1          BE IT REMEMBERED THAT, pursuant to the Federal

2    Rules of Civil Procedure, the deposition of SALLY W.

3    BEESLEY, was taken before LISA I. KROON, a Certified

4    Shorthand Reporter for Oregon and a Registered

5    Professional Reporter, cn Friday, January 18, 2008,

6    commencing at the hour cf 10:58 a.m., the questions

7    being propounded and prcceedings reported at the

8    Jefferson County Library, 241 SE 7th Street, Madras,

9    Oregon 97741.

10

11                        APPEARANCES

12   MR. DUNCAN MANVILLE

13        1629 2nd Avenue West

14        Seattle, Washington  98119

15        (206) 288-9330

16        Attorney for Plaintiffs

17        Appearing by telephone

18

19   KARR TUTTLE CAMPBELL

20        BY MS. CELESTE MOUNTAIN MONROE

21        1201 Third Avenue, Suite 2900

22        Seattle, Washington  98101

23        (206) 223-1313

24        Attorney for Defendant

25

58e03572-1282-4f61-bef6-c8174332bd8b

## Page 14

1  examples right now of things that they endorsed or
2  supported.
3      Q. Have you ever considered not being a member of
4  the ALA?
5      A. Yeah.
6      Q. Okay. And why is that?
7      A. I think partially because, you know, kind of
8  what I said before, but on the other hand, that's more
9  of a reason to stay there because if all of the more
10 conservative librarians leave, then it just -- you
11 know, it would just become more and more liberal.
12     The only other reason is, you know, do I really
13 want to spend 120 bucks every year to belong to
14 something that I really don't use that much, but...
15     Q. All right. Are you a member of the ACLU?
16     A. I don't think so. What's that?
17     Q. The American Civil Liberties Union.
18     A. No, uh-uh.
19     Q. All right. So I'd like to learn as much as I
20 can while I'm here about the Jefferson County Library
21 District of which you're the director.
22     Can you tell me how the district itself is set
23 up? How does it work?
24     A. You mean geographically?
25     Q. Regionally.

## Page 15

1      A. Okay. It has the same boundaries as the school
2  district. It includes most of Jefferson County with
3  the exception of Crooked River Ranch, and it does
4  include most of Warm Springs Reservation and also
5  includes a small section of Wasco County, and we
6  service, you know, a little town just right over the
7  border into Wasco County, so that kind of -- and it's
8  also part of our school district.
9      Q. Okay. So when you say just over the border,
10 the Washington/Oregon border?
11     A. No, the county border.
12     Q. The county border. Okay.
13     A. Between Wasco County and Jefferson County.
14     Q. How many branches in the district?
15     A. There's just this one.
16     Q. Do you know what the mile radius is of your
17 territory?
18     A. Not off the top of my head, no, uh-uh.
19     There's one other part that you probably
20 wouldn't think to ask that would be important is that
21 we're in a regional library with Deschutes County as
22 well.
23     Q. Okay.
24     A. So everybody in Deschutes County or in
25 Jefferson County, we all use our libraries as if it's

## Page 16

1  one big library system.
2      Q. So if I have a library card for Jefferson
3  County, I can go to Deschutes County and check out
4  books?
5      A. Yeah, yeah. And many people do that because
6  there's a lot of commuting especially between Redmond
7  and Madras, so we have kind of -- and our catalog is
8  all together so like if you looked it up online, you
9  would see what's in La Pine and Sisters and Bend and
10 Redmond and Madras.
11     Q. So does the Deschutes County Library have the
12 same Internet collection policy -- or Internet use
13 policy as the Jefferson County Library?
14     A. No, they have their own.
15     Q. They do?
16     A. Uh-huh.
17     Q. Okay. What is your understanding of the
18 Deschutes County Internet usage policy?
19     A. I don't know exactly what their Internet --
20 their policy is, but I know that they do have filtered
21 and unfiltered public computers, and for those 17 and
22 under to have unfiltered access, they do have to have
23 parent permission.
24     Q. Okay. So in Deschutes County, the -- are the
25 computers automatically filtered unless you ask to opt

## Page 17

1  out?
2      A. They -- you log on with your library card and
3  it knows whether you're allowed unfiltered access or
4  not.
5      Q. All right.
6      A. So...
7      Q. Is there a default or is it -- you know, is the
8  default if I sit down, I guess it would be -- I have to
9  sign up first so they know my age and --
10     A. Yeah, if you didn't have a card and you signed
11 on as a visitor, you would automatically get filtered
12 if you were under 17, and you would automatically get
13 unfiltered if you were over 17 unless you specifically
14 asked for a filtered machine. I'm pretty sure that's
15 how they do it.
16     Q. Do you know what filtering product Deschutes
17 County uses?
18     A. No, uh-uh.
19     Q. Do you know how long they've had their current
20 policy of filtered/unfiltered access in place?
21     A. Not exactly, but I would say three to five
22 years.
23     Q. Do you know -- so is that a change from a prior
24 policy?
25     A. I believe so, yeah.

## Page 18

1    Q. Do you know what the prior policy was?
2    A. No, uh-uh.
3    Q. How is the administration of the Jefferson
4  County Library set up? Is there a governing board?
5    A. Uh-huh.
6    Q. How many people are on the board?
7    A. There are five people on the board. They are
8  elected.
9    Q. For -- for a term of years?
10   A. Yeah, for two years.
11   Q. Two years. Okay.
12     Who are the current board members?
13   A. The board chair is Stephen Hillis.
14   Q. Uh-huh.
15   A. There's also Susan Stovall; Leslie Weigand,
16  W-e-i-g-a-n-d; Cathy Luther. Cathy with a C; and Marie
17  Glenn. There's two Ns in Glenn.
18   Q. Okay. So Stephen Hillis is the chair?
19   A. Uh-huh.
20   Q. Do the other individuals you've named have
21  titles, for example, secretary or president?
22   A. We have a vice chair. We just changed. I
23  should know this. I'm pretty sure Marie Glenn is the
24  vice chair.
25   Q. And how are they selected?

## Page 19

1    A. They're -- they're elected.
2    Q. By whom?
3    A. By the district, by the library district. You
4  know, there's -- you know, there's a vote and people
5  vote for who it's going to be, everybody in the
6  district, so it's on a regular ballot.
7    Q. It's on a ballot?
8    A. Yeah.
9    Q. All four or five individuals are subject to a
10  ballot vote?
11   A. Uh-huh.
12   Q. So do they all live in different parts of the
13  district? Is it geographically based?
14   A. No, uh-huh.
15   Q. Okay. There's just five positions and anyone
16  within the district can run?
17   A. Yeah. Uh-huh.
18   Q. What are the board's duties?
19   A. Their duty is to set policy and to, you know,
20  monitor that the policies that they put in place are
21  being followed, to give direction to the library and --
22  you know, they're on a more broader, more global level.
23   Q. How often does the board meet?
24   A. Once a month.
25   Q. Are you present at those meetings?

## Page 20

1    A. Yes.
2    Q. So did the board adopt the current Internet
3  usage policy --
4    A. Yes.
5    Q. -- for Jefferson County?
6    A. Yeah, uh-huh. It's been in place since before
7  I got here and they were the ones that did.
8    Q. So you were not there when they adopt --
9  formally adopted the policy?
10   A. That's right.
11   Q. All right. Do you know roughly when that was,
12  when it was adopted?
13   A. Not off the top of my head, but it's dated in
14  the policy manual. Well -- (reading).
15     It's dated November 6, 2001.
16   Q. So understanding that this -- that the date the
17  policy was adopted predates your employment here, you
18  may not know the answer to this question. Do you have
19  any idea whether or not that policy, the Internet use
20  policy, was adopted unanimously?
21   A. I don't know that.
22   Q. Do you attend -- I may have asked you this. Do
23  you attend the board meetings?
24   A. Uh-huh. Yeah.
25   Q. Do you -- what is your role there? Do you have

## Page 21

1  a separate title at the board meeting?
2    A. I'm clerk of the board.
3    Q. And what do your job responsibilities include
4  with respect to that?
5    A. Mostly -- I print up the agenda for the meeting
6  and I prepare any documents that need to be prepared
7  for it, and I usually e-mail those off to the board a
8  week to five days before the meeting and, you know,
9  just assimilate any information that they need at the
10  time.
11     I have been also a person that takes minutes,
12  but I usually have another staff member actually come
13  and take minutes now. It's difficult to do both.
14   Q. It's hard to concentrate --
15   A. Yeah, and write everything down at the same
16  time.
17   Q. -- on what's going on.
18     How many Internet accessible computers are
19  there in the Jefferson County Library?
20   A. Public?
21   Q. Yes.
22   A. Six.
23   Q. And Internet access at all six computers is
24  unfiltered, correct?
25   A. That's correct.

## Page 62

1      Q. Do you have any opinion, as you sit here today,
2   as to whether or not NCRL's policy with respect to
3   filtering is furthering their specific mission?
4      A. I don't know. I haven't really -- I don't have
5   an answer for that.
6      Q. Okay. So you don't have an opinion on that?
7      A. Correct.
8          MS. MONROE: Okay. I have no further
9   questions.
10         MR. MANVILLE: Okay. I have no more questions.
11   I think we're done.
12         (Deposition concluded at 12:42 p.m.)
13             * * *
14
15
16
17
18
19
20
21
22
23
24
25

## Page 63

1   STATE OF OREGON        )
2                          )
3   COUNTY OF DESCHUTES   )
4
5      I, LISA I. KROON, do hereby certify:
6      That SALLY W. BEESLEY, in the foregoing deposition
7   named, was present and by me sworn as a witness in the
8   above-entitled action at the time and place therein
9   specified;
10      That said deposition was taken before me at said
11   time and place, and was taken down in shorthand by me,
12   a Certified Shorthand Reporter of the State of Oregon
13   and a Registered Professional Reporter, and was
14   thereafter transcribed into typewriting, and that the
15   foregoing transcript constitutes a full, true and
16   correct report of said deposition and of the
17   proceedings that took place;
18      IN WITNESS WHEREOF, I have hereunder subscribed my
19   hand this 23rd day of January 2008.
20
21
22
23      _____  _____
           LISA I. KROON, CSR No. 95-0311
24         Registered Professional Reporter
25

# Exhibit MM

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

| | |
|---|---|
| SARAH BRADBURN, PEARL CHERRINGTON, CHARLES HEINLEN, and THE SECOND AMENDMENT FOUNDATION, | ) ) ) ) ) |
| Plaintiffs, | ) NO. ) CV-06-327-EFS |
| vs. | ) ) |
| NORTH CENTRAL REGIONAL LIBRARY DISTRICT, | ) ) ) |
| Defendant. | ) ) |

DEPOSITION UPON ORAL EXAMINATION OF
SARAH MARIA BRADBURN

TAKEN ON:    Monday, August 13th, 2007

TAKEN AT:    Omak Library
             30 South Ash
             Omak, Washington

START TIME:  1:42 P.M.

END TIME:    2:55 P.M.

REPORTED BY:  BARBARA J. SCOVILLE, CCR, RPR
              CCR NO. 2124

83248208-50f2-4d78-a09c-0058f44c8d7d

Page 2

1  APPEARANCES:

2  FOR THE PLAINTIFFS:

3          MR. DUNCAN MANVILLE, ESQ.
          RAFEL MANVILLE, PLLC
4          Attorneys at Law
          999 3rd Avenue
5          Suite 1600
          Seattle, Washington 98104
6          (206) 838-2660

7

8  FOR THE DEFENDANT:

9          MR. THOMAS D. ADAMS, ESQ.
          KARR TUTTLE CAMPBELL
10         Attorneys at Law
          1201 Third Avenue
11         Suite 2900
          Seattle, Washington 98101
12         (206) 223-1313

13

14

15

16  ALSO PRESENT:  MR. DEAN MARNEY
                MR. DAN HOWARD
17

18

19

20

21

22

23

24

25

## Page 26

1    because of the Internet policy? Could you then take
2    that Web address and put it on this form?
3  A. I guess I could.
4  Q. If you had that information.
5  A. I would -- I think I would prefer if the librarian
6    could just release that at the time but not go
7    through this kind of procedure.
8  Q. Okay. Do you know what happens when a form like
9    this is filled out and given to a librarian?
10  A. It goes to the main branch and they research it and
11    send it back and --
12  Q. Do you know how long all that takes?
13  A. It sounds like a while.
14  Q. Do you know that for a fact?
15  A. I don't.
16  Q. Okay.
17  A. But I know it's not going to be right now.
18  Q. Okay. What would be a reasonable time to get a
19    response?
20  A. I suppose it depends on what you're doing. The
21    paper I was doing was due the next week, so no kind
22    of timeline except right then would have been
23    appropriate.
24  Q. Uh-huh. If you were trying to obtain a book that
25    was unavailable at the Republic branch but might be

## Page 27

1    available at the Twisp branch by inter-library loan,
2    would it be reasonable for you to wait a couple days
3    to get that book? Would you expect a book to be
4    delivered along that kind of timeline?
5  A. Yes.
6  Q. Okay. Not within hours though.
7  A. No.
8  Q. Okay. What other resources do you use at the
9    Republic branch besides the Internet?
10  A. I check out books. I check out the DVDs, videos.
11  Q. Okay. What would you say is your primary use of the
12    library's resources if there is a primary use?
13  A. Probably the books.
14  Q. How often do you check out books?
15  A. Oh, gosh, it goes in spurts, but there are periods
16    where I check out books weekly.
17  Q. Okay. How often do you use the Internet?
18  A. At the library?
19  Q. Yes.
20  A. The Internet at the library, I don't use very often.
21  Q. Okay. Where else do you go to access the Internet?
22  A. I was able to access it at work but no longer, so
23    I'll probably be back to the library. But I would
24    say once a month maybe.
25  Q. Before your job ended at Ferry County?

## Page 28

1  A. Correct.
2  Q. Okay. Are there any other Internet access points in
3    Republic besides the library?
4  A. There is a computer center.
5  Q. Okay. Is that a fee-based access point?
6  A. Yes, it's a donation.
7  Q. Do you use that from time to time?
8  A. About once a year.
9  Q. Okay. Do you know whether you are accepting the
10    NCRL Internet Usage Policy as a condition of your
11    accessing the computer terminals? That's a poor
12    question. Do you know whether or not by -- you must
13    accept the NCRL Internet Usage Policy in order to
14    proceed further toward using the Internet when you
15    sit down at a terminal? That's not much better, is
16    it.
17  A. I'm sorry.
18  Q. No, no, it's not you. It's probably me. Do you
19    understand what I'm getting at? The Internet Usage
20    Policy that NCRL has, do you know whether or not you
21    have to accept it in order to use the Internet?
22        MR. MANVILLE: Object to the form.
23        You can answer that.
24        THE WITNESS: Pardon me?
25        MR. MANVILLE: I'm just making an

## Page 29

1  objection for the record.
2        THE WITNESS: And I'm still unclear about
3    the question. I'm sorry.
4  Q. (By Mr. Adams) That's okay. Do you know whether or
5    not the NCRL requires its patrons to agree to and
6    accept the Internet Usage Policy before the patrons
7    are permitted to use the NCRL computers?
8  A. Oh, I would -- I would think so.
9  Q. Okay. So do you believe that you have, in fact,
10    accepted the policy and agreed to the policy before
11    using NCRL's computers?
12        MR. MANVILLE: Object to the form.
13        THE WITNESS: I think -- I'm not exactly
14    sure how to answer that. I don't -- I think I
15    agree with it to some degree but not entirely that
16    it's -- that it's necessarily the way it should be
17    or necessarily the way it needs to be in place at
18    this time.
19  Q. (By Mr. Adams) Okay. What would you change about
20    it?
21  A. Well, I think -- like this form, I think I would
22    want to have some kind of ability to go to the
23    librarian to be able to say, "Look, I'm looking for
24    information on this topic; and can you unlock the
25    filter?" or have access at that time not, you know,

8 (Pages 26 to 29)

| Page 30 |
|---|
| 1   however long that procedure takes. |
| 2   Q. Okay. Do you think it's appropriate for NCRL to |
| 3   filter for some subjects? |
| 4      MR. MANVILLE: Object to the form. |
| 5      THE WITNESS: For adults? |
| 6   Q. (By Mr. Adams) Yeah. |
| 7   A. I guess I don't know specifically what you have in |
| 8   mind. |
| 9   Q. Well, let's just choose, say, pornography. Do you |
| 10   think it's appropriate for NCRL to screen out |
| 11   Web sites that deal with pornography? |
| 12   A. I don't have any problem with that. |
| 13   Q. With that kind of screening -- |
| 14   A. Correct. |
| 15   Q. -- that type of filtering? |
| 16   A. Correct. |
| 17   Q. Okay. So filtering for that purpose is all right |
| 18   from your standpoint. |
| 19   A. I don't have a problem with that. I don't -- I |
| 20   certainly don't want children to be able to access |
| 21   whatever they want to access in that regards. |
| 22   Q. Okay. So filtering for children in particular |
| 23   doesn't create an issue for you. |
| 24   A. No, it doesn't. |
| 25   Q. Okay. Let's focus on adults for a second. Do you |

| Page 31 |
|---|
| 1   have any particular objection to NCRL's filtering |
| 2   Web content, Internet-based content, that deals with |
| 3   pornographic topics? |
| 4   A. For an adult, I don't know. But I know the library |
| 5   isn't a place that's private. So in that sense, I |
| 6   don't have a problem with them filtering that even |
| 7   for adults. |
| 8   Q. Okay. What about other illegal activity? Let's say |
| 9   online gambling or let's say Web sites that promote |
| 10   hacking or the proliferation of spyware, things that |
| 11   are against the law, do you think it's appropriate |
| 12   for NCRL to filter Web-based content deriving from |
| 13   sites that promote illegal activity? |
| 14   A. I don't think I have a problem with that either. |
| 15   Q. Okay. So for some subjects such as we're talking |
| 16   about -- illegal activity, pornography -- Internet |
| 17   filtering doesn't trouble you. |
| 18   A. No. |
| 19   Q. As a conceptual matter or in the way that NCRL is |
| 20   doing it; is that correct? |
| 21   A. Correct. |
| 22      MR. MANVILLE: Object to the form. |
| 23   Q. (By Mr. Adams) You can answer. |
| 24   A. Correct. |
| 25      MR. MANVILLE: It's also subject to lack |

| Page 32 |
|---|
| 1   of foundation. |
| 2   Q. (By Mr. Adams) What do you know about the -- if |
| 3   anything, about the filtering software and filtering |
| 4   service employed today by the NCRL? |
| 5   A. I don't have any idea. |
| 6   Q. Okay. Have you heard the brand name Fortinet, |
| 7   F-o-r-t-i-n-e-t? |
| 8   A. I saw it today. |
| 9   Q. Okay. In what context? |
| 10   A. On the computer. |
| 11   Q. Okay. Tell me what you saw. |
| 12   A. Just saw that name. |
| 13   Q. "Filtering by Fortinet" or something? |
| 14   A. (Witness nodding her head) |
| 15   Q. Is that a "yes"? |
| 16   A. Yes. |
| 17   Q. Okay. Do you know anything about the Fortinet |
| 18   service? |
| 19   A. No idea. |
| 20   Q. Okay. Do you know what categories of information or |
| 21   types of content NCRL does filter for now? |
| 22   A. No. |
| 23   Q. Okay. Same question as to the previous software |
| 24   that NCRL had in place, something called "Bess," |
| 25   B-e-s-s, do you know anything about that type of |

| Page 33 |
|---|
| 1   software? |
| 2   A. No. |
| 3   Q. Okay. Or what categories were filtered by NCRL |
| 4   using that software? |
| 5   A. No. |
| 6   Q. Do you know anything about how Fortinet classifies |
| 7   particular Web sites within certain topical areas or |
| 8   other topical areas? |
| 9   A. No. |
| 10   Q. Okay. Having been a substitute librarian for a time |
| 11   in Republic, do you have a thought about how |
| 12   libraries -- how NCRL goes about making |
| 13   content-based decisions in determining what is in or |
| 14   not in its collections? |
| 15   A. No, I don't. |
| 16   Q. Have you ever -- Were you ever a part of any |
| 17   collection decisions? |
| 18   A. No. |
| 19   Q. Okay. Are you familiar with NCRL's mission |
| 20   statement, Mrs. Bradburn? |
| 21   A. Off the top of my head, no. |
| 22   Q. Let me show you a document that we've marked |
| 23   previously as Exhibit 4. You're free to look at it |
| 24   in its entirety, but I'm really only interested in |
| 25   asking you a question or two about the mission |

9 (Pages 30 to 33)

## Page 46

1   IN RE: SARAH BRADBURN vs. NORTH CENTRAL REGIONAL LIBRARY
    NO. CV-06-327-EFS
2
3            CORRECTION SHEET
4   CHANGES IN FORM AND SUBSTANCE REQUESTED BE MADE IN THE
    FOREGOING ORAL EXAMINATION TRANSCRIPT:
5
    PAGE  LINE              CORRECTION AND REASON
6
7
8
9
10
11
12
13
14
15
16
17  I hereby certify that this is a true and correct copy of my
    testimony, with the exception of the corrections noted above.
18
19            SARAH MARIA BRADBURN
              Date
20
21            Notary Public in and for the state
              of Washington residing at
22            Subscribed and sworn to before me on
              this     day of      , 2007.
23            My commission expires on
24
    See: Wash. Reports 34A, Rule 30 (e)
25  USCA 28, Rule 30 (e)

## Page 47

1            C E R T I F I C A T E
2   STATE OF WASHINGTON)
             ) ss.
3   COUNTY OF CHELAN  )
4
5        THIS IS TO CERTIFY that I, Barbara J. Scoville,
6   Notary Public in and for the State of Washington, residing
7   at Entiat, reported the within and foregoing testimony; said
8   testimony being taken before me as a Notary Public on the
9   date herein set forth; that the witness was first by me duly
10  sworn; that said examination was taken by me in shorthand
11  and thereafter under my supervision transcribed, and that
12  same is a full, true and correct record of the testimony of
13  said witness, including all questions, answers and
14  objections, if any, of counsel, to the best of my ability.
15       I further certify that I am not a relative, employee,
16  attorney, counsel of any of the parties; nor am I
17  financially interested in the outcome of the cause.
18       Transcribed notes will be destroyed three years from
19  the affixed date unless requested by counsel to retain them.
20       IN WITNESS WHEREOF, I have hereunto set my hand and
21  affixed my official seal this _____ day of
22  _____, 2007.
23
24            Barbara J. Scoville, CCR, RPR
              CCR NO. 2124
25

13 (Pages 46 to 47)

# Exhibit NN

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

| | |
|---|---|
| SARAH BRADBURN, PEARL CHERRINGTON, CHARLES HEINLEN, and THE SECOND AMENDMENT FOUNDATION,<br><br>        Plaintiffs,<br><br>   vs.<br><br>NORTH CENTRAL REGIONAL LIBRARY DISTRICT,<br><br>        Defendant. | )<br>)<br>)<br>) Case No.<br>)<br>) CV-06-327-EFS<br>)<br>)<br>)<br>)<br>)<br>) |

DEPOSITION OF LIAM CHASTEEN
January 17, 2008
Sunnyvale, California

Reported by:
EMI ALBRIGHT
RPR, CSR No. 13042
Job No. 78479

1                   UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF WASHINGTON

3                           AT SPOKANE

4    _____

5

6    SARAH BRADBURN, PEARL CHERRINGTON,          )
     CHARLES HEINLEN, and THE SECOND AMENDMENT   )
7    FOUNDATION,                                 )
                                                 ) Case No.
8                   Plaintiffs,                  )
                                                 ) CV-06-327-EFS
9             vs.                                )
                                                 )
10   NORTH CENTRAL REGIONAL LIBRARY DISTRICT,    )
                                                 )
11                  Defendant.                   )
                                                 )
12

13   _____

14

15

16            DEPOSITION OF LIAM CHASTEEN, taken on behalf of

17   Defendant, at 1100 North Matilda Avenue, Sunnyvale,

18   California, beginning at 2:10 p.m. and ending at 4:12 p.m.,

19   on January 17, 2008, before me, EMI ALBRIGHT, RPR, CSR

20   No. 13042.

21

22

23

24

25

## Page 34

1 the market at the time you joined Fortinet?
2     A  I believe so.
3     Q  And that would have been in 2004?
4     A  That is correct.
5     Q  Has the service been updated in any major
6 way? Has there been a more recent edition released
7 since your employment began with Fortinet?
8     A  Can you rephrase that question?
9     Q  Has there been a Fortinet 1.0 and a 2.0 and
10 a 3.0? Where are we in the --
11     A  With regards to version numbering that's
12 more of a marketing kind of a thing. On the back end in
13 engineering everything is undergoing constant
14 development. So as to how the version numbering goes, I
15 couldn't provide any information to that.
16     Q  Tell me what you mean by that when you say
17 that on the back end the engineering is undergoing
18 constant development. What is being developed?
19     A  New features, improved infrastructure.
20 It's not constantly deployed but it's constantly under
21 development, and at specific points in time they
22 release. So although to the public it may appear that
23 releases occur every so many months, in reality it's
24 constantly undergoing development in the back end.
25     Q  Are engineering initiatives constantly

## Page 35

1 underway aimed at improving the accuracy of the filter?
2     A  That would be more the FortiGuard back end
3 stuff, which I don't have a whole deal of information
4 on.
5     Q  Is that an engineering function as opposed
6 to a marketing function?
7     A  That would be an engineering function but
8 an aspect of the service side of engineering.
9     Q  Are you familiar with the Children's
10 Internet Protection Act?
11     A  I have a vague knowledge of what that is.
12     Q  Sometimes referred to by the acronym, CIPA,
13 C-I-P-A?
14     A  Yes.
15     Q  Is the FortiGuard web filtering service
16 CIPA compliant?
17     MR. MANVILLE:  Object to the form of the
18 question.
19 BY MR. ADAMS:
20     Q  You can answer.
21     A  What was that?
22     Q  He objected to the form of the question but
23 it does not affect your --
24     A  Could you rephrase that question?
25     Q  Is the FortiGuard web filtering service

## Page 36

1 certified by Fortinet to comply with the requirements of
2 CIPA?
3     A  The FortiGate can be a useful tool in
4 achieving CIPA compliance.
5     (Exhibit No. 59 marked
6     for identification.)
7
8     Q  Mr. Chasteen, I am going to show you a
9 three page document that we marked Deposition
10 Exhibit 59. This is www.fortinet.com/solutions/web_
11 filtering.html.
12     A  Okay.
13     Q  The last sentence of the first paragraph on
14 page 1 of Exhibit 59, second to the last sentence
15 actually says, Fortinet's web filtering solutions are
16 also CIPA certified. Do you see that?
17     A  No. Where am I looking?
18     Q  First paragraph under the heading, Fortinet
19 in web filtering, the second to last sentence in that
20 paragraph?
21     A  Okay.
22     Q  Did you find it?
23     A  Yes.
24     Q  What is meant by the statement that the
25 Fortinet web filtering solutions are CIPA certified?

