The Honorable Edward F. Shea

Thomas D. Adams
Celeste Mountain Monroe
KARR TUTTLE CAMPBELL
1201 Third Avenue, Suite 2900
Seattle, Washington  98101-3028
(206) 223-1313
Attorneys for North Central Regional Library District

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

SARAH BRADBURN, PEARL
CHERRINGTON, CHARLES
HEINLEN, and THE SECOND
AMENDMENT FOUNDATION,

        Plaintiffs,

        v.

NORTH CENTRAL REGIONAL
LIBRARY DISTRICT,

        Defendant.

NO.  CV-06-327-EFS

DEFENDANT NORTH CENTRAL
REGIONAL LIBRARY'S
OBJECTIONS TO PLAINTIFFS'
WITNESS AND EXHIBIT LIST

DEFENDANT NORTH CENTRAL
REGIONAL LIBRARY'S OBJECTIONS
TO PLAINTIFFS' WITNESS AND
EXHIBIT LIST - 1
CV-06-327-EFS
#664872 v1 / 42703-001

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Dockets.Justia.com

Defendant North Central Regional Library ("NCRL") objects to the following witnesses and exhibits.

## I. Objections to Plaintiffs' Witness List

NCRL has moved to strike Kenton Oliver, Sally Beesley and June Pinnell-Stevens from Plaintiffs' Witness List in its Motions in Limine for the reasons that follow:

**1.  Sally Beesley and Kenton Oliver should be excluded from trial as their testimony is irrelevant.**

Plaintiffs have identified Sally Beesley as a fact witness. Ms. Beesely is the Director of the Jefferson County Library District ("JCLD") in Madras, Oregon. Plaintiffs propose to call Ms. Beesley to testify "about her library's policies, procedures and experiences with regard to Internet filters." In addition, Plaintiffs propose to have Ms. Beesley testify regarding "alternatives to refusing to disable Internet filters at the request of adult library patrons; the JCLD's Internet policies and procedures; how the JCLD's Internet policies and procedures have been implemented; her experience working with Internet policies, procedures and filters; and the consequences of providing unfiltered access at JCLD's computers."

DEFENDANT NORTH CENTRAL
REGIONAL LIBRARY'S OBJECTIONS
TO PLAINTIFFS' WITNESS AND
EXHIBIT LIST - 2
CV-06-327-EFS
#664872 v1 / 42703-001

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1    Plaintiffs have also identified Kenton Oliver as a fact witness.  Mr. Oliver

2    is the Executive Director of the Stark County District Library ("SCDL") in

3

4    Canton, Ohio.  Plaintiffs intend to call Mr. Oliver to testify "about his library

5    system's policies, procedures and experiences with regard to Internet filters."  In

6

7    addition, Mr. Oliver is expected to testify regarding "alternatives to refusing to

8    disable Internet filters at the request of adult library patrons; the SCDL's

9    Internet policies and procedures; how the SCDL's Internet policies and

10   procedures have been implemented; his experience working with Internet

11

12   policies, procedures and filters; and the consequences of allowing patrons of the

13

14   SCDL to bypass the library's Internet filter."

15       Plaintiffs offer Ms. Beesley's and Mr. Oliver's testimony to show

16   (1) some libraries do not use filters or will remove the filter at the request of an

17

18   adult patron and (2) some of the same libraries do not report any problems with

19   their Internet policies.  With respect to the first point, the fact that some libraries

20

21   do not use filters, or will remove the filter on the request of an adult patron, is

22   not disputed.  No testimony on this point is necessary.  Regarding the second

23

24   point, the fact that other libraries may not have problems with unfiltered access

25   is not germane.  The essential issue posed by this case is whether NCRL's

26

27   DEFENDANT NORTH CENTRAL
     REGIONAL LIBRARY'S OBJECTIONS
28   TO PLAINTIFFS' WITNESS AND
     EXHIBIT LIST - 3
     CV-06-327-EFS
     #664872 v1 / 42703-001

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

policy of refusing to completely disable the Internet filter on an adult patron's request is constitutional under the Washington and Federal Constitutions. How another library may choose to address issues associated with Internet use has no bearing on NCRL's approach. This is particularly true, where as here, neither Ms. Beesley nor Mr. Oliver has any personal knowledge of NCRL's policies, its territories, its patrons, or its administration, and therefore, have no basis upon which to draw any parallels. See Deposition of Sally Beesley, pp. 14-15; 49-50; Deposition of Kenton Oliver, pp. 36-38; 47-49.

At best, Mr. Oliver and Ms. Beelsey's testimony is unproductive and pointless. At worst, their testimony serves to confuse the issue. In either case, their testimony is precluded by ER 403.

Mr. Oliver has a longstanding affiliation with the American Library Association ("ALA"). In his deposition, Mr. Oliver testified that he is the Chair of the Intellectual Freedom Committee. The Intellectual Freedom Committee "deals with censorship...including access to information through the Internet...and to make sure (libraries) will not discriminate in their access." See Dep. of Kenton Oliver at p. 20. The Intellectual Freedom Committee is "opposed to Internet filters in any way that would impeded access for

DEFENDANT NORTH CENTRAL
REGIONAL LIBRARY'S OBJECTIONS
TO PLAINTIFFS' WITNESS AND
EXHIBIT LIST - 4
CV-06-327-EFS
#664872 v1 / 42703-001

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

1   information to any library users" and this is, in fact, the ALA official position on

2   the issue. Id. at pg. 21.

4       Mr. Oliver's only understanding of the facts of this case, is based on

5   verbal updates from the Americans for Civil Liberties Union ("ACLU"), which

7   has taken an active role in the prosecution of Plaintiffs' claims against NCRL.

8   Id. at 51. Mr. Oliver's testimony may be nothing more than an effort to interject

10  the official positions of the ALA and the ACLU into this litigation.

11  **2.    June Pinnell-Stevens should be excluded from Plaintiff's witness list
          as her testimony is irrelevant and her opinion is biased.**

13      Plaintiffs identified June Pinnell-Stephens as an expert witness.

14  Ms. Pinnell-Stevens served as the Collection Services Manager for the

16  Fairbanks North Star Borough Public Library in Fairbanks, Alaska from 1988-

17  2006. Plaintiff's retained Ms. Pinnell-Stevens to testify as an expert "about

18  issues such as the role of public libraries in our society, the distinction between

20  collection development and censorship and alternatives to filtering."

