The Honorable Edward F. Shea

Thomas D. Adams
Celeste Mountain Monroe
KARR TUTTLE CAMPBELL
1201 Third Avenue, Suite 2900
Seattle, Washington  98101-3028
(206) 223-1313
Attorneys for Defendant North Central Regional Library District

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON
### AT SPOKANE

SARAH BRADBURN, PEARL
CHERRINGTON, CHARLES
HEINLEN, and THE SECOND
AMENDMENT FOUNDATION,

   Plaintiffs,

  v.

NORTH CENTRAL REGIONAL
LIBRARY DISTRICT,

   Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

NO.  CV-06-327-EFS

NORTH CENTRAL REGIONAL
LIBRARY'S MOTIONS IN LIMINE

//

//

NCRL'S MOTIONS IN LIMINE
JUDGMENT - 1
CV-06-327-EFS
#664313 v1 / 42703-001

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**A. Sally Beesley and Kenton Oliver should be excluded from trial as their testimony is irrelevant.**

Plaintiffs have identified Sally Beesley as a fact witness. Ms. Beesely is the Director of the Jefferson County Library District ("JCLD") in Madras, Oregon. Plaintiffs propose to call Ms. Beesley to testify "about her library's policies, procedures and experiences with regard to Internet filters." In addition, Plaintiffs propose to have Ms. Beesley testify regarding "alternatives to refusing to disable Internet filters at the request of adult library patrons; the JCLD's Internet policies and procedures; how the JCLD's Internet policies and procedures have been implemented; her experience working with Internet policies, procedures and filters; and the consequences of providing unfiltered access at JCLD's computers."

Plaintiffs have also identified Kenton Oliver as a fact witness. Mr. Oliver is the Executive Director of the Stark County District Library ("SCDL") in Canton, Ohio. Plaintiffs intend to call Mr. Oliver to testify "about his library system's policies, procedures and experiences with regard to Internet filters." In addition, Mr. Oliver is expected to testify regarding "alternatives to refusing to disable Internet filters at the request of adult library patrons; the SCDL's Internet policies and procedures; how the SCDL's Internet policies and

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

procedures have been implemented; his experience working with Internet policies, procedures and filters; and the consequences of allowing patrons of the SCDL to bypass the library's Internet filter."

Plaintiffs offer Ms. Beesley's and Mr. Oliver's testimony to show (1) some libraries do not use filters or will remove the filter at the request of an adult patron and (2) some of the same libraries do not report any problems with their Internet policies. With respect to the first point, the fact that some libraries do not use filters, or will remove the filter on the request of an adult patron, is not disputed. No testimony on this point is necessary. Regarding the second point, the fact that other libraries may not have problems with unfiltered access is not germane. The essential issue posed by this case is whether NCRL's policy of refusing to completely disable the Internet filter on an adult patron's request is constitutional under the Washington and Federal Constitutions. How another library may choose to address issues associated with Internet use has no bearing on NCRL's approach. This is particularly true, where as here, neither Ms. Beesley nor Mr. Oliver has any personal knowledge of NCRL's policies, its territories, its patrons, or its administration, and therefore, have no basis upon which to draw any parallels. See Deposition of Sally Beesley, pp. 14-15; 49-50; Deposition of Kenton Oliver, pp. 36-38; 47-49.

NCRL'S MOTIONS IN LIMINE
JUDGMENT - 3
CV-06-327-EFS
#664313 v1 / 42703-001

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

At best, Mr. Oliver and Ms. Beelsey's testimony is unproductive and pointless. At worst, their testimony serves to confuse the issue. In either case, their testimony is precluded by ER 403.

Mr. Oliver has a longstanding affiliation with the American Library Association ("ALA"). In his deposition, Mr. Oliver testified that he is the Chair of the Intellectual Freedom Committee. The Intellectual Freedom Committee "deals with censorship…including access to information through the Internet…and to make sure (libraries) will not discriminate in their access." See Dep. of Kenton Oliver at p. 20. The Intellectual Freedom Committee is "opposed to Internet filters in any way that would impeded access for information to any library users" and this is, in fact, the ALA official position on the issue. Id. at pg. 21.

Mr. Oliver's only understanding of the facts of this case, is based on verbal updates from the Americans for Civil Liberties Union ("ACLU"), which has taken an active role in the prosecution of Plaintiffs' claims against NCRL. Id. at 51. Mr. Oliver's testimony may be nothing more than an effort to interject the official positions of the ALA and the ACLU into this litigation.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**B.** **June Pinnell-Stevens should be excluded from Plaintiff's witness list as her testimony is irrelevant and her opinion is biased.**

Plaintiffs identified June Pinnell-Stephens as an expert witness. Ms. Pinnell-Stevens served as the Collection Services Manager for the Fairbanks North Star Borough Public Library in Fairbanks, Alaska from 1988-2006. Plaintiff's retained Ms. Pinnell-Stevens to testify as an expert "about issues such as the role of public libraries in our society, the distinction between collection development and censorship and alternatives to filtering."

Any discussion of alternatives to filtering is irrelevant to the constitutionality of the choices made by NCRL. Accordingly, Ms. Pinnell-Stevens should not be allowed to testify regarding alternatives, particularly those utilized by a distant library with which she has no particularly recent affiliation. Furthermore, it is clear that Ms. Pinnell-Stevens is incapable of offering a fair and balanced opinion of value to this Court. Ms. Pinnell-Stevens is actively involved in the ALA. She is currently on its executive board and has served in that role for two years. She also has served on various ALA committees, including: The Presidential Advisory Committee, The Intellectual Freedom Committee, and the Freedom to Read Committee. Ms. Pinnell-Stevens embraces ALA's opposition to Internet filtering and the organization's belief

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

that the blocking of <u>any</u> constitutionally protected speech by an Internet filter constitutes censorship and is, therefore, unacceptable for a public library. See Pinnell-Stevens Deposition, pg. 43. Ms. Pinnell-Stevens' opinion on the traditional role of a library and her opinions on censorship are inexorably tied to the mission of the American Library Association, and only serve to inflame and confuse the issues before the court.

