UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

SARAH BRADBURN, PEARL
CHERRINGTON, CHARLES HEINLEN,
SECOND AMENDMENT FOUNDATION,

        Plaintiffs,

       v.

NORTH CENTRAL REGIONAL
LIBRARY DISTRICT,

        Defendant.

NO. CV-06-0327-EFS

**ORDER GRANTING AND DENYING IN PART DEFENDANT'S MOTION FOR CERTIFICATION AND HOLDING IN ABEYANCE THE MOTIONS FOR SUMMARY JUDGMENT**

A hearing was held in the above-captioned matter on April 23, 2008. Catherine Crump and Duncan Manville appeared on behalf of Plaintiffs Sarah Bradburn, Pearl Cherrington, Charles Heinlen, and the Second Amendment Foundation (collectively referred to as "Plaintiffs"). Thomas Adams appeared on behalf of Defendant North Central Regional Library District (NCRL). Before the Court were NCRL's Motion for Certification of Questions of State Constitutional Law (Ct. Rec. 37), NCRL's Motion for Summary Judgment (Ct. Rec. 28), and Plaintiffs' Motion for Summary Judgment (Ct. Rec. 39). After reviewing the submitted material and relevant authority and hearing from counsel, the Court was fully informed. This Order supplements and memorializes the Court's oral ruling granting and denying in part NCRL's certification motion and

ORDER ~ 1

holding in abeyance the motions for summary judgment, absent the standing issues, until the the to-be-certified state constitution Article I, § 5 issue(s) are resolved.

## I.  Facts[1]

**A.  Plaintiffs**

Sarah Bradburn, Pearl Cherrington, and Charles Heinlen are patrons of NCRL.  (Ct. Rec. 41 at 1-2.)  Each uses, or has used, computers made available to the public by NCRL to access the Internet.  *Id.* at 2.

Ms. Bradburn is a resident of Republic, Washington, and primarily uses NCRL's Republic branch for Internet access and other purposes.  *Id.* In October or November 2003, Ms. Bradburn attempted to conduct Internet research regarding alcohol and drug-addiction topics in connection with academic assignments.  *Id.* at 2.  Ms. Bradburn was unable to access certain Web sites relating to youth tobacco usage; she believes her access was blocked by NCRL's Internet filter, but she cannot recall the sites specifically.  *Id.* at 2-3; Ct. Rec. 57 at 21.  Ms. Bradburn completed her research in Spokane where she was attending school, and she did not tell NCRL staff of her access difficulties before filing suit.  (Ct. Rec. 41 at 3; Ct. Rec. 49 at 32.)  NCRL has had no opportunity to confirm that access was in fact blocked and, if so, whether access was blocked by the Internet filter, a transient network problem, or some other cause.  *Id.*  Ms. Bradburn seeks to have, on

---

[1]  This factual statement is based on the parties' Joint Statement of Uncontroverted Facts.  (Ct. Rec. 71.)

ORDER ~ 2

request, unfiltered Internet access for lawful purposes at her local NCRL branch. (Ct. Rec. 57 at 21.)

Ms. Cherrington is a resident of Twisp, Washington, and she primarily uses NCRL's Twisp branch. (Ct. Rec. 41 at 3.) Ms. Cherrington attempted to conduct Internet research on art and health-related topics in the summer of 2005 through NCRL's network using a computer in the Twisp branch. *Id.*; Ct. Rec. 57 at 21-22. NCRL's Internet filter denied Ms. Cherrington access to the Idaho art gallery Web site and a site containing health information, but she cannot recall the specific Web sites. (Ct. Rec. 41 at 3; Ct. Rec. 57 at 21-22.) After Plaintiffs filed their Complaint, Ms. Cherrington attempted to access the YouTube Web site. (Ct. Rec. 41 at 3; Ct. Rec. 57 at 21-22.) NCRL's current filter denied Ms. Cherrington access to YouTube. (Ct. Rec. 41 at 3; Ct. Rec. 57 at 21-22.) NCRL no longer blocks access to YouTube. (Ct. Rec. 29 at. 33.) Ms. Cherrington seeks to have, on request, unfiltered Internet access for lawful purposes at her local NCRL branch. (Ct. Rec. 57 at. 22.) Ms. Cherrington denies ever having seen a "Material Selection Review Form" – a form that NCRL made, and still makes, available to patrons requesting to unblock specific Web sites. *Id.* at 20.

