

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE _____ MAY 0 6 2010

Madsen C. J.
CHIEF JUSTICE

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CERTIFICATION FROM THE UNITED STATES DISTRICT FOR THE EASTERN DISTRICT OF WASHINGTON IN SARAH BRADBURN; PEARL CHERRINGTON; CHARLES HEINLEN; and the SECOND AMENDMENT FOUNDATION, | ) ) ) ) ) ) ) ) ) | No. 82200-0 |
| Plaintiffs, | ) ) | |
| v. | ) ) | En Banc |
| NORTH CENTRAL REGIONAL LIBRARY DISTRICT, | ) ) ) | |
| Defendants. | ) ) ) | Filed    MAY 0 6 2010 |

MADSEN, C.J.—The question in this case has been certified to us from the

United States District Court for the Eastern District of Washington:

> Whether a public library, consistent with Article I, § 5 of the Washington
> Constitution, may filter Internet access for all patrons without disabling
> Web sites containing constitutionally-protected speech upon the request of
> an adult library patron.[1]

---

[1] The defendant, North Central Regional Library District, suggests that the question is better
understood if read to mean:
> Whether a public library, consistent with Article I, § 5 of the Washington
> Constitution, may filter Internet access for all patrons without disabling *the filter
> to allow access to* Web sites containing constitutionally-protected speech upon the
> request of an adult library patron.

No. 82200-0

We conclude that a library can, subject to the limitations set forth in this opinion, filter Internet access for all patrons, including adults, without violating article I, section 5 of the Washington State Constitution.

FACTS

The facts summarized here are taken from the district court's order granting in part and denying in part defendant North Central Regional Library's (NCRL) motion for certification. *Bradburn v. N. Cent. Reg'l Library Dist.*, CV-06-0327-EFS, Order Granting and Den. in Part Def.'s Mot. for Cert. and Holding in Abeyance the Mots. for Summ. J. (E.D. Wa. Sept. 30, 2008) (hereafter Order).

NCRL is an intercounty rural library district with 28 branch libraries, established in 1960 by citizens of Chelan, Douglas, Ferry, Grant, and Okanogan Counties. Its mission is to promote reading and lifelong learning. It is also committed to support of public education, with 26 school districts operating within its area. In 14 of these districts, the branch libraries act as de facto school libraries. NCRL is managed and controlled by a board of trustees that is responsible for its policies.

NCRL maintains a collection of more than 675,000 books and other materials that are available to its patrons at the branch libraries, by order through its web site, or by mail order. The branch libraries vary in size from 701 square feet of public area to 12,000 square feet, with an average of 2,865 square feet. Only one branch has a wall or

---

We agree that the added language better conveys the issue in the case because NCRL has no ability (or authority) to disable the web sites themselves. Rather, the issue concerns the patrons' access to web sites via NCRL's computer terminals. With this clarification, we address the certified question.

No. 82200-0

partition separating the children's section of the library from the rest of it. Twenty of the branches are staffed by one librarian.

NCRL provides public Internet access in all of its branches in furtherance of its mission and to meet the diverse needs and interests of its patrons. This access is subject to two policies, the Collection Development Policy and the Internet Public Use Policy. NCRL's director and director of public services interpret and apply these policies.

NCRL's Collection Development Policy states:

The North Central Regional Library District's Board of Trustees recognizes that the library was created to serve all of the people within the District's service area, regardless of race, age, creed, or political persuasions. The Board of Trustees further recognizes that within the District's service area there are individuals and groups with widely disparate and diverse interests, cultural backgrounds, and needs. The Board of Trustees, therefore, declares as a matter of policy that:

1. The Collection Development Policy is based on and reflects the District's mission, goals, and values as stated in the current Strategic Plan.

2. Library materials shall be selected and retained in the library on the basis of their value for the interest, information, and enlightenment of all the people of the community in conformance with the District's mission. Some of the factors which will be considered in adding to or removing materials from the library collection shall include: present collection composition, collection development objectives, interest, demand, timeliness, audience, significance of subject, diversity of viewpoint, effective expression, and limitation of budget and facilities.

No library materials shall be excluded because of the race, nationality, political, religious, or social views of the author. Not all materials will be suitable for all members of the community.

The District shall be responsive to public suggestion of titles and subjects to be included in the library collection. Gifts of materials may be accepted with the understanding that the same standards of selection are applied to

No. 82200-0

gifts as to materials acquired by purchase, and that any gifts may be discarded at the District's discretion.

To ensure a vital collection of continuing value to the community, materials that are not well used may be withdrawn.

The Director is responsible to the Board of Trustees for collection development.

The Director may delegate collection development activities to members of the staff who are qualified by reason of education and training.

3. The Board of Trustees believes that reading, listening to, and viewing library materials are individual, private matters. While individuals are free to select or to reject materials for themselves, they cannot restrict the freedom of others to read, view, or inquire. The Board of Trustees recognizes that parents have the primary responsibility to guide and direct the reading and viewing of their own minor children.

The Board of Trustees recognizes the right of individuals to question materials in the District collection. A library customer questioning material in the collection is encouraged to talk with designated members of the staff concerning such material. To formally state his or her opinion and receive a written response, a customer may submit the form provided for that purpose.

Order at 8-9. NCRL's Internet Public Use Policy states:

The mission of the North Central Regional Library is to promote reading and lifelong learning. Internet access is offered as one of many information resources supporting that mission.

The Internet is currently an unregulated medium. While the Internet offers access to materials that are enriching to users of all ages, the Internet also enables access to some materials that may be offensive, disturbing, or illegal. There is no guarantee that information obtained through the Internet is accurate or that individuals are who they represent themselves to be. The library district recognizes that it cannot fully control the amount of material accessible through the Internet but will take reasonable steps to apply to the Internet the selection criteria stated in the Collection Development Guidelines and Procedures.

4

No. 82200-0

> All Internet access on NCRL library computers is filtered.
>
> The library district does not host customer e-mail accounts or provide access to chat rooms.
>
> The library district cannot guarantee privacy for individuals using library public access computers to search the Internet and computer screens may be visible to people of all ages, backgrounds, and sensibilities. Customers are requested to exercise appropriate discretion in viewing materials or submitting sensitive personal information. Minors, in particular, are discouraged from sharing personal information online.
>
> Hacking and other unlawful online activities are prohibited.
>
> The District's director is responsible for establishing procedures to carry out this policy.

*Id.* at 9-10.

In October 2006, following its earlier use of other software, NCRL implemented the "FortiGuard Web Filtering Service," a widely used filtering service. Using proprietary algorithms and human review, FortiGuard sorts web sites into 76 categories based upon predominant content. The database catalogues over 43 million web sites and over 2 billion individual web pages. It is continually updated. Anyone can ask for FortiGuard to review its classification of a particular site or page by using an electronic form available on the Fortinet site.

A FortiGate unit, which acts as an intermediary between a computer's browser and the server, is installed at each of NCRL's 28 branches. All Internet traffic on NCRL's public computers is routed through one of these units, which filters content.

NCRL's FortiGuard filter is configured to block the following of the 76 categories that can be blocked using the FortiGuard system:

5

No. 82200-0

Hacking:  Websites that depict illicit activities surrounding the unauthorized modification or access to programs, computers, equipment and websites.

Proxy Avoidance:  Websites that provide information or tools on how to bypass Internet access controls and browse the Web anonymously, includes anonymous proxy servers.

Phishing:  Counterfeit web pages that duplicate legitimate business webpages for the purpose of eliciting financial, personal or other private information from the users.

Adult Materials:  Mature content websites (18+ years and over) that feature or promote sexuality, strip clubs, sex shops, etc. excluding sex education, without the intent to sexually arouse.

