The Honorable Edward F. Shea

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON AT SPOKANE

| | |
|---|---|
| SARAH BRADBURN, PEARL CHERRINGTON, CHARLES HEINLEN, and the SECOND AMENDMENT FOUNDATION,<br><br>Plaintiffs,<br><br>v.<br><br>NORTH CENTRAL REGIONAL LIBRARY DISTRICT,<br><br>Defendant. | NO.   CV-06-327-EFS<br><br>**PLAINTIFFS' BRIEF REGARDING IMPACT OF WASHINGTON STATE SUPREME COURT'S CERTIFIED QUESTION DECISION ON PENDING CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

PLAINTIFFS' BRIEF REGARDING IMPACT OF WASHINGTON STATE SUPREME COURT'S CERTIFIED QUESTION DECISION ON PENDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

SAVITT BRUCE & WILLEY LLP
1325 Fourth Avenue Suite 1410
Seattle, Washington 98101-2509
(206) 749-0500

A. INTRODUCTION ............................................................................................... 1

B. THE *BRADBURN* MAJORITY OPINION IS NOT DISPOSITIVE OF PLAINTIFFS' CLAIMS UNDER FEDERAL LAW .............................................. 1

C. THE *BRADBURN* MAJORITY WRONGLY FAILED TO PROTECT SPEECH IN A SETTING WHERE THE RIGHTS TO SPEAK AND TO RECEIVE INFORMATION ARE MOST VITALLY IMPORTANT ............................................................................................ 1

    1. Speech in Public Libraries and on the World Wide Web Deserves Robust First Amendment Protection ......................................... 1

    2. The *Bradburn* Majority Opinion Threatens to Widen the Digital Divide ....................................................................................... 2

D. FEDERAL FIRST AMENDMENT JURISPRUDENCE DOES NOT SUPPORT THE *BRADBURN* MAJORITY'S OVERBREADTH OPINION ................................................................................ 4

    1. Print Collection Development Is Selection; Internet Filtering Is Censorship ...................................................................... 4

    2. Under Federal Law, the NCRL's Filtering Policy Is Overbroad .......................................................................................... 6

E. THE *BRADBURN* MAJORITY WRONGLY SUBJECTED THE NCRL'S CONTENT-BASED FILTERING POLICY TO RATIONAL-BASIS REVIEW ............................................................................ 7

F. CONCLUSION ................................................................................................. 10

PLAINTIFFS' BRIEF REGARDING IMPACT OF
WASHINGTON STATE SUPREME COURT'S CERTIFIED
QUESTION DECISION ON PENDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - i

**SAVITT BRUCE & WILLEY LLP**
1325 Fourth Avenue Suite 1410
Seattle, Washington  98101-2509
(206) 749-0500

A.    INTRODUCTION.

In a rapidly-evolving world, the majority opinion in *Bradburn v. North Central Regional Library District*, No. 82200-0, slip op. (Wash. May 6, 2010), fails to protect speech in precisely those locations – Internet-accessible computer terminals in public libraries – where vigorous speech protection is most vitally needed.  The *Bradburn* majority misread and misapplied *United States v. American Library Ass'n, Inc.*, 539 U.S. 194 (2003) ("*ALA*"), which expressly left open the question presented here: whether a public library's use of a particular filter in a given fact setting is unconstitutional as applied.  This Court need not, and should not, follow the *Bradburn* majority in ruling on Plaintiffs' First Amendment claims.  The *Bradburn* dissenters predicted that the federal courts would strike down the NCRL's filtering policy under the First Amendment.  No. 82200-0, slip op. at 7 (Chambers, J. dissenting).  That is what this Court should do.

B.    **THE *BRADBURN* MAJORITY OPINION IS NOT DISPOSITIVE OF PLAINTIFFS' CLAIMS UNDER FEDERAL LAW.**

A state court's construction of the United States Constitution is not binding on the federal courts.  *Watson v. Estelle*, 886 F.2d 1093, 1095 (9th Cir. 1989).  It follows that the *Bradburn* majority's construction of a *state* constitutional provision (Wash. Const. art. I, § 5) cannot control this Court's resolution of Plaintiff's First Amendment claims.  Rather, this Court must "make [an] independent inquiry and determination" regarding those claims.  *Aftanase v. Economy Baler Co.*, 343 F.2d 187, 192 (8th Cir. 1965).