## Page 37

1     A  I would have to assume that it means our
2 products can help in CIPA compliance so that libraries
3 and schools can be certified. To the best of my
4 knowledge, there is no certification process for actual
5 products with regards to CIPA.
6     Q  Continuing in that same paragraph under
7 the -- a little lower under the heading, web filtering
8 simplified, there are a number of bullet points listed.
9 And again in the middle you see CIPA certified; do you
10 not?
11     A  Yes.
12     Q  And from what you just said, it sounds like
13 you are unaware of who is doing the certification or
14 what actually is being certified?
15     A  Yeah, I can't attest to what they mean by
16 that on that page.
17     Q  The bullet point immediately above that
18 states, URL database is updated constantly. Is that
19 consistent with your understanding of the manner in
20 which the URL database is maintained?
21     A  Yes.
22     Q  Do you have a sense of how much the
23 database grows, say, in a month?
24     A  No, I do not.
25     Q  Flip to the third page if you would of

10 (Pages 34 to 37)

### Page 54

1    A    Yes.
2    Q    Of the 70 some categories that we have
3 talked about several times on Exhibit 58, have any
4 particular categories stood out in your experience at
5 Fortinet as being subject to any kind of controversy or
6 internal debate for any reason about what is included
7 and what is not?
8    A    I would have no direct knowledge of that.
9    Q    How about indirect?
10    A    No.
11    Q    Do you have Exhibit 57 in front of you?
12    A    Yes.
13    Q    Who is the person or persons perhaps on the
14 web filtering team, perhaps on another team who decides
15 when another database version is to be released?
16    A    I would not know.
17    Q    If you read through the second sentence in
18 that paragraph below the heading, FortiGuard Center,
19 where it says, our FortiGuard web filtering 2.0
20 subscription service, et cetera, offers more than
21 30 million web sites categorized into 76 unique content
22 categories.
23         If you compare that 30 million number with
24 the 43,000,000 number over on the right side, you got a
25 significant difference, of course. And I am wondering

### Page 55

1 if you can help me reconcile that? Is it simply a
2 matter of part of the content not having been updated?
3    A    I couldn't state with any absolute
4 certainty. But my assumption would be that more than
5 30 million web sites, that content was written at some
6 point in time and has not been updated, whereas the web
7 sites categorized is dynamic and is updated. Basically
8 every time they update the database, that value would be
9 updated. So at some point in time it was just slightly
10 over 30 million, and for brevity sake they merely stated
11 more than 30 million web sites.
12         MR. NELSON: Are we going much longer?
13         MR. ADAMS: Let's take a break right now.
14         (Recess 3:36 p.m.-3:56 p.m.)
15
16
17         EXAMINATION
18 BY MR. MANVILLE:
19    Q    Mr. Chasteen, my name is Duncan Manville.
20 I am one of the attorneys representing the plaintiffs in
21 this case. I just had a few questions for you. We will
22 try to keep this quick so Tom can get out of here and
23 catch his flight.
24         You were talking with counsel earlier about
25 the Children's Internet Protection Act, or CIPA; do you

### Page 56

1 recall that?
2    A    Yes.
3    Q    Have you ever read CIPA?
4    A    Not the entire actual legislation. I have
5 read a brief synopsis and summary of it.
6    Q    Do you recall where the brief synopsis came
7 from?
8    A    No, I do not.
9    Q    Was it in a publication or was it online or
10 something like that?
11    A    Online.
12    Q    Do you have any understanding of what CIPA
13 requires libraries to do?
14    A    Vaguely.
15    Q    What is your understanding of what CIPA
16 requires libraries to do with regard to Internet
17 filtering?
18    A    With regards to Internet filtering, it
19 needs to protect certain types of content, specifically
20 content that is harmful to minors, indecent, obscene,
21 and, secondly, it also needs to provide policies for
22 enforcing that content filtering.
23    Q    What do you mean by policies for enforcing
24 the content filtering? What is your understanding of
25 what those policies need to be?

### Page 57

1    A    My understanding is that it needs to
2 basically be clearly defined what is being filtered, and
3 it needs to -- in order to be certified, this
4 institution must define how it is being filtered.
5    Q    Can a librarian at a particular library
6 branch that is using the FortiGuard filter disable the
7 filter on a particular computer terminal?
8    A    Yes.
9    Q    How would a librarian go about doing that?
10    A    Depending on how the FortiGate was
11 configured, it could be as simple as merely logging in
12 and checking a check box.
13    Q    That would allow a library patron to have
14 unfiltered Internet access at that terminal; correct?
15    A    If properly configured; correct.
16    Q    You had a discussion with Mr. Adams earlier
17 about whether the FortiGate filter can be -- the
18 FortiGuard filter -- excuse me -- can be configured to
19 allow access to particular web pages on a web site; do
20 you recall that conversation?
21    A    No. Can you refresh my memory?
22    Q    Well, why don't I just ask you some
23 questions about it. It does not really matter if you
24 remember it or not.
25    A    All right.

15  (Pages 54 to 57)

## Page 58

1    Q   Let's take a site like Playboy, for
2  example. Do you know whether the Playboy web site in
3  its entirety is categorized by FortiGuard as adult
4  materials or pornography or something like that?
5    A   I have no direct knowledge of that. I
6  would assume so.
7    Q   Would you anticipate that individual web
8  pages on the Playboy web site might be categorized
9  differently; for example, a page that does not have any
10 pictures of nude women but simply an interview with a
11 celebrity, for example, would you expect that page to be
12 categorized differently than the web site as a whole?
13   A   I have no direct knowledge into how
14 categorization actually is implemented.
15   Q   All right. You testified that there were
16 some web sites, for example, GeoCities or Wikipedia,
17 where the web site as a whole might have a single rating
18 and then individual pages might also be individually
19 rated. Do you recall that testimony?
20   A   Yes.
21   Q   Do you have any knowledge of whether with
22 regard to Wikipedia, specifically, that's the case?
23   A   I don't know with Wikipedia, specifically,
24 if that is the case.
25   Q   Can you think of any specific web site, can

## Page 59

1  you identify any specific web site that is categorized a
2  particular way and that also has individual web pages on
3  the site that are categorized differently?
4    A   No, I don't have access to that specifics.
5  I have a general knowledge, and I know that the system
6  is capable of doing that. How it's actually implemented
7  is outside of my scope of knowledge.
8    Q   All right. And when you say the system is
9  capable of being implemented that way, do you mean
10 implemented in that fashion by Fortinet or by the end
11 user?
12   A   Technically both. The FortiGuard service
13 maintained by Fortinet can categorize something based on
14 a domain name and then have subcategorizations for
15 individual pages. A FortiGate owner can configure
16 specific URLs to allow them to pass the filter on a per
17 user basis.
18   Q   So, for example, a FortiGate user could
19 identify a particular URL on, say, the Playboy web site
20 and configure the system so the access to that page is
21 allowed even though access to, let's say, the main flash
22 page, Playboy flash page would be denied; right?
23   A   Yes.
24   Q   Could a library -- could a library create
25 one filtering policy for adults and another filtering

## Page 60

1  policy for children? Let me ask that question in two
2  ways.
3    First, I assume that a library could do
4  that on different terminals; in other words, the library
5  could have one terminal configured in a particular way,
6  let's say, in an adult section of the library, and then
7  the library could configure a different terminal another
8  way in a children's section of the library; correct?
9    MR. ADAMS:  I will just object to the form
10 of the question since he is not here to speak to what
11 libraries can and cannot do. He can speak to what
12 FortiGate allows or FortiGuard allows.
13 BY MR. MANVILLE:
14   Q   Well, that's the question. I am not
15 talking about whether a library has the legal authority
16 to do that. I am talking about whether the FortiGate or
17 FortiGuard system would allow the library to configure
18 different terminals in different ways?
19   A   Yes.
20   Q   Would it be possible for a library to
21 configure -- to have different configurations on the
22 same terminal such that the library patron could log
23 onto a terminal and select, for example, filtered or
24 unfiltered access?
25   A   I have no direct knowledge of that

## Page 61

1  particular application.
2    Q   So you don't know one way or the other
3  whether it would be possible for a library to set up a
4  system where a patron could sit down at a terminal and
5  click on a button to obtain unfiltered access to the
6  Internet versus filtered access?
7    A   I don't have that knowledge at this moment.
8    Q   But it would be possible for a librarian or
9  an IT person employed by the library to disable a filter
10 on that computer terminal at the request of a patron?
11   A   Yes.
12   Q   Do you have any personal knowledge of --
13 let me ask this a different way. I know that -- let me
14 see if I can get you the right exhibit here. Hold on a
15 second.
16   I believe Exhibit 58 is the URL categories;
17 is that right?
18   A   It appears to be the case, yes.
19   Q   And this is a list that is published by
20 Fortinet to summarize the types of materials that are
21 included within each category; is that correct?
22   A   Yes.
23   Q   Other than what is listed here, other than
24 the descriptions contained in this list, do you have any
25 understanding of what types of web sites are included in

16  (Pages 58 to 61)

Page 66

```
1
2
3
4
5
6
7        I, LIAM CHASTEEN, do hereby declare under penalty
8   of perjury that I have read the foregoing transcript of my
9   deposition; that I have made such corrections as noted
10  herein, in ink, initialed by me, or attached hereto; that my
11  testimony as contained herein, as corrected, is true and
12  correct.
13
14      EXECUTED this _____ day of _____, 2008, at
15  _____(City), _____(State).
16
17
18          LIAM CHASTEEN
19
20
21
22
23
24
25
```

Page 67

```
1   STATE OF CALIFORNIA )
2           : ss        )
3   County of Alameda  )
4
5       I, the undersigned, a Certified Shorthand Reporter
6   of the State of California, do hereby certify:  That the
7   foregoing proceedings were taken before me at the time and
8   place herein set forth; that any witnesses in the foregoing
9   proceedings, prior to testifying, were placed under oath;
10  that a verbatim record of the proceedings was made by me
11  using machine shorthand which was thereafter transcribed
12  under my direction; further, that the foregoing is an
13  accurate transcription thereof.
14      I further certify that I am not a relative,
15  employee, attorney or counsel of any party to this action or
16  relative or employee of any such attorney or counsel and that
17  I am not financially interested in the said action or the
18  outcome thereof;
19      IN WITNESS WHEREOF, I have this date subscribed my
20  name.
21      Dated:_____
22
23
24      EMI ALBRIGHT, CSR No. 13042
25
```

18 (Pages 66 to 67)

# Exhibit OO

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

| | |
|---|---|
| SARAH BRADBURN, PEARL CHERRINGTON, CHARLES HEINLEN, and THE SECOND AMENDMENT FOUNDATION, | ) ) ) ) |
| Plaintiffs, | ) NO. ) CV-06-327-EFS |
| vs. | ) ) |
| NORTH CENTRAL REGIONAL LIBRARY DISTRICT, | ) ) ) |
| Defendant. | ) ) |

DEPOSITION UPON ORAL EXAMINATION OF
PEARL ANNE CHERRINGTON

TAKEN ON:      Monday, August 13th, 2007

TAKEN AT:      Omak Library
               30 South Ash
               Omak, Washington

START TIME:    10:42 A.M.

END TIME:      11:58 A.M.

REPORTED BY:   BARBARA J. SCOVILLE, CCR, RPR
               CCR NO. 2124

accba41b-d087-48a0-b97a-c037d7d02375

Page 2

1   APPEARANCES:

2   FOR THE PLAINTIFFS:

3           MR. DUNCAN MANVILLE, ESQ.
            RAFEL MANVILLE, PLLC
4           Attorneys at Law
            999 3rd Avenue
5           Suite 1600
            Seattle, Washington 98104
6           (206) 838-2660

7

8   FOR THE DEFENDANT:

9           MR. THOMAS D. ADAMS, ESQ.
            KARR TUTTLE CAMPBELL
10          Attorneys at Law
            1201 Third Avenue
11          Suite 2900
            Seattle, Washington 98101
12          (206) 223-1313

13

14

15

16  ALSO PRESENT:  MR. DEAN MARNEY
                   MR. DAN HOWARD
17

18

19

20

21

22

23

24

25

accba41b-d087-48a0-b97a-c037d7d02375

## Page 22

1   to tamper with the system and not to do any hacking.
2   And that's all I recall that it said. It was a
3   little sign.
4   Q. In a previous deposition, we marked this as
5   Deposition Exhibit 3, and I'm going to show this to
6   you now, Mrs. Cherrington. And let me just ask you
7   to take a quick look at that and let me know when
8   you've had a chance to do that.
9   A. Okay. I've read it.
10  Q. Have you had a chance to look at Exhibit 2 (sic)?
11  A. Uh-huh.
12  Q. Have you seen this before?
13  A. Now that I see it. I have seen it on the screen, but
14  I really didn't take the time to read it thoroughly.
15  Q. Okay.
16  A. There are certain words in and then phrases in
17  there that I can recall seeing -- having seen.
18  Q. Were you generally aware that Internet access was
19  filtered?
20  A. At the time I went in there. I wasn't aware of it.
21  Q. Okay. When I showed you this document a moment ago,
22  I don't recall if I made reference to "Deposition
23  Exhibit 2" or "Deposition Exhibit 3." I meant to
24  say "3" if I said "2". And I just want to make sure
25  that we're clear that we're referring to Exhibit 3.

## Page 23

1   A. Yes.
2   Q. In the pile of deposition exhibits I've put in front
3   of you now, Deposition -- the document that we have
4   previously marked as Deposition Exhibit 2 is a
5   one-page document. Will you take a look at that for
6   a moment, please.
7   A. Okay.
8   Q. Have you seen this document which is called a
9   "Material Selection Review Form" prior to my just
10  showing it to you just now?
11  A. No.
12  Q. Okay. So you didn't fill out a form like this when
13  you were blocked at getting to the Idaho gallery
14  Web site?
15  A. No, no, I did not.
16  Q. Apart from this Idaho gallery's Web site, have you
17  ever experienced a similar episode where you tried
18  to get to a Web site and have been denied access?
19  A. Yes, I do.
20  Q. Do you recall any specific Web sites?
21  A. I don't recall the specific Web site.
22  Q. In general, can you tell me were they related
23  Web sites to a particular topic?
24  A. No, they weren't. It was -- Well, yeah, I can tell
25  you the topic. I Googled it. It was "anal

## Page 24

1   fissure," and it blocked that -- me from putting
2   that in.
3   Q. Okay. You were just researching a health topic?
4   A. Yes, I was.
5   Q. Okay. Did you bring that to the attention of Terry
6   or anyone else at NCRL?
7   A. I didn't because I knew -- I realized, well, it's
8   one of those that was filtered.
9   Q. Okay. So. again, you would not have filled out a
10  Material Selection Review Form?
11  A. Right.
12  Q. Okay. Have you ever sought out assistance from the
13  Twisp branch staff about how you might formulate an
14  Internet inquiry to get around a blocked-site
15  notice?
16  A. No.
17  Q. Have you ever talked to Terry or anyone else at
18  Twisp about Internet searching generally, about how
19  to be effective in Internet searching?
20  A. No.
21  Q. Is it your position in this lawsuit,
22  Mrs. Cherrington, that adult patrons of NCRL
23  branches should have unfiltered access to the
24  Internet?
25  A. Yes.

## Page 25

1   Q. Do you think a filter is appropriate for any topic?
2   A. No.
3   Q. Okay. What about, say, pornography?
4   A. You would have to define what "pornography" is.
5   Q. Okay. Let's use your definition of "pornography,"
6   and you don't even have to tell me what your
7   definition is. We all know it when we see it. I
8   think the Supreme Court has told us.
9   A. Uh-huh.
10  Q. But with your definition in mind. do you agree or
11  disagree that it's proper for NCRL to filter out
12  Web sites that would touch upon that definition of
13  "pornography" that you have in mind?
14        MR. MANVILLE: Object to the form of the
15  question.
16        But you can go ahead and answer.
17        THE WITNESS: Could you repeat the
18  question, please.
19        MR. ADAMS: I'm not sure I can.
20        I'll let you reread it.
21
22        (CONTINUE ON THE FOLLOWING PAGE.)
23
24
25

## Page 26

1  (THE FOLLOWING RECORD WAS READ:)
2
3  "Q  But with your definition in mind, do
4      you agree or disagree that it's
5      proper for NCRL to filter out
6      Web sites that would touch upon that
7      definition of 'pornography' that you
8      in mind?")
9
10  THE WITNESS: Okay. Well, my definition
11  of "pornography" is I know there are forms of
12  pornography that are illegal that the Supreme Court
13  has said. Those would be the ones that would be
14  filtered if they are illegal.
15  Q. (By Mr. Adams) Would you agree that filtering for
16      that purpose is proper?
17  A. Yes.
18  Q. And you wouldn't have a problem with the library
19      filtering for those particular Web sites?
20  A. If it's against the law, I wouldn't have a problem.
21  Q. Okay. Does that extend to -- does that reasoning
22      extend to other topics that would be against the
23      law, let's say, online gambling or, let's say,
24      Web sites focused on teaching people how to hack
25      into computers --

## Page 27

1  A. Uh-huh.
2  Q. -- things that are clearly illegal?
3  A. Okay. If they're clearly illegal, then they could
4      be filtered.
5  Q. Okay. Do I take it from your statements then that
6      you would agree that there are some types of speech
7      which are not constitutionally protected?
8      MR. MANVILLE: I'll object to the form.
9  Q. (By Mr. Adams) You can still answer.
10  A. I'm sorry, the question?
11  Q. Would you agree with me that there are some
12      categories of speech, of expression, which are not
13      constitutionally protected?
14      MR. MANVILLE: Object to the form.
15      THE WITNESS: I don't understand the
16  question. I'm sorry.
17  Q. (By Mr. Adams) Okay. Let me try it a slightly
18      different way. Would you agree with me that there
19      are certain categories of speech, certain topics of
20      content, which if access is blocked raise no
21      Constitutional issue?
22      MR. MANVILLE: Object to the form of the
23  question.
24      THE WITNESS: It's still confusing to me.
25  Q. (By Mr. Adams) I don't mean to belabor this. You

## Page 28

1  told me that you don't have an issue with the
2  library blocking Web sites devoted to the sorts of
3  pornographic content which have been deemed illegal
4  correct?
5  A. Yes. uh-huh.
6  Q. Okay. So would you also agree that if the library,
7      the NCRL, blocked access to those sites that it
8      would not be invading the Constitutional rights
9      under the First Amendment or the Constitutional
10      rights under the Washington State Constitution of a
11      user such as yourself?
12      MR. MANVILLE: Object to the form of the
13  question.
14      THE WITNESS: If just -- All I can say
15  is if it's illegal, then they have a right to filter
16  it if it is deemed illegal by the Supreme Court or
17  the State of Washington.
18  Q. (By Mr. Adams) Okay. And the flip side of that is
19      you would not claim, would you, a Constitutional
20      right to access it through NCRL's computers?
21  A. That is right. That is right.
22  Q. Thank you.
23  A. Sorry.
24  Q. So filtering for some purposes can be appropriate in
25      your view; true?

## Page 29

1  A. Yes.
2  Q. Okay. I appreciate from your prior testimony that
3      you've never invoked the NCRL's procedure for
4      reviewing blocked sites and possibly unblocking
5      them, but I'll ask you to just take it as a given
6      that such a procedure exists. All right?
7  A. Okay.
8  Q. If you were to invoke such a procedure, what would
9      you believe to be a reasonable time to get a
10      response back from the library?
11  A. Within the hour.
12  Q. Okay. What about within a day?
13  A. I think within a day is too long because those of us
14      that live ten miles out would have to come in the
15      next day to get an answer or we could call. But you
16      have to wait too long. And if you need information
17      quickly, that's too long to wait given that the
18      Internet is so instantaneous. So waiting a day is
19      still not good.
20  Q. Okay. If a branch had no computer terminals but you
21      wanted to get access to a certain book --
22  A. Uh-huh.
23  Q. -- how long would you expect to wait for that book
24      if it came by inter-library loan?
25  A. We wait about a week.

## Page 38

1    decisions in deciding what to include in their
2    collections?
3    A. I would guess so.
4    Q. They can't include everything.
5    A. Right, they can't -- they can't include everything.
6    Q. So would you agree that in determining what
7    categories of content to exclude from Internet
8    access the libraries are making a form of a content
9    decision?
10   A. They are making a form of content decision, yes.
11   Q. And would you also agree that all content is not
12   appropriate for viewing by the library's patrons?
13   A. Once again, if we go back to illegitimate -- or
14   illegal, I would agree to that.
15   Q. Okay. And that might be true, would it not, of
16   adults as well as children?
17   A. Well --
18   Q. If it's illegal for a child --
19   A. If it's illegal, yes.
20   Q. -- it can be illegal for an adult.
21   A. Uh-huh, yes, yes.
22   Q. Have you spoken to the news media about this
23   lawsuit?
24   A. Yes, I have.
25   Q. The Wenatchee World?

## Page 39

1    A. Yes.
2    Q. Okay.
3    A. And the Methow Valley newspaper.
4    Q. Reporter K.C. Mahaffey from the Wenatchee World is
5    referenced in your Interrogatory Answers, but it
6    doesn't look like you can recall who wrote the story
7    for the Methow Valley News; right?
8    A. I don't.
9    Q. How long ago did the Methow Valley article appear?
10   A. A couple of years, a couple of years ago, a year and
11   a half ago.
12   Q. Oh, okay. Are you familiar with the United States
13   Supreme Court decision in the US v. ALA lawsuit?
14   A. What is "ALA"?
15   Q. American Libraries Association.
16   A. No, I'm not.
17   Q. Okay. Have you ever read the ALA decision?
18   A. No, I haven't.
19   Q. Have you heard of the Children's Internet Protection
20   Act?
21   A. I've heard of it. I don't know the content, but
22   I've heard of.
23   Q. Sometimes it's referred to as "CIPA".
24   A. Okay.
25   Q. Have you heard of CIPA?

## Page 40

1    A. Yes.
2    Q. Okay. But you're not necessarily up to speed on
3    CIPA any more than the ALA decision. I guess. I
4    don't mean to characterize it.
5    A. Yeah. I don't know the details about it.
6         MR. ADAMS: Okay. Let's take a break if
7    we can.
8
9         (A BRIEF RECESS WAS TAKEN.)
10
11   Q. (By Mr. Adams) Mr. Cherrington, you are aware, of
12   course, that the library serves patrons of all ages;
13   is that right?
14   A. Yes.
15   Q. Children -- young children to adults?
16   A. Yes.
17   Q. Okay. Would you also agree that in serving the
18   needs of that diverse demography that the library
19   necessarily needs to balance the interests of all?
20   A. Yes.
21   Q. What might be appropriate for an adult to view may
22   not be appropriate for a minor; is that true?
23   A. Yes.
24   Q. And in the category of adults, there are some things
25   that not even adults have a right to view on the

## Page 41

1    Internet; is that true?
2         MR. MANVILLE: Objection to the form of
3    the question.
4         THE WITNESS: Again, if it's illegal.
5    Q. (By Mr. Adams) Okay. So Internet filtering, in
6    some respects, does not present a problem for you,
7    does it, when it pertains to things that are
8    illegal?
9    A. Yes.
10   Q. True?
11   A. Yes.
12   Q. Is there anything that you can think of that would
13   prevent you this afternoon from driving to the Twisp
14   branch and asking Terry to submit for review the
15   URL, the Web site address, for the Idaho gallery
16   with the request that it be unblocked? Anything
17   preventing you from doing that?
18   A. There isn't except I don't remember the site.
19   Q. All right, fair enough. If you were able to
20   remember the site, nothing would prevent you from
21   asking that it be unblocked.
22   A. Right.
23   Q. Okay.
24   A. I would have to wait a day though for an answer; is
25   that right?

11 (Pages 38 to 41)

## Page 46

1  IN RE: SARAH BRADBURN vs. NORTH CENTRAL REGIONAL LIBRARY
   NO. CV-06-327-3FS

2

3          CORRECTION SHEET
4  CHANGES IN FORM AND SUBSTANCE REQUESTED BE MADE IN THE
   FOREGOING ORAL EXAMINATION TRANSCRIPT:

5

   PAGE  LINE         CORRECTION AND REASON

6

7

8

9

10

11

12

13

14

15

16

17  I hereby certify that this is a true and correct copy of my
   testimony, with the exception of the corrections noted above.

18

19         PEARL ANNE CHERRINGTON
        Date

20

21         Notary Public in and for the state
        of Washington residing at

22         Subscribed and sworn to before me on
        this    day of    , 2007.

23         My commission expires on

24

   See: Wash. Reports 34A, Rule 30 (e)

25  USCA 28, Rule 30 (e)

## Page 47

1         C E R T I F I C A T E
2  STATE OF WASHINGTON)
        ) ss.
3  COUNTY OF CHELAN  )

4

5       THIS IS TO CERTIFY that I, Barbara J. Scoville,
6  Notary Public in and for the State of Washington, residing
7  at Entiat, reported the within and foregoing testimony; said
8  testimony being taken before me as a Notary Public on the
9  date herein set forth; that the witness was first by me duly
10  sworn; that said examination was taken by me in shorthand
11  and thereafter under my supervision transcribed, and that
12  same is a full, true and correct record of the testimony of
13  said witness, including all questions, answers and
14  objections, if any, of counsel, to the best of my ability.
15       I further certify that I am not a relative, employee,
16  attorney, counsel of any of the parties; nor am I
17  financially interested in the outcome of the cause.
18       Transcribed notes will be destroyed three years from
19  the affixed date unless requested by counsel to retain them.
20       IN WITNESS WHEREOF, I have hereunto set my hand and
21  affixed my official seal this _____ day of
22  _____, 2007.