21      Any discussion of alternatives to filtering is irrelevant to the

22  constitutionality of the choices made by NCRL. Accordingly, Ms. Pinnell-

24  Stevens should not be allowed to testify regarding alternatives, particularly those

DEFENDANT NORTH CENTRAL
REGIONAL LIBRARY'S OBJECTIONS
TO PLAINTIFFS' WITNESS AND
EXHIBIT LIST - 5
CV-06-327-EFS
#664872 v1 / 42703-001

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

utilized by a distant library with which she has no particularly recent affiliation. Furthermore, it is clear that Ms. Pinnell-Stevens is incapable of offering a fair and balanced opinion of value to this Court. Ms. Pinnell-Stevens is actively involved in the ALA. She is currently on its executive board and has served in that role for two years. She also has served on various ALA committees, including: The Presidential Advisory Committee, The Intellectual Freedom Committee, and the Freedom to Read Committee. Ms. Pinnell-Stevens embraces ALA's opposition to Internet filtering and the organization's belief that the blocking of <u>any</u> constitutionally protected speech by an Internet filter constitutes censorship and is, therefore, unacceptable for a public library. See Pinnell-Stevens Deposition, pg. 43. Ms. Pinnell-Stevens' opinion on the traditional role of a library and her opinions on censorship are inexorably tied to the mission of the American Library Association, and only serve to inflame and confuse the issues before the court.

Ms. Pinnell-Stevens is also an active member of the ACLU. She was awarded the Citizen Activist of the Year in 1998. Although she could not specifically recall the reason for the recognition, Ms. Pinnell-Stevens testified that it may have been for her work on Internet filtering. See Deposition of June

DEFENDANT NORTH CENTRAL
REGIONAL LIBRARY'S OBJECTIONS
TO PLAINTIFFS' WITNESS AND
EXHIBIT LIST - 6
CV-06-327-EFS
#664872 v1 / 42703-001

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Pinnell-Stevens, pg. 49.  Yet Ms. Pinnell-Stevens has no personal knowledge of NCRL's policies, its territories, its patrons, or its administration.  Consequently, she is unable to draw any comparisons between her experience and NCRL's approach to filtering.  Id. at pp 16-25.  For the reasons set forth above, Ms. Pinnell-Steven should be excluded from trial.

## II. Objections to Plaintiffs' Exhibit List

**1.    Plaintiffs' Trial Ex. 1 – Objection. Irrelevant.**

The sole question before the court is whether NCRL's policy of refusing to disable its Internet filter at an adult patron's request infringes upon the state or federal Constitutions.  The question is not whether NCRL's policy violates the American Library Associations' Library Bill of Rights.  The Library Bill of Rights is a document that lacks legal significance.  NCRL is not bound by the terms of the document nor does it establish a legal standard.  The document has no bearing on the issues before the Court.

Plaintiffs offer the Library Bill of Rights solely to infuse the policies and politics of the American Library Association into this litigation.  It is not evidence and should not be admitted.

DEFENDANT NORTH CENTRAL
REGIONAL LIBRARY'S OBJECTIONS
TO PLAINTIFFS' WITNESS AND
EXHIBIT LIST - 7
CV-06-327-EFS
#664872 v1 / 42703-001

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**2.      Plaintiffs' Trial Ex. 2 – Objection. Irrelevant.**

Plaintiffs seek to admit NCRL's former Collection Development Guidelines and Procedures.  NCRL's former guidelines were not in place at the time Plaintiffs' claims arose and thus has not relevance to any issue before the Court.

**3.      Plaintiffs' Trial Exs. 17/18 – Objection. Irrelevant.**

Plaintiffs seek to admit the Jefferson County Rules of Conduct and Internet Policy.  The Jefferson County Library is not a party.  Its Rules of Conduct and Internet Policy have no bearing on the legality of NCRL's Internet filtering policy.  The introduction of this evidence is misleading and confuses the issue before the court, in violation of ER 403.

**4.      Plaintiffs' Trial Ex. 66 – Objection to Inclusion of Patron's Personal Information.**

NCRL objects to the introduction of Plaintiffs' Trial Ex. 66 to the extent it includes the names and personal information of NCRL patrons.  RCW 42.56.310 exempts from disclosure any library record that discloses or could be used to disclose the identity of a library user.  Accordingly, NCRL requests all library

DEFENDANT NORTH CENTRAL
REGIONAL LIBRARY'S OBJECTIONS
TO PLAINTIFFS' WITNESS AND
EXHIBIT LIST - 8
CV-06-327-EFS
#664872 v1 / 42703-001

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

patrons personal information be redacted from Plaintiffs' Ex. 66, and any other trial exhibit to which this statute may apply.

**5.     Plaintiffs' Trial Ex. 70 – Objection.  Irrelevant.**

NCRL installed the Fortinet Filter in October 2006.  The Fortinet filter replaced a different product, referred to as Smartfilter (BESS Edition).  The Fortinet filter had been in place since Plaintiffs' filed the present lawsuit.

By way of Ex. 70, Plaintiffs' seek to introduce the internet content categories that were applicable under BESS, as well as the categories that NCRL was blocking at the time BESS was in place.  As BESS is no longer the operative filter, and was replaced before Plaintiffs commenced this action, this exhibit is irrelevant to the issue before the court and has no bearing on the legality of NCRL's Internet Filtering Policy. The exhibit should be excluded.

**6.     Plaintiffs' Trial Ex. 73 – Objection. Duplicative.**

Plaintiffs' Trial Ex. 73 is the same as Plaintiffs' Trial Ex. 61.

**7.     Plaintiffs' Trial Ex. 76 – Objection.  Not evidence, but a demonstrative exhibit.**

Ex. 76 is a table, prepared by Plaintiffs' counsel, that summarizes unblocking request received by NCRL between 10/1/07 and 2/20/08.  This chart

DEFENDANT NORTH CENTRAL
REGIONAL LIBRARY'S OBJECTIONS
TO PLAINTIFFS' WITNESS AND
EXHIBIT LIST - 9
CV-06-327-EFS
#664872 v1 / 42703-001

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

is not evidence. Rather, this chart summarizes evidence contained in Plaintiffs' Ex. 66.