Ms. Pinnell-Stevens is also an active member of the ACLU. She was awarded the Citizen Activist of the Year in 1998. Although she could not specifically recall the reason for the recognition, Ms. Pinnell-Stevens testified that it may have been for her work on Internet filtering. See Deposition of June Pinnell-Stevens, pg. 49. Yet Ms. Pinnell-Stevens has no personal knowledge of NCRL's policies, its territories, its patrons, or its administration. Consequently, she is unable to draw any comparisons between her experience and NCRL's approach to filtering. Id. at pp 16-25. For the reasons set forth above, Ms. Pinnell-Steven should be excluded from trial.

C. **All non-party witnesses should be excluded from the courtroom during the course of trial so that they cannot hear the testimony of other witnesses.**

In the event that Kenton Oliver, Sally Beesley and June Pinnell-Stevens are permitted to testify, NCRL requests that all non-party witnesses be excluded

NCRL'S MOTIONS IN LIMINE
JUDGMENT - 6
CV-06-327-EFS
#664313 v1 / 42703-001

from the courtroom during the testimony of other witnesses due to the effect that other non-party (and party) testimony may have on their own.[1]

**D. The parties should be required to give at least eight hours notice of witnesses to be called, and/or for depositions and exhibits to be used at trial.**

The parties should give the Court and opposing counsel eight (8) hours prior notice of each witness, deposition or exhibit to be called or used at trial to facilitate the prompt and orderly presentation of evidence and witnesses so as to expedite the trial of this matter. Such a ruling will permit the parties to prepare for anticipated testimony in an orderly fashion.

**E. Witnesses should be precluded from making conclusions of law.**

Although testimony in the form of an opinion or inference otherwise admissible is not objectionable because it also embraces an ultimate issue to be decided by the trier of fact, under ER 702 and ER 704, no witness is permitted to express an opinion that is purely a conclusion of law, or merely tells the trier of fact what results should be reached. Such opinions on the ultimate legal issues before the court are not properly considered under the guise of expert testimony.

---

[1] *See* ER 615.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**F.   Any personal opinions of plaintiff's counsel regarding the "justness" of his client's claims.**

RPC 3.4(e) specifically prohibits an attorney from stating "a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant... ."   Any comments by counsel regarding their personal opinion about the validity of their client's claims or defenses do not tend to prove anything and are inadmissible.[2] ER 402.

Comments regarding an attorney's own opinion regarding the legal or moral validity of his or her case also creates the danger of confusing and misleading the trier of fact from its real purpose — to decide the case on the merits.   Thus, even if such commentary were somehow relevant, it must be excluded.[3]

//

//

//

//

//

---

[2] ER 402.

[3] ER 403.

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

In short, it is inappropriate for counsel to inject their attorney's own opinion regarding the legal, factual or moral validity of the claims, which, as stated above, is inappropriate.

DATED this 31st day of March, 2008

KARR TUTTLE CAMPBELL

By:/s/ *Celeste Mountain Monroe*
Celeste Mountain Monroe, WSBA #35843
E-mail – cmonroe@karrtuttle.com
Thomas D. Adams, WSBA #18470
E-mail – tadams@karrtuttle.com
Attorneys for Defendant North Central
Regional Library District
KARR TUTTLE CAMPBELL
1201 Third Ave., Ste. 2900
Seattle, WA 98101
Telephone: 206.233.1313
Facsimile: 206.682.7100

*Law Offices*
KARR TUTTLE CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the persons listed below:

Duncan Manville
1629 2nd Ave. W
Seattle, WA 98119

Aaron Caplan
ACLU of Washington
705 Second Ave., Ste. 300
Seattle, WA 98103

Catherine Crump
American Civil Liberties Union
Foundation
125 Broad Street, 17th Floor
New York, NY 10004

KARR TUTTLE CAMPBELL

By: _____
Heather L. White
hwhite@karrtuttle.com

Law Offices
KARR TUTTLE CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

```
 1              UNITED STATES DISTRICT COURT

 2             EASTERN DISTRICT OF WASHINGTON

 3                        AT SPOKANE

 4   SARAH BRADBURN, PEARL

 5   CHERRINGTON, CHARLES

 6   HEINLEN and the SECOND

 7   AMENDMENT FOUNDATION,

 8               Plaintiffs,

 9        vs.                      No. CV-06-327-EFS

10   NORTH CENTRAL REGIONAL

11   LIBRARY DISTRICT,

12               Defendant.

13                          /

14

15

16

17          DEPOSITION OF SALLY W. BEESLEY

18            Taken on behalf of Defendant

19

20

21

22          Taken before LISA I. KROON

23               CSR No. 95-0311

24              January 18, 2008

25
```

1    examples right now of things that they endorsed or

2    supported.

3        Q.   Have you ever considered not being a member of

4    the ALA?

5        A.   Yeah.

6        Q.   Okay.  And why is that?

7        A.   I think partially because, you know, kind of

8    what I said before, but on the other hand, that's more

9    of a reason to stay there because if all of the more

10   conservative librarians leave, then it just -- you

11   know, it would just become more and more liberal.

12           The only other reason is, you know, do I really

13   want to spend 120 bucks every year to belong to

14   something that I really don't use that much, but...

15       Q.   All right.  Are you a member of the ACLU?

16       A.   I don't think so.  What's that?

17       Q.   The American Civil Liberties Union.

18       A.   No, uh-uh.

19       Q.   All right.  So I'd like to learn as much as I

20   can while I'm here about the Jefferson County Library

21   District of which you're the director.

22           Can you tell me how the district itself is set

23   up?  How does it work?