Mr. Heinlen, a resident of Okanogan County, Washington, primarily uses NCRL's Omak and Okanogan branches. (Ct. Rec. 41 at 3.) Mr. Heinlen attempted to use NCRL computers to conduct Internet research, communicate with others via email, maintain a MySpace.com blog, obtain information on firearms, and access various dating sites and other Web sites. *Id.* at 3-4; Ct. Rec. 57 at 6. NCRL's Internet filter prevented him from

accessing images or photographs embedded in commercial emails sent to his Hotmail and Yahoo! Accounts, and to the Web sites listed in his answer to NCRL's Interrogatory No. 5 and his Declaration in Opposition to Defendant's Motion for Summary Judgment. (Ct. Rec. 41 at 4; Ct. Rec. 57 at 6.) On February 23, 2008, while using an NCRL computer at the Omak branch, Mr. Heinlen found that NCRL's Internet filter blocked access to the following Web sites under the category Nudity and Risque (except www.courting-disaster.com, which was blocked under the category "Adult Materials"):

www.netnude.com

aanr.com

www.artenuda.com/paintings2.asp

gregfriedler.com

billbrandt.com

www.ryoung-art.com

www.courting-disaster.com

www.mapplethorpe.org/index.html

fineartnude.com/webring

(Ct. Rec. 57 at 6.) Mr. Heinlen also attempted to access the "personals" section of craigslist.org on February 23, 2008, through an NCRL computer. *Id.* NCRL's Internet filter prevented him from doing so. *Id.* Mr. Heinlen wishes to access the Craigslist personals section. *Id.* Mr. Heinlen is the only person to have requested that NCRL's Internet filter be disabled during his computer sessions prior to this lawsuit. (Ct. Rec. 29 at 10; Ct. Rec. 62 at 20.) Mr. Heinlen maintains that his request to unblock a specific "personal Web site" in 2004 was denied.

ORDER ~ 4

(Ct. Rec. 57 at 20.)   Mr. Heinlen denies having seen a "Material Selection Review Form."  *Id.*  Mr. Heinlen seeks to have, on request, unfiltered Internet access for lawful purposes at his local NCRL branch. *Id.* at 23.

Second Amendment Foundation ("SAF"), a Washington non-profit corporation headquartered in Bellevue, Washington, is dedicated to issues associated with the constitutional right to keep and bear firearms. (Ct. Rec. 29 at 30-31; Ct. Rec. 41 at 4.)   SAF has approximately 650,000 contributing members and supporters throughout the United States – including about 1,000 in Chelan, Douglas, Ferry, Grant, and Okanogan Counties. (Ct. Rec. 41 at 4.)   SAF maintains the www.saf.org Web site and sponsors online publications, including Women & Guns ("The World's First Firearms Publication for Women") at www.womenandguns.com.  *Id.* at 4-5.   SAF wishes to communicate the Web site's content and sponsored publications to Internet users in North Central Washington.  *Id.* at 5. SAF was advised by one or more of its members that access to www.womenandguns.com was blocked on NCRL's computers. (Ct. Rec. 29 at 31; Ct. Rec. 41 at 5; Ct. Rec. 49 at 2.)   SAF has no personal knowledge or experience confirming that access to its sites were, in fact, blocked. (Ct. Rec. 29 at 31; Ct. Rec. 41 at 5; Ct. Rec. 49 at 2.) Plaintifff Heinlen attempted to access www.womenandguns.com in November 2006, but was prevented from doing so by NCRL's Internet filter. (Ct. Rec. 57 at 20.)   Before this lawsuit, NCRL had not received any report that access to www.womenandguns.com was blocked. (Ct. Rec. 29 at 31.) Access to www.womenandguns.com is not presently blocked, and NCRL does not contend that it should be blocked.  *Id.* SAF, however, is concerned

that NCRL will block that Web site (or another site sponsored by SAF) in the future. (Ct. Rec. 57 at 20.)

**B.    NCRL**

NCRL is an inter-county rural library district established in 1960 by the citizens of Chelan, Douglas, Ferry, Grant, and Okanogan Counties. (Ct. Rec. 29 at 2; Ct. Rec. 41 at 5.) NCRL was formed and operates under RCW 27.12 *et seq.* and other statutes applicable to inter-county rural library districts. *Id.* NCRL's mission is to promote reading and lifelong learning. (Ct. Rec. 29 at 6; Ct. Rec. 41 at 7.)

NCRL also is committed to supporting public education. (Ct. Rec. 29 at 4.) Twenty-six (26) school districts operate within NCRL's territorial reach. *Id.* In fourteen (14) of those districts, NCRL branch libraries serve as the *de facto* school library for children. *Id.*

NCRL, which maintains twenty-eight (28) branches and serves over 220,000 people, is funded by local property taxes, federal subsidies, private grants, and endowments. (Ct. Rec. 29 at 2-3.) NCRL receives federal assistance through the E-Rate program, which provides for discounted Internet access and other telecommunications services, and the Library Services and Technology Act, which provides for grants to public libraries. (Ct. Rec. 41 at 6.)