Gambling:  Sites that cater to gambling activities such as betting, lotteries, casinos, including gaming information, instruction, and statistics.

Nudity and Risqu[é]:  Mature content websites (18+ years and over) that depict the human body in full or partial nudity without the intent to sexually arouse.

Pornography:  Mature content websites (18+ years and over) which present or display sexual acts with the intent to sexually arouse and excite.

Web Chat:  Websites that promote Web chat services.

Instant Messaging:  Websites that allow users to communicate in "real-time" over the Internet.

Malware:  Sites that are infected with destructive or malicious software, specifically designed to damage, disrupt, attack or manipulate computer systems without the user's consent, such as virus or trojan horse.

Spyware:  Sites that host software that is covertly downloaded to a user's machine, to collect information and monitor user activity, including spyware, adware, etc.

*Id.* at 11-12.

NCRL also blocks the Image Search, Video Search, and Spam classifications, certain specific image search web sites, and the "personals" section of craigslist.org. NCRL also initially blocked but subsequently unblocked access to youtube.com, myspace.com, and craigslist.org (except for the "personals" section).

In addition, to qualify for certain federal funding, i.e., discounted Internet access and grants available to state libraries, NCRL is required to certify its compliance with the

6

No. 82200-0

Children's Internet Protection Act (CIPA), Pub. L. No. 106-554, 114 Stat. 2763A-335

(codified at 20 U.S.C. § 6777, 20 U.S.C. § 9134, 47 U.S.C. 254(h) (2004)).  As explained

in *United States v. American Library Ass'n*, 539 U.S. 194, 123 S. Ct. 2297, 156 L. Ed. 2d

221 (2003) (hereafter *A.L.A.*), CIPA requires libraries to employ measures that prohibit

access by minors to depictions that are obscene, child pornography, or otherwise harmful

to minors.

NCRL also has a policy that its Internet filter not be disabled at the request of an

adult patron.  This means that if material is appropriately blocked under the Internet Use

Policy, it is not unblocked upon request.  However, if the material is erroneously blocked,

it can be unblocked upon request.

Plaintiffs Sarah Bradburn, Pearl Cherrington, and Charles Heinlen are patrons of

NCRL who use or have used computers that NCRL has made available to access the

Internet.  Each claims that access to certain web sites was blocked by NCRL's Internet

filter.  Plaintiff Second Amendment Foundation (SAF) is a Washington nonprofit

corporation dedicated to issues associated with the constitutional right to keep and bear

firearms, with about 1,000 members in the counties served by NCRL.  SAF has a web

site and sponsors on-line publications, including Women and Guns.  SAF was advised by

a member or members that access to its publication www.womenandguns was blocked on

NCRL's computers.  Prior to this lawsuit, NCRL had not received any report that this site

was blocked and does not contend that it should be blocked.  It is not presently blocked.

SAF is concerned about possible future blocking.

No. 82200-0

Plaintiffs brought suit against NCRL, challenging the filtering policy's constitutionality and, in particular, NCRL's decision that it would not disable the filter at the request of an adult (except in the case of a site being blocked when it did not in fact fall within a prohibited category such as spyware, gambling, or pornography).

ANALYSIS

Certified questions from federal court are questions of law that we review de novo. *In re F5 Networks, Inc.*, 166 Wn.2d 229, 236, 207 P.3d 433 (2009). We do not consider the legal issues in the abstract but instead consider them based on the certified record that the federal court provides. RCW 2.60.030(2); *St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 165 Wn.2d 122, 126, 196 P.3d 664 (2008).

The plaintiffs claim that NCRL's Internet filtering policy is overbroad and, more specifically, so overbroad as to rise to the level of a prior restraint in violation of article I, section 5. They also contend that the filtering policy is an impermissible content-based restriction on speech. NCRL maintains that use of the FortiGuard filter makes it possible to provide its patrons access to vast amounts of constitutionally protected material while ensuring that on-line resources are aligned with its mission and collection policy, the interests of public education are advanced, and a safe and appropriate environment for staff and patrons is maintained. NCRL maintains that its filtering policy is constitutional under article I, section 5.

No. 82200-0

Overbreadth and Prior Restraint

Article I, section 5 of the Washington State Constitution provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." The plaintiffs present an analysis of the six nonexclusive *Gunwall*[2] factors to show that article I, section 5 is more protective of speech than the First Amendment to the United States Constitution. This analysis applies to determine whether an independent state constitutional analysis is appropriate, however, and it is already settled that article I, section 5 is subject to independent interpretation. *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 115, 937 P.2d 154 (1997). This does not mean that the state provision always affords greater protection than the First Amendment, however. *Id.* For example, no greater protection is afforded to obscenity, speech in nonpublic forums, commercial speech, and false or defamatory statements. *Id.* at 116 (citing *State v. Reece*, 110 Wn.2d 766, 778, 757 P.2d 947 (1988); *City of Seattle v. Huff*, 111 Wn.2d 923, 926, 767 P.2d 572 (1989); *Nat'l Fed'n of Retired Persons v. Ins. Comm'r*, 120 Wn.2d 101, 119, 838 P.2d 680 (1992); *Richmond v. Thompson*, 130 Wn.2d 368, 382, 922 P.2d 1343 (1996)).

In some contexts, however, greater protection is afforded under article I, section 5. We have recognized, for example, that when applying a time, place, and manner test to a restriction on speech in a public forum, the restriction can be imposed consistent with article I, section 5 only upon the showing of a "compelling state interest," rather than the

---

[2] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

No. 82200-0

"substantial governmental interest" that is sufficient under the First Amendment. *Bering v. SHARE*, 106 Wn.2d 212, 234, 721 P.2d 918 (1986). In addition, unlike the First Amendment, article I, section 5 categorically prohibits prior restraints on constitutionally protected speech. *Voters Educ. Comm. v. Wash. State Pub. Disclosure Comm'n*, 161 Wn.2d 470, 493-94, 166 P.3d 1174 (2007).

The plaintiffs say that article I, section 5 is also more protective in cases involving overbreadth but the cases they cite do not support this conclusion. Rather, the cited cases state the principle that article I, section 5 is less tolerant than the First Amendment of overbroad restrictions if they rise to the level of a prior restraint. *O'Day v. King County*, 109 Wn.2d 796, 803-04, 749 P.2d 142 (1988); *Ino Ino*, 132 Wn.2d at 117; *cf. Voters Educ. Comm.*, 161 Wn.2d at 494 (also cited by the plaintiffs, discussing whether challenged laws rose to the level of a prior restraint as a result of vagueness).

Moreover, although the plaintiffs assert there is greater protection under the state provision, in the broadest sense, they have not offered any explanation of why, absent a level akin to a prior restraint, overbroad provisions should be treated any differently under article I, section 5 than under the First Amendment, or what independent analysis should apply to their claim of a content-based restriction. In fact, many of the cases upon which the plaintiffs rely were decided under the First Amendment and the plaintiffs particularly urge that we follow the analysis in *Mainstream Loudoun v. Board of Trustees*, 2 F. Supp. 2d 783, 795 (E.D. Va. 1998) (*Mainstream Loudoun I*) and *Mainstream Loudoun v. Board of Trustees*, 24 F. Supp. 2d 552 (E.D. Va. 1998)

10

No. 82200-0

(*Mainstream Loudoun* II), decided under a federal constitutional analysis. Accordingly, in deciding whether the filtering policy suffers from overbreadth under article I, section 5, our analytical approach aligns with the approach taken under the First Amendment.