C.    **THE *BRADBURN* MAJORITY WRONGLY FAILED TO PROTECT SPEECH IN A SETTING WHERE THE RIGHTS TO SPEAK AND TO RECEIVE INFORMATION ARE MOST VITALLY IMPORTANT.**

1.    **Speech in Public Libraries and on the World Wide Web Deserves Robust First Amendment Protection.**

One would expect the First Amendment to apply with special force in public libraries. Libraries are "essential to the functioning of a democratic society."  Franklin D. Roosevelt, *reprinted in* LIBRARIES & DEMOCRACY: THE CORNERSTONES OF LIBERTY 3 (Nancy Kranich ed.

PLAINTIFFS' BRIEF REGARDING IMPACT OF WASHINGTON STATE SUPREME COURT'S CERTIFIED QUESTION DECISION ON PENDING CROSS-MOTIONS FOR SUMMARY JUDGMENT - 1

SAVITT BRUCE & WILLEY LLP
1325 Fourth Avenue Suite 1410
Seattle, Washington  98101-2509
(206) 749-0500

2001). They are "the great tools of scholarship, the great repositories of culture, and the great symbols of the freedom of the mind." *Id.* They are a "mighty resource in the free marketplace of ideas," *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582-83 (6th Cir. 1976). Librarian and educator Leon Carnovsky wrote:

> If there is one agency above all which has the power to put teeth into the principle of free speech, it is the public library. I know of no nobler function which it has to perform than this: the presenting of all points of view, however unpopular, even loathsome, some of them may seem; by the same token, I know of no greater evil, no surer betrayal of that function, than the denial of the expression of certain viewpoints through a deliberate or contrived censorship.

Leon Carnovsky, *The Obligations and Responsibilities of the Librarian Concerning Censorship*, 20 LIBRARY QUARTERLY 21 (1950), *reprinted in* LANDMARKS OF LIBRARY LITERATURE 1876-1976 188, 194 (Dianne J. Ellsworth and Norman D. Stevens eds. 1976). Consistent with the foregoing views, federal courts have held that "[t]he right to receive information is vigorously enforced in the context of a public library." *Sund v. City of Wichita Falls, Texas*, 121 F. Supp.2d 530, 547 (N.D. Tex. 2000).

And yet paradoxically, according to the *Bradburn* majority, public libraries are a singular environment where censorship is allowed and fundamental speech protections do not apply. Adding to this irony is the fact that the Internet is "the most participatory form of mass speech yet developed," *Reno v. American Civil Liberties Union*, 521 U.S. 844, 863 (1997) (citation omitted); and that in other contexts there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium," *id.* at 870. In effect, the *Bradburn* majority has created, at the intersection of two crucial information sources that should (and in other contexts do) enjoy special protection in free-speech jurisprudence, an unwarranted exception to basic free-speech rights. This Court should not extend that error into federal law.

### 2. The *Bradburn* Majority Opinion Threatens to Widen the Digital Divide.

*Bradburn* is especially pernicious because it disproportionately targets the residents of rural and poor communities. According to a 2008 report, 28% of the residents of five rural

PLAINTIFFS' BRIEF REGARDING IMPACT OF
WASHINGTON STATE SUPREME COURT'S CERTIFIED
QUESTION DECISION ON PENDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 2

Washington counties (including Ferry County, which the NCRL serves) do not have in-home Internet access, and only 39% have broadband Internet access. Thomas Robinson *et al.*, *Broadband Study Report Prepared for the Washington Utilities and Transp. Comm'n* 37-38 (2008).[1] A recent report based on the first-ever large-scale study of library computer and Internet usage showed that nearly one-third of Americans age 14 or older – 77 million people – had used a public library computer or wireless network to access the Internet in the prior twelve-month period. Samantha Becker *et al.*, Institute of Museum and Library Services, *Opportunity for All: How the American Public Benefits from Internet Access at U.S. Libraries* 1-2 (2010).[2] Libraries, the report noted, "appear to be particularly effective in addressing the needs of families who still lack [Internet] access elsewhere," *id.* at 2:

> Overall, 44 percent of people in households living below the federal poverty line ($22,000 a year for a family of four) used public library computers and Internet access. Among young adults (14-24 years of age) in households below the federal poverty line, 61 percent used public library computers and Internet for educational purposes. Among seniors (65 and older) living in poverty, 54 percent used public library computers for health or wellness needs.