23

24         Barbara J. Scoville, CCR, RPR
        CCR NO. 2124

25

SCOVILLE COURT REPORTING      **26**
(509) 884-1712

accba41b-d087-48a0-b97a-c037d7d02375

# Exhibit PP

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

| | |
|---|---|
| SARAH BRADBURN, PEARL CHERRINGTON, CHARLES HEINLEN, and THE SECOND AMENDMENT FOUNDATION, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| NORTH CENTRAL REGIONAL LIBRARY DISTRICT, | ) ) ) |
| Defendant. | ) |

No. CV-06-327-EFS

DEPOSITION UPON ORAL EXAMINATION OF
ALAN MERRIL GOTTLIEB

September 12, 2007
Seattle, Washington

Taken Before:

Cheryl L Hendricks, CCR #2274
Certified Court Reporter
of
CAPITOL PACIFIC REPORTING, INC.
2401 Bristol Court SW, Olympia, WA 98502
Tel (360) 352-2054  Fax (360) 705-6539

| Tacoma | Seattle | Aberdeen |
|---|---|---|
| (253) 564-8494 | (206) 622-9919 | (360) 532-7445 |
| Chehalis | Bremerton | |
| (360) 330-0262 | (360) 373-9032 | |

www.capitolpacificreporter.com
scheduling@capitolpacificreporting.com

276b7a5e-fe43-4961-95db-7c36a94e701a

1                          APPEARANCES

2

    FOR THE PLAINTIFF:   AARON H. CAPLAN
3                        STAFF ATTORNEY
                         AMERICAN CIVIL LIBERTIES UNION
4                            CF WASHINGTON
                         705 2ND AVENUE, #300
5                        SEATTLE, WA 98104-1799
                         PHONE: (206) 624-2184
6                        FAX: (206) 624-2190
                         E-MAIL: caplan@aclu-wa.org
7

8    FOR THE DEFENDANT:   THOMAS D. ADAMS
                         ATTORNEY AT LAW
9                        KARR TUTTLE CAMPBELL
                         1201 THIRD AVENUE, #2900
10                       SEATTLE, WA 98101
                         PHONE: (206) 223-1313
11                       FAX: (206) 682-7100
                         E-MAIL: tadams@karrtuttle.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Page 34

1  rights movement wasn't really organized as a movement,
2  made up of lots of different people and organizations,
3  so the same kind of thing.
4  Q  So there are no identified officers or even members of
5     The Wise Use Movement; is that right?  Is it more of an
6     idea?
7  A  There are no -- in the answer to the first part of your
8     question, there are no officers or members per se.
9     There's no organization. As far as an idea goes, it's a
10    little nebulous for me.
11 Q  Is there intellectual property, in your opinion,
12    associated with The Wise Use Movement?
13 A  Not that the movement would own. Individuals or
14    organizations might own.
15 Q  Okay. What individuals --
16        (Interruption by the reporter.)
17 A  Not -- not -- the movement itself would obviously own no
18    intellectual property, but various individuals or
19    organizations probably would.
20 Q  (By Mr. Adams)  Would you be one of those individuals?
21        THE WITNESS: Do you want me to repeat any of
22    that?
23        THE REPORTER: No. I've got it.
24 Q  (By Mr. Adams)  Would you be one of them?
25 A  One could make an argument that I would because I've

## Page 35

1  written books and articles and I assume that's
2  intellectual property.
3  Q  What about the Council for National Policy, what kind of
4     organization is that?
5  A  It's a national organization made up of individuals to
6     promote a national -- a national policy with a
7     conservative libertarian bent to it.
8  Q  Okay. Do you have a leadership position in that
9     organization?
10 A  Not at this time, no. I was on its Executive Committee
11    Board for a number of years.
12 Q  From when to when?
13 A  Oh, boy. Say, mid '80s through mid '90s probably.
14 Q  Are you still an active member?
15 A  No.
16 Q  But you're a part of that group?
17 A  No. If you're not a member you're not a part of it.
18 Q  Okay. So you're not a part of the Council for National
19    Policy at this time?
20 A  At this time, no.
21 Q  Okay. Did you choose to leave it?
22 A  Yes.
23 Q  Why?
24 A  The dues are rather expensive and I didn't -- and --
25    and -- and you have to go to a number of meetings per

## Page 36

1  year and my schedule is really tough to make the
2  meetings and so I wasn't really able to participate. It
3  wasn't worth paying the dues if I couldn't go.
4  Q  Okay. You mentioned a number of nonprofit
5     organizations, American Political Action Committee,
6     nointernettax.org, Keep and Bear, the Citizens
7     Committee, and then there's -- I'm probably mixing up my
8     names. I apologize.
9  A  Don't feel bad. I do it all the time.
10 Q  My question is this: Of any of these organizations that
11    we've discussed today, do any of these organizations
12    have a philosophical position about Internet filtering?
13 A  A philosophical position, I can't say that they do.
14 Q  I mean, I suspect that you would -- you might say that
15    Second Amendment Foundation does because they're a party
16    to this lawsuit; is that correct?
17 A  Well, you said philosophical position. In the case of
18    the Foundation, it's a practical one. We'd like our
19    materials to be able to be viewed on the Internet.
20 Q  Okay. Does SAF not have a philosophical position beyond
21    the practical one then?
22 A  Correct. The Foundation, Second Amendment Foundation,
23    really pretty much only deals with one issue, the right
24    to keep and bear arms.
25 Q  Okay. Well, if I told you here now that the Second

## Page 37

1  Amendment Foundation's web-based content, Women & Guns
2  web-based content, and the web-based content of any and
3  all other sources of information generated by the Second
4  Amendment Foundation is freely available through NCRL
5  computers, would you tell me that you have no claim
6  against the NCRL then?
7  A  Well, I guess I'd have to say this: That I don't know
8     that would be the case tomorrow based on their past
9     performance.
10 Q  What if I told you that was the case yesterday? What if
11    I told you that was the case when this lawsuit was
12    filed, what would you say?
13 A  I'd say I don't really necessarily believe that was the
14    case when the lawsuit was filed based on the calls and
15    complaints we received at our office.
16 Q  If I told you it's true and you determined that it's
17    true, would you agree that you have no claim in this
18    case?
19 A  Not you telling me. Me seeing some evidence maybe.
20        (Interruption by the reporter.)
21 A  Your telling me wouldn't convince me.
22 Q  (By Mr. Adams)  Fine. If you sent a representative or
23    yourself walked into an NCRL branch and typed in the URL
24    www.womenandguns.com and it came up unrestricted, would
25    you agree that The Second Amendment Foundation has no

10  (Pages 34 to 37)

## Page 38

1  place in this lawsuit?
2       MR. CAPLAN: I'm going to object to the phrase
3  no place in the lawsuit and claim as vague and calling
4  for legal conclusions.
5  Q (By Mr. Adams) You can still answer.
6  A No, I wouldn't say we don't -- we don't have a claim
7  because --
8       (Interruption by the reporter.)
9  A I wouldn't say that. I believe at the time our
10  information was blocked on their -- on the library
11  system's computers and I have no guarantee that it
12  wouldn't be blocked tomorrow or next week or next year
13  based on past performance.
14       Can I -- before you ask your question?
15       (Discussion held off record.)
16  A I'm ready.
17       (Exhibit No. 18 marked.)
18  Q (By Mr. Adams) Mr. Gottlieb, I have handed you a
19  two-page document that we have marked Deposition
20  Exhibit 18. And I'll represent to you that this is a
21  copy of a document that we obtained from the Second
22  Amendment Foundation website and that has also been
23  provided in discovery. Take a look at it, if you would,
24  please, and let me know when you have finished.
25  A I recognize the document.

## Page 39

1  Q Okay. Is Exhibit 18 a document that you drafted?
2  A I did not draft it. It would have been drafted by
3  our -- by Dave Workman who serves as our public -- who
4  does this type of stuff. I'm forgetting -- I'm
5  forgetting what his exact title is. But he deals with
6  putting out our news releases.
7  Q Did you approve it?
8  A Yes.
9  Q Have you ever been to an NCRL branch?
10  A No, I have not. Well, I can't say that for certainty.
11  I may have been -- the problem is is that in past years
12  I wasn't familiar with the fact that there was a system
13  that handled all the libraries in Central Washington. I
14  thought each library was done locally. So I don't know
15  which -- which branches are actually run by this library
16  system.
17  Q Tell me what branches you've visited in North Central
18  Washington.
19  A I've been in a library in Wenatchee, if Ellensburg
20  counts as North Central Washington, I've been in a
21  library branch in Yakima.
22  Q Any others?
23  A Not that I remember.
24  Q Omak?
25  A No.

## Page 40

1  Q Okay. Did you use a computer terminal in any of those
2  libraries?
3  A I can't say with certainty if I did or did not.
4  Q Are you aware of any other SAF representatives using a
5  computer at an NCRL library branch?
6  A No, I am not.
7  Q Okay. In the fifth paragraph on the first page of
8  Exhibit 18 there is a quote that is attributed to you.
9  Do you see that?
10  A Yes.
11  Q And it says that, "We," meaning the SAF I presume,
12  "entered this lawsuit because citizens have been denied
13  access to our website and information about our
14  organization and publication. That clearly violates
15  both the First Amendment of the U.S. Constitution and
16  the Washington State Constitution."
17       Do you see where I'm reading?
18  A Yes.
19  Q Okay. How did you determine that citizens were being
20  denied access to the SAF website and information
21  available through it and its sister publications?
22  A People who called our office and I also believe may have
23  called our New York office as well because one of our
24  publications is actually published out of there.
25  Q So SAF has a New York office?

## Page 41

1  A Mm-hmm.
2  Q Yes?
3  A Yes.
4  Q Who are these people that put in the calls?
5  A I'm assuming some of them may have been members and
6  contributors and some of them may have been citizens
7  doing research.
8  Q So the calls didn't come to you personally?
9  A No. Through the receptionist at the office and were
10  referred to people on staff.
11  Q What people on staff? I just want to know about the
12  chain of custody of the communication, if you will.
13  A I really don't know with certainty. All I know is I've
14  had people on staff come to me to complain about the
15  fact that, hey, we have this problem in Central
16  Washington, people can't get to our publication on their
17  website.
18  Q When did this occur?
19  A Well before the suit was filed. I can't with
20  certainty -- with all the things that I do, I can't with
21  certainty tell you when.
22  Q What did you do in response?
23  A At the time initially nothing directly because --
24  because we were also getting calls from people in other
25  states having similar problems with libraries as well.

## Page 46

1 Q Yes. And I'm not asking --
2     MR. CAPLAN: I'm going to object to the extent
3 this calls for attorney-client communications that you
4 had with any other attorney.
5 Q (By Mr. Adams) I'm not asking you for content or
6 anything like that, content about what was discussed
7 with any such lawyer, if there was a lawyer. I'm just
8 asking you if it was passed by counsel.
9 A It may have been looked at by attorneys that worked with
10 us on a volunteer basis. I can't say with certainty,
11 but definitely not by paid counsel.
12 Q Okay. On page 6 and 7 in paragraph 20, the Complaint
13 sets forth allegations about SAF's complaint in
14 particular. Would you go ahead and read through
15 paragraph 20 to yourself and let me know when you've had
16 a chance to do that.
17 A Okay.
18 Q Okay. Now, about midway through that paragraph there is
19 a sentence, an allegation, that reads, "Women & Guns
20 website has been blocked by the Internet filters that
21 the NCRL has installed on its computers."
22     Do you see that?
23 A Mm-hmm.
24 Q Okay. Is that a yes?
25 A Yes.

## Page 47

1 Q Okay. What steps did SAF take before filing of this
2 Complaint to verify that?
3 A People that called our office and filed the complaint
4 with us and my understanding that counsel verified it.
5 Q Okay. So SAF through its own personnel did not verify
6 it, it was just reported to SAF; is that right?
7 A Correct.
8 Q Okay. Has SAF been made aware that NCRL went through an
9 overhaul of its Internet filtering system prior to the
10 filing of this Complaint?
11 A Prior to the filing of this complaint? No.
12 Q Okay. Would it make a difference to you, SAF, about
13 SAF's participation in this lawsuit if it knew that an
14 upgraded Internet filter is now in place and does not
15 block womenandguns com?
16 A Well, I think we'd be happy about that if that were the
17 fact, but we'd also be concerned that other gun websites
18 or gun-related information would be being blocked and be
19 concerned about what happens tomorrow or the next day,
20 permanency.
21 Q Let's say hypothetically that the current filter blocked
22 the NRA's, the National Rifle Association's, website but
23 did not block SAF's website, and let's say the NRA chose
24 not to do anything about that, would the SAF have
25 standing to assert a claim on behalf of NRA in that

## Page 48

1 hypothetical?
2     MR. CAPLAN: Object, it calls for a legal
3 conclusion from a lay witness.
4 Q (By Mr. Adams) You can answer.
5 A It's also hypothetical.
6 Q It is.
7 A And I think we'd be concerned that some of our
8 membership also overlaps with the NRA membership and
9 we'd want to make sure that our membership and our
10 donors could access things on the Internet from a
11 library, so I think we'd still be concerned.
12 Q But you cannot sit here today, can you, Mr. Gottlieb,
13 and say that you know for certainty that any content
14 generated by SAF and its affiliated publications is
15 blocked in any way by NCRL, can you?
16 A Not unless you give me a computer plugged into their
17 system from here so we could check.
18 Q If I did that, would that make a difference?
19 A I don't know if it would make a difference, but we could
20 find out.
21 Q Well, what do you hope to -- what does SAF hope to
22 achieve by this lawsuit?
23 A Making sure that the NCRL doesn't block information from
24 adults about firearms and right to keep and bear arms on
25 the Internet.

## Page 49

1 Q How does SAF generate revenue to fund its affairs?
2 A From a few different sources: One, from membership
3 donations, membership fees, donations, from
4 subscriptions to publications, book sales, foundation
5 grants, advertising in our publications. I don't know
6 if I said that one already or not. That pretty much
7 covers it.
8 Q Okay. And on what sorts of activities does SAF spend
9 money or devote some of its monetary resources?
10 A We do it to -- for what we consider public education,
11 publishing and research and legal defense activities.
12 Q Is SAF in part funding this lawsuit?
13 A No.
14 Q Has this lawsuit been discussed in public by any SAF
15 board member?
16 A Yes.
17 Q Okay. Which member?
18 A Me.
19 Q Any others?
20 A Not to my knowledge.
21 Q Okay. In what context did you discuss it?
22 A At a speech that I gave in California and a number of
23 radio shows that I've been a guest on.
24 Q Radio shows hosted by some of the radio stations we
25 discussed earlier, KBNP?

13 (Pages 46 to 49)

Page 78

```
 1          C E R T I F I C A T E
 2
 3          I, CHERYL L. HENDRICKS, a duly authorized Court
            Reporter and Notary Public in and for the State of
            Washington, residing at Olympia, do hereby certify;
 4
 5          That the foregoing deposition of Alan Merril
            Gottlieb was taken before me on September 12, 2007, and
 6          thereafter transcribed to the best of my ability by
            means of computer-aided transcription; that the
 7          deposition is a full, true, and complete transcript of
            the testimony of said witness;
 8          That the witness, before examination, was by me
            duly sworn to testify the truth, the whole truth, and
 9          nothing but the truth, and the witness reserved
            signature;
10
11          That I am not a relative, employee, attorney, or
            counsel of any party to this action, or relative or
12          employee of any such attorney or counsel, and I am not
            financially interested in said action or outcome
13          thereof;
14          That upon completion of signature, if required,
            I shall herewith securely seal the original transcript
15          and serve same upon Thomas D. Adams, counsel for the
            Defendants.
16          IN WITNESS WHEREOF, I have hereunto set my hand
            and affixed my official seal this 1st day of October,
17          2007.
18
19
20
21          _____
22          Cheryl L. Hendricks,
            CCR NO. 2274
23
24
25
```

# Exhibit QQ

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

| | |
|---|---|
| SARAH BRADBURN, PEARL CHERRINGTON, CHARLES HEINLEN, and THE SECOND AMENDMENT FOUNDATION, | ) ) ) ) |
| Plaintiffs, | ) NO. ) CV-06-327-EFS |
| vs. | ) ) |
| NORTH CENTRAL REGIONAL LIBRARY DISTRICT, | ) ) ) |
| Defendant. | ) |

DEPOSITION UPON ORAL EXAMINATION OF
CHARLES MERLE HEINLEN

TAKEN ON:    Monday, August 13th, 2007

TAKEN AT:    Omak Library
             30 South Ash
             Omak, Washington

START TIME:  7:30 A.M.

END TIME:    10:35 A.M.

REPORTED BY:  BARBARA J. SCOVILLE, CCR, RPR
              CCR NO. 2124

1    APPEARANCES:

2    FOR THE PLAINTIFFS:

3            MR. DUNCAN MANVILLE, ESQ.
             RAFEL MANVILLE, PLLC
4            Attorneys at Law
             999 3rd Avenue
5            Suite 1600
             Seattle, Washington 98104
6            (206) 838-2660

7

8    FOR THE DEFENDANT:

9            MR. THOMAS D. ADAMS, ESQ.
             KARR TUTTLE CAMPBELL
10           Attorneys at Law
             1201 Third Avenue
11           Suite 2900
             Seattle, Washington 98101
12           (206) 223-1313

13

14

15

16   ALSO PRESENT:  MR. DEAN MARNEY
                    MR. DAN HOWARD
17

18

19

20

21

22

23

24

25

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

## Page 38

1   And under a specific category more often than not.
2   some sites come up and just say "Blocked." Most of
3   them will say "Blocked" and then give a category.
4   Q. Okay. So is it your position that as a patron of
5    the NCRL library that you're entitled to completely
6    unfiltered access to the Internet?
7   A. Yes, sir.
8   Q. Would that include categories of speech that are not
9    entitled to Constitutional protection?
10   A. Such as?
11   Q. Pornography.
12   A. As I said earlier, I was not surfing for porn.
13   Q. Okay. I realize you said that you weren't surfing
14    for it, but do you think that you're entitled to
15    access to it?
16      MR. MANVILLE: Objection to the extent it
17    calls for a legal conclusion.
18      THE WITNESS: Do I think that NCRL
19    patrons should be able to look up materials that
20    some people would consider pornographical?
21   Q. (By Mr. Adams) Sure. Answer that question.
22   A. It's a relative term. I mean, what one man would
23    consider pornographic, another man certainly
24    wouldn't, so ...
25   Q. That isn't the question. The question is access.

## Page 39

1   A. I believe that NCRL patrons should have completely
2    unfiltered access. That's my answer.
3   Q. Okay. So do you believe NCRL is entitled to filter
4    Internet access to exclude pornographic content?
5   A. Could you repeat that?
6
7      (THE FOLLOW RECORD WAS READ:
8
9      "Q Okay. So do you believe NCRL is
10      entitled to filter Internet access to
11      exclude pornographic content?")
12
13      MR. MANVILLE: Object to the form of the
14    question.
15   Q. (By Mr. Adams) You can answer.
16   A. I do object to the form of the question. I mean, I
17    said I believe the patrons are -- adult patrons as
18    defined in US v. ALA are entitled to unfiltered
19    access. Okay, that includes all categories.
20   Q. Okay. Is it your position that your rights under
21    the United States Constitution and the Constitution
22    of the State of Washington pertaining to free
23    expression are impaired or breached or somehow
24    compromised by your inability to access pornography?
25      MR. MANVILLE: Object to the form of the

## Page 40

1   question.
2      THE WITNESS: I believe that my rights
3   are infringed under the constitutions of the United
4   States and of the State of Washington when I'm
5   denied my ability to seek information on a public
6   library terminal. I believe that that is an
7   infringement of my civil liberties.
8   Q. (By Mr. Adams) Okay. Would you agree that
9    libraries make content-based decisions all the time?
10   A. I would agree that they make content-based decisions
11    based on limited space availability for, like, books
12    and magazines; however, the Internet presents the
13    opposite problem. I mean, it's totally different.
14    There's no shelf space limitation when it comes to
15    Internet access.
16   Q. Let's say the Internet is not installed at this Omak
17    branch and you came in and asked the library to
18    obtain a pornographic book. Would you feel that
19    they have a right to provide that book to you?
20   A. That goes to a shelf space limitation. Their board
21    of directors would make decisions on what they will
22    and will not stock based on the cubic footage
23    available inside their building. I would agree that
24    Okanogan could not, therefore, stock nearly as many
25    books as Omak which can stock less books, I would

## Page 41

1   assume, than their main branch in Wenatchee. And
2   that's all a space limitation. And they will make
3   their decisions based on that among other
4   considerations. And, again, I would restate that
5   the Internet presents an opposite dilemma.
6   Q. What other considerations besides shelf space?
7   A. I'm not a librarian nor am I a board member. I'm
8    not qualified to answer that question.
9   Q. You're not qualified to answer that question. Okay.
10    Are librarians qualified to answer that question?
11   A. I believe that's up to the board and not the
12    individual librarians themselves.
13   Q. Okay. Well, who makes the content decisions about
14    what materials are or are not kept at a particular
15    library branch?
16   A. Again, not working for a library, I couldn't
17    honestly answer that.
18   Q. Presumably the librarians; right?
19   A. No.
20      MR. MANVILLE: Object to the form.
21      THE WITNESS: No, presumably the board of
22    directors. I think they would have final say since
23    they're the ones that are signing the librarians'
24    paychecks.
25   Q. (By Mr. Adams) What's the role of the public

| Page 42 |
| --- |

1    library in your opinion?
2    A. I believe it is their role to facilitate access of
3      information to any member of the public that seeks
4      it.
5    Q. Would you agree that the role of the library is to
6      facilitate learning and cultural enrichment?
7    A. I said, "information." I believe that learning and
8      cultural enrichment would fall under that.
9    Q. Have you read NCRL's mission statement?
10   A. Years ago.
11   Q. Do you have any idea what its mission is presently?
12   A. I do not know what they presently say their mission
13     is.
14            MR. ADAMS: Let's make this Number 4.
15
16            (EXHIBIT 4 WAS MARKED.)
17
18   Q. (By Mr. Adams) Mr. Heinlen, I've handed you a
19     multi-page document that we've marked as Deposition
20     Exhibit 4. Take a look at it and generally
21     familiarize yourself with it if you would, please.
22     You don't have to read it word for word.
23   A. You're just wanting me to familiarize myself with
24     the one sentence, section "I. Mission Statement"?
25   Q. Sure we'll start with that.

| Page 43 |
| --- |

1    A. Okay. "To promote reading and lifelong learning."
2    Q. Okay. Does that strike you as a mission that is an
3      appropriate mission for the NCRL?
4    A. I think it goes to what I said, that a library is
5      there to facilitate information to them that take
6      it.
7    Q. Okay. Well, the mission statement of NCRL is "to
8      promote reading and lifelong learning." Is that
9      correct?
10   A. Uh-huh.
11   Q. Is that a "yes"?
12   A. Yes, sir.
13   Q. Now, in your view, does that mission require NCRL to
14     provide its patrons with unlimited access to any
15     kind of content of any form of any nature at any
16     time if it can do so?
17            MR. MANVILLE: Object to the form of the
18     question.
19   Q. (By Mr. Adams) You can answer.
20            THE WITNESS: Could you feed me back that
21     question again?
22
23           (CONTINUE ON THE FOLLOWING PAGE.)
24
25

| Page 44 |
| --- |

1            (THE FOLLOWING RECORD WAS READ:
2
3       "Q Now, in your view, does that mission
4         require NCRL to provide its patrons
5         with unlimited access to any kind of
6         content of any form of any nature at
7         any time if it can do so?")
8
9            THE WITNESS: That would be a yes. What
10   if one of their patrons wants to learning something
11   that the board might object to? That still goes to
12   their mission statement of lifelong learning.
13   Q. (By Mr. Adams) What if a patron -- what if you
14     walked into the Omak branch and you said, "I'd like
15     to do some online gambling and I don't care that it
16     may be illegal; I want you to provide me access to
17     Internet sites that allow me to engage in this
18     pursuit of mine which I deem interesting and
19     important to me"?
20   A. If I wanted to perform an illegal act on library
21     property, they are well within their rights to get
22     the police right across the street and deal with it
23     accordingly.
24   Q. Would they be within their rights to block your
25     access to those sites?

| Page 45 |
| --- |

1            MR. MANVILLE: Object to the form.
2            THE WITNESS: Yeah, do I have to answer
3     that one?
4            MR. MANVILLE: Yes, subject to your
5     objection.
6            THE WITNESS: Subject to your objection.
7     Subject to his objection, I said that I think
8     the patrons should have unfiltered access, period.
9   Q. (By Mr. Adams) Is that a "yes"?
10   A. That is a "yes."
11   Q. And if you came in and said, I have an interest in
12     undertaking learning how to conduct hacking
13     operations so that I can bring down the NCRL
14     computer system," could you have access to such
15     sites that would teach you to do that?
16            MR. MANVILLE: Object to the form.
17            THE WITNESS: Again, I believe all access
18     for adults should be ongoing, so that would be a
19     "yes" as well --
20   Q. (By Mr. Adams) Okay.
21   A. -- but simply on the premise that I believe adults
22     should have unfiltered access.
23   Q. Okay. If you came into the Omak branch and said, "I
24     want access to a site so I can buy cigars from
25     Cuba," should the Omak library branch provide you

12 (Pages 42 to 45)

## Page 46

1  with access to such sites?
2          MR. MANVILLE: Object to the form.
3          THE WITNESS: You can get Cubans in
4  Canada. But, yes.
5  Q. (By Mr. Adams) My point, I think you understand, is
6  that your position -- and I'm trying to just
7  understand this as clearly as I can -- that you
8  believe you are entitled to walk into a branch of
9  the NCRL library and ask for access to sites that
10 would permit you to undertake illegal activity: is
11 that correct?
12         MR. MANVILLE: Object to the form.
13         THE WITNESS: Yeah, I object to that
14 question. I said --
15 Q. (By Mr. Adams) You still have to answer.
16 A. I understand I still have to answer it. I simply
17 want unfiltered access to the information that I
18 want to seek.
19 Q. I understand --
20 A. So that would have to, by association, be a "yes."
21 But it is not my position that I want to do anything
22 illegal here at all.
23 Q. I understand. That isn't the point, sir. I'm just
24 trying to get a sense of whether you think it is the
25 obligation of the library to provide access to a

## Page 47

1  patron who might.
2          MR. MANVILLE: Object to the form.
3          THE WITNESS: I think it is their
4  obligation to provide unfiltered access to -- you
5  know, unfiltered Internet access for adults -- for
6  adult patrons.
7  Q. (By Mr. Adams) Okay. Are you aware of NCRL's
8  stated interest in making its library branches safe
9  for children?
10 A. I've always told my daughter it's impolite to look
11 over somebody's shoulder to read what they're
12 reading, to seek what they're seeking.
13 Q. Okay. Are you aware of NCRL's stated objective that
14 I just characterized for you?
15 A. I believe that Mr. Marney stated that in a Wenatchee
16 World article when this case first went public.
17 Q. Okay. Is that a compelling objective in your view?
18         MR. MANVILLE: Object to the form.
19 Q. (By Mr. Adams) Is that a proper objective?
20 A. No. I believe that it is not their role to act as
21 parents or baby-sitters in any way whatsoever.
22 Okay? My parental responsibilities are my parental
23 responsibilities not theirs.
24 Q. The Omak branch has four computer terminals with
25 Internet access -- is that correct? -- to the best

## Page 48

1  of your knowledge?
2  A. To the best of my knowledge, I've never walked back
3  into the children's section or over here. I don't
4  know if they have another terminal over there.
5  Q. But in the area that you use here at the Omak
6  branch, there are four terminals together?
7  A. Yes, sir.
8  Q. And they're all in close proximity to one another?
9  A. Uh-huh.
10 Q. Is that a "yes"?
11 A. Yes.
12 Q. Okay. Side by side at a desk similar to what we're
13 sitting at right now?
14 A. Desks almost identical to this, two terminals per
15 desk, yes.
16 Q. Okay. Is it possible for the user of one terminal
17 to look over and see what is being previewed on the
18 Internet by another user at a different terminal?
19 A. If he was curious as to what his neighbor was doing,
20 I suppose.
21 Q. That's a "yes"?
22 A. That is a "yes."
23 Q. Okay. Does the posing of -- Excuse me. Does the
24 provision of unfiltered Internet access present any
25 danger of any kind in your mind?