Plaintiffs' Ex. 76 should not be admitted as evidence. In the event the Court chooses to allow it as a demonstrative exhibit, NCRL asks that it be allowed to supplement the exhibit with information Plaintiffs' did not have, or consider, in preparing it, including the information contained in the Supplemental Declaration of Dan Howard, filed on March 28, 2008. (Ct. Rec. 74).

DATED this 31st day of March, 2008.

KARR TUTTLE CAMPBELL

By:/s/ Celeste Mountain Monroe
Celeste Mountain Monroe, WSBA #35843
E-mail – cmonroe@karrtuttle.com
Thomas D. Adams, WSBA #18470
E-mail – tadams@karrtuttle.com
Attorneys for Defendant North Central
Regional Library District
KARR TUTTLE CAMPBELL
1201 Third Ave., Ste. 2900
Seattle, WA 98101
Telephone: 206.233.1313
Facsimile: 206.682.7100

DEFENDANT NORTH CENTRAL
REGIONAL LIBRARY'S OBJECTIONS
TO PLAINTIFFS' WITNESS AND
EXHIBIT LIST - 10
CV-06-327-EFS
#664872 v1 / 42703-001

**CERTIFICATE OF SERVICE**

I hereby certify that on March 31, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the persons listed below:

Duncan Manville
1629 2nd Ave. W
Seattle, WA 98119

Aaron Caplan
ACLU of Washington
705 Second Ave., Ste. 300
Seattle, WA 98103

Catherine Crump
American Civil Liberties Union
Foundation
125 Broad Street, 17th Floor
New York, NY 10004

KARR TUTTLE CAMPBELL

By: _____
Heather L. White
hwhite@karrtuttle.com

DEFENDANT NORTH CENTRAL
REGIONAL LIBRARY'S OBJECTIONS
TO PLAINTIFFS' WITNESS AND
EXHIBIT LIST - 11
CV-06-327-EFS
#664872 v1 / 42703-001

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

```
1                UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF WASHINGTON

3                        AT SPOKANE

4    SARAH BRADBURN, PEARL

5    CHERRINGTON, CHARLES

6    HEINLEN and the SECOND

7    AMENDMENT FOUNDATION,

8              Plaintiffs,

9         vs.                      No. CV-06-327-EFS

10   NORTH CENTRAL REGIONAL

11   LIBRARY DISTRICT,

12             Defendant.

13                       /

14

15

16

17         DEPOSITION OF SALLY W. BEESLEY

18         Taken on behalf of Defendant

19

20

21

22       Taken before LISA I. KROON

23             CSR No. 95-0311

24            January 18, 2008

25
```

Page 12

1  examples right now of things that they endorsed or

2  supported.

3      Q.  Have you ever considered not being a member of

4  the ALA?

5      A.  Yeah.

6      Q.  Okay.  And why is that?

7      A.  I think partially because, you know, kind of

8  what I said before, but on the other hand, that's more

9  of a reason to stay there because if all of the more

10  conservative librarians leave, then it just -- you

11  know, it would just become more and more liberal.

12          The only other reason is, you know, do I really

13  want to spend 120 bucks every year to belong to

14  something that I really don't use that much, but...

15      Q.  All right.  Are you a member of the ACLU?

16      A.  I don't think so.  What's that?

17      Q.  The American Civil Liberties Union.

18      A.  No, uh-uh.

19      Q.  All right.  So I'd like to learn as much as I

20  can while I'm here about the Jefferson County Library

21  District of which you're the director.

22          Can you tell me how the district itself is set

23  up?  How does it work?

24      A.  You mean geographically?

25      Q.  Regionally.          Page 13

1    A.  Okay.  It has the same boundaries as the school

2  district.  It includes most of Jefferson County with

3  the exception of Crooked River Ranch, and it does

4  include most of Warm Springs Reservation and also

5  includes a small section of Wasco County, and we

6  service, you know, a little town just right over the

7  border into Wasco County, so that kind of -- and it's

8  also part of our school district.

9    Q.  Okay.  So when you say just over the border,

10  the Washington/Oregon border?

11    A.  No, the county border.

12    Q.  The county border.  Okay.

13    A.  Between Wasco County and Jefferson County.

14    Q.  How many branches in the district?

15    A.  There's just this one.

16    Q.  Do you know what the mile radius is of your

17  territory?

18    A.  Not off the top of my head, no, uh-uh.

19       There's one other part that you probably

20  wouldn't think to ask that would be important is that

21  we're in a regional library with Deschutes County as

22  well.

23    Q.  Okay.

24    A.  So everybody in Deschutes County or in

25  Jefferson County, we all use our libraries as if it's

1  that a library does need to address is that, you know,

2  would filtering or not filtering be appropriate for the

3  library.

4      Q.  Okay.  Do you have a copy of your speech?

5      A.  No.

6      Q.  With respect to the current litigation for

7  which we're taking your deposition today, what is your

8  understanding of the issues in the current litigation?

9      A.  That there was a library in the state of

10  Washington that does have filtered access and there was

11  an adult who objected to that because it blocked them

12  from some site that they were wanting to get on that

13  they apparently felt that they had a right to access in

14  the library.

15      Q.  Okay.  So as I said in the beginning, I

16  represent North Central Regional Library District, and

17  that is presumably the library district that you're

18  talking about.

19          Have you read the North Central Regional

20  Library's Internet policy?

21      A.  I don't think so.

22      Q.  Are you able to, as you sit here today,

23  articulate their mission or vision?

24      A.  No.

25      Q.  Do you know specifically where the district --

Page 50

1    the subject library district is located?

2        A.  No.  I may have been told at one time, but I

3    don't remember.

4        Q.  Okay.  So you don't know what -- the size of

5    the territory or the cities that may be within its

6    region?