24       A.   You mean geographically?

25       Q.   Regionally.

1      A.   Okay.  It has the same boundaries as the school

2   district.   It includes most of Jefferson County with

3   the exception of Crooked River Ranch, and it does

4   include most of Warm Springs Reservation and also

5   includes a small section of Wasco County, and we

6   service, you know, a little town just right over the

7   border into Wasco County, so that kind of -- and it's

8   also part of our school district.

9      Q.   Okay.  So when you say just over the border,

10  the Washington/Oregon border?

11     A.   No, the county border.

12     Q.   The county border.  Okay.

13     A.   Between Wasco County and Jefferson County.

14     Q.   How many branches in the district?

15     A.   There's just this one.

16     Q.   Do you know what the mile radius is of your

17  territory?

18     A.   Not off the top of my head, no, uh-uh.

19          There's one other part that you probably

20  wouldn't think to ask that would be important is that

21  we're in a regional library with Deschutes County as

22  well.

23     Q.   Okay.

24     A.   So everybody in Deschutes County or in

25  Jefferson County, we all use our libraries as if it's

1   that a library does need to address is that, you know,

2   would filtering or not filtering be appropriate for the

3   library.

4        Q.   Okay.  Do you have a copy of your speech?

5        A.   No.

6        Q.   With respect to the current litigation for

7   which we're taking your deposition today, what is your

8   understanding of the issues in the current litigation?

9        A.   That there was a library in the state of

10  Washington that does have filtered access and there was

11  an adult who objected to that because it blocked them

12  from some site that they were wanting to get on that

13  they apparently felt that they had a right to access in

14  the library.

15       Q.   Okay.  So as I said in the beginning, I

16  represent North Central Regional Library District, and

17  that is presumably the library district that you're

18  talking about.

19            Have you read the North Central Regional

20  Library's Internet policy?

21       A.   I don't think so.

22       Q.   Are you able to, as you sit here today,

23  articulate their mission or vision?

24       A.   No.

25       Q.   Do you know specifically where the district --

1    the subject library district is located?

2        A.   No.   I may have been told at one time, but I

3    don't remember.

4        Q.   Okay.  So you don't know what -- the size of

5    the territory or the cities that may be within its

6    region?

7        A.   Not that I remember.

8        Q.   Do you know if you've ever been to a North

9    Central Regional Library branch?

10       A.   No, I haven't.

11       Q.   So I take it you haven't sat down at a computer

12   and tried to access the Internet --

13       A.   That's correct.

14       Q.   -- in their territory?

15       A.   I have not.

16       Q.   To your knowledge, have you ever spoken with a

17   North Central Regional Library patron about the

18   Internet filter?

19       A.   No.

20       Q.   Do you know Dean Marney?

21       A.   No.

22       Q.   I'll represent to you he's the director of the

23   North Central Regional Library District.

24            What about Dan Howard?

25       A.   No.

1    STATE OF OREGON          )

2                             )

3    COUNTY OF DESCHUTES      )

4

5        I, LISA I. KROON, do hereby certify:

6        That SALLY W. BEESLEY, in the foregoing deposition

7    named, was present and by me sworn as a witness in the

8    above-entitled action at the time and place therein

9    specified;

10       That said deposition was taken before me at said

11   time and place, and was taken down in shorthand by me,

12   a Certified Shorthand Reporter of the State of Oregon

13   and a Registered Professional Reporter, and was

14   thereafter transcribed into typewriting, and that the

15   foregoing transcript constitutes a full, true and

16   correct report of said deposition and of the

17   proceedings that took place;

18       IN WITNESS WHEREOF, I have hereunder subscribed my

19   hand this 23rd day of January 2008.

20

21

22                              /s/ LISA I. KROON

23                              _____

24                              LISA I. KROON, CSR No. 95-0311
                                Registered Professional Reporter

25



# Digital Court Reporting & Video

Transcript of the Testimony of
## Kenton Oliver

**Date:** November 14, 2007

**Caption:** Sarah Bradburn, et al v. North Central Regional Library District



Digital Court Reporting and Video, LLC
866.721.0972 Toll-free
713.683.0401 Local
713.683.8935 Fax
depos@digitalreporting.com
www.digitalreporting.com

**Job Number: 2761**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT SPOKANE

CASE NO. CV 06 327 EFS

JUDGE EDWARD SHEA


SARAH BRADBURN, ET AL.,

         Plaintiffs,        DEPOSITION OF

versus                  KENTON OLIVER

NORTH CENTRAL REGIONAL
LIBRARY DISTRICT,

         Defendant.

- - - - -

      Deposition of KENTON OLIVER, a witness herein, called by the Defendant as upon cross-examination pursuant to the Federal Rules of Civil Procedure, taken before me, the undersigned, Laurie Maryl Hart, a Registered Merit Reporter and Notary Public in and for the State of Ohio, at the Stark County District Library, 715 Market Avenue North, Canton, Ohio, on Wednesday, November 14, 2007, at 12:36 p.m.

- - - - -

```
 1   Q    Have you spoken to Miss Pennell Stephens about this

 2        case?

 3   A    Briefly.

 4   Q    Was that recently?

 5   A    No.

 6   Q    Do you recall the substance of your conversation?

 7   A    It was following when our initial contact by

 8        Mr. Manville.  And just general, you know, what are

 9        you talking about.

10             (Off the Record.)

11        BY MS. MONROE:

12   Q    Can you talk to me about the Intellectual Freedom

13        Committee.  What is the mission of the committee?

14   A    Our primary role is to make sure that we defend the

15        access to information and materials in libraries.  As

16        a committee goes, we help create guidelines and

17        standards for the association in that area.

18        Censorship is a broad term, but that's what most

19        people who think of it as being the main committee

20        that deals with censorship, but it has to do with

21        many other things, including access to information

22        through the Internet; it has to do with privacy

23        rights for library patrons; it has to do with how

24        librarians present information in libraries to make

25        sure they will not discriminate in their access,
```

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

1          discriminate in access by their patrons.  That's kind

2          of the broad.