NCRL is managed and controlled by a Board of Trustees ("the Board"), which is responsible for issuing NCRL's policies. (Ct. Rec. 29 at 2.) The Board is comprised of two trustees from each of Chelan and Grant Counties, and one trustee from each of Douglas, Ferry, and Okanogan Counties. *Id.* NCRL's operations are overseen and managed by a Board-appointed director. *Id.* The director serves as liaison between the

Board and library employees. *Id.* Dean Marney, a NCRL employee since 1977, has served as NCRL's Director since being appointed in 1990. *Id.*

NCRL maintains a collection exceeding 675,000 books and other materials, all of which are available to patrons at any of NCRL's twenty-eight (28) branches or by order placed through NCRL's Web site, www.ncrl.org. *Id.* NCRL also offers its patrons access to materials by mail order. *Id.* NCRL's mail order service is one of the few remaining mail services in the United States. *Id.*

NCRL's branches vary in physical size, with the average size being approximately 2,865 square feet. *Id.* The largest is the Wenatchee branch, which is about 12,000 square feet of public area; the smallest is the Twisp branch, which is approximately 701 square feet of public space. *Id.* While there is a designated children's area in every NCRL branch, only one branch has a wall or other partition physically separating the children's section from the rest of the library. *Id.* Twenty (20) NCRL branches are staffed by one librarian. *Id.* Sixteen NCRL branches offer only one or two computers for public use in accessing the Internet. *Id.*

In furtherance of its mission, and to meet the diverse needs and interests of its patrons, NCRL provides public Internet access at all of its branches. (Ct. Rec. 41 at 7.) Internet access through the NCRL network is subject to two policies: the Internet Public Use Policy and the Collection Development Policy (hereinafter, collectively referred to as "the Policy"). (Ct. Rec. 29 at 6-9.) Dean Marney, NCRL's Director, and Dan Howard, NCRL's Director of Public Services, interpret and apply the Policy. (Ct. Rec. 29 at 2-3, 17; Ct. Rec. 41 at 9, 15; Ct. Rec. 49

1   at 12-13; Ct. Rec. 57 at 1; Ct. Rec. 59 at 5-6; Ct. Rec. 62 at 2.)

2   NCRL's Collection Development Policy states:

3       The North Central Regional Library District's Board of Trustees
        recognizes that the library was created to serve all of the
4       people within the District's service area, regardless of race,
        age, creed, or political persuasions.  The Board of Trustees
5       further recognizes that within the District's service area
        there are individuals and groups with widely disparate and
6       diverse interests, cultural backgrounds, and needs.  The Board
        of Trustees, therefore, declares as a matter of policy that:

7
        1.  The Collection Development Policy is based on and
8           reflects the District's mission, goals, and values as
            stated in the current Strategic Plan
9
        2.  Library materials shall be selected and retained in the
10          library on the basis of their value for the interest,
            information, and enlightenment of all the people of the
11          community in conformance with the District's mission.
            Some of the factors which will be considered in adding to
12          or removing materials from the library collection shall
            include: present collection composition, collection
13          development objectives, interest, demand, timeliness,
            audience, significance of subject, diversity of
14          viewpoint, effective expression, and limitation of budget
            and facilities.
15
            No library materials shall be excluded because of the
16          race, nationality, political, religious, or social views
            of the author. Not all materials will be suitable for all
17          members of the community.

18          The District shall be responsive to public suggestion of
            titles and subjects to be included in the library
19          collection. Gifts of materials may be accepted with the
            understanding that the same standards of selection are
20          applied to gifts as to materials acquired by purchase,
            and that any gifts may be discarded at the District's
21          discretion.

22          To ensure a vital collection of continuing value to the
            community, materials that are not well used may be
23          withdrawn.

24          The Director is responsible to the Board of Trustees for
            collection development.
25

26

ORDER ~ 8

The Director may delegate collection development activities to members of the staff who are qualified by reason of education and training.

3. The Board of Trustees believes that reading, listening to, and viewing library materials are individual, private matters. While individuals are free to select or to reject materials for themselves, they cannot restrict the freedom of others to read, view, or inquire. The Board of Trustees recognizes that parents have the primary responsibility to guide and direct the reading and viewing of their own minor children.

The Board of Trustees recognizes the right of individuals to question materials in the District collection. A library customer questioning material in the collection is encouraged to talk with designated members of the staff concerning such material. To formally state his or her opinion and receive a written response, a customer may submit the form provided for that purpose.

(Ct. Rec. 29 at 6-8.) NCRL's Internet Public Use Policy states:

The mission of the North Central Regional Library is to promote reading and lifelong learning. Internet access is offered as one of many information resources supporting that mission.