The first question here is whether, as the plaintiffs claim, NCRL's filtering policy acts as a prior restraint in violation of article I, section 5. A prior restraint seeks to prohibit future speech rather than to punish speech that has occurred. *Voters Educ. Comm.*, 161 Wn.2d at 494. A prior restraint is an official restriction imposed on speech or another form of expression in advance of its occurrence. *Sanders v. City of Seattle*, 160 Wn.2d 198, 224, 156 P.3d 874 (2007); *see Soundgarden v. Eikenberry*, 123 Wn.2d 750, 764, 871 P.2d 1050 (1994).

NCRL maintains that its policy is neither a prior restraint nor its functional equivalent. Rather, it is an operational rule that applies in the same way as any other collection decision by NCRL managers.

We first note that the plaintiffs' complaint is that they are prevented from accessing the speech of others in violation of article I, section 5. The First Amendment protects the right to receive information and ideas. *Kleindeinst v. Mandel*, 408 U.S. 753, 762-63, 92 S. Ct. 2576, 33 L. Ed.2d 683 (1972); *see Voters Educ. Comm.*, 161 Wn.2d at 483 (acknowledging that under the First Amendment, free speech includes the fundamental counterpart of the right to receive information). We believe that a comparable right exists under article I, section 5.

11

No. 82200-0

There are very few appellate cases involving Internet filters and free speech issues, and no cases decided under article I, section 5. However, *A.L.A.* involved First Amendment challenges to CIPA. Among other things, the United States Supreme Court considered whether the Internet filtering required by CIPA constitutes a prior restraint. The plurality in *A.L.A.* termed it a mistake to extend "prior restraint to the context of public libraries' collection decisions. A library's decision to use filtering software is a collection decision, not a restraint on private speech." *A.L.A.*, 539 U.S. at 209 n.4. We similarly agree that NCRL's filtering policy does not constitute a prior restraint within the meaning of article I, section 5.

As the plurality in *A.L.A.* explained, a public library selects what it will collect and make available to its patrons. "Public libraries pursue the worthy missions of facilitating learning and cultural enrichment." *Id.* at 203. A public library "provides Internet access . . . for the same reasons it offers other library resources: to facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality." *Id.* at 206. "To fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide to their patrons." *Id.* at 204.

This discretion is not unlimited. In *Board of Education v. Pico*, 457 U.S. 853, 102 S. Ct. 2799, 73 L. Ed. 2d 435 (1982) (plurality opinion), an action seeking injunctive relief was brought with regard to removal of certain books from school libraries.[3] The

---

[3] The books had been characterized in a press release as "'anti-American, anti-Christian, and anti-Sem[i]tic, and just plain filthy.'" *Pico*, 457 U.S. at 857. The plurality concluded that "local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek their removal to 'prescribe what shall be orthodox.'" *Id.*

No. 82200-0

plurality took great pains to point out that the action did "not involve the *acquisition* of books," saying that "nothing in our decision today affects in any way the discretion of a local school board to choose books to *add* to the libraries of their schools." *Id.* at 862, 871. The plurality added, however, that the "discretion could not be exercised in a narrowly partisan or political manner." *Id.* at 870.

We agree with the observations made in *A.L.A.* and conclude that a library's decision about what materials to make available to its patrons does not constitute a prior restraint. NCRL's filtering policy does not prevent any speech and in particular it does not ban or attempt to ban online speech before it occurs. Rather, it is a standard for making determinations about what will be included in the collection available to NCRL's patrons.

The plaintiffs maintain, however, that NCRL's policy is overbroad and in fact is so overbroad that it rises to the level of a prior restraint that violates article I, section 5 because it restricts access to a substantial amount of protected speech. There are necessarily two inquiries that must be made: whether the policy suffers from overbreadth, and, if so, whether the overbreadth rises to the level of a prior restraint. As explained, only in the latter instance is article I, section 5 "less tolerant" than the First Amendment. As also explained, our article I, section 5 analysis of overbreadth follows the analysis under the First Amendment.

---

at 872 (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S. Ct. 1178, 87 L. Ed. 2d 1628 (1943)).

No. 82200-0

In general, a law is unconstitutionally overbroad if constitutionally protected free speech activities are swept within its prohibitions. *State v. Johnston*, 156 Wn.2d 355, 127 P.3d 707 (2006). The plaintiffs contend that an overbreadth problem results from categorizations that fail to track constitutional requirements, filtering errors, and NCRL's policy of blocking entire web sites when a single page is deemed harmful to minors.

Initially, we agree with NCRL that the *Mainstream Loudoun* cases are of little value in light of the Court's decision in *A.L.A.*, contrary to the plaintiffs' heavy reliance on these cases. For example, the court in the *Mainstream Loudoun* cases applied a forum analysis and concluded that a library is a limited public forum, determined that strict scrutiny applies in deciding whether Internet filtering is constitutional, and concluded that the closest analogy to the decision to filter Internet content is *removal* of library materials rather than *selection* of library materials as additions to the library's collection. *Mainstream Loudoun* I, 2 F. Supp. 2d at 793-94, 795; *Mainstream Loudoun* II, 24 F. Supp. 2d at 561-563.

However, all of these conclusions are at odds with the decision in *A.L.A.* A majority of the Court in *A.L.A.* agreed that public forum analysis is inappropriate in determining whether a library can constitutionally filter certain Internet content. *A.L.A.*, 539 U.S. at 205-07 (plurality, concluding that public forum analysis is not applicable to Internet access in a public library); *id.* at 215-16 (Breyer, J., concurring, agreeing with plurality on this point). A majority of the Court also agreed that strict scrutiny does not apply. The plurality stated that

14

No. 82200-0

> [a] library's need to exercise judgment in making collection decisions
> depends on its traditional role in identifying suitable and worthwhile
> material; it is no less entitled to play that role when it collects material from
> the Internet than when it collects material from any other source. Most
> libraries already exclude pornography from their print collections because
> they deem it inappropriate for inclusion. We do not subject these decisions
> to heightened scrutiny; it would make little sense to treat libraries'
> judgments to block online pornography any differently, when these
> judgments are made for just the same reason.

*Id.* at 208. In Justice Breyer's concurrence he agreed that strict scrutiny is too rigid a test

to apply in this context. *Id.* at 217 (Breyer, J., concurring).[4]

Finally, a majority of the Court acknowledged the discretion that libraries'

exercise when selecting material and treated filtering policies as pertaining to collection

of materials, not removal of materials after once having been selected. In his

concurrence, Justice Breyer observed that "libraries often properly engage in the selection

of materials, either as a matter of necessity (*i.e.*, due to scarce resources) or by design

(*i.e.*, in accordance with collection development policies)." *Id.* Significantly, the

plurality observed that it is not constitutionally relevant that when selecting books a

library makes an affirmative decision to acquire them for its collection but that when

filtering the Internet a library does not review every web site that it makes available. "A

library's need to exercise judgment in making collection decisions depends on its

traditional role in identifying suitable and worthwhile material; it is no less entitled to

play that role when it collects material from the Internet than when it collects material

from any other source." *Id.* at 208. Because of the sheer quantity of material on the

---

[4] Justice Breyer would have applied a heightened level of scrutiny, but not strict scrutiny. *A.L.A.*,
539 U.S. at 216-17.

No. 82200-0

Internet and the rapidity with which it changes, libraries cannot possibly review the material item by item to determine what should be included and what should not. *Id.* The only way it could make such determinations would be to exclude "an enormous amount of valuable information that it lacks the capacity to review. Given that tradeoff, it is entirely reasonable for public libraries to reject that approach and instead exclude certain categories of content, without making individualized judgments that everything they do make available has requisite and appropriate quality." *Id.*

Thus, NCRL's filtering policy, when applied, is not comparable to removal of items from NCRL's collection, but rather acquisition of materials to add to its collection. NCRL has made the only kind of realistic choice of materials that is possible without unduly and unnecessarily curtailing the information available to a bare trickle—or a few drops—of the vast river of information available on the Internet.