*Id.* The study confirmed that millions of Americans who use public library computers have no other means of sending and receiving information online. *Id.*, Appendix Table 8. "But for libraries," the report stated, "millions of Americans would not have reliable Internet access in a digital age when a connection is often needed to complete school assignments, apply for jobs, or secure government services." *Id.* at 2.

"[T]he notion that privileged citizens who have Internet access without the use of public facilities can choose whether or not to use filters, while those dependent on government-funded access have no choice, is inimical to the nature of democracy." Susan B. Kretchmer, *The Library Internet Access Controversy and Democracy, in* LIBRARIES & DEMOCRACY 96, 103.

---

[1] Available at http://www.wutc.wa.gov/webimage.nsf/0/0C107F2AECEC013A8825733800684FCF.
[2] Available at http://impact.ischool.washington.edu/documents/OPP4ALL_FinalReport.pdf.

PLAINTIFFS' BRIEF REGARDING IMPACT OF
WASHINGTON STATE SUPREME COURT'S CERTIFIED
QUESTION DECISION ON PENDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 3

**SAVITT BRUCE & WILLEY LLP**
1325 Fourth Avenue Suite 1410
Seattle, Washington 98101-2509
(206) 749-0500

The digital revolution is transforming the ways in which we send and receive information.[3] As this trend accelerates, judicial opinions sanctioning the censorship of online speech by public library administrators will assume increasing significance – particularly for patrons whose only window on the digital world is a library computer. Under the *Bradburn* majority's sweeping opinion, what would prevent a public library district from denying all patrons – including adults – access to websites falling within the Fortiguard category "Tasteless" ("Websites that host offensive and crude material such as insulting jokes, negative opinions, pranks, dark humor, harsh language, etc.," Docket No. 41-8 at 563)? What would stop a library district from denying all patrons access to websites about subjects like gambling, abortion, homosexuality, smoking, drug abuse, New Age religion or firearms, on the theory that such sites are not suitable for children? What would prevent a library district from "selecting" only certain "worthwhile" websites of "requisite and appropriate quality," *Bradburn*, No. 82200-0, slip op. at 12, 15, while blocking less "worthwhile" sites offering diverse perspectives? In short, what would prevent public library administrators from restricting online content to include only materials conforming to their worldview and perception of suitability, in a misguided attempt to protect readers from the imagined harmful consequences of their reading? This Court should not follow the *Bradburn* majority, and should not allow unreviewable censorship in a venue where speech is most in need of abiding protection.

**D.    FEDERAL FIRST AMENDMENT JURISPRUDENCE DOES NOT SUPPORT THE *BRADBURN* MAJORITY'S OVERBREADTH OPINION.**

**1.    Print Collection Development Is Selection; Internet Filtering Is Censorship.**

Library administrators undoubtedly enjoy broad latitude in shaping their print collections. The only restriction on print acquisition decisions is that they not be made "'in a

---

[3] *See, e.g.*, Jennifer C. Hendrix, ALA Office for Information Technology Policy, *Checking Out the Future: Perspectives from the Library Community on Information Technology and 21st-Century Libraries* (Policy Brief No. 2, Feb. 2010), available at http://www.ala.org/ala/aboutala/offices/oitp/publications/policybriefs/ala_checking_out_the.pdf; John D. Sutter, *The future of libraries, with or without books* (2008), available at http://www.cnn.com/2009/TECH/09/04/future.library.technology/index.html?iref=newssearch; Jonathan Shaw, *Gutenberg 2.0: Harvard's Libraries Deal with Disruptive Change*, HARVARD MAGAZINE, May-June 2010, at 36.