## Page 49

1  A. No.
2  Q. None whatsoever?
3  A. None whatsoever.
4  Q. Okay. Is all form of expression, is all speech, is
5  everything published on the Internet in your opinion
6  Constitutionally protected?
7          MR. MANVILLE: Object to the form.
8          THE WITNESS: I'm not a lawyer. I can't
9  answer that one in good conscience.
10 Q. (By Mr. Adams) Is pornography Constitutionally
11 protected?
12         MR. MANVILLE: Object to the form.
13         THE WITNESS: In what context? I mean --
14 Is pornography protected speech? I don't know the
15 case history on that. I know that Larry Flint beat
16 Jerry Falwell all the way to the Supreme Court but
17 George Carlin didn't, so ...
18 Q. (By Mr. Adams) Well, we don't have to define it as
19 "pornography." We don't have to --
20 A. Well, we kind of do if you keep asking me what I
21 think about it, don't we?
22 Q. Well, let's say this then: let's use "obscenity" and
23 let's say that "obscenity" has the definition that
24 is set forth in federal law. Now, whatever it is --
25 And we don't have to say what it is; but whatever it

13  (Pages 46 to 49)

## Page 50

1    is, it is out there.

2    A. Well, you mean printed versions of, you know. the

3    seven words on George Carlin's list?

4    Q. Okay. Let's just --

5    A. I mean. you know. people publish that all the time.

6    Q. We don't have to define it. Let's just say that

7    something out there constitutes "pornography."

8    Would you agree with me on that?

9    A. It depends. Different people are offended by

10    different things. It's all relative.

11    Q. Okay. Let's switch gears. Let's talk about the

12    activities of a terrorist in a foreign country. All

13    right?

14    A. Okay.

15    Q. Let's say that such activities were interesting to

16    somebody here in the United States. And let's --

17    Would you agree that the library has a right to

18    block Internet access to the publications of such a

19    person?

20    MR. MANVILLE: Object to the form of the

21    question.

22    THE WITNESS: Well, let's say

23    hypothetically I wanted a different perspective on

24    what we were doing in Iraq and I wanted to get my

25    news from Al Jazeera just to read what they had to

## Page 51

1    say and see their side of it for a perspective.

2    What's the difference? It doesn't make me a

3    terrorist by any stretch.

4    Q. (By Mr. Adams) Of course not. No one is suggesting

5    that, sir. I'm just asking about access to things

6    that might promote such activities. Is it

7    appropriate to block or filter that kind of thing?

8    MR. MANVILLE: Object to the form.

9    THE WITNESS: I don't know that anybody

10    ever has tried to access that information from one

11    of these terminals.

12    Q. (By Mr. Adams) That's not the question.

13    A. Unblocked is unblocked.

14    MR. ADAMS: Let's mark this Number 5,

15    please.

16

17    (EXHIBIT 5 WAS MARKED.)

18

19    Q. (By Mr. Adams) Mr. Heinlen, I've just handed you a

20    document that we've marked as Deposition Exhibit 5.

21    And for the record, I'll indicate that this is the

22    Complaint for Declaratory and Injunctive Relief by

23    the plaintiffs in this lawsuit.

24    A. Uh-huh.

25    Q. Take a look at this, if you would, please, and just

## Page 52

1    generally familiarize yourself with it.

2    A. I've seen this before. Okay.

3    Q. Have you had a chance to look it over?

4    A. I'm skimming through it now. Like I said. I believe

5    this is a document that I have seen before. Yeah,

6    this was filed some time ago.

7    Q. This was filed in late 2006.

8    A. Uh-huh.

9    Q. Is that right to the best of your knowledge?

10    A. I do not see a date on the front of it, so I'll take

11    your word for it.

12    Q. Okay.

13    A. Oh, yeah, okay, "November 2006" right here on the

14    bottom. (Indicating)

15    MR. MANVILLE: Somehow we've got two

16    dates on it.

17    MR. ADAMS: It's not a big deal about the

18    date.

19    THE WITNESS: Okay.

20    Q. (By Mr. Adams) On page 1 in paragraph 1, the first

21    sentence, the statement was made that

22    "Plaintiffs" -- And you are a plaintiff; correct?

23    A. Yes, sir.

24    Q. -- "challenge the Constitutionality of a policy

25    adopted by the NCRL whereby the NCRL will not, at

## Page 53

1    the request of adults who wish to access

2    Constitutionally-protected speech, disable Internet

3    filters on its publicly-available computer

4    terminals." Do you see where I'm reading?

5    A. Yes. sir.

6    Q. Okay. Does that accurately describe your claim?

7    A. Yes. sir.

8    Q. Does your claim go beyond that?

9    A. How would you define going "beyond that"?

10    Q. I'm focusing on the phrase

11    "Constitutionally-protected speech."

12    A. Which as I've said is a relative term. and since I'm

13    not a member of the legal profession. one that I'm

14    really not qualified to define. But I would say the

15    first sentence is accurate.

16    Q. You would?

17    A. Uh-huh.

18    Q. That's "yes"?

19    A. Yes, to the best of my knowledge.

20    Q. That's fine. Just so I'm clear, Mr. Heinlen -- and

21    I don't mean to belabor the point -- will you agree

22    with me or do you disagree with me that there

23    are -- that there is Constitutionally-protected

24    speech and there is speech that is not

25    Constitutionally protected?

## Page 54

1    MR. MANVILLE: Object to the form.
2    THE WITNESS: Let's split a very fine
3  hair. As I said, having -- myself being an
4  equipment operator, I don't feel qualified to
5  interpret the Constitution. I was -- That's where
6  I stand on that.
7  Q. (By Mr. Adams) Well, that's fine. And I wouldn't
8    expect you to interpret the Constitution as we sit
9    here in your deposition today. What I'm getting at,
10   however, is the adjective
11   "Constitutionally-protected" that precedes the word
12   "speech." Does that define speech -- a subset of
13   speech that you're suing about?
14  A. I believe that the courts have typically only
15   restricted speech in the most narrow of instances.
16
17       (A BRIEF RECESS WAS TAKEN.)
18
19  Q. (By Mr. Adams) Mr. Heinlen, based on your previous
20   testimony, I'm fairly clear in your position that
21   you believe NCRL's library branches should provide
22   adult patrons with completely unfiltered access to
23   the Internet. Am I correct in that regard?
24  A. I said that I believe that they should disable the
25   filters for adults upon request, yes.

## Page 55

1  Q. Okay. And in your view, a site-by-site review
2    process is inadequate; is that correct?
3  A. Not only is it inadequate, but it's been my
4    contention that it is invasive.
5  Q. Okay. But you've never invoked the procedure here
6    at NCRL to test that; is that correct?
7  A. You know, I've never in all the times I've come here
8    once been presented with the first exhibit -- or
9    Exhibit 2 that you showed me, this sheet.
10   (Indicating)
11  Q. Okay. But have you attempted to gain access to a
12   particular site by any other means?
13  A. No. I mean, I could have cheated and set up a proxy
14   server, I suppose, if I wanted to, but I haven't
15   done that.
16  Q. What's a proxy server?
17  A. Something a kid told me about to get around the
18   filtering.
19  Q. How does it work?
20  A. I'm not sure.
21  Q. A kid told you about it. How old is the kid?
22  A. A teenager.
23  Q. Okay. And what'd the kid tell you?
24  A. I don't recall. It was years ago. He said, "You
25   could set up a proxy server and get around it

## Page 56

1  perhaps." That's all I remember from that. I don't
2  remember who. I don't remember when. I don't
3  remember what was said. I just remember that that
4  was passed on to me once by somebody that appeared
5  to be a 17-year-old male.
6  Q. And the sum and substance of that conversation was,
7    This is the way to get around the filter?
8  A. He said, "If you really want to get around it, set
9    up a proxy server." And that was it. I never
10   pursued that.
11  Q. What dangers or risks might be posed by unfiltered
12   access, if any, in your opinion?
13  A. None in my opinion.
14  Q. How about to library staff?
15  A. How could that be a risk to them?
16  Q. Well, let's just assume it created a hostile
17   environment. Let's say a patron wanted to view
18   something inappropriate, illegal, offensive.
19   pornographic on the Internet. Would that present a
20   problem for library staff?
21  A. As I said earlier, what's, quote unquote,
22   "offensive" or, quote unquote, "pornographic" is
23   relative. So I suppose it would depend on how
24   sensitive a staff member might be, and that's
25   different for everybody.

## Page 57

1  Q. What if somebody wanted to use a proxy server to
2    conduct illegal activity, would that be a risk to
3    guard against?
4  A. Having no familiarity with that, I couldn't say. I
5    would say that unfiltered access is unfiltered
6    access. And, again I said that repeatedly in the
7    context of adults, you know, as defined in US v. ALA
8    Web site.
9  Q. Right. Then an adult could set up a proxy server;
10   right?
11  A. I don't know how. I'm 41 years old; so if I don't,
12   I assume most adults in this town wouldn't either.
13  Q. If a patron walks into the Omak branch and asks for
14   a book, is it the obligation of the NCRL to get that
15   book regardless of its content?
16       MR. MANVILLE: Object to the form.
17       THE WITNESS: I thought we'd been over
18   that. You know, libraries are limited with respect
19   to shelf space and that the Internet is a different
20   medium. I mean, a library has to pay for books and
21   it has to store the books; whereas with the
22   Internet, the library has to pay and make an effort
23   to keep information out. It's exactly the opposite.
24  Q. (By Mr. Adams) Do you think a -- do you think that
25   a library also has an obligation to determine if a

SCOVILLE COURT REPORTING
(509) 884-1712

51c3a7a6-d9f4-4f89-9e50-91e19da2ea94

Page 106

1         C E R T I F I C A T E
2   STATE OF WASHINGTON)
             ) ss.
3   COUNTY OF CHELAN  )
4
5      THIS IS TO CERTIFY that I, Barbara J. Scoville,
6   Notary Public in and for the State of Washington, residing
7   at Entiat, reported the within and foregoing testimony; said
8   testimony being taken before me as a Notary Public on the
9   date herein set forth; that the witness was first by me duly
10   sworn; that said examination was taken by me in shorthand
11   and thereafter under my supervision transcribed, and that
12   same is a full, true and correct record of the testimony of
13   said witness, including all questions, answers and
14   objections, if any, of counsel, to the best of my ability.
15      I further certify that I am not a relative, employee,
16   attorney, counsel of any of the parties; nor am I
17   financially interested in the outcome of the cause.
18      Transcribed notes will be destroyed three years from
19   the affixed date unless requested by counsel to retain them
20      IN WITNESS WHEREOF, I have hereunto set my hand and
21   affixed my official seal this _____ day of
22   _____, 2007.
23
24         Barbara J. Scoville, CCR, RPR
           CCR NO. 2124
25

28 (Page 106)

# Exhibit RR

Page 1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

SARAH BRADBURN, PEARL          )
CHERRINGTON, CHARLES HEINLEN,  )
and the SECOND AMENDMENT       )
FOUNDATION,                    )
                               )
            Plaintiffs,        )
                               )
            vs.                )  NO. CV-06-327-EFS
                               )
NORTH CENTRAL REGIONAL LIBRARY )
DISTRICT,                      )
                               )
            Defendants.        )
-------------------------------------------------
DEPOSITION UPON ORAL EXAMINATION

OF

DEAN MARNEY

-------------------------------------------------

Date:        October 16, 2007

Location:    North Central Library Administration Office
             15 North Columbia
             Wenatchee, WA

Start Time: 12:30 p.m.

End Time:    5:15 p.m.

Reported By:  Alison J. Howze, CCR
              CCR # 2575

```
 1    APPEARANCES:

 2    For the Plaintiffs:        MR. DUNCAN MANVILLE
                                 Attorney at Law
 3                               C/O ACLU of Washington
                                 705 2nd Avenue, Suite 300
 4                               Seattle, WA  98104-1799
                                 (206) 288-9330
 5                               dmanville@yahoo.com

 6                               MS. CATHERINE CRUMP
                                 ACLU
 7                               125 Broad Street, 17th Floor
                                 New York, NY  10004
 8                               (212) 519-7806
                                 ccrump@aclu.org
 9

10    For the Defendants:        MR. THOMAS ADAMS
                                 MS. CELESTE MONROE
11                               Karr Tuttle Campbell
                                 Attorneys at Law
12                               1201 Third Avenue, Suite 2900
                                 Seattle, WA  98101
13                               (206) 223-1313
                                 (206)682-7100
14                               tadams@karrtutle.com

15

16    Also Present:              MS. BARBARA WALTERS
                                 MR. DAN HOWARD
17

18

19

20

21

22

23

24

25
```

65fdb704-fa3f-4ced-944b-bc4e673c3b71

| Page 106 | Page 108 |
|---|---|
| 1  Q How many over a typical two-week period would you have gotten<br>2    previously with the written form?<br>3  A Oh, probably one or less.<br>4  Q And so does the request come to you and Barbara and Dan in<br>5    the form of an e-mail?<br>6  A Yes.<br>7  Q Have those e-mails been produced?  Are they in this new stack<br>8    here?<br>9        MR. ADAMS: I'm not sure.<br>10      MS. MONROE: I don't think we have.<br>11  A I think we just sent them to Celeste.  I mean, it's only been<br>12    two weeks.<br>13      MR. ADAMS:  We can probably get you an example if<br>14    you'd like.<br>15      MR. MANVILLE:  Yeah, that's fine.  It would be<br>16    nice but --<br>17      MR. ADAMS:  Sure.<br>18      MS. MONROE:  Yeah.<br>19  Q (By Mr. Manville) How quickly have you responded to those<br>20    requests?<br>21  A Really fast.  I mean some in, you know, like an hour.  But<br>22    because some of them are technical problems, they're faster.<br>23    Dan usually does the follow up and contacting them.  And he<br>24    tries to talk to them personally on the phone.  It's just our<br>25    style.  Otherwise he e-mails them. | 1  A 7:00 we close.<br>2  Q Are the various NCRL branches open on weekends?<br>3  A Yes.<br>4  Q Does -- do you or Barbara or Dan work weekends typically?<br>5  A I know that Barbara checks her e-mail all weekend long and I<br>6    usually do at least once or twice.<br>7  Q Every weekend?<br>8  A Yeah.<br>9  Q Every Saturday and Sunday?<br>10  A Oh, I don't know.<br>11  Q And I take it that nonpatrons -- nonNCRL patrons can use the<br>12    computer terminals as well, correct?<br>13  A Yes.  They can receive a guest pass.<br>14  Q That's sort of a temporary password for them to enter?<br>15  A Yes.<br>16  Q What's the NCRL's filtering policy with regard to staff<br>17    terminals?<br>18  A They're all filtered.  CIPA requires that.  Obviously, we<br>19    have computers here that the filter gets turned off so we can<br>20    view those sites that are blocked.<br>21  Q Are the filters on the staff terminals ever turned off at any<br>22    other time?<br>23  A I don't know.<br>24  Q What would be the procedure for disabling a filter on a staff<br>25    terminal? |
| **Page 107** | **Page 109** |
| 1  Q What's been the range of response times for those ten or so<br>2    requests?<br>3  A Really fast.  I would say within a couple of hours.  It<br>4    depends on what time of day they come in.<br>5  Q Has anything taken longer than that?<br>6  A Not so far.  I mean, we haven't gotten any on a Friday night<br>7    that would take the weekend but --<br>8  Q What are your -- when are you typically in the office?<br>9  A I'm in -- you're going to get me in trouble here.  I have<br>10    bankers hours.  No, I'm in sometime in the morning between<br>11    9:00 and 10:00.  Then I'm here late.  Usually until about<br>12    7:00 --<br>13  Q And do you know --<br>14  A -- on most nights.<br>15  Q Okay.  And then Barbara and Dan, do you know roughly what<br>16    their hours are?<br>17  A Yes.<br>18  Q What are they?<br>19  A Barbara is here fairly early in the morning and she's here<br>20    until -- she's probably here late right now.  So, yeah.  And<br>21    then she leaves in the afternoon.  But her -- the person<br>22    working with her, Chad, stays until 8:00 o'clock at night.<br>23    Dan is here usually between like 7:30, and he leaves between<br>24    5:00 and 5:30.<br>25  Q All right.  How late are the NCRL's branches open? | 1  A The -- I don't know.<br>2  Q Is there --<br>3  A I'd ask Barbara.<br>4  Q Okay.  Do you know what the procedure would be for disabling<br>5    the filter on a public use terminal?<br>6  A I do not know.<br>7  Q Did you -- did you work with anyone in drafting the Internet<br>8    Public Use Policy, or did you draft it yourself and then<br>9    present it to the Board as a draft?<br>10  A I'm sure I worked with people and showed it to them.  I'm --<br>11    I -- I have someone edit most things that I write, so I<br>12    probably showed it.<br>13  Q You mean various people edit it?<br>14  A Sure.  And Marilyn was the one that was doing the E-rate<br>15    application, so she was particularly interested to make sure<br>16    that I had the wording in that that E-rate needed.<br>17  Q How was the Internet Public Use Policy initially presented to<br>18    the Board?  Was it presented to them at the Board meeting?<br>19  A Absolutely.<br>20  Q Okay.  So did you show up with a copy of the policy and hand<br>21    it around?  Did you circulate it in advance of the meeting?<br>22  A It's been affirmed several times, so I think it's been done<br>23    all those ways.<br>24  Q I see.  Do you recall when the NCRL first put it's Internet<br>25    filter in place? |

28  (Pages 106 to 109)

65fdb704-fa3f-4ced-944b-bc4e673c3b71

## Page 110

1  A  We've never had unfiltered access so --
2  Q  From --
3  A  -- from the inception.
4  Q  Okay. So the first day you went -- went online --
5  A  Went online.
6  Q  -- it was filtered?
7  A  That's my recollection.
8     MR. MANVILLE:  Why don't we take a break just a
9  minute.
10    (Recess taken.)
11    (Ms. Walters absent.)
12  Q  (By Mr. Manville) Back in January of 2004 a policy for
13  removing the filter on NCRL's computers was presented to the
14  NCRL Board; is that right?
15  A  Repeat that, please.
16  Q  Let me show you --
17    MR. MANVILLE:  Why don't we just make this an
18  exhibit.
19    (Exhibit No. 33 marked.)
20  Q  (By Mr. Manville) Dean, handing you Exhibit 33, if you go
21  almost down to the bottom on the third paragraph up --
22  A  Just look at that?
23  Q  Yes. So tell me about that. Why was that policy developed?
24  A  It was developed because we thought we had to remove the
25  filter to get E-rate funds.

## Page 111

1  Q  Did you reach that conclusion in consultation with legal
2  counsel?
3  A  No. We were taking ALA's word for it.
4  Q  All right. So who -- was there somebody in particular that
5  you were communicating with at ALA regarding the need to
6  disable the filters?
7  A  No.
8  Q  Was that you that was interacting with ALA on that issue?
9  A  No. It was just going on the website and what they were
10  telling us and --
11  Q  Oh, I see. Okay. But was this some research that you did,
12  going to the ALA site to see what they were saying --
13  A  Yes. And I think it was on --
14  Q  -- about the need to disable --
15  A  Excuse me for -- yes.
16  Q  Okay. And what prompted you to do that?
17  A  We wanted the E-rate funds.
18  Q  All right.
19  A  I wanted the E-rate funds.
20  Q  Had you been receiving E-rate funds prior to January of 2004
21  or whenever you started looking at policy, at changing the
22  policy?
23  A  Yes.
24  Q  Okay. And so you were concerned that if you continued to
25  filter all the public computers all the time, you might lose

## Page 112

1  your E-rate funds?
2  A  Correct.
3  Q  Was a written policy relating to disabling the filters ever
4  developed?
5  A  I believe there was one.
6  Q  Do you know what happened to that?
7  A  I have no idea.
8  Q  And do you recall what you saw on the ALA website that led
9  you to conclude that if you continued to filter all computers
10  all the time, the library would lose its Internet -- its
11  E-rate funding?
12  A  I think it's the same wording that's on there now.
13  Q  Did the NCRL purchase software that would have allowed the
14  NCRL to disable its filter?
15  A  My recollection is that we went for the Board -- I went for
16  the Board's approval before we started working toward getting
17  how we were going to remove the filter.
18  Q  And what did you tell the Board about the need to disable the
19  filters; do you recall?
20  A  I recall that I told them that we might lose E-rate funds and
21  that I wanted their approval to go ahead and try to do this
22  and see if we could make it work. So it was definitely an
23  open-ended discussion.
24  Q  How much does the NCRL currently receive in the way of E-rate
25  discounts; do you know?

## Page 113

1  A  40,000 plus.
2  Q  Per year?
3  A  Yes.
4  Q  And was it roughly the same back in 2004, little bit less?
5  A  Probably less.
6  Q  Did the Board approve the policy change?
7  A  Yes.
8  Q  In principle?
9  A  The principle of it, yes.
10  Q  And then did you set about developing a new policy that would
11  provide for disabling the filters at the request of adults?
12  A  I remember talking to staff and we were -- we were working
13  towards that.
14  Q  Okay. And did you -- there is a reference in your April 14,
15  2004, report to the Board about the software to dismantle the
16  filter being installed. It's NCRL 00428.
17  A  In the Director's Report here?
18  Q  Yes. Yeah, it's where that red flag is.
19  A  I don't remember.
20  Q  You don't remember whether you bought the software?
21  A  I'm assuming from the statement that we did buy the software.
22  Q  Okay. And ultimately the NCRL did not implement a plan of --
23  excuse me -- ultimately the NCRL did not implement a policy
24  of disabling its filters at the request of adults, correct?
25  A  Correct.

65fdb704-fa3f-4ced-944b-bc4e673c3b71

## Page 162

1    so forth, correct?

2    A  Correct.

3    Q  Do you not view those two decisions as different?

4    A  Yes, they are different. But they also have similarities.

5    Q  What are the similarities --

6    A  The similarities are -- excuse me for talking over you. The

7       similarities are: How does this fit our mission? How does

8       this fit our vision? Does it fit our values?

9    Q  And the differences?

10   A  The difference is it's in a different form.

11   Q  What do you mean by that?

12   A  It's on the Internet. It's a media. The choices are huge.

13      It is very hard to select by website, so we do the best we

14      can by selecting by content. So right now I'm assuming that

15      technology will get better and better and this will get more

16      refined and it will be better. But in the meantime we have

17      some -- if we unblock, we have some unintended services.

18   Q  What -- I'm sorry. What do you mean by unintended services?

19   A  We don't intend to provide adult erotic material to people or

20      illegal material to people.

21         MR. MANVILLE:  All right. Why don't we leave it

22   at that.

23         MR. ADAMS:  All done?

24         MR. MANVILLE:  Yeah.

25         MR. ADAMS:  We'll reserve signature if it's

## Page 163

1    ordered.

2         (Concluded at 5:15 p.m.. signature reserved.)

## Page 164

CORRECTION SHEET

CHANGES IN FORM AND SUBSTANCE REQUESTED BE MADE IN THE FOREGOING ORAL EXAMINATION TRANSCRIPT:

Page____Line_____Correction & Reason_____

I hereby certify that this is a true and correct copy of my testimony, with the exception of the corrections noted above.

_____
DEAN MARNEY

_____
(Notary signature)
(Print Name)
             NOTARY PUBLIC in and for the State of
             Washington, residing at _____
             Subscribed and sworn to before me on
             this _____ day of _____, 2007.
My commission expires on _____
See: Wash. Reports, CR 30(e), USCA, Rule 30(e)

## Page 165

REPORTER'S CERTIFICATE

I, ALISON J. HOWZE, Certified Shorthand Reporter, do hereby certify:

          That the foregoing proceedings were taken before me at the times and place therein set forth, at which time any witnesses were placed under oath;

          That the testimony and all objections made were recorded stenographically by me and were thereafter transcribed by me or under my direction;

          That the foregoing is a true and correct record of all testimony given, to the best of my ability;

          That I am not a relative or employee of any attorney or of any of the parties, nor am I financially interested in the action;

          IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 25th day of October, 2007.


_____
ALISON J. HOWZE, CCR
CCR # 2575
Notary Public in and for the
State of Washington, residing
at Wenatchee.

My commission expires on October 31, 2008.

42 (Pages 162 to 165)

# Exhibit SS



# Digital Court Reporting & Video

Transcript of the Testimony of
## Kenton Oliver

**Date:** November 14, 2007

**Caption:** Sarah Bradburn, et al v. North Central Regional
Library District

Digital Court Reporting and Video, LLC
866.721.0972 Toll-free
713.683.0401 Local
713.683.8935 Fax
depos@digitalreporting.com
www.digitalreporting.com

**Job Number: 2761**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

CASE NO. CV 06 327 EFS

JUDGE EDWARD SHEA


SARAH BRADBURN, ET AL.,

         Plaintiffs,        DEPOSITION OF

versus                    KENTON OLIVER

NORTH CENTRAL REGIONAL
LIBRARY DISTRICT,

         Defendant.

- - - - -

Deposition of KENTON OLIVER, a witness
herein, called by the Defendant as upon
cross-examination pursuant to the Federal Rules of
Civil Procedure, taken before me, the undersigned,
Laurie Maryl Hart, a Registered Merit Reporter and
Notary Public in and for the State of Ohio, at the
Stark County District Library, 715 Market Avenue
North, Canton, Ohio, on Wednesday, November 14, 2007,
at 12:36 p.m.