7        A.  Not that I remember.

8        Q.  Do you know if you've ever been to a North

9    Central Regional Library branch?

10       A.  No, I haven't.

11       Q.  So I take it you haven't sat down at a computer

12   and tried to access the Internet --

13       A.  That's correct.

14       Q.  -- in their territory?

15       A.  I have not.

16       Q.  To your knowledge, have you ever spoken with a

17   North Central Regional Library patron about the

18   Internet filter?

19       A.  No.

20       Q.  Do you know Dean Marney?

21       A.  No.

22       Q.  I'll represent to you he's the director of the

23   North Central Regional Library District.

24           What about Dan Howard?

25       A.  No.

1    STATE OF OREGON           )

2                              )

3    COUNTY OF DESCHUTES       )

4

5         I, LISA I. KROON, do hereby certify:

6         That SALLY W. BEESLEY, in the foregoing deposition

7    named, was present and by me sworn as a witness in the

8    above-entitled action at the time and place therein

9    specified;

10        That said deposition was taken before me at said

11   time and place, and was taken down in shorthand by me,

12   a Certified Shorthand Reporter of the State of Oregon

13   and a Registered Professional Reporter, and was

14   thereafter transcribed into typewriting, and that the

15   foregoing transcript constitutes a full, true and

16   correct report of said deposition and of the

17   proceedings that took place;

18        IN WITNESS WHEREOF, I have hereunder subscribed my

19   hand this 23rd day of January 2008.

20

21

22                                    /s/ LISA I. KROON

23                              _____

24                              LISA I. KROON, CSR No. 95-0311
                                Registered Professional Reporter

25



# Digital Court Reporting & Video

Transcript of the Testimony of
## Kenton Oliver

**Date:** November 14, 2007

**Caption:** Sarah Bradburn, et al v. North Central Regional Library District



Digital Court Reporting and Video, LLC
866.721.0972 Toll-free
713.683.0401 Local
713.683.8935 Fax
depos@digitalreporting.com
www.digitalreporting.com

**Job Number: 2761**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

CASE NO. CV 06 327 EFS

JUDGE EDWARD SHEA


SARAH BRADBURN, ET AL.,

          Plaintiffs,        DEPOSITION OF

versus                     KENTON OLIVER

NORTH CENTRAL REGIONAL
LIBRARY DISTRICT,


          Defendant.

        - - - - -

     Deposition of KENTON OLIVER, a witness herein, called by the Defendant as upon cross-examination pursuant to the Federal Rules of Civil Procedure, taken before me, the undersigned, Laurie Maryl Hart, a Registered Merit Reporter and Notary Public in and for the State of Ohio, at the Stark County District Library, 715 Market Avenue North, Canton, Ohio, on Wednesday, November 14, 2007, at 12:36 p.m.

        - - - - -

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

1  Q   Have you spoken to Miss Pennell Stephens about this

2      case?

3  A   Briefly.

4  Q   Was that recently?

5  A   No.

6  Q   Do you recall the substance of your conversation?

7  A   It was following when our initial contact by

8      Mr. Manville.  And just general, you know, what are

9      you talking about.

10         (Off the Record.)

11     BY MS. MONROE:

12  Q   Can you talk to me about the Intellectual Freedom

13     Committee.  What is the mission of the committee?

14  A   Our primary role is to make sure that we defend the

15     access to information and materials in libraries.  As

16     a committee goes, we help create guidelines and

17     standards for the association in that area.

18     Censorship is a broad term, but that's what most

19     people who think of it as being the main committee

20     that deals with censorship, but it has to do with

21     many other things, including access to information

22     through the Internet; it has to do with privacy

23     rights for library patrons; it has to do with how

24     librarians present information in libraries to make

25     sure they will not discriminate in their access,

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

1       discriminate in access by their patrons.  That's kind

2       of the broad.

3    Q  Okay.  And what is your role in furthering that

4       mission as the chair?

5    A  Actually I'm more of a facilitator than anything.

6       I'm the person that facilitates our meetings.  I

7       consult with the Office of Intellectual Freedom in

8       setting the agendas and our strategic direction of

9       the committee.

10   Q  When you say consult with the Office of Intellectual

11      Freedom, is this a national office located --

12   A  In Chicago.

13   Q  In Chicago.  Okay.  The Intellectual Freedom

14      Committee, though, is a national committee; correct?

15      It's not an Ohio --

16   A  Correct.

17   Q  -- version.  Okay.  Has the Intellectual Freedom

18      Committee taken an official position on the use of

19      Internet filters in public libraries?

20   A  Yes.

21   Q  Okay.  And what is that position?

22   A  They are opposed to Internet filters in any way that

23      they would impede access for information to any

24      library users.

25   Q  And you said "in any way"?          Page 21

1    A    I'd have to double-check.  Bess is, if I'm correct,

2         Bess is also been known as N2-H2.  It's actually a

3         company that's in the Pacific Northwest, I believe,

4         and it's gone through several alliterations.

5    Q    Has that filter product changed since you've been

6         here for six years?  Besides upgrades.

7    A    No.

8    Q    Which may happen.  So it's always been Bess?

9    A    To my knowledge.

10   Q    Who was involved in selecting that product?

11   A    Our computer services staff.  And their manager.  And

12        myself.  But what they did, they did a -- they did an

13        analysis of the marketplace, and as I recall, it was

14        based on quality of the product and pricing as well.

15   Q    Are you aware of whether there's been any concerns

16        from patrons who are minors who feel that they're

17        being denied access to appropriate content because of

18        Bess?

19   A    I'm not directly aware of that.

20   Q    When I asked you about your responsibilities as

21        executive director and about the library, you

22        provided some background about the district itself,

23        including the number of branches, the number of

24        people in the staff and the operating budget.  You

25        said there are eleven branches plus a main branch, so

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

Page 37

1       twelve?

2    A  Yes.

3    Q  Total branches.  Okay.  What is the physical area

4       that this serves, that your district serves?  What is

5       the size of the district?

6    A  Oh, gosh.  It's hard to give you that in size and

7       square miles because we serve about, our population

8       that we serve is about 250,000.

9    Q  Okay.

10   A  And the reason it's hard to explain it to you is that

11      we are a composite of quite a few different school

12      districts, which is how public library districts in

13      the state of Ohio are defined.  And in our particular

14      case in this county it's actually kind of an odd

15      geographical configuration.

16   Q  Because, as you pointed out, you are one of seven --

17   A  Correct.

18   Q  -- library districts in the county?

19   A  Correct.

20   Q  Okay.  You serve 250,000 patrons?

21   A  Uh-huh.

22   Q  How many people are in the county, do you know?

23   A  I believe there are about 450,000.

24   Q  Okay.  So you serve a good --

25   A  Yeah.                          Page 23

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

1    Q    -- number of those people?

2    A    Right.

3    Q    All right.  What is the general demographic of this

4         county?