3    Q     Okay.  And what is your role in furthering that

4          mission as the chair?

5    A     Actually I'm more of a facilitator than anything.

6          I'm the person that facilitates our meetings.  I

7          consult with the Office of Intellectual Freedom in

8          setting the agendas and our strategic direction of

9          the committee.

10   Q     When you say consult with the Office of Intellectual

11         Freedom, is this a national office located --

12   A     In Chicago.

13   Q     In Chicago.  Okay.  The Intellectual Freedom

14         Committee, though, is a national committee; correct?

15         It's not an Ohio --

16   A     Correct.

17   Q     -- version.  Okay.  Has the Intellectual Freedom

18         Committee taken an official position on the use of

19         Internet filters in public libraries?

20   A     Yes.

21   Q     Okay.  And what is that position?

22   A     They are opposed to Internet filters in any way that

23         they would impede access for information to any

24         library users.

25   Q     And you said "in any way"?                Page 20

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

Page 36

```
 1   A    I'd have to double-check.  Bess is, if I'm correct,

 2        Bess is also been known as N2-H2.  It's actually a

 3        company that's in the Pacific Northwest, I believe,

 4        and it's gone through several alliterations.

 5   Q    Has that filter product changed since you've been

 6        here for six years?  Besides upgrades.

 7   A    No.

 8   Q    Which may happen.  So it's always been Bess?

 9   A    To my knowledge.

10   Q    Who was involved in selecting that product?

11   A    Our computer services staff.  And their manager.  And

12        myself.  But what they did, they did a -- they did an

13        analysis of the marketplace, and as I recall, it was

14        based on quality of the product and pricing as well.

15   Q    Are you aware of whether there's been any concerns

16        from patrons who are minors who feel that they're

17        being denied access to appropriate content because of

18        Bess?

19   A    I'm not directly aware of that.

20   Q    When I asked you about your responsibilities as

21        executive director and about the library, you

22        provided some background about the district itself,

23        including the number of branches, the number of

24        people in the staff and the operating budget.  You

25        said there are eleven branches plus a main branch, so
```

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

1      twelve?

2   A   Yes.

3   Q   Total branches.  Okay.  What is the physical area

4       that this serves, that your district serves?  What is

5       the size of the district?

6   A   Oh, gosh.  It's hard to give you that in size and

7       square miles because we serve about, our population

8       that we serve is about 250,000.

9   Q   Okay.

10  A   And the reason it's hard to explain it to you is that

11      we are a composite of quite a few different school

12      districts, which is how public library districts in

13      the state of Ohio are defined.  And in our particular

14      case in this county it's actually kind of an odd

15      geographical configuration.

16  Q   Because, as you pointed out, you are one of seven --

17  A   Correct.

18  Q   -- library districts in the county?

19  A   Correct.

20  Q   Okay.  You serve 250,000 patrons?

21  A   Uh-huh.

22  Q   How many people are in the county, do you know?

23  A   I believe there are about 450,000.

24  Q   Okay.  So you serve a good --

25  A   Yeah.                        Page 22

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

1  Q   -- number of those people?

2  A   Right.

3  Q   All right.  What is the general demographic of this

4      county?

5  A   Actually I would say that our demographic is a little

6      bit of everything.  We have some very urban

7      characteristics in the city of Canton.  And some very

8      impoverished areas.  We have some very affluent areas

9      in the surrounding townships.  We have manufacturing,

10     we have a large manufacturer here, Timken, which is a

11     steel manufacturer.  We have a strong labor influence

12     in the area.  We have quite a few small universities

13     and colleges in the area.

14 Q   And you said you have two bookmobiles?

15 A   Two bookmobiles and two kidmobiles.

16 Q   With respect to how the branches are physically

17     organized, is there a children's room in every

18     branch?

19 A   There's a children's area.  Our branches range in

20     size from just literally like 1,500 feet to 20,000

21     square feet.

22 Q   Okay.  Do all of your library branches have Internet

23     usage computers?

24 A   Yes.

25 Q   Okay.  And is the policy the same at every branch?

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

| | | |
|---|---|---|
| 1 | A | I don't believe so.  Not to my knowledge anyway. |
| 2 | Q | Okay.  Have you ever been to Washington state? |
| 3 | A | Yes. |
| 4 | Q | Okay.  When was the last time you were in Washington? |
| 5 | A | American Library Association mid winter meeting. |
| 6 | | January of this year. |
| 7 | Q | Okay.  Have -- do you know where the NC -- I'm going |
| 8 | | to use the word NCLR throughout to stand for the |
| 9 | | North Central Regional Library system, but do you |
| 10 | | understand where their territory is? |
| 11 | A | Yes. |
| 12 | Q | Okay.  And what is your understanding of their |
| 13 | | territory? |
| 14 | A | Rural area in north central Washington state. |
| 15 | Q | Do you know the names of the counties that they |
| 16 | | serve? |
| 17 | A | I could not give them to you. |
| 18 | Q | Do you have an idea of the size in square miles of |
| 19 | | the district that they serve? |
| 20 | A | No. |
| 21 | Q | Do you have any concept of the number of employees |
| 22 | | that they have? |
| 23 | A | No. |
| 24 | Q | Have you ever been to an NCRL branch library? |
| 25 | A | No. |