The Internet is currently an unregulated medium. While the Internet offers access to materials that are enriching to users of all ages, the Internet also enables access to some materials that may be offensive, disturbing, or illegal. There is no guarantee that information obtained through the Internet is accurate or that individuals are who they represent themselves to be. The library district recognizes that it cannot fully control the amount of material accessible through the Internet but will take reasonable steps to apply to the Internet the selection criteria stated in the Collection Development Guidelines and Procedures

All Internet access on NCRL library computers is filtered.

The library district does not host customer e-mail accounts or provide access to chat rooms.
The library district cannot guarantee privacy for individuals using library public access computers to search the Internet and computer screens may be visible to people of all ages, backgrounds, and sensibilities. Customers are requested to exercise appropriate discretion in viewing materials or submitting sensitive personal information. Minors, in particular, are discouraged from sharing personal information online.

Hacking and other unlawful online activities are prohibited.

The District's director is responsible for establishing procedures to carry out this policy.

*Id.* at 8-9.

Pursuant to the Policy, public Internet access through the NCRL network is filtered and has been filtered continuously since access began in the late 1990s. *Id.* at 5-6; Ct. Rec. 41 at 8. NCRL does not and will not disable the filter at the request of an adult patron. (Ct. Rec. 29 at 6; Ct. Rec. 41 at 8.)

**C. Internet Filtering at NCRL**

1. <u>How Filtering is Accomplished</u>

Prior to October 2006, NCRL filtered Web content using a software product called SmartFilter, Bess edition. (Ct. Rec. 41 at 13.) In October 2006, as part of a comprehensive network and cataloguing system upgrade, NCRL replaced its SmartFilter product with a Web-based filtering solution offered by Fortinet called the FortiGuard Web Filtering Service ("FortiGuard"). (Ct. Rec. 29 at 11; Ct. Rec. 41 at 13.) The FortiGuard service has two primary components: the FortiGuard Rating Server and the FortiGate firewall/proxy unit. (Ct. Rec. 35 at 2; Ct. Rec. 41 at 13.)

The FortiGuard Rating Server is a database maintained by Fortinet that catalogues more than 43 million Web sites and over two (2) billion individual Web pages. (Ct. Rec. 29 at 11; Ct. Rec. 35 at 2; Ct. Rec. 41 at 13) Using a combination of proprietary algorithms and human review, Fortinet sorts sites and pages into seventy-six (76) categories based on predominant content, and also assigns Web sites to one (1) of seven (7) classifications based on media types and sources. (Ct. Rec. 29 at 11;

ORDER ~ 10

Ct. Rec. 35 at 2-3; Ct. Rec. 41 at 12.) Any one may request that Fortinet review its classification of a particular Web site or page by using an electronic form available on the Fortinet site. (Ct. Rec. 29 at 12.)

A FortiGate unit is installed at each of NCRL's 28 branches. (Ct. Rec. 41 at 13.) The FortiGate unit is an appliance that acts as an intermediary between a user's computer browser and the servers. *Id.* All Internet traffic to and from NCRL's public use computers is routed through the FortiGate unit, which filters Web content in accordance with information provided by the Fortinet Rating Server and settings established by NCRL that define which categories and classifications of Web sites to block. (Ct. Rec. 29 at 13-15; Ct. Rec. 41 at 13-15.) If access to a Web site or page is denied, the computer user receives a message to that effect. (Ct. Rec. 41 at 15.) If access to an embedded image is denied, the user receives no message; instead, a blank image is substituted for the blocked image. *Id.*

2. NCRL's FortiGuard Configuration

The Internet site categories that NCRL's FortiGuard filter is configured to block – along with category descriptions provided by Fortinet – are listed below:

| Hacking | Websites that depict illicit activities surrounding the unauthorized modification or access to programs, computers, equipment and websites. |
|---|---|
| Proxy Avoidance | Websites that provide information or tools on how to bypass Internet access controls and browse the Web anonymously, includes anonymous proxy servers. |

| | |
|---|---|
| Phishing | Counterfeit web pages that duplicate legitimate business webpages for the purpose of eliciting financial, personal or other private information from the users. |
| Adult Materials | Mature content websites (18+ years and over) that feature or promote sexuality, strip clubs, sex shops, etc. excluding sex education, without the intent to sexually arouse. |
| Gambling | Sites that cater to gambling activities such as betting, lotteries, casinos, including gaming information, instruction, and statistics. |
| Nudity and Risque | Mature content websites (18+ years and over) that depict the human body in full or partial nudity without the intent to sexually arouse. |
| Pornography | Mature content websites (18+ years and over) which present or display sexual acts with the intent to sexually arouse and excite. |
| Web Chat | Websites that promote Web chat services. |
| Instant Messaging | Websites that allow users to communicate in "real-time" over the Internet. |
| Malware | Sites that are infected with destructive or malicious software, specifically designed to damage, disrupt, attack or manipulate computer systems without the user's consent, such as virus or trojan horse. |
| Spyware | Sites that host software that is covertly downloaded to a user's machine, to collect information and monitor user activity, including spyware, adware, etc. |