Because so much of *Mainstream Loudoun* is no longer sound, we find it of little assistance in addressing the certified question before us.

The foundations of the plaintiffs' overbreadth challenge are the presumption that a public library must make accessible all constitutional speech on the Internet and the contention that a policy that applies so broadly that it excludes any constitutionally protected speech violates article I, section 5. But a public library has no obligation to make available any and all constitutionally protected material, and the goal of libraries has never, as the plurality in *A.L.A.* noted, been to provide "'universal coverage.'" *A.L.A.*, 539 U.S. at 204 (quoting *Am. Library Ass'n v. United States*, 201 F. Supp. 2d 401,

16

No. 82200-0

421 (E.D. Pa. 2002)). Rather, "'[t]he librarian's responsibility . . . is to separate out the gold from the garbage, not to preserve everything.'" *Id.* (quoting William A. Katz, *Collection Development: The Selection of Materials for Libraries* 6 (1980)). "'[I]t is the aim of the selector to give the public, not everything it wants, but the best that it will read or use to advantage.'" *Id.* (quoting Francis K.W. Drury, *Book Selection* xi (1930)).

The principle that a library has no obligation to provide universal coverage of all constitutionally protected speech applies to Internet access just as it does to the printed word in books, periodicals, and other material physically collected and made available to patrons. "The Internet is simply another method for making information available in a . . . library'" and "is 'no more than a technological extension of the book stack.'" *A.L.A.*, 539 U.S. at 207 (quoting S. Rep. No. 106-141, at 7 (1999)). Just as it is entitled to exercise its acknowledged discretion in amassing a collection of printed materials physically placed on the shelves in order to carry out its mission, it is entitled to exercise discretion when it comes to Internet access involving its facilities and equipment.

The discretion that public libraries enjoy in selecting materials for their collections is not merely a function of what a library can afford in terms of costs and space, contrary to the position taken in *Mainstream Loudoun* I, 2 F. Supp. 2d at 795. Even if one were to assume a public library with unlimited funds and space, that library would be under no obligation to make all constitutionally protected printed materials available. For example, regardless of its resources a library need not place pornographic materials on its shelves, although such materials are constitutionally protected. It need not place

17

No. 82200-0

children's comic books on its shelves, although these, too, are constitutionally protected. As another example, if a private collector offered a library a collection of books at an attractive set price for the entire collection and the library purchased the collection, it would not have to include all of the books in its own collection and would not have to make them all available to its patrons.

In any event, it is simply not true that there are no costs or physical restrictions attendant to access to the Internet via a public library. Although generally purchase of Internet access includes all of the Internet's free sites, making the Internet accessible to patrons requires devoted library space and frequently scarce computer terminals and resources.

Given the traditional and necessary discretion lodged in public libraries with respect to acquisition of materials, we do not agree that the overbreadth doctrine applies to a public library's decisions about what materials to place in its collections. For example, if a public library decides, in accord with its written policies, not to acquire pornography for its collection, can it be said that its policies are unconstitutionally overbroad? To the contrary, exclusion of this type of constitutionally protected speech is within the discretion that libraries traditionally enjoy. We do not believe there is any good reason to treat the material available on the Internet any differently.

In short, a library simply does not have to include all constitutionally protected materials in its collection and it follows that no overbreadth problem necessarily results

No. 82200-0

under article I, section 5 as a result of a public library's Internet filtering policy under which access to certain categories of constitutionally protected materials is denied.

Next, turning to the plaintiffs' overbreadth claim based on filtering errors, NCRL concedes that its filter on some occasions incorrectly includes inoffensive web sites in the prohibited categories, a circumstance known as "overblocking." This means that the filter blocks web sites that do not actually fall within the categories that the filter is intended to block. The parties make vastly different statements about the degree of overblocking. The plaintiffs claim that their expert's study shows that the filter has an error rate of 11 and 23.6 percent. The plaintiffs' expert determined that of 100,000 randomly selected .com domains, FortiGuard blocked 536 web pages as pornography or adult materials and 64 were blocked in error, and the expert concluded this resulted in an error rate of 11.9 percent. Of 100,000 .org domains, 207 web pages were blocked as pornography or adult materials and 49 were blocked in error, for an error rate of 23.6 percent.

On the other hand, NCRL's expert conducted a study of URLs (uniform resource locators) actually visited or requested during a week in August 2007. Of 60,000 URLs, 2,180 were blocked and of these, 289 complete web pages were blocked, with 20 blocked in error; 1406 "helper images" ("little images that are parts of web pages") were blocked, with 744 blocked in error; 194 "other images" were blocked, with 24 blocked in error; and 110 URLs were not "ratable," i.e., the expert could not determine whether they were correctly blocked. Order at 15.

No. 82200-0

Regardless of the disparities, as the plurality in *A.L.A.* concluded, *even if* any constitutional issue is implicated by overblocking, it is "dispelled" if the material that is erroneously blocked is easily unblocked upon the request of an adult. *A.L.A.*, 539 U.S. at 209. Like the plurality in *A.L.A.*, we conclude under article I, section 5, that if material that is blocked when it does not fall within the categories that are supposed to be blocked may be unblocked upon request, no overbreadth problem would exist. Because there would be no unconstitutional overbreadth, it follows there would be no overbreadth rising to the level of a prior restraint.

Here, if a library patron wants to access a web site or page that has been blocked by FortiGuard, he or she may send an e-mail to NCRL administrators asking for a manual override of the block. The site or page is reviewed to ascertain whether allowing access would accord with NCRL's mission, its policy, and CIPA requirements. If not, the request is denied. If the request is approved, access will be allowed on all of NCRL's public access computers.

Between October 1, 2007, and February 20, 2008, NCRL received 92 requests to unblock access, of which 90 were automated. NCRL responded to 8 within an hour, to another 19 within the same day, to another 29 the next day, to another 20 within three days, and to another 5 more than three days after the request. There is no evidence about the remaining 11 requests. Since October 1, 2007, NCRL unblocked sites in response to 12 requests. Among other things, sites that were erroneously blocked as "Pornography," "Gambling," and "Malware" were unblocked upon request.

No. 82200-0

Because adults can request and obtain unblocking of erroneously blocked sites, we conclude that on this record no overbreadth problem exists under article I, section 5 as a result of overblocking.

The plaintiffs next contend that an overbreadth problem results when entire web sites are blocked rather than just the specific pages that contain material within the prohibited categories. This claim is similar to the overblocking claim, i.e., a claim that material is blocked that should not be blocked because it does not fall within a prohibited category. It differs in that at least a part of what is on the blocked site falls within one of the categories that the filter is designed to block.

Again, the crux of the issue is NCRL's discretion regarding what will be added to its collection. Given that a public library simply has no obligation to include all types of constitutionally protected printed material in its collection, and is not, for example, required to include a book with three pages of pornography and three hundred pages that are not pornographic, it does not have to include access to an Internet site that contains some matter falling within a prohibited category even if other matter on the site does not. We do not believe an overbreadth problem occurs under article I, section 5 when the filter blocks sites containing matter falling within one of the prohibited categories, even if other material on the site does not.

Finally, the plaintiffs contend that the filtering policy is an overbroad restriction on adult speech because, they assert, no person can access on-line material that NCRL decides is inappropriate for a child. The plaintiffs rely on *Butler v. Michigan*, 352 U.S.

21

No. 82200-0

380, 382-83, 77 S. Ct. 524, 1 L. Ed. 2d 412 (1957), where the United States Supreme

Court overturned a conviction under a law criminalizing the distribution of literature that

could have a "potentially deleterious influence upon youth." The Court stated that the

government may not "reduce the adult population . . . to reading only what is fit for

children." *Id.* at 383. In *Adams v. Hinkle*, 51 Wn.2d 763, 779-80, 322 P.2d 844 (1958),

our court followed *Butler* and invalidated a statute prohibiting the sale of comic books in

part because the statute limited adults' access to this type of speech.