PLAINTIFFS' BRIEF REGARDING IMPACT OF
WASHINGTON STATE SUPREME COURT'S CERTIFIED
QUESTION DECISION ON PENDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 4

SAVITT BRUCE & WILLEY LLP
1325 Fourth Avenue Suite 1410
Seattle, Washington 98101-2509
(206) 749-0500

narrowly partisan or political manner.'" *Bradburn*, No. 82200-0, slip op. at 13 (*quoting Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870 (1982)). This is all we can realistically hope for in the context of print materials, since "[t]here is only so much money and so much shelf space." *ALA*, 539 U.S. at 236 (Souter, J., dissenting). "At every single point, however, … Internet blocking … defies comparison to the process of acquisition" – most significantly because blocking "is not necessitated by scarcity of either money or space. In the instance of the Internet, what the library acquires is electronic access, and the choice to block is a choice to limit access that has already been acquired." *Id.* at 237. Justice Chambers similarly observed in his *Bradburn* dissent that "censoring material on the Internet" "is like refusing to circulate a book that is in the collection based on its content. That would raise serious constitutional concerns." No. 82200-0, slip op. at 7-8 (Chambers, J., dissenting).

Justice Chambers' reference to censorship was apt. In selecting print materials to include in their collections, librarians do their best, given limited resources, to "promot[e] the freedom to read by making as accessible as possible as many things as [they] can." Lester Asheim, *Not Censorship but Selection*, 28 WILSON LIBRARY BULLETIN 63 (1953).[4] The censor of websites, by contrast, inhibits reading, disrupts the free flow of ideas, and acts as a bar to communication that would occur but for the existence of a filter blocking access to protected speech stored in the vast online repository that is the World Wide Web.

The *Bradburn* majority concluded that Internet filtering was indistinguishable from print collection development. No. 82200-0, slip op. at 15-16. But only four justices in *ALA* expressed a similar view. 539 U.S. at 208 (plurality opinion). Justice Breyer, writing separately, stated that although in his opinion the Children's Internet Protection Act (CIPA, the statute at issue in *ALA*), was, "in essence, a kind of 'selection' restriction," it should be subject to heightened scrutiny, *unlike* collection-development decisions. 539 U.S. at 216-18 (Breyer, J., concurring in the judgment). No other justice addressed the issue. In short, *ALA* does not

---

[4] Available at http://www.ala.org/ala/aboutala/offices/oif/basics/notcensorship.cfm.

PLAINTIFFS' BRIEF REGARDING IMPACT OF
WASHINGTON STATE SUPREME COURT'S CERTIFIED
QUESTION DECISION ON PENDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 5

SAVITT BRUCE & WILLEY LLP
1325 Fourth Avenue Suite 1410
Seattle, Washington 98101-2509
(206) 749-0500

support the *Bradburn* majority's view that library administrators enjoy the same discretion to block Internet content as they do in acquiring print volumes.

### 2. Under Federal Law, the NCRL's Filtering Policy Is Overbroad.

The *Bradburn* majority's overbreadth holding – essentially that the doctrine does not apply to public-library filtering policies, No. 82200-0, slip op. at 18 – is not supported by *ALA* or any other pertinent authority. The *ALA* plurality did not mention overbreadth or authorize libraries to prevent their adult patrons from accessing protected speech. The closest the plurality came to discussing overbreadth was a paragraph addressing the dissents' criticism of the tendency of Internet filters to block Web pages containing innocuous content. 539 U.S. at 208-09 (plurality opinion). But instead of arguing that this problem was constitutionally insignificant, the plurality dismissed it based on "the ease with which patrons may have the filtering software disabled." *Id.* at 209. Justices Kennedy and Breyer similarly upheld CIPA on the assumption that adults would be able to access protected speech. *Id.* at 214-15 (Kennedy, J., concurring in the judgment); *id.* at 219-20 (Breyer, J., concurring in the judgment). As the *Bradburn* dissenters observed, eight justices in *ALA* "found the ability of a patron to *disable* the filter constitutionally critical," while the ninth (Justice Stevens) believed CIPA was unconstitutional on its face even if adult library patrons could obtain unfiltered Internet access on request. *Bradburn*, No. 82200-0, slip op. at 5-6 (Chambers, J., dissenting). No *ALA* justice even hinted, let alone held, that the First Amendment allowed library administrators to filter a substantial quantity of protected speech for adults. If anything, *ALA* suggests precisely the opposite – that public libraries run afoul of the First Amendment if they prevent adults from accessing protected speech online.