- - - - -

1   APPEARANCES:

2   On behalf of the Plaintiffs:

3   (Via Telephone)

4
         Duncan Manville, Attorney at Law
5        1629 2nd Avenue West
         Seattle, Washington 98119
6

7   On behalf of the Defendant:

8
         Celeste Mountain Monroe, Attorney at Law
9        Karr, Tuttle, Campbell
         1201 Third Avenue
10       Suite 2900
         Seattle, Washington 98101-3028
11

12

13                  - - - - -

14

15

16

17

18

19

20

21

22

23

24

25

## Page 10

1      THE WITNESS: Okay.
2      BY MS. MONROE:
3    Q  Okay. Can you give me an understanding of your
4      educational background starting after high school?
5    A  Sure. I have an undergraduate degree, MA from
6      Washburn University of Topeka. I have a master's of
7      library science degree from Emporia State University.
8      I've taken postgraduate work at the University of
9      Missouri in Columbia, Missouri. And I've done
10     various training institutes, including the Library
11     Administrator and Management School that the
12     University of Maryland used to put on at one time.
13   Q  Okay. Do you recall the last, the year of the last
14     training seminar you attended was put on by the
15     University of Maryland?
16   A  Oh, early eighties.
17   Q  Do you participate in any continuing education type
18     courses currently?
19   A  Yes. I regularly attend programs and trainings
20     sponsored by the American Library Association and the
21     Ohio Library Council. At annual conferences and
22     occasional special opportunities.
23   Q  Have any of those programs, specifically let's start
24     with those put on by the American Library
25     Association, addressed the issue of Internet

## Page 11

1      filtering in public libraries?
2    A  Yes.
3    Q  Okay. Do you recall when those programs were held?
4    A  Actually, at the last Public Library Association
5      conference in Boston, Massachusetts, which would have
6      been approximately two years ago, I was a presenter.
7    Q  On that topic?
8    A  On that, that topic along with another, along with
9      other topics related to information access and
10     intellectual freedom.
11   Q  Do you still have a copy of the presentation that
12     you -- let me take a step back. As part of your
13     presentation, did you prepare a Power Point
14     presentation?
15   A  No.
16   Q  Did you prepare an outline?
17   A  Yes.
18   Q  Was that outline prepared on a computer?
19   A  Yes.
20   Q  Is it in electronic format?
21   A  I believe it is, yes.
22   Q  Do you still have a copy of that outline?
23   A  I may have.
24   Q  Okay. I will ask and follow up with Duncan that if
25     you still do have a copy of that if we could receive

## Page 12

1      a copy. After your deposition is fine. Do you know
2      if your presentation was videotaped?
3    A  I'm uncertain.
4    Q  Okay.
5    A  I believe it was.
6    Q  Okay.
7         MR. MANVILLE: Celeste, can I interrupt for
8      just a second?
9         MS. MONROE: Yes.
10        MR. MANVILLE: I don't have any problem with
11     producing that, but please do send me a reminder or
12     I'll forget.
13        MS. MONROE: I do have a little star right
14     here on my outline.
15        MR. MANVILLE: Okay.
16     BY MS. MONROE:
17   Q  Okay. Generally speaking, do you recall the
18     substance of your remarks with respect to Internet
19     filtering?
20   A  I do not. And I would have to review my comments
21     simply because it was part of a larger presentation
22     that was -- and that was just simply one, one aspect
23     of my discussion.
24   Q  Okay. No problem. How about with respect to your
25     professional background? Can you talk to me about

## Page 13

1      your current, your current job?
2    A  Sure. I'm the executive director of the Stark County
3      District Library. We have eleven branches plus a
4      main library. Two bookmobiles, which are mobile
5      units, two kidmobiles. We have a staff of
6      approximately 300. We are one of seven library
7      districts in the county but the largest system. Our
8      operating budget is approximately $14 million.
9    Q  And what is your role as executive director? What
10     are your day-to-day duties?
11   A  Frankly, they're quite varied. I, you know, it
12     ranges from financial responsibilities to work with
13     my governing board to supervision of my managers,
14     dealing with public service, technical services. It
15     involves advocating for the library both within the
16     community, it involves work with our many
17     partnerships we have in the community. You know, it
18     requires that I maintain a current knowledge of
19     public library practices.
20   Q  Do you have any collection development
21     responsibilities?
22   A  The person in charge of collection development
23     reports directly to me. I have a collection
24     development coordinator.
25   Q  And what is his or her name?

## Page 34

1　A　Correct.

2　Q　When a patron has access, has full access, you know,

3　　　gave -- they're an adult or a minor with permission,

4　　　is it possible then that child pornography is

5　　　accessible?

6　A　Well, I would say yes, on the Internet in general,

7　　　not just at our library.

8　Q　Oh, yes. All right. I note that it says "Internet

9　　　users are governed by the library's Appropriate

10　　Conduct Policy." That is, I'm reading from the

11　　Internet and Computer Use Policy the last sentence of

12　　Paragraph 5. Is the library's Appropriate Conduct

13　　Policy online?

14　A　I believe it is.

15　Q　Okay. Is there anything in the conduct policy that

16　　speaks to the Internet use policy?

17　A　Not to my knowledge.

18　Q　What types of behaviors are considered inappropriate

19　　by the terms of the conduct policy?

20　A　The conduct policy is what you would consider a

21　　general behavioral policy. So for instance, noise,

22　　you know, starting fights. Its primary focus is on

23　　the idea that your conduct should not be such that it

24　　would inhibit or prevent another person from using

25　　the library in a productive manner.

## Page 35

1　Q　With respect to the Internet and Computer Use Policy,

2　　did you draft this policy?

3　A　We had a committee that drafted it.

4　Q　Okay. How many people were on the committee?

5　A　I would have to check. I cannot remember.

6　Q　Okay. Are they all from this district?

7　A　They're from our library.

8　Q　Okay. Did you get any input from the Intellectual

9　　Freedom Committee with respect to this policy?

10　A　We benchmarked against many library publications and

11　　also other existing policies of other libraries.

12　Q　To your knowledge, is the staff happy with this

13　　policy?

14　A　To my knowledge.

15　Q　Does it work? What about the board? Are they --

16　　have they expressed any new concerns since it was

17　　adopted in April of 2007?

18　A　No.

19　Q　Any plans to change any part of this Internet and

20　　computer use policy as you look ahead?

21　A　No. We're very happy with the way it's being used.

22　Q　You said that the filter product that you use for

23　　minors is Bess?

24　A　Correct.

25　Q　How long have you had that filter product?

## Page 36

1　A　I'd have to double-check. Bess is, if I'm correct,

2　　Bess is also been known as N2-H2. It's actually a

3　　company that's in the Pacific Northwest, I believe,

4　　and it's gone through several alliterations.

5　Q　Has that filter product changed since you've been

6　　here for six years? Besides upgrades.

7　A　No.

8　Q　Which may happen. So it's always been Bess?

9　A　To my knowledge.

10　Q　Who was involved in selecting that product?

11　A　Our computer services staff. And their manager. And

12　　myself. But what they did, they did a -- they did an

13　　analysis of the marketplace, and as I recall, it was

14　　based on quality of the product and pricing as well.

15　Q　Are you aware of whether there's been any concerns

16　　from patrons who are minors who feel that they're

17　　being denied access to appropriate content because of

18　　Bess?

19　A　I'm not directly aware of that.

20　Q　When I asked you about your responsibilities as

21　　executive director and about the library, you

22　　provided some background about the district itself,

23　　including the number of branches, the number of

24　　people in the staff and the operating budget. You

25　　said there are eleven branches plus a main branch, so

## Page 37

1　　twelve?

2　A　Yes.

3　Q　Total branches. Okay. What is the physical area

4　　that this serves, that your district serves? What is

5　　the size of the district?

6　A　Oh, gosh. It's hard to give you that in size and

7　　square miles because we serve about, our population

8　　that we serve is about 250,000.

9　Q　Okay.

10　A　And the reason it's hard to explain it to you is that

11　　we are a composite of quite a few different school

12　　districts, which is how public library districts in

13　　the state of Ohio are defined. And in our particular

14　　case in this county it's actually kind of an odd

15　　geographical configuration.

16　Q　Because, as you pointed out, you are one of seven --

17　A　Correct.

18　Q　-- library districts in the county?

19　A　Correct.

20　Q　Okay. You serve 250,000 patrons?

21　A　Uh-huh.

22　Q　How many people are in the county, do you know?

23　A　I believe there are about 450,000.

24　Q　Okay. So you serve a good --

25　A　Yeah.

## Page 38

1    Q   -- number of those people?
2    A   Right.
3    Q   All right. What is the general demographic of this
4        county?
5    A   Actually I would say that our demographic is a little
6        bit of everything. We have some very urban
7        characteristics in the city of Canton. And some very
8        impoverished areas. We have some very affluent areas
9        in the surrounding townships. We have manufacturing,
10       we have a large manufacturer here, Timken, which is a
11       steel manufacturer. We have a strong labor influence
12       in the area. We have quite a few small universities
13       and colleges in the area.
14   Q   And you said you have two bookmobiles?
15   A   Two bookmobiles and two kidmobiles.
16   Q   With respect to how the branches are physically
17       organized, is there a children's room in every
18       branch?
19   A   There's a children's area. Our branches range in
20       size from just literally like 1,500 feet to 20,000
21       square feet.
22   Q   Okay. Do all of your library branches have Internet
23       usage computers?
24   A   Yes.
25   Q   Okay. And is the policy the same at every branch?

## Page 39

1    A   Yes.
2    Q   Where is your smallest branch?
3    A   I'm trying to be specific for you. It's either the
4        Community Center branch or it is the East Canton
5        branch.
6    Q   Where is the Community Center branch located here?
7    A   In the southeast area of Canton.
8    Q   Okay.
9    A   And the reason I say both of them is the difference
10       in the size is very slight.
11   Q   Okay. Is the so-called tap and tell approach the
12       only privacy measure that this district takes into
13       account? For example, do you also use privacy
14       screens?
15   A   No.
16   Q   No? Did you research privacy screens?
17   A   We have.
18   Q   And what, what are your thoughts on privacy screens?
19   A   Primarily we've not started in that direction for
20       cost.
21   Q   Did you consider -- well, let me ask, are the
22       computers situated in recessed desks?
23   A   No.
24   Q   Okay. Was that an option you ever researched?
25   A   Actually Johnson County, where I previously worked,

## Page 40

1        that is the way we had a number of our Internet
2        screens.
3    Q   Okay.
4    A   And we've not pursued that here.
5    Q   Is that a cost issue here?
6    A   It just isn't an option that we've chosen to pursue.
7    Q   Do you have any opinion, having worked with those
8        types of desks, as to their ability, their limits
9        or --
10   A   I think they can be a good option for privacy but I
11       think there's the cost factor and having the specific
12       millwork done and they also become a -- once you've
13       configured a desk to use it that way its uses are
14       limited after that.
15   Q   Did you research here any other options with respect
16       to ensuring privacy on the Internet use computers?
17   A   We are always looking at layout and configuration.
18       As far as the way you position workstations so that
19       patrons have as much privacy as possible. And that
20       is something we consider whenever we're laying out
21       our computers.
22   Q   That's a good point then. So with your smallest
23       branch, how is the layout of the computer configured?
24   A   Gosh.
25   Q   Let's say East Canton, just for --

## Page 41

1    A   In East Canton specifically it's just a large room
2        and there's really very limited amount you can do to
3        totally ensure privacy in what you're looking at so,
4        I mean, we haven't really been able to do anything
5        special there.
6    Q   Okay. Are there any other branches that come to mind
7        that kind of have a similar situation?
8    A   Other than East Canton, no. For instance, we've just
9        recently built two new branches and in both of those
10       locations the computers tend to be in their own
11       specific carrels that are separated so you would have
12       to be making an effort to look at a screen when you
13       went by in order to see those screens.
14   Q   All right. What is your understanding of the level
15       of privacy that is -- I'm not going to -- Duncan is
16       going to object to that question before I even start
17       so let me rephrase that. I was going to ask you for
18       a legal conclusion.
19           As the chair of the Intellectual Freedom
20       Committee and as someone who's been working in the
21       libraries for a long time, what is your understanding
22       of the level of privacy that a patron should be
23       afforded, in your opinion, at a public library?
24   A   I believe a corollary of the First Amendment right to
25       access information without government interference is

11 (Pages 38 to 41)

Page 66

1       CERTIFICATE
2
3
        STATE OF OHIO  )
4                      )SS
        STARK COUNTY   )
5
6           I, Laurie Maryl Hart, a Registered Merit
        Reporter and Notary Public in and for the State of
7       Ohio, duly commissioned and qualified, do hereby
        certify that the within named witness, KENTON OLIVER,
8       was by me first duly sworn to tell the truth, the
        whole truth and nothing but the truth in the cause
9       aforesaid; that the testimony given was by me reduced
        to Stenotype and afterwards transcribed by
10      computer-aided transcription, and that the foregoing
        is a true and correct transcription of the testimony
11      so given by him as aforesaid.
12
13          I do further certify that this deposition was
        taken at the time and place in the foregoing caption
14      specified. I do further certify that I am not a
        relative, counsel or attorney of either party, or
15      otherwise interested in the event of this action, nor
        is the court reporting firm with which I am
16      affiliated under a contract as defined in Civil Rule
        28(D).
17
18          IN WITNESS WHEREOF, I have hereunto set my
        hand and affixed my seal of office at Canton, Ohio,
19      on this 19th day of November, 2007.
20
21      _____
        Laurie Maryl Hart, RMR & Notary Public.
22      My commission expires January 6, 2012.
23
24
25

56

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

# Exhibit TT

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

| | |
|---|---|
| SARAH BRADBURN, PEARL CHERRINGTON, CHARLES HEINLEN, and THE SECOND AMENDMENT FOUNDATION,<br><br>        Plaintiffs,<br><br>     vs.<br><br>NORTH CENTRAL REGIONAL LIBRARY DISTRICT,<br><br>        Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) No. CV-06-327-EFS |

DEPOSITION UPON ORAL EXAMINATION OF
JUNE PINNELL-STEPHENS

October 3, 2007
Seattle, Washington

Taken Before:

Cheryl L Hendricks, CCR #2274
Certified Court Reporter
of
CAPITOL PACIFIC REPORTING, INC.
2401 Bristol Court SW, Olympia, WA 98502
Tel (360) 352-2054  Fax (360) 705-6539

| Tacoma | Seattle | Aberdeen |
|---|---|---|
| (253) 564-8494 | (206) 622-9919 | (360) 532-7445 |
| Chehalis | Bremerton | |
| (360) 330-0262 | (360) 373-9032 | |

www.capitolpacificreporter.com
scheduling@capitolpacificreporting.com

04035559-7bdc-4960-a4ea-bd542e318ee9

1                    APPEARANCES

2

  FOR THE PLAINTIFF:   DUNCAN MANVILLE
3                         ATTORNEY AT LAW
                        1629 SECOND AVENUE WEST
4                         SEATTLE, WA 98119-1799
                        PHONE: (206) 390-8164
5                         E-MAIL: duncan.manville@gmail.com

6

  FOR THE DEFENDANT:   CELESTE MOUNTAIN MONROE
7                         ATTORNEY AT LAW
                        KARR TUTTLE CAMPBELL
8                         1201 THIRD AVENUE, #2900
                        SEATTLE, WA 98101
9                         PHONE: (206) 223-1313
                        FAX: (206) 682-7100
10                        E-MAIL: cmonroe@karrtuttle.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

04035559-7bdc-4960-a4ea-bd542e318ee9

## Page 6

1  Q  June, what is your date of birth?

2  A  June 11, 1948.

3  Q  Have you ever been a party in any prior litigation?

4  A  No. Oh, does divorce count in that?

5  Q  Yeah.

6  A  Okay. We didn't go to trial. We just settled.

7  Q  Oh, okay. And what year was that?

8  A  19... Actually, there were two. 1968.

9  Q  Okay.

10 A  And 1980.

11 Q  And there was no depositions taken --

12 A  No.

13 Q  -- in any of those cases?

14 A  No.

15 Q  Great. Can you tell me a little bit about your current

16    employment.

17 A  I've had to retire on a medical disability.

18 Q  Oh, just recently?

19 A  Yes.

20 Q  What was the effective date of your retirement?

21 A  February 14th, 2006.

22 Q  Okay. And what was your last job prior to retirement?

23 A  The collection services manager at the Fairbanks North

24    Star Borough Public Library in Fairbanks.

25 Q  Can you describe for me what your responsibilities were

## Page 7

1     as the collections services manager.

2  A  The short answer is I bought books for the library using

3     other people's money.

4  Q  Okay.

5  A  But the real answer to that question is using a staff of

6     13 I developed policies for collection, acquisition,

7     processing, and management of all materials in the

8     library, all formats, all types, all placements.

9        To do that we -- let's see. We spent -- I think

10    the last stats I remember anyway, we spent something

11    over $200 a day for each individual title in the

12    discount and processed, as I said, that's entering them

13    in the computer databases, putting all the -- the call

14    numbers, property stamps, things like that on them and

15    getting them out ready for circulation. And then

16    management of the collection was involved with where it

17    went on the shelves, when, if ever, the item was ready

18    for discard.

19       So it's controlling all 300,000 volumes plus in

20    the main library and the branch library in North Pole

21    and supervising the staff. I had one professional

22    librarian and the rest were all assistants.

23       THE REPORTER: I'd like to clarify. You didn't

24    say North Pole, did you?

25       THE WITNESS: Yes. It's a city about 13 miles

## Page 8

1     outside of Fairbanks.

2  A  We also sent a van around to the smaller community once

3     a month that hit all of these smaller places like Two

4     Rivers and Salcha and Ester and they relied on our

5     collection as well.

6        And then we also in contract with the State

7     Library provided what we called regional services. And

8     we did -- that was a books by mail service and we sent

9     out books, DVD's, all kinds of materials to people who

10    signed up for this service. And they -- those were

11    people who had no library service in their own

12    communities.

13       So essentially we served in the main body of

14    Alaska. Anybody in Southeast Alaska had service out of

15    the Juneau Public Library. But all those communities in

16    there, we're talking like communities of maybe 100

17    people, often less, who would rely on our collection and

18    somewhat on the regional services collection which was a

19    very small accessory collection for their library

20    services.

21 Q  All right. So let me take some of the points you have

22    made and go back and have you clarify.

23       So when you said a staff of 13, that included an

24    assistant to you --

25 A  Mm-hmm.

## Page 9

1  Q  -- and then a staff of librarians?

2  A  Oh, no. I had one librarian who was our in-house

3     cataloguer and then the other assistants. I didn't have

4     anything like a secretary or --

5  Q  Okay

6  A  -- an assistant. I had an associate librar -- an

7     associate for processing, an associate for acquisitions,

8     and then there were a number of folks who operated under

9     them as well, like the people who received all 14,000

10    issues of our magazines and newspapers and checked them

11    in and got them out to the shelves every day.

12 Q  Okay. Did you supervise them in the sense that you were

13    their boss?

14 A  Yes.

15 Q  Of the entire staff?

16 A  Of that staff.

17 Q  Of that staff.

18 A  Now, that was only one part.

19 Q  Okay.

20 A  There were four managers, essentially assistant

21    directors. One was public services, controlling

22    circulation and those functions. One was outreach

23    services who supervised regional services, personnel and

24    the North Pole personnel. And there was automated

25    services, the guys who did all the computers.

## Page 10

1 Q All right. When you said that part of your
2 responsibilities was developing policies for management
3 of material, --
4 A Mm-hmm, mm-hmm.
5 Q -- how were policies developed?
6 A Normally I would write a draft and take it to the
7 management team meetings or the selection committee
8 which was composed of all professional librarians. And
9 the difference there, I guess the collection development
10 plan and the selec -- a little difficult. The selection
11 policy is part of the collection development plan but
12 not all of it. The selection policy's the only portion
13 of the plan that is adopted and approved by the library
14 commission. The rest of it is management,
15 administrative. and is developed and approved by the
16 professional staff.
17 Q Okay. Was there any sort of board of trustees or board
18 involved in reviewing policy?
19 A Yes. They -- they -- as I said, they specifically
20 approved the selection policy and they also reviewed and
21 approved the Internet use policy.
22 Q Okay. And how many people are on the board?
23 A Oh, maybe nine. I can't remember offhand.
24 Q Was this nine people at the time that you retired?
25 A I think so.

## Page 11

1 Q Okay. And do you recall if that number changed or
2 fluctuated or were there always nine people on the
3 board?
4 A If that is, in fact, the correct number, it was static
5 the whole time, 18 years I was in -- at that library.
6 Q And what was the years?
7 A I started there in 1988, January of '88.
8 Q Okay. To February of 2006?
9 A Right.
10 Q With respect to management of materials, you stated that
11 it was for all formats.
12 A Mm-hmm.
13 Q Does that include the Internet?
14 A Well, it included electronic resources. When we
15 selected the Internet, we chose to select the Internet
16 as a whole, as one item, and felt the justification for
17 acquiring it as one item was in the selection criteria
18 in our Internet use policy. And I pointed that out in
19 my testimony.
20 The other electronic resources that we selected
21 were things like the EBSCOhost which is a database of
22 magazines, newspapers, and other articles.
23 Q Can you spell EBSCO?
24 A E-B-S-C-O, capital H-o-s-t.
25 Q Okay.

## Page 12

1 A The Gale databases, Literature Resource Center, Student
2 Resource Center. It's been a while since I've thought
3 of some of these titles.
4 Q Sure. That's fine. Was the automated services
5 department responsible for maintaining that portion of
6 the materials, the electronic resources?
7 A They were more concerned with setting up the networks
8 and fitting these items in.
9 Now, I did -- at one point I maintained the --
10 oh, the licenses and the -- who to contact in various
11 cases. Customer service, for example, that part of this
12 access database I set up went to my acquisitions
13 associate so she should call the customer service people
14 if we weren't receiving the database, if service had
15 been cut off, so we could look into a refund or
16 something.
17 The tech services contacted each of these
18 databases. I pulled out the information that our tech
19 services, automated services, folks needed to make any
20 technical corrections. But they were not involved in
21 actually selecting them or controlling them. When it
22 came to the Internet, they had. . . . Actually, no, it
23 wasn't -- it wasn't just the Internet. That was their
24 role along with maintaining access to it, maintaining
25 the printer to -- we had a centralized printer at the

## Page 13

1 main library, and they networked all these things
2 together. So that was their primary responsibility.
3 Q With respect to specifically electronic resources, as
4 part of your responsibilities under your job
5 description, if there were any complaints about access
6 to the Internet, either from a technical stand -- let's
7 start specifically from a technical standpoint, would
8 those concerns come to you?
9 A Technical, could you explain what you mean by --
10 Q If people were having trouble accessing the Internet,
11 would they bring their concerns to you or is there
12 someone else at the branch who would be responsible for
13 addressing that?
14 A So if the Internet was just down or the database they
15 wanted to get into was down, typically they would tell
16 someone, the user would tell someone at the reference
17 desk because they are the folks who are out there and
18 all professional staff worked on the desk. So, in fact,
19 it may have been me if that were one of my reference
20 shifts.
21 Q Okay. Is the same true for if there were any complaints
22 with respect to material or content contained on the
23 electronic databases?
24 A For that we would ask people to fill in the patron
25 complaint form. It's a resource free action form. And

4 (Pages 10 to 13)

## Page 14

1    all of those came to me.
2    Q   Would someone at the resource desk --
3    A   Reference desk.
4    Q   Reference desk, excuse me, take the form and then bring
5        it to you?
6    A   Mm-hmm.
7    Q   So you saw all --
8    A   Mm-hmm.
9    Q   -- patron complaints?
10   A   Mm-hmm, about content.
11   Q   About content. Do you specifically recall any examples
12       of patrons filling out this form regarding complaints
13       about content they were viewing on the Internet?
14   A   No.
15   Q   Do you have any personal knowledge of whether any other
16       employee of your branches received such complaints?
17   A   If they had received a complaint, they would have
18       brought it to me.
19   Q   Okay. And was the patron complaint form the only
20       written method for conveying concerns to staff?
21   A   They might -- there was another form that was. . . Wait
22       a minute. There's a -- there was a resource reaction
23       form and that could be anything from the bathroom to the
24       lighting, the chairs. And then there's a
25       reconsideration form, and those -- that was the formal

## Page 15

1    complaint form. Sometimes people would come up to us at
2    the desk and complain about something, but it wasn't a
3    formal complaint on which we acted unless and until
4    someone had filled in one of those resource reaction
5    or reconsideration forms.
6    Q   Okay. So to that point, do you recall any situations
7        where a patron approached the desk and made a verbal
8        complaint or expressed a concern about content they were
9        viewing on the Internet or someone else was viewing on
10       the Internet that was acted upon?
11   A   No.
12   Q   Are you aware of any other staff or personnel having to
13       address such a concern when you might not have been
14       there?
15   A   No, not a written complaint, no.
16   Q   And what about an oral complaint?
17   A   There may have been one or two.
18   Q   Do you have any specific recollection?
19   A   No.
20   Q   Okay.
21   A   It's been my experience in, what, 35 years just about
22       that 90 percent of expression of concern, people want --
23       just want to -- just want to say something. And when
24       you get a chance to talk to them, they understand why we
25       can't get rid of that book or -- or anything, whatever

## Page 16

1    the concern happens to be. And I would estimate that
2    only 10 percent of concerns expressed actually end up in
3    formal written complaints.
4    Q   And these percentages are based on your personal
5        experience?
6    A   Yes. I have no research to back it up. It's just my
7        feeling.
8    Q   And when you say 10 percent of concerns expressed end up
9        in formal complaints, in your experience are most of
10       these 10 percents regarding written texts or books,
11       materials, or any portion of that being electronic?
12   A   Any time there was a new format introduced there seemed
13       to be a flurry of complaints because it was a new
14       format, people weren't used to it and there was always
15       something they were concerned about. But after they'd
16       been around for a while, the new formats, the complaints
17       would calm down because people were used to them. And
18       I'm sure the thing -- we expected the same thing about
19       the Internet.
20   Q   Okay. With respect to the Fairbanks Public Library, the
21       area that you were working, there's a main library --
22   A   Mm-hmm.
23   Q   -- which is Fairbanks and then there's another branch
24       that services which is the North Pole --
25   A   Mm-hmm.

## Page 17

1    Q   -- or North Pole, probably not "The" North Pole. Is
2        that the extent of the actual physical branches?
3    A   Those are the physical buildings. But as I said, we
4        took this van --
5    Q   Right.
6    A   -- which is, oh, maybe the length of this room, not a
7        big one, like sort of a large RV or about that size.
8        And there is -- there are some items that are actually
9        shelved on that van. And then they do take orders for
10       books from the collection because everybody can see our
11       catalogue online, of course, so they can order books
12       they want to be brought to either the drop site or in
13       the case of services to the senior centers, that's
14       another scheduled stop.
15   Q   Okay. What can you tell me about the demographic of the
16       Fairbanks branch, the patrons that you serve?
17   A   Oh, boy. Well, the community is about 25 percent
18       military and dependants. It is also the location of the
19       largest university in the state and it's the flagship
20       for the university. We have a large mining community.
21       And it's a transportation hub for all the communities
22       out in the interior. It's also the last city before the
23       Haul Road starts up to Prudhoe Bay. Its minorities, the
24       largest minority is -- consisted of Alaskan natives,
25       primarily Athabascan, some Inuit or Yup'ik Eskimos

5 (Pages 14 to 17)

| Page 18 | Page 20 |
|---|---|

**Page 18**

1　coming in.

2　　　　　(Interruption by the reporter.)

3　A　Yup'ik, Y-u-p apostrophe i-k, I believe, and Inuit is

4　　I-n-u-i-t. The Inuit Eskimos are from the top coastal

5　　area and the Yup'ik are from the sort of southwestern

6　　area.