5    A    Actually I would say that our demographic is a little

6         bit of everything.  We have some very urban

7         characteristics in the city of Canton.  And some very

8         impoverished areas.  We have some very affluent areas

9         in the surrounding townships.  We have manufacturing,

10        we have a large manufacturer here, Timken, which is a

11        steel manufacturer.  We have a strong labor influence

12        in the area.  We have quite a few small universities

13        and colleges in the area.

14   Q    And you said you have two bookmobiles?

15   A    Two bookmobiles and two kidmobiles.

16   Q    With respect to how the branches are physically

17        organized, is there a children's room in every

18        branch?

19   A    There's a children's area.  Our branches range in

20        size from just literally like 1,500 feet to 20,000

21        square feet.

22   Q    Okay.  Do all of your library branches have Internet

23        usage computers?

24   A    Yes.

25   Q    Okay.  And is the policy the same at every branch?

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

Page 47

1   A   I don't believe so.  Not to my knowledge anyway.

2   Q   Okay.  Have you ever been to Washington state?

3   A   Yes.

4   Q   Okay.  When was the last time you were in Washington?

5   A   American Library Association mid winter meeting.

6       January of this year.

7   Q   Okay.  Have -- do you know where the NC -- I'm going

8       to use the word NCLR throughout to stand for the

9       North Central Regional Library system, but do you

10      understand where their territory is?

11  A   Yes.

12  Q   Okay.  And what is your understanding of their

13      territory?

14  A   Rural area in north central Washington state.

15  Q   Do you know the names of the counties that they

16      serve?

17  A   I could not give them to you.

18  Q   Do you have an idea of the size in square miles of

19      the district that they serve?

20  A   No.

21  Q   Do you have any concept of the number of employees

22      that they have?

23  A   No.

24  Q   Have you ever been to an NCRL branch library?

25  A   No.

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

```
 1   Q   Are you familiar with the scope of NCRL's services
 2       that they provide to their community?
 3   A   No.
 4   Q   Are you familiar at all with the demographics of the
 5       community that the NCRL serves?
 6   A   Not specifically.
 7   Q   What about an idea of the number of patrons?
 8   A   No.
 9   Q   Have you ever met NCRL's director, Dean Marney?
10   A   Not to my knowledge.
11   Q   Okay.  Have you met the director of branch services,
12       Dan Howard?
13   A   I do not believe so.
14   Q   Have you ever spoken with anyone at NCRL?
15   A   No.
16   Q   In your own words, can you describe NCRL's Internet
17       usage policy?
18   A   Based upon what I've read, secondhand knowledge, is
19       that they provide filtered Internet access and they
20       have a process set up whereas if an adult wishes to
21       bypass the filler they have to go through a long,
22       drawn-out process without any guarantee that they'll
23       be able to bypass the filter.
24   Q   Okay.  Let's take that in a couple parts.  You said
25       based on what you read.  What do you recall you read?
```

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

 1   A   Specifically that they provide filtered access and

 2       that there is a request process by which an adult

 3       wishing to access a site that is filtered may apply

 4       for.  But there is no guarantee that the library will

 5       agree to do that, nor is there necessarily what I

 6       would consider a timely process or a reasonable

 7       process for that request to take place.

 8   Q   Okay.  And I apologize, my question was poorly

 9       worded.  What was the source?

10   A   It would be a combination of verbal updates at

11       Intellectual Freedom Committee meetings and general

12       written summaries from Intellectual Freedom Committee

13       documents.

14   Q   Who is providing the verbal updates at the

15       Intellectual Freedom Committee meetings?

16   A   Well, Duncan Manville provided one at mid winter, and

17       then we have had, I've had informal conversations

18       with various staff at the OIF office.

19   Q   Have you ever read NCRL's policy?

20   A   I've glanced at it but it's been some time.

21   Q   Are you aware of the type of filtering product that

22       NCRL uses?

23   A   No.

24   Q   You said that, in your words, that if an adult wanted

25       to bypass it, it was a long, drawn-out process of

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

```
 1   A    No.

 2   Q    Okay.  And you have never accessed the Internet at an

 3        NCRL computer; correct?

 4   A    No.

 5   Q    Okay.  And you don't have a specific understanding of

 6        what is in fact filtered; correct?

 7   A    No.

 8   Q    Okay.  And you don't have a specific understanding of

 9        how the review process works or what triggers the

10        review process; correct?

11   A    I believe I have a good general knowledge based upon

12        the background material that I've seen.

13   Q    Okay.  And this was what's been provided to you at

14        IFC meeting?

15   A    As well as --

16   Q    And staff?

17   A    And a verbal update from the ACLU.

18   Q    Do you have any problem with NCRL filtering

19        unprotected speech?

20   A    No.

21   Q    What about content that is potentially harmful to its

22        network?

23   A    No.

24   Q    Let me clarify that.  Network security.

25   A    Yes.
```

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

Oliver, Kenton

## ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:      Sarah Bradburn, et al v. North Central Regional Library
District
Dep. Date:      November 14, 2007
Deponent:       Kenton Oliver

## CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read |
|-----|-----|-----------|-------------|
| 36 | 25 | eleven branches | ten branches |
| 13 | 3 | eleven branches | ten branches |
| 18 | 19-25 | omission | Include "Freedom to Read Foundation" |

_____
Signature of Deponent

Kenton Oliver                         Sarah Bradburn, et al v. North Central Regional Library District

Page 65

1                C E R T I F I C A T E

2

3          I, KENTON OLIVER, do hereby certify that I

4   have read the foregoing deposition in the case of

5   SARAH BRADBURN, ET AL., Plaintiffs, versus NORTH

6   CENTRLA REGIONAL LIBRARY DISTRICT, Defendant, and

7   said deposition constitutes a true and correct

8   transcript of my testimony given at the specified

9   time.