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

Page 48

| | | |
|---|---|---|
| 1 | Q | Are you familiar with the scope of NCRL's services |
| 2 | | that they provide to their community? |
| 3 | A | No. |
| 4 | Q | Are you familiar at all with the demographics of the |
| 5 | | community that the NCRL serves? |
| 6 | A | Not specifically. |
| 7 | Q | What about an idea of the number of patrons? |
| 8 | A | No. |
| 9 | Q | Have you ever met NCRL's director, Dean Marney? |
| 10 | A | Not to my knowledge. |
| 11 | Q | Okay.  Have you met the director of branch services, |
| 12 | | Dan Howard? |
| 13 | A | I do not believe so. |
| 14 | Q | Have you ever spoken with anyone at NCRL? |
| 15 | A | No. |
| 16 | Q | In your own words, can you describe NCRL's Internet |
| 17 | | usage policy? |
| 18 | A | Based upon what I've read, secondhand knowledge, is |
| 19 | | that they provide filtered Internet access and they |
| 20 | | have a process set up whereas if an adult wishes to |
| 21 | | bypass the filler they have to go through a long, |
| 22 | | drawn-out process without any guarantee that they'll |
| 23 | | be able to bypass the filter. |
| 24 | Q | Okay.  Let's take that in a couple parts.  You said |
| 25 | | based on what you read.  What do you recall you read? |

Page 25

```
 1   A    Specifically that they provide filtered access and
 2        that there is a request process by which an adult
 3        wishing to access a site that is filtered may apply
 4        for.  But there is no guarantee that the library will
 5        agree to do that, nor is there necessarily what I
 6        would consider a timely process or a reasonable
 7        process for that request to take place.
 8   Q    Okay.  And I apologize, my question was poorly
 9        worded.  What was the source?
10   A    It would be a combination of verbal updates at
11        Intellectual Freedom Committee meetings and general
12        written summaries from Intellectual Freedom Committee
13        documents.
14   Q    Who is providing the verbal updates at the
15        Intellectual Freedom Committee meetings?
16   A    Well, Duncan Manville provided one at mid winter, and
17        then we have had, I've had informal conversations
18        with various staff at the OIF office.
19   Q    Have you ever read NCRL's policy?
20   A    I've glanced at it but it's been some time.
21   Q    Are you aware of the type of filtering product that
22        NCRL uses?
23   A    No.
24   Q    You said that, in your words, that if an adult wanted
25        to bypass it, it was a long, drawn-out process of
```

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

1  A  No.

2  Q  Okay.  And you have never accessed the Internet at an

3     NCRL computer; correct?

4  A  No.

5  Q  Okay.  And you don't have a specific understanding of

6     what is in fact filtered; correct?

7  A  No.

8  Q  Okay.  And you don't have a specific understanding of

9     how the review process works or what triggers the

10    review process; correct?

11 A  I believe I have a good general knowledge based upon

12    the background material that I've seen.

13 Q  Okay.  And this was what's been provided to you at

14    IFC meeting?

15 A  As well as --

16 Q  And staff?

17 A  And a verbal update from the ACLU.

18 Q  Do you have any problem with NCRL filtering

19    unprotected speech?

20 A  No.

21 Q  What about content that is potentially harmful to its

22    network?

23 A  No.

24 Q  Let me clarify that.  Network security.

25 A  Yes.

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

Oliver, Kenton

## ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:     Sarah Bradburn, et al v. North Central Regional Library
District
Dep. Date:     November 14, 2007
Deponent:      Kenton Oliver

## CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read |
|-----|-----|-----------|-------------|
| 36 | 25 | eleven branches | ten branches |
| 13 | 3 | eleven branches | ten branches |
| 18 | 19-25 | omission | Include "Freedom to Read Foundation" |

_____
                                Signature of Deponent

Kenton Oliver                          Sarah Bradburn, et al v. North Central Regional Library District

Page 65

1        C E R T I F I C A T E

2

3        I, KENTON OLIVER, do hereby certify that I

4    have read the foregoing deposition in the case of

5    SARAH BRADBURN, ET AL., Plaintiffs, versus NORTH

6    CENTRLA REGIONAL LIBRARY DISTRICT, Defendant, and

7    said deposition constitutes a true and correct

8    transcript of my testimony given at the specified

9    time.

10

11                                    KENTON OLIVER

12

13   Dated this 27th day of December, 2007

14        - - - - -

15   Subscribed and sworn to before me this 27th day of

16   December, 2007.

17

18                    Notary Public

19                    My commission expires _____

20        - - - - -        THERESA A. BULICZ
                           Notary Public, State Of Ohio
21                         My Commission Expires 4/3/10

22

23

24

25

713-683-0401    Digital Court Reporting and Video    713-683-8935

3abb95d3-e4e4-4883-a9fc-7f34a9cc7aaa

Page 29

CERTIFICATE

STATE OF OHIO        )
                     ) SS
STARK COUNTY         )

I, Laurie Maryl Hart, a Registered Merit Reporter and Notary Public in and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within named witness, KENTON OLIVER, was by me first duly sworn to tell the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony given was by me reduced to Stenotype and afterwards transcribed by computer-aided transcription, and that the foregoing is a true and correct transcription of the testimony so given by him as aforesaid.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified. I do further certify that I am not a relative, counsel or attorney of either party, or otherwise interested in the event of this action, nor is the court reporting firm with which I am affiliated under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Canton, Ohio, on this 19th day of November, 2007.

Laurie Maryl Hart
Laurie Maryl Hart, RMR & Notary Public.
My commission expires January 6, 2012.