*Id.* at 16-17. NCRL also blocks the Image Search, Video Search, and Spam URL classifications of Web sites, as well as certain specific sites and pages within those sites.[2]

_____

[2] NCRL blocks netvue.com and pixsy.com, and certain pages within Web sites, including: ask.com/images, ask.com/pictures, search.live.com/images, images.google.com and images.search.yahoo.com (image search engines); and craigslist.org/cgi-bin/personals.cgi (a

ORDER ~ 12

3. <u>Accessibility of Blocked Internet Sites</u>

If a NCRL patron wishes to access a Web site or page that is blocked by FortiGuard, the patron may ask NCRL to manually override the filter by sending an email to NCRL administrators. (Ct. Rec. 29 at 17; Ct. Rec. 41 at 8-9.) When a request is submitted, the Web site or page at issue is reviewed to determine whether allowing access would be consistent with NCRL's mission, its Policy, and the Childrens Internet Protection Act's (CIPA) requirements. (Ct. Rec. 29 at 17; Ct. Rec. 41 at 8; Ct. Rec. 49 at 4, 8.) If the request is approved, access is allowed on all public computers in all branches. (Ct. Rec. 41 at 8.) If, on the other hand, NCRL deems the request to be inconsistent with its mission, its Policy, or CIPA, the request is denied. (Ct. Rec. 29 at 17; Ct. Rec. 41 at 8; Ct. Rec. 49 at 4, 8.) NCRL received 92 requests to unblock access to Web sites (including 90 automated requests) between October 1, 2007, and February 20, 2008. (Ct. Rec. 57 at 7.) Of those 90 automated requests, NCRL responded as follows:

- within less than an hour to eight (8) of the requests;
- within the same day to nineteen (19) of the requests;
- the day after twenty-nine (29) of the requests;

---

personals site). (Ct. Rec. 41. at 17.) Since it implemented the FortiGuard filter, NCRL initially blocked but susquently unblocked the YouTube, MySpace, and Craigslist Web sites (excluding the personals section of the Craigslist site). (Ct. Rec. 29 at 33; Ct. Rec. 41 at 17-18.)

1     •     more than twenty-four (24) hours, but less than three days,
2           after twenty (20) of the requests
3     •     more than three (3) days after five (5) of the requests; and
4     •     there is no evidence in the record if NCRL responded to the
5           remaining eleven (11) requests.

6     Since October 1, 2007, NCRL unblocked sites upon request on twelve
7     (12) occasions.  *Id.*  Examples of sites unblocked at a patron's request
8     include: www.keyartpromotions.com, artbyjohndan.com (described by the
9     requestor as "non-offensive, mostly abstract art"), www.pcthandbook.com
10    (erroneously blocked as Pornography), www.firstthings1st.com (described
11    by the requestor as a nonprofit ministry but erroneously blocked as
12    Gambling), and www.ourfamily-web.com (erroneously blocked as Malware).
13    *Id.* at 7-8.  FortiGuard also blocked access to the Kalispel tribe's Web
14    site under the "Gambling" category, even though the site did not itself
15    allow any online gambling; upon a patron's request, NCRL unblocked access
16    to the tribe's Web site while the patron was in the library researching
17    employment opportunities.  (Ct. Rec. 57-3 at 210-13.)

18          4.   The FortiGuard Filter's Error Rates

19    Like all Internet filters, the FortiGuard filter makes mistakes.
20    (Ct. Rec. 41 at 18.)   In some instances, NCRL patrons were able to
21    obtain pornographic, sexually explicit, child pornographic, or obscene
22    materials online at NCRL branch libraries.  (Ct. Rec. 29 at 23; Ct. Rec.
23    41 at. 18.)  In other instances, NCRL patrons were unable to access sites
24    that should not be blocked.  (Ct. Rec. 41 at 18-19.)

25    Plaintiffs' expert Bennett Haselton tested the FortiGuard filter's
26    accuracy, describing his methodology and results in an expert report.