Although the plaintiffs would make it appear that NCRL's filtering policy presents

the same kind of restriction as condemned in these cases, there are significant differences.

Most importantly, just as a public library has discretion to make content-based decisions

about which magazines and books to include in its collection, it has discretion to make

decisions about Internet content. A public library can decide that it will not include

pornography and other adult materials in its collection in accord with its mission and

policies and, as explained, no unconstitutionality necessarily results. It can make the

same choices about Internet access.

We do not believe this case presents circumstances analogous to those in *Butler*

and *Adams*. Rather, it concerns a public library's collection policies. A public library

does not come readily to mind as having been a source of pornography and other adult

material before the advent of the Internet (and the current dispute), and should not be

forced to become one just because it makes Internet access available to its patrons. As

the plurality in *A.L.A.* observed, "[m]ost libraries already exclude pornography from their

22

No. 82200-0

print collections because they deem it inappropriate for inclusion." *A.L.A.*, 539 U.S. at

208. It makes "little sense" to treat libraries' decisions to block access to "online

pornography any differently, when these judgments are made for just the same reason."

*Id.*

We conclude that no overbreadth in violation of article I, section 5 occurs as a

result of NCRL's choice to block Internet access to pornography, adult materials, and

nudity/risqué materials.

Content-based restrictions

The plaintiffs also argue that NCRL's filtering policy constitutes an

unconstitutional content-based restriction under article I, section 5. According to the

plaintiffs, any content-based restriction is presumptively invalid and ordinarily upheld

only if it is meets the strict scrutiny standard of review.

Contrary to the plaintiffs' apparent position, not all content-based standards are

presumptively invalid or reviewed under a strict scrutiny standard. The plurality in

*A.L.A.* explained that the Court held in "analogous contexts that the government has

broad discretion to make content-based judgments in deciding what private speech to

make available to the public." *A.L.A.*, 539 U.S. at 204. In *National Endowment for Arts

v. Finley,* 524 U.S. 569, 118 S. Ct. 2168, 141 L. Ed. 2d 500 (1998), the Court upheld an

arts funding program requiring the National Endowment for the Arts (NEA) to make

funding decisions using content-based criteria. The Court observed that "[a]ny content-

based considerations that may be taken into account in the grant-making process are a

No. 82200-0

consequence of the nature of arts funding." *Id.* at 585. It also said that "[t]he very assumption of the NEA is that grants will be awarded according to the artistic worth of competing applicants and absolute neutrality is simply inconceivable." *Id.* (internal quotation marks and cites omitted). *See also Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672-73, 118 S. Ct. 1633, 140 L. Ed. 2d 875 (1998) (public television's editorial decisions regarding private speech presented to viewers). These cases demonstrate, contrary to the plaintiffs' argument, that not all content-based distinctions must be subjected to strict scrutiny.

A public library necessarily considers content when making collection decisions and must do so to fulfill its mission; content-based considerations in selecting materials are part and parcel of the traditional role served by a public library. For this reason, the Court in *A.L.A.* declined to apply a public forum analysis to assess CIPA's filtering requirements and declined to apply strict scrutiny. We agree that under article I, section 5 a public forum analysis does not apply in this context.

Generally, when a free speech challenge arises in regard to activity on property owned and controlled by the government, a court will engage in a "forum analysis" to determine the level of judicial scrutiny that applies. We have adopted the federal analysis for determining whether public property is a public forum, and federal case law is persuasive, though not binding. *Sanders*, 160 Wn.2d at 208. Internet access in a public library is not a traditional public forum. As the plurality in *A.L.A.* explained, this resource did not exist until recently and has not "'immemorially been held in trust for the

24

No. 82200-0

use of the public, and, time out of mind, . . . been used for purposes of assembly, communication of thoughts between citizens and discussing public questions.'" *A.L.A.*, 539 U.S. at 205 (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679, 112 S. Ct. 2701, 120 L. Ed 2d 541 (1992)). Traditional forum analysis does not extend beyond its historical confines. *Id.* at 206; *Sanders*, 160 Wn.2d at 209 (applying test for traditional public forum under article I, section 5).

In addition, a public forum may exist where the government makes an affirmative decision to open up its property for use as a public forum. *A.L.A.*, 539 U.S. at 206 (citing *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 802, 105 S. Ct. 3429, 87 L. Ed. 2d 567 (1985)). So long as the government holds government property open to the public as a place for expressive activity the same analysis applies as applies to a traditional public forum. *Sanders*, 160 Wn.2d at 210. The Court in *A.L.A.* concluded that Internet access in a public library is not a designated public forum because "[a] public library does not acquire Internet terminals in order to create a public forum for Web publishers to express themselves, any more than it collects books in order to provide a public forum for the authors of the books to speak." *A.L.A.*, 539 U.S. at 206. Rather than providing Internet access to encourage private speakers' diversities of view, it offers Internet access for the same reasons that other library resources are offered: "to facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality." *Id.*

No. 82200-0

The United States Court of Appeals for the Third and Sixth Circuits have held, however, that a library is a limited public forum insofar as the library must permit the public to exercise the right to receive information and ideas consistent with the nature of the library as a place for reading, writing, and quiet contemplation. *See Neinast v. Board of Trustees*, 346 F.3d 585, 591 (6th Cir. 2003); *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1259 (3d Cir. 1992). But not all aspects of a library are a limited public forum, the Sixth Circuit explained in *Neinast*. That court held that the high level of scrutiny applicable to a public forum does not apply to a library regulation requiring a patron to wear shoes because the regulation did not directly impact the right to receive information. *Neinast*, 346 F.3d at 591-92.

The premise that not all aspects of a particular government property are treated the same under a forum analysis is also exemplified by *Illinois Dunesland & Preservation Society v. Illinois Department of Natural Resources*, 587 F. Supp. 2d 1012 (E.D. Ill. 2008), *aff'd on other grounds*, 584 F.3d 719 (7th Cir. 2009). There, the court held that although a state park itself was unquestionably a traditional public forum, a display rack in the park was not a public forum because it was created to facilitate the recreational pursuit of park visitors and provide useful information for them—in essence a "mini-library of resources for the public" with respect to which the department of natural resources made editorial judgments about what to include. *Id.* at 1018 n.6, 1019-20[5]; *see*

---

[5] The Seventh Circuit agreed that the government did not have to make the display rack available to exhibit any and all pamphlets that interest groups wanted to place in it. *Ill. Dunesland & Pres. Soc'y*, 584 F.3d at 725.

No. 82200-0

*also Pleasant Grove City v. Summum*, __ U.S. __, 129 S. Ct. 1125, 1137-38, 172 L. Ed. 2d 853 (2009) (concluding that although parks are a traditional public forum, monuments placed in them are not subject to forum analysis).

The limited public forum analysis in *Neinast* and *Kreimer* relate to the patrons' right to receive information, which is effectively equated to the right to express oneself in a public forum. But even assuming the right to receive information implicates forum analysis as the Third and Sixth Circuits concluded, and that this right exists with respect to a public library, it would still exist only with respect to the materials that are actually in a library's collection. A patron would not have a right to receive information in a public library if that information was not part of the library's collection. And a patron does not have the constitutional right to force a public library to acquire a particular book or type of book. Analogously, this right would not exist with respect to Internet sites that have not been added to a library's collection. Accordingly, even under the limited public forum analysis addressed in *Neinast* and *Kreimer*, collection decisions about Internet materials are not an aspect of a public library subject to public forum analysis.