The NCRL's Internet filter indisputably blocks a substantial quantity of speech – because of filtering errors (overblocking), because the filter blocks entire websites, and because the NCRL has deliberately configured the filter to block speech that is constitutionally protected for adults. Docket No. 40 at 3-4, 11-13; Docket No. 53 at 7-11. It is undisputed that

PLAINTIFFS' BRIEF REGARDING IMPACT OF
WASHINGTON STATE SUPREME COURT'S CERTIFIED
QUESTION DECISION ON PENDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 6

SAVITT BRUCE & WILLEY LLP
1325 Fourth Avenue Suite 1410
Seattle, Washington 98101-2509
(206) 749-0500

patrons requesting access to erroneously blocked sites have waited days for the NCRL to review their requests.  Docket No. 57 at 7-8, ¶ 13.  It is undisputed that the NCRL blocks an enormous amount of protected speech by filtering websites and not Web pages.  Docket No. 40 at 3-4, 13.  And it is undisputed that the NCRL's policy of limiting its adult patrons to viewing only websites that the NCRL's executive staff deem fit children prevents adult patrons from accessing a substantial quantity of protected speech.  *Id.* at 3-4, 9-10; Docket No. 53 at 7-9.[5]

The *Bradburn* majority brushed these harms aside, but this Court cannot do so under federal law.  "The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. The Free Speech Coalition*, 535 U.S. 234, 255 (2002).[6]  This Court should follow established precedent, heed the numerous statements in *ALA* indicating that libraries must unblock Internet filters at the request of adult library patrons, and strike down as overbroad the NCRL's policy of refusing to disable its Internet filter at the request of adult library patrons.

E. **THE *BRADBURN* MAJORITY WRONGLY SUBJECTED THE NCRL'S CONTENT-BASED FILTERING POLICY TO RATIONAL-BASIS REVIEW.**

*ALA* also does not support the *Bradburn* majority's conclusion that library filtering policies denying adult patrons access to websites containing protected speech are subject only to rational-basis scrutiny.  No. 82200-0, slip op. at 27.  Although the *ALA* plurality concluded that filtering decisions by library administrators should not be subject to heightened judicial scrutiny, 539 U.S. at 205 (plurality opinion), *this view was not shared by any other justice*.

Justice Breyer was the only other justice who agreed that blocking access to a website

---

[5] The *Bradburn* majority misstated the nature of Plaintiffs' overbreadth challenge.  Plaintiffs have never contended that "a policy that applies so broadly that it excludes *any* constitutionally protected speech violates article I, section 5."  No. 82200-0, slip op. at 16 (emphasis added).  Rather, Plaintiffs maintain that a filtering policy like the NCRL's that blocks *a real and substantial quantity* of protected speech is unconstitutionally overbroad.

[6] *See also Mainstream Loudoun v. Board of Trustees of the Loudoun County Library*, 2 F.Supp.2d 783, 796-97 (E.D. Va. 1998); *Mainstream Loudoun v. Board of Trustees of the Loudoun County Library*, 24 F.Supp.2d 552, 567 (E.D. Va. 1998); Docket No. 40 at 9-13.  Contrary to the *Bradburn* majority's suggestion, No. 82200-0, slip op. at 14-16, *ALA*, which did not involve an overbreadth challenge to an actual library filtering policy, in no way abrogated or undermined Judge Brinkema's conclusion that the filtering policy at issue in the *Mainstream Loudoun* cases improperly reduced adults to viewing only what was fit for children.