7　　　　It's a -- it's mostly a very conservative area.

8　Q　(By Ms. Monroe) Meaning politically conservative?

9　A　Yes.

10　　　And very, very independent. They are lots of

11　　people who live off the grid, that is, they have no

12　　electricity, they have to haul water, and either they

13　　try to grow or hunt or live on subsistence, subsistence

14　　life-style. So -- pardon me?

15　Q　No. Go ahead.

16　A　Okay. So it's a very, very different mix. You could

17　　never tell just sort of watching somebody walking down

18　　the street what -- what group that person might belong

19　　to and what their philosophies might be. But there's a

20　　lot of libertarian philosophy, I think.

21　Q　What is the physical size, to the best of your

22　　recollection, of the Fairbanks branch?

23　A　The size of the branch?

24　Q　Mm-hmm.

25　A　In terms of volumes?

**Page 19**

1　Q　In terms of square footage.

2　A　Oh, boy. I'm really bad at that. I don't know how big

3　　it is. I know we have about 300,000 volumes.

4　Q　Is it two stories? One story?

5　A　One.

6　Q　Bigger than. . . I'm trying to come up with a good

7　　example. Can I ask, how big is your home? Do you know

8　　the square footage size?

9　A　No. Let's see. I don't. How embarrassing. Let's see.

10　　I can try and estimate it for you.

11　Q　Well, with comparison coming into this office today, is

12　　it about -- from what you have seen from this office, is

13　　it a large -- is it about the same size of what you have

14　　seen --

15　A　I would say it's smaller than the floor. I can't --

16　　with all the cubbies --

17　Q　Yeah.

18　A　-- and breakups, it's hard to estimate space. I would

19　　guess -- let's see. The Bothell library is no longer

20　　the way it was when I was there. I'm sorry. I'm trying

21　　to remember. . . Hmm. You know, it's just really

22　　difficult to judge.

23　Q　How many rooms were there?

24　A　Well, there was the main library stacks area. There

25　　were four very small group study areas that would fit no

**Page 20**

1　more than -- the largest one would hold no more than

2　　eight people. There was a quiet use room that held no

3　　more than three. And this is all sort of tacked onto

4　　this main -- main room. There was an area around a

5　　fireplace that was a quiet reading area and then more

6　　stacks and then the children's room.

7　　　　And then that was the end of the library section

8　　and then there was -- there were the security gates.

9　　Oh, the reference desk was about the first thing you saw

10　　straight ahead, the circ desk on the left. After the

11　　security gates there were public bathrooms and there was

12　　an auditorium that would hold about 250.

13　Q　Okay. So it sounds fairly sizable.

14　A　Mm-hmm.

15　Q　Was the children's room separated from -- by a wall?

16　A　Yeah, there was a wall and most of it was glass.

17　Q　Any estimate of the number of patrons that the Fairbanks

18　　branch served, for example, at the time that you

19　　retired?

20　A　I would have to say this in terms of the entire -- of

21　　the branch and here because so many people came in to

22　　use the main library because the branch was so small.

23　Q　Okay. So you're estimating both North Pole and

24　　Fairbanks with this number?

25　A　The whole -- the whole borough --

**Page 21**

1　Q　Okay.

2　A　-- which used -- we were primarily tasked with serving

3　　the North Star Borough. And the latest population was

4　　about 86,000 and the size of the bureau -- of the

5　　borough was about that of New Jersey.

6　Q　In physical size?

7　A　Yes.

8　Q　Specifically then with respect to the North -- with the

9　　North Pole branch, what did that look like, much

10　　smaller?

11　A　Yes, it was much smaller and more cramped. They had --

12　　oh, and -- well, in the -- let me go back. The -- the

13　　areas I described were public areas. There were, of

14　　course, pretty much a warren of staff areas.

15　Q　In Fairbanks?

16　A　Yeah.

17　Q　Okay.

18　A　In North Pole, the staff area is shrunk to a room

19　　smaller than this, I would think. And they had a

20　　children's area and then stacks and reference all sort

21　　of mashed together. They were very crowded.

22　Q　So no walls separating? It was an open room just

23　　separated by aisles of books?

24　A　Well, and then the children room which was also then the

25　　story room -- story time area was open but partially cut

6 (Pages 18 to 21)

## Page 22

1      off by a wall.
2   Q   Okay. We will likely get into this in more detail
3      later. But from reading your report, it sounds like at
4      one point the Internet terminals at the Fairbanks branch
5      and possibly the North Pole branch were not filtered.
6   A   That's right.
7   Q   Can you tell me from what period of time -- at what
8      point were Internet computers installed?
9   A   Oh, maybe '95. I can't remember exactly. Seems to me
10     it was almost eight years, between six and eight years,
11     that we did not have filters on our Internet stations.
12   Q   So assuming approximately 1995, then seven or eight
13     years later --
14   A   Mm-hmm.
15   Q   -- a filter was employed at both branches --
16   A   Mm-hmm.
17   Q   -- on their Internet computers?
18   A   Mm-hmm.
19   Q   What was the reason for the decision to install a
20     filter?
21   A   The Mayor --
22   Q   Of Fairbanks.
23   A   -- of Fairbanks at the North Star Borough decided that
24     it would be good public policy as well as a good
25     campaign issue to install filters and the assembly voted

## Page 23

1      to do so.
2      We had decided previously -- the library staff,
3      we had looked at the cost benefit for putting them on.
4      We'd had no complaints from anybody about Internet use
5      at that point. And we received approximately $2,500 a
6      year from E-Rate money, if that makes sense to you.
7   Q   Mm-hmm.
8   A   Okay. I thought it might. And ended up costing --
9      well, we figured it would cost us $26,000 to install an
10     adequate filtering system.
11   Q   What do you mean by adequate?
12   A   Well, one that had among the best ratings of those that
13     were available at the time. I mean, some we -- that
14     were tested were clearly inappropriate. And I can't
15     tell you the names of those. The automated services
16     folks did most of the testing. But there were reviews
17     written by a number of different organizations about the
18     various systems.
19   Q   And by best ratings, you mean performance ratings?
20   A   Mm-hmm.
21   Q   With respect to error rates? Is that what you're
22     referring to?
23   A   Yes.
24   Q   Okay. So before filters were installed what, if
25     anything, were you doing with respect to your Internet

## Page 24

1      stations to prevent children or other people from seeing
2      what was on someone's screen?
3   A   Well, as time went by we started putting -- installing
4      privacy. . .
5   Q   Screens?
6   A   Screens and stations. We went through an expansion of
7      the library not long after the Internets went into
8      place. And when we reopened after -- when that
9      expansion was done, we planned for stations with
10     recessed screens, so they are down underneath a table
11     and it's a glass tabletop and you look down through it.
12     And for those stations that had to be on the desktop,
13     some people with trifocals or other reading problems
14     needed a screen on the desktop, we provided privacy
15     screens that actually fit over the screen.
16     We directed the locations of these stations so
17     they would not be right in the largest line of traffic
18     and tried our best to minimize incidental viewing of
19     anything. And one of the reasons we did that is that
20     our nonfiction collection was fully integrated, that is,
21     children's material, adult material, nonprint material
22     were all interfiled on the same shelves and to -- you
23     had to walk past the main groupings of Internet stations
24     to get to the nonfiction collection of the library.
25   Q   Okay. Was the mayor's decision to ask you to install

## Page 25

1      filters or the assembly's decision based in any part on
2      the Children's Internet Protection Act?
3   A   No.
4   Q   No?
5   A   Hmm-mm.
6   Q   What was the timing of the mayor's decision?
7   A   Oh, what was the -- the date of CIPA was '93; is that
8      right?
9   Q   I can't answer.
10   A   Oh, I'm sorry. I can't remember the actual date of
11     CIPA. Let me see if I can find it here.
12   Q   And just to make a record, you're looking at the report
13     that you prepared and disclosed to us?
14   A   Yes.
15   Q   Okay. Well, maybe this will help. To my question of
16     when the mayor --
17   A   Oh.
18   Q   -- asked you to install filters, that would have been
19     roughly maybe 2002?
20   A   It was after CIPA was adopted, I'm quite sure, because
21     we tried -- in our cost benefit analysis that I just
22     mentioned we would have received $2,500 or something
23     from E-Rate, which is the CIPA money.
24   Q   So you were having conversations at that time, roughly
25     1995, when the computers were installed about how to

7 (Pages 22 to 25)

## Page 26

1    comply with CIPA?
2    A  CIPA wasn't passed in '95.
3    Q  Okay. So your decision to install privacy screens to
4    stations, what prompted that?
5    A  We wanted to avoid complaints and inadvertent viewing of
6    whatever was on the screen.
7    Q  Okay. Once CIPA was passed, did you take any further
8    efforts in light of the statute?
9    A  No. We were -- we were pretty well set up to preserve
10   privacy to protect the user. We -- I mean, we were well
11   aware of the problems that people could have with their
12   Internet stations and wanted to avoid as much as we
13   could. And Alaska has an explicit privacy law as well
14   as that library confidentiality law, so we had -- we
15   knew we were not required to install filters if we did
16   not accept the CIPA money.
17   Q  Let me take a step back. Will you explain to me your
18   understanding of the requirements of the Children's
19   Internet Protection Act, which we are referring to in
20   short as CIPA.
21   A  CIPA, right. Any library or school library that accepts
22   E-Rate money from the federal government must install a
23   technical software product that blocks access to
24   material that is obscene or harmful to minors for anyone
25   under 17. And let's see. There's another part of it.

## Page 27

1    You have to draw up a detailed Internet use plan. And I
2    think schools had to do something else as well. Oh, and
3    you had to be able to disable the filter for adult
4    users.
5    Q  Is it your understanding that you had to be able to
6    disable the filter, that it was required by statute?
7    A  I can't remember if that was part of CIPA as a
8    requirement or if that was -- if that came from the
9    Supreme Court opinion. They were mentioned.
10   Q  When you say the Supreme Court opinion, are you
11   referring to the United States versus American Library
12   Association?
13   A  Yes.
14   Q  And is it your understanding or belief that based on
15   that opinion that libraries had to be able to disable
16   the filter at adult patrons' request?
17   A  In the -- I'm sorry. The first part of that again?
18   Q  Is it your belief that after the American Library
19   Association opinion that libraries who were receiving
20   E-Rate funds had to be able to disable the filters at an
21   adult patron's request?
22   A  Yes, or risk another lawsuit.
23   Q  About how many Internet capable computers were there at
24   the time that you retired in Fairbanks?
25   A  Oh, the main library had three, six, ten, 14, 17 -- 17,

## Page 28

1    18, 19 available to the public and then all the staff
2    computers fit under the CIPA Act as well or fit under --
3    let me say fit under the Fairbanks ordinance that
4    required filters as well.
5    Q  Okay. How many in North Pole?
6    A  I believe they had five, or maybe it was just four
7    available to the public.
8    Q  To your recollection, were any of the computers in
9    Fairbanks, let's start there, specifically for children,
10   children only?
11   A  They had some -- let's see. They had two computers in
12   the children's room that were for children only.
13   Q  Did those have access to the Internet?
14   A  You know, I'm trying to think. It took a long time for
15   the tech folks to figure out how to handle white sites,
16   those sites that were approved by -- by the librarians
17   actually examining them and starting off with
18   recommended sites, and then I think -- well, to go to
19   the regular workstations and they were not -- they were
20   not barred from the regular workstations out in the main
21   library. To have those... Well, yes, they had
22   access -- they had access to the machines in the main
23   part of the library.
24          There were I think two computers that they were
25   planning to open to the Internet as soon as they could

## Page 29

1    find a way to start them with viewed -- reviewed by --
2    sites reviewed by the librarians and made the primary
3    port of -- point of entry. And I don't know if they had
4    gotten to that point.
5    Q  Okay. But children could use computers in the main
6    area?
7    A  Yes.
8    Q  And those -- for a time those computers were not filt --
9    A  Right.
10   Q  -- were not filtered?
11   A  Mm-hmm.
12   Q  Did children at that time need permission to view
13   anything on the computers?
14   A  No.
15   Q  No. What about in North Pole, how many -- were any of
16   the Internet capable computers specifically for children
17   or any computers specifically for children?
18   A  I don't think -- well, they may have had one computer
19   with games or something in the children's room but it
20   was not connected.
21   Q  So how did things change after the filters were
22   installed?
23   A  Well, one of the -- one of the things we did was add a
24   PC reservation system which scheduled all of the -- all
25   of the stations. And people had to have a library card

8 (Pages 26 to 29)

## Page 114

1 Q And the last bullet is, "Developing educational

2 approaches to online literacy and Internet safety."

3 Any awareness of what NCRL is doing to educate

4 their patrons with respect to online literacy and

5 Internet safety?

6 A No.

7 MS. MONROE: I have no further questions.

8 MR. MANVILLE: I just have a couple because I

9 want to clarify something, June.

10

11 EXAMINATION

12

13 BY MR. MANVILLE:

14 Q This was a question that Ms. Monroe just asked you with

15 respect to the third bullet point on page 122, or page

16 17 of your report.

17 A Mm-hmm.

18 Q She asked you if you had any knowledge of what the

19 NCRL's policy with regard -- was with regard to

20 disabling filters on requests from adults. And I

21 believe your testimony was that you did not have any

22 knowledge of that. But I'm wondering if you do have an

23 understanding of what the library's policy is with

24 regard to disabling a filter on the request of an adult.

25 In other words, if an adult comes in and says, "I want

## Page 115

1 unfiltered access," do you have any understanding of

2 what the NCRL's policy is in that situation?

3 A It's my understanding that an adult can ask the library

4 director to unblock. I'm not sure if it's just the whole

5 filter or just a site.

6 Q Okay. So your understanding is that. . . Okay. Do you

7 have an understanding of what the NCRL's policy is with

8 regard to requests to disable the entire filter, to have

9 unfiltered access as an adult?

10 A No, other than going to the director, I guess, and

11 asking for it.

12 Q Okay. And do you know the NCRL has a stated policy with

13 regard to whether it will disable filters at the request

14 of adults?

15 A I assume there's a written policy. But I don't know --

16 I don't know if it's -- I don't think it's in any of

17 this, any of the -- just from what I've heard, or maybe

18 I something I saw on their website when I was looking at

19 their collection development policy.

20 Okay. Here's the -- yeah, the Internet public

21 use policy.

22 Q What page are you looking at?

23 A Page 119.

24 Q Okay.

25 A And it's 14 on mine. So I obviously saw it on their

## Page 116

1 website because there's -- there's no other citation and

2 DNP.

3 Q And can you go to the top of page 15 of your report. --

4 A Mm-hmm.

5 Q -- the first sentence?

6 A Okay.

7 Q It reads, "Their policy," in other words, the NCRL's

8 policy, right?

9 A Yes. Okay.

10 Q "Does not allow for adults to request that the filter be

11 disabled during their session."

12 Is that your understanding of what the NCRL's

13 policy is?

14 A It was after -- after reading the policy online, yeah, I

15 guess -- I guess so, yeah. So that was -- that was my

16 understanding of their policy after -- after reading it

17 online. I don't know where I got the go to the

18 director. I think maybe --

19 Q The information about unblocking particular websites?

20 A Mm-hmm, mm-hmm, yeah.

21 MR. MANVILLE: I think that's all I have.

22 (Concluded at 1:25 p.m.)

23 (Signature reserved.)

24

25

## Page 117

1
2 CERTIFICATE

I, CHERYL L. HENDRICKS, a duly authorized Court
3 Reporter and Notary Public in and for the State of
Washington, residing at Olympia, do hereby certify;

4 That the foregoing deposition of June
5 Pinnell-Stephens was taken before me on October 3, 2007,
and thereafter transcribed to the best of my ability by
6 means of computer-aided transcription; that the
deposition is a full, true, and complete transcript of
7 the testimony of said witness;
8 That the witness, before examination, was by me
duly sworn to testify the truth, the whole truth, and
9 nothing but the truth, and the witness reserved
signature;
10
That I am not a relative, employee, attorney, or
11 counsel of any party to this action, or relative or
employee of any such attorney or counsel, and I am not
12 financially interested in said action or outcome
thereof;
13
That upon completion of signature, if required,
14 I shall herewith securely seal the original transcript
and serve same upon Tom Adams, counsel for the
15 Defendant.
16 IN WITNESS WHEREOF, I have hereunto set my hand
and affixed my official seal this 15th day of October,
17 2007.
18
19
20
21

Cheryl L. Hendricks,
22 CCR NO. 2274
23
24
25

# Exhibit UU

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

No. CV-06-327-EFS

SARAH BRADBURN, PEARL CHERRINGTON,
CHARLES HEINLEN, and the SECOND
AMENDMENT FOUNDATION,

        Plaintiffs,

     vs.

NORTH CENTRAL REGIONAL LIBRARY
DISTRICT,

        Defendant.
_____/

      The Deposition of PAUL RESNICK, an Expert
Witness herein, taken pursuant to Notice of Taking
Deposition before Shari Blythe Holtz, CSR-3910,
Registered Professional Reporter and Notary Public within
and for the County of Wayne, State of Michigan, at
8000 Merriman Road, Romulus, Michigan, on Thursday,
November 15, 2007, commencing at about 12:15 p.m.

APPEARANCES:

    DUNCAN MANVILLE, ESQ.
    1629 2nd Avenue West
    Seattle, Washington  98119
    9206)288-9330

    For the Plaintiffs.

    CELESTE M. MONROE, ESQ.
    Karr Tuttle Campbell
    1201 Third Avenue, Suite 2900
    Seattle, Washington  98101
    (206)224-8064

    For the Defendant.

          - - -

Page 2

1                            INDEX

2      WITNESS:  PAUL RESNICK                          PAGE

3           Examination By Mr. Manville                  3

4           Examination By Ms. Monroe                  152

5                        - - -

6                         EXHIBITS
                (Attached to Original Only)
7
        Resnick
8      Deposition                                      Page
        Exhibit            Description              Marked
9      ============================================================

10        53              Curriculum Vitae             10

11        54              Expert Report                30

12                        - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

## Page 46

1     set of sites with a mean Google PageRank of 2.6, how much
2     will the difference in the mean page ranks between those
3     two sets of sites impact the blocking error rate?
4   A   Oh, I don't have a model that would allow me to estimate
5     that parameter.
6   Q   So you can say that, in your opinion, popular sites are
7     less likely to be -- more popular sites are less likely
8     to be the subject of blocking errors, but you can't say
9     how much less likely those sites are to be the subject of
10     blocking errors?
11   A   Correct. Or at least I haven't come up with a model yet
12     that would let me do that. You've got me thinking now.
13     But I don't have one that -- I don't have anything yet
14     that would let me say that.
15   Q   Are there any other ways, in your view, in which the set
16     of web sites that Mr. Haselton evaluated was not
17     representative of the web sites that are typically viewed
18     by patrons of the NCRL?
19   A   I think it's likely that they differ on a number of other
20     dimensions, but I did not evaluate, in my study, any
21     other dimensions on which they differ.
22   Q   Would you be prepared to testify about any other
23     dimension in which those two sets of web sites might
24     differ?
25   A   I would be prepared to speculate.

## Page 47

1   Q   Would you be prepared to do anything more than speculate
2     about other possible differences in those two sets of
3     sites?
4   A   No.
5   Q   The other major concern that you mentioned with regard to
6     Mr. Haselton's study was the lack of assessment of
7     reliability of his own rating, is that right?
8   A   Correct.
9   Q   Did you, or any of your colleagues, look at the sites
10     that Mr. Haselton classified as having been incorrectly
11     blocked by the Fortiguard filter?
12   A   I looked at the lists, but I did not look at the sites.
13   Q   Did any of your colleagues look at those sites?
14   A   No.
15   Q   Do you have any reason to believe that Mr. Haselton
16     misclassified any of those sites as having been
17     incorrectly blocked?
18   A   I don't have any specific -- anything specific to his
19     study that would make me think he made errors, only my
20     general knowledge of classification processes and the
21     difficulty of getting inter-rater agreement.
22   Q   So it's entirely possible that despite what you perceive
23     as a flaw in his methodology, he correctly classified all
24     of the sites that he identified as having been
25     incorrectly blocked, is that right?

## Page 48

1   A   I actually think that the notion of "correctly blocked"
2     or "correctly classified" is a problematic notion, given
3     that you don't have -- if you take different raters, you
4     won't necessarily get a 100-percent agreement between
5     them. Since there is no gold standard, all we have is
6     how close would his assessments match those of some
7     unnamed other person.
8         I think it's possible that he may have come
9     close to whatever we might think is the ultimate
10     standard.
11   Q   Is it possible that he got them all right?
12   A   If we could come to an agreement on what "all right"
13     meant, I think it's possible that he could have gotten
14     them all right.
15   Q   Is it possible that he correctly classified the web sites
16     based on the criteria that you used in your report?
17   A   That's unlikely, since he wasn't trying to.
18   Q   Why is that unlikely?
19   A   He stated that he was only looking for -- he only
20     classified something as blockable if it had nudity in it.
21     Our raters classified things as blockable for some other
22     reasons, too, based on categories that the library had
23     configured the FortiGates to block. So, presumably, he
24     would not have classified as blockable some of the things
25     that we would classify as blockable that have nothing to

## Page 49

1     do with nudity.
2   Q   So can you tell me what some of those other criteria are,
3     criteria other than "nudity" that you used to classify
4     sites as blockable?
5   A   Yes. These are listed on page 13 and 14 of the report.
6     I guess the handwritten numbers 13 and 14. So instant
7     messaging, image search, spyware, hacking, just to list a
8     few.
9   Q   Well, now you've got me a little bit confused.
10         Can you go to page 20 of your report?
11   A   Yes.
12   Q   Up at the top there's a bullet point indicating that your
13     raters had found it difficult to assess the categories of
14     hacking, phishing, and malware, correct?
15   A   Correct.
16   Q   So those four categories were -- in the end you didn't
17     attempt to rate any sites as falling into the categories
18     of hacking, phishing, or malware, correct?
19   A   We tried, but in the end, we didn't use any of those
20     classifications.
21   Q   Going back to the list on page 13 and 14, how did you
22     classify "proxy avoidance" sites? Where are those
23     referenced elsewhere in your report?
24   A   Proxy avoidance is one of the categories that NCRL has
25     configured their computers to not be able to access if

On The Record Reporting & Video
313-274-2800                              Fax: 313-274-2802

cac112cc-59c1-479e-8cf4-8275ce711e6e

| Page 54 | Page 56 |
|---|---|

**Page 54**

1  as pornography, is that right?
2  A  Correct.
3  Q  Did your raters distinguish between pornography adult
4  materials and nudity and risque?
5  A  They did.
6  Q  Okay. Are adult materials and nudity and risque shown in
7  the table on page 142?
8  A  I'd just like to clarify. Our raters did distinguish --
9  they had separate categories for those. In the analysis,
10  I did not treat those ratings as being distinct.
11  Q  Those ratings for adult materials and nudity and risque,
12  those are included in the column for pornography on
13  page 142?
14  A  No. That middle table that we're looking at on page 142,
15  the columns are the classifications given by Fortinet.
16  The rows, the rung names like nonratable, okay, and
17  unblockable, those are the classifications that we have
18  given them. So "blockable" means any of the blockable
19  categories. If our raters put it in any of the blockable
20  categories, then it's just marked as "blockable" there.
21  If our raters said it was none of the blockable
22  categories, then it's marked as "okay" there.
23  Q  Okay. All right. I think I'm beginning to understand
24  how this table works.
25  A  Having a printout in wide format would make it much

**Page 55**

1  easier.
2  Q  So for adult material, tell me how many sites -- how many
3  of the 289 sites were classified by Fortinet as adult
4  material.
5  A  It looks to me like that was the first column, so I see
6  77 things that they classified as adult materials where
7  our raters said it was blockable; and six where Fortinet
8  classified it as adult materials and our raters said it
9  should not have been blocked.
10  Q  For a total of 83?
11  A  Yeah.
12  Q  And then for nudity and risque?
13  A  It looks like 2 and 27.
14  Q  For a total of 29.
15  How about gambling? How many of those 289
16  sites were gambling sites?
17  A  Zero. That column is not showing up here because there
18  weren't any items that Fortinet had classified as
19  gambling.
20  Q  Web chat? How many types were web chat sites?
21  A  It looks like zero and eight. That is, eight things that
22  they classified as web chat that our raters said were
23  correctly blocked and none that were classified as web
24  chat that our raters said were incorrectly blocked.
25  Q  How about instant messaging sites?

**Page 56**

1  A  It looks like zero and 23.
2  Q  Image search?
3  A  Image search is in the next table because Fortinet has
4  this separate thing of categories and classes. And image
5  search is a blocked class, rather than a blocked
6  category.
7  So you'll see that there were three things
8  that -- three pages that Fortinet classified as image
9  search that our raters thought were mistakes that
10  shouldn't have been blocked at all; and nine that
11  Fortinet classified as image search that our raters said
12  should have been blocked.
13  Q  Video search, it looks like you've got four and zero.
14  Four that were properly classified by Fortinet and zero
15  that weren't, is that right?
16  A  Four correctly blocked and zero error, yeah.
17  Q  And then for spam it's zero and zero, right?
18  A  Yes. Basically because we classified all the spam ones
19  as nonratable because it wasn't possible, by looking at
20  the web site, to know that if you look at the definition
21  of the spam URL, it's web sites or web pages whose URLs
22  are found in spam e-mails. So just by looking at the
23  site, you can't tell whether it's a URL that's found in
24  spam e-mails. So we defined those as not ratable.
25  Q  So let me get back to what got us off on this tangent, it

**Page 57**

1  was your comment about the fact that Mr. Haselton only
2  looked at sites that were blocked as pornography or adult
3  material?
4  A  Yes. That wasn't a criticism. I just responded to your
5  question where you asked me whether it's possible that
6  his classification might agree with the classification of
7  my raters.
8  Q  Well, I have a couple of follow-up questions there.
9  One is I know that, from one of the
10  publications I read in the appendices that you provided,
11  you draw a distinction between what you refer to as the
12  okay and overblocking rate and the blocked-sites
13  overblock rate.
14  Can you explain the difference between those
15  two?
16  A  Between the okay-sites overblock rate and the
17  blocked-sites overblock rate?
18  Q  Yes.
19  A  It's really easy to misspeak on this, so let me just look
20  at that paper and use it to refresh my memory.
21  Q  Absolutely. Appendix 2.
22  A  Okay. So I'm on page 38. the nice figure in the middle.
23  So the okay-sites overblock rate takes. as the
24  denominator, the set of all things that are okay, whether
25  they are blocked or not, and says: What percentage of

## Page 82

1   web server and asks for the path, the path part of the
2   URL. So the URL is a name for something.
3        And as we discovered, many of the URLs that
4   were accessed were actually things like helper images.
5   They weren't real pages.
6        And I think, in common parlance, the notion of
7   a web site really means sort of a collection of pages
8   that has an initial entry point, some kind of home --
9   "web site" is not a technical term -- but every web site
10  has sort of an entry point, the home page of a site has a
11  URL, as do other pages of a web site, as do individual
12  icons and images that appear on particular pages.
13  Q   Do you draw a distinction between a URL and a URL path?
14  A   Yes.
15  Q   And I guess, as a lay person, I tend to equate a URL with
16  maybe not so much a web site, but the splash page or the
17  home page, at least, of a web site like, your example,
18  www.yahoo.com and then a URL path as a particular page on
19  that web site.
20       But it doesn't sound like that's exactly right,
21  is that right?
22  A   No. I'm using "URL path" here in a technical sense to
23  be, in my example, just "/NFL." It's just the stuff
24  after you've specified the domain -- or after you've
25  specified the site -- after you've specified the server.