10

11                     KENTON OLIVER

12

13   Dated this 27th day of December, 2007

14          - - - - -

15   Subscribed and sworn to before me this 27th day of

16   December, 2007.

17

18                     Notary Public

19                     My commission expires _____

20         - - - - -     **THERESA A. BULICZ**
                                   Notary Public, State Of Ohio

21                                 My Commission Expires 4/3/10

22

23

24

25

713-683-0401    Digital Court Reporting and Video    713-683-8935

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

# C E R T I F I C A T E

STATE OF OHIO    )
                 )SS
STARK COUNTY     )

      I, Laurie Maryl Hart, a Registered Merit Reporter and Notary Public in and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within named witness, KENTON OLIVER, was by me first duly sworn to tell the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony given was by me reduced to Stenotype and afterwards transcribed by computer-aided transcription, and that the foregoing is a true and correct transcription of the testimony so given by him as aforesaid.

      I do further certify that this deposition was taken at the time and place in the foregoing caption specified. I do further certify that I am not a relative, counsel or attorney of either party, or otherwise interested in the event of this action, nor is the court reporting firm with which I am affiliated under a contract as defined in Civil Rule 28(D).

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Canton, Ohio, on this 19th day of November, 2007.

      *Laurie Maryl Hart*

Laurie Maryl Hart, RMR & Notary Public.
My commission expires January 6, 2012.

Page 31

Page 1

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF WASHINGTON
2                      AT SPOKANE

3    ─────────────────────────────────────────

     SARAH BRADBURN, PEARL        )   No. CV-06-327-EFS
4    CHERRINGTON, CHARLES         )
     HEINLEN, and THE SECOND      )
5    AMENDMENT FOUNDATION,        )
                                  )
6                  Plaintiffs,    )
                                  )
7            vs.                  )
                                  )
8    NORTH CENTRAL REGIONAL       )
     LIBRARY DISTRICT,            )
9                                 )
                   Defendant.     )
10

11   ─────────────────────────────────────────

          DEPOSITION UPON ORAL EXAMINATION OF
12               JUNE PINNELL-STEPHENS
13                 October 3, 2007
                 Seattle, Washington
14   ─────────────────────────────────────────
15

16

17               Taken Before:
18         Cheryl L Hendricks, CCR #2274
              Certified Court Reporter
19                      of
          CAPITOL PACIFIC REPORTING, INC.
20      2401 Bristol Court SW, Olympia, WA 98502
         Tel (360) 352-2054  Fax (360) 705-6539
21
        Tacoma          Seattle         Aberdeen
22   (253) 564-8494   (206) 622-9919   (360) 532-7445
             Chehalis          Bremerton
23        (360) 330-0262     (360) 373-9032
24          www.capitolpacificreporter.com
         scheduling@capitolpacificreporting.com
25

```
 1        the concern happens to be.  And I would estimate that
 2        only 10 percent of concerns expressed actually end up in
 3        formal written complaints.
 4    Q   And these percentages are based on your personal
 5        experience?
 6    A   Yes.  I have no research to back it up.  It's just my
 7        feeling.
 8    Q   And when you say 10 percent of concerns expressed end up
 9        in formal complaints, in your experience are most of
10        these 10 percents regarding written texts or books,
11        materials, or any portion of that being electronic?
12    A   Any time there was a new format introduced there seemed
13        to be a flurry of complaints because it was a new
14        format, people weren't used to it and there was always
15        something they were concerned about.  But after they'd
16        been around for a while, the new formats, the complaints
17        would calm down because people were used to them.  And
18        I'm sure the thing -- we expected the same thing about
19        the Internet.
20    Q   Okay.  With respect to the Fairbanks Public Library, the
21        area that you were working, there's a main library --
22    A   Mm-hmm.
23    Q   -- which is Fairbanks and then there's another branch
24        that services which is the North Pole --
25    A   Mm-hmm.
```

Page 33

1   Q   -- or North Pole, probably not "The" North Pole.   Is

2       that the extent of the actual physical branches?

3   A   Those are the physical buildings.   But as I said, we

4       took this van --

5   Q   Right.

6   A   -- which is, oh, maybe the length of this room, not a

7       big one, like sort of a large RV or about that size.

8       And there is -- there are some items that are actually

9       shelved on that van.   And then they do take orders for

10      books from the collection because everybody can see our

11      catalogue online, of course, so they can order books

12      they want to be brought to either the drop site or in

13      the case of services to the senior centers, that's

14      another scheduled stop.

15  Q   Okay.   What can you tell me about the demographic of the

16      Fairbanks branch, the patrons that you serve?

17  A   Oh, boy.   Well, the community is about 25 percent

18      military and dependants.   It is also the location of the

19      largest university in the state and it's the flagship

20      for the university.   We have a large mining community.

21      And it's a transportation hub for all the communities

22      out in the interior.   It's also the last city before the

23      Haul Road starts up to Prudhoe Bay.   Its minorities, the

24      largest minority is -- consisted of Alaskan natives,

25      primarily Athabascan, some Inuit or Yup'ik Eskimos

```
 1        coming in.

 2                         (Interruption by the reporter.)

 3    A   Yup'ik, Y-u-p apostrophe i-k, I believe, and Inuit is

 4        I-n-u-i-t.  The Inuit Eskimos are from the top coastal

 5        area and the Yup'ik are from the sort of southwestern

 6        area.

 7             It's a -- it's mostly a very conservative area.

 8    Q   (By Ms. Monroe)  Meaning politically conservative?

 9    A   Yes.

10             And very, very independent.  They are lots of

11        people who live off the grid, that is, they have no

12        electricity, they have to haul water, and either they

13        try to grow or hunt or live on subsistence, subsistence

14        life-style.  So -- pardon me?

15    Q   No.  Go ahead.

16    A   Okay.  So it's a very, very different mix.  You could

17        never tell just sort of watching somebody walking down

18        the street what -- what group that person might belong

19        to and what their philosophies might be.  But there's a

20        lot of libertarian philosophy, I think.

21    Q   What is the physical size, to the best of your

22        recollection, of the Fairbanks branch?

23    A   The size of the branch?

24    Q   Mm-hmm.

25    A   In terms of volumes?                    Page 35
```

```
1    Q    In terms of square footage.

2    A    Oh, boy.  I'm really bad at that.  I don't know how big

3         it is.  I know we have about 300,000 volumes.

4    Q    Is it two stories?  One story?

5    A    One.

6    Q    Bigger than. . .  I'm trying to come up with a good

7         example.  Can I ask, how big is your home?  Do you know

8         the square footage size?

9    A    No.  Let's see.  I don't.  How embarrassing.  Let's see.

10        I can try and estimate it for you.

11   Q    Well, with comparison coming into this office today, is

12        it about -- from what you have seen from this office, is

13        it a large -- is it about the same size of what you have

14        seen --

15   A    I would say it's smaller than the floor.  I can't --

16        with all the cubbies --

17   Q    Yeah.

18   A    -- and breakups, it's hard to estimate space.  I would

19        guess -- let's see.  The Bothell library is no longer

20        the way it was when I was there.  I'm sorry.  I'm trying

21        to remember. . .  Hmm.  You know, it's just really

22        difficult to judge.

23   Q    How many rooms were there?

24   A    Well, there was the main library stacks area.  There

25        were four very small group study areas that would fit no
```