Page 1

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF WASHINGTON
 2                     AT SPOKANE

 3      _____

        SARAH BRADBURN, PEARL        )   No. CV-06-327-EFS
 4      CHERRINGTON, CHARLES         )
        HEINLEN, and THE SECOND      )
 5      AMENDMENT FOUNDATION,        )
                                     )
 6                   Plaintiffs,     )
                                     )
 7               vs.                 )
                                     )
 8      NORTH CENTRAL REGIONAL       )
        LIBRARY DISTRICT,            )
 9                                   )
                     Defendant.      )
10
        _____
11
                DEPOSITION UPON ORAL EXAMINATION OF
12                   JUNE PINNELL-STEPHENS
13                     October 3, 2007
                       Seattle, Washington
14      _____
15

16

17                    Taken Before:
18          Cheryl L Hendricks, CCR #2274
                Certified Court Reporter
19                         of
            CAPITOL PACIFIC REPORTING, INC.
20        2401 Bristol Court SW, Olympia, WA 98502
            Tel (360) 352-2054  Fax (360) 705-6539
21
            Tacoma            Seattle          Aberdeen
22      (253) 564-8494    (206) 622-9919   (360) 532-7445
                Chehalis           Bremerton
23          (360) 330-0262     (360) 373-9032
24             www.capitolpacificreporter.com
            scheduling@capitolpacificreporting.com
25
```

```
 1        the concern happens to be.  And I would estimate that
 2        only 10 percent of concerns expressed actually end up in
 3        formal written complaints.
 4    Q   And these percentages are based on your personal
 5        experience?
 6    A   Yes.  I have no research to back it up.  It's just my
 7        feeling.
 8    Q   And when you say 10 percent of concerns expressed end up
 9        in formal complaints, in your experience are most of
10        these 10 percents regarding written texts or books,
11        materials, or any portion of that being electronic?
12    A   Any time there was a new format introduced there seemed
13        to be a flurry of complaints because it was a new
14        format, people weren't used to it and there was always
15        something they were concerned about.  But after they'd
16        been around for a while, the new formats, the complaints
17        would calm down because people were used to them.  And
18        I'm sure the thing -- we expected the same thing about
19        the Internet.
20    Q   Okay.  With respect to the Fairbanks Public Library, the
21        area that you were working, there's a main library --
22    A   Mm-hmm.
23    Q   -- which is Fairbanks and then there's another branch
24        that services which is the North Pole --
25    A   Mm-hmm.
```

```
 1   Q   -- or North Pole, probably not "The" North Pole.  Is
 2       that the extent of the actual physical branches?
 3   A   Those are the physical buildings.  But as I said, we
 4       took this van --
 5   Q   Right.
 6   A   -- which is, oh, maybe the length of this room, not a
 7       big one, like sort of a large RV or about that size.
 8       And there is -- there are some items that are actually
 9       shelved on that van.  And then they do take orders for
10       books from the collection because everybody can see our
11       catalogue online, of course, so they can order books
12       they want to be brought to either the drop site or in
13       the case of services to the senior centers, that's
14       another scheduled stop.
15   Q   Okay.  What can you tell me about the demographic of the
16       Fairbanks branch, the patrons that you serve?
17   A   Oh, boy.  Well, the community is about 25 percent
18       military and dependants.  It is also the location of the
19       largest university in the state and it's the flagship
20       for the university.  We have a large mining community.
21       And it's a transportation hub for all the communities
22       out in the interior.  It's also the last city before the
23       Haul Road starts up to Prudhoe Bay.  Its minorities, the
24       largest minority is -- consisted of Alaskan natives,
25       primarily Athabascan, some Inuit or Yup'ik Eskimos
```

```
 1        coming in.
 2                            (Interruption by the reporter.)
 3    A   Yup'ik, Y-u-p apostrophe i-k, I believe, and Inuit is
 4        I-n-u-i-t.  The Inuit Eskimos are from the top coastal
 5        area and the Yup'ik are from the sort of southwestern
 6        area.
 7              It's a -- it's mostly a very conservative area.
 8    Q   (By Ms. Monroe)  Meaning politically conservative?
 9    A   Yes.
10              And very, very independent.  They are lots of
11        people who live off the grid, that is, they have no
12        electricity, they have to haul water, and either they
13        try to grow or hunt or live on subsistence, subsistence
14        life-style.  So -- pardon me?
15    Q   No.  Go ahead.
16    A   Okay.  So it's a very, very different mix.  You could
17        never tell just sort of watching somebody walking down
18        the street what -- what group that person might belong
19        to and what their philosophies might be.  But there's a
20        lot of libertarian philosophy, I think.
21    Q   What is the physical size, to the best of your
22        recollection, of the Fairbanks branch?
23    A   The size of the branch?
24    Q   Mm-hmm.
25    A   In terms of volumes?
```

1    Q    In terms of square footage.

2    A    Oh, boy.  I'm really bad at that.  I don't know how big

3         it is.  I know we have about 300,000 volumes.

4    Q    Is it two stories?  One story?

5    A    One.

6    Q    Bigger than. . .  I'm trying to come up with a good

7         example.  Can I ask, how big is your home?  Do you know

8         the square footage size?

9    A    No.  Let's see.  I don't.  How embarrassing.  Let's see.

10        I can try and estimate it for you.

11   Q    Well, with comparison coming into this office today, is

12        it about -- from what you have seen from this office, is

13        it a large -- is it about the same size of what you have

14        seen --

15   A    I would say it's smaller than the floor.  I can't --

16        with all the cubbies --

17   Q    Yeah.

18   A    -- and breakups, it's hard to estimate space.  I would

19        guess -- let's see.  The Bothell library is no longer

20        the way it was when I was there.  I'm sorry.  I'm trying

21        to remember. . .  Hmm.  You know, it's just really

22        difficult to judge.

23   Q    How many rooms were there?

24   A    Well, there was the main library stacks area.  There

25        were four very small group study areas that would fit no