*Id.* at 19.  Mr. Haselton determined that of 100,000 randomly-selected .com domains, FortiGuard blocked 536 "real" Web pages as Pornography or Adult Materials, and that of those blocked sites 64 were blocked in error, for an error rate of 11.9%.  *Id.*  Mr. Haselton determined that of 100,000 randomly-selected .org domains, FortiGuard blocked 207 "real" Web pages as Pornography or Adult Materials, and that of those blocked sites 49 were blocked in error, for an error rate of 23.6%.  *Id.*

NCRL's expert, Dr. Paul Resnick, conducted his own study based on the URLs that were actually visited or requested at NCRL branch libraries during the week of August 23-29, 2007.  (Ct. Rec. 29 at 28; Ct. Rec. 57 at. 17.)  Dr. Resnick found that, of the 60,000 URLs that were visited or requested during the week of August 23-29, 2007, 2,180 URLs were blocked by the FortiGuard filter under NCRL's filtering policy; and that of those 2,180 URLs:

- 289 complete Web pages were blocked, with 20 of those blocked in error;

- 1,406 "helper images" (that is, "little images that are parts of web pages") were blocked, with 744 of those blocked in error;

- 194 "other images" were blocked, with 24 of those blocked in error; and

- 110 URLs were not "ratable" – meaning that Dr. Resnick could not determine whether they had been correctly blocked.

(Ct. Rec. 57 at 17-19; Ct. Rec. 62 at 17-18.)

**D.  Filtering Alternatives**

NCRL installed privacy screens on terminals in its Wenatchee branch when Internet access was first provided in approximately 1999, but

ORDER ~ 15

1  removed the screens shortly thereafter.  (Ct. Rec. 41 at 20; Ct. Rec. 49

2  at 16.)   Since 1999, NCRL has not considered any other alternatives to

3  full-time Internet filtering, such as recessed desks or a tap-and-tell

4  policy.  (Ct. Rec. 41 at 21; Ct. Rec. 49 at 17.)   NCRL expects branch

5  librarians to monitor and respond to complaints of inappropriate public

6  computer use.  (Ct. Rec. 29 at 23.)

7  **E.    The Complaint**

8       Plaintiffs challenge the Policy's constitutionality - in particular,

9  NCRL's decisions to not disable the Internet filter at the request of an

10 adult.  Plaintiffs claim the Policy violates the First Amendment of the

11 U.S. Constitution and Article I, § 5 of the Washington Constitution.

12 They seek permanent injunctive relief requiring NCRL to turn off Internet

13 filtering upon an adult patron's request.

14 **II.  Defendant North Central Regional Library District's Motion for**

15 **Certification of Questions of State Constitutional Law (Ct. Rec. 37)**

16      The  threshold  motion  before  the  Court  is  NCRL's  certification

17 motion.   NCRL  asks  the  Court  to  certify  standing  and  constitutional

18 issues  to  the  Washington  Supreme  Court  pursuant  to  RCW  2.60.020.[3]

19 Plaintiffs  oppose  the  motion  because  certification  is  an  unnecessary

20 ────────────────────

21      [3]  The two certification questions posed by NCRL are:

22      1.    Whether Plaintiffs have standing to challenge on state
             constitutional grounds NCRL's Internet Use Policy and
23           practice pursuant to which NCRL elects not to disable
             internet filtering upon the request of library adult
24           patrons.

25      2.    If Plaintiffs have standing, whether NCRL's Internet Use
             Policy and practice is permissible under Article 1, § 5
26           of the Washington State Constitution.

complication that will burden this Court, the state court, and the parties.

**A.    Standard**

RCW 2.60.020 states:

> When in the opinion of any federal court before whom a proceeding is pending, [1] it is necessary to ascertain the local law of this state in order to dispose of such proceeding and [2] the local law has not been clearly determined, such federal court *may* certify to the supreme court for the answer the question of local law involved and the supreme court shall render its opinion in answer thereto.

RCW 2.60.020 (2008) (emphasis added).

**B.    State Constitutional Issue(s)**

NCRL asks the Court to certify to the Washington Supreme Court Plaintiffs' Washington Article 1, § 5 constitutional challenge to the Policy.

> 1.    "Necessary to ascertain the local law of this state in order to dispose of such proceeding"

Plaintiffs challenge NCRL's Policy on both state and federal constitutional grounds.  Defendants highlight the federal "doctrine that federal courts should not decide federal constitutional issues when alternative grounds yielding the same relief are available." *Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 856 (9th Cir. 2004); *Barnes-Wallace v. City of San Diego*, 471 F.3d 1038, 1046-47 (9th Cir. 2007) (citing to *City of Mesquite v. Aladdin's Castle*, 455 U.S. 282, 295 (1982)).  In compliance with this directive, the First Amendment issue need not be reached if Washington Article 1, § 5 provides Plaintiffs with the relief they request - invalidation of the Policy.