For purposes of article I, section 5, we agree with the Court in *A.L.A.* that Internet access in a public library—in terms of what may be offered and what may be blocked by Internet filtering—is not subject to public forum analysis and the strict scrutiny that accompanies such a classification, whether as a traditional, designated, or limited public forum.

No. 82200-0

Given the traditional and historical role of a public library, and the discretion

necessarily entailed to make content-based judgments about what to include in its

collection, we conclude that article I, section 5 is not violated by a public library's

Internet filtering policy if it is reasonable when measured in light of the library's mission

and policies, and is viewpoint neutral.

It appears to us that NCRL's filtering policy is reasonable and accords with its

mission and these policies and is viewpoint neutral. It appears that no article I, section 5

content-based violation exists in this case. NCRL's essential mission is to promote

reading and lifelong learning. As NCRL maintains, it is reasonable to impose restrictions

on Internet access in order to maintain an environment that is conducive to study and

contemplative thought.

NCRL points out that more than half of its branches serve as the de facto school

library for local school districts. Article IX, section 1 establishes education as the State's

highest priority. While the Internet provides opportunities for educational enrichment,

exposure to unfiltered Internet access on demand by adults in these branches is not suited

to education of children. NCRL has documented instances of sexually explicit content

displayed on its computers and printed from them despite the FortiGuard filtering, which

NCRL says can be expected to increase if the filter can be disabled upon request.

Children are not the only patrons who might be adversely affected by unlimited

Internet access in the public libraries. Even adults may find such exposure ill-suited to

their use and enjoyment of a public library as a place for reading and contemplative

No. 82200-0

thought. As NCRL says, limited restrictions on Internet access may help to minimize circumstances that staff and other patrons, including adults, may find threatening, hostile, or disruptive.

NCRL maintains that patrons have practical alternatives when access to a particular kind of on-line content is blocked, including access to image databases through NCRL's home page and searches using Google's main search engine at Google.com, which is not blocked. NCRL also points out, for example, that it has unblocked casino-related sites at the request of patrons with interests other than illegal wagering.[6] NCRL also points out that it has a large number of print volumes available and a mail order program that is also available for obtaining some material that may be blocked under the filtering policy.

The filtering policy appears to us, as NCRL contends, to be a reasonable measure that sets minimal restrictions on Internet access so that the Internet is used by all of NCRL's patrons in a way that advances the duty of education and fulfills NCRL's mission and traditional role.

The filtering policy is neutral in application, applying to all patrons alike. It is viewpoint neutral because it makes no distinctions based on the perspective of the speaker. *See generally Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984) (describing the viewpoint neutrality

---

[6] NCRL says that it has declined to unblock freelotto.com, which hosts gambling, but has allowed access to oregonlotto.com, which does not.

29

No. 82200-0

requirement as forbidding the government from regulating speech in ways that favor some viewpoints or ideas at the expense of others).

While we would conclude, on this record, that the filtering policy does not violate article I, section 5, we recognize that applying this constitutional provision according to the legal principles we delineate in this opinion to the facts of this case is a matter for the federal court.

## CONCLUSION

A public library has traditionally and historically enjoyed broad discretion to select materials to add to its collection of printed materials for its patrons' use. We conclude that the same discretion must be afforded a public library to choose what materials from millions of Internet sites it will add to its collection and make available to its patrons. A public library has never been required to include all constitutionally protected speech in its collection and has traditionally had the authority, for example, to legitimately decline to include adult-oriented material such as pornography in its collection. This same discretion continues to exist with respect to Internet materials.

The plaintiffs' claims of overbreadth, prior restraint, and that NCRL's Internet filtering policy is an impermissible content-based restriction all fail to account for this traditional and long-standing discretion to select what materials will be included in a public library's collection. We conclude that on the factual record presented to us in the district court's order on certification, the filtering policy suffers from none of the constitutional infirmities under article I, section 5 claimed by the plaintiffs. However, we

No. 82200-0

acknowledge that the federal court will apply the legal guidelines we set forth in this opinion to the facts of the case.

In response to the question certified by the United States District Court for the Eastern District of Washington, we answer that in accord with our analysis in this opinion a public library may, consistent with article I, section 5 of the Washington State Constitution, filter Internet access for all patrons without disabling the filter to allow access to web sites containing constitutionally protected speech upon the request of an adult library patron.

No. 82200-0

Madsen, C. J.

WE CONCUR:

Alexander, J.                Owens, J

Fairhurst, J.

*Bradburn v. N. Cent. Reg'l Library Dist.*, No. 82200-0
Concurrence by J.M. Johnson, J.

No. 82200-0

J.M. JOHNSON, J. (concurring)—The certified question has a simple answer: yes.   I agree with the majority's conclusion but write separately because the majority overcomplicates the analysis.

*Limited Resources*

A public library providing computer access may, consistent with article I, section 5 of the Washington Constitution, filter Internet access without disabling that filter to allow access to all web sites containing constitutionally protected speech.   The reason is simple: in determining the makeup of their collections, public libraries have limited resources, including computers; some libraries in this case have only one or two.  Public libraries may determine – by filter – among the vast sea of educational and informational materials which materials are appropriate for the libraries' collections.  The number of available computer terminals is a more limited resource for many public libraries than the amount of available shelf space and funds to buy books.

*Bradburn v. N. Cent. Reg'l Library Dist.*, No. 82200-0

Scarcity of resources is particularly relevant in the present case. The North Central Regional Library District's (NCRL) twenty-eight branch libraries in five rural counties also serve as school libraries for fourteen school districts. Sixteen branches have only one or two computer terminals available for patrons. Twenty branches are staffed with only one librarian. Public libraries have the "traditional role of obtaining material of requisite and appropriate quality for educational and informational purposes." *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 211, 123 S. Ct. 2297, 156 L. Ed. 2d 221 (2003). Public libraries are necessarily empowered with discretion to make quality-based judgments on how to allocate their limited resources, including finances and shelf space, in building their collections. Some content-based decisions have been held to strict scrutiny. *Collier v. City of Tacoma*, 121 Wn.2d 737, 749-50, 854 P.2d 1046 (1993). However, due to public libraries' traditional role, their collection decisions to allocate scarce resources are not subject to strict scrutiny, but instead are subject to the rational basis test. Protecting patrons (including minors) from obscene material and increasing the library's capacity to provide literary, scientific, historic, and other materials clearly satisfies the rational basis test.

*Bradburn v. N. Cent. Reg'l Library Dist.*, No. 82200-0

This analysis applies directly to a library's online collection as well. Removing NCRL's Internet filters would allow patrons to access online pornography and other materials currently unavailable because they are not selected for collection, resulting in increased demand for an extremely limited resource: available computer terminals. In many libraries, children would be displaced from computer terminal use to allow adult access. The libraries are thus exercising quality-based collection judgments to determine the best way to fulfill their traditional role. These decisions are viewpoint neutral. Rationales for the Internet filters include protecting patrons (often children) from offensive, disturbing, and illegal material, conserving resources, and safety. These are sufficient to satisfy the rational basis test, especially given the dual school-library function of many of NCRL's branches.

The analysis should end here. Unfortunately, I must also address the majority's improper discussion of article I, section 5.

*Freedom of Speech*

Our state constitution provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." WASH. CONST. art. I, § 5. The words "right to receive information and ideas," majority at 12, do not exist in this provision. Our analysis should focus on the

3

right to "speak, write and publish on all subjects," not on a right to receive information and ideas that is not found in the constitution.[1]

Our constitution reserves the right to amend our constitution to the people of Washington. WASH. CONST art. XXIII. By its unambiguously plain language, article I, section 5 provides the right to "speak, write and publish" only. This court may believe that *access* to information and ideas is important to a free and well-informed society, but we do not amend our state constitution via judicial opinion, especially an advisory opinion on a certified question. That power is entrusted to the people of Washington.