PLAINTIFFS' BRIEF REGARDING IMPACT OF WASHINGTON STATE SUPREME COURT'S CERTIFIED QUESTION DECISION ON PENDING CROSS-MOTIONS FOR SUMMARY JUDGMENT - 7

SAVITT BRUCE & WILLEY LLP
1325 Fourth Avenue Suite 1410
Seattle, Washington  98101-2509
(206) 749-0500

was in any way analogous to refusing to acquire a print volume. *Id.* at 216-17 (Breyer, J., concurring in the judgment). Importantly, however, Justice Breyer did *not* agree with the plurality that library filtering decisions should be reviewed for rationality. To the contrary, he concluded that because Internet filtering "directly restricts the public's receipt of information," filtering provisions require "a form of heightened scrutiny" and must be examined with "special care." *Id.* at 216. Courts in such cases should "ask[ ] whether the harm to speech-related interests is disproportionate in light of both the justifications and the potential alternatives." *Id.* at 217. Courts should "consider[ ] the legitimacy of the statute's objective, the extent to which the statute will tend to achieve that objective, whether there are other, less restrictive ways of achieving that objective, and ultimately whether the statute works speech-related harm that, in relation to that objective, is out of proportion." *Id.* at 217-18 (*citing Board of Trustees of the State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989)). Justice Breyer upheld CIPA because of its disabling provision, *id.* at 219; and noted that a library's refusal to disable its filter for adults could be actionable under the First Amendment, *id.* at 219-20.

Justice Kennedy observed that although "there is little to this case" "[i]f, on the request of an adult user, a librarian will unblock filtered material or disable the Internet software filter without significant delay," an as-applied challenge to CIPA could succeed "[i]f some libraries do not have the capacity to unblock specific Web sites or to disable the filter or if it is shown that an adult user's election to view constitutionally protected Internet material is burdened in some other substantial way." *Id.* at 214-15 (Kennedy, J., concurring in the judgment). He did not discuss what standard of scrutiny should apply to filtering decisions, or indicate how he would decide a case like this one, involving restrictions on what adult patrons can read online.

It is significant that Justice Kennedy did not join the plurality. Over the years he has authored and joined in numerous opinions which, in similar factual contexts, have been highly protective of First Amendment rights. For example, in *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000), he wrote the majority opinion striking down a federal statute

PLAINTIFFS' BRIEF REGARDING IMPACT OF
WASHINGTON STATE SUPREME COURT'S CERTIFIED
QUESTION DECISION ON PENDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 8

**SAVITT BRUCE & WILLEY LLP**
1325 Fourth Avenue Suite 1410
Seattle, Washington 98101-2509
(206) 749-0500

requiring television operators to scramble sexually-explicit channels or limit such programming to hours when children were unlikely to be watching. *Id.* at 806-07. "If a statute regulates speech based on its content," he wrote, "it must be narrowly tailored to promote a compelling Government interest. If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Id.* at 813 (citation omitted). Moreover, "[w]here the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists." *Id.* Driving home the importance of this holding, he wrote:

> The Constitution exists precisely so that opinions and judgments, including esthetic and moral judgments about art and literature, can be formed, tested, and expressed. What the Constitution says is that these judgments are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority. *Technology expands the capacity to choose; and it denies the potential of this revolution if we assume the Government is best positioned to make these choices for us.*

*Id.* at 818 (emphasis added).

The *Bradburn* majority adopted a view even less protective of speech than that of the *ALA* plurality, but this Court may not similarly ignore the concurring and dissenting opinions in *ALA*. When the United States Supreme Court renders a splintered decision in which no opinion garners a majority, lower federal courts should adhere to "a legal standard which, when applied, will necessarily produce results with which a majority of the Court from that case would agree." *United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir. 2006) (citation and internal quotation marks omitted). *See also Marks v. United States*, 430 U.S. 188, 193 (1977) (holding in fragmented decision is "that position taken by those Members who concurred in the judgments on the narrowest grounds") (citation and internal quotation marks omitted). Here, the rational-basis test is *not* the appropriate standard. A majority of the United States Supreme Court almost certainly would *not* agree that only rational-basis scrutiny governs decisions by library administrators to prevent adults from accessing constitutionally-protected speech online.