## Page 83

1   So www.yahoo.com says "go to this server" and "/NFL" is
2   the URL path -- or just the path.
3   Q   What's the difference between a web site and a domain?
4   Is it the same thing? Is it a domain really a name of
5   something on a web site is --
6   A   The domain is just www.yahoo.com. And most domains have
7   a splash page, a home page, that if you just go to
8   www.yahoo.com with a URL path of "/," nothing after the
9   slash, you'll get a web site.
10  Q   Right.
11  A   But that's not the only types of things that we would
12  call a web site. For example, my personal web site is on
13  a umich server and it has, as a path "/ presnick." So
14  the whole URL with the "/ presnick" identifies my web
15  site or sort of the starting point for my web site. And
16  there's subpages under that.
17       So, for example, when I did the -- yeah, well,
18  that's it.
19  Q   Can you summarize for me, very briefly, the section of
20  your report that is titled "What Happens When a Patron
21  Fetches a Page," it starts on page 6?
22  A   Sure. So here, you know, well, let's go through with the
23  example of yahoo.com/NFL. The browser tries to talk to
24  the Yahoo server. And if it succeeds in talking to the
25  Yahoo server, it asks for "/NFL" and an html page comes

## Page 84

1   back. The browser then figures out exactly how to
2   display that on the user's computer. Some of that html
3   may include references to additional content that needs
4   to be fetched from the original server or possibly from
5   other servers.
6        Those are the things that I'm sort of calling
7   helper elements. So things like little icons, or
8   sometimes even bigger sections of content.
9        If you've opened a web page and you've noticed
10  some stuff shows up and then a little while later some
11  other images show up, that's because additional URLs were
12  getting fetched.
13       In this section I'm describing what happens
14  when the extra equipment that NCRL has installed for
15  doing filtering is added into that process. And
16  essentially it's getting in the middle between the end
17  user's browser and the servers that the browser is going
18  to talk to. So it's intercepting the communication going
19  both ways and it can decide to change what comes back
20  depending on whether the request is allowed and so on.
21       So the FortiGate is this intermediary and it is
22  doing two things. It's going and actually fetching the
23  content the same as from the Yahoo server or whatever
24  server you are connecting to, but it's also talking to a
25  rating server that Fortinet maintains called the

## Page 85

1   Fortiguard rating server and it's asking how is this URL
2   classified. It's not asking should this URL be blocked.
3   It's just asking how is it classified by Fortinet.
4        When it hears back from the ratings server, it
5   compares that classification to the rules that have been
6   set up locally for what's allowed and which categories
7   are allowed and which categories are not. So if Fortinet
8   has classified it as spam URL, then if the local policy
9   that's programmed into the FortiGate says spam URL is not
10  allowed, then it won't send the contents back to the end
11  user. But if that is allowed, it will send it back.
12       And if it's not allowed, then there are
13  slightly different things that happen, depending on what
14  kind of thing it is. If it's a web page that was
15  requested and it's blocked, then it gets a screen like in
16  Figure 3 or in Figure 2. So the difference between
17  Figure 2 and Figure 3 is Figure 3 are things that
18  Fortinet has classified in a certain category and the
19  library has decided to block that category. Figure 2 is
20  for specific URLs that the library has decided to filter,
21  regardless of how Fortinet is classifying it.
22       And then if it happens to be an image, and this
23  is the inference I made for actually trying this with the
24  sample unit, that if it's an image, rather than giving
25  you a block message, it substitutes a little blank image.

On The Record Reporting & Video

313-274-2800                              Fax: 313-274-2802

cac112cc-59c1-479e-8cf4-8275ce711e6e

## Page 86

1    And that allows kind of graceful degradation like you see
2    in Figure 6 where some helper images are missing, but you
3    can still use the page. But it also has the effect that
4    the user may not even realize that some things have been
5    blocked.
6    Q    The embedded images that you reference on page 12 of your
7         report, are those typically images that are associated
8         with links to other web sites or advertisements or that
9         sort of thing?
10   A    They are different things. Sometimes they are used just
11        to kind of -- just for visual effects in web pages, you
12        know, horizontal lines or things that are kind of spacers
13        to make things space out and look better. Sometimes they
14        are things that you can click on to navigate to, you
15        know, sort of acting as an advertisement. And sometimes
16        they are even things that you can click on for navigation
17        within a site, sometimes like little right arrow and left
18        arrows are sometimes put into images rather than text and
19        then the user would click on them to navigate within a
20        site.
21   Q    And when those embedded images are blocked, what happens?
22        Is there any indication, typically, that embedded images
23        have been blocked?
24   A    From what we were able to see, unlike when you go to
25        Playboy and you get a page back that says you can't

## Page 87

1    access Playboy, when one of these images is blocked, you
2    just get a substitute small blank image instead. I'm not
3    sure -- we didn't test it too much. I don't know how
4    smart they are about figuring out -- maybe they are
5    actually figuring out to send a blank image of the same
6    size as the other. But as a user, you would not
7    necessarily know that something was missing.
8    Q    But the small blank image that you mentioned, what is it?
9         Is it typically a box thing, you know, "This image can't
10        be displayed"?
11   A    No. It's literally blank. Well, compare Figure 5 and
12        Figure 6. So in Figure 5 you see the "Firefox Start" at
13        the top and you see the little Firefox swirly thing, I
14        think that's two images, but I'm not sure.
15            In Figure 6 it turns out those images are
16        coming from google.com/images. And Fortinet has
17        classified everything -- everything I've found -- they've
18        certainly classified that particular URL as being image
19        search. And so the image of "Firefox Start" with the
20        swirl was blocked when we did the test.
21        And the page that you would get would look like Figure 6.
22            So it doesn't -- you don't see it, but there's
23        actually a blank image in there above Google in Figure 6
24        and that's what makes the spacing come out the same
25        between Figure 5 and Figure 6. But it doesn't say "image

## Page 88

1    missing."
2    Q    Okay. And that's what typically happens, based on what
3         you observed, for these embedded images when they are
4         blocked by Fortiguard?
5    A    I don't have a large sample of them, but from my
6         understanding of the technology, I would extrapolate from
7         what I saw here to -- it's my opinion that that would
8         also happen with other helper images that are blocked.
9    Q    Do you know how Fortinet goes about reviewing and
10        classifying web sites?
11   A    No. I know only the written descriptions of their
12        categories that I took from their web site.
13   Q    That are available on the web?
14   A    Yes.
15   Q    Do you know what category the NCRL is currently blocking,
16        as we sit here today?
17   A    No.
18   Q    Do you know what local overrides the library is currently
19        using?
20   A    I don't know about any changes that may have happened
21        since the time that I found out what they were blocking
22        in order to do the report. And I've reported what I
23        believe their policy to be as of that time, but I don't
24        know whether or what changes they have made since then.
25            Celeste mentioned something this morning that

## Page 89

1    they may have changed something with Craigslist. And I
2    don't know if they've changed anything else.
3    Q    Do you know if categories like hacking and phishing
4         include information regarding general information about
5         those activities as well as how-to information?
6    A    I don't know. I only know the two-line description that
7         they've given here.
8    Q    Is that the same for all of the categories, your
9         understanding of what is included in them is limited to
10        the description that's included in your report?
11   A    Yes. I don't know anything about their procedures for
12        classifying things. In a few cases I've seen particular
13        items that they've classified, just because we came
14        across them in doing our study.
15   Q    With regard to the definition of "nudity and risque," do
16        you have any understanding of what a mature content web
17        site would be?
18   A    I'm trying to think if we needed to give our raters any
19        guidance about that. It would have been in one of the
20        appendices.
21            (Witness reviewed documents.) So in our rating
22        scheme, we didn't ask our raters to distinguish between
23        adult porn and nudity because we found the Fortinet
24        descriptions to be a little bit confusing. We weren't
25        sure how to assign things among those three categories.

23 (Pages 86 to 89)

## Page 90

1      All three of those have this 18-plus years and over.
2         I know one indicator that came up for that were
3      sites that had something right in the site that said, you
4      know, how old are you or what's your birth date, or not
5      intended for people under 18. That was one indicator,
6      but not the only one.
7    Q   Do you know if the gambling category includes general
8      information about gambling, as well as --
9    A   Well, again, I don't have a set of items that are blocked
10      to know. I'm looking at their definition, which says
11      sites that cater to gambling activities, such as betting,
12      lotteries, casinos, including gaming information,
13      instruction, and statistics. The second half of that
14      sounds to me like it would be, you know, here's my system
15      for winning at Black Jack in Vegas, which would be
16      information about gambling, but not actually an
17      opportunity to gamble.
18         So my interpretation of that category is that
19      it would include both gambling and information about
20      gambling, but I don't know what they actually do in
21      practice.
22    Q   Taking a look at page 14 of your report down toward the
23      bottom, the section titled "The Overblock Test" --
24    A   Yes.
25    Q   -- you used a sample of URLs visited at NCRL branch

## Page 91

1      libraries during the week of August 23 to 29, 2007.
2         Why did you choose that sample to analyze?
3    A   We were aiming to have a reasonable number of items. So
4      something in the one to 2,000 range.
5         The reason to have a large enough sample is to
6      have statistical validity with the results you come up
7      with. And we knew that some of the items were going to
8      be these helper images and unreachable and unratable for
9      various reasons, so we wanted more than a thousand.
10         Part of it was timing of when we were
11      conducting the test and so what we had to choose was
12      some set of items from all through the month of August.
13      And it looked like a week would get us about the right
14      number of items. And we thought it would be better to
15      have a complete sample for one week than to have a random
16      sample across time just because then there's no question
17      about whether your sampling process is good or not. So
18      that's why we chose that.
19         We did a little checking to, you know, we were
20      a little worried that the end of August would be vacation
21      time, but we looked at that compared to other times in
22      August and the usage was about the same level.
23    Q   Can you take a look for me at Appendix 2 to your report?
24      Again, your Calculating Error Rate for Filtering Software
25      article.

## Page 92

1    A   Yes.
2    Q   If you go to handwritten page 37 --
3    A   Yes.
4    Q   -- down in the second column toward the end, the second
5      paragraph up from the bottom, about the middle of the
6      paragraph, this article criticizes Cory Finnell for using
7      a sample that reflected patrons' access patterns when the
8      filters were installed, not what their access patterns
9      would have been without the filters.
10         Isn't that exactly what you did in this case?
11    A   Yes.
12    Q   And why did you think it was appropriate to take a sample
13      reflecting patrons' access patterns when the filters were
14      installed?
15    A   Well, it depends what you are trying to test. So if you
16      are trying to test in a situation how many of the things
17      that people try to access are done in error, then it's
18      good to take a list of what they actually access.
19         What you miss when you do that, and the reason
20      I was bringing this up, is that there may be things that
21      people would have tried to access that they don't try to
22      access because they've had experience that they are
23      blocked. And if the filters had been around for a while,
24      maybe the patrons have adjusted their behavior. So any
25      wouldn't be able to tell that from my study. So any

## Page 93

1      self-censorship that users are doing, I wouldn't be able
2      to detect with my study.
3    Q   But it doesn't sound like you think that self-censorship
4      would impact your conclusions regarding the okay-sites
5      overblock rate or the blocked-sites overblock rate, is
6      that right?
7    A   I think it could. I mean, it depends on the extent of
8      it, but I think it could affect the -- wait. Let me stop
9      a second because we're going back into this territory,
10      Hypotheticals with this table.
11         Yes, I think it could affect especially the
12      okay-sites overblock rate. It could potentially affect
13      the other one, as well.
14         So, for example, suppose that there were a lot
15      of people who would like to access pornography in the
16      library and they don't come to the library because they
17      know that the stuff that they want they won't be able to
18      get access to there. Those people would not show up as
19      correct blocks because they didn't even try.
20         And so that would mean -- what would that mean
21      for my okay sites? Overblock rate, they are not going to
22      show up either in the enumerator or the denominator. Let
23      me pause again.
24         Okay, so if there are a bunch of people who
25      would like to access pornography and that pornography

24   (Pages 90 to 93)

On The Record Reporting & Video    **74**
313-274-2800            Fax: 313-274-2802
cac112cc-59c1-479e-8cf4-8275ce711e6e

## Page 94

1  would be blocked, but they don't come to the library,
2  that means basically our number A in that Figure 2 is
3  lower than it would otherwise be and that has no effect
4  on the okay-sites overblock rate. If there are sites
5  that they would like to access that are incorrectly
6  blocked, the Cs in Figure 2, but they don't come to the
7  library because they can't get access to those things,
8  then we would miss that in our calculation of the
9  blocking rates -- of all the blocking rates and we would
10 then be underestimating it.
11 Q   Above the blocking rate? You would be underestimating
12     both the blocking rates, right?
13 A   Yeah. To the extent that people are not trying to access
14     the things that are blocked in error, then we would be --
15     now, to the extent that they are not trying to access the
16     things that are blocked correctly, we are overestimating
17     the blocked-sites overblock rate.
18         Now, imagine a world where nobody ever tries to
19     access pornography there. Then the only blocks that are
20     going to happen as the ones that are mistakes. And it
21     will look like you have a really high error rate on the
22     blocks. But that would only be because people aren't
23     trying anymore to access the things that are supposed to
24     be blocked.
25         So, yeah, definitely this doesn't tell us

## Page 95

1  exactly, you know, the ideal study would be to get your
2  sample the week before the filters are installed.
3  Q   Do you have any knowledge of what the patrons of the NCRL
4      understand about the filters? Do you know whether they
5      know there's a filter in place?
6  A   I don't know.
7  Q   Do you know whether they know what categories of
8      materials are blocked by the filter?
9  A   I haven't seen any data about NCRL patrons and I haven't
10     talked to any of them.
11 Q   So you don't know whether, for example, NCRL patrons may
12     believe that the weapons category is filtered?
13 A   They could believe that.
14 Q   Or other categories that could potentially be filtered,
15     you don't know whether they know one way or the other
16     what's filtered and what isn't, right?
17 A   Right. If they go to certain sites that are blocked,
18     they do get information that the page has been blocked
19     and what the category is. But that does not give them
20     any information about other categories that they might
21     imagine would be blocked. They never see any information
22     about that.
23 Q   So you don't know whether, for example, the patrons of
24     the NCRL are not searching for weapons sites or alcohol
25     sites or other sites like that because they think that

## Page 96

1  they are blocked by the filters, you don't know one way
2  or the other whether they are not looking to go to those
3  sites?
4  A   I do not know.
5  Q   Also I noticed in your ACM article about calculating
6      error rates that you stress the importance of large test
7      sets. It's, again, on handwritten page 33.
8          What do you consider to be a "large test set"?
9  A   Large enough to get statistically significant results.
10 Q   So, in your view, the set that you used in conducting
11     your test in this case was sufficiently large to obtain
12     statistically significant results?
13 A   Yes, for some of the results. You've asked me some other
14     questions about trying to compare the error rates on
15     proxy avoidance versus error rates on nudity sites. And
16     I don't know yet whether it's large enough to do that
17     comparison.
18 Q   On page 15 of your report, right up at the top, it
19     indicates, beginning at the end of the second line, that:
20         "The logfile doesn't always include all
21         the information that would be needed to
22         recover, at a later time, what information the
23         destination host sent in response to the
24         request."
25         And then a little further down in the paragraph

## Page 97

1  it says:
2      "Sometimes it will not be possible to
3      determine whether a particular request
4      contained in the logfile should have been
5      blocked."
6      Can you tell me what you are talking about
7      here?
8  A   Yes, this is sort of after the fact we're looking in the
9      log file to try to see what was requested and then we're
10     trying to make an assessment, should that have been
11     blocked. And in the simple example I've given you, the
12     URL has all the information about -- that's all the
13     information that was going to be passed from the web
14     browser to the server.
15         And so we can assess -- we can try, at later
16     times, entering exactly that same information and we see
17     what comes back. But in reality, there may be other
18     information that's getting passed besides what's just in
19     the URL and, therefore, we can't, just based on what's in
20     the log file, we can't replay, at a later time, exactly
21     the same information that was sent.
22         For example, along with the URL, the browser
23     may send to the site a cookie that was set on a
24     previous -- perhaps even just a few minutes ago -- but a
25     previous visit to that site. And that may be sufficient

## Page 106

1   just knowing how often the two raters agree works pretty
2   well. But it's sort of an adjustment to keep you from
3   looking too good when it's just because of one
4   classification being more frequent than another.
5           So the kappa scores range between zero and one.
6   So a good rule of thumb is .8 or higher you are very
7   happy. And in practice, you are often living with the
8   fact that you are less than .8.
9           MR. MANVILLE: Can we go off the record for a
10  second?
11          MS. MONROE: Yep.
12          (Discussion held off the record.)
13          (Short recess.)
14              - - -
15  BY MR. MANVILLE:
16  Q   Page 17 of your report, Mr. Resnick, I want to talk about
17  training procedures.
18          Can you just summarize for me what the training
19  procedures were that you used?
20  A   Yeah. We had a separate set of URLs as a training set
21  and the two raters -- well, you know, in tandem with the
22  training was the development of the category scheme and
23  what became that document that's in the Appendix is the
24  explicit instructions to the raters.
25          So we were working with the training set and

## Page 107

1   whatever -- if we weren't sure how to classify something
2   in the training set, we would talk about it and, you
3   know, make adjustments to the category scheme, if
4   necessary; generally around adding these other things,
5   like helper images or no session data or things like
6   that.
7           And once we converged on the procedures, then
8   we did the actual rating on a test set -- on the test set
9   that we have been doing all our talking about. The
10  training set was separate, disjointed. None of the
11  items -- well, there could have been, if the same item
12  happened to be accessed in the test set from a
13  different -- from different days, then it could have
14  shown up in both the training set and the test set.
15  Q   And did you, during this process, did you prepare any
16  kind of a written protocol governing the tests that you
17  were running?
18  A   Yeah, that's Appendix 6, the rating procedures, starting
19  on page 66.
20  Q   Sure. Okay. I see it.
21          So is this a document that was finalized at the
22  end of the training process and prior to the process of
23  actually classifying the web sites that he used in the
24  study?
25  A   Right. In fact, after we finalized it, they went through

## Page 108

1   the training set again, using it, and then they went on
2   to do the test set.
3   Q   Okay. Let's go to page 19.
4           So now we're getting into some numbers here.
5   These are the URLs at the bottom of page 19 and then at
6   the top of page 20 that you classified as nonratable, is
7   that right?
8   A   These are the ones that we automatically, through machine
9   methods, identified as nonratable. There were some other
10  ones that the raters identified as nonratable; that's on
11  page 20 after the bullets, it talks about the ones
12  that -- human judgments. But the bullets are listings of
13  things that were automatically classified as nonratable.
14  Q   The first full paragraph on page 20 that begins, "We
15  examined the agreement of the raters" --
16  A   Yes.
17  Q   Where does that number 2169 come from?
18  A   It should be that you take the 2380 and subtract all the
19  ones that were from the bullet points and you should get
20  to 2169.
21          Having said that, let me check if I'm basically
22  in the right ballpark there. Yeah, it looks like it's in
23  the right ballpark, at least.
24          So the 2380 was 2180 that were blocked,
25  according to the NCRL policy, and 200 distracters that

## Page 109

1   were not blockable, just to make sure that they -- to
2   keep the raters honest.
3   Q   And if I take 2380 and then I subtract 12, 66, 167, and
4   35, I get 2100.
5   A   You start with 2380, subtract 12, 66, 167, and 35.
6   Q   Yes. I get 2100, but I've never been very good with a
7   calculator.
8   A   Yep, so do I. I've got to look at the log file. Hold
9   on.
10          (Witness reviewed document.) So I suspect that
11  the answer is that some items are double counted here.
12  Q   Okay.
13  A   That is, they were both omniture and they were in another
14  category or they were --
15  Q   Okay.
16  A   All right. So we got down to 2100. We were only
17  supposed to get down to 2169. If you wanted me to verify
18  that, I'd have to get back to you on that.
19  Q   No, I think that's probably okay.
20          Now, taking that number, 2169, and subtracting
21  an additional 99 items that were determined by him to be
22  nonratable, correct?
23  A   I think "96" it says. But then why did we get -- hold
24  on. It says it's 96. Oh, plus three more, yeah. That's
25  right. So 99.

| Page 110 | Page 112 |
|---|---|

**Page 110**

1  Q  And that gave you a total number of ratable items of
2  2070, correct?
3  A  Yes.
4  Q  The next section in your report deals with helper images.
5  Can you tell me, generally, what a helper image
6  is?
7  A  Well, we talked earlier about basically little images
8  that are parts of web pages.
9  Q  So it's like this example in Figure 5 of your report on
10  page 12?
11  A  Yeah, like that Firefox Start image. That should be
12  counted as a helper image, rather than being its own
13  page. And I think that one might be too big to count in
14  our automatic classification of it, but I'm not sure
15  exactly what its dimensions are. But that's the kind of
16  image that we intend to capture as, you know, intuitively
17  that's a helper image.
18  Q  But as with the classification of nonratable items, your
19  classification was in two phases. First there was an
20  automatic classification and then there was a manual
21  classification of the remaining web pages, correct?
22  A  Correct.
23  Q  And you arrived at a total number of helper images of
24  1539 at the top of page 21 of your report, correct?
25  A  Yes, 1,539 were either automatically or based on the

**Page 111**

1  human rate.
2  Q  And what definition of "helper image" did you use to
3  manually select the helper images that you weren't able
4  to identify automatically?
5  A  Sure. Let's go take a look at the instructions to the
6  raters in Appendix 6. It should say.
7  On page 66, item number 2, "helper images."
8  Q  So helper images on this item number 2 on page 66 were
9  identified manually based on the fact that they included
10  logo or navs in the URL?
11  A  Or it looked like an image that you would see as part of
12  a web page, like a long horizontal line or something that
13  clearly wasn't meant to stand on its own as a destination
14  page.
15  Q  It sounds like there are web sites, also helper images?
16  A  I'm sorry?
17  Q  Item number 2 on page 66 says:
18  "However, if the site is a helper image,
19  the image should be classified into a content
20  category solely on its own merit."
21  A  No, that should say, "However, if the URL is a helper
22  image."
23  Q  I see. Okay. That makes more sense.
24  A  Oh, here, actually, on page 68, there's something that
25  defines what "helper image" is:

**Page 112**

1  "Includes only a typically small image
2  that is part of a web page and used for
3  navigation purposes."
4  Q  So navigation on that page or to another page?
5  A  Yeah. I mean probably it should have said "navigation or
6  aesthetics." I don't think our raters had too many
7  questions about that.
8  Q  And generally speaking, why was it that you looked
9  individually at the elements of web pages or web sites
10  instead of looking at the page as a whole? Was that
11  basically because that was the way the information was
12  recorded by the NCRL?
13  A  Exactly. They don't -- yeah, the Fortianalyzer logs
14  don't distinguish between something that was the main
15  page or the subsequent pages that were -- or subsequent
16  URLs that are accessed in order to fill out the page.
17  Q  Would you anticipate that a study of blocking rates for
18  web pages as a whole would yield different results than a
19  study of blocking rates for different components of web
20  pages, individual URLs?
21  MS. MONROE: I'm going to object to the extent
22  it calls for speculation. Go ahead and answer.
23  A  Well, we tried to, you know, in the set of items that
24  really are text/html or text/plain or things that we
25  would think of as web pages, we have done that study.

**Page 113**

1  So to the extent that that's -- it wasn't
2  clear, initially, you know, exactly what we were
3  interested in. So we decided to classify the images, as
4  well, especially because you can't -- you couldn't
5  completely automatically tell whether something was a
6  helper image or whether it was actually -- I mean, there
7  are pages that people go to that are just the picture,
8  not the picture plus one line of text. So we didn't want
9  to completely throw out all the images.
10  But, you know, after the fact, we certainly can
11  restrict our attention and most of my report does
12  restrict attention to the things that were web pages.
13  BY MR. MANVILLE:
14  Q  I see. And the total number of blocked web pages that
15  you wound up analyzing was the 289 number that's shown on
16  page 21 of your report, is that right?
17  A  Correct.
18  Q  Is that a substantially smaller sample size than the one
19  that Bennett Haselton used?
20  A  Bennett Haselton had 536 dot-com sites that were blocked,
21  right, that were real web pages. And he had 207 dot-org
22  sites that were real web pages.
23  Q  So he add a total sample size of 743, I guess, versus
24  your 289, is that right?
25  A  If you add together his dot coms and dot orgs, that

On The Record Reporting & Video

313-274-2800                              Fax: 313-274-2802
                                    cac112cc-59c1-479e-8cf4-8275ce711e6e

| Page 154 | Page 156 |
|---|---|

**Page 154**

1  whether any of the patrons at NCRL are prohibited from
2  viewing sites that contain general information about
3  gambling? For example, the example you used, "How To Win
4  at Black Jack," do you have any personal information as
5  to whether or not that information is available to
6  patrons at NCRL?
7  A  I don't. I don't know.
8  Q  Earlier Mr. Manville asked you a series of questions
9  about the sample size of your test versus Mr. Haselton's
10  test. Do you recall that?
11  A  Yes.
12  Q  Although Mr. Haselton's sample size might have been
13  larger, would you reiterate your concerns about the
14  parameters with the parameters that Mr. Haselton used in
15  his test?
16  A  I'm not quite sure what you are asking, but in general,
17  larger sample sizes, when you are sampling from some
18  population, a larger sample size let's you get a tighter
19  estimate; that is, a smaller confidence interval for your
20  estimate of whatever population parameter you're trying
21  to assess, such as the blocking error rate.
22      So all other things being equal, larger samples
23  are better in that they let you get more precise
24  estimates. But a larger sample -- that's not sufficient
25  to say that larger samples are better. A larger sample

**Page 156**

1      MR. MANVILLE: Sure.
2      MS. MONROE: Okay. I have no further
3  questions. Duncan?
4      MR. MANVILLE: I don't think I have any, but
5  just give me a second.
6      I don't have any further questions.
7      MS. MONROE: Okay.
8      (Deposition concluded at about 6:35 p.m.)
9      - - -

**Page 155**

1  taken from the wrong population just lets you estimate
2  parameters of the wrong population. And no matter how
3  big you get in your sample, you are still just more
4  precisely estimating the wrong thing.
5      So I would say a bigger sample is better, other
6  things being equal; but to assess the quality of a sample
7  overall, you have to look at: Is it random? Is it drawn
8  from the correct population? As well as the size.
9  Q  Okay. And my last question would just be in addition to
10  the billing information that we discussed earlier, is
11  there any other information in your possession relating
12  to either what was required to prepare your report or any
13  other information you might have obtained to develop your
14  opinions that has not yet been produced to myself or my
15  office?
16  A  In addition to the billing information? Well, I think
17  one thing that came up during today was that we have the
18  SQL database of basically the dump of the Fortianalyzer
19  log files and I didn't provide that. That would be even
20  harder to print out than the other things that we had
21  trouble printing out. But that could be provided in some
22  kind of electronic form if that is desirable.
23      MS. MONROE: Okay. And Duncan, we can talk
24  about that as to whether you want that information
25  because we want to provide whatever you require here.