1    more than -- the largest one would hold no more than

2    eight people.  There was a quiet use room that held no

3    more than three.  And this is all sort of tacked onto

4    this main -- main room.  There was an area around a

5    fireplace that was a quiet reading area and then more

6    stacks and then the children's room.

7         And then that was the end of the library section

8    and then there was -- there were the security gates.

9    Oh, the reference desk was about the first thing you saw

10   straight ahead, the circ desk on the left.  After the

11   security gates there were public bathrooms and there was

12   an auditorium that would hold about 250.

13  Q   Okay.  So it sounds fairly sizable.

14  A   Mm-hmm.

15  Q   Was the children's room separated from -- by a wall?

16  A   Yeah, there was a wall and most of it was glass.

17  Q   Any estimate of the number of patrons that the Fairbanks

18      branch served, for example, at the time that you

19      retired?

20  A   I would have to say this in terms of the entire -- of

21      the branch and here because so many people came in to

22      use the main library because the branch was so small.

23  Q   Okay.  So you're estimating both North Pole and

24      Fairbanks with this number?

25  A   The whole -- the whole borough --

1    Q    Okay.

2    A    -- which used -- we were primarily tasked with serving

3         the North Star Borough.  And the latest population was

4         about 86,000 and the size of the bureau -- of the

5         borough was about that of New Jersey.

6    Q    In physical size?

7    A    Yes.

8    Q    Specifically then with respect to the North -- with the

9         North Pole branch, what did that look like, much

10        smaller?

11   A    Yes, it was much smaller and more cramped.  They had --

12        oh, and -- well, in the -- let me go back.  The -- the

13        areas I described were public areas.  There were, of

14        course, pretty much a warren of staff areas.

15   Q    In Fairbanks?

16   A    Yeah.

17   Q    Okay.

18   A    In North Pole, the staff area is shrunk to a room

19        smaller than this, I would think.  And they had a

20        children's area and then stacks and reference all sort

21        of mashed together.  They were very crowded.

22   Q    So no walls separating?  It was an open room just

23        separated by aisles of books?

24   A    Well, and then the children room which was also then the

25        story room -- story time area was open but partially cut

Page 22

1           off by a wall.

2    Q    Okay.  We will likely get into this in more detail

3           later.  But from reading your report, it sounds like at

4           one point the Internet terminals at the Fairbanks branch

5           and possibly the North Pole branch were not filtered.

6    A    That's right.

7    Q    Can you tell me from what period of time -- at what

8           point were Internet computers installed?

9    A    Oh, maybe '95.  I can't remember exactly.  Seems to me

10          it was almost eight years, between six and eight years,

11          that we did not have filters on our Internet stations.

12   Q    So assuming approximately 1995, then seven or eight

13          years later --

14   A    Mm-hmm.

15   Q    -- a filter was employed at both branches --

16   A    Mm-hmm.

17   Q    -- on their Internet computers?

18   A    Mm-hmm.

19   Q    What was the reason for the decision to install a

20          filter?

21   A    The Mayor --

22   Q    Of Fairbanks.

23   A    -- of Fairbanks at the North Star Borough decided that

24          it would be good public policy as well as a good

25          campaign issue to install filters and the assembly voted

1    to do so.

2         We had decided previously -- the library staff,

3    we had looked at the cost benefit for putting them on.

4    We'd had no complaints from anybody about Internet use

5    at that point.  And we received approximately $2,500 a

6    year from E-Rate money, if that makes sense to you.

7  Q  Mm-hmm.

8  A  Okay.  I thought it might.  And ended up costing --

9    well, we figured it would cost us $26,000 to install an

10   adequate filtering system.

11 Q  What do you mean by adequate?

12 A  Well, one that had among the best ratings of those that

13   were available at the time.  I mean, some we -- that

14   were tested were clearly inappropriate.  And I can't

15   tell you the names of those.  The automated services

16   folks did most of the testing.  But there were reviews

17   written by a number of different organizations about the

18   various systems.

19 Q  And by best ratings, you mean performance ratings?

20 A  Mm-hmm.

21 Q  With respect to error rates?  Is that what you're

22   referring to?

23 A  Yes.

24 Q  Okay.  So before filters were installed what, if

25   anything, were you doing with respect to your Internet

1    stations to prevent children or other people from seeing

2    what was on someone's screen?

3  A  Well, as time went by we started putting -- installing

4    privacy. . .

5  Q  Screens?

6  A  Screens and stations.  We went through an expansion of

7    the library not long after the Internets went into

8    place.  And when we reopened after -- when that

9    expansion was done, we planned for stations with

10    recessed screens, so they are down underneath a table

11    and it's a glass tabletop and you look down through it.

12    And for those stations that had to be on the desktop,

13    some people with trifocals or other reading problems

14    needed a screen on the desktop, we provided privacy

15    screens that actually fit over the screen.

16        We directed the locations of these stations so

17    they would not be right in the largest line of traffic

18    and tried our best to minimize incidental viewing of

19    anything.  And one of the reasons we did that is that

20    our nonfiction collection was fully integrated, that is,

21    children's material, adult material, nonprint material

22    were all interfiled on the same shelves and to -- you

23    had to walk past the main groupings of Internet stations

24    to get to the nonfiction collection of the library.

25  Q  Okay.  Was the mayor's decision to ask you to install

1      filters or the assembly's decision based in any part on

2      the Children's Internet Protection Act?