```
 1        more than -- the largest one would hold no more than
 2        eight people.  There was a quiet use room that held no
 3        more than three.  And this is all sort of tacked onto
 4        this main -- main room.  There was an area around a
 5        fireplace that was a quiet reading area and then more
 6        stacks and then the children's room.
 7              And then that was the end of the library section
 8        and then there was -- there were the security gates.
 9        Oh, the reference desk was about the first thing you saw
10        straight ahead, the circ desk on the left.  After the
11        security gates there were public bathrooms and there was
12        an auditorium that would hold about 250.
13   Q    Okay.  So it sounds fairly sizable.
14   A    Mm-hmm.
15   Q    Was the children's room separated from -- by a wall?
16   A    Yeah, there was a wall and most of it was glass.
17   Q    Any estimate of the number of patrons that the Fairbanks
18        branch served, for example, at the time that you
19        retired?
20   A    I would have to say this in terms of the entire -- of
21        the branch and here because so many people came in to
22        use the main library because the branch was so small.
23   Q    Okay.  So you're estimating both North Pole and
24        Fairbanks with this number?
25   A    The whole -- the whole borough --
```

1    Q    Okay.

2    A    -- which used -- we were primarily tasked with serving

3         the North Star Borough.  And the latest population was

4         about 86,000 and the size of the bureau -- of the

5         borough was about that of New Jersey.

6    Q    In physical size?

7    A    Yes.

8    Q    Specifically then with respect to the North -- with the

9         North Pole branch, what did that look like, much

10        smaller?

11   A    Yes, it was much smaller and more cramped.  They had --

12        oh, and -- well, in the -- let me go back.  The -- the

13        areas I described were public areas.  There were, of

14        course, pretty much a warren of staff areas.

15   Q    In Fairbanks?

16   A    Yeah.

17   Q    Okay.

18   A    In North Pole, the staff area is shrunk to a room

19        smaller than this, I would think.  And they had a

20        children's area and then stacks and reference all sort

21        of mashed together.  They were very crowded.

22   Q    So no walls separating?  It was an open room just

23        separated by aisles of books?

24   A    Well, and then the children room which was also then the

25        story room -- story time area was open but partially cut

1       off by a wall.

2   Q   Okay.  We will likely get into this in more detail

3       later.  But from reading your report, it sounds like at

4       one point the Internet terminals at the Fairbanks branch

5       and possibly the North Pole branch were not filtered.

6   A   That's right.

7   Q   Can you tell me from what period of time -- at what

8       point were Internet computers installed?

9   A   Oh, maybe '95.  I can't remember exactly.  Seems to me

10      it was almost eight years, between six and eight years,

11      that we did not have filters on our Internet stations.

12   Q   So assuming approximately 1995, then seven or eight

13      years later --

14   A   Mm-hmm.

15   Q   -- a filter was employed at both branches --

16   A   Mm-hmm.

17   Q   -- on their Internet computers?

18   A   Mm-hmm.

19   Q   What was the reason for the decision to install a

20      filter?

21   A   The Mayor --

22   Q   Of Fairbanks.

23   A   -- of Fairbanks at the North Star Borough decided that

24      it would be good public policy as well as a good

25      campaign issue to install filters and the assembly voted

1          to do so.

2                  We had decided previously -- the library staff,

3          we had looked at the cost benefit for putting them on.

4          We'd had no complaints from anybody about Internet use

5          at that point.  And we received approximately $2,500 a

6          year from E-Rate money, if that makes sense to you.

7     Q    Mm-hmm.

8     A    Okay.  I thought it might.  And ended up costing --

9          well, we figured it would cost us $26,000 to install an

10         adequate filtering system.

11    Q    What do you mean by adequate?

12    A    Well, one that had among the best ratings of those that

13         were available at the time.  I mean, some we -- that

14         were tested were clearly inappropriate.  And I can't

15         tell you the names of those.  The automated services

16         folks did most of the testing.  But there were reviews

17         written by a number of different organizations about the

18         various systems.

19    Q    And by best ratings, you mean performance ratings?

20    A    Mm-hmm.

21    Q    With respect to error rates?  Is that what you're

22         referring to?

23    A    Yes.

24    Q    Okay.  So before filters were installed what, if

25         anything, were you doing with respect to your Internet

1          stations to prevent children or other people from seeing

2          what was on someone's screen?

3    A    Well, as time went by we started putting -- installing

4          privacy. . .

5    Q    Screens?

6    A    Screens and stations.  We went through an expansion of

7          the library not long after the Internets went into

8          place.  And when we reopened after -- when that

9          expansion was done, we planned for stations with

10          recessed screens, so they are down underneath a table

11          and it's a glass tabletop and you look down through it.

12          And for those stations that had to be on the desktop,

13          some people with trifocals or other reading problems

14          needed a screen on the desktop, we provided privacy

15          screens that actually fit over the screen.

16                We directed the locations of these stations so

17          they would not be right in the largest line of traffic

18          and tried our best to minimize incidental viewing of

19          anything.  And one of the reasons we did that is that

20          our nonfiction collection was fully integrated, that is,

21          children's material, adult material, nonprint material

22          were all interfiled on the same shelves and to -- you

23          had to walk past the main groupings of Internet stations

24          to get to the nonfiction collection of the library.

25    Q    Okay.  Was the mayor's decision to ask you to install