ORDER ~ 17

In their motion for summary judgment, Plaintiffs argue Article 1, § 5 is more protective than the First Amendment with respect to overly broad governmental policies. This is correct if the policy is so overbroad that it leads to a prior restraint. *See O'Day v. King County*, 109 Wn. 2d 796, 804 (1988). "Unlike the First Amendment, [A]rticle 1, section 5 categorically rules out prior restraints on constitutionally protected speech under any circumstances." *Id.*

> Chilling of free speech is the product of state action, which exists if "the conduct allegedly causing the deprivation of a federal right [is] fairly attributable to the State." This court has concluded that the Washington Constitution is less tolerant of overly broad restrictions on speech than the Federal First Amendment and that "regulations that sweep too broadly chill protected speech prior to publication, and thus may rise to the level of a prior restraint", while the United States Supreme Court "considers the overbreadth doctrine 'strong medicine', employing it only as a 'last resort.'

*Soundgarden*, 123 Wn.2d at 764-65; *see also Voter Educ. Comm. v. Public Disc. Comm.*, 161 Wn. 2d 470, 496 (2007).[4]

Because Plaintiffs argue that the Policy is overbroad, and Washington Constitution Article 1, § 5 provides greater protection against policies that rise to the level of a prior restraint, the Court

_____

[4] The Washington Supreme Court determined that Article 1, § 5 disallows prior restraints and, therefore, a *Washington v. Gunwall*, 106 Wn.2d 54, 58 (1986), analysis is not needed to determine whether the Washington Constitution provides a separate and independent grounds of decision as compared to the federal constitution. *See Voters Educ. Comm. v. Wash. State Public. Disclosure Comm'n*, 161 Wn.2d 470, 494 n.16 (2007); *Ino Ino Ino v. City of Bellevue*, 132 Wn.2d 103, 114-22 (1997).

ORDER ~ 18

finds that a ruling in Plaintiffs' favor on Article 1, § 5 will provide Plaintiffs with the relief requested. Accordingly, the Washington state constitutional issue(s) must be resolved before the First Amendment issue(s). RCW 2.60.020's first requirement is satisfied.

2. "Local law has not been clearly determined"

NCRL contends Washington law has not clearly determined a state library's discretionary authority to filter public Internet access. Plaintiffs contend Washington constitutional law is clearly determined and that this Court is in just as good of a position as the Washington Supreme Court to analyze the state constitutional issue(s). The two cases cited by Plaintiffs set forth Washington's overbreadth principles but do not clearly address whether a library's public Internet filter use violates Article 1, § 5: *Soundgarden v. Eikenberry*, 123 Wn. 2d 750, 764, and *O'Day v. King County*, 109 Wn.2d 796, 803-04 (1988).

In fact, there are only three reported cases addressing Internet filter use in public libraries: *United States v. American Library Association*, 539 U.S. 94 (2003); *Miller v. NW Region Library Bd.*, 348 F. Supp. 2d 563, 569-70 (M.D.N.C. 2004); and *Mainstream Loudoun v. Board of Trustees of the Loudoun County Public Library*, 24 F. Supp. 2d 552 (E.D. Va. 1998) - none are Washington decisions. The U.S. Supreme Court's decision in *American Library Association* indicates that the nature of the library's mission and functions are critical components to consider when determining whether a library's Internet-filtering system violates free speech rights. 539 U.S. 94 (upholding CIPA following a challenge under Congress' spending power). But, it is presently unclear how Washington will balance a library's mission and functions with an adult's free

speech rights under Article 1, § 5, especially in light of CIPA, 20 U.S.C. § 9134(f). Accordingly, the Court finds the second requirement of RCW 2.60.020 is met.

3. "May Certify"

The parties disagree as to whether certification is best. NCRL contends certification will promote state and federal comity; Plaintiffs contend that certification will burden the state court and cause delay and expense.

The Court acknowledges that certification is not required; rather, it is a within this Court's discretion. Since the Washington Supreme Court is in a better position than this Court to determine what role a state library's mission and functions play in the Article 1, § 5 analysis, the Court finds certification appropriate. Any delay caused by certification is not of great concern to the Court given that this case, which was filed in November 2006, advanced to the summary-judgment stage slowly at the parties' request. Therefore, the Court denies Plaintiffs' request for Order requiring NCRL to bear the costs associated with certification.

**C. Standing Issues**

NCRL argued that standing is intertwined with the constitutional issues; the Court disagrees. The Court can determine whether Plaintiffs suffered an injury in fact without determining whether the Policy violates either the First Amendment or Article 1, § 5. Therefore, below, the Court will consider the standing issues under the clearly-established federal standing principles. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

ORDER ~ 20

**D.    Conclusion**

The Court finds it is necessary to ascertain Washington law with respect to a library's public computer Internet filtering because Article 1, § 5 provides broader coverage from an overly broad governmental policy than the First Amendment.  Washington law does not clearly define what role a state library's mission and functions play in analyzing whether a library's Internet-filtering policy violates Article 1, § 5. Therefore, the Court exercises its discretion to certify the state constitutional issue(s) to the Washington Supreme Court.  However, the Court denies NCRL's request to certify standing issues, which the Court addresses below.