The dissent notes, and the majority appears to agree, that the First Amendment to the United States Constitution protects the "freedom to read." Dissent at 1. That the right to receive information has been discussed in First Amendment analyses is not determinative here. The Washington State Constitution defines the term "freedom of speech." WASH. CONST art. I, § 5. In contrast, the First Amendment lists freedom of speech among other rights, including the rights of the press and petitioning the government, but does not define what "freedom of speech" entails. Necessity has led some federal courts to consider this undefined term's meaning. The First Amendment has thus been

---

[1] Inasmuch as plaintiffs' rights to speak, write or publish are not infringed, they fail to state a claim upon which relief can be granted. CR 12(b)(6).

*Bradburn v. N. Cent. Reg'l Library Dist.*, No. 82200-0

interpreted to include the rights of writing, publishing, distributing, and receiving information and ideas. *See, e.g., N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964); *Martin v. City of Struthers*, 319 U.S. 141, 63 S. Ct. 862, 87 L. Ed. 1313 (1943). This does not mean the Washington State Constitution must have an identical interpretation; in fact, the interpretation is not identical. This court has previously recognized that article I, section 5 is subject to *independent* interpretation. *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 118, 937 P.2d 154, 943 P.2d 1358 (1997). Sometimes the more specific speech protections of article I, section 5 has warranted greater freedom of speech than the First Amendment. *See, e.g., O'Day v. King County*, 109 Wn.2d 796, 804, 749 P.2d 142 (1988) (article I, section 5 provides greater protection against prior restraints and overbreadth than the First Amendment). Sometimes the speech protections under both provisions are equivalent. *See, e.g., Ino Ino, Inc.*, 132 Wn.2d at 115-16 (article I, section 5 and the First Amendment provide equivalent degrees of protection regarding speech that is obscene, commercial, false, defamatory, or expressed in nonpublic forums). However, we must not lose sight of the fact that article I, section 5 is differently worded and constructed than the First Amendment.

*Bradburn v. N. Cent. Reg'l Library Dist.*, No. 82200-0

An analysis of whether article I, section 5 contains a right to receive information and ideas (and a focused *Gunwall*[2] argument) may well be necessary in another case. Today, we need only determine that the NCRL's policy of Internet filtering on its computers is consistent with article I, section 5 of the Washington Constitution.

---

[2] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

*Bradburn v. N. Cent. Reg'l Library Dist.*, No. 82200-0

*Bradburn v. N. Cent. Reg'l Library Dist.*

No. 82200-0

CHAMBERS, J. (dissenting) — The question before this court is whether, consistent with our state constitution's free speech protections, a public library can actively restrict adult access to web sites containing *constitutionally protected* speech. The question is easy to answer: of course it cannot.

Article I, section 5 is direct. It says that "[e]very person may freely speak, write and publish on all subjects, being responsible for abuse of that right." The freedom to "speak, write and publish" encompasses the freedom to read as well. *Cf. Fritz v. Gorton,* 83 Wn.2d 275, 297, 517 P.2d 911 (1974) ("Freedom of speech without the corollary-freedom to receive-would seriously discount the intendment purpose and effect of the first amendment."). Article I, section 5 provides greater protection from restrictions than the First Amendment. *Ino Ino, Inc. v. City of Bellevue,* 132 Wn.2d 103, 115, 937 P.2d 154, 943 P.2d 1358 (1997) (citing *State v. Reece,* 110 Wn.2d 766, 778, 757 P.2d 947 (1988)). The "Washington Constitution is less tolerant than the First Amendment of overly broad restrictions on speech." *O'Day v. King County,* 109 Wn.2d 796, 804, 749 P.2d 142 (1988). Our cases have stated the principle broadly, as they should.

Here, a library district, I am sure with the best of intentions, hired a private company to install a technological censor on its public computer terminals. Order at 11. I am willing to accept for our purposes today that the vast majority of what

*Bradburn v. N. Cent. Reg'l Library Dist.,* No. 82200-0

the censor catches is low value speech. While the purpose seems to be to protect children, the libraries within the library district flatly refuse to remove the filter on the request of an adult patron, or use any less censorial ways to accomplish their aims. *Id.* at 10. The library district does not attempt to argue that it cannot disable its computer filters at the request of adults. It merely suggests that to do so would be inconvenient and might require additional staff, which could be expensive.

I am not unsympathetic to the goal of protecting children. But that laudable goal has all too often been advanced as a ground to restrict constitutionally protected speech generally though, at least in our state before today, usually unsuccessfully. Animated by the understanding that freedom to say what might annoy or offend others comes with the corollary cost that others may say what might annoy or offend you, the founders chose risk as the price of freedom. "We endure and embrace these potential harms willingly as the price we pay to freely exchange ideas without government interference." *Sanders v. City of Seattle,* 160 Wn.2d 198, 235, 156 P.3d 874 (2007) (Chambers, J., dissenting). This court has rarely retreated from its constitutional duty to defend the constitutional right of free speech, even though such speech may have a detrimental effect on children. This court has struck legislation that forbade the sale of erotic music and unlicensed comic books to adults simply because the State deemed they were too dangerous for children. *Soundgarden v. Eikenberry,* 123 Wn.2d 750, 778, 871 P.2d 1050 (1994) (music); *Adams v. Hinkle,* 51 Wn.2d 763, 775, 779, 322 P.2d 844 (1958) (comics). Though we noted solemnly "[t]hat the regulation of comic books is a

2

*Bradburn v. N. Cent. Reg'l Library Dist.*, No. 82200-0

matter of grave public concern is exemplified by the many private and legislative

studies . . . collected in the margin," *Adams,* 51 Wn.2d at 765, we took a dim view

of the idea that the State could restrict an adult's access to books to protect

children. "'The State insists that, by thus quarantining the general reading public

against books not too rugged for grown men and women in order to shield juvenile

innocence, it is exercising its power to promote the general welfare. Surely, this is

to burn the house to roast the pig.'" *Id.* at 779, *quoted with approval in Butler v.*

*Michigan,* 352 U.S. 380, 383, 77 S. Ct. 524, 1 L. Ed. 2d 412 (1957). This principle

is deeply enshrined in our free speech jurisprudence, be it under the First

Amendment or article I, section 5. *See, e.g., Bering v. SHARE,* 106 Wn.2d 212,

242, 721 P.2d 918 (1986) (invalidating portion of an injunction that forbade speech

harmful to children even if children were not present; "[t]he injunction cannot

water down speech to make it suitable for the sandbox"); *Ashcroft v. Am. Civil*

*Liberties Union,* 542 U.S. 656, 660, 124 S. Ct. 2783, 159 L. Ed. 2d 690 (2004)

("the Constitution demands that content-based restrictions on speech be presumed

invalid, and that the Government bear the burden of showing their

constitutionality" (citing *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S. Ct.