PLAINTIFFS' BRIEF REGARDING IMPACT OF WASHINGTON STATE SUPREME COURT'S CERTIFIED QUESTION DECISION ON PENDING CROSS-MOTIONS FOR SUMMARY JUDGMENT - 9

SAVITT BRUCE & WILLEY LLP
1325 Fourth Avenue Suite 1410
Seattle, Washington 98101-2509
(206) 749-0500

To the contrary, heightened scrutiny (at least at the level specified by Justice Breyer) almost certainly applies, and the NCRL's filtering policy fails that standard. The "narrowest ground" on which the plurality and Justices Kennedy and Breyer agreed was that a public library does not violate the First Amendment by deploying filtering to block "harmful to minors" material *so long as it completely disables the filter at the request of adults*. *ALA*, 539 U.S. at 214-15 (Kennedy, J., concurring in the judgment), 219-20 (Breyer, J., concurring in the judgment). Because the NCRL will *not* disable its filter for adults, *ALA* requires this Court to strike down the NCRL's filtering policy as an unconstitutional content-based restriction on speech.

### F. CONCLUSION.

One cannot help but conclude in reading *Bradburn* that the majority was animated in large part by a belief – unstated in its opinion, but apparent in its focus on pornography – that much of the speech at issue in this case can be censored because it is of low value. Such a belief is inappropriate in the context of the First Amendment:

> The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it.

*United States v. Stevens*, No. 08-769, slip op. at 7 (U.S. Apr. 20, 2010). In any event, as explained at length in Plaintiffs' summary judgment briefs (Docket Nos. 40, 53, 58), this case is not about pornography, but rather about an overbroad filtering regime that is preventing adults in five rural Washington counties from viewing non-pornographic, constitutionally-protected speech on public library computers. As the *Bradburn* dissenters admonished, "the State has no interest in protecting adults from constitutionally protected materials on the Internet." *Bradburn*, No. 82200-0, slip op. at 8 (Chambers, J., dissenting). This Court should heed that admonition and strike down the NCRL's overbroad content-based filtering policy as violative of the First Amendment.

PLAINTIFFS' BRIEF REGARDING IMPACT OF WASHINGTON STATE SUPREME COURT'S CERTIFIED QUESTION DECISION ON PENDING CROSS-MOTIONS FOR SUMMARY JUDGMENT - 10

SAVITT BRUCE & WILLEY LLP
1325 Fourth Avenue Suite 1410
Seattle, Washington 98101-2509
(206) 749-0500

DATED: July 2, 2010.

**AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON FOUNDATION**

By: ___*s/ Duncan E. Manville*___
Duncan E. Manville, WSBA #30304
Savitt Bruce & Willey LLP
1325 Fourth Avenue, Suite 1410
Seattle, Washington 98101-2509
Telephone: 206.749.0500
Facsimile: 206.749.0600
Email: dmanville@jetcitylaw.com

Sarah A. Dunne, WSBA #34869
American Civil Liberties Union of
Washington Foundation
901 Fifth Avenue, Suite 630
Seattle, WA 98164-2008
Telephone: 206.624-2184
Facsimile: 206.682-3002
Email: dunne@aclu-wa.org

Catherine Crump, pro hac vice
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212.519.7806
Email: ccrump@aclu.org

Aaron H. Caplan, WSBA #22525
Loyola Law School Los Angeles
919 Albany St.
Los Angeles, CA 90015-1211
Telephone: 213.736.8110
Facsimile: 213.380.3769
Email: aaron.caplan@lls.edu

Counsel for Plaintiffs

PLAINTIFFS' BRIEF REGARDING IMPACT OF
WASHINGTON STATE SUPREME COURT'S CERTIFIED
QUESTION DECISION ON PENDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT - 11

**SAVITT BRUCE & WILLEY LLP**
1325 Fourth Avenue Suite 1410
Seattle, Washington 98101-2509
(206) 749-0500