**Page 157**

1  STATE OF MICHIGAN )
                     )SS.
2  COUNTY OF WAYNE )
3      CERTIFICATE OF NOTARY PUBLIC
4      I, Shari Blythe Holtz, a duly commissioned and
   qualified Notary Public within and for the County of
5  Wayne, State of Michigan, do hereby certify that the
   witness, whose attached testimony was taken by me in the
6  entitled cause on Thursday, November 15, 2007, was by me
   first duly sworn to testify the whole truth in the
7  aforesaid cause; that the testimony contained herein was
   taken down by me in machine shorthand; transcribed upon a
8  computer under my personal supervision, and is a true and
   correct transcript of the whole of the testimony given by
9  said witness.
10      I do further certify that I have delivered the
   original transcript into the possession of DUNCAN
11  MANVILLE, ESQ., for filing at the time of trial.
12      I do further certify that I am not connected by
   blood or marriage with any of the parties; their
13  attorneys; that I am not an employee of any of them; nor
   interested directly or indirectly in the matter in
14  controversy, as counsel, attorney, or otherwise.
15      IN WITNESS WHEREOF, I have hereunto set my hand
   at Dearborn, County of Wayne, State of Michigan, this
16  11th day of December, 2007.
17
18
19
20      Shari Blythe Holtz, CSR-3910
        Certified Shorthand Reporter
21      Registered Professional Reporter
        Notary Public, Wayne County, Michigan
22      My Commission expires:   September 6, 2013
23      - - -
24
25

# Exhibit VV

Lynn Beltz, Chair, called the regular meeting of the North Central Regional Library Board to order in the Regional Library Service Center. Board members Ruth Honey, Brad Lucas, Roger Lucas, John Whitecar and Barbara Wolff were present. Marilyn Neumiller, Assistant Director, Joy Neal, Human Resources, Carol Burke CWU Intern, Katy Sessions, Wenatchee Supervisor, and Jean Frank, Mail Order Supervisor, were also present.

The agenda and minutes of the previous meeting were approved as presented.

A financial report including a listing of bills to be paid, payroll, and fund balances was presented to members of the board. Fund balances held at the Chelan County Treasurer's Office as of May 31, 1999 were reported: General Fund, $1,762,932.64; Automation Development Fund, $381,489.41; Service Center Facility Fund, $1,582,941.97; Payroll Emergency Fund, $371,120.53. After review and discussion, Brad Lucas moved that vouchers #36703 through #36845 in the amount of $257,554.97 and payroll in the amount of $185,104.87 be approved for payment. The motion was seconded by Honey and passed unanimously.

Resolution 99-4: Surplus Property was discussed. The resolution declares selected items to be delivered to the Chelan County auction held jointly with other government agencies during June. After discussion, Roger Lucas moved to pass the resolution. Brad Lucas seconded the motion, which passed unanimously with Ruth Honey abstaining.

The Director's report included personnel, training, services and buildings. Kit Curtis, Mail Order, has announced his resignation. Three students were hired to assist with the summer storytelling and puppetry programs. The medical plan currently available to employees is leaving our area. The insurance trust is looking into alternative plans. An increase in premium is expected.

Training during the month included cultural diversity, assertiveness skills, management skills, organizing and retrieving materials, WEB resources, computer training, customer service, design, and internet. Materials have been ordered to support the Accelerated Reader Programs in local schools. Curriculum kits containing multiple copies of books will also be available to schools. All the videos have been entered into the automated inventory system, as well as the materials stored in one of four card file machines. The new payroll system is installed and July's payroll will be run on it. Work continues on the large print catalog. Moses Lake has re-opened, but Okanogan remains closed.

The roof condensing unit at Wenatchee is not functioning. Siemens, our HVAC consultant, has assessed the unit, and bids for repairs are being received. The exterior of the Service Center is being painted. New security lighting has been installed on the north and east sides of the Service Center building.

Internet access for public use was discussed. After discussing training, policies and filtering programs, Roger Lucas moved to reflect in the minutes the general consensus of the board to implement filtering systems on public access internet. After discussion, the motion was withdrawn. After further discussing reasons for filtering, including protection for offensive materials and the ability to customize filtering programs, Roger Lucas moved that the board instruct the Director to install a filtering system on all public access computers in the library system. Brad Lucas seconded. The motion passed, with Whitecar casting a vote against the motion.

After discussion of a draft of the Public Use Internet Policy, Whitecar moved the policy be adopted. Roger Lucas seconded the motion, which passed unanimously.

Attendance by board members at the WILL conference in Yakima September 8th through the 10th was discussed.

The next meeting is scheduled for July 15, 1999 at the Service Center.

There being no further business, the meeting was adjourned.

Respectfully submitted,

Dean C. Marney, Director

(approved by)     Lynn Beltz, Chairperson

# Exhibit WW

Lynn Beltz, Chair, called the regular meeting of the North Central Regional Library Board to order in the Regional Library Service Center. Board members Ruth Honey, Brad Lucas, Roger Lucas, John Whitecar and Joanne Whitehall were present. Marilyn Neumiller, Assistant Director, Joy Neal, Human Resources, Howard Purcell, Automation, Katy Sessions, Wenatchee Library Supervisor, and Jean Frank, Mail Order Supervisor, were also present.

The agenda and minutes were accepted as presented.

A financial report including a listing of bills to be paid, payroll, and fund balances was presented to members of the board. Fund balances held at the Chelan County Treasurer's Office as of July 31, 1999 were reported: General Fund, $1,651,007.16; Automation Development Fund, $384,478.04; Service Center Facility Fund, $1,595,658.30; Payroll Emergency Fund, $374,025.21. After review and discussion, Honey moved that vouchers #36982 through #37097 in the amount of $174,792.25 and payroll in the amount of $193,975.68 be approved for payment. The motion was seconded by Roger Lucas and passed unanimously.

The Director's report included personnel, training, services, and buildings. Beth Schmidt has been transferred full time to the automated inventory project. Training included working with volunteers, satellite down link system, team building and leading, teaching and learning in libraries, and a motivational seminar. Filtering software has been ordered and received. A "shelf ready" service with Ingram is being looked into. Books would arrive cataloged, bar-coded, jacketed and ready for delivery to branches. ERA Hearth and Home realtors would like to sponsor the Summer Reading Program next year. Bids are being sought for insulating the roof area around the new satellite dish.

The Budget Planning Schedule for the 2000 budget was reviewed and members asked to present suggestions at the September meeting.

Information on Initiative 695 was reviewed. The initiative and its impact on government agencies was discussed.

The Director informed members that he was contacted by the Town of Almira regarding library service. The cost of service was calculated in different ways, and Almira was notified that a contract figured on the tax levy rate times the assessed valuation would be the fairest way to charge for services.

Whitecar reported on a complaint from a job applicant for an Omak position. The applicant was concerned that he did not receive preferential treatment and that the library should have an Affirmative Action policy in place. The Director reminded the members that women, considered minorities, are the greatest percentage of NCRL's work force, that a woman was hired for the position, and that NCRL is not required to have an Affirmative Action policy. The number of applicants receiving interviews for each opening was discussed. Neal confirmed that letters were mailed to those applicants who were not selected for interviews before the interviewing process began. It was requested that a disclaimer be added to the application form stating that applying for a position does not automatically guarantee an interview.

The Okanogan Library will be completed by the first of September. Shelving will then be set up, and the library will be opened to the public.

Whitehall asked members to consider holding a reception at the Wenatchee or East Wenatchee Library for local legislators. The lack of success of Legislative Day in Olympia was discussed.

The next meeting is scheduled for September 16, 1999 at the Service Center.

There being no further business, the meeting was adjourned.

Respectfully submitted,

Dean C. Marney, Director

(approved by) Lynn Beltz, Chairperson

# Exhibit XX

00492

Lynn Beltz, Chair, called the regular meeting of the North Central Regional Library Board to order in the Regional Library Service Center. Board members Ruth Honey, Brad Lucas, Roger Lucas, John Whitecar, Joanne Whitehall and Barbara Wolff were present. Marilyn Neumiller, Assistant Director; Howard Purcell, Information Specialist; Katy Sessions, Wenatchee Library Supervisor, Jean Frank, Mail Order Supervisor, and Lucy Ford, Renee Whitfield, and Shelley Small, Extension Supervisors, were present.

The agenda was revised to include Satellite Use Policy Discussion and Executive Session – Personnel Issue. The minutes were accepted as presented.

A financial report including a listing of bills to be paid, payroll, and fund balances was presented to members of the board. Fund balances held at the Chelan County Treasurer's Office as of October 31, 1999 were reported: General Fund, $1,302,257.94; Automation Development Fund, $389,400.84; Service Center Facility Fund, $1,616,563.20; Payroll Emergency Fund, $378,810.08. After review and discussion, Whitehall moved that vouchers #37355 through #37557 in the amount of $472,371.27 and payroll in the amount of $195,186.05 be approved for payment. The motion was seconded by Brad Lucas and passed unanimously.

Resolution 99-5: Transfer of Funds From General Fund Into Designated Funds was discussed. The Resolution allows for the budgeted transfer of $100,000.00 into the Service Center Facility Fund and $50,000.00 into the Payroll Emergency Fund from the general fund. After discussion, Roger Lucas moved to pass the resolution. Joanne Whitehall seconded the motion, which passed unanimously.

The Director's report included personnel, training, services and buildings. Shawn Mangan has been hired in Mail Order. Mary Shelton is retiring the end of December from Mail Order and will be replaced by Sharon Stephens. An ergonomics expert from the Department of Labor & Industries observed Mail Order and will write his recommendations for improving comfort and reducing injuries. Several employees took advantage of training opportunities. The Fall Workshop was held in October. Omak Library staff is expanding their storytime to year round.

LaserPac, our computerized card catalog, is experiencing problems, with the latest updates being defective. OCLC is working with the library to alleviate the problem. The Omak branch was wired for public use Internet. Friends of the Okanogan Library held an open house to celebrate the newly remodeled facility. The Royal City branch is planning on recarpeting. Ingram shelf ready books are still experiencing a few problems.

Repair work has been done on the roof of the Service Center, and replacing insulation and rock covering will still need to be done. A hydraulic lift was purchased for use at the Wenatchee Library to change lights and ballasts with more safety than afforded with a ladder. Siemen, HVAC consultants, recommend the replacement of a damper motor that allows air circulation.

Budget 2000 considerations, including personnel, Internet, webpage, and branch computer and memory upgrades, was discussed. Preliminary figures for revenues, expenditures and the designated funds were reviewed. A new line item was included in the draft budget allowing a budgeted carryover to the year 2001. Resolution 99-6: Approving and Adopting Levy Tax Rate for 2000 Assessment was discussed. The resolution sets the levy rate at the allowable rate of $.50/$1,000.00. Roger Lucas moved the resolution be accepted as presented. Honey seconded the motion, which passed unanimously.

NCRL 00296

Page 2--November 17, 1999
Regional Library Board Meeting

Satellite Downlink Facility Use Policy was presented to the members. The policy sets guidelines for public use of the satellite downlink now installed at the Service Center. After discussion, Whitecar moved the policy be adopted. Roger Lucas seconded the motion, which passed unanimously.

Executive Session was called by the Chair, with Howard Purcell, Marilyn Neumiller and Susan McGriff included in the discussion. Purpose of the Executive Session was discussion of an employee's letter expressing concern with accountability, the current salary schedule and providing up-to-date customer service, that was sent to the Board without her supervisor's or management's knowledge. The members suggested that a detailed discussion of our salary schedule and how it compares to other libraries be included on the agenda sometime in 2000. Executive Session was adjourned.

The next scheduled regular meeting of the board is for December 16, 1999, at 1:00 p.m. in the Service Center, Wenatchee.

There being no further business, the meeting was adjourned.

Respectfully submitted,

Dean C. Marney, Director

(approved by) Lynn Beltz, Chairperson

# Exhibit YY

North Central Regional Library
Board of Trustees Meeting
January 13, 2000
Director's Report

## Personnel:

Sharon Stephens has resigned in Mail Order. We are currently recruiting to fill her position. Mary Shelton, who had planned on retiring at the beginning of this month has postponed leaving until February 1, 2000.

Clarice Michael, Oroville Branch librarian, will retire at the end of this month. We will be interviewing for her replacement next week.

Claudia Smith, a substitute at the Omak Branch, has been hired to fill the open part time position at Omak.

## Training:

Robin Borchers is enrolled in a Conversational Spanish class at WVC. Paula Walters is taking an Anthropology course through WSU toward her degree. Gayle Valdivia, Soap Lake Branch librarian, has enrolled in a Computer Basics class at BBCC along with English Composition.

Cass Wiggs and Chad Roseburg, Wenatchee Branch, are taking a distance learning course on Basic Reference. Chad has also signed up for a basic supervisory skills workshop.

JoAnne Pearsall, Graphics, and Leslie Marshall, Extension Youth Services, will be participants in a design workshop.

Several staff have signed up for a telecourse to be held here tomorrow. The course is on librarians using the internet and training other people to use it.

## Services:

The public access internet computers are installed and ready to go at the Wenatchee Branch. Staff are reviewing procedures and we should be operational by next week.

## Building:

The front outdoor lights have been replaced at the Service Center.

We have also replaced the recessed lighting in the Wenatchee Branch staff room with fluorescent lighting.

NCRL 00301
89

# Exhibit ZZ

Lynn Beltz, Chair, called the regular meeting of the North Central Regional Library Board to order in the Regional Library Service Center. Board members Ruth Honey, Brad Lucas, Roger Lucas, Joanne Whitehall, and Barbara Wolff were present. Marilyn Neumiller, Assistant Director, Howard Purcell, Information Specialist, Joy Neal, Human Resources, Katy Sessions, Wenatchee Library Supervisor, Jean Frank, Mail Order Supervisor, and Esther Dalgas, Entiat Librarian, were present.

The agenda and the March meeting minutes were accepted as presented.

A financial report including a listing of bills to be paid, payroll, and fund balances, was presented to members of the board. Reports for April expenditures were reviewed. After review and discussion, Roger Lucas moved that vouchers #38081 through #38207 in the amount of $382,230.91 and payroll in the amount of $195,876.61 be approved for payment. Brad Lucas seconded the motion, which passed unanimously. Fund balances held at the Chelan County Treasurer's Office as of April 30, 2000 were reported: General Fund, $1,095.426.30; Automation Development Fund, $400,141.47; Service Center Facility Fund, $1,764,042.63; Payroll Emergency Fund, $440,217.63. After review and discussion of May expenditures, Roger Lucas moved that vouchers #38208 through #38355 in the amount of $268,243.04 and payroll in the amount of $199,095.65 be approved for payment. The motion was seconded by Honey and passed unanimously.

Resolution 00-2: Cancellation of Outstanding Warrants was reviewed. The resolution authorizes the Chelan County Treasurer and Auditor's offices to cancel warrants that have not been presented for payment within one year of date of issue. The warrants total $334.87. Whitehall moved to accept the resolution. Roger Lucas seconded the motion, which passed unanimously.

The Director's report included trustees, personnel, training, services and buildings. John Whitecar has submitted his resignation from the board due to teaching and other obligations. Cass Wiggs, holding a temporary position in the Automation department, has resigned. Deborah McVay is doing outreach full time. Maricella Perez, hired to replace McVay's hours at Moses Lake, has resigned and Vicky Skane has been hired to fill that position. Ruth Darwood, part time Request, has been hired in a temporary part time position in Technical Processing.

The ACLU has requested additional information on Surfwatch. The Director recommended using the Vernon Blough bequest to start an endowment fund. The Director and Sue McGriff, Finance Manager, toured a warehouse in downtown Wenatchee as a possible location for the Service Center.

Training attended by employees included WLA, children's literature, Internet, and the Summer Reading Program workshop. Republic Friends received an award from WLA for their work and persistence in raising funds for the new addition.

Purcell reported that public Internet connection has been ordered for the Republic branch. Dial-up is the only available service at this time. Four more branches should be ready in the next couple of months. Ameritech has a public access version or Horizon that would allow public access to NCRL's catalog.

Neumiller distributed a rough draft of floor plans for the Moses Lake branch. Space difficulties and making public use Internet computers convenient required re-arranging existing service areas.

May 11, 2000
Board Meeting Minutes (cont'd)

Esther Dalgas reported on the Summer Reading Program, "Amaze Yourself at the Library". The Summer Reading Program committee has developed its own theme and graphics this year.

Katy Sessions reported that problems in the Internet area have decreased. The arts commission will place a frog prince statue in the children's area of Wenatchee Library, and dancing bunnies at the entrance.

The next scheduled regular meeting of the board is for June 15, 2000 at 1:00 p.m. in the Service Center, Wenatchee.

There being no further business, the meeting was adjourned.

Respectfully submitted,

Dean C. Marney, Director

(approved by)    Lynn Beltz, Chairperson

# Exhibit AAA

North Central Regional Library
Board of Trustees Meeting
January 11, 2001
Director's Report

Personnel:

There were no personnel changes this month.

Training:

Requests for spring training continue to be submitted and approved.

Services:

The Information Services and Interlibrary Loan Staff centered at the Wenatchee Branch received a donation of $200.00 to the library district from Anita Waller in Ephrata. In a letter to the staff, she wrote that she takes "full advantage of all the resources and services you provide. I also greatly appreciate books from NCRL's collection that are delivered by mail and think it is a very important service in our rural counties."

On December 15, 2000, the U.S. Congress passed legislation requiring that any public school or library providing Internet access and receiving federal funding must provide Internet filtering as part of an Acceptable Use Policy. President Clinton signed the bill.

Our public access Internet stations are currently up and running. We are using N2H2 which meets the requirements of the new law.

**Building:**

We had a leak in our fire prevention sprinkling system at the service center this month and a leak above the carport has been fixed.

The City of Chelan has requested modification of the Building Maintenance and Reimbursement Agreement to run through October 2001.

NCRL 00334
94

# Exhibit BBB

Lynn Beltz, Chair, called the regular meeting of the North Central Regional Library Board to order in the Service Center, Wenatchee.  Board members Ruth Honey, Brad Lucas, Roger Lucas, Joanne Whitehall, and Barbara Wolff were present.  Marilyn Neumiller, Assistant Director, Joy Neal, Human Resources, Jean Frank, Mail Order Supervisor, and Katy Sessions, Wenatchee Library Supervisor, were present.

The agenda and the minutes of the previous meeting were accepted as presented.

A financial report including listings of bills to be paid, payroll, and fund balances, was presented to members of the board.  Fund balances held at the Chelan County Treasurer's Office as of December 31, 2000 were reported:  General Fund, $2,177,091.93; Automation Development Fund, $417,315.73; Service Center Facility Fund, $1,866,144.55; Payroll Emergency Fund, $484,152.77.  After review and discussion of vouchers and payroll to be issued in January with payment to be made from fiscal year 2000, Roger Lucas moved that vouchers #39312 through #39394 in the amount of $72,644.86 and payroll in the amount of $18,898.84 be approved for payment.  The motion was seconded by Whitehall and passed unanimously.  After reviewing vouchers and payroll for January, 2001 fiscal year funds, Whitehall moved that vouchers #39395 through #39435 in the amount of $121,878.48 and payroll in the amount of $184,138.65 be approved for payment.  The motion was seconded by Roger Lucas and passed unanimously.

Resolution 01-01:  Mileage Reimbursement Rate was reviewed.  The resolution increases the mileage reimbursement rate for use of personal vehicles from $.325 (thirty-two and on half cents) per mile to $.345 (thirty-four and one half cents) effective January 1, 2001, as determined by the Internal Revenue Service.  Brad Lucas moved that the resolution be approved.  Roger Lucas seconded the motion, which passed unanimously.

The Director's report included personnel, training, services and buildings.  Circulation for 2000 was up 2% over 1999.  The Information Services/ILL department received a $200.00 donation in appreciation for quality service provided to a resident of Ephrata. With the signing of a bill passed by the Congress, filtering of public use Internet will be required to qualify for federal funds.  The district is currently using N2H2, which meets the requirements of the new law.  Omak, Wenatchee, Quincy, Cashmere, Chelan, Leavenworth and Republic now have public access Internet, with Moses Lake's connection nearly finished.

The City of Chelan has signed a revised Building Maintenance Reimbursement Agreement, with the agreement to run through October 2001.  The City is negotiating with the school district to work on a way to keep the library open.

Joy Neal presented information on Section 125 Flexible Benefit Plan that is being offered to employees through Chelan County who issues the library's payroll warrants. The plan allows for employees who have medical, dental and vision premiums deducted from their paycheck to have the premium deducted before payroll taxes are computed. AFLAC administers the plan and completes the filings required by the Internal Revenue Service.  After discussion, the general consensus of the board was to accept the plan and offer it to employees.

The Chair called for election of officers for the year 2001.  Roger Lucas nominated Lynn Beltz to serve another term as chair, and Brad Lucas seconded the motion. Roger Lucas nominated Ruth Honey to serve as vice-chair and was seconded by Joanne Whitehall.  Ruth Honey nominated Joanne Whitehall to serve as secretary and was seconded by Roger Lucas.  After discussion, the nominees were unanimously elected.

**00514**

Whitehall informed members of a news release about the Waterville Library and the benefits of Friend's groups. The value of the Omak Library to the community was also in the news. Esther Dalgas, Entiat Library, received a plaque in appreciation for her services.

The next scheduled regular meeting of the board is February 15, 2001 at 1:00 p.m. in the Service Center, Wenatchee.

There being no further business, the meeting was adjourned.

Respectfully submitted,

Dean C. Marney, Director

(approved by) Lynn Beltz, Chairperson

# Exhibit CCC

# North Central Regional Library

238 Olds Station Road • Wenatchee WA 98801-8103 • (509) 663-1117

March 30, 2000

Nancy L. Talner, Staff Attorney
American Civil Liberties Union of Washington
705 Second Avenue
Suite 300 Hoge Building
Seattle, WA 98104-1799

Dear Nancy L. Talner:

Thank you for faxing me a copy of your letter dated February 28, 2000. To the best of my knowledge we did not receive the orginal.

Since our previous correspondence, two branch libraries, Omak and Wenatchee, have installed public access internet stations currently filtered with SurfWatch. The Board of Trustees has also passed a revised Public Use Internet Policy.

I've enclosed that policy, the Board Minutes that authorized that policy and the sign currently placed by the computers. These are the only documents we have at this time.

I provided information about SurfWatch and what the software blocks in our last correspondence. In checking with our librarian in charge of computer technology, the information we provided in our last correspondance has not changed.

We do not have any documents or electronic files discussing how the filtering is implemented, either by technology or by library staff. We have given verbal instructions to staff to treat requests for internet information or specific sites like a request for any other library material or service.

We do not maintain a listing of sites that library patrons visit.

To the best of my knowledge we haven't received any requests to unblock a blocked site.

Sincerely,

Dean Marney
Director

Enclosures

**99**

# North Central Regional Library

238 Olds Station Road • Wenatchee WA 98801-8103 • (509) 663-1117

May 1, 2000

Nancy L. Taylor
Staff Attorney
American Civil Liberties Union of Washington
705 Second Avenue
Suite 300 Hoge Building
Seattle WA 98104-1799

RE:    Filtered public Internet stations/public records request

Dear Nancy L. Talner:

To the best of my knowledge we are experimenting with the Standard Edition of SurfWatch at the Omak and Wenatchee Branches.

Sincerely,

Dean Marney
Director

# North Central Regional Library



238 Olds Station Road • Wenatchee WA 98801-8103 • (509) 663-1117

October 10, 2000

Nancy L. Talner
ACLU of Washington
705 Second Avenue
Suite 300 Hoge Building
Seattle WA  98104-1799

Re:  public records request dated October 5, 2000

Dear Nancy L. Talner:

To the best of my knowledge we have not received any documents or been
informed of any changes in Surfwatch or the company that produces
Surfwatch.

We also, to the best of my knowledge, have no documents discussing changes
or potential changes in Surfwatch or the library's use of Surfwatch since it
was first purchased.

Sincerely,

Dean Marney
Director

February 6, 2001


Nancy L. Talner
ACLU of Washington
705 Second Ave.
Suite 300 Hoge Building
Seattle, Washington 98104-1799

Dear Nancy L. Talner:

My understanding is that we are currently experimenting with a library version of BESS with modification to allow for access to free e-mail sites. We also have a license with CyberPatrol that was converted from our subscription with SurfWatch but it is my understanding that we are not currently using that software on any public access computers.

As requested, I'm enclosing a copy of our invoices from N2H2. To the best of my knowledge, all contact with N2H2 has been done by phone and there is no record of those conversations.

Our managing librarian in charge of automation obtained information from the web site after seeing an ad in a periodical. I would direct you to the N2H2 web site for the documentation for which you are asking. To the best of my knowledge, that is the only documentation we have. It is available at www.n2h2.com with additional information at www.n2h2.com/support and especially www.n2h2.com/support/faq.html. There is also about one hundred pages of administrative pdf.files available from their site.

It is my understanding that we have not developed any patron or staff information on the N2H2 product.

To the best of my knowledge, our computers purge their caches after each user for security and privacy reasons and therefore we do not keep a record of searches. It is my understanding that N2H2 does not maintain the records you are requesting.

The Board of Trustees was made aware that we were using the N2H2 product at their January meeting. A copy of the Director's Report is included with this letter.

Today, Tuesday February 6, 2001, one station at the Omak Library is operable, four stations at the Wenatchee Library are operating, and one each at the Republic, Cashmere, Quincy, and Chelan Libraries. The Leavenworth Branch computer is being repaired. I would note that because of telecommunications infrastructure limitations within Eastern Washington and the challenge we have keeping public access computers repaired, an accurate statement of who is running or not is changeable by the day or even the hour.

It is my understanding that all of our public access work stations are using the N2H2 software at this time.

Sincerely,

Dean Marney
Director

enclosure