3   A  No.

4   Q  No?

5   A  Hmm-mm.

6   Q  What was the timing of the mayor's decision?

7   A  Oh, what was the -- the date of CIPA was '93; is that

8      right?

9   Q  I can't answer.

10  A  Oh, I'm sorry.  I can't remember the actual date of

11     CIPA.  Let me see if I can find it here.

12  Q  And just to make a record, you're looking at the report

13     that you prepared and disclosed to us?

14  A  Yes.

15  Q  Okay.  Well, maybe this will help.  To my question of

16     when the mayor --

17  A  Oh.

18  Q  -- asked you to install filters, that would have been

19     roughly maybe 2002?

20  A  It was after CIPA was adopted, I'm quite sure, because

21     we tried -- in our cost benefit analysis that I just

22     mentioned we would have received $2,500 or something

23     from E-Rate, which is the CIPA money.

24  Q  So you were having conversations at that time, roughly

25     1995, when the computers were installed about how to

1    Q    -- report which we will later introduce as an exhibit.

2              MR. MANVILLE:  And I don't believe we provided a

3         copy, I think, on this one.  We just provided a link.

4              MS. MONROE:  Okay.  Thanks.

5    Q    (By Ms. Monroe)  Do you share the ALA's position, you

6         personally share the ALA's position, on Internet

7         filtering?

8    A    That the use of filters that blocks protected speech is

9         a violation of the Library Bill of Rights?  Yes, I do.

10             A lot of people misunderstand what that

11        resolution says.  It doesn't say don't filter.  Just

12        that if you block protected speech, you're violating the

13        Library Bill of Rights.  If you can find a way to use a

14        filter that does not block protected speech, it's not a

15        violation of the Library Bill of Rights.

16   Q    So you recognize that there are categories of protected

17        and unprotected speech, correct?

18   A    Yes.

19   Q    Okay.  And can you explain what you believe falls under

20        the category of unprotected speech?

21   A    So far as I understand, it's speech that has been found

22        obscene in a court of law, child pornography, libelous

23        speech, treason or speech that endangers national

24        security, and in some states in the case of minors,

25        material that is -- people under 17 -- or under 18,

1          filters could be removed.

2     Q    This is at --

3     A    At the Loussac Library in Anchorage.

4     Q    So Loussac Library was filtering any content containing

5          ACLU information?

6     A    No, no.  They were filtering -- using the filter period

7          and --

8     Q    Okay.

9     A    -- they wouldn't remove it.

10    Q    I saw in your CV that you were awarded the Citizen

11         Activist of the Year by the ACLU in 1998?

12    A    Mm-hmm.

13    Q    Can you tell me if there was something specific that you

14         had done to earn their recognition?

15    A    '98 was -- was that -- I'm trying to think what -- what

16         incident that was.  '95 was the display.  I think it was

17         just helping them with a display.  Was it a display

18         issue?  May have been the filters.  I don't -- I don't

19         remember what -- what it was.  And that must have been

20         one of the years I was off the board.  I can't remember.

21    Q    Okay.

22    A    It just -- it just sort of flies by.  I'm sorry.

23    Q    That's fine.  Of the publications that you have authored

24         either in whole or in part as a collaboration, how many,

25         to your recollection, addressed the issue of Internet

**CAPITOL**
**PACIFIC**
**REPORTING,INC.**

*2401 Bristol Court SW, Olympia, WA 98502*

Aberdeen 360-532-7445 olympia 360-352-2054 Chehalis 360-330-0262

CASE: Bradburn vs. NCRL

DATE TAKEN: October 3,2007

VENUE: Eastern District of Washington

REPORTER: Cheryl Hendricks

DEPONENT: June Pinnell-Stephens

## CORRECTION & SIGNATURE CERTIFICATE

I, June Pinnell-Stephens, hereby certify under penalty of perjury of the laws of the State of Washington that I have read my foregoing deposition taken the _3_ day of October and that to the best of my knowledge the transcript is true and accurate with the exception of the following corrections:

### CORRECTION

PAGE

13, line 25:  It's a reconsideration form.

24, line7:  "... not long after the Internet workstations ..."

34, line 6:  I did.  All but one of them occurred before I started working at the library, and it involved Conspectus and collection management directly related to my job.

37, line 12: We currently happen to have on the board ...

46, line 2:  "... but freedom of speech generally.  The full statement is available at their web site."

46, line 19-22: I wrote the article, "Asheim in Cyberspace," in American Libraries , Oct., 2002.  At that time, I was FTRF's treasurer.

56, line 9: Yes.  Experience in Alaska and Washington

101, line 19: "and  - very few people in my experience have ...

112, line 24:  Yes.  As I testified earlier, I understand that the NCRL will not disable filters at the request of adults.

113, line 6:  Yes, as I testified earlier.

115, line 10-11:  Yes.  As I testified earlier, I understand that the NCRL will not disable filters at the request of adults.

Executed at Fairbanks, Alaska, on the 8 day of  November, 2007.

*June Pinnell-Stephens*
**(Deponent's signature)**

Page 45

Page 117

1                   C E R T I F I C A T E
2

            I, CHERYL L. HENDRICKS, a duly authorized Court
3   Reporter and Notary Public in and for the State of
    Washington, residing at Olympia, do hereby certify;
4

            That the foregoing deposition of June
5   Pinnell-Stephens was taken before me on October 3, 2007,
    and thereafter transcribed to the best of my ability by
6   means of computer-aided transcription; that the
    deposition is a full, true, and complete transcript of
7   the testimony of said witness;
8           That the witness, before examination, was by me
    duly sworn to testify the truth, the whole truth, and
9   nothing but the truth, and the witness reserved
    signature;
10

            That I am not a relative, employee, attorney, or
11  counsel of any party to this action, or relative or
    employee of any such attorney or counsel, and I am not
12  financially interested in said action or outcome
    thereof;
13

            That upon completion of signature, if required,
14  I shall herewith securely seal the original transcript
    and serve same upon Tom Adams, counsel for the
15  Defendant.
16          IN WITNESS WHEREOF, I have hereunto set my hand
    and affixed my official seal this 15th day of October,
17  2007.
18
19
20
21  _____
                    Cheryl L. Hendricks,
22                  CCR NO. 2274
23
24
25