```
 1        filters or the assembly's decision based in any part on
 2        the Children's Internet Protection Act?
 3   A    No.
 4   Q    No?
 5   A    Hmm-mm.
 6   Q    What was the timing of the mayor's decision?
 7   A    Oh, what was the -- the date of CIPA was '93; is that
 8        right?
 9   Q    I can't answer.
10   A    Oh, I'm sorry.  I can't remember the actual date of
11        CIPA.  Let me see if I can find it here.
12   Q    And just to make a record, you're looking at the report
13        that you prepared and disclosed to us?
14   A    Yes.
15   Q    Okay.  Well, maybe this will help.  To my question of
16        when the mayor --
17   A    Oh.
18   Q    -- asked you to install filters, that would have been
19        roughly maybe 2002?
20   A    It was after CIPA was adopted, I'm quite sure, because
21        we tried -- in our cost benefit analysis that I just
22        mentioned we would have received $2,500 or something
23        from E-Rate, which is the CIPA money.
24   Q    So you were having conversations at that time, roughly
25        1995, when the computers were installed about how to
```

1    Q    -- report which we will later introduce as an exhibit.

2         MR. MANVILLE:  And I don't believe we provided a

3         copy, I think, on this one.  We just provided a link.

4         MS. MONROE:  Okay.  Thanks.

5    Q    (By Ms. Monroe)  Do you share the ALA's position, you

6         personally share the ALA's position, on Internet

7         filtering?

8    A    That the use of filters that blocks protected speech is

9         a violation of the Library Bill of Rights?  Yes, I do.

10        A lot of people misunderstand what that

11        resolution says.  It doesn't say don't filter.  Just

12        that if you block protected speech, you're violating the

13        Library Bill of Rights.  If you can find a way to use a

14        filter that does not block protected speech, it's not a

15        violation of the Library Bill of Rights.

16   Q    So you recognize that there are categories of protected

17        and unprotected speech, correct?

18   A    Yes.

19   Q    Okay.  And can you explain what you believe falls under

20        the category of unprotected speech?

21   A    So far as I understand, it's speech that has been found

22        obscene in a court of law, child pornography, libelous

23        speech, treason or speech that endangers national

24        security, and in some states in the case of minors,

25        material that is -- people under 17 -- or under 18,

1      filters could be removed.

2    Q   This is at --

3    A   At the Loussac Library in Anchorage.

4    Q   So Loussac Library was filtering any content containing

5        ACLU information?

6    A   No, no.  They were filtering -- using the filter period

7        and --

8    Q   Okay.

9    A   -- they wouldn't remove it.

10   Q   I saw in your CV that you were awarded the Citizen

11       Activist of the Year by the ACLU in 1998?

12   A   Mm-hmm.

13   Q   Can you tell me if there was something specific that you

14       had done to earn their recognition?

15   A   '98 was -- was that -- I'm trying to think what -- what

16       incident that was.  '95 was the display.  I think it was

17       just helping them with a display.  Was it a display

18       issue?  May have been the filters.  I don't -- I don't

19       remember what -- what it was.  And that must have been

20       one of the years I was off the board.  I can't remember.

21   Q   Okay.

22   A   It just -- it just sort of flies by.  I'm sorry.

23   Q   That's fine.  Of the publications that you have authored

24       either in whole or in part as a collaboration, how many,

25       to your recollection, addressed the issue of Internet

CASE: Bradburn vs. NCRL

DATE TAKEN: October 3,2007

VENUE: Eastern District of Washington

REPORTER: Cheryl Hendricks

DEPONENT: June Pinnell-Stephens

## CORRECTION & SIGNATURE CERTIFICATE

I, June Pinnell-Stephens, hereby certify under penalty of perjury of the laws of the State of Washington that I have read my foregoing deposition taken the _3_ day of October and that to the best of my knowledge the transcript is true and accurate with the exception of the following corrections:

### CORRECTION

**PAGE**

13, line 25:  It's a reconsideration form.

24, line7:  "... not long after the Internet workstations ..."

34, line 6:  I did.  All but one of them occurred before I started working at the library, and it involved Conspectus and collection management directly related to my job.

37, line 12:  We currently happen to have on the board ...

46, line 2:  "... but freedom of speech generally.  The full statement is available at their web site."

46, line 19-22:  I wrote the article, "Asheim in Cyberspace," in American Libraries , Oct., 2002.  At that time, I was FTRF's treasurer.

56, line 9:  Yes.  Experience in Alaska and Washington

101, line 19:  "and - very few people in my experience have ...

112, line 24:  Yes.  As I testified earlier, I understand that the NCRL will not disable filters at the request of adults.

113, line 6:  Yes, as I testified earlier.

115, line 10-11:  Yes.  As I testified earlier, I understand that the NCRL will not disable filters at the request of adults.

Executed at Fairbanks, Alaska, on the 8 day of  November, 2007.

*June Pinnell-Stephens*
(Deponent's signature)

Page 44

1                        C E R T I F I C A T E

2

            I, CHERYL L. HENDRICKS, a duly authorized Court
3   Reporter and Notary Public in and for the State of
    Washington, residing at Olympia, do hereby certify;

4

            That the foregoing deposition of June
5   Pinnell-Stephens was taken before me on October 3, 2007,
    and thereafter transcribed to the best of my ability by
6   means of computer-aided transcription; that the
    deposition is a full, true, and complete transcript of
7   the testimony of said witness;

8           That the witness, before examination, was by me
    duly sworn to testify the truth, the whole truth, and
9   nothing but the truth, and the witness reserved
    signature;

10

            That I am not a relative, employee, attorney, or
11  counsel of any party to this action, or relative or
    employee of any such attorney or counsel, and I am not
12  financially interested in said action or outcome
    thereof;

13

            That upon completion of signature, if required,
14  I shall herewith securely seal the original transcript
    and serve same upon Tom Adams, counsel for the
15  Defendant.

16          IN WITNESS WHEREOF, I have hereunto set my hand
    and affixed my official seal this 15th day of October,
17  2007.

18

19

20

21                        _____

                          Cheryl L. Hendricks,
22                        CCR NO. 2274

23

24

25