### III.    Motions for Summary Judgment

The parties filed cross-motions for summary judgment.  Because the Court elects to certify the state constitutional issue(s) to the Washington Supreme Court, the Court holds in abeyance the motions for summary judgment pertaining to the constitutionality of NCRL's Internet-filtering system.  NCRL's motion for summary judgment preliminarly asked the Court to find that Plaintiffs lack standing to raise the constitutional challenges.  Because the Court finds the question of standing is separate and apart from the filtering system's constitutionality, the Court addresses that portion of NCRL's motion.

**A.    Summary Judgment Standard**

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." FED. R. CIV. P. 56(c).  Once a party has moved for summary judgment, the opposing party must point to specific facts establishing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion. *Id.* at 322.  "When the moving party has carried its burden of [showing that it is entitled to judgment as a matter of law], its opponent must do more than show that there is some metaphysical doubt as to material facts.  In the language of [Rule 56], the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (citations omitted) (emphasis in original opinion).

When considering a motion for summary judgment, a court should not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  This does not mean that a court will accept as true assertions made by the non-moving party that are flatly contradicted by the record. *See Scott v. Harris,* 127 S. Ct. 1769, 1776 (2007).

**B.  Standing**

NCRL argues Plaintiffs do not have standing to bring "as applied" challenges.  To bring an "as applied" challenge to a statute, the traditional standing rules apply: a litigant must establish injury in

fact, causation, and redressability.[5]  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The Supreme Court, however, has altered its traditional standing rules to permit First Amendment facial overbreadth attacks on a statute.  *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984); *Broadrick v. Oklahoma*, 413 U.S. 61, 612 (1973).

The Court finds SAF has standing to bring an "as applied" challenge. Although SAF does not have evidence that their Web sites were/are blocked by the filter, Plaintiff Heinlen testified that he tried to access one of SAF's Web sites and was denied access by the filter.  Accordingly, the Policy caused an injury in fact to SAF, as it is uncontested that this site should not be blocked.

Next, the Court finds Ms. Cherrington also presented sufficient evidence that she suffered an injury in fact due to NCRL's Policy.  The Court concludes it is not necessary that Plaintiffs identify the URL of the Web site that the filter blocked, but rather allege that they experienced an inability to access a Web site due to the filter.  Ms. Cherrington did so.  Ms. Bradburn, however, was unable to testify as to the cause of her inability to view the desired Web site.  Accordingly, the Court finds Ms. Bradburn failed to present sufficient evidence of an

---

[5]  "Injury in fact" requires evidence of "an invasion of a legally-protected interest which is concrete and particularized and actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560.

injury caused by the Policy to have standing to bring an "as applied" challenge to the Policy; she may, however, pursue a facial challenge.[6]

Lastly, the Court finds Mr. Heinlen has standing to bring an "as applied" challenge to the Policy. Mr. Heinlein was able to list a variety of Web sites that he was not able to view because of the filter. These Web sites are currently unblocked; however, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Aladdin's Castle*, 455 U.S. at 289; *see also Loudoun*, 24 F. Supp. 2d at 558-59.

Accordingly, NCRL's motion is granted (Ms. Bradburn may only bring a facial challenge) and denied in part (all other Plaintiffs may bring an as applied challenge).

### IV. CONCLUSION

For the reasons given above, **IT IS HEREBY ORDERED:**

1. Defendant North Central Regional Library District's Motion for Certification of Questions of State Constitutional Law **(Ct. Rec. 37)** is **GRANTED** (constitutional issue(s)) **AND DENIED** (standing) **IN PART.**

2. Defendant NCRL's Motion for Summary Judgment **(Ct. Rec. 28)** is **GRANTED** (Ms. Bradburn may only bring a facial challenge), **DENIED** (all

---

[6] In a facial challenge, the court looks only at the language of the policy to determine whether it violates the constitution. *JJR, Inc. v. City of Seattle*, 126 Wn.2d 1, 3 (1995)

ORDER ~ 24

other Plaintiffs have standing to bring as applied challenge), **AND HELD IN ABEYANCE IN PART** (constitutional issues).

3. Plaintiffs' Motion for Summary Judgment **(Ct. Rec. 39)** is **HELD IN ABEYANCE.**

4. The remaining pretrial deadlines, pretrial conference, and trial are **STRICKEN.**

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and provide copies to counsel.

**DATED** this ____30th____ day of September 2008.


_____s/ Edward F. Shea_____
EDWARD F. SHEA
United States District Judge

Q:\Civil\2006\0327.certif.msj.frm

ORDER ~ 25