2538, 120 L. Ed. 2d 305 (1992); *United States v. Playboy Entm't Group, Inc.,* 529

U.S. 803, 817, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000))).[1]

---

[1] In *Ashcroft,* the United States Supreme Court upheld a temporary injunction against enforcement of the Child Online Protection Act (COPA), 47 U.S.C. § 231. On remand, the trial court entered a permanent injunction against enforcing COPA. While the Court agreed Congress's goal in protecting children was compelling, it found that COPA was overinclusive, underinclusive, not narrowly tailored to meet Congress's goal, vague, and overbroad. *Am. Civil*

*Bradburn v. N. Cent. Reg'l Library Dist.*, No. 82200-0

Our constitution does not prohibit any law or policy that touches on speech. *Bering,* 106 Wn.2d at 215. Rights do not express themselves absolutely. *Id.* But any law that impinges upon the right to read, in my view, in a public forum or otherwise, must be narrowly tailored to serve a compelling purpose. *See id.* at 234, 245-46; *State v. Coe,* 101 Wn.2d 364, 374, 679 P.2d 353 (1984); *cf. Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983). Content based restrictions on speech are presumptively invalid. *City of Bellevue v. Lorang,* 140 Wn.2d 19, 24, 992 P.2d 496 (2000). At the very least, even on government property, any restrictions on speech have to be rational and viewpoint neutral. *City of Seattle v. Mighty Movers, Inc.,* 152 Wn.2d 343, 351, 96 P.3d 979 (2004) (citing *City of Seattle v. Huff,* 111 Wn.2d 923, 928, 767 P.2d 572 (1989)). In my view, article I, section 5 protects speech in many more forums than the First Amendment. *See Sanders,* 160 Wn.2d at 235 (Chambers, J., dissenting).

Congress, which put this chain of events in play by enacting Child Internet Protection Act (CIPA),[2] recognizes that children can be protected in libraries that

---

*Liberties Union v. Gonzales,* 478 F. Supp 2d 775, 810-20 (E.D. Pa. 2007). The United States Supreme Court denied certiorari. *Mukasey v. Am. Civil Liberties Union,* __ U.S. __, 129 S. Ct. 1032, 173 L. Ed. 2d 293 (2009). While we are not interpreting the First Amendment, the failure of the congressional attempts to do much the same thing as North Central Regional Library District attempts to do by policy should give us pause.

[2] CIPA requires that libraries protect access to "visual depictions that are . . . obscene," "child pornography," or "harmful to minors." 20 U.S.C. § 9134(f)(1)(A); 47 U.S.C. § 254(h)(5)(B). "Harmful to minors" is defined as a "visual depiction" that "taken as a whole, lacks serious literary, artistic, political, or scientific value as to minors" and "taken as a whole and with respect to minors, appeals to a prurient interest in nudity, sex, or excretion"; or "depicts, describes, or represents, in a patently offensive way with respect to what is suitable for minors, an actual or

*Bradburn v. N. Cent. Reg'l Library Dist.,* No. 82200-0

disable their Internet censorship at the request of an adult patron. 20 U.S.C. § 9134(f)(3); 47 U.S.C. § 254(h)(6)(D). If the concern is that children might see scandalous images on the screen, privacy screens could be installed or librarians could enforce a code of conduct, but these libraries have not explored any alternative since 1999. Order at 16. There is simply no reason that withstands article I, section 5 to install a system to protect children that cannot be disabled when used by adults.

I respectfully disagree with the majority that *United States v. American Library Ass'n,* 539 U.S. 194, 123 S. Ct. 2297, 156 L. Ed. 2d 221 (2003), supports upholding the policy's constitutionality under either the federal or state constitution. Even accepting for the moment that these libraries are not a limited public forum, eight justices found the ability of a patron to *disable* the filter constitutionally critical. Writing for a four justice plurality upholding CIPA, Justice Rehnquist noted constitutional concerns about the software blocking "are dispelled by the ease with which patrons may have the filtering software disabled. When a patron encounters a blocked site, he need only ask a librarian to unblock it or (at least in the case of adults) disable the filter." *Id.* at 209. Justice Kennedy was even more pointed, beginning his concurrence by saying, "If, on the request of an adult user, a librarian will unblock filtered material or disable the Internet software filter without significant delay, there is little to this case." *Id.* at 214

---

simulated sexual act or sexual contact, actual or simulated normal or perverted sexual acts, or a lewd exhibition of the genitals." 20 U.S.C. § 9134(f)(7)(B).

*Bradburn v. N. Cent. Reg'l Library Dist.,* No. 82200-0

(Kennedy, J., concurring). Justice Breyer also agreed that because a library patron could ask to have the filter disabled, the limitation on First Amendment activity was too slight to be of concern. *Id.* at 219 (Breyer, J., concurring). Justice Stevens alone thought the ability of an adult patron to have the filter removed was constitutionally irrelevant and even with that escape hatch, the CIPA was flatly unconstitutional. "A law that prohibits reading without official consent, like a law that prohibits speaking without consent, 'constitutes a dramatic departure from our national heritage and constitutional tradition.'" *Id.* at 225 (Stevens, J., dissenting) (quoting *Watchtower Bible & Tract Soc. of N.Y., Inc. v. Village of Stratton,* 536 U.S. 150, 166, 122 S. Ct. 2080, 153 L. Ed. 2d 205 (2002)).

Justice Souter (joined by Justice Ginsburg) agreed with the plurality that *if* "an adult library patron could, consistently with the Act, obtain an unblocked terminal simply for the asking," then the First Amendment would not be offended. *Id.* at 232 (Souter, J., dissenting). However, unlike the plurality, which had accepted the solicitor general's statement that the filter would be removed on request, Justice Souter relied upon the trial court's contrary findings of fact. *Id.* Based on the trial court's conclusion that filters were not in fact being removed, Justice Souter concluded that CIPA was unconstitutional. *Id.* Justice Souter went further, substantially reaching the question now before Judge Shea in this case:

> The question for me, then, is whether a local library could itself constitutionally impose these restrictions on the content otherwise available to an adult patron through an Internet connection, at a library terminal provided for public use. The answer is no. A library that

*Bradburn v. N. Cent. Reg'l Library Dist.*, No. 82200-0

> chose to block an adult's Internet access to material harmful to
> children (and whatever else the undiscriminating filter might
> interrupt) would be imposing a content-based restriction on
> communication of material in the library's control that an adult could
> otherwise lawfully see. This would simply be censorship [and]
> presumptively invalid.

*Id.* at 234-35 (Souter, J., dissenting). Thus, four United States Supreme Court justices stated explicitly and four other justices hinted strongly that content filtering in libraries is only constitutional if the filter can be removed at the request of an adult patron. Under the First Amendment, the library's filtering policy is at best doubtful and, I predict, will be struck down. And, again, our state constitution is more protective of speech. *O'Day,* 109 Wn.2d at 804.

The majority assumes that there is some constitutional equivalent between removing the filter and removing, often after considerable time, a particular site from the list of blocked sites. Order at 13-14. But, as Justice Stevens noted, filtered Internet content is akin to having "a significant part of every library's reading materials . . . kept in unmarked, locked rooms or cabinets, which could be opened only in response to specific requests." *Am. Library Ass'n,* 539 U.S. at 224 (Stevens, J., dissenting). I do not accept they are constitutionally equivalent.

I agree with the majority that public libraries have no responsibility to have any particular text in their collection, though of course the decision to exclude a text cannot be made for a constitutionally prohibited reason. But censoring material on the Internet is not the same thing as declining to purchase a particular book. It is more like refusing to circulate a book that is in the collection based on

*Bradburn v. N. Cent. Reg'l Library Dist.*, No. 82200-0

its content. That would raise serious constitutional concerns. *Cf. Lorang,* 140 Wn.2d at 24. I also agree that libraries in this state are not necessarily public forums, though I disagree that we should be deciding on this record whether these particular libraries have become public forums by their own policies and practices. *Cf. Sanders,* 160 Wn.2d at 209-10. But it is the freedom to read, not whether libraries are public forums, that is the issue before us.

North Central Regional Library's Internet filters reach admittedly constitutionally protected speech, and, we are informed, it "does not and will not disable the filter at the request of an adult person." Order at 10. Simply put, the State has no interest in protecting adults from constitutionally protected materials on the Internet. These policies do exactly that. The filter should be removed on the request of an adult patron. Concerns that a child might see something unfortunate on the screen must be dealt with in a less draconian manner. I respectfully dissent.

*Bradburn v. N. Cent. Reg'l Library Dist.*, No. 82200-0